**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| MAC ACQUISITION LLC, *et al.*,[1] | Case No. 17-12224 (___) |
| Debtors. | (Joint Administration Requested) |

**DECLARATION OF NISHANT MACHADO IN SUPPORT OF THE
DEBTORS' CHAPTER 11 PETITIONS AND REQUESTS FOR FIRST DAY RELIEF**

I, Nishant Machado, under penalty of perjury, declare as follows:

1.      I am the President, Chief Executive Officer ("CEO"), and Chief Restructuring

Officer ("CRO") of Mac Acquisition LLC ("Mac Acquisition"), a Delaware limited liability

company and an affiliate of each of the above-captioned debtors and debtors in possession (each

a "Debtor" and collectively, the "Debtors").  I am also the President, CEO, and CRO of Mac

Parent LLC ("Mac Parent"), a Delaware limited liability company, Mac Holding LLC ("Mac

Holding"), a Delaware limited liability company, Macaroni Grill Services LLC ("Mac Grill

Services"), a Delaware limited liability company, each of Mac Acquisition's Debtor subsidiaries

(the "Debtor Operating Subsidiaries"), and of Mac Acquisition's non-Debtor affiliates—RMG

Development, LLC ("RMG Development"), a Delaware limited liability company, and Mac

Acquisition IP LLC ("Mac Acquisition IP"), a Delaware limited liability company.[2]  Mackinac

---

[1]      The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: Mac Acquisition LLC (6362); Mac Parent LLC (6715); Mac Holding LLC (6682); Mac Acquisition of New Jersey LLC (1121); Mac Acquisition of Kansas LLC (3910); Mac Acquisition of Anne Arundel County LLC (6571); Mac Acquisition of Frederick County LLC (6881); Mac Acquisition of Baltimore County LLC (6865); and Macaroni Grill Services LLC (5963).  The headquarters for the above-captioned Debtors is located at 1855 Blake St., Ste. 200, Denver, CO 80202.

[2]      As explained below, non-Debtor RMG Development is the affiliate that franchises "Romano's Macaroni Grill" restaurants to third parties in the United States and in foreign countries.  Mac Acquisition IP owns the trademarks and other intellectual property licensed to franchisees and to the Debtors.

Partners, LLC ("Mackinac"), of which I am a Senior Managing Director, was engaged by Mac

Parent on May 16, 2017, to provide the Debtors with advisory services with respect to their

business operations and potential restructuring.  I was thereafter appointed as President, CEO,

and CRO of the entities referenced above.  In my capacity as President, CEO, and CRO, I am

familiar with the Debtors' day-to-day operations, businesses, financial affairs, and books and

records.

2.      On October 18, 2017 (the "Petition Date"), each Debtor filed a voluntary petition

for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

3.      I submit this declaration (this "First Day Declaration"), pursuant to Rule 1007 of

the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to provide an overview of

the Debtors and these chapter 11 cases (the "Chapter 11 Cases") and to support the Debtors'

applications and motions for "first day" relief (each, a "First Day Motion," and collectively, the

"First Day Motions").  Except as otherwise indicated herein, all facts set forth in this First Day

Declaration are based upon my personal knowledge of the Debtors' operations and finances,

information learned from my review of relevant documents, information supplied to me by other

members of the Debtors' management and the Debtors' professional advisors, or my opinion

based on my experience, knowledge, and information concerning the Debtors' operations and

financial condition.  I am authorized to submit this First Day Declaration on behalf of the

Debtors and, if called upon to testify, I could and would testify competently to the facts set forth

herein.

## PRELIMINARY STATEMENT

4.      The Debtors commenced the Chapter 11 Cases to implement a balance sheet and

operational restructuring that will allow the Debtors to reemerge as a successful leading casual

dining restaurant chain.  The Debtors, in consultation with their professional advisors and after careful examination by the Debtors' management team, have already implemented the initial phase of the Debtors' turnaround efforts.  In 2017, the Debtors closed 37 company-operated restaurant locations and over the last several years have subleased and assigned other locations that were not generating operating profits, substantially decreasing their operating expenses on a go-forward basis.[3]  Through the Chapter 11 Cases, the Debtors seek to restructure their current liabilities, including the damages claims by lessors under terminated leases to preserve and maximize value.

5.      Shortly after the Petition Date, the Debtors intend to file a chapter 11 plan (the "Proposed Plan") that implements the Debtors' proposed restructuring and that de-leverages the Debtors' balance sheets.  The Proposed Plan has the support of two of the Debtors' largest secured creditors, Bank of Colorado ("BOC") and Riesen Funding LLC ("Riesen Funding"), which collectively hold more than $23 million of secured claims.  Both BOC and Riesen Funding have entered into the Restructuring Support Agreement, a true and correct copy of which is attached hereto as Exhibit B, to help pave the way for a swift and efficient chapter 11 plan process.  The Debtors have also entered into an agreement with Raven Capital Management LLC ("Raven") pursuant to which its funds (the "DIP Lenders"), will provide $5 million in debtor-in-possession financing (the "DIP Financing").  This DIP Financing may be converted into exit financing, assuming certain conditions are satisfied, with the DIP Lenders providing up to an additional $8.5 million in available exit financing (the "Exit Facility").

---

[3]      The Debtors have subleased five (5) locations that were not operating profitably.  None of these locations currently operate as Romano's Macaroni Grills.

6.      The Debtors' proposed process is designed to maximize the value of their business and assets, while restructuring their substantial debt load.  With a deleveraged balance sheet, a rationalized portfolio of restaurants, and a committed lender that supports the Debtors' turnaround efforts, the Debtors will be poised to successfully emerge as a positive example for the casual dining industry, and will be positioned to increase annual revenue and profitability on a sustainable basis.

## I.      General Background

### a.      Debtors' Business and Overview

7.      The Debtors operate full-service casual dining restaurants under the trade name, "Romano's Macaroni Grill."  As of the Petition Date, the Debtors operated 93 company-owned restaurants located in 23 states, with a workforce of approximately 4,600 employees.  The Debtors' non-Debtor affiliate, RMG Development, also franchises an additional 23 restaurants in Florida, Hawaii, Illinois, Texas, Puerto Rico, Mexico, Bahrain, Egypt, Oman, the United Arab Emirates, Qatar, Germany, and Saudi Arabia.  During 2016, the Debtors and RMG generated gross revenues through restaurant sales and franchisee payments of approximately $230 million.

### b.      The Debtors' Prepetition Capital Structure

#### i.      Equity Ownership

8.      At all relevant times, Mac Parent has owned 100% of the membership interests of Mac Holding, which in turn owns 100% of the membership interests of Mac Acquisition.[4]  Mac Holding also owns 100% of the membership interests in Debtor Mac Grill Services.  Mac Grill Services is responsible for the Debtors' gift card programs.  Mac Acquisition is the 100% equity

---

[4]      Mac Acquisition is recognized as a foreign entity in the states of Florida, New York, and Indiana under the name of Mac Acquisition of Delaware LLC.  Mac Acquisition of Delaware LLC is a fictitious business name of Mac Acquisition, not a separate legal entity.

member of the Debtor Operating Subsidiaries: (a) Mac Acquisition of New Jersey LLC, a New Jersey limited liability company; (b) Mac Acquisition of Kansas LLC, a Kansas limited liability company; (c) Mac Acquisition of Anne Arundel County LLC, a Maryland limited liability company; (d) Mac Acquisition of Frederick County LLC, a Maryland limited liability company; and (e) Mac Acquisition of Baltimore County LLC, a Maryland limited liability company.  An organization chart showing the Debtors' and certain of its affiliates' equity ownership is attached hereto as Exhibit A.

9.      On April 17, 2015, RedRock Partners, LLC ("RedRock"), an Arizona limited liability company, acquired 100% of the membership interests in Mac Parent (and indirectly in each of the Debtors) for a cash purchase price of $8 million.  RedRock continues to own this interest.

**ii.      Secured Loans from Bank of Colorado**

10.      To provide Mac Acquisition and the Debtor Operating Subsidiaries with adequate liquidity, the Debtors arranged for a revolving line of credit from BOC on or about April 17, 2015 (the "BOC Revolving Loan"), contemporaneously with the acquisition of the Debtors by RedRock.  The BOC Revolving Loan is governed by that Business Loan Agreement, dated as of April 17, 2015, by and between Mac Parent and BOC.  When the BOC Revolving Loan was entered into, it was guaranteed by Debtors Mac Acquisition and Mac Holding, and by several non-Debtor affiliates.[5]  Mac Parent's obligations under the BOC Revolving Loan, as well as Mac Acquisition's and Mac Holding's guarantees, are secured by grants of liens against such entities'

---

[5]      The non-Debtor persons or entities that have guaranteed certain of the BOC Revolving Loan, $2.5M Term Loan (defined below), and/or $3.5M Loan (defined below) include Dean Riesen and Richard Monfort, and certain affiliates thereof.  The family limited partnership established by Mr. Monfort that owned an interest in RedRock sold that interest to Riesen Funding, an entity 100% owned by Mr. Riesen, and no longer owns any equity in RedRock or indirectly in the Debtors, but Mr. Monfort has not been relieved of his commitment as a guarantor of certain of BOC's claims.

"Inventory, Chattel Paper, Accounts, Equipment and General Intangibles," and all products and proceeds thereof.  As of the Petition Date, approximately $12,033,000 in principal and accrued interest was outstanding under the BOC Revolving Loan, with approximately $4,100,000 of that amount representing undrawn letters of credit issued under the BOC Revolving Loan.

11.     On or about December 20, 2016, the Debtors also arranged for a term loan in the amount of $2,500,000 (the "$2.5M Term Loan").  As with the BOC Revolving Loan, the $2.5M Term Loan is structured as a loan to Mac Parent, guaranteed by Debtors Mac Acquisition and Mac Holding, as well as by non-Debtor affiliates.  Mac Parent granted liens on its assets to secure the $2.5M Term Loan.  As of the Petition Date, approximately $2,396.065 in principal and accrued interest was outstanding under the $2.5M Term Loan.

12.     BOC has been supportive of the Debtors' restructuring efforts, and agreed to provide additional financing for the Debtors to cover their costs leading up to the Petition Date. On or about September 19, 2017, BOC provided the Debtors with an additional line of credit in the amount of $3,500,000 (the "$3.5M Loan").  The $3.5M Loan is structured as a loan to Mac Parent, and is guaranteed by all of the Debtors and by certain non-Debtor affiliates.  The Debtors' guaranties are secured by a security interest against such entity's "Inventory, Chattel Paper, Accounts, Equipment and General Intangibles," and all products and proceeds thereof. As of the Petition Date, approximately $3,500,015 in principal and accrued interest was outstanding under the $3.5M Loan.  In connection with the $3.5M Loan, (a) Mac Grill Services, the Debtor Operating Subsidiaries, and certain non-Debtor entities, guarantied the BOC Revolving Loan and pledged certain of their assets to secure such obligations, and (b) all of the Debtors and certain non-Debtor entities guarantied and pledged certain of their assets to secure the obligations under the $2.5M Term Loan, to the extent they had not done so already.

13.     BOC has agreed to support the Debtors' restructuring efforts.  It has agreed to consent to the Debtors' proposed DIP Financing, as described below, and to the framework for the treatment of its claims under the Proposed Plan.

### iii.       Riesen Funding Secured Loan

14.     On or about July 3, 2017, Mac Parent received a loan in the amount of $5,000,000 (the "Riesen Funding Loan") from Riesen Funding LLC ("Riesen Funding").  Riesen Funding is the ultimate indirect equity owner of the Debtors.  The Riesen Funding Loan was intended to enable the Debtors to meet their obligations on an on-going basis, while they completed their operational improvement plan and sought to negotiate settlements with their former lessors of surrendered locations.  The Riesen Funding Loan was guaranteed by Mac Acquisition and by Mac Holding and is secured by security interests in substantially all of Mac Parent's, Mac Acquisition's and Mac Holding's personal property, including, without limitation, Mac Acquisition's equity interests in those Debtor Operating Subsidiaries with remaining restaurant locations (the "Riesen Funding Liens").  As of the Petition Date, approximately $5,130,000 in principal and accrued interest was outstanding under the Riesen Funding Loan.

15.     Riesen Funding has agreed to subordinate the Riesen Funding Liens to the liens to be granted to the DIP Lenders.  Further, Riesen Funding has entered into the Restructuring Support Agreement, pursuant to which Riesen Funding has agreed, pursuant to the Proposed Plan, to accept the equity in the reorganized Mac Parent in full satisfaction of its approximately $5 million secured Riesen Funding Loan.

16.     None of the collateral granted by any of the Debtors to any of the prepetition lenders, including BOC and Riesen Funding, includes (a) real property leases, or (b) the Debtors'

liquor licenses to the extent that applicable state law bars the imposition of a security interest on such licenses.

     **iv.**       **<u>Supplier Security Interests</u>**

     17.     Two of the Debtors' key suppliers—Sysco Corporation ("<u>Sysco</u>") and Edward Don & Company ("<u>Edward Don</u>")—have also filed UCC-1 financing statements to perfect security interests they assert against certain assets of Mac Acquisition.

     18.     Sysco provides most of the food and beverages served at the Debtors' restaurants, 90% of which is entitled to special rights under PACA and PASA (as defined below), even if Sysco did not have a security interest in the goods it has provided.  Sysco asserts a security interest in, among other things, all of Mac Acquisition's goods, inventory, equipment, instruments, chattel paper, documents, accounts, accounts receivable, general intangibles, deposit accounts, investment property, payment intangibles, and intellectual property.  The balance owing to Sysco as of the Petition Date was approximately $2,500,000.

     19.     Edward Don is a party to a distribution agreement with the Debtors, pursuant to which Edward Don has and continues to deliver certain hard goods necessary to the Debtors' restaurants, such as dinnerware, glassware, and flatware for the Debtors' restaurant tables.  Edward Don asserts a security interest in substantially all of Mac Acquisition's personal property assets to secure a balance owing as of the Petition Date was approximately $500,000.

     20.     Cisco Systems Capital Corporation ("<u>Cisco</u>") has also recorded a UCC-1 financing statement relating to a lease of certain equipment to the Debtors.  The Debtors reserve all rights with respect to whether the Cisco lease is a true lease or disguised security device, but do include in their budget the regular monthly payment provided for in the Cisco lease.  The balance owing to Cisco as of the Petition Date was approximately $100,000.

II.    **Events Leading to the Chapter 11 Cases.**

21.    At all times since RedRock acquired the Debtors, the Debtors' operations have failed to produce sufficient cash flow to cover all operating expenses and to service their debt obligations.  The Debtors' trailing twelve month EBITDA as of August 2017 was approximately negative $12 million.  This financial performance reflects all restaurants, including closures.  The Debtors' losses were the product of several factors, including a decrease in the Debtors' top line sales and its profit margins as a result of increased costs for both commodities and labor.

22.    The Debtors' operations and financial performance have been adversely affected by a number of economic factors, but perhaps most notably by an overall downturn for the casual dining industry.  The preferences of such customers have shifted to cheaper, faster alternatives.  On the other end of the spectrum, there is a trend among younger customers to spend their disposable income at non-chain "experience-driven" restaurants, even if slightly more expensive.

23.    The Debtors engaged Mackinac Partners and me to advise the Debtors with respect to needed changes in their operations.  Mackinac Partners is a nationally recognized financial advisory firm with extensive expertise in turning around troubled business operations, with particular expertise in the restaurant industry.

24.    The Debtors, with the aid of the Debtors' management and advisors, identified certain restaurants that would need to be closed in order to reduce or eliminate ongoing cash-flow losses, and formulated a plan to reorganize around the Debtors' better-performing stores.  As a result, the Debtors closed 37 unprofitable restaurant locations during the period from approximately January 2017 through approximately July 2017.  The Debtors are currently operating 93 Debtor-owned restaurant locations, which the Debtors intend to reorganize around

01:22431104.3

with the aim of emerging from chapter 11 in early 2018 and having profitable operations during 2018.

25.     The Debtors engaged in negotiations with the lessors for the Debtors' 37 closed locations in an effort to reach consensual resolutions of the damages claims asserted by these lessors.  The Debtors were able to reach agreements or tentative agreements with the majority of the lessors of closed locations.  Unfortunately, the Debtors were not able to reach agreements with all of these lessors and many of the holdout lessors commenced litigation seeking to enforce their claims against the Debtors.  The lessors filed approximately 16 lawsuits across the country seeking to recover damages far in excess of anything they would be entitled to under Bankruptcy Code section 502(b)(6) or anything the Debtors could afford to pay.  Unable to resolve the claims of the lessors of the vacated stores out of court and facing mounting litigation costs, the Debtors were forced to file the Chapter 11 Cases in order to preserve the Debtors' value for creditors.

**III.     The Debtors' Restructuring Process**

26.     It is the Debtors' goal to complete the Chapter 11 Cases quickly and efficiently. They have the consent and support of BOC and Riesen Funding, the Debtors' largest secured creditors.  The Debtors believe they will be able to obtain the support of their other secured creditors in the first few weeks of the Chapter 11 Cases and hope to obtain the support of unsecured creditors, as well.

27.     One of the critical elements to the Debtors' restructuring efforts is the availability of financing to fund the Debtors' anticipated cash shortfalls during the bankruptcy case, as well as the need for financing upon emergence from Chapter 11.  Notwithstanding their support in the past, neither BOC nor Riesen Funding was willing to provide financing for the Debtors' during

the Chapter 11 Cases.  With the assistance of Mackinac Partners, the Debtors have contacted

several potential lenders to inquire as to their willingness to provide financing during the

Debtors' Chapter 11 Cases.  Based on the responses received from other potential lenders, the

Debtors faced two primary hurdles in obtaining financing from traditional sources.  *First*, the

Debtors had secured debt potentially in excess of $18 million owing to BOC alone and an

additional $5 million in secured debt owed to Riesen Funding, all of which would require some

form of adequate protection to the extent any DIP lender insisted on taking a first priority lien on

the Debtors' assets.  *Second*, the Debtors have only recently ceased operations at their 37

underperforming restaurants.  While the Debtors are confident that they will be able to operate

on a cash-flow positive basis during 2018, the Debtors' historical financial statements reflect

substantial losses.

   28. The Debtors were able to negotiate a DIP Facility with Raven, which will provide

the Debtors with $5 million in postpetition financing ($3 million to be available on an interim

basis) through the DIP Lenders and DIP Agent to fund the Debtors' costs and expenses during

the Chapter 11 Cases.  Raven agreed to provide DIP Financing secured by liens junior to any

valid and unavoidable liens held by BOC, Sysco, Edward Don, and Cisco.  Riesen Funding has

agreed to subordinate the Riesen Funding Liens to liens securing the DIP Facility.  Raven agreed

to structure the DIP Facility in a manner that will allow for the Debtors' turnaround efforts to be

fully realized.  Subject to satisfaction of several conditions, Raven has agreed to provide the

Debtor with an option to convert any principal and interest owing under the DIP Facility into exit

financing upon confirmation of an acceptable chapter 11 plan and the Debtors' successful

emergence from chapter 11, and has committed to provide up to an additional $8.5 million in

financing through the Exit Facility, all subject to the terms and conditions of the DIP Facility.[6] This exit financing would provide the reorganized Debtors with additional operating liquidity that would create opportunity for the Debtors to successfully complete their turnaround and fund the chapter 11 plan.  In other words, Raven could represent both an immediate and longer-term solution to the Debtors' current liquidity needs.

29.     The Debtors seek to exit chapter 11 and reorganize pursuant to the Proposed Plan. The Proposed Plan has the support of the Debtors' primary secured creditors, and could provide unsecured creditors more value than they would receive in the event of a chapter 7.  Further, a reorganization under the Proposed Plan allow the Debtors to maintain operations, preserve approximately 4,600 jobs and assume most of its leases and contracts, providing substantial benefits to the parties to these contracts.

30.     While the Debtors believe their Proposed Plan provides the greatest opportunity for the Debtors to promptly emerge from chapter 11 and make distributions to creditors, the Debtors are currently pursuing retention of an investment banker to market the Debtors' companies and assets on a parallel path with the Debtors' plan process.  If the marketing process identifies a third party that is willing to pay a purchase price that provides greater value for the estate than the Proposed Plan, both the Restructuring Support Agreement and the DIP Agreement (as defined below) contain "fiduciary outs" that would permit the Debtors to pursue an alternative sale transaction.

---

[6]     The Debtors will not seek approval of the Exit Facility until confirmation proceedings with respect to the Proposed Plan.

01:22431104.3

IV.     **Evidentiary Support for First Day Motions**[7]

     a.     **DIP Financing and Cash Collateral Motion**

31.     The Debtors are seeking an order through the above-referenced motion (the "DIP Motion") authorizing the (a) incurrence of post-petition indebtedness through the DIP Facility, (b) granting of security interests and superpriority administrative expenses, and (c) use of cash collateral.  I have reviewed the DIP Motion and the factual statements therein are true and correct.  Attached to Debtors' proposed Interim Order as Exhibit B is a an initial thirteen week cash flow budget (the "Budget"), which sets forth on a line-item basis the Debtors' anticipated cumulative cash receipts and expenditures and all necessary and required cumulative expenses which the Debtors expect to incur.  I supervised the preparation of the Budget.

32.     The DIP Facility gives the Debtors appropriate flexibility during the Chapter 11 Cases.  The Debtors need the cash available under the DIP Facility to fund ongoing operating expenses as well as the necessary administrative expenses of bankruptcy.  The Debtors considered whether they could operate using only the cash generated from postpetition operations, and determined that they could only do so for a very limited period of time.  Without the DIP Facility, the Debtors would not be able to fund ongoing operating expenses, including payroll, on an ongoing basis, and bankruptcy-related expenses during these cases.  The Company's ability to remain a viable operating entity depends on obtaining the interim and final relief requested in the DIP Motion.

33.     The DIP Lenders and DIP Agent have indicated that the DIP Facility and the DIP Documents set forth the only terms under which they would agree to provide the Debtors'

---

[7]     Capitalized terms not otherwise defined herein shall have the meanings afforded to them in the applicable motion.

financing.  I asked BOC to provide DIP financing and it was unwilling to do so.  I also contacted

four (4) other lenders, none of which offered to provide DIP financing.  BOC has indicated that it

would not agree to the use of its cash collateral absent the adequate protection provided under the

proposed Interim Order and Final DIP Order.

34.     The Debtors negotiated the terms of the DIP Facility at arms' length and in good

faith, with all relevant parties represented by counsel.  I believe that the negotiated terms are the

best available under the circumstances.

   **b.**  **<u>Employee Wages and Benefits Motion</u>**

35.     The Debtors are seeking an order authorizing the Debtors to (a) pay accrued

prepetition wages, salaries and other compensation to their Workforce (as defined below);

(b) honor any prepetition obligations in respect of, and continue in the ordinary course of

business until further notice (but not assume), certain of the Debtors' paid time off policies, and

employee benefit plans and programs, as described below; (c) reimburse Employees (as defined

below) for prepetition expenses that Employees incurred on behalf of the Debtors in the ordinary

course of business on a prepetition basis; (d) pay all related prepetition payroll taxes and other

deductions; (e) honor workers' compensation obligations; and (f) pay any prepetition claims of

administrators and providers in the ordinary course of business to the extent that any of the

foregoing programs are administered, insured or paid through a third-party administrator or

provider (the "<u>Employee Wages and Benefits Motion</u>").  I have reviewed the Employee Wages

and Benefits Motion and the factual statement therein are true and correct.

36.     The Debtors currently employ approximately 4,612 employees (the "<u>Employees</u>")

in 23 states.  The Employees are the lifeblood of the Debtors' business, and their value cannot be

overstated.  The institutional knowledge, experience, and skills of the Employees are essential to

the Debtors' ability to continue business operations during the Chapter 11 Cases.  If the Debtors

01:22431104.3

cannot assure Employees that they will promptly pay prepetition Employee Obligations (as defined in the Employee Wages and Benefits Motion) to the extent allowed under the Bankruptcy Code, and continue to honor, as applicable, Employee Benefits Obligations, certain Employees will likely seek employment elsewhere.  The loss of Employees at this critical juncture would have a material adverse impact on the Debtors' business and ability to maximize value through the prosecution of the Chapter 11 Cases.

37.     The Debtors also utilize the services of approximately eight contract workers (collectively, the "Contract Workers", and, together with the Employees, the "Workforce") to provide a variety of training, operations support and other daily business services, and the number of Contract Workers fluctuates depending on the Debtors' needs.  Approximately five of Contract Workers are provided by Robert Half International (the "Employment Agency") and the Debtors currently engage three Contract Workers who are not provided by the Employment Agency.

38.     The Contract Workers fill certain critical and immediate business needs of the Debtors, and allow the Debtors to have a flexible workforce in a cost-effective way.  In such capacity, the Contract Workers fill several types of roles for the Debtors, including providing accounting, information systems, and marketing services as needed.  The Contract Workers are a reliable and cost-efficient component of the Debtors' operations.  Thus, as with the Debtors' regular Employees, if the Debtors fail to honor their prepetition compensation obligations for the Contract Workers, it is likely that the Debtors will lose such individuals' valuable services to the detriment of the Debtors' ongoing business operations.

39.     In the ordinary course of business, the Debtors incur payroll and other compensation obligations for their Workforce.  The Debtors also provide other benefits to

01:22431104.3

Employees for the performance of services.  These benefits and obligations are described in more detail in the Employee Wages and Benefits Motion.

40.     The Debtors pay approximately 90% of the Team Member Employees on a bi-weekly basis, a week in arrears, on Mondays ("Group A Team Member Employees"), with the remaining Team Member Employees paid on a weekly basis, a week in arrears, on Mondays ("Group B Team Member Employees").  The Debtors pay Salaried Employees on a bi-weekly basis, one week in arrears, on Mondays.  The Debtors' weekly gross payroll on account of the Employees averages approximately $1.5 million.

41.     The last date Employees were compensated prior to the Petition Date was (a) October 6, 2017 for Group A Team Member Employees and all Salaried Employees, with such Employees receiving payment primarily for salaries and wages earned for September 19, 2017 to October 2, 2017 and (b) October 13, 2017 for the Group B Team Member Employees, with such Employees receiving payment primarily for wages earned from October 3, 2017 to October 9, 2017.

42.     The next scheduled payroll date for all Employees is October 23, 2017 for all Employees, which will include salaries and wages for Group A Team Member Employees and Salaried Employees from October 3, 2017 to October 16, 2017 and wages for Group B Team Member Employees from October 10, 2017 to October 16, 2017, and will include salaries and wages earned prepetition.  The Debtors estimate that, as of the Petition Date, they owe approximately $1.75 million on account of accrued and unpaid prepetition salaries and wages

(the "Employee Compensation Obligations").  I do not believe that any of the Employees are owed more than $12,850 in accrued and unpaid general prepetition wages or salaries.[8]

43.    Approximately 90% of the Employees elect to have their payroll administered via direct deposit, with the remainder of the Employees electing to receive a physical check. The Debtors use InfoSync Services (the "Payroll Administrator") to process their payroll and coordinate the payment of Withholding Obligations.  In connection with each payroll cycle, the Debtors create certain interface reports which they submit to the Payroll Administrator and approve cash disbursements processed by the Payroll Administrator from the Debtors' accounts to transfer the appropriate amounts to the various parties.

44.    The ongoing services of the Payroll Administrator are imperative to the smooth functioning of the Debtors' payroll system.  The Debtors pay the Payroll Administrator approximately $30,000 per month for its services, which include payroll processing, tax filing, time and attendance, self-service benefits administration, and data processing services.  As of the Petition Date, the Debtors estimate that they owe the Payroll Administrator approximately $30,000 in outstanding fees in connection with its services (the "Payroll Administrator Obligations").

45.    As noted above, the Debtors also utilize Contract Workers in the ordinary course of business.  The Contract Workers are skilled persons who allow for a flexible workforce to meet the business' fluctuating staffing needs.  As of the Petition Date, the Debtors estimate that the aggregate amount owing to the Contract Workers not provided by the Employment Agency is less than $10,000 and the aggregate amount owing to the Employment Agency on account of the

---

[8]    Although some Employees may have accrued PTO (defined below), the value of which would cause the amount owed to such Employees to exceed $12,850, the Debtors do not believe such Employees are owed the value of their PTO in cash as the Debtors will continue the PTO program.

Contract Workers for services performed prior to the Petition Date is approximately $25,000

(the "Contract Workers Obligations" and collectively with the Employee Compensation

Obligations the "Compensation Obligations").  The Debtors would be irreparably harmed

without the services of the Contract Workers because such parties play a critical role in the

Debtors' day-to-day operations. To the best of the Debtors' understanding, none of the Contract

Workers are owed more than $12,850 in accrued and unpaid general prepetition wages or

salaries.

46.      For each applicable pay period, the Debtors routinely deduct certain amounts

directly from Employees' paychecks, including, without limitation, (a) garnishments, child

support and service charges, and similar deductions and (b) other pre- and after-tax deductions

payable pursuant to certain of the Employees' benefit plans discussed herein (such as an

Employee's share of health care benefits and insurance premiums and 401(k) contributions),

legally-ordered deductions, and miscellaneous deductions (collectively, the "Deductions").

47.      In connection with the salaries and wages paid to Employees, the Debtors are

required by law to withhold from Employees' wages amounts related to federal, state, and local

income taxes, as well as social security and Medicare taxes (collectively, the "Employee

Withholding Taxes") and to remit the same to the applicable taxing authorities.  In addition, the

Debtors are required to make matching payments from their own funds for, among other things,

social security and Medicare taxes and to pay, based on a percentage of gross payroll, state and

federal unemployment insurance, employment training taxes, and state disability insurance

contributions (the "Employer Payroll Tax Obligations," and together with Employee

Withholding Taxes, the "Payroll Tax Obligations").  Each pay cycle, the Debtors withhold any

applicable Employee Withholding Taxes from the Employees' wages, and the Payroll

Administrator remits the same to the applicable taxing authorities.  The amounts in satisfaction of the Payroll Tax Obligations are transferred to the Payroll Administrator in advance of the relevant payroll processing day.

48.     The Debtors estimate that, as of the Petition Date, the Debtors have withheld approximately $1.2 million in Deductions and Payroll Tax Obligations (collectively, the "Withholding Obligations") to be remitted to the appropriate third-party recipients.

49.     In the ordinary course of business, the Debtors have typically maintained a number of performance-based bonus programs for Restaurant Management Employees, RSC Employees and certain catering Employees (collectively, the "Bonus Programs"; the bonuses earned under the Bonus Programs, the "Bonuses").  Approximately 340 employees participate in the following Bonus Programs:

- *Restaurant Bonus Programs*:  Eligible Restaurant Management Employees are entitled to participate in various Bonus Programs (the "Restaurant Bonus Programs") under which such Employees can earn Bonuses based on performance.  Approximately 285 Employees participate in the Restaurant Bonus Programs and Bonuses under the Restaurant Bonus Programs are paid quarterly.

- *RSC Bonus Program*: RSC Employees are entitled to participate in a Bonus Program (the "RSC Bonus Program"), wherein a pool of bonus funds based on the Debtors' financial performance is shared among participating RSC Employees, including the Executive Leadership Team. The maximum amount of the potential RSC Bonus Program pool for 2017 is $820,000. Approximately 47 Employees participate in the RSC Bonus Program and Bonuses under the RSC Bonus Program are paid annually.

01:22431104.3

- *Catering Bonus Program*: Eligible catering sales managers and coordinators are entitled to participate in a Bonus Program (the "Catering Bonus Program") that allows eligible Employees to earn up to a 3% commission on catering sales.  Approximately three (3) Employees participate in the Catering Bonus Program and Bonuses under the Catering Bonus Program are paid quarterly.

50.     For all of the Employees who receive them, the Bonuses are an important aspect of their overall compensation.  Maintaining the historical prepetition practices with regard to the Bonuses is essential to ensuring that the Debtors can retain their Workforce and continue to operate their businesses and maximize value through the prosecution of the Chapter 11 Cases.

51.     As of the Petition Date, the Debtors estimate that approximately $300,000 has accrued under the Debtors' Bonus Programs.  The next payment under the Bonus Programs is for the Restaurant Bonus Programs and Catering Bonus Program and is scheduled to be made in late October.  The Debtors do not believe that there are any Bonus Program payments owed to insiders. To the best of the Debtors' understanding, none of the Employees will have earned Bonuses that, when taken together with accrued and unpaid general prepetition wages or salaries, will exceed $12,850.

52.     The Debtors offer Salaried Employees paid time off ("PTO").  PTO may be accrued up to certain caps, which vary based on an Employee's service time.  Employees may not elect to receive payment in lieu of taking PTO.  In accordance with applicable law, Employees who are terminating their employment for any reason are entitled to payment for all accrued but unused PTO as of the date of termination of employment.  These PTO programs are typical and customary, and continuing to offer them is necessary for the Debtors to retain

Employees during the reorganization process. Because PTO is accrued and used by Employees on a continuous basis, it is difficult to precisely quantify the cost of accrued PTO as of the Petition Date.  However, the Debtors estimate that as of the Petition Date the value of accrued and unpaid PTO is approximately $550,000.

53.    Prior to the Petition Date, in the ordinary course of business, the Debtors reimbursed Salaried Employees for approved, legitimate expenses incurred on behalf of the Debtors in the scope of the Employee's employment ("Reimbursable Expense Obligations"). Reimbursable Expense Obligations typically include expenses for, among other things, air travel, meals, parking, mileage and certain other business related expenses.  The Debtors have policies whereby Employees seek reimbursement, or file expense reports for the Debtors' payment, of business related expenses.  It is essential to the continued operation of the Debtors' business that the Debtors' be permitted to continue reimbursing, or making direct payments on behalf of, employees for such expenses.

54.    The Debtors process expense and reimbursement payments on a rolling basis, and are current on all expense and reimbursement payments submitted through September 2017.  It is difficult for the Debtors to determine the exact amount of Reimbursable Expense Obligations outstanding as of the Petition Date because, among other things, Employees may have expenses that they have yet to submit to the Debtors for reimbursement.  On average, over the past year, the Debtors have paid approximately $40,000 per month on account of Reimbursable Expense Obligations.  As of the Petition Date, the Debtors estimate that the total amount of unpaid prepetition Reimbursable Expense Obligations will not exceed $40,000.

55.    Further, as a means of inducing and retaining high quality and talented employees and to support employees with company roles that require extensive travel, the Debtors pay the

costs to finance or lease a personal vehicle for approximately thirteen (13) Salaried Employees (the "Car Allowance Obligations").  The Debtors reimburse these employees for the loan or lease payments for their personal vehicles in the ordinary course of business.  These Car Allowance Obligations cost the Debtors approximately $3,500 every two (2) weeks.  In the absence of these expenses, the Debtors do not believe they would be able to maintain the high-quality of employee support that will be necessary to the Debtors' reorganization.  As of the Petition Date, the Debtors estimate that the total amount of unpaid Car Allowance Obligations will not exceed $5,000.

56.    In the ordinary course of business, the Debtors implement various benefit plans and policies for Employees that can be divided into the following categories, all as are described in more detail below: (a) prescription and medical benefits (collectively the "Medical Plans"), dental care (the "Dental Plan"), vision care (the "Vision Plan," and collectively with the Medical Plans and the Dental Plan, the "Health Plans"); (b) basic life and accidental death and dismemberment insurance, supplemental life and accidental death and dismemberment insurance, short- and long-term disability insurance, and other voluntary insurance plans (collectively, the "Income Protection Plans"); (c) a retirement savings 401(k) plan ("401(k) Plan"); (d) a flexible spending account plan (the "FSA Plan"); (e) employee assistance programs ("EAPs"); (f) the Relocation Programs (as defined below); (g) the Family Fund (as defined below); and (h) the Crave Card Program (as defined below; and, collectively with the Health Plans, Income Protection Plans, 401(k) Plan, FSA Plan, EAP, the Relocation Programs and the Family Fund, the "Employee Benefits Plans").  In certain instances, the Debtors deduct specified amounts from the participating Employees' wages in connection with the Employee Benefits Plans.  All obligations with respect to the Employee Benefits Plans are hereinafter referred to as

the "Employee Benefits Obligations."  There are no Employee Benefits Obligations owed by the Debtors to retired Employees.

57.    The Debtors primarily offer the Health Plans to Salaried Employees.  Salaried Employee contributions to the Health Plans have been and are collected through payroll deductions from participating Salaried Employees.  It is necessary and appropriate to continue to honor their obligations to current Salaried Employees under the Health Plans.

58.    The Debtors' offer two Medical Plans (the "HRA Plans") to Salaried Employees through Blue Cross Blue Shield of Texas ("Blue Cross") that provide a "Health Reimbursement Arrangement" pursuant to which a Salaried Employee first uses Debtor-funded dollars (the "HRA Fund") to pay medical expenses up to a set amount, and then the Salaried Employee becomes responsible for all medical expense up to an annual deductible.  After a Salaried Employee reaches his/her annual deductible, the Debtors share the cost of medical expenses with the Employee, subject to an out-of-pocket maximum that caps the Salaried Employee's total expenses in a plan year.  At the end of the plan year, any unused HRA Fund dollars can be rolled over and used in the following plan year, provided that the Salaried Employee remains enrolled in the HRA Plan.  The two HRA Plans vary in the amounts of the HRA Fund and annual deductible. Under the "Base Plan" the HRA Fund is $750 for an individual Employee and $1,500 for a family and under the "Buy-Up Plan" the HRA Fund is $1,000 for an individual Employee and $2,000 for a family.

59.    Approximately 315 Salaried Employees are enrolled in the HRA Plans. The HRA Plans are self-insured by the Debtors.  The Debtors pay Blue Cross approximately $35,000 per month for the HRA Plans, including stop loss premiums.  Although it is difficult to estimate the amount of claims submitted under the HRA Plans due to high variability in the number of claims

in process at any time, the Debtors estimate that, as of the Petition Date, approximately $500,000

is owed to Salaried Employees on account of claims submitted under the HRA Plans prior to the

Petition Date.  Additionally, as of the Petition Date, the Debtors owe Blue Cross approximately

$35,000 in connection with the HRA Plans, including stop loss premiums.

60.    The Debtors also offer a Medical Plan through Blue Cross to Team Member

Employees who average over 30 hours worked per week over a rolling 12-month look-back

period (the "Hourly Medical Plan").  The Hourly Medical Plan covers the costs of preventive

care and screenings and for other services a Team Member Employee pays the full cost of the

service up to an annual deductible amount ($6,350 for an individual and $12,700 for a family).

After a Team Member Employee reaches his/her annual deductible, the Hourly Medical Plan

pays 100% of in-network covered medical expenses for the remainder of the year.

61.    On average, approximately 40 Team Member Employees are enrolled in the

Hourly Medical Plan each month.  The Debtors pay Blue Cross approximately $38,000 per year

for the Hourly Medical Plan.

62.    The HRA Plans are administered by TaxSaver (the "Medical Administrator").

The Debtors pay the Medical Administrator approximately $850 per month for its services.  As

of the Petition Date, the Debtors owe the Medical Administrator approximately $850 in

outstanding fees in connection with its services (the "Medical Administrator Obligations").

63.    The Debtors offer the Dental Plan to Salaried Employees through Met Life.

Approximately 250 Salaried Employees participate in the Dental Plan.  The Dental Plan is fully

insured and has a monthly premium of approximately $20,000.  As of the Petition Date, the

Debtors owe approximately $15,000 on account of the Dental Plan.

01:22431104.3

64.     The Debtors offer the Vision Plan, administered by Vision Service Plan, to Salaried Employees.  Approximately 200 Salaried Employees participate in the Vision Plan.  The Debtors do not subsidize Salaried Employees' participation in the Vision Plan, but Salaried Employees may pay for the Vision Plan through payroll deductions.  The estimated monthly payment by the Debtors for the Vision Plan is approximately $3,000.  The Debtors estimate that as of the Petition Date they owe approximately $3,000 in Withholding Obligations in connection with the Vision Plan.

65.     The Debtors maintain certain Income Protection Plans including primary life and accidental death and dismemberment insurance (the "Life and AD&D Insurance") through The Hartford for Salaried Employees.  All benefits-eligible Salaried Employees have Life and AD&D Insurance.  Life and AD&D Insurance costs the Debtors approximately $2,000 per month.  The Debtors estimate that as of the Petition Date they owe approximately $2,000 on account of Life and AD&D Insurance.  In addition, certain of the Debtors' Salaried Employees choose elective coverage such as supplemental, spousal and dependent life insurance.

66.     As part of the Income Protection Plans, the Debtors also offer benefits-eligible Salaried Employees short and long term disability insurance ("Disability Insurance").  The Debtors maintain long-term Disability Insurance through The Hartford and the Debtors' short-term Disability Insurance is self-insured and administered by The Hartford.  Disability Insurance costs the Debtors approximately $6,500 per month.  As of the Petition Date, the Debtors owe approximately $6,500 on account of Disability Insurance as of the Petition Date.

67.     As part of the Income Protection Plans, the Debtors offer Team Member Employees the option to enroll in accident insurance and critical illness insurance through MetLife ("Accident Insurance").  The Debtors do not subsidize Team Member Employees'

participation in the Accident Insurance, but Team Member Employees may pay for the Accident Insurance through payroll deductions.  As of the Petition Date, the Debtors believe that they owe approximately $1,000 in Withholding Obligations in connection with the Accident Insurance.

68.    The Debtors maintain the 401(k) Plan, a retirement savings plans for eligible Salaried Employees pursuant to section 401 of the Internal Revenue Code.  For the 401(k) Plan, Dean Mackey and David Godfrey serves as trustees, and Principal Financial Services serves as the record keeper.  Salaried Employees participating in the 401(k) Plan may contribute up to 90% of their pay or the federal statutory cap of $18,000 per year.  Approximately 90 individuals, comprised of both Salaried Employees and former Salaried Employees, currently participate in the 401(k) Plan, and the approximate amount withheld from the participating Salaried Employees' September 2017 paychecks for 401(k) contributions was $20,000.

69.    The annual compliance fee in connection with the 401(k) Plan is approximately $3,200.  As of the Petition Date, the Debtors believe that they owe approximately $25,000 in connection with the 401(k) Plan, including Withholding Obligations.

70.    Under the Debtors' FSA Plan, the Debtors offer Salaried Employees the ability to contribute a portion of their pre-tax compensation to flexible spending accounts to pay for qualified medical and dependent care expenses.  The FSA Plan has two components: (1) a Healthcare Flex Account that allows eligible Salaried Employees to elect to set aside up to $2,550 in pre-tax contributions to be used for reimbursement of eligible medical, dental, and vision care expenses and (2) a Dependent Care Flex Account that allows eligible Employees to elect to set aside up to $5,000 in pre-tax contributions to be used for reimbursement of qualified day care costs for children under age 13, parents, grandparents, disabled spouse, domestic partner or dependents who qualify as an eligible dependent under IRS rules.

71.     Approximately 70 Salaried Employees participate in the FSA Plan with approximately 65 participating in the Healthcare Flexible Spending Account and approximately 5 participating in the Dependent Care Spending Account. Salaried Employees participating in the FSA Plan designate approximately $6,000 per month on account of health care, and approximately $1,500 per month on account of dependent care.  These amounts are Deductions withheld by the Debtors through payroll. As of the Petition Date, the Debtors estimate owing $7,500 in Withholding Obligations in connection with the FSA Plan.

72.     The FSA Plan is administered by TaxSaver (the "FSA Administrator") and the Debtors pay the FSA Administrator approximately $350 per month for its services.  As of the Petition Date, the Debtors owe the FSA Administrator approximately $350 in outstanding fees in connection with its services (the "FSA Administrator Obligations").

73.     The Debtors offer the EAPs through Hartford Ability Assist Program and through Interface EAP.  The EAPs provides Salaried Employees and Team Member Employees with assistance relating to a variety of issues including marital and family concerns, substance abuse problems, and similar type supportive services.  The EAPs costs the Debtors approximately $600 per quarter.  The Debtors estimate that, as of the Petition Date, $300 is owed on account of the EAPs.

74.     The Debtors also reimburse certain relocation expenses to DO Employees, managers and general managers who have relocated at the request of the Debtors (the "Permanent Relocation Program").  Expenses reimbursed under the Permanent Relocation Program include home finding, home selling, household goods movement and final trip expenses and the payments under the Permanent Relocation Program include tax gross-up payments made directly to the relevant taxing authority, if applicable.  The maximum amount of expenses

reimbursed under the Permanent Relocation Program varies based on the eligible Employee's position.  In 2016, the Debtors spent approximately $50,000 in connection with the Permanent Relocation Program.  As of the Petition Date, approximately $10,000 in Permanent Relocation Program expenses was accrued and unpaid.

75.    The Debtors also use a third party vendor, Lodging Source, to reserve and pay hotel accommodations for managers in training who temporarily relocate to work on-site at a designated training restaurant as part of the manager training program (the "Temporary Relocation Program", and together with the Permanent Relocation Program, the "Relocation Programs").  The Temporary Relocation Program is a benefit offered to Employees to compete in the marketplace for talent, and any disruption would be to the detriment of the Debtors' efforts to recruit, train and retain top restaurant management talent.  As of the Petition Date, the Debtors owe approximately $50,000 in connection with the Temporary Relocation Program.

76.    The Debtors have formed Romano's Macaroni Grill Family Fund, a Texas nonprofit corporation that is tax-exempt pursuant to section 501(c)(3) of the Internal Revenue Code (the "Family Fund"),[9] to assist Team Member Employees with living, medical, funeral and other expenses in the event of illness, injury, death, fire or other catastrophic conditions.  Team Member Employees may make tax-deductible donations to the Family Fund through payroll deductions.  Eligible Team Member Employees may apply for support from the Family Fund through a supervisor.  Support payments are subject to caps, which vary based on the applicable Employee's service time.  The Family Fund is a separate legal entity and the cash it has received is held in its name is not property of the Debtors' estates.

---

[9]        The Family Fund is not a Debtor in the Chapter 11 Cases.

01:22431104.3

77.     The Debtors provide Employees with cards that entitle the Employee to a certain dollar amount of complimentary meals and beverages each month through the Debtors' "Crave Card Program".  The maximum amount of complimentary meals provided to an eligible Employee under the Crave Card Program varies based on the Employee's position.  In addition to these complimentary meals, the Debtors reimburse eligible Employees at the end of the year for taxes that the Employees would owe due to their complimentary meal benefit.  The Debtors pay approximately $50,000 per year to reimburse Employees for taxes in connection with the Crave Card Program. The Debtors estimate that, as of the Petition Date, the Debtors owe approximately $40,000 on account of accrued and unpaid tax reimbursement obligations in connection with the Crave Card Program.

78.     The Debtors maintain workers' compensation policies with Liberty Insurance Corporation, the Ohio Bureau of Workers' Compensation and the Washington State Department of Labor & Industries(the "Workers' Compensation Policies").  The Debtors' deductible under the Liberty Insurance Corporation Workers' Compensation Policy is $250,000 per incident.  The Debtors are liable for all claim amounts below the deductible and are also liable for similar claims under previous workers' compensation policies (collectively, the "Workers' Compensation Claims").  The Debtors estimate that they paid approximately $50,000 per month in Workers' Compensation Claims in the last two years.  The Debtors' liability for Workers' Compensation Claims under the current Workers' Compensation Policy and for Workers' Compensation Claims under previous policies is secured by letters of credit.[10]

---

[10]     A standby letter of credit in favor of Liberty Mutual Insurance Company issued by BOC with a liability amount of $2,000,000 is outstanding in connection with policy periods from 2016 to 2018 in connection with the Debtors' workers' compensation policies.  A standby letter of credit in favor of The Travelers Indemnity Company issued by BOC with a liability amount of $425,000 is outstanding in connection with policy periods from 2009 to 2014 in connection with previous workers' compensation policies.  A standby letter of credit in favor of Zurich

*(Cont'd on next page)*

79.     The Debtors utilize the services of Liberty Mutual Insurance Corporation and Broadspire (the "Workers' Compensation Administrators") to administer the Workers' Compensation Claims.  The Workers' Compensation Administrators are paid per claim fees when claims are processed (the "Workers' Compensation Administrator Obligations").  In the twelve months preceding the Petition Date, the Debtors paid approximately $67,435 in Workers' Compensation Administrator Obligations.

80.     Although it is difficult to estimate the amount of Workers' Compensation Claims due to high variability in the number of claims in process at any time, the Debtors estimate that, as of the Petition Date, there are approximately $1 million in outstanding Workers' Compensation Claims for which the Debtors may be liable.

### c.     Utilities Motion

81.     The Debtors are seeking an order (a) prohibiting the Utility Providers (as defined in the motion) from (i) altering, refusing, or discontinuing utility services to, or discriminating against, the Debtors on account of any outstanding amounts for services rendered prepetition or (ii) drawing upon any existing security deposit, surety bond, or other form of security to secure future payment for utility services; (b) determining that adequate assurance of payment for postpetition utility services has been furnished to the Utility Providers providing services to the Debtors; and (c) establishing procedures for resolving future requests by any Utility Provider for additional adequate assurance of payment (the "Utilities Motion").  I have reviewed the Utilities Motion and the factual statements contained therein are true and correct.

---

*(Cont'd from previous page)*

American Insurance Company issued by BOC with a liability amount of $700,000 is outstanding in connection with policy periods from 2014 to 2015 in connection with previous workers' compensation policies.

01:22431104.3

82.     In conjunction with the operation of their business, the Debtors receive traditional

utility services from various utility providers (each, a "Utility Provider" and collectively, the

"Utility Providers"), for, among other things, electricity, water, gas, fire protection, waste

disposal, sewer service and other similar services (collectively, the "Utility Services").  The

Utility Providers include, without limitation, the entities set forth on the list annexed to the

Utilities Motion as Exhibit C (the "Utility Providers List").  The Debtors pay for certain Utility

Services as rent obligations pursuant to leases and the Utility Services are paid for in turn by the

landlords. The Debtors are not seeking relief as to such leases.

83.     The Debtors paid an average of approximately $680,000 per month on account of

all Utility Services during the 2017 calendar year.

84.     To manage the Utility Services at their many locations, the Debtors contract with

Schneider Electric and affiliates of the same: Cass Information Systems and Summit Energy

Systems (collectively, the "Administrators").  The Administrators manage the Debtors' accounts

for all the Utility Providers, including managing the Utility Services, reviewing bills for the

Utility Services, paying bills for the Utility Services as an agent for the company (after receiving

funds from the Debtors for such payments), establishing new Utility Services, terminating Utility

Services for closing locations and providing accounting information to the Debtors with respect

to the Utility Services managed by the Administrators.  The Debtors paid approximately $5,500

per month for the Administrators' services during the 2017 fiscal year.  The Debtors are

analyzing whether any prepetition amounts are owed to the Administrator or should be paid

during the Chapter 11 Cases.  The Debtors are parties to a service agreement with the

Administrators that they intend to perform pursuant to and enforce during the Chapter 11 Cases

on a go-forward basis.  However, out of an abundance of caution, the Debtors request authority,

01:22431104.3

31

but not the direction, to satisfy any incurred prepetition obligations to the Administrators so as to ensure that there is no disruption in the Debtors' Utility Services.

**d.**   **Critical Vendors Motion**

85.    The Debtors are seeking an order through the above-referenced motion (a) authorizing, but not directing, the Debtors to pay prepetition claims held by critical vendors with claims (the "Critical Vendor Claims") in an aggregate amount not to exceed $700,000 (the "Critical Vendor Cap") and (b) authorizing the Debtors' banks and financial institutions to receive, process, honor, and pay checks presented for payment and electronic payment requests relating to the foregoing.  I have reviewed the Critical Vendors Motion and the factual statements contained therein are true and correct.

86.    To operate the Debtors' restaurants, the Debtors require a wide variety of fresh produce, meat, dairy, beverages, condiments, dry and canned goods, and restaurant accessories. Raw groceries are typically delivered directly to the Debtors' restaurant locations on an as-needed basis.  If the delivery of products to the Debtors is stopped or delayed for even one day, the Debtors could not operate their restaurants.  Without a full supply of food and beverages, the Debtors would be extremely disadvantaged in a highly competitive market segment and would suffer swift attrition in customer patronage, which would be difficult, if not impossible, to restore.  The Debtors' business depends on, among other things, the Debtors' ability to retain their vendors and maintain their reputation and customer loyalty.

87.    To identify the Critical Vendors, the Debtors have reviewed their accounts payable and prepetition vendor lists to identify those creditors most essential to the Debtors' operations pursuant to the following criteria: (a) whether certain quality specifications or customer expectations prevent the Debtors from obtaining a vendor's products or services from

alternative sources within a reasonable timeframe; (b) whether, if a vendor is not a single-source supplier, the Debtors have sufficient product in inventory to continue their operations while a replacement vendor is put in place; and (c) whether a vendor meeting the foregoing criteria is able or likely to refuse to ship products to the Debtors postpetition if its prepetition balances are not paid.

88.    It is essential that the Debtors be able to maintain their business relationships with, and honor outstanding payment obligations to, the Critical Vendors in light of the critical role that they play in the day-to-day operation of the Debtors' business.  In addition, approximately $400,000 of the proposed Critical Vendor Claims are on account of claims entitled to administrative expense priority under section 503(b)(9) of the Bankruptcy Code to the extent the Debtors received goods in the ordinary course of business within the 20-day period immediately prior to the Petition Date.  The Debtors are seeking authority to pay Critical Vendor Claims up to the $700,000 Critical Vendor Cap.  While the Debtors reserve the right to seek Court authority at a later date to increase the Critical Vendor Cap, payment of the amounts specified herein would allow the Debtors to obtain those services most necessary to operating the Debtors' restaurants.

89.    One of the Debtors' largest Critical Vendors is Sysco.  Mac Acquisition LLC and Sysco are parties to a *Master Distribution Agreement* dated as of July 1, 2016 (as amended from time to time, the "Sysco Agreement"), pursuant to which Sysco has agreed to provide a substantial majority of the Debtors' food and non-alcoholic beverage inventory at their restaurants across the country.  The Debtors contemplate seeking to assume the Sysco Agreement under the proposed plan.  Sysco asserts a perfected security interest against, among other things, the product and inventory distributed to the Debtors pursuant to the Sysco

Agreement, and any proceeds thereof.  The Debtors anticipate that, as of the Petition Date, Sysco

is owed approximately $2.5 million on account of goods delivered to the Debtors prior to the

Petition Date.  Approximately $2.25 million of that claim is on account of goods or products

subject to protection under PACA or PASA, and the Debtors are not seeking authority to pay that

amount as a Critical Vendor Claim pursuant to this Motion, but these claims are subject to the

PACA/PASA Motion described below.  Approximately $250,000 of Sysco's prepetition claim is

not likely subject to PACA or PASA, but is sought to be paid as Critical Vendor Claims.

90.     In determining the amount of the Critical Vendor Cap, the Debtors carefully

reviewed all of their vendors to determine which vendors could meet the stringent criteria used to

identify the universe of potential Critical Vendors.  Consequently, the Critical Vendor Cap

represents the Debtors' best estimate of the prepetition claims that should be paid immediately to

ensure a continued supply of critical goods and services.

### e.     PACA/PASA Motion

91.     The Debtors are seeking an order (i) authorizing, but not directing, the Debtors, in

their sole discretion, to pay, in the ordinary course of business as such claims come due, all

prepetition claims arising under (a) the Perishable Agricultural Commodities Act of 1930, as

amended, 7 U.S.C. §§ 499a–499t ("PACA") and (b) the Packers and Stockyards Act of 1921, as

amended, 7 U.S.C. §§ 181–231 ("PASA"), and (ii) authorizing the Debtors' banks and financial

institutions to receive, process, honor, and pay all checks and electronic payment requests

relating to the foregoing (the "PACA/PASA Motion").  I have reviewed the PACA/PASA

Motion and the factual statements contained therein are true and correct.

92.     As of the Petition Date, the Debtors estimate they owe holders of PACA/PASA

Claims approximately $2.75 million in the aggregate for PACA and PASA goods delivered prior

to the Petition Date.  The Debtors expect to be invoiced for substantially this entire amount within twenty-one (21) days following the Petition Date.

93.     Approximately $2.25 million of the Debtors' anticipated PACA/PASA Claims is owed to Sysco under the Sysco Agreement.   The remaining approximately $500,000 of the Debtors' anticipated PACA/PASA Claims are held by separate third party vendors, which are all critical to the Debtors' ongoing operations.  In addition, many PACA/PASA Vendors may also be entitled to administrative expense priority under section 503(b)(9) of the Bankruptcy Code to the extent the Debtors received goods in the ordinary course of business within the 20-day period immediately prior to the Petition Date.  Specifically, the Debtors estimate that as of the Petition Date, of the $2.75 million in estimated PACA/PASA Claims, approximately $2 million of that amount is on account of goods delivered within 20 days of the Petition Date.

f.    **Customer Programs Motion**

94.     The Debtors are seeking an order (a) authorizing, but not directing, the Debtors to continue the Customer Programs and Customer Obligations (each as defined below) in the ordinary course of the Debtors' business and to honor or pay prepetition obligations in respect thereof; and (b) authorizing banks and other financial institutions at which the Debtors hold accounts to honor and process check and electronic transfer requests related to the foregoing (the "Customer Programs Motion").  I have reviewed the Customer Programs Motion and the factual statements contained therein are true and correct.

95.     Prior to the Petition Date, both in the ordinary course of the Debtors' business and as is customary in the industry, the Debtors offered and engaged in certain customer and other programs and practices (collectively, the "Customer Programs").  The Customer Programs include, but are not limited to, the following (as described in detail below): (a) co-branded,

prepaid gift cards sold pursuant to the Brinker Agreement (as defined below) (the "Brinker Gift Cards"); (b) prepaid gift cards sold by the Debtors outside of the Brinker Agreement (the "Mac Gift Cards"); (c) various coupon, discounts, promotions and all such other similar policies, programs, and practices of the Debtors; and (d) the Customer Refunds (defined below).

96.    In order to effectuate a smooth transition into chapter 11, the Debtors must maintain customer loyalty and goodwill by maintaining and honoring the Customer Programs. Indeed, the Debtors implemented the Customer Programs in the ordinary course of business prior to the Petition Date as a means to enhance customer satisfaction, develop and sustain customer relationships and loyalty, improve profitability and ensure that the Debtors remain competitive in their industry.  Accordingly, the Debtors' ability to honor the Customer Programs in the ordinary course of business is necessary to retain their customer base and reputation within their industry. On account of the Customer Programs, the Debtors may owe certain obligations to their customers as well as other third parties, arising both before and after the Petition Date (collectively, the "Customer Obligations").

97.    In 2008, Mac Acquisition LLC entered into an agreement (the "Brinker Agreement") with Brinker Services Corporation ("Brinker") to distribute and honor the co-branded Brinker Gift Cards.  The Brinker Agreement was later assigned to Debtor Macaroni Grill Services LLC.  Once purchased, a Brinker Gift Card can be used at any restaurants owned or franchised by the Debtors (the "Mac Restaurants") or certain restaurants owned or franchised by Brinker (the "Brinker Restaurants"), but may not be redeemed for cash or monetary credit except under limited circumstances as required by law.

98.    The Brinker Gift Cards were primarily distributed to third party retailers for sale to customers, and are not currently sold at the Debtors' restaurants.  Upon purchase, the gift

cards are "activated" and the location selling and activating the Brinker Gift Card retains the proceeds of the Brinker Gift Card, subject to a monthly "true-up" to reimburse the location where the Brinker Gift Card is later redeemed.  The Brinker Agreement expired on June 30, 2017, but, pursuant to the Brinker Agreement, Brinker may continue to sell and activate the Brinker Gift Cards until the current stock is depleted.  Further, the Debtors and Brinker will continue to redeem activated Brinker Gift Cards, and will continue to comply with and make payments in accordance with the monthly true-up.

99.    The "true-up" provides that (a) if a Brinker Gift Card was activated at a Mac Restaurant and subsequently redeemed at a Mac Restaurant, then the Debtors shall be solely responsible for all amounts related to such redemption; (b) if a Brinker Gift Card was activated at a Mac Restaurant and subsequently redeemed at a Brinker Restaurant, then the Debtors shall pay to Brinker an amount equal to such redemption; (c) if a Brinker Gift Card was activated at a Brinker Restaurant and subsequently redeemed at a Brinker Restaurant, then Brinker shall be solely responsible for all amounts related to such redemption; (d) if a Brinker Gift Card was activated at a Brinker Restaurant and subsequently redeemed at a Mac Restaurant, then Brinker shall pay to the Debtors an amount equal to such redemption; (e) if a Brinker Gift Card was activated at a third party retailer and subsequently redeemed at a Mac Restaurant, then Brinker shall pay to the Debtors an amount equal to such redemption, as adjusted pursuant to the Brinker Agreement; (f) if a Brinker Gift Card was activated at a third party retailer and subsequently redeemed at a Brinker Restaurant, then Brinker shall be solely responsible for all amounts related to such redemption; and (g) if a Brinker Gift Card was activated by Brinker at any other location and subsequently redeemed at Mac Restaurant, then Brinker shall pay to the Debtors an amount equal to such redemption, as adjusted pursuant to the Brinker Agreement.

100.    The Brinker Gift Cards program is administered by Brinker, not the Debtors.  As a result, the Debtors do not possess detailed information about holders of Brinker Gift Cards. However, based on the Debtors' records, as of the Petition Date, approximately $1.2 million in Brinker Gift Cards activated by Mac Restaurants is outstanding.  In 2017 leading up to the Petition Date, monthly true-up payments made by Brinker to the Debtors averaged $25,000.  The Debtors have historically received positive net payments each month from Brinker pursuant to the "true up".

101.    In addition to the Brinker Gift Cards, the Debtors sell the Mac Gift Cards, redeemable only at Debtor-owned or franchised restaurants, at the Debtors' locations, online and at third-party locations.  Once purchased, a Mac Gift Card can be used at any restaurants owned or franchised by the Debtors, but may not be redeemed for cash or monetary credit except under limited circumstances as required by law.

102.    The Debtors net credits for Mac Gift Cards activated at a Debtor-owned restaurant and subsequently redeemed at a franchised restaurant and deductions for Mac Gift Cards activated at a franchised restaurant and subsequently redeemed at a Debtor-owned restaurant against the franchise fees paid by a franchisee to the Debtors.

103.    Paytronix (the "Processor") processes the Mac Gift Cards and maintains records associated with activity related to the redemption of Mac Gift Cards.  The Processor provides the Debtors a portal where the Debtors can manage the card inventory and generate reporting.  The Processor charges the Debtors per-card transaction fees (the "Processor Fees") in connection with the processing of Gift Cards.  The Debtors have paid all Processor Fees on a timely basis. The Debtors estimate that as of the Petition Date approximately $4,000 in Processor Fees is accrued and unpaid.

01:22431104.3

104.    As of the Petition Date, approximately $4,000,000 in Mac Gift Cards is outstanding.  In 2017 leading up to the Petition Date, approximately $300,000 in Mac Gift Cards was redeemed each month.

105.    In the ordinary course of their business, the Debtors issue additional coupons, discounts and promotions (collectively, the "Promotions") that are redeemable for a certain dollar amount, percentage discount, or free meal.  The Promotions are not redeemable for cash. Coupons and promotions generally expire within two (2) months, while discounts are offered on a continuous basis.  Promotions that expire state the applicable expiration date on the Promotion.

106.    The Promotions are offered through social media, direct mailings and the Debtors' "E-Club" mailing list (the "E-Club"). As of the Petition Date, there were approximately 1,472,843 customers enrolled as E-Club members (collectively, the "Members").  The Debtors issue "welcome" coupons to new Members, birthday coupons, and anniversary coupons to Members to drive more business.  Redemptions of the Promotions offered under the E-Club vary greatly from month-to-month.  In 2017 leading up to the Petition Date, monthly redemptions ranged from $41,511 to $382,278, but averaged approximately $169,378 per month.

107.    The E-Club is managed by Fishbowl Inc. (the "E-Club Manager").  The Debtors and the E-Club Manager entered into a certain services agreement, pursuant to which the E-Club Manager maintains the website dedicated to the E-Club and arranges marketing communications to Members.  The E-Club Manager charges the Debtors specified fees on a monthly basis in arrears for managing the E-Club and providing other related marketing and customer relationship management services (collectively, the "E-Club Fees").  The Debtors estimate that as of the Petition Date approximately $20,000 in E-Club Fees is accrued and unpaid.  The E-Club Manager is critical to the Debtors' efforts to continue to drive customer traffic and manage the E-

Club.  Without the E-Club Manager, the Debtors would have to invest or divert significant

resources in an attempt to manage the E-Club internally or seek another third party to fill the

void that would necessarily result if the E-Club Manager were to cease its management of the E-

Club.

108.    Continuing to honor the Promotions and the E-Club Fees is essential to

maintaining their relationships with their customers.

109.    In the ordinary course of their business, the Debtors offer refunds to guests that

contact the Debtors regarding a bad experience at one of the Debtors' locations (the "Customer

Refunds").  The Debtors issue the Customer Refunds in the hopes of retaining the customers as

future guests and to maintain the Debtors' brand reputation.  The Customer Refunds are issued

by check and the Debtors estimate that approximately $2,500 in Customer Refunds have been

issued and are outstanding as of the Petition Date.

110.    Continuing to honor the Customer Refunds is essential to maintaining their

relationships with their customers.

**g.    Cash Management Motion**

111.    The Debtors are seeking an order through the above-referenced motion (the "Cash

Management Motion") an order authorizing (a) the Debtors to (i) continue to use their Cash

Management System (defined below), (ii) maintain existing Bank Accounts and Corporate Credit

Cards (each as defined below), (iii) authorizing a waiver of certain operating guidelines relating

to bank accounts, (iv) in their discretion, to pay or otherwise satisfy all prepetition Credit Card

Processing Fees (defined below), and (v) continue to use existing Business Forms (defined

below), (b) continued performance of  Intercompany Transactions and grant of administrative

expense status for postpetition Intercompany Claims (defined below), and (c) an interim waiver of the deposit and investment requirements of section 345(b) of the Bankruptcy Code.

     **i.**       **The Debtors' Cash Management System**

112.     The Debtors' business requires the collection, payment, and transfer of funds through numerous bank accounts.  In the ordinary course of business and prior to the Petition Date, the Debtors maintained a centralized cash management system (the "<u>Cash Management System</u>").  Like other large businesses, the Debtors designed their Cash Management System to efficiently collect, transfer, and disburse funds generated through the Debtors' operations and to accurately record such collections, transfers, and disbursements as they are made.  The Debtors' financial personnel manage the Cash Management System from the Debtors' headquarters in Denver, Colorado.  The Debtors' Cash Management System is comprised of 118 bank accounts. Each general category of accounts is described below and a diagram of the Cash Management System is annexed to the Cash Management Motion as Exhibit B.

113.     The Cash Management System includes number Bank Accounts and corporate credit cards as various Banks that are listed in Exhibit C to the Cash Management Motion.  These accounts and corporate credit cards are explained in detail in the Cash Management Motion.

114.     Further, the Debtors have entered into that Debtor-in-Possession Credit, Guaranty and Security Agreement dated as of October 18, 2017 (the "<u>DIP Credit Agreement</u>"), pursuant to which, if approved, the Debtors shall have access to $5 million in postpetition financing.  Under the proposed DIP Credit Agreement, the DIP Agent (as defined in the DIP Credit Agreement) will hold the proceeds of the DIP Facility (as defined in the DIP Credit Agreement) in a separate deposit account (the "<u>Loan Proceeds Account</u>") for withdrawal to the Debtors.  Subject to the terms of the DIP Credit Agreement, funding under the DIP Facility will be released from Loan

Proceeds Account directly to the Master Concentration Account to be used consistent with the

Debtors' Cash Management System.  Entry of an order approving the Cash Management Motion

is a condition to the closing of the transactions under the DIP Credit Agreement, and therefore

the relief requested herein is critical to the Debtors' ability to maintain their operations during

these cases.

115.     The Debtors accept Visa, Mastercard, American Express, and Discover credit

cards at all of their restaurants.  The Debtors' credit card receipts are all processed through Bank

of America Merchant Services (the "<u>Processor</u>").  The Debtors receive funds directly into the

Credit Card Depository Account electronically each day from the Processor.  The Processor

automatically deducts its fees (collectively, the "<u>Credit Card Processing Fees</u>") for its card

processing services, certain amount of which may have accrued, but remain unpaid as of the

Petition Date.

116.     The Cash Management System is a mainstay of the Debtors' ordinary, usual, and

essential business practices.  The Debtors' system provides numerous benefits, including the

ability to (a) quickly create status reports on the location and amount of funds, thereby allowing

management to track and control corporate funds; (b) ensure cash availability and prompt

payment of corporate, employee and vendor related expenses; and (c) reduce administrative costs

by facilitating the efficient movement of funds.

### ii.        The Debtors' Existing Business Forms and Check Stock

117.     In the ordinary course of business, the Debtors use a variety of checks and

business forms.  To minimize expenses to their estates and avoid unnecessarily confusing their

employees, customers, and suppliers, it is appropriate to continue to use all checks,

correspondence, and other business forms (including, without limitation, letterhead, purchase

orders, and invoices) (collectively, the "Business Forms") as such forms were in existence immediately before the Petition Date—without reference to the Debtors' status as debtors in possession—rather than requiring the Debtors to incur the expense and delay of ordering entirely new business forms. With respect to checks, the Debtors will, as debtors in possession, use the existing check stock until depleted and then reorder checks with a reference to the Debtors' status as debtors in possession and bankruptcy case.

### iii.   The Debtors' Intercompany Transactions

118.    Prior to the Petition Date, in the ordinary course of their business, the Debtors engaged in intercompany transactions and transfers amongst themselves and with non-Debtor affiliates (the "Intercompany Transactions") related to their gift card program, the collection of credit card receivables, the payment of expenses, and intercompany loans. The Intercompany Transactions may result in intercompany receivables and payables (the "Intercompany Claims").

119.    The Debtors maintain strict records of transfers of cash and can readily ascertain, trace and account for all such intercompany transactions. The Debtors will continue to maintain such records, including records of all current intercompany accounts receivable and payable.

120.    Further, the Debtors engage in intercompany transactions with affiliates that are not debtors in possession. Mac Acquisition IP owns the Debtors' intellectual property, and licenses such intellectual property to Mac Acquisition for no cost. Further, RMG Development is the franchisor under franchise agreements with respect to the Debtors' franchised Macaroni Grill locations. Mac Acquisition employs a person specifically to manage such franchise agreements, and all foreign royalty proceeds received on account of RMG Development's franchise agreements are transferred directly from RMG Development's depository account to the Master Concentration Account to be used by the Debtors. As a result, any costs of the

01:22431104.3

Debtors in connection with non-Debtor affiliates are netted out by the proceeds and other benefits received, and the Debtors do not seek to make any payments on account of prepetition indebtedness to non-Debtor affiliates pursuant to this Motion.

121.    If the Intercompany Transactions were discontinued, the Cash Management System and related administrative controls would be disrupted to the Debtors' detriment.  As described in more detail in the Cash Management Motion, discontinuing the Intercompany Transactions would disrupt the Debtors' business operations, harming their creditors and other parties in interest.

**iv.**    **The Debtors' Depository Policies and Practices**

122.    The Debtors are in compliance with the requirements of section 345 of the Bankruptcy Code because the Bank Accounts are maintained at U.S. Trustee-approved institutions.

**h.**    **Joint Administration Motion**

123.    The Debtors are seeking an order directing the joint administration of the Debtors' chapter 11 cases (the "Joint Administration Motion").  I have reviewed the Joint Administration Motion and the factual statements contained therein are true and correct.  Given the commercial and corporate relationships among the Debtors, joint administration of the Chapter 11 Cases will provide administrative convenience without harming the substantive rights of any party in interest.  Thus, the entry of an order directing joint administration of these cases will reduce fees and costs by, for example, avoiding duplicative filings and objections.

**i.**    **Application to Engage Donlin, Recano & Company, Inc.**

124.    The Debtors are seeking entry of an order authorizing the employment and retention of Donlin, Recano & Company, Inc. ("DRC") as administrative advisor (the

"<u>Administrative Advisor</u>") for the Debtors in connection with the Chapter 11 Cases, effective *nunc pro tunc* to the Petition Date (the "<u>DRC Application</u>").  The terms and conditions pursuant to which DRC has agreed to serve as Administrative Advisor for the Debtors are set forth in the Services Agreement attached to the DRC Application as Exhibit 1 to Exhibit A thereto.  I have reviewed the DRC Application and the factual statements contained therein are true and correct.

125.     The Debtors selected DRC in a competitive bidding process that included two other nationally recognized firms for the services contemplated by DRC, from which DRC emerged as the cost-effective choice.  Based on this process and after conferring with the Debtors' advisors, the Debtors believe that the rates to be charged by DRC for its services are competitive and are either at or below the rates charged by its competitors.  I am informed that DRC is well-qualified to service as Administrative Advisor and that DRC's retention is in the best interests of the Debtors' estates and creditors.

j.     **Priority Tax Motion**

126.     The Debtors are seeking an order (a) authorizing the Debtors to remit and pay (i) sales, use, value-added, and liquor license taxes and (ii) business license, permit, and other similar fees or charges; and (b) authorizing the banks and other financial institutions at which the Debtors hold accounts to receive, process, and honor checks issued and electronic payment requests made related to the foregoing (the "<u>Priority Tax Motion</u>").  I have reviewed the Priority Tax Motion and the factual statements contained therein are true and correct.

127.     The Debtors operate restaurants in 23 states.  In the ordinary course of business, the Debtors (a) incur and/or collect Sales Taxes (as defined below) and Liquor Taxes (as defined below) (with the Sales Taxes, collectively, the "<u>Taxes</u>"); (b) incur business license, permit, and other similar fees or charges (collectively, the "<u>Fees</u>") in connection with obtaining licenses and

permits necessary to operate their businesses; and (c) remit such Taxes and Fees to various

taxing, licensing, and other governmental authorities (collectively, the "Taxing Authorities").

The Taxes and Fees may, from time to time, be the subject of an audit (each an "Audit") by the

applicable Taxing Authority, and the amounts estimated as due or already paid by the Debtors

may be subject to upward or downward adjustment based upon the amount that the applicable

Taxing Authority ultimately claims is due following an Audit.  The Debtors pay the Taxes and

Fees in a timely manner on a monthly, quarterly, or annual basis, in each case as required by

applicable laws and regulations.  The Debtors do not hold any funds specifically earmarked for

the payment of taxes in a segregated account.

128.    The Debtors collect or incur sales, use and miscellaneous similar taxes

(collectively, the "Sales Taxes") in connection with the operation of their business.  The Debtors

conduct business in 23 states and remit Sales Taxes in all states and municipalities that impose

such obligations.  Based on their large volume of sales, the Debtors are generally required to

remit Sales Taxes to the Taxing Authorities on a monthly basis.  During the 2016 calendar year,

the Debtors paid approximately $18.8 million in the aggregate in Sales Taxes, with a monthly

average of approximately $1.5 million, although this amount varies based on sales throughout

the year.  The Debtors estimate that, as of the Petition Date, approximately $1.6 million on

account of Sales Taxes has accrued and is unpaid.

129.    The Debtors pay taxes to certain Taxing Authorities in connection with liquor

sales made at the Debtors' restaurants (collectively, the "Liquor Taxes").  The Debtors generally

make timely payments on a monthly basis to cover their estimated Liquor Taxes.  During the

2016 calendar year, the Debtors paid approximately $0.4 million on account of Liquor Taxes,

with a monthly average of approximately $30,000, although the Debtors' tax liabilities are not

always proportionate throughout the year.  The Debtors estimate that, as of the Petition Date, approximately $35,000 on account of Liquor Taxes has accrued and is unpaid.

130.    The Debtors also pay certain Fees, which include business license and permit fees in various jurisdictions and fees and taxes for annual reports, permits, liquor licenses, and health and fire inspections.  Over the trailing twelve months the Debtors remitted approximately $0.4 million on account of Fees related to locations currently operating, with a monthly average of approximately $35,000.  The Debtors estimate that, as of the Petition Date, approximately $35,000 on account of Fees has accrued and is unpaid.

### k.    Insurance Motion

131.    The Debtors are seeking an order (a) authorizing, but not directing, the Debtors to (i) continue and, to the extent necessary, renew prepetition insurance policies in the ordinary course of business, (ii) maintain certain insurance bonds on an uninterrupted basis and (iii) pay prepetition obligations in respect thereof; and (b) authorizing banks and other financial institutions at which the Debtors hold accounts to honor and process check and electronic transfer requests related to the foregoing (the "Insurance Motion").  I have reviewed the Insurance Motion and the factual statements contained therein are true and correct.

132.    In the ordinary course of their businesses, the Debtors (directly and, in limited circumstances, through certain non-debtor affiliates)[11] maintain numerous insurance policies with various insurance providers (collectively, the "Insurers" and the "Insurance Policies"), as summarized in Exhibit B annexed to the Insurance Motion.  The Debtors incur a total of

---

[11]    The Debtors are insured under each of the Insurance Policies listed on Exhibit B to the Insurance Motion, although non-debtor RedRock is the named insured under the directors and officers policy with Federal Insurance Company (policy number ending in 6508).  Notwithstanding this, as the operating entities covered under this insurance contract, the Debtors are the primary beneficiaries thereof.  Thus, historically, the Debtors have made the payments required under all Insurance Policies and are seeking authority to continue this practice post-petition.

approximately $2.1 million in the aggregate in annual premiums for the Insurance Policies as well as other obligations, including financing fees under the PFA (as defined below), obligations relating to the Insurance Bonds (as defined below), the Broker Fees (as defined below) and the Third-Party Administrator Fees (as defined below) (collectively, the "Insurance Obligations"), which are all paid at cost by or through Mac Acquisition LLC.

133.    The Debtors maintain third-party Insurance Policies through various insurance companies.  The Insurance Policies are essential to the ongoing operation of the Debtors' business.  The Debtors incur approximately $1.5 million in annual premiums relating to third-party Insurance Policies, excluding workers' compensation plan obligations.  The Debtors timely remit payments to cover the Insurance Policies and, as of the Petition Date, are current on all premium payments under the Insurance Policies. The third-party Insurance Policies can be grouped into four categories.

134.    The Debtors' property insurance policies which cover losses relating to, among other things, loss or damage to property resulting from fire, flood, terrorism, weather damage, boiler and machinery, earthquake, sprinkler leakage, inventory, and business interruption.  The Debtors incur approximately $718,112 in the aggregate in annual premiums for the Property Policies.  The Debtors finance the premiums for certain of the Property Policies under the PFA, and the remaining premiums are paid over time by the Debtors directly.  As of the Petition Date, the Debtors have paid approximately $423,720 of the current premiums for the Property Policies in the ordinary course of business, not including amounts paid pursuant to the PFA. Accordingly, the Debtors still owe approximately $278,392 on account of the current premiums for the Property Policies, not including amounts due under the PFA.

135.     The Debtors' casualty policies cover losses relating to, among other things, food borne illness, liquor liability, general liability, automobile, cyber liability, umbrella liability, excess liability, foreign liability and travel accident liability.  The Debtors incur approximately $588,226 in the aggregate in annual premiums for the Casualty Policies.  The Debtors finance the premiums for certain of the Casualty Policies under the PFA, and the remaining premiums are paid over time by the Debtors directly.  As of the Petition Date, the Debtors have paid approximately $235,689 of the current premiums for the Casualty Policies in the ordinary course of business, not including amounts paid pursuant to the PFA.  Accordingly, the Debtors still owe approximately $164,645 on account of the current premiums for the Casualty Policies, not including amounts due under the PFA.

136.     The Debtors (through a non-debtor affiliate) maintain Insurance Policies that cover management and employee liability (the "Management Liability Policies"), which cover, among other things, directors' and officers' liability, fiduciary liability, employment-related claims against the Debtors, crime kidnap, ransom and extortion payments.  The Debtors incur approximately $155,664 in annual premiums for the Management Liability Policies.  The premiums for the Management Liability Policies are financed pursuant to the PFA.

137.     The Debtors maintain Insurance Policies that cover workers' compensation claims (collectively, the "Workers' Compensation Policies").  The Debtors incur approximately $646,580 in annual premiums for the Workers' Compensation Policies.[12]  As of the Petition Date, the Debtors have paid approximately $337,404 of the current premiums for the Workers' Compensation Policies in the ordinary course of business.  Accordingly, the Debtors still owe

---

[12]     The premiums for the Workers' Compensation Policies may be subject to adjustment in the ordinary course of business.

approximately $309,175 on account of the current premiums for the Workers' Compensation Policies.

138.    The Insurers party to certain of the Property Policies, Casualty Policies and Management Liability Policies require that the annual premiums be paid in full in advance, as opposed to in installment payments over time.  In the ordinary course of the Debtors' business, the Debtors finance the premiums on these Insurance Policies pursuant to a premium financing agreement (the "PFA"), attached to the Insurance Motion as Exhibit C, with a third-party lender, AFCO Premium Credit LLC.  The PFA was used to finance premiums in an aggregate amount of $361,733.31.  The Debtors made a down payment of $72,347.00 and financed the balance of $289,386.31, which, along with a finance charge of $6,772.91, is to be paid in 9 monthly installments.  The obligations under the PFA are secured by the unearned premiums under the policies.  The Debtors timely remit payments on the PFA, and, as of the Petition Date, the Debtors have paid approximately $164,533 under the PFA in the ordinary course of business. Accordingly, the Debtors still owe approximately $131,626 on account of the PFA.

139.    In addition to the Insurance Policies, the Debtors' insurance coverage consists of surety bonds that guarantee the Debtors' performance of obligations owing to state government departments and utility providers (collectively, the "Insurance Bonds").  A list of the Insurance Bonds is attached the Insurance Motion as Exhibit D and incorporated by reference herein.  The Insurance Bonds are issued in the aggregate face amount of approximately $745,077.  In many instances, the Insurance Bonds are required by applicable law.

140.    The Debtors pay annual premiums on account of the Insurance Bonds, which are typically paid on the invoice dates listed on Exhibit D to the Insurance Motion.  As of the Petition Date, the Debtors estimate that they owe nothing on account of premiums for the

01:22431104.3

50

Insurance Bonds.  By their terms, however, the Insurance Bonds may require the Debtors to

provide certain credit support to the issuer in order to maintain the bonds, including fully cash

collateralizing the Insurance Bonds.  The Debtors have already cash-collateralized the Insurance

Bonds in the amount of approximately $350,000.

141.    The Debtors employ Marsh & McClennan Agency and AmWINS Group as the

insurance brokers (collectively, the "Brokers") to assist them with the procurement and

negotiation of the Insurance Policies.  The Brokers receive compensation from the Debtors

through commissions built into premiums.

142.    The Debtors utilize the services of Helmsman Management Services LLC and

Broadspire (the "Third-Party Administrators") to administer casualty claims that are less than the

self-insured retention under the Debtors' general liability Insurance Policies.  The Third-Party

Administrators are paid annual fees as summarized in Exhibit B annexed to the Insurance Motion

as well as per claim fees when claims are processed (the "Third-Party Administrator Fees").  In

the twelve months preceding the Petition Date, the Debtors paid approximately $54,620 in Third-

Party Administrator Fees.  As part of the claims administration process, the Third-Party

Administrators makes payments on casualty claims that are below the deductible limit and are

then reimbursed by the Debtors for these amounts.  The Debtors timely remit payments to cover

the Third-Party Administrator Fees and casualty claims processed by the Third-Party

Administrators, and as of the Petition Date, the Debtors have paid approximately $175,000 in

2017 to the Third-Party Administrators for claims and services rendered in the ordinary course of

business.  The Debtors currently anticipate assuming the executory contract with the Third Party

Administrator under the proposed plan.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my information, knowledge, and belief.

Wilmington, Delaware

Dated:  October 18, 2017

Respectfully submitted,

Mac Acquisition LLC, *et al.*

*/s/ Nishant Machado*

Nishant Machado

President, Chief Executive Officer & Chief Restructuring Officer

## EXHIBIT A

**Corporate Organization Chart**

# Mac Acquisition LLC Organizational Structure



Non-Debtor

\*   These entities also have non-voting/non-equity interests.

**EXHIBIT B**

**Restructuring Support Agreement**

**THIS RESTRUCTURING SUPPORT AGREEMENT IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE.  ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE.**

## RESTRUCTURING SUPPORT AGREEMENT

## October 18, 2017

This RESTRUCTURING SUPPORT AGREEMENT (including all exhibits and schedules attached hereto, and as may be amended, restated, supplemented or otherwise modified from time to time in accordance with the terms hereof, this "Agreement") is entered into by and among the following parties:

(a)    Mac Parent LLC, a Delaware limited liability company ("Mac Parent"), Mac Holding LLC, a Delaware limited liability company ("Mac Holding"); Macaroni Grill Services LLC, a Florida limited liability company ("Mac Grill Services"); Mac Acquisition LLC, a Delaware limited liability company ("Mac Acquisition") and each of Mac Acquisition's direct and indirect subsidiaries that are party hereto (collectively, with Mac Parent, Mac Holding, Mac Grill Services, and Mac Acquisition, the "Debtors" and each such entity, a "Debtor");

(b)    Bank of Colorado, a Colorado corporation ("Bank of Colorado"); and

(c)    Riesen Funding LLC, an Arizona limited liability company ("Riesen Funding"). (each of the foregoing described in sub-clauses (a) through (c), a "Party" and, collectively, the "Parties").  Each of the Parties set forth in sub-clauses (b) through (c) is a "Supporting Party" and they are collectively referred to herein as the "Supporting Parties."

## RECITALS

**WHEREAS**, the Debtors and Bank of Colorado are parties to loan agreements, promissory notes, guaranties, security agreements, and related documents entered into prior to the date hereof, including but not limited to those listed on Schedule A hereto (collectively, the "BOC Loan Documents");

**WHEREAS**, the Debtors and Riesen Funding are parties to loan agreements, promissory notes, guaranties, security agreements, and related documents entered into prior to the date hereof, including but not limited to those listed on Schedule B hereto (collectively, the "Riesen Loan Documents");

**WHEREAS**, the Debtors intend to commence voluntary reorganization cases (the "Bankruptcy Cases") under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (such court, or another court of competent jurisdiction with respect to the subject matter, the "Bankruptcy Court") to effect the restructuring and recapitalization transactions (the "Restructuring") through the chapter 11 plan of reorganization

attached hereto as <u>Exhibit A</u>, or such other chapter 11 plan consistent with this Agreement (the "<u>Plan</u>");

**WHEREAS**, the Parties desire to express to one another their mutual support and commitment in respect of the matters discussed herein; and

**WHEREAS**, the Parties have engaged in arm's length, good faith discussions with the objective of reaching an agreement regarding the Restructuring.

**NOW, THEREFORE**, in consideration of the covenants and agreements contained herein, and for other valuable consideration, the receipt and sufficiency of which is hereby acknowledged, each Party, intending to be legally bound hereby, agrees as follows:

## AGREEMENT

## SECTION 1    DEFINITIVE DOCUMENTATION.

(a)    The definitive documents and agreements governing the Restructuring (collectively, the "<u>Restructuring Documents</u>") shall consist of:  (i) this Agreement; (ii) that Debtor-in-Possession Credit, Guaranty and Security Agreement in substantially the form attached hereto as <u>Exhibit B</u> (the "<u>DIP Credit Agreement</u>"); (iii) the Interim DIP Order (as defined in the DIP Credit Agreement and attached hereto as <u>Exhibit C</u>), and the Final DIP Order (as defined in the DIP Credit Agreement), and the Credit Documents (as defined in the DIP Credit Agreement) (collectively, including DIP Credit Agreement, the DIP Motion and the Interim DIP Order, the "<u>DIP Loan Documents</u>"); (iv) the Plan (and all exhibits thereto); (v) a disclosure statement for the Plan when it is finalized (the "<u>Disclosure Statement</u>"), the other solicitation materials in respect of the Plan (such materials, collectively, the "<u>Solicitation Materials</u>"), the motion to approve the Disclosure Statement, and the order entered by the Bankruptcy Court approving the Disclosure Statement and Solicitation Materials as containing, among other things, "adequate information" as required by section 1125 of the Bankruptcy Code (the "<u>Disclosure Statement Order</u>"); (vi) the order entered by the Bankruptcy Court confirming the Plan (the "<u>Confirmation Order</u>"); (vii) the documentation with respect to the Exit Facility (as defined in the DIP Credit Agreement); and (viii) such other documents or agreements as may be reasonably necessary to implement the Restructuring contemplated by this Agreement.

(b)    Each of the Restructuring Documents remains subject to negotiation and completion and shall, upon completion, contain terms, conditions, representations, warranties, and covenants consistent with this Agreement and shall otherwise be in form and substance reasonably satisfactory to the Debtors and each Supporting Party; <u>provided</u>, <u>however</u>, for the avoidance of doubt, each Supporting Creditor hereby consents to the form of any of the DIP Loan Documents or Plan that are consistent in all material respects with the forms attached to this Agreement and any modifications thereto that do not have any material, adverse impact on such Supporting Creditor.

(c)    The transaction documents in the foregoing forms, with the foregoing required approvals or as otherwise modified pursuant to the terms of this Agreement are collectively referred to herein as the "<u>Approved Transaction Documents</u>."  Notwithstanding anything herein to the contrary, the Approved Transaction Documents shall include any

alternative debtor-in-possession financing agreement, and any interim and final orders with respect to such agreement, if such alternative debtor-in-possession financing agreement and related orders provide the Supporting Parties with treatment that is materially the same as that provided under the attached DIP Credit Agreement and supporting DIP Loan Documents.

(d)    Each of the exhibits and schedules attached hereto is expressly incorporated herein and made a part of this Agreement, and all references to this Agreement shall include the exhibits and schedules.  The terms of this Agreement and the exhibits and schedules shall whenever possible be read in a complementary manner; provided, that, to the extent there is a conflict between this Agreement and the exhibits and schedules, the conflicting term of this Agreement (excluding exhibits and schedules) shall control and govern.

## SECTION 2   REPRESENTATIONS OF THE SUPPORTING PARTIES AND THE DEBTORS.

Each of the Supporting Parties, severally and not jointly, hereby represents and warrants to the Debtors, and each of the Debtors hereby represents and warrants to the Supporting Parties that, as of the Execution Date (as defined below), the following statements are true, correct, and complete:

(a)    It has all requisite corporate, partnership, limited liability company or similar authority to execute this Agreement and carry out the transactions contemplated by, and perform its obligations contemplated under this Agreement; and the execution and delivery of this Agreement and the performance of such Party's obligations under this Agreement have been duly authorized by all necessary corporate, partnership, limited liability company or other similar action on its part.

(b)    The execution, delivery, and performance by such Party of this Agreement does not violate (i) any provision of law, rule or regulation applicable to it or any of its subsidiaries or (ii) its charter or bylaws (or other similar governing documents) or those of any of its subsidiaries.

(c)    This Agreement is the legally valid and binding obligation of such Party, enforceable against such Party in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

(d)    Except as expressly set forth herein and with respect to the Debtors' performance of this Agreement (and subject to necessary Bankruptcy Court approvals associated with the Restructuring), the execution, delivery, and performance by such Party of this Agreement does not and will not require any material registration or material filing with, material consent or material approval of, or material notice to, or other material action to, with or by, any federal, state or other governmental authority or regulatory body, other than those which have been obtained, taken or made.

(e)    Although none of the Parties intends that this Agreement should constitute, and they each believe it does not constitute, a solicitation and acceptance of the Plan,

regardless of whether its claims[1] constitute a "security" within the meaning of the Securities Act of 1933 (as amended, the "Securities Act"), such Supporting Party (A) is a sophisticated investor with respect to the transactions described herein with sufficient knowledge and experience in financial and business matters and is capable of evaluating the merits and risks of owning and investing in any securities that may be issued in connection with the Restructuring, making an informed decision with respect thereto, and evaluating properly the terms and conditions of this Agreement, and it has made its own analysis and decision to enter in this Agreement, (B) is acquiring any securities that may be issued in connection with the Restructuring for its own account and not with a view to the distribution thereof, and (C) has made its own decision to execute this Agreement based upon its own independent assessment of documents and information available to it, as it deemed appropriate and sufficient.

(f)     If such Party is a Supporting Party (i) either (A) is the sole legal and beneficial owner of all rights, claims, and obligations under the BOC Loan Documents (only with respect to Bank of Colorado) or the Riesen Loan Documents (solely with respect to Riesen Funding), or (B) has sole investment and voting discretion with respect to such rights, claims, and obligations in respect of matters relating to the Restructuring contemplated by this Agreement and has the power and authority to bind the beneficial owner(s) of such rights, claims, and obligations to the terms of this Agreement (with respect to a Supporting Party, all claims under clauses (A) and (B) and any additional claims against the Debtors it owns or has such control over from time to time or acquires after the Execution Date, collectively, its "Participating Claims") and (ii) has full power and authority to act on behalf of, vote and consent to matters concerning such Participating Claims in respect of matters relating to the Restructuring contemplated by this Agreement and dispose of, exchange, assign and transfer such Participating Claims.  Further, such Supporting Party has made no prior assignment, sale or other transfer of, and has not entered into any other agreement to assign, sell or otherwise transfer, in whole or in part, any portion of its ownership of such Participating Claims.

## SECTION 3   AGREEMENTS OF THE SUPPORTING PARTIES AND THE DEBTORS.

(a)     During the period beginning on the Execution Date and ending on a Termination Event (such period, the "Effective Period"):

(i)     each Supporting Party agrees that it shall, subject to the receipt by such Supporting Party of the Disclosure Statement and the Solicitation Materials, in each case, approved by the Bankruptcy Court as containing "adequate information" as such term is defined in section 1125 of the Bankruptcy Code:

1.     timely vote all of its claims, including Participating Claims, in voting classes now or hereafter beneficially owned by such Supporting Party or for which it now or hereafter serves as the nominee, investment manager or advisor for beneficial holders thereof, as applicable, to accept the Plan, by delivering its duly executed and completed ballots accepting the Plan on a timely

---

[1]   As used herein the term "claim" has the meaning ascribed to such term as set forth in section 101(5) of the Bankruptcy Code.

basis following the commencement of the solicitation of the Plan, which ballots shall be in favor of and not indicate that the Supporting Party opts out of any releases and exculpation provided under the Plan; provided that such vote shall be immediately revoked and deemed *void ab initio* upon termination of this Agreement pursuant to the terms hereof  (except any termination pursuant to <u>Section 8(a)</u> hereof); and

        2.    not change or withdraw (or seek or cause to be changed or withdrawn) such vote.

      (ii)    each Supporting Party agrees to not (A) object to, delay, impede or take any other action to interfere with acceptance or implementation of the Plan or the Restructuring, (B) directly or indirectly seek, solicit, encourage, propose, file, support, assist, participate, engage in the formulation, negotiations or discussions of or vote for, any restructuring, sale of assets, merger, workout or plan of reorganization for the Debtors other than the Plan (any such transaction, an "<u>Alternative Transaction</u>"), (C) object to or otherwise commence any proceeding, take any action opposing, or support any other person's efforts to oppose or object to, any of the terms of any of the DIP Loan Documents, or (D) otherwise take any action that would in any material respect interfere with, delay or postpone the consummation of the Restructuring;

      (iii)    each Supporting Party and each Debtor agrees to (A) support, and take all reasonable actions necessary to facilitate the implementation and consummation of, the Restructuring (including without limitation, approval of the Restructuring Documents and DIP Loan Documents, the confirmation of the Plan and the consummation of the Restructuring pursuant to the Plan) and (B) not take any action that is inconsistent with the implementation or consummation of the Restructuring; and

      (iv)    each Supporting Party (subject to <u>Section 26</u> of this Agreement) agrees to not (A) support or encourage the termination or modification of the Debtors' exclusive period for the filing of a plan or the Debtors' exclusive period to solicit votes on a plan, or (B) take any other action, including initiating any legal proceedings or enforcing rights under the BOC Loan Documents or Riesen Loan Documents, as applicable (including but not limited any action against any non-Debtor that is party to the BOC Loan Documents or Riesen Loan Documents or against any other affiliate[2] of the Debtors) that is inconsistent with this Agreement or the Restructuring Documents, or that would reasonably be expected to prevent, interfere with, delay or impede the implementation or consummation of the Restructuring (including the Bankruptcy Court's approval of the Restructuring Documents, the solicitation and confirmation of the Plan and the consummation of the Restructuring Transaction pursuant to the Plan).

      (b)    Notwithstanding the forgoing, this Agreement will not limit any of the following Supporting Party rights, to the extent consistent with this Agreement:

---

[2]  As used herein the term "affiliate" has the meaning ascribed to such term as set forth in section 101(2) of the Bankruptcy Code.

(i)     to appear and participate as a party in interest in any matter to be adjudicated in the Bankruptcy Cases, so long as such appearance and the positions advocated in connection therewith are not inconsistent with this Agreement and do not hinder, delay or prevent consummation of the Restructuring;

(ii)     to enforce any rights under this Agreement;

(iii)     to take or direct any action relating to maintenance, protection or preservation of any collateral; or

(iv)     the ability of a Supporting Party or Debtor and its advisors to consult with other Supporting Parties or the Debtors and their respective advisors.

## SECTION 4   AGREEMENTS RELATED TO DIP FACILITY AND EXIT FINANCING.

(a)     In addition to their agreements as Supporting Parties and Debtors set forth in Section 3 above, during the Effective Period,

(i)     each of the Supporting Parties hereby consents to the use of cash collateral and adequate protection as provided in the DIP Credit Agreement, the Interim DIP Order, the Final DIP Order, and the other DIP Loan Documents;

(ii)     Bank of Colorado hereby agrees and consents to (A) the Debtors' entry into the DIP Loan Documents, including but not limited to the granting of liens and superpriority administrative expense claims therein, and (B) the treatment of its claims against the Debtors as set forth in the Plan;

(iii)     Riesen Funding hereby agrees and consents to (A) the Debtors' entry into the DIP Loan Documents, including but not limited to the granting of liens and superpriority administrative expense claims therein, (B) the treatment of its claims against the Debtors as set forth in the Plan, and (C) to subordinate any liens or security interests securing the obligations under the Riesen Loan Agreements to the liens or security interests granted under the BOC Loan Documents or the DIP Loan Documents.

(b)     No Supporting Party shall be obligated to fund or otherwise be committed to provide funding in connection with the Restructuring except pursuant to separate definitive documentation relating specifically to such funding, if any, (i) executed by such Supporting Party and (ii) approved by an order of the Bankruptcy Court, if necessary, along with the satisfaction of any conditions precedent to such funding under the definitive documentation relating thereto.

## SECTION 5   SUPPORT FOR MUTUAL RELEASES BY THE SUPPORTING PARTIES.

(a)     Subject to Section 5(b) below, during the Effective Period, each of the Supporting Parties agrees that it shall not object to or opt out of any release included in the Plan.

6

(b)     Bank of Colorado's agreement under Section 5(a) above, and its support under the terms of this Agreement, are expressly conditioned upon (i) none of the Restructuring Documents or Approved Transaction Documents impairing, altering, or in any way affecting any rights or remedies that Bank of Colorado has against any non-Debtor guarantors under the BOC Loan Documents including, without limitation the following: RMG Development, LLC, Mac Acquisition IP LLC, RedRock Partners, LLC, Monfort Family Limited Partnership I, Richard Monfort, Riesen & Company LLC, Dean A. Riesen, Riesen Funding LLC, and Barbara H. Riesen (collectively, the "Non-Debtor Guarantors"); (ii) the Non-Debtor Guarantors providing to Bank of Colorado a written consent to the transactions contemplated under this Agreement, the Restructuring Documents and the Approved Transaction Documents in the form attached hereto as Exhibit D; and (iii) the Non-Debtor Guarantors ratifying their existing guaranties, and further agreeing to execute and deliver new or restated guaranties as a condition of the Plan

**SECTION 6   AGREEMENTS OF THE DEBTORS.**

During the Effective Period and subject to Section 26 hereof:

(a)     The Debtors hereby agree that, as soon as reasonably practicable, but in no event later than October 20, 2017, the Debtors shall file with the Bankruptcy Court voluntary petitions for relief under chapter 11 of the Bankruptcy Code and any and all other documents necessary to commence the Bankruptcy Cases of each Debtor.  If the Debtors do not file such voluntary petitions on or before October 20, 2017, this Agreement shall be null and void.

(b)     The Debtors hereby agree, as soon as reasonably practicable, but in no event later than October 27, 2017, to file the Plan and the Disclosure Statement with the Bankruptcy Court.

(c)     The Debtors hereby agree, as soon as reasonably practicable, but in no event later than October 27, 2017, to file a motion seeking entry of the Disclosure Statement Order.

(d)     During the Effective Period, the Debtors shall:  (i) support and take all steps necessary or desirable to obtain orders of the Bankruptcy Court in respect of the Restructuring, including obtaining entry of the Interim DIP Order and the Final DIP Order, Disclosure Statement Order and Confirmation Order; (ii) support and take all steps reasonably necessary or desirable to consummate the Restructuring in accordance with this Agreement, including the preparation and filing within the time-frame provided herein of the Approved Transaction Documents; (iii) execute and deliver any other required agreements to effectuate and consummate the Restructuring; (iv) obtain any and all required regulatory and/or third-party approvals for the Restructuring; (vi) comply with any other deadlines set forth herein; (vii) operate their business in the ordinary course, taking into account the Restructuring; and (viii) not object to, delay, impede, or take any other action that is materially inconsistent with, or is intended or is likely to interfere with acceptance or implementation of the Plan or the Restructuring.

(e)     During the Effective Period, the Debtors shall timely file an objection to any motion filed with the Bankruptcy Court by any person seeking an order (i) directing the appointment in the Bankruptcy Cases of an examiner with expanded powers or a trustee, (ii) converting any of the Bankruptcy Cases to cases under chapter 7 of the Bankruptcy Code, (iii) dismissing any of the Bankruptcy Cases; (iv) granting any relief that is inconsistent with this Agreement in any material respect; or (v) modifying or terminating the Debtors' exclusive right to file and/or solicit acceptances of a plan of reorganization.

(f)     [RESERVED]

(g)     The Debtors shall use commercially reasonable efforts to preserve their businesses and assets, maintain their operating assets in their present condition (ordinary wear and tear excepted), and maintain their existing insurance coverage.

(h)     For the avoidance of doubt, nothing in this Agreement shall prohibit or prevent the Debtors from marketing their assets for sale.

## SECTION 7   TRANSFERS OF PARTICIPATING CLAIMS.

(a)     Each Supporting Party agrees that, during the Effective Period, it shall not sell, transfer, assign or otherwise dispose of (collectively, "**Transfer**") any of its Participating Claims, or any option thereon or any right or interest (voting or otherwise) in any of its Participating Claims without the advance written consent of the Debtors; provided, however, that (i) a Supporting Party may, after providing written notice to the Debtors and the DIP Agent (as defined in the DIP Credit Agreement), Transfer such Participating Claims to an affiliate thereof that agrees to become a Supporting Party bound by this Agreement, and (ii) any transferee of a Participating Claim shall automatically be deemed a Supporting Party.  Any transfer of Participating Claims by a Supporting Party that does not comply with this Section 7(a) shall be deemed void *ab initio* without the need for further action.

(b)     This Agreement shall in no way be construed to preclude any Supporting Party from acquiring additional claims; provided that any such additional claims shall automatically be deemed to be Participating Claims of such Supporting Party and shall be subject to all of the terms of this Agreement.  Each Supporting Party agrees to provide to counsel for the Debtors a notice of the acquisition of any additional claims within three (3) business days of the consummation of the acquisition transaction.

## SECTION 8   TERMINATION OF OBLIGATIONS.

(a)     Each Supporting Party, shall have the right to terminate this Agreement upon three (3) business days' prior written notice to the Parties and the DIP Agent and, if such right is so exercised, except as set forth in Section 18, all obligations of the Parties shall immediately terminate and be of no further force and effect upon the occurrence of any of the following events (each, a "**Termination Event**"):

(i)     the occurrence of the Effective Date (as defined in the Plan);

(ii)     the breach in any material respect by any of the Debtors of any of its covenants, obligations, representations, warranties, or commitments contained in this Agreement, which breach or failure to act would materially and adversely impede or interfere with the acceptance, implementation or consummation of the Restructuring on the terms and conditions set forth in this Agreement and such breach remains uncured for a period of five (5) business days from the date the Debtors receive a written notice of such breach from any Supporting Party (such notice, the "**Supporting Party Termination Notice**"); provided, however, to the extent such material breach impacts only one Supporting Party, only the impacted Supporting Party shall have a termination right under this Section 8(b);

(iii)     the breach in any material respect by any other Supporting Party of any of its covenants, obligations, representations, warranties, or commitments contained in this Agreement, which breach or failure to act would materially and adversely impede or interfere with the acceptance, implementation or consummation of the Restructuring on the terms and conditions set forth in this Agreement, and such breach remains uncured for a period of five (5) business days from the date the Supporting Parties receive a written notice of such breach from the Debtors; provided, however, that no Supporting Party shall have a termination right under this Section 8(c) on account of its own breach;

(iv)     [RESERVED];

(v)     the issuance by any governmental authority or court of competent jurisdiction of any ruling, decision, judgment or order enjoining or otherwise preventing the consummation of a material portion of the Restructuring or requiring the Debtors to take actions inconsistent in any material respect with the Plan, unless such ruling, no party has within ten (10) business days sought to have the judgment stayed, reversed or vacated, or such judgment or order has not been stayed, reversed or vacated within fifteen (15) business days after the date of such issuance; *provided, however*, that if such issuance has been made at the request of any of the Supporting Parties, then this Agreement shall not be terminated by that Supporting Party on account of such issuance;

(vi)     the Debtors file any motion or pleading with the Bankruptcy Court that is inconsistent in any material respect with this Agreement or the Plan and such motion or pleading has not been withdrawn prior to the earlier of (i) five (5) business days from the date the Debtors receive written notice from any Supporting Party of the same, and (ii) entry of an order of the Bankruptcy Court approving such motion or pleading;

(vii)     the Bankruptcy Court grants relief that is inconsistent with this Agreement in any material respect which granted relief would materially and adversely impede or interfere with the acceptance, implementation or consummation of the Restructuring on the terms and conditions set forth in this Agreement;

(viii)     the Debtors enter into a definitive agreement for an Alternative Transaction without the prior written consent of the Supporting Parties, provided that, for

9

the avoidance of doubt, the process for marketing the Debtors' assets for sale shall not, in and of itself, be a Termination Event;

(ix)    the Debtors (i) withdraw the Plan or publicly announce their intention to withdraw the Plan or to pursue an Alternative Transaction, (ii) move voluntarily to dismiss any of the Bankruptcy Cases, (iii) move for conversion of any of the Bankruptcy Cases to chapter 7 under the Bankruptcy Code, (iv) move for the appointment of an examiner with expanded powers or a chapter 11 trustee in any of the Bankruptcy Cases, or (vi) support any other party seeking any of the foregoing relief;

(x)    the modification of the Plan or any of the DIP Loan Documents in a manner that materially adversely impacts the treatment of the Participating Claims of a Supporting Party without the express written consent of such Supporting Party; provided, however, that only the impacted Supporting Party shall have a termination right under this Section 8(j) and such Supporting Party may only terminate if the impacted Supporting Party has not had its treatment restored to a treatment at least as favorable as its prior treatment after a period of five (5) business days from the date the Debtors receive a written notice of such adverse modification from the impacted Supporting Party;

(xi)    the Bankruptcy Court enters an order (A) directing the appointment of an examiner with expanded powers or a chapter 11 trustee in any of the Bankruptcy Cases, (B) converting any of the Bankruptcy Cases to cases under chapter 7 of the Bankruptcy Code, or (C) dismissing any of the Bankruptcy Cases;

(xii)    the Debtors exercise their rights to terminate under Section 26 hereof;

(xiii)    April 16, 2018, if a written agreement to extend such termination date has not been entered into between and among the Supporting Parties and the Debtors;

(xiv)    the Debtors fail to meet any of the Chapter 11 Milestones (as defined and set forth in in Annex B to the DIP Credit Agreement) and the DIP Agent pursues enforcement remedies against the Debtors; or

(xv)    the occurrence of the Termination Date under the Interim DIP Order or Final DIP Order.

(b)    The Debtors shall have the right to terminate this Agreement upon three (3) business days' prior written notice to the Parties and the DIP Agent and, if such right is so exercised, except as set forth in Section 18, all obligations of the Parties shall immediately terminate and be of no further force and effect upon the occurrence of any of the following events (each, a "**Termination Event**"):

(i)    the occurrence of the Effective Date (as defined in the Plan);

(ii)    the breach in any material respect by any other Supporting Party of any of its covenants, obligations, representations, warranties, or commitments contained in this Agreement, which breach or failure to act would materially and adversely impede or interfere with the acceptance, implementation or consummation of the Restructuring on the terms and conditions set forth in this Agreement, and such breach remains uncured for a period of five (5) business days from the date the Supporting Parties receive a written notice of such breach from the Debtors;

(iii)    the issuance by any governmental authority or court of competent jurisdiction of any ruling, decision, judgment or order enjoining or otherwise preventing the consummation of a material portion of the Restructuring or requiring the Debtors to take actions inconsistent in any material respect with the Plan, unless such ruling, no party has within ten (10) business days sought to have the judgment stayed, reversed or vacated, or such judgment or order has not been stayed, reversed or vacated within fifteen (15) business days after the date of such issuance; *provided*, *however*, that if such issuance has been made at the request of any of the Debtors, then this Agreement shall not be terminated by the Debtors on account of such issuance;

(iv)    the Bankruptcy Court grants relief that is inconsistent with this Agreement in any material respect which granted relief would materially and adversely impede or interfere with the acceptance, implementation or consummation of the Restructuring on the terms and conditions set forth in this Agreement;

(v)    exercise of their rights to terminate under Section 26 hereof.

No Party may terminate this Agreement if such Party failed to perform or comply in all material respects with the terms and conditions of this Agreement, with such failure to perform or comply causing, or resulting in, the occurrence of one or more termination events specified herein.

Upon the occurrence of a Termination Event and the exercise by such Supporting Party of its termination rights, this Agreement shall terminate, each Party shall be released from its commitments, undertakings and agreements under or related to this Agreement, and there shall be no liability or obligation on the part of any Party hereto; provided that in no event shall any such termination relieve a Party hereto from (a) liability for its breach or non-performance of its obligations under this Agreement before the date of such termination, (b) any liabilities or obligations under the DIP Loan Documents, or (c) obligations under this Agreement, which expressly survive any such termination pursuant to Section 18 hereunder.  Upon the occurrence of a Termination Event, any and all consents or ballots tendered by the Parties subject to such termination before a Termination Event shall be deemed, for all purposes, to be null and void from the first instance and shall not be considered or otherwise used in any manner by the Parties in connection with the Restructuring and this Agreement or otherwise.

The Debtors acknowledge and agree, and shall not dispute, that solely with respect to the giving of a Supporting Party Termination Notice by any of the Supporting Parties pursuant to this Agreement, such an action shall not be a violation of the automatic stay under section 362 of the Bankruptcy Code (and the Debtors hereby waive, to the greatest extent possible, the

applicability of the automatic stay to the giving of such notice), and no cure period contained in this Agreement shall be extended pursuant to sections 108 or 365 of the Bankruptcy Code.

## SECTION 9  GOOD FAITH COOPERATION; FURTHER ASSURANCES; TRANSACTION DOCUMENTS.

The Parties shall cooperate with each other in good faith and shall coordinate their activities (to the extent practicable) in respect of all matters concerning the implementation and consummation of the Restructuring.  Furthermore, each of the Parties shall take such action (including executing and delivering any other agreements and making and filing any required regulatory filings) as may be reasonably necessary, or as may be required by order of the Bankruptcy Court, to carry out the purposes and intent of this Agreement.  Each of the Debtors and the Supporting Parties, as applicable, hereby covenants and agrees (a) to negotiate in good faith the Restructuring Documents and Approved Transaction Documents, each of which shall, except as otherwise provided for herein, (i) otherwise be in form and substance reasonably acceptable in all respects to the Parties (to the extent such Parties are specifically provided with consent rights over such documents pursuant to this Agreement), and (ii) be consistent with this Agreement in all respects, and (b) subject to the satisfaction of the terms and conditions set forth herein, to execute the Restructuring Documents and Approved Transaction Documents (in each case to the extent such Party is contemplated to be a party thereto).

## SECTION 10 SPECIFIC PERFORMANCE.

It is understood and agreed by the Parties that money damages would not be a sufficient remedy for any breach of this Agreement by any Party and each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief as a remedy for any such breach, including any order of the Bankruptcy Court or other court of competent jurisdiction requiring any Party to comply with any of its obligations hereunder; provided, however, that each Party agrees to waive any requirement for the securing or posting of a bond in connection with such remedy.  All rights, powers, and remedies provided under this Agreement or otherwise available in respect hereof at law or in equity shall be cumulative and not alternative, and the exercise of any right, power, or remedy thereof by any Party shall not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party or any other Party.

## SECTION 11 AMENDMENTS AND WAIVERS.

This Agreement, including the Exhibits hereto, may be amended only upon written approval of each of the Debtors and each of the Supporting Parties.  Any waiver of any condition, term or provision to this Agreement must be in writing signed by the Parties whose consent would be required to amend such condition, term or provision consistent with the impact of the waiver.

## SECTION 12 REPRESENTATION BY COUNSEL.

Each Party acknowledges that it has had the opportunity to be represented by counsel in connection with this Agreement and the transactions contemplated by this Agreement. Accordingly, any rule of law or any legal decision that would provide any Party with a defense to the enforcement of the terms of this Agreement against such Party based upon lack of legal

counsel shall have no application and is expressly waived.  The provisions of this Agreement shall be interpreted in a reasonable manner to effect the intent of the Parties hereto.  None of the Parties hereto shall have any term or provision construed against such Party solely by reason of such Party having drafted the same.

**SECTION 13 GOVERNING LAW; SUBMISSION TO JURISDICTION; WAIVER OF JURY TRIAL.**

This Agreement shall be governed by, and construed in accordance with, the internal laws of the State of Delaware, without giving effect to the principles of conflict of laws that would require the application of the law of any other jurisdiction.  By its execution and delivery of this Agreement, each of the Parties hereto hereby irrevocably and unconditionally agrees for itself that any legal action, suit or proceeding against it with respect to any matter under or arising out of or in connection with this Agreement or for recognition or enforcement of any judgment rendered in any such action, suit or proceeding, shall be brought in the United States Bankruptcy Court for the District of Delaware or, if that court does not have jurisdiction over the matter, the Chancery Court or Superior Court located in New Castle County, Delaware (the "Chosen Courts").  By execution and delivery of this Agreement, each of the Parties hereto hereby irrevocably accepts and submits itself to the exclusive jurisdiction of the Chosen Courts, generally and unconditionally, with respect to any such action, suit or proceeding. EACH PARTY HERETO UNCONDITIONALLY WAIVES TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING REFERRED TO ABOVE.

**SECTION 14 EXECUTION DATE.**

This Agreement shall become effective, and each Party hereto shall be bound to the terms of this Agreement, as of the date the Debtors and each of the Supporting Parties have executed and delivered a signature page to this Agreement (the "Execution Date").

**SECTION 15 NOTICES.**

All demands, notices, requests, consents and other communications under this Agreement shall be in writing, sent contemporaneously to all of the Supporting Parties and the Debtors, and deemed given when delivered, if delivered by hand, or upon confirmation of transmission, if delivered by email or facsimile, at the addresses and facsimile numbers set forth on Schedule C hereto.

**SECTION 16 RESERVATION OF RIGHTS.**

Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair or restrict the ability of each Party to protect and preserve its rights, remedies and interests, including its Participating Claims and any other claims against the Debtors or other parties.  Without limiting the foregoing sentence in any way, after a Termination Event, the Parties hereto each fully reserve any and all of their respective rights, remedies, claims and interests, subject to Section 8, in the case of any claim for breach of this Agreement.

**SECTION 17 RULE OF INTERPRETATION.**

This Agreement shall be interpreted in accordance with section 102 of the Bankruptcy Code.  Notwithstanding anything contained herein to the contrary, it is the intent of the Parties that all references to votes or voting in this Agreement be interpreted to include all means of expressing agreement with, or rejection of, as the case may be, a Restructuring.

**SECTION 18 SURVIVAL.**

Notwithstanding (a) any transfer of Participating Claims in accordance with Section 7  or (b) the termination of this Agreement in accordance with its terms, the agreements and obligations of the Parties in Section 2, Section 10, Section 12, Section 13, Section 15, Section 16, Section 17, Section 20, Section 22, Section 24, Section 25, and Section 26 shall survive such transfer and/or termination and shall continue in full force and effect for the benefit of the Parties in accordance with the terms hereof.

**SECTION 19 SUCCESSORS AND ASSIGNS; SEVERABILITY; SEVERAL OBLIGATIONS.**

This Agreement is intended to bind and inure to the benefit of the Parties and their respective permitted successors, assigns, heirs, executors, estates, administrators and representatives.  The invalidity or unenforceability at any time of any provision hereof in any jurisdiction shall not affect or diminish in any way the continuing validity and enforceability of the remaining provisions hereof or the continuing validity and enforceability of such provision in any other jurisdiction; provided, however, that nothing in this Section 19 shall be deemed to amend, supplement or otherwise modify, or constitute a waiver of, any Termination Event.  The agreements, representations and obligations of the Supporting Parties under this Agreement are, in all respects, several and not joint.

**SECTION 20 THIRD-PARTY BENEFICIARY.**

This Agreement is intended for the benefit of the Parties hereto and the DIP Agent and no other person or entity shall be a third party beneficiary hereof or have any rights hereunder.

**SECTION 21 COUNTERPARTS; ADDITIONAL SUPPORTING PARTIES.**

This Agreement may be executed in several identical counterparts, each of which shall be deemed to be an original, and all of which together shall be deemed to be one and the same agreement.  Execution copies of this Agreement may be delivered by facsimile, electronic mail or otherwise, each of which shall be deemed to be an original for the purposes of this paragraph.

**SECTION 22 ENTIRE AGREEMENT.**

This Agreement constitutes the entire agreement of the Parties with respect to the subject matter hereof and supersedes all prior agreements (oral and written) and all other prior negotiations but shall not supersede the Approved Transaction Documents; provided, however, that the Parties acknowledge and agree that any confidentiality agreements heretofore executed between the Debtors and any Supporting Party shall continue in full force and effect as provided

14

therein, except that the Parties acknowledge and agree that this Agreement may be publicly filed with the Bankruptcy Court without redaction, and otherwise used and disseminated in connection with the Restructuring without violating any such confidentiality agreements.

### SECTION 23 HEADINGS.

The section headings of this Agreement are for convenience of reference only and shall not, for any purpose, be deemed a part of this Agreement and shall not affect the interpretation of this Agreement.

### SECTION 24 INDEPENDENT DUE DILIGENCE AND DECISION-MAKING.

Each Party hereto hereby confirms that it has made its own decision to execute this Agreement based upon its own independent assessment of documents and information available to it, as it has deemed appropriate.

### SECTION 25 SETTLEMENT DISCUSSIONS.

This Agreement is part of a proposed settlement of matters that could otherwise be the subject of litigation among the parties hereto.  Regardless of whether or not the transactions contemplated herein are consummated, or whether or not a Termination Event has occurred, if applicable, nothing herein shall be construed herein as an admission of any kind or a waiver by any Party of any or all of such Party's rights or remedies.  Pursuant to Federal Rule of Evidence 408, any applicable state rules of evidence and any other applicable law, foreign or domestic, this Agreement and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than to prove the existence of this Agreement or in a proceeding to enforce the terms of this Agreement.

### SECTION 26 THE DEBTORS' FIDUCIARY DUTIES.

Notwithstanding anything to the contrary herein, to the extent that any Debtors' managers (or comparable governing body) determine in good faith after consulting with outside legal counsel that the Debtors' fiduciary obligations under applicable law require the Debtors to take any action or terminate this Agreement and the Debtors' obligations hereunder, the Debtors may take any action, including to terminate this Agreement, without incurring any liability to any one or more of the Supporting Parties under this Agreement.  In the event that the Debtors determine to terminate this Agreement in accordance with this Section 26, the Debtors shall provide notice of such termination to each of the Supporting Parties and their advisors not more than one (1) business day after such determination.  Notwithstanding anything to the contrary herein, nothing in this Agreement shall create any additional fiduciary obligations on the part of the Debtors or any members, managers, or officers of the Debtors or their affiliated entities, in such capacity, that did not exist prior to the Execution Date.

IN WITNESS WHEREOF, the undersigned Parties have executed this Agreement on the day and year first above written.

*[Remainder of page intentionally left blank]*

**MAC ACQUISITION LLC**

Nishant Machado
President, Chief Executive Officer
and Chief Restructuring Officer


**MACARONI GRILL SERVICES LLC**

Nishant Machado
President, Chief Executive Officer
and Chief Restructuring Officer


**MAC PARENT LLC**

Nishant Machado
President, Chief Executive Officer
and Chief Restructuring Officer


**MAC HOLDING LLC**

Nishant Machado
President, Chief Executive Officer
and Chief Restructuring Officer


**MAC ACQUISITION OF NEW JERSEY LLC**

Nishant Machado
President, Chief Executive Officer
and Chief Restructuring Officer


Signature Page to Restructuring Support Agreement

**MAC ACQUISITION OF
KANSAS LLC**

Nishant Machado
President, Chief Executive Officer
and Chief Restructuring Officer


**MAC ACQUISITION OF ANNE
ARUNDEL COUNTY LLC**

Nishant Machado
President, Chief Executive Officer
And Chief Restructuring Officer


**MAC ACQUISITION OF
FREDERICK COUNTY LLC**

Nishant Machado
President, Chief Executive Officer
and Chief Restructuring Officer


**MAC ACQUISITION OF
BALTIMORE COUNTY LLC**

Nishant Machado
President, Chief Executive Officer
and Chief Restructuring Officer


Signature Page to Restructuring Support Agreement

**BANK OF COLORADO**

By: *James D. Steeples*
Its: *Senior Vice President*

**RIESEN FUNDING LLC**

By: ~~DEAN A. RIESEN~~

Its: ~~MANAGER~~

## SCHEDULE A


## BOC LOAN DOCUMENTS

**BOC Loan Documents**

1.      Agreement to Provide Insurance, dated April 17, 2015, executed by Mac Parent LLC.

2.      Business Account Questionnaire, dated April 17, 2015, executed by Mac Parent LLC.

3.      Business Loan Agreement, dated April 17, 2015, by and between Mac Parent LLC and Bank of Colorado.

4.      Commercial Guaranty, dated April 17, 2015, made by Barbara H. Riesen for the benefit of Mac Parent LLC.

5.      Commercial Guaranty, dated April 17, 2015, made by Dean A. Riesen for the benefit of Mac Parent LLC.

6.      Commercial Guaranty, dated April 17, 2015, made by Mac Acquisition IP LLC for the benefit of Mac Parent LLC.

7.      Commercial Guaranty, dated April 17, 2015, made by Mac Acquisition LLC for the benefit of Mac Parent LLC.

8.      Commercial Guaranty, dated April 17, 2015, made by Mac Holding LLC for the benefit of Mac Parent LLC.

9.      Commercial Guaranty, dated April 17, 2015, made by Mac Management Blocker LLC for the benefit of Mac Parent LLC.

10.     Commercial Guaranty, dated April 17, 2015, made by Monfort Family Limited Partnership I for the benefit of Mac Parent LLC.

11.     Commercial Guaranty, dated April 17, 2015, made by Redrock Partners, LLC for the benefit of Mac Parent LLC.

12.     Commercial Guaranty, dated April 17, 2015, made by Richard Monfort for the benefit of Mac Parent LLC.

13.     Commercial Guaranty, dated April 17, 2015, made by Riesen & Company, LLC for the benefit of Mac Parent LLC.

14.     Commercial Guaranty, dated April 17, 2015, made by RMG Development LLC for the benefit of Mac Parent LLC.

15.     Commercial Security Agreement, dated April 17, 2015, made by Mac Acquisition IP LLC for the benefit of Mac Parent LLC.

16.    Commercial Security Agreement, dated April 17, 2015, made by Mac Acquisition LLC for the benefit of Mac Parent LLC.

17.    Commercial Security Agreement, dated April 17, 2015, made by Mac Holding LLC  for the benefit of Mac Parent LLC.

18.    Commercial Security Agreement, dated April 17, 2015, made by Mac Management Blocker LLC for the benefit of Mac Parent LLC.

19.    Commercial Security Agreement, dated April 17, 2015, made by Mac Parent LLC for the benefit of Mac Parent LLC.

20.    Commercial Security Agreement, dated April 17, 2015, made by Redrock Partners, LLC for the benefit of Mac Parent LLC.

21.    Commercial Security Agreement, dated April 17, 2015, made by RMG Development LLC for the benefit of Mac Parent LLC.

22.    Entity Authorization, dated April 17, 2015, executed by Mac Parent LLC.

23.    Errors and Omissions Agreement, dated April 17, 2015, executed by Mac Parent LLC.

24.    Internet Banking Agreement, dated April 17, 2015, by and between Mac Parent LLC and Bank of Colorado.

25.    Internet Gambling and Marijuana Sales Certification, dated April 17, 2015, executed by Mac Parent LLC.

26.    LLC Operating Authority Affidavit Addendum, dated April 17, 2015, executed by Mac Parent LLC.

27.    Notice of Default Agreement, dated April 17, 2015, by and between Mac Parent LLC, Bank of Colorado, and Performance Food Group.

28.    Ownership of Account Certification, dated April 17, 2015, executed by Mac Parent LLC.

29.    Promissory Note, dated April 17, 2015, made by Mac Parent LLC in favor of Bank of Colorado.

30.    Resolution of Limited Liability Company Member, dated April 17, 2015, executed by Mac Parent LLC.

31.    Limited Liability Company Resolution to Borrow / Grant Collateral, dated April 17, 2015, executed by Mac Parent LLC.

32.    Wire Transfer Agreement, dated April 17, 2015, by and between Mac Parent LLC and Bank of Colorado.

33.    Change in Terms Agreement, dated April 17, 2016, executed by Mac Parent LLC.

Schedule A

34.     Change in Terms Agreement, dated July 16, 2017, executed by Mac Parent LLC.

35.     Resolution of Limited Liability Company Member, dated July 16, 2016, executed by Mac Parent LLC.

36.     Limited Liability Company Resolution to Borrow / Grant Collateral, dated July 16, 2016, executed by Mac Parent LLC.

37.     Limited Liability Company Resolution to Borrow / Grant Collateral, dated July 27, 2016, made by Mac Acquisition LLC for the benefit of Mac Parent LLC.

38.     Change in Terms Agreement, dated July 17, 2017, executed by Mac Parent LLC.

39.     Agreement to Provide Insurance, dated December 20, 2016, executed by Mac Parent LLC.

40.     Business Loan Agreement, dated December 20, 2016, by and between Mac Parent LLC and Bank of Colorado.

41.     Commercial Guaranty, dated December 20, 2016, made by Barbara H. Riesen for the benefit of Mac Parent LLC.

42.     Commercial Guaranty, dated December 20, 2016, made by Dean A. Riesen for the benefit of Mac Parent LLC.

43.     Commercial Guaranty, dated December 20, 2016, made by Mac Acquisition IP LLC for the benefit of Mac Parent LLC.

44.     Commercial Guaranty, dated December 20, 2016, made by Mac Acquisition LLC for the benefit of Mac Parent LLC.

45.     Commercial Guaranty, dated December 20, 2016, made by Mac Holding LLC for the benefit of Mac Parent LLC.

46.     Commercial Guaranty, dated December 20, 2016, made by Redrock Partners, LLC for the benefit of Mac Parent LLC.

47.     Commercial Guaranty, dated December 20, 2016, made by Riesen & Company, LLC for the benefit of Mac Parent LLC.

48.     Commercial Guaranty, dated December 20, 2016, made by RMG Development LLC for the benefit of Mac Parent LLC.

49.     Commercial Guaranty, dated December 20, 2016, made by Monfort Family Limited Partnership I for the benefit of Mac Parent LLC.

50.     Commercial Guaranty, dated December 20, 2016, made by Richard Monfort for the benefit of Mac Parent LLC.

Schedule A

51.  Commercial Security Agreement, dated December 20, 2016, by and between Mac Parent LLC and Bank of Colorado.

52.  Disbursement Request and Authorization, dated December 20, 2016, executed by Mac Parent LLC.

53.  Errors and Omissions Agreement, dated December 20, 2016, executed by Mac Parent LLC.

54.  Notice of Insurance Requirements, dated December 20, 2016, executed by Mac Parent LLC.

55.  Promissory Note, dated December 20, 2016, made by Mac Parent LLC in favor of Bank of Colorado.

56.  Agreement to Provide Insurance, dated September 19, 2017, made by Mac Acquisition IP LLC for the benefit of Mac Parent LLC.

57.  Agreement to Provide Insurance, dated September 19, 2017, 2016, made by Mac Acquisition LLC for the benefit of Mac Parent LLC.

58.  Agreement to Provide Insurance, dated September 19, 2017, made by Mac Acquisition of Anne Arundel County LLC for the benefit of Mac Parent LLC.

59.  Agreement to Provide Insurance, dated September 19, 2017, made by Mac Acquisition of Baltimore County LLC for the benefit of Mac Parent LLC.

60.  Agreement to Provide Insurance, dated September 19, 2017, made by Mac Acquisition of Frederick County LLC for the benefit of Mac Parent LLC.

61.  Agreement to Provide Insurance, dated September 19, 2017, made by Mac Acquisition of Kansas LLC for the benefit of Mac Parent LLC.

62.  Agreement to Provide Insurance, dated September 19, 2017, made by Mac Acquisition of New Jersey LLC for the benefit of Mac Parent LLC.

63.  Agreement to Provide Insurance, dated September 19, 2017, made by Mac Holding LLC for the benefit of Mac Parent LLC.

64.  Agreement to Provide Insurance, dated September 19, 2017, executed by Mac Parent LLC.

65.  Agreement to Provide Insurance, dated September 19, 2017, made by Macaroni Grill Services LLC for the benefit of Mac Parent LLC.

66.  Agreement to Provide Insurance, dated September 19, 2017, made by Redrock Partners, LLC for the benefit of Mac Parent LLC.

4

Schedule A

67.     Agreement to Provide Insurance, dated September 19, 2017, made by Riesen &
        Company, LLC for the benefit of Mac Parent LLC.

68.     Agreement to Provide Insurance, dated September 19, 2017, made by Riesen Funding
        LLC for the benefit of Mac Parent LLC.

69.     Agreement to Provide Insurance, dated September 19, 2017, made by RMB Development
        LLC for the benefit of Mac Parent LLC.

70.     Business Loan Agreement, dated September 19, 2017, by and between Mac Parent LLC
        and Bank of Colorado.

71.     Commercial Guaranty, dated September 19, 2017, made by Mac Acquisition IP LLC for
        the benefit of Mac Parent LLC.

72.     Commercial Guaranty, dated September 19, 2017, made by Mac Acquisition LLC for the
        benefit of Mac Parent LLC.

73.     Commercial Guaranty, dated September 19, 2017, made by Mac Acquisition of Anne
        Arundel County LLC for the benefit of Mac Parent LLC.

74.     Commercial Guaranty, dated September 19, 2017, made by Mac Acquisition of
        Baltimore County LLC for the benefit of Mac Parent LLC.

75.     Commercial Guaranty, dated September 19, 2017, made by Mac Acquisition of Frederick
        County LLC for the benefit of Mac Parent LLC.

76.     Commercial Guaranty, dated September 19, 2017, made by Mac Acquisition of Kansas
        LLC for the benefit of Mac Parent LLC.

77.     Commercial Guaranty, dated September 19, 2017, made by Mac Acquisition of New
        Jersey LLC for the benefit of Mac Parent LLC.

78.     Commercial Guaranty, dated September 19, 2017, made by Mac Holding LLC for the
        benefit of Mac Parent LLC.

79.     Commercial Guaranty, dated September 19, 2017, made by Macaroni Grill Services LLC
        for the benefit of Mac Parent LLC.

80.     Commercial Guaranty, dated September 19, 2017, made by Redrock Partners, LLC for
        the benefit of Mac Parent LLC.

81.     Commercial Guaranty, dated September 19, 2017, made by Riesen & Company, LLC for
        the benefit of Mac Parent LLC.

82.     Commercial Guaranty, dated September 19, 2017, made by Barbara H. Riesen for the
        benefit of Mac Parent LLC.

Schedule A

83.  Commercial Guaranty, dated September 19, 2017, made by Dean A. Riesen for the benefit of Mac Parent LLC.

84.  Commercial Guaranty, dated September 19, 2017, made by RMG Development LLC for the benefit of Mac Parent LLC.

85.  Commercial Guaranty, dated September 19, 2017, made by Riesen Funding LLC for the benefit of Mac Parent LLC.

86.  Commercial Guaranty, dated September 19, 2017, made by Monfort Family Limited Partnership I for the benefit of Mac Parent LLC.

87.  Commercial Guaranty, dated September 19, 2017, made by Richard Monfort for the benefit of Mac Parent LLC.

88.  Acknowledgment of Voluntary Guaranty, dated September 19, 2017, made by Monfort Family Limited Partnership I.

89.  Acknowledgment of Voluntary Guaranty, dated September 19, 2017, made by Richard Monfort.

90.  Commercial Security Agreement, dated September 19, 2017, made by Mac Acquisition IP LLC for the benefit of Mac Parent LLC.

91.  Commercial Security Agreement, dated September 19, 2017, made by Mac Acquisition LLC for the benefit of Mac Parent LLC.

92.  Commercial Security Agreement, dated September 19, 2017, made by Mac Acquisition of Anne Arundel County LLC for the benefit of Mac Parent LLC.

93.  Commercial Security Agreement, dated September 19, 2017, made by Mac Acquisition of Baltimore County LLC for the benefit of Mac Parent LLC.

94.  Commercial Security Agreement, dated September 19, 2017, made by Mac Acquisition of Frederick County LLC for the benefit of Mac Parent LLC.

95.  Commercial Security Agreement, dated September 19, 2017, made by Mac Acquisition of Kansas LLC for the benefit of Mac Parent LLC.

96.  Commercial Security Agreement, dated September 19, 2017, made by Mac Acquisition of New Jersey LLC for the benefit of Mac Parent LLC.

97.  Commercial Security Agreement, dated September 19, 2017, made by Mac Holding LLC for the benefit of Mac Parent LLC.

98.  Commercial Security Agreement, dated September 19, 2017, executed by Mac Parent LLC.

Schedule A

99.    Commercial Security Agreement, dated September 19, 2017, made by Macaroni Grill Services LLC for the benefit of Mac Parent LLC.

100.   Commercial Security Agreement, dated September 19, 2017, made by Redrock Partners, LLC for the benefit of Mac Parent LLC.

101.   Commercial Security Agreement, dated September 19, 2017, made by Riesen & Company, LLC for the benefit of Mac Parent LLC.

102.   Commercial Security Agreement, dated September 19, 2017, made by Riesen Funding LLC for the benefit of Mac Parent LLC.

103.   Commercial Security Agreement, dated September 19, 2017, made by RMG Development LLC for the benefit of Mac Parent LLC.

104.   Disbursement Request and Authorization, dated September 19, 2017, executed by Mac Parent LLC.

105.   Errors and Omissions Agreement, dated September 19, 2017, made by Mac Acquisition IP LLC for the benefit of Mac Parent LLC.

106.   Errors and Omissions Agreement, dated September 19, 2017, made by Mac Acquisition LLC for the benefit of Mac Parent LLC.

107.   Errors and Omissions Agreement, dated September 19, 2017, made by Mac Acquisition of Anne Arundel County LLC for the benefit of Mac Parent LLC.

108.   Errors and Omissions Agreement, dated September 19, 2017, made by Mac Acquisition of Baltimore County LLC for the benefit of Mac Parent LLC.

109.   Errors and Omissions Agreement, dated September 19, 2017, made by Mac Acquisition of Frederick County LLC for the benefit of Mac Parent LLC.

110.   Errors and Omissions Agreement, dated September 19, 2017, made by Mac Acquisition of Kansas LLC for the benefit of Mac Parent LLC.

111.   Errors and Omissions Agreement, dated September 19, 2017, made by Mac Acquisition of New Jersey LLC for the benefit of Mac Parent LLC.

112.   Errors and Omissions Agreement, dated September 19, 2017, made by Mac Holding LLC for the benefit of Mac Parent LLC.

113.   Errors and Omissions Agreement, dated September 19, 2017, executed by Mac Parent LLC.

114.   Errors and Omissions Agreement, dated September 19, 2017, made by Macaroni Grill Services LLC for the benefit of Mac Parent LLC.

Schedule A

115.   Errors and Omissions Agreement, dated September 19, 2017, made by Redrock Partners, LLC for the benefit of Mac Parent LLC.

116.   Errors and Omissions Agreement, dated September 19, 2017, made by Riesen & Company, LLC for the benefit of Mac Parent LLC.

117.   Errors and Omissions Agreement, dated September 19, 2017, made by Riesen Funding LLC for the benefit of Mac Parent LLC.

118.   Errors and Omissions Agreement, dated September 19, 2017, made by RMG Development LLC for the benefit of Mac Parent LLC.

119.   Limited Liability Company Resolution to Borrow / Grant Collateral, dated September 19, 2017, executed by Mac Parent LLC.

120.   Limited Liability Company Resolution to Grant Collateral / Guarantee, dated September 19, 2017, made by Mac Acquisition IP LLC for the benefit of Mac Parent LLC.

121.   Limited Liability Company Resolution to Grant Collateral / Guarantee, dated September 19, 2017, made by Mac Acquisition LLC for the benefit of Mac Parent LLC.

122.   Limited Liability Company Resolution to Grant Collateral / Guarantee, dated September 19, 2017, made by Mac Acquisition of Anne Arundel County LLC for the benefit of Mac Parent LLC.

123.   Limited Liability Company Resolution to Grant Collateral / Guarantee, dated September 19, 2017, made by Mac Acquisition of Baltimore County LLC for the benefit of Mac Parent LLC.

124.   Limited Liability Company Resolution to Grant Collateral / Guarantee,  dated September 19, 2017, made by Mac Acquisition of Frederick County LLC for the benefit of Mac Parent LLC.

125.   Limited Liability Company Resolution to Grant Collateral / Guarantee, dated September 19, 2017, made by Mac Acquisition of Kansas LLC for the benefit of Mac Parent LLC.

126.   Limited Liability Company Resolution to Grant Collateral / Guarantee, dated September 19, 2017, made by Mac Acquisition of New Jersey LLC for the benefit of Mac Parent LLC.

127.   Limited Liability Company Resolution to Grant Collateral / Guarantee, dated September 19, 2017, made by Mac Holding LLC for the benefit of Mac Parent LLC.

128.   Limited Liability Company Resolution to Grant Collateral / Guarantee, dated September 19, 2017, made by Macaroni Grill Services LLC for the benefit of Mac Parent LLC.

129.   Limited Liability Company Resolution to Grant Collateral / Guarantee, dated September 19, 2017, made by Redrock Partners, LLC for the benefit of Mac Parent LLC.

Schedule A

130.    Limited Liability Company Resolution to Grant Collateral / Guarantee, dated September 19, 2017, made by Riesen & Company, LLC for the benefit of Mac Parent LLC.

131.    Limited Liability Company Resolution to Grant Collateral / Guarantee, dated September 19, 2017, made by RMG Development LLC for the benefit of Mac Parent LLC.

132.    Notice of Insurance Requirements, dated September 19, 2017, made by Mac Acquisition IP LLC for the benefit of Mac Parent LLC.

133.    Notice of Insurance Requirements, dated September 19, 2017, made by Mac Acquisition LLC for the benefit of Mac Parent LLC.

134.    Notice of Insurance Requirements, dated September 19, 2017, made by Mac Acquisition of Anne Arundel County LLC for the benefit of Mac Parent LLC.

135.    Notice of Insurance Requirements, dated September 19, 2017, made by Mac Acquisition of Baltimore County LLC for the benefit of Mac Parent LLC.

136.    Notice of Insurance Requirements, dated September 19, 2017, made by Mac Acquisition of Frederick County LLC for the benefit of Mac Parent LLC.

137.    Notice of Insurance Requirements, dated September 19, 2017, made by Mac Acquisition of Kansas LLC for the benefit of Mac Parent LLC.

138.    Notice of Insurance Requirements, September 19, 2017, made by Mac Acquisition of New Jersey LLC for the benefit of Mac Parent LLC.

139.    Notice of Insurance Requirements, dated September 19, 2017, made by Mac Holding LLC for the benefit of Mac Parent LLC.

140.    Notice of Insurance Requirements, dated September 19, 2017, executed by Mac Parent LLC.

141.    Notice of Insurance Requirements, dated September 19, 2017, made by Macaroni Grill Services LLC for the benefit of Mac Parent LLC.

142.    Notice of Insurance Requirements, dated September 19, 2017, made by Redrock Partners, LLC for the benefit of Mac Parent LLC.

143.    Notice of Insurance Requirements, dated September 19, 2017, made by Riesen & Company, LLC for the benefit of Mac Parent LLC.

144.    Notice of Insurance Requirements, dated September 19, 2017, made by Riesen Funding LLC for the benefit of Mac Parent LLC.

145.    Notice of Insurance Requirements, , dated September 19, 2017, made by RMG Development LLC for the benefit of Mac Parent LLC.

Schedule A

146.    Promissory Note, dated September 19, 2017 made by Mac Parent LLC in favor of Bank of Colorado.

147.    Resolution of Limited Liability Company Member, dated September 19, 2017, made by Mac Acquisition regarding Mac Acquisition IP LLC for the benefit of Mac Parent LLC.

148.    Resolution of Limited Liability Company Member, dated September 19, 2017, made by Mac Acquisition regarding Mac Acquisition of Anne Arundel County LLC for the benefit of Mac Parent LLC.

149.    Resolution of Limited Liability Company Member, dated September 19, 2017, made by Mac Acquisition regarding Mac Acquisition of Baltimore County LLC for the benefit of Mac Parent LLC.

150.    Resolution of Limited Liability Company Member, dated September 19, 2017, made by Mac Acquisition regarding Mac Acquisition of Frederick County LLC for the benefit of Mac Parent LLC.

151.    Resolution of Limited Liability Company Member, dated September 19, 2017, made by Mac Acquisition regarding Mac Acquisition of Kansas LLC for the benefit of Mac Parent LLC.

152.    Resolution of Limited Liability Company Member, September 19, 2017, made by Mac Acquisition regarding Mac Acquisition of New Jersey LLC for the benefit of Mac Parent LLC.

153.    Resolution of Limited Liability Company Member, September 19, 2017, made by Mac Acquisition LLC regarding RMG Development LLC for the benefit of Mac Parent LLC.

154.    Resolution of Limited Liability Company Member, dated September 19, 2017, made by Mac Holding LLC regarding Mac Acquisition LLC for the benefit of Mac Parent LLC.

155.    Resolution of Limited Liability Company Member, dated September 19, 2017, made by Mac Holding LLC regarding Macaroni Grill Services LLC for the benefit of Mac Parent LLC.

156.    Resolution of Limited Liability Company Member, dated September 19, 2017, regarding Mac Holding LLC, executed by Mac Parent LLC.

157.    Resolution of Limited Liability Company Member, dated September 19, 2017, regarding Redrock Partners, LLC, executed by Mac Parent LLC.

158.    Resolution of Limited Liability Company Member, dated September 19, 2017, regarding Riesen & Company, LLC, executed by Mac Parent LLC.

159.    Agreement to Provide Insurance, dated September 28, 2017, made by Mac Acquisition of Anne Arundel County LLC for the benefit of Mac Parent LLC.

Schedule A

160.   Agreement to Provide Insurance, dated September 28, 2017, made by Mac Acquisition of Baltimore County LLC for the benefit of Mac Parent LLC.

161.   Agreement to Provide Insurance, dated September 28, 2017, made by Mac Acquisition of Frederick County LLC for the benefit of Mac Parent LLC.

162.   Agreement to Provide Insurance, dated September 28, 2017, made by Mac Acquisition of Kansas LLC for the benefit of Mac Parent LLC.

163.   Agreement to Provide Insurance, dated September 28, 2017, made by Mac Acquisition of New Jersey LLC for the benefit of Mac Parent LLC.

164.   Agreement to Provide Insurance, dated September 28, 2017, made by Riesen & Company, LLC for the benefit of Mac Parent LLC.

165.   Agreement to Provide Insurance, dated September 28, 2017, made by Riesen Funding LLC for the benefit of Mac Parent LLC.

166.   Change in Terms Agreement, September 28, 2017, executed by Mac Parent LLC.

167.   Commercial Guaranty, dated September 28, 2017, made by Mac Acquisition of Anne Arundel County LLC for the benefit of Mac Parent LLC.

168.   Commercial Guaranty, dated September 28, 2017, made by Mac Acquisition of Baltimore County LLC for the benefit of Mac Parent LLC.

169.   Commercial Guaranty, dated September 28, 2017, made by Mac Acquisition of Frederick County LLC for the benefit of Mac Parent LLC.

170.   Commercial Guaranty, dated September 28, 2017, made by Mac Acquisition of Kansas LLC for the benefit of Mac Parent LLC.

171.   Commercial Guaranty, dated September 28, 2017, made by Mac Acquisition of New Jersey LLC for the benefit of Mac Parent LLC.

172.   Commercial Guaranty, dated September 28, 2017, made by Macaroni Grill Services LLC for the benefit of Mac Parent LLC.

173.   Commercial Guaranty, dated September 28, 2017, made by Redrock Partners, LLC for the benefit of Mac Parent LLC.

174.   Commercial Guaranty, dated September 28, 2017, made by Riesen & Company, LLC for the benefit of Mac Parent LLC.

175.   Commercial Guaranty, dated September 28, 2017, made by Riesen Funding LLC for the benefit of Mac Parent LLC.

176.   Commercial Security Agreement, dated September 28, 2017, made by Mac Acquisition of Anne Arundel County LLC for the benefit of Mac Parent LLC.

177.   Commercial Security Agreement, dated September 28, 2017, made by Mac Acquisition of Baltimore County LLC for the benefit of Mac Parent LLC.

178.   Commercial Guaranty, dated September 28, 2017, made by Mac Acquisition of Frederick County LLC for the benefit of Mac Parent LLC.

179.   Commercial Security Agreement, dated September 28, 2017, made by Mac Acquisition of Kansas LLC for the benefit of Mac Parent LLC.

180.   Commercial Security Agreement, dated September 28, 2017, made by Mac Acquisition of New Jersey LLC for the benefit of Mac Parent LLC.

181.   Commercial Security Agreement, dated September 28, 2017, made by Macaroni Grill Services LLC for the benefit of Mac Parent LLC.

182.   Commercial Security Agreement, dated September 28, 2017, made by Riesen & Company, LLC for the benefit of Mac Parent LLC.

183.   Commercial Security Agreement, dated September 28, 2017, made by Riesen Funding LLC for the benefit of Mac Parent LLC.

184.   Errors and Omissions Agreement, dated September 28, 2017, made by Mac Acquisition of Anne Arundel County LLC for the benefit of Mac Parent LLC.

185.   Errors and Omissions Agreement, dated September 28, 2017, made by Mac Acquisition of Baltimore County LLC for the benefit of Mac Parent LLC.

186.   Errors and Omissions Agreement, dated September 28, 2017, made by Mac Acquisition of Frederick County LLC for the benefit of Mac Parent LLC.

187.   Errors and Omissions Agreement, dated September 28, 2017, made by Mac Acquisition of Kansas LLC for the benefit of Mac Parent LLC.

188.   Errors and Omissions Agreement, dated September 28, 2017, made by Mac Acquisition of New Jersey LLC for the benefit of Mac Parent LLC.

189.   Errors and Omissions Agreement, dated September 28, 2017, made by Macaroni Grill Services LLC for the benefit of Mac Parent LLC.

190.   Errors and Omissions Agreement, dated September 28, 2017, made by Redrock Partners, LLC for the benefit of Mac Parent LLC.

191.   Errors and Omissions Agreement, dated September 28, 2017, made by Riesen & Company, LLC for the benefit of Mac Parent LLC.

192.   Errors and Omissions Agreement, dated September 28, 2017, made by Riesen Funding LLC for the benefit of Mac Parent LLC.

Schedule A

193.    Limited Liability Company Resolution to Grant Collateral / Guarantee, dated September 28, 2017, made by Mac Acquisition of Anne Arundel County LLC for the benefit of Mac Parent LLC.

194.    Limited Liability Company Resolution to Grant Collateral / Guarantee, dated September 28, 2017, made by Mac Acquisition of Baltimore County LLC for the benefit of Mac Parent LLC.

195.    Limited Liability Company Resolution to Grant Collateral / Guarantee, dated September 28, 2017, made by Mac Acquisition of Frederick County LLC for the benefit of Mac Parent LLC.

196.    Limited Liability Company Resolution to Grant Collateral / Guarantee, dated September 28, 2017, made by Mac Acquisition of Kansas LLC for the benefit of Mac Parent LLC.

197.    Limited Liability Company Resolution to Grant Collateral / Guarantee, dated September 28, 2017, made by Mac Acquisition of New Jersey LLC for the benefit of Mac Parent LLC.

198.    Limited Liability Company Resolution to Grant Collateral / Guarantee, dated September 28, 2017, made by Macaroni Grill Services LLC for the benefit of Mac Parent LLC.

199.    Limited Liability Company Resolution to Grant Collateral / Guarantee, dated September 28, 2017, made by Redrock Partners, LLC for the benefit of Mac Parent LLC.

200.    Limited Liability Company Resolution to Grant Collateral / Guarantee, dated September 28, 2017, made by Riesen & Company, LLC for the benefit of Mac Parent LLC.

201.    Limited Liability Company Resolution to Grant Collateral / Guarantee, dated September 28, 2017, made by Riesen Funding LLC for the benefit of Mac Parent LLC.

202.    Notice of Insurance Requirements, dated September 28, 2017, made by Mac Acquisition of Anne Arundel County LLC for the benefit of Mac Parent LLC.

203.    Notice of Insurance Requirements, dated September 28, 2017, made by Mac Acquisition of Baltimore County LLC for the benefit of Mac Parent LLC.

204.    Notice of Insurance Requirements, dated September 28, 2017, made by Mac Acquisition of Frederick County LLC for the benefit of Mac Parent LLC.

205.    Notice of Insurance Requirements, dated September 28, 2017, made by Mac Acquisition of Kansas LLC for the benefit of Mac Parent LLC.

206.    Notice of Insurance Requirements, September 28, 2017, made by Mac Acquisition of New Jersey LLC for the benefit of Mac Parent LLC.

207.    Notice of Insurance Requirements, dated September 28, 2017, made by Macaroni Grill Services LLC for the benefit of Mac Parent LLC.

Schedule A

208.    Notice of Insurance Requirements, dated September 28, 2017, made by Riesen & Company, LLC for the benefit of Mac Parent LLC.

209.    Notice of Insurance Requirements, dated September 28, 2017, made by Riesen Funding LLC for the benefit of Mac Parent LLC.

210.    Resolution of Limited Liability Company Member, dated September 28, 2017, made by Mac Acquisition LLC for the benefit of Mac Parent LLC.

211.    Resolution of Limited Liability Company Member, dated September 28, 2017, made by Redrock Partners, LLC for the benefit of Mac Parent LLC.

212.    Resolution of Limited Liability Company Member, dated September 28, 2017, made by Riesen & Company, LLC for the benefit of Mac Parent LLC.

213.    Resolution of Limited Liability Company Member, dated September 28, 2017, made by Riesen Funding LLC for the benefit of Mac Parent LLC.

Schedule A

# **SCHEDULE B**

## **RIESEN LOAN DOCUMENTS**

**Riesen Loan Documents**

1.    Security Agreement, dated July 3, 2017, executed by Mac Parent LLC.

2.    Promissory Note, dated July 3, 2017, made by Mac Parent LLC in favor of Riesen Funding LLC.

3.    Security Agreement, dated July 3, 2017, made by Mac Holding LLC for the benefit of Mac Parent LLC.

4.    Unconditional Guaranty of Payment, dated July 3, 2017, made by Mac Holding LLC  for the benefit of Mac Parent LLC.

5.    Security Agreement, dated July 3, 2017, made by Mac Acquisition LLC for the benefit of Mac Parent LLC.

6.    Unconditional Guaranty of Payment, dated July 3, 2017, made by Mac Acquisition LLC for the benefit of Mac Parent LLC.

**Exhibit A**

**Plan**

**See attached.**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| MAC ACQUISITION LLC, *et al.*,[1] | Case No. _____ |
| Debtors. | (Jointly Administered) |

### DEBTORS' JOINT PLAN OF REORGANIZATION
### UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

THIS DRAFT CHAPTER 11 PLAN IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES OR SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE. ANY SUCH OFFER OR SOLICITATION WILL BE MADE ONLY IN COMPLIANCE WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE.

**YOUNG CONAWAY STARGATT & TAYLOR, LLP**
Michael R. Nestor (No. 3526)
Edmon L. Morton (No. 3856)

Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Tel:    (302) 571-6600
Fax:    (302) 571-1253

**GIBSON DUNN & CRUTCHER LLP**
Jeffrey C. Krause (*Pro Hac Vice* Pending)
Michael S. Neumeister (*Pro Hac Vice* Pending)
333 So. Grand Avenue
Los Angeles, California 90071-3197
Tel:    (213) 229-7000
Fax:    (213) 229-7520

Dated: October ___, 2017
          Wilmington, Delaware

---

[1] The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: Mac Acquisition LLC (6362); Mac Parent LLC (6715); Mac Holding LLC (6682); Mac Acquisition of New Jersey LLC (1121); Mac Acquisition of Kansas LLC (3910); Mac Acquisition of Anne Arundel County LLC (6571); Mac Acquisition of Frederick County LLC (6881); Mac Acquisition of Baltimore County LLC (6865); and Macaroni Grill Services LLC (5963). The headquarters for the above-captioned Debtors is located at 1855 Blake St., Ste. 200, Denver, CO 80202.

Exhibit A

# TABLE OF CONTENTS

**Page**

**I. DEFINITIONS AND CONSTRUCTION OF TERMS** ........................................................ 2

    A.    Definitions........................................................................................................ 2
    B.    Interpretation, Application of Definitions, and Rules of Construction............... 10
    C.    Reference to Monetary Figures........................................................................ 11
    D.    Consent Rights of Supporting Parties .............................................................. 11

**II. CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS** .................................... 11

    A.    General Rules of Classification. ....................................................................... 11
    B.    Classification of Claims and Interests............................................................... 12

**III. TREATMENT OF ADMINISTRATIVE CLAIMS, PROFESSIONAL FEE**
**CLAIMS, PRIORITY TAX CLAIMS, DIP FACILITY CLAIMS AND**
**STATUTORY FEES** ........................................................................................................ 12

    A.    Administrative Claims. ..................................................................................... 12
    B.    Administrative Claims Bar Date. ...................................................................... 12
    C.    Professional Fee Claims. .................................................................................. 13
    D.    Priority Tax Claims. ......................................................................................... 13
    E.    DIP Facility Claims........................................................................................... 13
    F.    Payment of Statutory Fees. .............................................................................. 14

**IV. TREATMENT OF CLASSIFIED CLAIMS AND EQUITY INTERESTS**.................... 14

    A.    Class 1 – Other Priority Claims. ...................................................................... 14
    B.    Class 2 – Other Secured Claims........................................................................ 14
    C.    Class 3 – BOC Claims. ..................................................................................... 15
    D.    Class 4  – Riesen Funding Claim. ..................................................................... 16
    E.    Class 5 – General Unsecured Claims. ............................................................... 16
    F.    Class 6 – Intercompany Claims. ....................................................................... 17
    G.    Class 7 – Subordinated Claims. ........................................................................ 17
    H.    Class 8 – Existing Equity Interests. .................................................................. 17
    I.    Class 9 – Intercompany Interests. .................................................................... 17
    J.    Special Provision Governing Claims. ............................................................... 18
    K.    Elimination of Vacant Classes.......................................................................... 18
    L.    Acceptance or Rejection of this Plan. ............................................................... 18
    M.    Nonconsensual Confirmation............................................................................ 18
    N.    Subordinated Claims. ....................................................................................... 18

**V. PROVISIONS REGARDING ENTITY GOVERNANCE OF THE**
**REORGANIZED DEBTORS** ......................................................................................... 19

    A.    Cancellation of Existing Equity Interests. ........................................................ 19
    B.    Directors and Officers of the Reorganized Debtors........................................... 19
    C.    Powers of Officers. .......................................................................................... 19

**VI. SUBSTANTIVE CONSOLIDATION OF THE DEBTORS** ........................................... 19

i

# TABLE OF CONTENTS
(continued)

Page

**VII. PROVISIONS REGARDING MEANS OF IMPLEMENTATION, DISTRIBUTIONS, AND RESOLUTION OF DISPUTED CLAIMS ...... 20**

   A. General Settlement of Claims. .............................................. 20
   B. Exit Financing. ..................................................................... 21
   C. Issuance of New Equity Interests. ........................................ 21
   D. Avoidance Actions. ............................................................... 22
   E. Restructuring Transactions. .................................................. 22
   F. Approval and Authorization of Corporate and Company Action. ...... 22
   G. Effectuating Documents; Further Transactions. ................... 23
   H. Reorganized Mac Parent Operating Agreement ................... 23
   I. Cancellation of Securities and Agreements. ......................... 23
   J. Distributions in Respect of Allowed Claims. ....................... 24
   K. Resolution of Disputed Claims. ........................................... 26

**VIII. EXECUTORY CONTRACTS AND UNEXPIRED LEASES ...... 28**

   A. Assumption and Rejection of Executory Contracts and Unexpired Leases. ...... 28
   B. Cure; Effect of Payment of Cure. ........................................ 28
   C. Rejection Damage Claims. .................................................... 29
   D. Restrictions on Assignment Void. ........................................ 29
   E. Benefit Plans. ........................................................................ 30
   F. Workers' Compensation and Insurance Programs. ............... 30

**IX. EFFECT OF CONFIRMATION OF THIS PLAN ...... 30**

   A. Continued Entity Existence .................................................. 30
   B. Vesting of Assets. ................................................................. 31
   C. Preservation of Causes of Action. ........................................ 31
   D. Discharge of the Debtors. ..................................................... 31
   E. Releases by the Debtors of Certain Parties. ......................... 32
   F. Releases by Non-Debtors. ..................................................... 32
   G. Exculpation. .......................................................................... 33
   H. Injunction. ............................................................................. 34
   I. Term of Bankruptcy Injunction or Stays. ............................. 34
   J. Setoff. .................................................................................... 34
   K. Preservation of Insurance. .................................................... 35
   L. Indemnification Obligations. ................................................ 35

**X. EFFECTIVENESS OF THIS PLAN ...... 35**

   A. Conditions Precedent to Confirmation .................................. 35
   B. Conditions Precedent to the Effective Date. ........................ 36
   C. Waiver of Conditions. ........................................................... 37
   D. Notice of Confirmation and Effective Date. ........................ 37
   E. Effect of Failure of Conditions. ........................................... 37
   F. Vacatur of Confirmation Order. ........................................... 37

Exhibit A

# TABLE OF CONTENTS
(continued)

**Page**

    G.    Revocation, Withdrawal, Modification or Non-Consummation.......................... 37

**XI. RETENTION OF JURISDICTION** ............................................................................. **38**

**XII. MISCELLANEOUS PROVISIONS** ........................................................................... **39**

    A.    Modification of this Plan. ............................................................................. 39
    B.    Dissolution of Creditors' Committee. ......................................................... 40
    C.    Votes Solicited in Good Faith. ..................................................................... 40
    D.    Obligations Incurred After the Effective Date. ............................................ 40
    E.    Request for Expedited Determination of Taxes. .......................................... 40
    F.    Determination of Tax Filings and Taxes. ..................................................... 40
    G.    Governing Law. ............................................................................................ 41
    H.    Filing or Execution of Additional Documents. ........................................... 41
    I.    Exemption From Transfer Taxes. ................................................................. 41
    J.    Exemption for Issuance of New Equity Interests. ....................................... 41
    K.    Waiver of Federal Rule of Civil Procedure 62(a). ...................................... 42
    L.    Exhibits/Schedules. ..................................................................................... 42
    M.    Notices. ........................................................................................................ 42
    N.    Plan Supplement. ......................................................................................... 42
    O.    Further Actions; Implementations. .............................................................. 43
    P.    Severability. ................................................................................................. 43
    Q.    Entire Agreement. ........................................................................................ 43
    R.    Binding Effect. ............................................................................................. 43
    S.    No Change in Ownership or Control. ........................................................... 44
    T.    Substantial Consummation. ......................................................................... 44
    U.    Conflict. ....................................................................................................... 44

iii

Exhibit A

## **INTRODUCTION**

Mac Acquisition LLC, Mac Parent LLC, Mac Holding LLC, Macaroni Grill Services LLC, Mac Acquisition of Anne Arundel County LLC, Mac Acquisition of Baltimore County LLC, Mac Acquisition of Frederick County LLC, Mac Acquisition of Kansas LLC, and Mac Acquisition of New Jersey LLC, the above-captioned debtors and debtors in possession, propose the following joint plan of reorganization under section 1121(a) of the Bankruptcy Code.[2]

The Chapter 11 Cases are being jointly administered pursuant to an order of the Court, and this Plan is being presented as a joint plan of reorganization of the Debtors.  Claims against, and Interests in, the Debtors (other than DIP Facility Claims, Administrative Claims, Professional Fee Claims, and Priority Tax Claims) are classified in Article II hereof and treated in Article IV hereof.

Reference is made to the Disclosure Statement accompanying this Plan, including the exhibits thereto, for a discussion of the Debtors' history, business, properties, financial projections of future operations, and risk factors, together with a summary and analysis of this Plan.  All Claim and Interest holders entitled to vote on this Plan are encouraged to review the Disclosure Statement and to read this Plan carefully before voting to accept or reject this Plan.

NO SOLICITATION MATERIALS, OTHER THAN THE DISCLOSURE STATEMENT AND RELATED MATERIALS TRANSMITTED THEREWITH AND APPROVED BY THE COURT, HAVE BEEN AUTHORIZED BY THE COURT FOR USE IN SOLICITING ACCEPTANCES OR REJECTIONS OF THIS PLAN.

Subject to certain restrictions and requirements set forth herein and section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, the Debtors reserve the right to alter, amend, modify, revoke or withdraw this Plan prior to its substantial consummation (as such term is defined in section 1101 of the Bankruptcy Code).

---

[2]    Capitalized terms used in this Introduction shall have the meanings ascribed to them below.

Exhibit A

# I.

## DEFINITIONS AND CONSTRUCTION OF TERMS

### A.    Definitions.

Unless otherwise defined herein, or the context otherwise requires, the following terms shall have the respective meanings set forth below:

1.    "*Administrative Claim*" means a Claim for costs and expenses of administration of the Estates pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code other than DIP Facility Claims, including: (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving and operating the Estates; (b) any indebtedness or obligations incurred or assumed by the Debtors in connection with the conduct of their businesses after the Petition Date, including for wages, salaries, or commissions for services, and payments for goods and other services and leased premises to the extent such indebtedness or obligations provided a benefit to the Debtors' estates; and (c) all fees and charges assessed against the Estates pursuant to section 1930 of chapter 123 of title 28 of the United States Code.

2.    "*Administrative Claims Bar Date*" means the first Business Day that is thirty (30) days after the Effective Date.

3.    "*Allowed*" means, with reference to a Claim, (i) a Claim against a Debtor that has been listed by such Debtor in the Schedules, as such Schedules may be amended by the Debtors from time to time in accordance with Bankruptcy Rule 1009, as liquidated in amount and not Disputed or contingent and for which no contrary Proof of Claim has been timely filed, (ii) a Claim with respect to which a Proof of Claim that has been timely filed by the applicable Bar Date (or for which Claim under this Plan, the Bankruptcy Code or Final Order of the Court a Proof of Claim is or shall not be required to be filed), which Proof of Claim has not been withdrawn and as to which Proof of Claim no objection to allowance, request for estimation, or motion or other effort to subordinate or reclassify has been interposed prior to the expiration of the time for filing any such objection, or (iii) any Claim expressly Allowed by a Final Order or Allowed under this Plan, provided that any Claim that is Allowed for the limited purpose of voting to accept or reject this Plan pursuant to an order of the Court shall not be considered "Allowed" for the purpose of Distributions hereunder.

4.    "*Avoidance Actions*" means any Causes of Action pursuant to chapter 5 of the Bankruptcy Code.

5.    "*Ballots*" means each of the ballot forms distributed with the Disclosure Statement to each holder of an Impaired Claim (other than to holders not entitled to vote on this Plan) for, among other things, voting on the acceptance or rejection of this Plan.

6.    "*Bankruptcy Code*" means chapter 11 of title 11 of the United States Code.

Exhibit A

7.    "***Bankruptcy Rules***" means the Federal Rules of Bankruptcy Procedure promulgated under section 2075 of the Judicial Code and the general, local and chambers rules of the Court.

8.    "***Bar Date***" means the applicable date on which a Proof of Claim must be filed as may be specifically fixed by an order of the Court.

9.    "***BOC***" means Bank of Colorado.

10.    "***BOC Claims***" means all Claims held by BOC against any of the Debtors as of the Petition Date.

11.    "***BOC Credit Documents***" means those promissory notes, guarantees, security agreements and related documents, including guarantees, security agreements, and all exhibits, amendments, and supplements thereto, in each case related to (i) that Business Loan Agreement dated as of April 17, 2015, by and between Mac Parent and BOC, (ii) that Business Loan Agreement dated as of December 20, 2016, by and between Mac Parent and BOC, and (iii) that Business Loan Agreement dated as of September 19, 2017, by and between Mac Parent and BOC.

12.    "***BOC Non-Debtor Guarantees***" means the guarantees executed by the BOC Non-Debtor Guarantors in favor of BOC.

13.    "***BOC Non-Debtor Guarantors***" means all entities and individuals who have previously signed guarantees in favor of BOC and that are not Debtors.

14.    "***BOC Post-Effective Date Credit Documents***" means the amended and restated business loan agreements, promissory notes, guarantees, security agreements and related documents and exhibits, memorializing the treatment of BOC Claims under the Plan

15.    "***Budget***" has the meaning set forth in the DIP Credit Agreement.

16.    "***Business Day***" means any day, other than a Saturday, Sunday or Legal Holiday (as defined in Bankruptcy Rule 9006(a)(6)).

17.    "***Business Plan***" means the business plan incorporated in the Disclosure Statement.

18.    "***Cash***" means the legal tender of the United States of America.

19.    "***Causes of Action***" means any and all actions, proceedings, causes of action, suits, accounts, demands, controversies, agreements, promises, rights to legal remedies, rights to equitable remedies, rights to payment, and claims, whether known, unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, non-contingent, matured, unmatured, now-owned, hereafter acquired, disputed, undisputed, secured, or unsecured, and whether asserted or assertable directly or derivatively in law, equity, or otherwise, including Avoidance Actions or any other cause of action arising under the

Exhibit A

Bankruptcy Code, unless otherwise waived or released by the Debtor(s) or by the Reorganized Debtor(s).

20.    "*Chapter 11 Cases*" means (a) when used with reference to a particular Debtor, the case pending for that Debtor under chapter 11 of the Bankruptcy Code and (b) when used with reference to all Debtors, the procedurally consolidated chapter 11 cases pending for the Debtors in the Court.

21.    "*Claim*" means any claim, as such term is defined in section 101(5) of the Bankruptcy Code, against a Debtor.

22.    "*Claims Agent*" means Donlin, Recano & Company, Inc., or any successor thereto.

23.    "*Class*" means a class of Claims or Equity Interests as classified under this Plan.

24.    "*Collateral*" means any property or interest in property of the Estates subject to a Lien to secure the payment or performance of a Claim, which Lien has not been avoided or is not subject to avoidance under the Bankruptcy Code or otherwise invalid under the Bankruptcy Code or applicable state law.

25.    "*Confirmation Date*" means the date upon which the Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

26.    "*Confirmation Hearing*" means the confirmation hearing held by the Court pursuant to section 1129 of the Bankruptcy Code, as such hearing may be continued from time to time.

27.    "*Confirmation Order*" means the order of the Court in form and substance satisfactory to the Supporting Parties and the DIP Agent confirming this Plan pursuant to section 1129 of the Bankruptcy Code.

28.    "*Court*" means, (a) the United States Bankruptcy Court for the District of Delaware, having jurisdiction over the Chapter 11 Cases; (b) to the extent there is no reference pursuant to section 157 of title 28 of the United States Code, the United States District Court for the District of Delaware; and (c) any other court having jurisdiction over the Chapter 11 Cases or proceedings arising therein.

29.    "*Creditors' Committee*" means the Official Committee of Unsecured Creditors appointed by the United States Trustee in the Chapter 11 Cases, as constituted from time to time.

30.    "*Debtors*" means Mac Acquisition LLC,  Mac Parent LLC, Mac Holding LLC, Macaroni Grill Services LLC, Mac Acquisition of New Jersey LLC, Mac Acquisition of Kansas LLC, Mac Acquisition of Anne Arundel County LLC, Mac Acquisition of Baltimore County LLC, and Mac Acquisition of Frederick County LLC.

Exhibit A

31.     "***DIP Agent***" means Raven, in its capacity as Administrative Agent and Collateral Agent under the under the DIP Credit Agreement.

32.     "***DIP Credit Agreement***" means that certain Debtor-in-Possession Credit, Guaranty and Security Agreement, dated as of October 18, 2017, by and among Mac Acquisition LLC, the guarantors from time to time party thereto, the DIP Lenders and the DIP Agent, and all exhibits, amendments, and supplements thereto.

33.     "***DIP Facility***" means the debtor-in-possession financing provided to the Debtors during the Chapter 11 Cases pursuant to the DIP Credit Agreement in an amount not less than $5 million; provided that, for the avoidance of doubt, the DIP Facility does not include the Exit Facility.

34.     "***DIP Facility Claims***" means all Claims arising under or relating to the DIP Facility, whether pursuant to the DIP Credit Agreement, any other DIP Loan Document, any notes, the Final DIP Order, or otherwise.

35.     "***DIP Lenders***" means the lender(s) under the DIP Facility.

36.     "***DIP Loan Documents***" means the DIP Credit Agreement, the Credit Documents (as defined in the DIP Credit Agreement) and all related documents, including guarantees, security agreements, and the Agent Fee Letter (as defined in the DIP Credit Agreement), the Interim DIP Order, and the Final DIP Order.

37.     "***Disbursing Agent***" means the Reorganized Debtors, or any Person designated by the Reorganized Debtors, to serve as a disbursing agent or to assist the Reorganized Debtors in the making of Distributions, under this Plan.

38.     "***Disclosure Statement***" means the written disclosure statement that relates to this Plan in form and substance reasonably satisfactory to the Supporting Parties and the DIP Agent, as approved by the Court pursuant to section 1125 of the Bankruptcy Code and Bankruptcy Rule 3017, as such disclosure statement may be amended, modified or supplemented from time to time subject to the prior written consent of the Supporting Parties and the DIP Agent.

39.     "***Disputed***" means, with reference to any Claim, any Claim that has not been Allowed.

40.     "***Distributions***" means the distribution in accordance with this Plan of (a) Cash, (b) New Equity Interests, (c) the amended and restated loan documents contemplated with respect to the Allowed BOC Claims, (d) rights and obligations with respect to the Exit Facility, or (e) other forms of consideration, as the case may be.

41.     "***Effective Date***" means the date on which all conditions to the effectiveness of this Plan are either (a) satisfied or (b) waived by each of the Debtors, the Supporting Parties, and the DIP Agent, and on which this Plan is declared effective.

42.     "***Equity Interest***" or "***Interest***" means any equity security within the meaning of section 101(16) of the Bankruptcy Code or any other instrument evidencing an ownership

Exhibit A

interest in any of the Debtors (or Reorganized Debtors, as applicable), whether or not transferable, any option, warrant, or right, contractual or otherwise, to acquire, sell or subscribe for any such interest, and any and all Claims that are otherwise determined by the Court to be an equity interest, including any Claim or debt that is recharacterized as an equity interest.

43. "*Estates*" means the chapter 11 estates of the Debtors, individually or collectively, as is appropriate in the context created by the commencement of and in the Chapter 11 Cases pursuant to section 541 of the Bankruptcy Code.

44. "*Exculpated Party*" means each of the following parties, solely in such capacity: (a) the Debtors; (b) the Creditors' Committee; (c) each member of the Creditors' Committee in its capacity as such; (d) the DIP Agent and DIP Lenders; (e) the Exit Facility Agent and Lenders; (f) with respect to each of the foregoing entities, such entities' successors, assigns, subsidiaries, managed accounts and funds; and (f) with respect to each of the foregoing entities in (a) through (e), such entity's current and former officers and directors, principals, equity holders, members, partners, managers, employees, subcontractors, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors (and employees thereof), and other Professionals, and such entity's respective heirs, executors, estates, servants, and nominees, in each case in their capacity as such.

45. "*Existing Equity Interests*" means all issued and outstanding Equity Interests in Mac Parent, including any vested or unvested and exercised or unexercised options or warrants to acquire such Equity Interests.

46. "*Exit Facility*" means the exit facility to be provided by Raven (or an affiliate of Raven) in the aggregate amount up to $8,500,000, plus all DIP Facility Claims converted into debt under the Exit Facility in accordance with and subject to approval of final terms consistent with terms and conditions set forth in the Exit Facility Term Sheet and definitive documentation acceptable to the Debtors and the Exit Facility Agent.

47. "*Exit Facility Agent and Lenders*" means Raven, in its respective capacity as Administrative Agent, Collateral Agent, and Lender under the Exit Facility and any other lender(s), agent(s), arranger(s) and other lender party(ies) in their respective capacities under the Exit Facility.

48. "*Exit Facility Documents*" means the definitive documentation acceptable to the Exit Facility Agent governing the Exit Facility and all related documents, including guarantees and security agreements.

49. "*Exit Facility Term Sheet*" means that certain term sheet attached to the DIP Credit Agreement as Annex C, that sets forth the principal understanding of the parties and terms of and conditions precedent to the Exit Facility, but does not constitute a commitment.

50. "*Final DIP Order*" means the Final Order entered by the Court in the Chapter 11 Cases approving, on a final basis, the DIP Facility, including without limitation the granting of liens and superiority claims to the DIP Agent and/or DIP Lenders (as applicable), and authorizing the use of cash collateral in accordance with the Budget, in form and substance

Exhibit A

consistent with the Interim DIP Order and otherwise reasonably satisfactory to the Supporting Parties and the DIP Agent.

51.    "*Final Order*" means an order or judgment of the Court, or other court of competent jurisdiction, as entered on the docket of such court, the operation or effect of which has not been stayed, reversed, vacated, modified or amended, and as to which order or judgment (or any revision, modification, or amendment thereof) the time to appeal, petition for certiorari, or seek review or rehearing has expired and as to which no appeal, petition for certiorari, or petition for review or rehearing was filed or, if filed, remains pending or subject to any right of further appeal, petition for certiorari or petition for review or rehearing.

52.    "*General Unsecured Claim*" means a Claim against any of the Debtors that is not a DIP Facility Claim, Administrative Claim, Priority Tax Claim, Other Priority Claim, BOC Claim, Riesen Funding Claims, Other Secured Claim, Intercompany Claim, or Subordinated Claim, and shall include any Claims arising from existing or potential litigation against any of the Debtors.

53.    "*General Unsecured Claim Cash Pool*" means the $500,000 Cash pool to be distributed to holders of Allowed General Unsecured Claims if Class 5 votes in favor of this Plan.

54.    "*Impaired*" means, when used with reference to a Claim or Interest, a Claim or Interest that is impaired within the meaning of section 1124 of the Bankruptcy Code.

55.    "*Indemnification Obligation*" means any obligation of any of the Debtors to indemnify, reimburse, or provide contribution pursuant to charter, by-laws, contract, or otherwise.

56.    "*Indemnified Parties*" means the DIP Agent, DIP Lenders, and any other "Indemnitees" (as defined under the DIP Credit Agreement) under the DIP Credit Agreement, and those individuals serving, immediately prior to the Effective Date, as members of the boards of directors (or comparable governing body) or officers of the Debtors.

57.    "*Intercompany Claims*" means any Claim held by one of the Debtors against any other Debtor, including (a) any account reflecting intercompany book entries by a Debtor with respect to any other Debtor, (b) any Claim not reflected in book entries that is held by such Debtor against any other Debtor or Debtors, and (c) any derivative Claim asserted or assertable by or on behalf of a Debtor against any other Debtor or Debtors.

58.    "*Intercompany Interests*" means any Interest held by one of the Debtors in any other Debtor.

59.    "*Interim DIP Order*" means the order entered by the Court in the Chapter 11 Cases approving, on an interim basis, the DIP Facility, including without limitation the granting of liens and superpriority claims to the DIP Agent and/or DIP Lenders (as applicable), and authorizing the use of cash collateral in accordance with the Budget entered on the docket of the Court on [_____], 2017 [Docket No. __].

Exhibit A

60.    "*Lien*" has the meaning set forth in section 101(37) of the Bankruptcy Code.

61.    "*Litigation Rights*" means the Causes of Action, claims, suits, or proceedings, whether in law or in equity, whether known or unknown, that the Debtors or their Estates may hold against any Person (except to the extent such claims are expressly released under this Plan), which are to be retained by the Reorganized Debtors and identified in the Plan Supplement.

62.    "*Mac Acquisition*" means Mac Acquisition LLC, a Delaware limited liability company.

63.    "*Mac Holding*" means Mac Holding LLC, a Delaware limited liability company.

64.    "*Mac Parent*" means Mac Parent LLC, a Delaware limited liability company.

65.    "*New Equity Interests*" means the new membership interests in Reorganized Mac Parent to be issued on or after the Effective Date.

66.    "*Other Priority Claim*" means any Claim against any of the Debtors other than an Administrative Claim, a Professional Fee Claim, a Priority Tax Claim or a DIP Facility Claim that is entitled to priority in payment as specified in section 507(a)(3), (4), (5), (6), (7), or (9) of the Bankruptcy Code.

67.    "*Other Secured Claims*" means any Claim (other than the DIP Facility Claims, the BOC Claims or the Riesen Funding Claims) to the extent reflected in the Schedules or a Proof of Claim filed as a secured Claim, which is (i) secured by a Lien on Collateral to the extent of the value of such Collateral, as determined in accordance with section 506(a) of the Bankruptcy Code, or, (ii) in the event that such Claim is subject to setoff under section 553 of the Bankruptcy Code, to the extent of such setoff.

68.    "*Person*" means any individual, corporation, partnership, limited liability company, association, indenture trustee, organization, joint stock company, joint venture, estate, trust, Governmental Unit (as defined in the Bankruptcy Code) or any political subdivision thereof, or any other entity.

69.    "*Petition Date*" means October 18, 2017.

70.    "*Plan*" means this "Debtors' Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code", as it may be amended or modified from time to time in accordance with the terms hereof, together with all addenda, exhibits, schedules or other attachments, if any.

71.    "*Plan Supplement*" means any compilation of documents and forms of documents, agreements, schedules, and exhibits to this Plan, which shall be filed by the Debtors no later than ten (10) calendar days before the Confirmation Hearing, and additional documents filed with the Court prior to the Effective Date as amendments to the Plan Supplement, each of which shall be consistent in all respects with, and shall otherwise contain, the terms and conditions set forth on the exhibits attached hereto, where applicable, and, without limiting the foregoing, shall be satisfactory in form and substance to the Supporting Parties, the DIP Agent, and the Debtors, except to the extent otherwise expressly provided herein. The Plan Supplement

Exhibit A

shall include the following documents, among others: Litigation Rights, Schedules of Assumed Contracts and Leases, Exit Facility Documents, BOC Post- Effective Date Credit Documents, an Intercreditor Agreement between BOC and Exit Facility Agent and Lenders, Reorganized Mac Parent Operating Agreement, and the form of Operating Agreement for each of the Debtors that are subsidiaries of Mac Parent, in a form reasonably acceptable to the Debtors, the Supporting Parties, and the DIP Agent..

72.    "*Priority Tax Claim*" means any unsecured Claim that is entitled to a priority in right of payment under section 507(a)(8) of the Bankruptcy Code.

73.    "*Professional*" means any professional employed in the Chapter 11 Cases pursuant to sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered and expenses incurred during the Chapter 11 Cases pursuant to sections 327, 328, 329, 330, 331, or 363 of the Bankruptcy Code.

74.    "*Professional Fee Claim*" means an Administrative Claim Allowed for reasonable compensation of a Professional or other Person for services rendered or expenses incurred in the Chapter 11 Cases on or prior to the Effective Date (including the reasonable, actual and necessary expenses of the members of the Creditors' Committee incurred as members of the Creditors' Committee in discharge of their duties as such).

75.    "*Pro Rata*" means the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims in that Class, or the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims in that Class and in any other Class entitled to share in the same recovery as such Allowed Claim under this Plan.

76.    "*Proof of Claim*" means a proof of Claim filed against any of the Debtors in the Chapter 11 Cases.

77.    "*Raven*" means Raven Asset-Based Opportunity Fund III, L.P., a Delaware limited liability company.

78.    "*Record Date*" means, for purposes of making distributions under this Plan on account of Allowed Claims, the Confirmation Date or such other date as established by the Bankruptcy Court with respect to publicly traded securities.

79.    "*Released Parties*" means:  (a) each Debtor, (b) the DIP Lenders and the DIP Agent, (c) the Exit Facility Agent and Lenders, (d) BOC, (e) Riesen Funding, and (f) with respect to each of the foregoing entities identified in subsections (a) through (e), such Person's current and former equity holders, including shareholders, partnership interest holders, and limited liability company unit holders, affiliates, partners, subsidiaries, members, officers, directors, managers serving on a board of managers, principals, employees, agents, managed funds, advisors, attorneys, accountants, investment banks, consultants, representatives, and other professionals, but solely in the foregoing capacities, together with their respective predecessors, successors, and assigns.

80.    "*Reorganized Debtor*" means each of the Debtors, or any successors thereto by merger, consolidation, or otherwise, on and after the Effective Date.

Exhibit A

81.    "***Reorganized Mac Parent***" means Mac Parent immediately from and after the Effective Date.

82.    "***Reorganized Mac Parent Operating Agreement***" means the limited liability company operating agreement of Reorganized Mac Parent.

83.    "***Restructuring Support Agreement***" means that certain Restructuring Support Agreement dated as of October 18, 2017, between the Debtors and the Supporting Parties, as the same may be amended or otherwise modified in accordance with its terms, and all exhibits and schedules thereto.

84.    "***Riesen Funding***" means Riesen Funding, LLC, an Arizona limited liability company.

85.    "***Riesen Funding Claims***" means all obligations arising from the $5,000,000 loan made by Riesen Funding to Mac Parent evidenced by that Promissory Note dated as of July 3, 2017, which was guarantied by, and secured by the assets of, Mac Acquisition and Mac Holding.

86.    "***Schedule of Assumed Contracts and Leases***" means the schedule of executory contracts and unexpired leases to be assumed pursuant to this Plan to be filed in connection with the Plan Supplement, which schedule shall be acceptable in form and substance to the DIP Agent and the Supporting Parties.

87.    "***Schedules***" means the schedules of assets and liabilities, statements of financial affairs, lists of holders of Claims and Equity Interests and related exhibits filed with the Court by each of the Debtors, including any amendments or supplements thereto.

88.    "***Subordinated Claims***" means any Claim that is subordinated by Final Order of the Court pursuant to section 510(b) or 510(c) of the Bankruptcy Code.

89.    "***Supporting Parties***" means the parties to the Restructuring Support Agreement.

90.    "***Unimpaired***" means, when used with reference to a Claim or Interest, a Claim or Interest that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

B.    **Interpretation, Application of Definitions, and Rules of Construction.**

Wherever from the context it appears appropriate, each term stated in either the singular or the plural shall include both the singular and plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine, and neuter, such meanings to be applicable to both the singular and plural forms of the terms defined. Capitalized terms in this Plan that are not defined herein shall have the same meanings assigned to such terms by the Bankruptcy Code or Bankruptcy Rules, as the case may be. The words "herein," "hereof," and "hereunder" and other words of similar import refer to this Plan as a whole and not to any particular section or subsection in this Plan unless expressly provided otherwise. The words "includes" and "including" are not limiting and mean that the things specifically identified are set forth for purposes of illustration, clarity or specificity and do not in any respect qualify, characterize or limit the generality of the class within which such things are included, and the

words "includes" or "including" are deemed immediately followed by the phrase "without limitation". Captions and headings to Articles, Sections, and exhibits to this Plan are inserted for convenience of reference only, are not a part of this Plan, and shall not be used to interpret this Plan. The rules of construction set forth in section 102 of the Bankruptcy Code shall apply to this Plan. In computing any period of time prescribed or allowed by this Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

C.    **Reference to Monetary Figures**

All references in this Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided.

D.    **Consent Rights of Supporting Parties**

Notwithstanding anything herein to the contrary, any and all consent rights of the respective parties to the Restructuring Support Agreement set forth in the Restructuring Support Agreement with respect to the form and substance of this Plan and the documents and instruments contained in the Plan Supplement, including any amendments, restatements, supplements, or other modifications to such documents, and any consents, waivers or other deviations under or from such documents, shall be incorporated herein by this reference and fully enforceable as if stated in full herein.

## II.

## CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS

A.    **General Rules of Classification.**

Pursuant to section 1122 of the Bankruptcy Code, set forth below is a designation of the Classes of Claims and Interests. In accordance with section 1123(a)(1) of the Bankruptcy Code, DIP Facility Claims, Administrative Claims, Professional Fee Claims, and Priority Tax Claims, as described below, have not been classified. These Claims are not entitled to vote to accept or reject this Plan. A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes. A Claim or Interest is also placed in a particular Class for the purpose of receiving Distributions pursuant to this Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and such Claim or Interest has not been paid, released or otherwise settled prior to the Effective Date.

As discussed in greater detail in Article VI hereof, this Plan is premised upon the consolidation of the Debtors for purposes of this Plan only and shall not affect the legal and entity structures of the Debtors, subject to the rights of the Debtors to effectuate the restructuring transactions contemplated herein. Accordingly, for purposes of this Plan, the assets and liabilities of each of the Debtors are deemed assets and liabilities of a single, consolidated entity. This consolidation treatment is designed to consensually pool the assets and liabilities of the Debtors solely to implement the settlements and compromises reached by the primary constituencies in the Chapter 11 Cases.

Exhibit A

B.    **Classification of Claims and Interests**.

      The following table designates the Classes of Claims against and Interests in the Debtors and specifies which of those Classes are (i) Impaired or Unimpaired under this Plan, (ii) entitled to vote to accept or reject this Plan, and (iii) deemed to either accept or reject this Plan.  A Claim or Interest is designated in a particular Class only to the extent it falls within the description of that Class, and is classified in any other Class to the extent (if any) that a portion of such Claim or Interest falls within the description of such other Class.

| Class | Designation | Status | Entitled to Vote |
|-------|-------------|--------|------------------|
| 1 | Other Priority Claims | Unimpaired | No (deemed to accept) |
| 2 | Other Secured Claims | Unimpaired | No (deemed to accept) |
| 3 | BOC Claims | Impaired | Yes |
| 4 | Riesen Funding Claims | Impaired | Yes |
| 5 | General Unsecured Claims | Impaired | Yes |
| 6 | Intercompany Claims | Unimpaired | No (deemed to accept) |
| 7 | Subordinated Claims | Impaired | No (deemed to reject) |
| 8 | Existing Equity Interests | Impaired | No (deemed to reject) |
| 9 | Intercompany Interests | Unimpaired | No (deemed to accept) |

**III.**

**TREATMENT OF ADMINISTRATIVE CLAIMS, PROFESSIONAL FEE CLAIMS, PRIORITY TAX CLAIMS, DIP FACILITY CLAIMS AND STATUTORY FEES**

A.    **Administrative Claims**.

      Except to the extent a holder of an Allowed Administrative Claim already has been paid during the Chapter 11 Cases or such holder agrees to less favorable treatment with respect to such holder's Claim, each holder of an Allowed Administrative Claim shall receive, in full satisfaction, settlement, release, and discharge of, and in exchange for, its Administrative Claim, Cash equal to the unpaid portion of its Allowed Administrative Claim, to be paid on the latest of:   (a) the Effective Date, or as soon as reasonably practicable thereafter, if such Administrative Claim is Allowed as of the Effective Date; (b) the date such Administrative Claim is Allowed, or as soon as reasonably practicable thereafter; (c) the date such Allowed Administrative Claim becomes due and payable, or as soon as reasonably practicable thereafter; and (d) such other date as may be agreed upon between the holder of such Allowed Administrative Claim and the Debtors or the Reorganized Debtors, as the case may be.

B.    **Administrative Claims Bar Date**.

      Unless a prior date has been established pursuant to the Bankruptcy Code, the Bankruptcy Rules or a prior order of the Court, the Confirmation Order will establish a bar date

Exhibit A

for filing notices, requests, Proofs of Claim, applications or motions for allowance of Administrative Claims (other than Professional Fee Claims, DIP Facility Claims, and Claims by any trade creditor of the Debtors whose Claim is on account of ordinary course of business goods or services provided to the Debtors during the course of these Chapter 11 Cases), which date shall be the Administrative Claims Bar Date.  All other holders of Administrative Claims not paid prior to the Confirmation Date must file with the Court and serve upon the Debtors or Reorganized Debtors, as applicable, a motion requesting payment of such Administrative Claim on or before the Administrative Claims Bar Date or forever be barred from doing so.  The notice of entry of the Confirmation Order to be delivered pursuant to Bankruptcy Rules 3020(c) and 2002(f) will set forth the Administrative Claims Bar Date and constitute good and sufficient notice of the Administrative Claims Bar Date.

### C.  Professional Fee Claims.

All requests for compensation or reimbursement of Professional Fee Claims pursuant to sections 327, 328, 330, 331, 363, 503 or 1103 of the Bankruptcy Code for services rendered prior to the Effective Date shall be filed and served on the Reorganized Debtors, counsel to the Reorganized Debtors, the United States Trustee, counsel to each of the Supporting Parties, counsel to the Creditors' Committee, and such other entities who are designated by the Bankruptcy Rules, the Confirmation Order or other order of the Court, no later than thirty (30) days after the Effective Date.  Holders of Professional Fee Claims that are required to file and serve applications for final allowance of their Professional Fee Claims and that do not file and serve such applications by the required deadline shall be forever barred from asserting such Claims against the Debtors, the Reorganized Debtors or their respective properties, and such Professional Fee Claims shall be deemed discharged as of the Effective Date.  Objections to any Professional Fee Claims must be filed and served no later than fifty (50) days following the Effective Date.  Objections must be served on the Reorganized Debtors, counsel for the Reorganized Debtors, counsel to each of the Supporting Parties, counsel to the Creditors' Committee and the holders of Professional Fee Claims requesting payment.

### D.  Priority Tax Claims.

Except to the extent a holder of an Allowed Priority Tax Claim agrees to a different treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each such holder shall be paid, at the option of the Debtors, with the approval of the Supporting Parties and the DIP Agent, (i) in the ordinary course of the Debtors' business, consistent with past practice; provided, however, that in the event the balance of any such Claim becomes due during the pendency of the Bankruptcy Cases and remains unpaid as of the Effective Date, the holder of such Claim shall be paid in full in Cash on the Effective Date, or (ii) in installment payments over a period of time not to exceed five years after the Petition Date, pursuant to section 1129(a)(9)(C) of the Bankruptcy Code.

### E.  DIP Facility Claims.

Upon the Effective Date, the DIP Facility Claims shall be deemed to be Allowed Claims.  The DIP Facility Claims shall be paid in full in Cash by the Debtors on the Effective Date and all commitments under the DIP Facility shall terminate; provided, however, subject to

Exhibit A

the satisfaction of the terms and conditions of the Exit Facility Term Sheet, the DIP Facility Claims may be indefeasibly satisfied by an an in-kind exchange on a dollar-for-dollar basis for obligations of the Reorganized Debtors (and their non-debtor affiliates and guarantors) under the Exit Facility; provided, however, subject to the terms and conditions of, and to the review provisions set forth in, the Interim DIP Order or Final DIP Order, any and all DIP Facility Claims constituting fees and expenses under the DIP Facility shall not be satisfied by the in-kind exchange and shall rather be deemed to be Allowed Claims and indefeasibly paid in full in Cash on the Effective Date.  The Debtors' contingent or unliquidated obligations under the DIP Facility, to the extent not indefeasibly paid in full in Cash on the Effective Date or otherwise satisfied by the Debtors in a manner acceptable to the DIP Facility Agent, any affected DIP Facility Lender, or any holder of a DIP Facility Claim, as applicable, shall survive the Effective Date and shall not be released or discharged pursuant to this Plan or the Confirmation Order, notwithstanding any provision hereof or thereof to the contrary.

F.    **Payment of Statutory Fees.**

All fees payable on or before the Effective Date pursuant to section 1930 of title 28 of the United States Code shall be paid by the Debtors on or before the Effective Date and all such fees payable after the Effective Date shall be paid by the applicable Reorganized Debtor.

**IV.**

**TREATMENT OF CLASSIFIED CLAIMS AND
EQUITY INTERESTS**

A.    **Class 1 – Other Priority Claims.**

1.    **Classification.**  Class 1 consists of all Other Priority Claims.

2.    **Treatment.**   Except to the extent that a holder of an Allowed Other Priority Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Other Priority Claim, each such holder shall be paid, to the extent such Claim has not already been paid during the Chapter 11 Cases, in full in Cash in the ordinary course of business by the Debtors or the Reorganized Debtors, as applicable, on or as soon as reasonably practicable after the latest of (i) the Effective Date, (ii) the date on which such Other Priority Claim against the Debtor becomes Allowed, or (iii) such other date as may be ordered by the Court.

3.    **Impairment and Voting.**  Class 1 is Unimpaired under this Plan.  Holders of Other Priority Claims in Class 1 are conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject this Plan.

B.    **Class 2 – Other Secured Claims.**

1.    **Classification.**  Class 2 consists of all Other Secured Claims.

Exhibit A

2.    **Treatment.**  Except to the extent that a holder of an Allowed Other Secured Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Other Secured Claim, each such holder shall be reinstated, or, at the option of the Debtors or the Reorganized Debtors with the consent of the  Supporting Parties and the DIP Agent, each holder of an Allowed Other Secured Claim shall receive, either (i) Cash in the full amount of such Allowed Other Secured Claim, including any postpetition interest Allowed pursuant to section 506(b) of the Bankruptcy Code, (ii) the net proceeds of the sale or disposition of the collateral securing such Allowed Other Secured Claim to the extent of the value of the holder's secured interest in such collateral, (iii) the collateral securing such Allowed Other Secured Claim, or (iv) such other Distribution as necessary to satisfy the requirements of section 1129 of the Bankruptcy Code on account of such Allowed Other Secured Claim.

3.    **Impairment and Voting.**  Class 2 is Unimpaired under this Plan.  Holders of Other Secured Claims in Class 2 are conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject this Plan.

C.    **Class 3 – BOC Claims.**

1.    **Classification.**  Class 3 consists of all BOC Claims.

2.    **Allowance.**  On the Effective Date, the BOC Claims shall be Allowed in full without set-off, defense or counterclaim in the aggregate principal amount of not less than 13,933,024 plus (i) all unreimbursed obligations on account of issued letters of credit and (ii) all outstanding fees, accrued and unpaid pre- and post-petition interest, expenses and contingent reimbursement obligations, in each case, pursuant to and as provided in the BOC Credit Documents.

3.    **Treatment.**  On the Effective Date except to the extent that BOC agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for the BOC Claims, each holder of a BOC Claim shall receive its Pro Rata share of:

a.    on the Effective Date payment of $3,500,000 in cash;

b.    payment of $41,666.67 each month for twenty-four (24) months from and after the Effective Date to be applied to the reduction of the principal portion of the Allowed BOC Claims;

c.    payment of interest only at the rate of 5.00% per annum on the remaining balance owing to BOC on account of the Allowed BOC Claims after receipt of the payments pursuant to (a) and (b), above, each month for twenty-four (24) months from and after the Effective Date;

d.    payment of the remaining portion of the Allowed BOC Claims representing principal and any other unpaid interest, fees and charges relating thereto that are part of the Allowed BOC Claims in full in Cash  on the first day of the twenty-fourth month after the Effective Date;

Exhibit A

e.      payment of the fees and expenses provided for in Article X.B.6;

f.      the reinstatement of any letters of credit that remain issued and outstanding as of the Effective Date on the same terms as the BOC Credit Documents or such other terms agreed to by BOC and the Debtors;

g.      the Liens granted under the BOC Credit Documents shall remain in place to secure payment of the foregoing items (a) through (f) and shall automatically terminate upon the indefeasible payment of all such obligations.

The payments and treatment of the BOC Claims set forth above shall be subject to terms and conditions set forth in BOC Post-Effective Date Documents the form of which shall be reasonably acceptable to the Debtors, BOC, and Raven and included in the Plan Supplement.

4.      **Impairment and Voting.**  Class 3 is Impaired.  Holders of the BOC Claims are entitled to vote to accept or reject this Plan.

D.      <u>**Class 4 – Riesen Funding Claim.**</u>

1.      **Classification.**  Class 4 consists of the Riesen Funding Claim.

2.      **Treatment.**  On the Effective Date, or as soon thereafter as reasonably practicable, in full and final satisfaction, settlement, release, and discharge of and in exchange for such Claim, each holder of a Riesen Funding Claim shall receive a Pro Rata share of the Equity Interests in the Reorganized Mac Parent.  The New Equity Interests will be subject to dilution if the warrants to acquire 5% of the Equity Interests in Reorganized Mac Parent granted under the Exit Facility are exercised.

3.      **Impairment and Voting.**  Class 4 is Impaired under this Plan.  Holders of the Riesen Funding Claim in Class 4 are entitled to vote to accept or reject this Plan.

E.      <u>**Class 5 – General Unsecured Claims.**</u>

1.      **Classification.**  Class 5 consists of all General Unsecured Claims.

2.      **Treatment.**  On the Effective Date, or as soon thereafter as reasonably practicable, except to the extent that a holder of an Allowed General Unsecured Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for such Claim, each holder of an Allowed General Unsecured Claim shall receive:

a.      If Class 5 votes in favor of this Plan, its Pro Rata share of the General Unsecured Claim Cash Pool; or

b.      If Class 5 rejects this Plan, no distribution on account of its Allowed General Unsecured Claim.

3.      **Impairment and Voting.**  Class 5 is Impaired under this Plan.  Holders of General Unsecured Claims in Class 5 are entitled to vote to accept or reject this Plan.

Exhibit A

F.    **Class 6 – Intercompany Claims**.

    1.    **Classification.**  Class 6 consists of all Intercompany Claims.

    2.    **Treatment.**  Intercompany Claims shall be reinstated, cancelled or compromised as determined by the Debtors.

    3.    **Impairment and Voting.**  Class 6 Claims are Unimpaired under this Plan. Holders of Intercompany Claims are conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject this Plan.

G.    **Class 7 – Subordinated Claims**.

    1.    **Classification.**  Class 7 consists of all Subordinated Claims.

    2.    **Treatment.**  The holders of Subordinated Claims, if any, shall neither receive Distributions nor retain any property under this Plan for or on account of such Subordinated Claims.

    3.    **Impairment and Voting.**  Class 7 is Impaired under this Plan.  Holders of Subordinated Claims are deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject this Plan.

H.    **Class 8 – Existing Equity Interests**.

    1.    **Classification.**  Class 8 consists of all Existing Equity Interests in Mac Parent.

    2.    **Treatment.**  Existing Equity Interests shall be discharged, cancelled, released, and extinguished as of the Effective Date and holders of Existing Equity Interests shall neither receive any Distributions nor retain any property under this Plan for or on account of such Equity Interests.

    3.    **Impairment and Voting.**  Class 8 is Impaired under this Plan.  Holders of Existing Equity Interests are deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject this Plan.

I.    **Class 9 – Intercompany Interests**.

    1.    **Classification.**  Class 9 consists of all Intercompany Interests.

    2.    **Treatment.**  Intercompany Interests shall be cancelled or reinstated, as determined by the Debtors.

    3.    **Impairment and Voting.**  Class 9 is Unimpaired under this Plan.  Holders of Intercompany Interests are conclusively presumed to have accepted this Plan pursuant to

section 1126(f) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject this Plan.

**J.      Special Provision Governing Claims.**

Except as otherwise provided in this Plan, nothing under this Plan shall affect the Debtors' or the Reorganized Debtors' rights in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Claims.

**K.      Elimination of Vacant Classes.**

Any Class of Claims or Interests that does not have a holder of an Allowed Claim or Allowed Interest or Claim or Interest temporarily Allowed by the Court as of the date of the Confirmation Hearing shall be deemed eliminated from this Plan for purposes of voting to accept or reject this Plan and for purposes of determining acceptance or rejection of this Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

**L.      Acceptance or Rejection of this Plan.**

1.      **Presumed Acceptance.**   Claims in Classes 1, 2, and 6, and Interests in Class 9 are Unimpaired under the Plan.   The holders of such Claims and Interests are conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code and are not entitled to vote to accept or reject this Plan.

2.      **Voting Classes.**   Claims in Classes 3, 4, and 5 are Impaired under this Plan and the holders of such Claims are entitled to vote to accept or reject this Plan.  If holders of Claims in a particular Impaired Class of Claims are given the opportunity to vote to accept or reject the Plan, but no holders of Claims in such Impaired Class of Claims vote to accept or reject this Plan, then such Class of Claims shall be deemed to have accepted this Plan.

3.      **Deemed Rejection of Plan.**   Subordinated Claims in Class 7 and Equity Interests in Class 8 are Impaired, and holders of such Claims and Equity Interests shall receive no Distributions.  The holders in such Classes are deemed to have rejected this Plan pursuant to section 1126(f) of the Bankruptcy Code and are not entitled to vote to accept or reject this Plan.

**M.      Nonconsensual Confirmation.**

If less than all Impaired Classes accept this Plan, but at least one (1) Class of Claims Impaired under this Plan has accepted this Plan (and which Class's acceptance is determined without inclusion of Claims of Insiders (as defined in the Bankruptcy Code)), the Debtors will seek to have the Court confirm this Plan under section 1129(b) of the Bankruptcy Code.

**N.      Subordinated Claims.**

The allowance, classification, and treatment of all Allowed Claims and Interests and the respective Distributions and treatments under this Plan take into account and conform to

the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, sections 510(a) or 510(b) of the Bankruptcy Code or otherwise.

V.

**PROVISIONS REGARDING ENTITY GOVERNANCE OF<br>THE REORGANIZED DEBTORS**

A. <u>**Cancellation of Existing Equity Interests**</u>.

On the Effective Date, all Existing Equity Interests shall be cancelled in accordance with this Plan.

B. <u>**Directors and Officers of the Reorganized Debtors**</u>.

On the Effective Date, the term of each member of the current boards of directors or manager of the Debtors shall expire, and the board or manager of each of the Reorganized Debtors, as well as the officers of each of the Reorganized Debtors, shall consist of those individuals that will be identified in the Plan Supplement. Following the Effective Date, the appointment and removal of the members of the board or manager of each of the Reorganized Debtors shall be governed by the terms of each Reorganized Debtor's respective entity governance documents. Raven shall be granted the observation rights set forth in the Exit Facility Documents from and after the Effective Date.

C. <u>**Powers of Officers**</u>.

The officers of the Debtors or the Reorganized Debtors, as applicable, shall have the power to (i) enter into, execute or deliver any documents or agreements that may be necessary and appropriate to implement and effectuate the terms of this Plan, and (ii) take any and all other actions that may be necessary and appropriate to effectuate the terms of this Plan, including the making of appropriate filings, applications or recordings, <u>provided</u> that such documents and agreements are in form and substance acceptable to the DIP Agent and the terms of the Exit Facility.

VI.

**SUBSTANTIVE CONSOLIDATION OF THE DEBTORS**

Solely for purposes of voting on, confirmation of, and Distributions to be made to holders of Allowed Claims under this Plan, this Plan is predicated upon, and it is a condition precedent to confirmation of this Plan, that the Court provide in the Confirmation Order for the limited consolidation of the Estates of the Debtors into a single Estate for purposes of this Plan, the confirmation hereof and Distributions hereunder.

Pursuant to the Confirmation Order (i) all assets and liabilities of the consolidated Debtors will be deemed to be merged solely for purposes of Distributions to be made hereunder,

Exhibit A

(ii) the obligations of each Debtor will be deemed to be the obligation of the consolidated Debtors solely for purposes of Distributions hereunder, (iii) any Claims filed or to be filed in connection with any such obligations will be deemed Claims against the consolidated Debtors, (iv) each Claim filed in the Chapter 11 Case of any Debtor will be deemed filed against the Debtors in the consolidated Chapter 11 Cases in accordance with the limited consolidation of the assets and liabilities of the Debtors, (v) all transfers, disbursements and Distributions made by any Debtor hereunder will be deemed to be made by the consolidated Debtors, and (vi) all guarantees of the Debtors of the obligations of any other Debtors shall be deemed eliminated so that any Claim against any Debtor and any guarantee thereof executed by any other Debtor and any joint or several liability of any of the Debtors shall be deemed to be one obligation of the consolidated Debtors. Holders of Allowed Claims in each Class shall be entitled to their share of assets available for Distribution to such Class without regard to which Debtor was originally liable for such Claim. Intercompany Claims shall be treated as provided in Class 6 of this Plan and Intercompany Interests shall be treated as provided in Class 9 of this Plan.

Notwithstanding the foregoing, such limited consolidation shall not affect (a) any aspects, rights, benefits, privileges, liens, security interests or claims under the BOC Post-Effective Date Documents, DIP Facility or Exit Facility or the legal and entity structure of the Reorganized Debtors, (b) any obligations under any contracts, licenses, or leases that were entered into during the Chapter 11 Cases or executory contracts or unexpired leases that have been or will be assumed pursuant to this Plan, (c) distributions from any insurance policies or proceeds of such policies, (d) the revesting of assets in the separate Reorganized Debtors pursuant to Article IX.B of this Plan, or (e) guarantees that are required to be maintained post-Effective Date (i) in connection with executory contracts or unexpired leases that were entered into during the Chapter 11 Cases or that have been, or will hereunder be, assumed, (ii) pursuant to the express terms of this Plan, (iii) in connection with the Exit Facility or (iv) the BOC Non-Debtor Guarantees. The limited consolidation proposed herein shall not affect each Debtor's obligation to file the necessary operating reports and pay any required fees pursuant to 28 U.S.C. § 1930(a)(6), which obligation shall continue until a Final Order is entered closing, dismissing or converting each such Debtor's Chapter 11 Case.

## VII.

## PROVISIONS REGARDING MEANS OF IMPLEMENTATION, DISTRIBUTIONS, AND RESOLUTION OF DISPUTED CLAIMS

### A.    <u>General Settlement of Claims</u>.

As discussed further in the Disclosure Statement and as otherwise provided herein, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under this Plan, upon the Effective Date, the provisions of this Plan shall constitute a good faith compromise and settlement of all Claims, Interests and controversies resolved pursuant to this Plan. Distributions made to holders of Allowed Claims in any Class are intended to be final.

Exhibit A

B.      **Exit Financing**.

On the Effective Date, the Exit Facility Documents shall be executed and delivered by the Reorganized Debtors and Exit Facility Agent and Lenders.  Confirmation of this Plan shall be deemed to constitute approval of the Exit Facility, and the Exit Facility Documents, and, subject to the occurrence of the Effective Date, authorization for the Reorganized Debtors to enter into and perform their obligations in connection with the Exit Facility without the need for any further action.

On the Effective Date, the Exit Facility Documents shall constitute legal, valid, binding, and authorized obligations of the Reorganized Debtors and the non-Debtor parties to the Exit Facility Documents, enforceable in accordance with their terms.   The financial accommodations to be extended pursuant to the Exit Facility Documents are being extended, and shall be deemed to have been extended, in good faith, for legitimate business purposes, are reasonable, shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever, and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any other applicable non-bankruptcy law.  On the Effective Date, all of the Liens and security interests to be granted in accordance with the Exit Facility Documents (1) shall be legal, binding, and enforceable Liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the Exit Facility Documents, (2) shall be deemed automatically perfected on the Effective Date, subject only to such Liens and security interests as may be permitted under the Exit Facility Documents which include without limitation BOC's security interests in the Debtors' and Reorganized Debtors' assets and in accordance with an Intercreditor Agreement to be executed and delivered as part of the Plan Supplement and (3) shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any applicable non-bankruptcy law. The Reorganized Debtors and the entities granted such Liens and security interests are authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, provincial, federal, or other law (whether domestic or foreign) that would be applicable in the absence of this Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order, and any such filings, recordings, approvals, and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

C.      **Issuance of New Equity Interests**.

The issuance of New Equity Interests by Reorganized Mac Parent is authorized without the need for any further entity action or without any further action by a holder of Claims or Interests.  On the Effective Date (or as soon as reasonably practicable thereafter), the New Equity Interests shall be issued, subject to the provisions of this Plan, Pro Rata to the holders of the Riesen Funding Claims.  The New Equity Interests will be subject to dilution by any equity in Reorganized Mac Parent issued pursuant to the Exit Facility Documents.

Exhibit A

All of the New Equity Interests issued pursuant to this Plan shall be duly authorized and validly issued. Each Distribution and issuance referred to in this Article VII shall be governed by the terms and conditions set forth herein applicable to such Distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such Distribution or issuance, including the Reorganized Mac Parent Operating Agreement, which terms and conditions shall bind each Person receiving such Distribution or issuance. Upon the Effective Date, the Reorganized Mac Parent Operating Agreement shall be deemed to become valid, binding and enforceable in accordance with its terms, and each holder of New Equity Interests shall be bound thereby, in each case, without need for execution by any party thereto other than Reorganized Mac Parent.

**D.    Avoidance Actions.**

On the Effective Date, the Reorganized Debtors shall retain the exclusive right to commence, prosecute, or settle all Causes of Action, including Avoidance Actions, as appropriate in accordance with the best interests of the Reorganized Debtors subject to the releases and exculpations contained in this Plan, the Interim DIP Order, the Final DIP Order, and the DIP Credit Agreement.

**E.    Restructuring Transactions.**

On the Effective Date or as soon as reasonably practicable thereafter, the Reorganized Debtors (to the extent permitted under the Exit Facility) may modify their entity structure by eliminating certain entities and may take all actions as may be necessary or appropriate to effect such transactions, including any transaction described in, approved by, contemplated by, or necessary to effectuate this Plan, including: (i) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution or liquidation containing terms that are consistent with the terms of this Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable entities may agree; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption or delegation of any asset, property, right, liability, debt or obligation on terms consistent with the terms of this Plan and having other terms to which the applicable parties may agree; (iii) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion (including related formation) or dissolution pursuant to applicable state law; and (iv) all other actions that the applicable entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law.

**F.    Approval and Authorization of Corporate and Company Action.**

Upon the Effective Date, all corporate and limited liability company actions contemplated by this Plan shall be deemed authorized and approved in all respects, including (i) the transactions contemplated by Article VII.C and E hereof, (ii) the adoption and filing of appropriate certificates or articles of incorporation, formation, association, reincorporation, merger, consolidation, conversion or dissolution, and memoranda and amendments thereto, pursuant to applicable law, (iii) the initial selection of managers, directors and officers for the Reorganized Debtors, (iv) the Distributions pursuant to this Plan, (v) the execution and entry into

Exhibit A

the Exit Facility, and (vi) all other actions contemplated by this Plan (whether to occur before, on, or after the Effective Date), in each case unless otherwise provided in this Plan.  All matters provided for under this Plan involving the entity structure of the Debtors and Reorganized Debtors or corporate and company action to be taken by or required of a Debtor or a Reorganized Debtor will be deemed to occur and be effective as of the Effective Date, if no such other date is specified in such documents, and shall be authorized, approved, adopted and, to the extent taken prior to the Effective Date, ratified and confirmed in all respects and for all purposes without any requirement of further action by holders of Claims or Interests, directors of the Debtors or the Reorganized Debtors, as applicable, or any other Person, except to effect the filing of any new entity governance documents respecting the Debtors, as necessary.

### G.    Effectuating Documents; Further Transactions.

On and after the Effective Date, the Reorganized Debtors, their managers, and the officers and directors of the boards of directors thereof, are authorized to and may issue, execute, deliver, file or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of this Plan and the securities issued pursuant to this Plan in the name of and on behalf of the Reorganized Debtors, without need for any approvals, authorization, or consents except for those expressly required pursuant to this Plan and applicable non-bankruptcy law.

### H.    Reorganized Mac Parent Operating Agreement

Pursuant to section 1123(a)(6) of the Bankruptcy Code, the Reorganized Mac Parent Operating Agreement will prohibit the issuance of non-voting equity securities.  After the Effective Date, Reorganized Mac Parent may amend and restate the Reorganized Mac Parent Operating Agreement and Reorganized Mac Parent By-Laws as permitted by the laws of Delaware, and any related governance documents.  The Reorganized Mac Parent Operating Agreement and Reorganized Mac Parent By-Laws shall be substantially in the form set forth in the Plan Supplement.

### I.    Cancellation of Securities and Agreements.

On the Effective Date, except as otherwise specifically provided for in this Plan, including as provided for in Articles III.C.3, IV.C., and IX.L hereof: (1) the obligations of the Debtors under their prepetition credit agreements and loan documents, and any other certificate, share, note, bond, indenture, purchase right, option, warrant, or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors giving rise to any Claim or Equity Interest (except such certificates, notes, or other instruments or documents evidencing indebtedness or obligations of the Debtors that are specifically reinstated pursuant to this Plan), shall be cancelled solely as to the Debtors, and the Reorganized Debtors shall not have any continuing obligations thereunder; and (2) the obligations of the Debtors pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the membership interests, certificates, notes, bonds, indentures, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or

23

obligation of the Debtors (except such agreements, certificates, notes, or other instruments evidencing indebtedness or obligations of the Debtors that are specifically reinstated pursuant to this Plan) shall be released and discharged; provided, however, notwithstanding confirmation of this Plan or the occurrence of the Effective Date, any agreement that governs the rights of the holder of a Claim shall continue in effect solely for purposes of allowing holders to receive Distributions under this Plan as provided herein.

**J.**       **Distributions in Respect of Allowed Claims.**

        1.       **Record Date for Distributions.**   As of the close of business on the Record Date, the various transfer registers for each of the Classes of Claims or Equity Interests as maintained by the Debtors or their respective agents shall be deemed closed, and there shall be no further changes made to reflect any new record holders of any Claims or Equity Interests occurring on or after the Record Date. The Debtors and the Reorganized Debtors shall have no obligation to recognize any transfer of any Claims or Equity Interests occurring after the Record Date.

        2.       **Date of Distributions.** Except as otherwise provided herein, Distributions and deliveries under this Plan with respect to Allowed Claims shall be made before the close of business on or as soon as reasonably practicable after the Effective Date. In the event that any payment or act under this Plan is required to be made or performed on a date that is not a Business Day, the making of such payment or the performance of such act may be completed on or as soon as reasonably practicable after the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

        3.       **Disbursing Agent.** Except as otherwise provided herein, all Distributions under this Plan shall be made by the Reorganized Debtors as Disbursing Agent or such other Entity (as defined in section 101(15) of the Bankruptcy Code) designated by the Reorganized Debtors to assist the Disbursing Agent on the Effective Date. If the Disbursing Agent is an independent third party designated by the Reorganized Debtors to serve in such capacity, such Disbursing Agent shall receive, without further Court approval, reasonable compensation for distribution services rendered pursuant to this Plan and reimbursement of reasonable out-of-pocket expenses incurred in connection with such services from the Reorganized Debtors on terms acceptable to the Reorganized Debtors. No Disbursing Agent shall be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Court. If otherwise so ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Reorganized Debtors.

        4.       **Powers of Disbursing Agent.** The Disbursing Agent shall be empowered to (i) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties hereunder, (ii) make all Distributions contemplated hereby, and (iii) exercise such other powers as may be vested in the Disbursing Agent by Final Order of the Court or pursuant to this Plan.

Exhibit A

5.      **Delivery of Distributions**.

Except as otherwise provided herein, the Disbursing Agent shall make Distributions to holders of Allowed Claims at the address for each holder indicated on the Debtors' records as of the date of any such Distribution unless such addresses are superseded by Proofs of Claim or transfers of Claim filed pursuant to Bankruptcy Rule 3001 by the Record Date.  If any Distribution to a holder of a Claim is returned as undeliverable, no further Distributions shall be made unless and until the Disbursing Agent is notified of the then-current address of such holder of the Claim, at which time all missed distributions shall be made to such holder of the Claim without interest.  Amounts in respect of undeliverable distributions shall be returned to the Reorganized Debtors until such Distributions are claimed.  The Reorganized Debtors shall make reasonable efforts to locate holders of undeliverable Distributions.

Except as otherwise provided herein, all Distributions to holders of DIP Facility Claims shall be governed by the DIP Credit Agreement.

6.      **Distribution of Cash.**  Any payment of Cash by the Reorganized Debtors pursuant to this Plan shall be made at the option and in the sole discretion of the Reorganized Debtors by (i) a check drawn on, or (ii) wire transfer from, a U.S. domestic bank selected by the Reorganized Debtors; provided that, any Cash paid to Raven or BOC shall be made by wire transfer.

7.      **Unclaimed Distributions**.  Any Distribution under this Plan that is unclaimed six (6) months after the Disbursing Agent has delivered (or has attempted to deliver) such Distribution shall become the property of the Reorganized Debtor against which such Claim was Allowed notwithstanding any federal or state escheat, abandoned or unclaimed property laws to the contrary, and the entitlement by the holder of such unclaimed Allowed Claim to such Distribution or any subsequent Distribution on account of such Allowed Claim shall be discharged and forever barred.

8.      **De Minimis Distributions.**

The Debtors or the Reorganized Debtors, as the case may be, shall not be required to, but may in their discretion, make distributions to any holder of a Claim of Cash in an amount less than twenty-five dollars ($25).  In addition, the Debtors and the Reorganized Debtors shall not be required to, but may in their discretion, make any payment on account of any Claim in the event that the costs of making such payment exceeds the amount of such payment.

9.      **Interest on Claims**.  Except as expressly provided for in this Plan, the Confirmation Order or any contract, instrument, release, settlement or other agreement entered into in connection with this Plan, or as required by applicable bankruptcy law, including sections 511 and 1129(a)(9)(C)-(D) of the Bankruptcy Code, post-Petition Date interest shall not be treated as accruing in respect of any Claim for purposes of determining the allowance of, and Distribution for or on account of, such Claim.

10.     **Withholding and Reporting Requirements**.  In connection with this Plan and all instruments issued in connection therewith, the Disbursing Agent shall comply with all applicable withholding and reporting requirements imposed by any federal, state or local

Exhibit A

taxing authority, and all Distributions under this Plan shall be subject to any such withholding or reporting requirements.  Any holder of an Allowed Claim shall provide the Disbursing Agent with information and forms required to satisfy its obligations under this subsection, as determined within the reasonable discretion of the Disbursing Agent ("***Required Tax Forms***"); and holder of an Allowed Claim that fails to provide the Disbursing Agent with Required Tax Forms within forty-five (45) days (or any longer period consented to by the Disbursing Agent in writing) after a written request from the Disbursing Agent for Required Tax Forms shall have all Distributions on account of such Allowed Claims deemed an Unclaimed Distribution as of the expiration of such period and shall have its Allowed Claim treated in accordance with Article VII.J.7 of the Plan.

11.     **Setoffs.**  Except as otherwise expressly provided in this Plan (including, without limitation, subject to the releases and exculpations contained in this Plan, the Interim DIP Order, the Final DIP Order, and the DIP Credit Agreement), the Debtors and the Reorganized Debtors, as applicable, may, but shall not be required to, set off against any Claim (for purposes of determining the Allowed amount of such Claim on which Distribution shall be made), any claims of any nature whatsoever that the Debtors or the Reorganized Debtors may have against the holder of such Claim, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors or the Reorganized Debtors of any such claim the Debtors or the Reorganized Debtors may have against the holder of such Claim.  Nothing in this Plan shall be deemed to expand rights to setoff under applicable non-bankruptcy law.

12.     **Allocation of Consideration**.  To the extent that any Allowed Claim entitled to a Distribution under this Plan is comprised of indebtedness and, accrued but unpaid interest thereon, the consideration distributed to the holder of such Allowed Claim shall be treated as first satisfying the principal amount of such Claim (as determined for federal income tax purposes), and any remaining consideration shall be treated as satisfying accrued but unpaid interest.

## K.     **Resolution of Disputed Claims.**

1.     **Objections to Claims.**  From and after the Effective Date, the Reorganized Debtors shall have the right to object to any and all Claims that have not been previously Allowed.  Any objections to Claims shall be filed and served on or before the later of (i) one hundred and eighty (180) days after the Effective Date, and (ii) such later date as may be fixed by the Court upon a motion by the Reorganized Debtors without notice to any party or a hearing, which later date may be fixed before or after the date specified in clause (i) above.  No objection shall be required with respect to a Proof of Claim filed after the applicable Bar Date, and any and all such Claims shall be deemed disallowed unless otherwise ordered by the Court after notice and a hearing.  Objections to Professional Fee Claims shall be filed and served in accordance with Article III.B.

2.     **Settlement of Claims.**  Notwithstanding the requirements that may be imposed pursuant to Bankruptcy Rule 9019, from and after the Effective Date, the Reorganized Debtors shall have the authority to settle or compromise any claim or objections or proceedings relating to the allowance of Claims as and to the extent deemed prudent and reasonable without

Exhibit A

further review or approval of the Court and without the need to file a formal objection. Nothing in this Article VII.K shall be deemed to affect or modify the applicable Bar Dates previously established in the Chapter 11 Cases.

       3.    **No Distributions Pending Allowance.** Notwithstanding any other provision hereof, if any portion of a Claim is a Disputed Claim, no payment or Distribution provided hereunder shall be made on account of the disputed portion of such Claim until the disputed portion of such Claim becomes an Allowed Claim.

       4.    **General Unsecured Claim Cash Pool.** If Class 5 votes to accept the Plan, on the Effective Date or as soon as practicable thereafter, the Reorganized Debtors shall establish the General Unsecured Claim Cash Pool. Cash held in the General Unsecured Claim Cash Pool shall be held by the Reorganized Debtors in trust for the benefit of holders of Allowed General Unsecured Claims. Cash held in the General Unsecured Claim Cash Pool shall not constitute property of the Reorganized Debtors. Each holder of a Disputed General Unsecured Claim that becomes an Allowed General Unsecured Claim shall have recourse only to the undistributed Cash in the General Unsecured Claim Cash Pool for satisfaction of such Allowed General Unsecured Claim and not to any Reorganized Debtor.

       5.    **Distributions after Allowance.** In the event that a Disputed Claim becomes an Allowed Claim, the Disbursing Agent shall distribute to the holder of such Claim such holder's Pro Rata portion of the property distributable with respect to the Class in which such Claim is classified herein. To the extent that all or a portion of a Disputed Claim is disallowed, the holder of such Claim shall not receive any Distributions on account of the portion of such Claim that is disallowed and any property withheld pending the resolution of such Claim shall be reallocated Pro Rata to the holders of Allowed Claims in the same Class. Nothing set forth herein is intended to, nor shall it, prohibit the Reorganized Debtors, in their sole discretion, from making a Distribution on account of any Claim at any time after such Claim becomes an Allowed Claim. Notwithstanding anything to the contrary in this Plan, no distributions shall be made from the General Unsecured Claim Cash Pool until all Disputed General Unsecured Claims are resolved and either become Allowed or disallowed by Final Order or estimated by Final Order for purposes of distribution.

       6.    **Interest on Disputed Claims.** Unless otherwise specifically provided for in this Plan or as otherwise required by sections 506(b), 511 or 1129(a)(9)(C)-(D) of the Bankruptcy Code, interest shall not accrue or be paid on any Disputed Claim in respect of the period from the Effective Date to the date a final Distribution is made when and if such Disputed Claim becomes and Allowed Claim.

       7.    **Estimation of Claims.** The Debtors or the Reorganized Debtors may at any time request that the Court estimate any Disputed Claim pursuant to section 502(c) of the Bankruptcy Code or other applicable law regardless of whether the Debtors or the Reorganized Debtors have previously objected to such Claim or whether the Court has ruled on any such objection. The Court will retain jurisdiction to estimate any Claim at any time during the pendency of litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection. In the event that the Court estimates any Disputed Claim, such estimated amount shall constitute either (a) the Allowed amount of such Claim, (b)

Exhibit A

the amount on which a reserve is to be calculated for purposes of any reserve requirement to this Plan or (c) a maximum limitation on such Claim, as determined by the Court. If the estimated amount constitutes a maximum limitation on such Claim, the Debtors or the Reorganized Debtors, as applicable, may pursue supplementary proceedings to object to the allowance of such Claim. Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Court.

## VIII.

## EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### A.    Assumption and Rejection of Executory Contracts and Unexpired Leases.

Except as otherwise provided herein or in any contract, instrument, release, indenture or other agreement or document entered into in connection with this Plan, as of the Effective Date, all executory contracts and unexpired leases governed by section 365 of the Bankruptcy Code to which any of the Debtors are parties are hereby rejected except for any executory contract or unexpired lease that (i) previously has been assumed or rejected by the Debtors in the Chapter 11 Cases, (ii) previously expired or terminated pursuant to its own terms; (iii) is specifically identified on the Schedule of Assumed Contracts and Leases, or (iv) is the subject of a separate motion to assume or reject such executory contract or unexpired lease filed by the Debtors under section 365 of the Bankruptcy Code prior to the Effective Date. The Debtors reserve the right to amend the Schedule of Assumed Contracts and Leases at any time prior to the Effective Date, subject to the consent of the Supporting Parties and the DIP Agent.

### B.    Cure; Effect of Payment of Cure.

Except to the extent that different treatment has been agreed to by the non-Debtor party or parties to any executory contract or unexpired lease to be assumed pursuant to Article VIII.A hereof, not less than fifteen (15) Business Days prior to the Confirmation Hearing, the Debtors shall, pursuant to the provisions of sections 1123(a)(5)(G) and 1123(b)(2) of the Bankruptcy Code, and consistent with the requirements of section 365 of the Bankruptcy Code, file and serve a notice with the Court listing the cure amounts of all executory contracts or unexpired leases to be assumed. The parties to such executory contracts or unexpired leases to be assumed by the Debtors shall have ten (10) Business Days from service of such pleading to object to the cure amounts listed by the Debtors. If there are any objections filed with respect thereto, the Court shall conduct a hearing to consider such cure amounts and any objections thereto. The Debtors shall retain their right to reject any of their executory contracts or unexpired leases, including any executory contracts or leases that are subject to a dispute concerning amounts necessary to cure any defaults. Payment of the cure amounts fixed in accordance with this paragraph shall be paid by the Debtors or Reorganized Debtors, as the case may be, as a condition to assumption of the underlying contracts and unexpired leases pursuant to the terms of the Plan. Such amount shall be paid on, or as soon as reasonably practicable after, the Effective Date, except that any cure amount that is disputed as of the Effective Date shall be paid as soon as reasonably practicable after the resolution of such dispute.

Exhibit A

Assumption of any executory contract or unexpired lease pursuant to the Plan, or otherwise, shall result in the full release and satisfaction of any Claims or defaults whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed executory contract or unexpired lease at any time on or before the Effective Date.  Any proofs of Claim filed with respect to an executory contract or unexpired lease that has been assumed shall be deemed disallowed and expunged, without further notice to or action, order or approval of the Bankruptcy Court or any other entity, upon the deemed assumption of such contract or unexpired lease.

**C.**    **Rejection Damage Claims.**

Any and all Claims for damages arising from the rejection of an executory contract or unexpired lease under the Plan must be filed with the Court in accordance with the terms of the Final Order authorizing such rejection, but in no event later than thirty (30) days after the Effective Date to the extent an earlier time has not been established by the Court.  Any Claim for damages arising from the rejection of an executory contract or unexpired lease pursuant to an order entered prior to the Bar Date will be governed by the order authorizing such rejection and will not be extended by this Plan or the Confirmation Order.  Any Claims for damages arising from the rejection of an executory contract or unexpired lease that is not filed within such time period will be forever barred from assertion against the Debtors, their respective Estates and the Reorganized Debtors.  All Allowed Claims arising from the rejection of executory contracts or unexpired leases shall be treated as General Unsecured Claims.

**D.**    **Restrictions on Assignment Void.**

Any executory contract or unexpired lease assumed or assumed and assigned shall remain in full force and effect to the benefit of the transferee or assignee in accordance with its terms, notwithstanding any provision in such executory contract or unexpired lease (including those of the type described in section 365(b)(2) of the Bankruptcy Code) that prohibits, restricts, or conditions such transfer or assignment, including based on any change of control provision.  Any provision that prohibits, restricts, or conditions the assignment or transfer of any such executory contract or unexpired lease, terminates or modifies such executory contract or unexpired lease or allows the counterparty to such executory contract or unexpired lease to terminate, modify, recapture, impose any penalty, condition renewal or extension, or modify any term or condition thereof (including on account of any change of control provision) on any such transfer or assignment, constitutes an unenforceable anti-assignment provision and is void and of no force or effect.

No sections or provisions of any executory contract or unexpired lease that purport to provide for additional payments, penalties, charges, rent acceleration, or other financial accommodations in favor of the non-debtor third party thereto shall have any force and effect with respect to the transactions contemplated hereunder, and such provisions constitute unenforceable anti-assignment provisions under section 365(f) of the Bankruptcy Code and are otherwise unenforceable under section 365(e) of the Bankruptcy Code.

Exhibit A

E.      **Benefit Plans.**

As of and subject to the Effective Date, all employment agreements and policies, and all employee compensation and benefit plans, policies, and programs of the Debtors applicable generally to their employees, including agreements and programs subject to section 1114 of the Bankruptcy Code, as in effect on the Effective Date, including all savings plans, retirement plans, health care plans, disability plans, incentive plans, and life, accidental death, and dismemberment insurance plans, and senior executive retirement plans, but expressly excluding any nonqualified deferred compensation plans that are treated as unfunded plan for tax purposes and Title I of ERISA, shall be deemed to be, and shall be treated as though they are, executory contracts that are assumed under this Plan, and the Debtors' obligations under all such agreements and programs shall survive the Effective Date of this Plan, without prejudice to the Reorganized Debtors' rights under applicable nonbankruptcy law to modify, amend, or terminate the foregoing arrangements in accordance with the terms and provisions thereof, except for (i) such executory contracts or plans specifically rejected pursuant to this Plan (to the extent such rejection does not violate section 1114 of the Bankruptcy Code), and (ii) such executory contracts or plans as have previously been terminated, or rejected, pursuant to a Final Order, or specifically waived by the beneficiaries of such plans, benefits, contracts, or programs.

F.      **Workers' Compensation and Insurance Programs.**

All (i) applicable workers' compensation laws in states in which the Reorganized Debtors operate and (ii) of the Debtors' written contracts, agreements, agreements of indemnity, self-insurer workers' compensation bonds and any other policies, programs and plans regarding or relating to workers' compensation, workers' compensation insurance, and all other forms of insurance are treated as executory contracts under this Plan and on the Effective Date will be assumed pursuant to the provisions of sections 365 and 1123 of the Bankruptcy Code, with a cure amount of zero dollars.

IX.

**EFFECT OF CONFIRMATION OF THIS PLAN**

A.      **Continued Entity Existence.**

Except as otherwise provided herein, including as provided with respect to Reorganized Mac Parent in Article V.B hereof, or as may be provided in the Confirmation Order, each Debtor will, as a Reorganized Debtor, continue to exist after the Effective Date as a separate corporate entity, or limited liability company, as the case may be, with all the powers thereof, pursuant to the applicable law in the jurisdiction in which each applicable Reorganized Debtor is incorporated or formed and pursuant to the entity organizational documents in effect prior to the Effective Date, except to the extent such other entity organizational documents are amended by the Plan and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval.

Exhibit A

B.    **Vesting of Assets.**

Except as otherwise provided in this Plan or any agreement, instrument, or other document incorporated herein, on the Effective Date all property in each Estate, all Causes of Action, and any other property acquired by any of the Debtors pursuant to this Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances (except for Liens granted to secure the Exit Facility, any Liens securing the BOC Claim, and any Liens applicable to any capitalized leases existing on the Effective Date).  On and after the Effective Date, except as otherwise provided in this Plan, each Reorganized Debtor may operate its business and conduct its affairs, and may use, acquire, or dispose of its property and assets and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Court and free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules.

C.    **Preservation of Causes of Action.**

Subject to the releases and exculpations set forth in the Plan, the Interim DIP Order, the Final DIP Order, and the DIP Credit Agreement, in accordance with section 1123(b)(3) of the Bankruptcy Code, the Debtors and the Reorganized Debtors shall retain all Litigation Rights, and nothing contained in this Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any such Litigation Rights.  The Debtors may (but are not required to) enforce all Litigation Rights and all other similar claims arising under applicable state laws, including fraudulent transfer claims, if any, and all other Causes of Action of a trustee and debtor-in-possession under the Bankruptcy Code.  Except as otherwise set forth in this Plan, the Reorganized Debtors, as applicable, in their sole and absolute discretion, shall determine whether to bring, settle, release, compromise, or enforce any such Litigation Rights (or decline to do any of the foregoing), and shall not be required to seek further approval of the Court for such action.  Except as otherwise set forth in this Plan, the Debtors, the Reorganized Debtors, or any successors thereof may pursue such Litigation Rights in accordance with the best interests of the Reorganized Debtors or any successors holding such rights of action.

D.    **Discharge of the Debtors.**

Pursuant to section 1141(d) of the Bankruptcy Code, except as otherwise specifically provided in this Plan or in the Confirmation Order, the Distributions and rights that are provided in this Plan shall be in complete satisfaction, discharge and release, effective as of the Effective Date, of any and all Claims and Causes of Action (whether known or unknown) against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property or assets shall have been distributed or retained pursuant to this Plan on account of such Claims, rights, and Interests, including Claims and Interests that arose before the Effective Date, any liability (including withdrawal liability to the extent such Claims relate to services performed by employees of the Debtors prior to the Petition Date and that arise from a termination of employment or a termination of any employee or retiree benefit program which occurred prior to the Effective Date), and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not (a) a Proof of Claim or Interest based upon such Claim, debt, right, or Interest was filed, is filed, or deemed filed under section 501 of the Bankruptcy Code,

Exhibit A

(b) a Claim or Interests based upon such Claim, debt, right, or Interest is Allowed under section 502 of the Bankruptcy Code, or (c) the holder of such a Claim, right, or Interest accepted this Plan.  The Confirmation Order shall be a judicial determination of the discharge of all Claims against and Interests in the Debtors, subject to the terms thereof and the occurrence of the Effective Date.  **NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THE PLAN OR OTHERWISE, NOTHING IN THE PLAN SHALL IMPAIR, ALTER OR IN ANY WAY AFFECT ANY OF THE RIGHTS OR REMEDIES OF BOC AGAINST THE NON-DEBTOR BOC GUARANTORS.**

      E.      <u>**Releases by the Debtors of Certain Parties**</u>.

      **TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, PURSUANT TO SECTION 1123(B)(3) OF THE BANKRUPTCY CODE, FOR GOOD AND VALUABLE CONSIDERATION, INCLUDING THE ACTIONS OF THE RELEASED PARTIES TO FACILITATE THE REORGANIZATION OF THE DEBTORS AND THE IMPLEMENTATION OF THE RESTRUCTURING CONTEMPLATED BY THE PLAN, EFFECTIVE AS OF THE EFFECTIVE DATE, EACH DEBTOR, IN ITS INDIVIDUAL CAPACITY AND AS A DEBTOR IN POSSESSION FOR ITSELF AND ON BEHALF OF ITS ESTATE, AND ANY PERSON CLAIMING THROUGH, ON BEHALF OF, OR FOR THE BENEFIT OF EACH DEBTOR AND ITS ESTATE, SHALL RELEASE AND DISCHARGE AND BE DEEMED TO HAVE CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY, AND FOREVER RELEASED AND DISCHARGED ALL RELEASED PARTIES FOR AND FROM ANY AND ALL CLAIMS OR CAUSES OF ACTION EXISTING AS OF THE EFFECTIVE DATE OR THEREAFTER WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, ARISING FROM OR RELATED TO ANY ACTIONS, TRANSACTIONS, EVENTS OR OMISSIONS OCCURRING ON OR BEFORE THE EFFECTIVE DATE RELATING TO THE DEBTORS, THE CHAPTER 11 CASES, THE DIP FACILITY, OR THE CREDIT AGREEMENT; <u>PROVIDED</u>, <u>HOWEVER</u>, THE FOREGOING RELEASE SHALL NOT APPLY TO ANY POST-EFFECTIVE DATE OBLIGATIONS ARISING UNDER THE PLAN OR ANY DOCUMENT, INSTRUMENT OR AGREEMENT (INCLUDING THOSE SET FORTH IN THE PLAN SUPPLEMENT AND THE EXIT FACILITY) EXECUTED TO IMPLEMENT THE PLAN.  THE REORGANIZED DEBTORS SHALL BE BOUND, TO THE SAME EXTENT THAT THE DEBTORS ARE BOUND, BY THE RELEASES AND DISCHARGES SET FORTH ABOVE.**

      F.      <u>**Releases by Non-Debtors**</u>.

      **EXCEPT WHERE A HOLDER OF A CLAIM OR EQUITY INTEREST HAS AFFIRMATIVELY OPTED-OUT OF GRANTING THE RELEASES SET FORTH IN THIS ARTICLE IX.F. EITHER (i) BY TIMELY ELECTING <u>NOT</u> TO GRANT THIS RELEASE IN ITS BALLOT OR (ii) BY FILING AN OBJECTION WITH THE BANKRUPTCY COURT TO THIS RELEASE BY THE INITIAL DEADLINE TO OBJECT TO THE PLAN SET FORTH IN THE CONFIRMATION ORDER, TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, FOR GOOD AND VALUABLE CONSIDERATION, INCLUDING THE ACTIONS OF THE RELEASED**

Exhibit A

PARTIES TO FACILITATE THE REORGANIZATION OF THE DEBTORS AND THE
IMPLEMENTATION OF THE RESTRUCTURING CONTEMPLATED BY THE PLAN,
ON THE EFFECTIVE DATE, EACH PERSON WHO DIRECTLY OR INDIRECTLY,
HAS HELD, HOLDS, OR MAY HOLD ANY CLAIM AGAINST THE DEBTORS OR
INTEREST IN THE DEBTORS SHALL RELEASE AND DISCHARGE AND BE
DEEMED TO HAVE CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY,
IRREVOCABLY, AND FOREVER RELEASED AND DISCHARGED ALL RELEASED
PARTIES FOR AND FROM ANY AND ALL CLAIMS OR CAUSES OF ACTION
EXISTING AS OF THE EFFECTIVE DATE OR THEREAFTER WHETHER KNOWN
OR UNKNOWN, FORESEEN OR UNFORESEEN, ARISING FROM OR RELATED TO
ANY ACTIONS, TRANSACTIONS, EVENTS OR OMISSIONS OCCURRING ON OR
BEFORE THE EFFECTIVE DATE RELATING TO THE DEBTORS, THE CHAPTER
11 CASES OR THE OBLIGATIONS UNDER THE DIP FACILITY AND THE CREDIT
AGREEMENT; **PROVIDED,** **HOWEVER,** THE FOREGOING RELEASE SHALL NOT
APPLY TO (A) THE OBLIGATIONS OF THE BOC NON-DEBTOR GUARANTORS
UNDER THE BOC NON-DEBTOR GUARANTEES OR (B) POST-EFFECTIVE DATE
OBLIGATIONS ARISING UNDER THE PLAN OR ANY DOCUMENT, INSTRUMENT
OR AGREEMENT (INCLUDING THOSE SET FORTH IN THE PLAN SUPPLEMENT
AND THE EXIT FACILITY) EXECUTED TO IMPLEMENT THE PLAN.

G.    **Exculpation**.

EXCEPT AS OTHERWISE SPECIFICALLY PROVIDED IN THIS PLAN,
THE PLAN SUPPLEMENT OR RELATED DOCUMENTS, NO EXCULPATED PARTY
SHALL HAVE OR INCUR ANY LIABILITY TO ANY ENTITY FOR ANY
PREPETITION OR POSTPETITION ACT TAKEN OR OMITTED TO BE TAKEN IN
CONNECTION WITH, OR RELATED TO, OR ARISING OUT OF THE CHAPTER 11
CASES, THE FILING OF THE CHAPTER 11 CASES, THE FORMULATION,
PREPARATION, NEGOTIATION, DISSEMINATION, FILING, IMPLEMENTATION,
ADMINISTRATION, CONFIRMATION OR CONSUMMATION OF THIS PLAN, THE
DISCLOSURE STATEMENT, THE EXHIBITS TO THIS PLAN AND THE
DISCLOSURE STATEMENT, THE PLAN SUPPLEMENT DOCUMENTS, ANY
EMPLOYEE BENEFIT PLAN, INSTRUMENT, RELEASE OR OTHER AGREEMENT
OR DOCUMENT CREATED, MODIFIED, AMENDED OR ENTERED INTO IN
CONNECTION WITH THIS PLAN, EXCEPT FOR THEIR WILLFUL MISCONDUCT
OR GROSS NEGLIGENCE AS DETERMINED BY A FINAL ORDER AND EXCEPT
WITH RESPECT TO OBLIGATIONS ARISING UNDER CONFIDENTIALITY
AGREEMENTS, JOINT INTEREST AGREEMENTS, OR PROTECTIVE ORDERS, IF
ANY, ENTERED DURING THE CHAPTER 11 CASES; **PROVIDED,** **HOWEVER,**
THAT EACH EXCULPATED PARTY SHALL BE ENTITLED TO RELY UPON THE
ADVICE OF COUNSEL WITH RESPECT TO THEIR DUTIES AND
RESPONSIBILITIES PURSUANT TO, OR IN CONNECTION WITH, THE ABOVE
REFERENCED DOCUMENTS, ACTIONS, OR INACTIONS.

Exhibit A

H.     **Injunction**.

THE SATISFACTION, RELEASE, AND DISCHARGE PURSUANT TO THIS ARTICLE IX SHALL ACT AS A PERMANENT INJUNCTION AGAINST ANY ENTITY COMMENCING OR CONTINUING ANY ACTION, EMPLOYMENT OF PROCESS, OR ACT TO COLLECT, OFFSET OR RECOVER ANY CLAIM, INTEREST, OR CAUSE OF ACTION SATISFIED, RELEASED, OR DISCHARGED UNDER THIS PLAN TO THE FULLEST EXTENT AUTHORIZED OR PROVIDED BY THE BANKRUPTCY CODE, INCLUDING TO THE EXTENT PROVIDED FOR OR AUTHORIZED BY SECTIONS 524 OR 1141 OF THE BANKRUPTCY CODE.

WITHOUT LIMITING THE FOREGOING, FROM AND AFTER THE EFFECTIVE DATE, ALL ENTITIES THAT HAVE HELD, HOLD, OR MAY HOLD CLAIMS AND INTERESTS THAT HAVE BEEN RELEASED OR DISCHARGED PURSUANT TO THIS ARTICLE IX, OR ARE SUBJECT TO EXCULPATION PURSUANT TO THIS ARTICLE IX, SHALL BE PERMANENTLY ENJOINED FROM TAKING ANY OF THE FOLLOWING ACTIONS AGAINST, AS APPLICABLE, THE DEBTORS, THE REORGANIZED DEBTORS, THE RELEASED PARTIES OR THE EXCULPATED PARTIES: (A) COMMENCING OR CONTINUING IN ANY MANNER ANY SUIT, ACTION OR OTHER PROCEEDING, ON ACCOUNT OF OR RESPECTING ANY SUCH CLAIMS OR INTERESTS; (B) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (C) CREATING, PERFECTING, OR ENFORCING ANY ENCUMBRANCE OF ANY KIND AGAINST SUCH ENTITIES OR THE PROPERTY OR ESTATES OF SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; AND (D) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS RELEASED, EXCULPATED, OR SETTLED PURSUANT TO THE PLAN.

I.     **Term of Bankruptcy Injunction or Stays**.

All injunctions or stays provided for in the Chapter 11 Cases under sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in this Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

J.     **Setoff**.

Notwithstanding anything herein, in no event shall any holder of a Claim be entitled to setoff any Claim against any claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, unless such holder preserves its right to setoff by filing a motion  for authority to effect such setoff on or before the Confirmation Date (regardless of whether such

motion is heard prior to or after the Confirmation Date), and notwithstanding any indication in any proof of claim or otherwise that such holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 of the Bankruptcy Code or otherwise.

### K.    Preservation of Insurance.

Except as otherwise provided herein, the Debtors' discharge and release from all Claims as provided herein, except as necessary to be consistent with this Plan, shall not diminish or impair the enforceability of any insurance policy that may cover Claims against the Debtors or the Reorganized Debtors, including their officers and current and former directors, or any other person or entity.

### L.    Indemnification Obligations.

The Debtors' obligations to indemnify the Indemnified Parties shall survive and shall continue in full force and effect for the benefit of the Indemnified Parties, notwithstanding confirmation of and effectiveness of the Plan, and such indemnification shall include, but not be limited to, all actions taken in connection with the Restructuring Support Agreement, the filing of the Chapter 11 Cases, the DIP Facility, the Interim DIP Order, the Final DIP Order, the DIP Credit Agreement and the Plan.

## X.

## EFFECTIVENESS OF THIS PLAN

### A.    Conditions Precedent to Confirmation.

It shall be a condition to confirmation of this Plan that the following conditions shall have been satisfied or waived pursuant to the provisions of Article X.C hereof:

1.    the Exit Facility Documents in a form acceptable to the Exit Facility Agent and Exit Facility Lenders shall be executed, and, except with respect to those conditions precedent that are contingent on the occurrence of the Effective Date, all conditions precedent to the consummation thereof (including without limitation any conditions in the Exit Facility Term Sheet) shall been  satisfied in accordance with the terms thereof (or waived by the Exit Facility Agent and Lenders);

2.    an order finding that the Disclosure Statement contains adequate information pursuant to section 1125 of the Bankruptcy Code shall have been entered by the Court;

3.    the Confirmation Order shall be in form and substance reasonably acceptable to the Debtors, BOC, Riesen Funding, the DIP Agent, and the Exit Facility Agent and Lenders; and

4.    the Restructuring Support Agreement shall be in full force and effect and binding on all parties thereto, and shall not have been terminated by the parties thereto.

Exhibit A

5.      this Plan, the Plan Supplement, and all of the schedules, documents, and exhibits contained therein shall have been filed in form and substance reasonably acceptable to the Debtors, BOC, Riesen Funding and the Exit Facility Agent and Lenders.

**B.      <u>Conditions Precedent to the Effective Date</u>.**

It shall be a condition to the Effective Date of this Plan that the following provisions, terms and conditions are approved or waived pursuant to the provisions of Article X.C hereof:

1.      the Confirmation Order, in form and substance reasonably acceptable to the Debtors, the Supporting Parties, the DIP Agent, and the Exit Facility Agent and Lenders, shall have been entered by the Court;

2.      the Confirmation Order shall have become a Final Order;

3.      the Confirmation Order shall have approved the limited substantive consolidation of the Debtors provided under Article VI of this Plan;

4.      the Exit Facility closing shall have occurred and the loans thereunder shall be funded or scheduled for funding upon consummation of this Plan;

5.      [RESERVED];

6.      the Debtors shall have paid all fees and documented out-of-pocket expenses payable to the DIP Agent, the DIP Lender and BOC, including all documented out-of-pocket fees and expenses of counsel and other professionals, subject to the terms and review provisions set forth in the Interim DIP Order or Final DIP Order, which shall apply to BOC for purposes of this Article X.B.6;

7.      all authorizations, consents and regulatory approvals required (if any) for this Plan's effectiveness shall have been obtained;

8.      the formation and governance documents for each of the Reorganized Debtors shall be consistent with this Plan and the Restructuring Support Agreement Term Sheet, and shall be reasonably acceptable to the Exit Facility Agent and Lenders;

9.      The Debtors shall have executed and delivered to BOC the BOC Post-Effective Date Credit Documents;

10.      The Non-Debtor Guarantors shall have executed and delivered to BOC new or restated guarantees of the BOC Claims in form acceptable to BOC; and

11.      BOC and Exit Facility Agent and Lenders shall have executed and delivered an Intercreditor Agreement in form acceptable to BOC and the Exit Facility Agent and Lenders.

36

C.      **Waiver of Conditions.**

The conditions to confirmation of this Plan and to the Effective Date set forth in Article X.A and X.B hereof may be waived by the Debtors (with the consent of the DIP Agent and the Exit Facility Agent and Lenders) without notice, leave or order of the Court or any formal action other than proceeding to confirm or consummate this Plan.

D.      **Notice of Confirmation and Effective Date.**

On or before five (5) Business Days after the occurrence of the Effective Date, the Reorganized Debtors shall mail or cause to be mailed to all holders of Claims and Interests a notice that informs such holders of (i) the entry of the Confirmation Order, (ii) the occurrence of the Effective Date, (iii) the occurrence of the Administrative Claims Bar Date and deadline for submission of Professional Fee Claims, and (iv) such other matters as the Debtors deem appropriate.

E.      **Effect of Failure of Conditions.**

In the event that the Effective Date does not occur:  (a) the Confirmation Order shall be vacated; (b) no Distributions under this Plan shall be made; (c) the Debtors and all holders of Claims and Equity Interests shall be restored to the *status quo ante* as of the day immediately preceding the Confirmation Date as though the Confirmation Date had never occurred; and (d) the Debtors' obligations with respect to Claims and Equity Interests shall remain unchanged and nothing contained in this Plan shall (i) constitute or be deemed a waiver or release of any Claims against or any Equity Interests in  the Debtors or any other Person, (ii) prejudice in any manner any right, remedy or claim of the Debtors or any Person in any further proceedings involving the Debtors or otherwise, or (iii) be deemed an admission against interest by the Debtors or any other Person.

F.      **Vacatur of Confirmation Order.**

If a Final Order denying confirmation of this Plan is entered, or if the Confirmation Order is vacated, then this Plan shall be null and void in all respects, and nothing contained in this Plan shall (a) constitute a waiver or release of any Claims against or Equity Interests in the Debtors, (b) prejudice in any manner the rights of the holder of any Claim against, or Equity Interest in, the Debtors, (c) prejudice in any manner any right, remedy or claim of the Debtors, or (d) be deemed an admission against interest by the Debtors.

G.      **Revocation, Withdrawal, Modification or Non-Consummation.**

The Debtors reserve the right to revoke, withdraw, amend or modify this Plan at any time prior to the Confirmation Date (in each case subject to the Debtors' obligations under the Restructuring Support Agreement, the Exit Facility Term Sheet and Exit Facility Documents, except as otherwise provided in Article XII.C of this Plan or as otherwise consented to in writing by the Exit Facility Agent and Lenders).  If the Debtors revoke or withdraw this Plan, the Confirmation Order is not entered, or the Effective Date does not occur, (i) this Plan shall be null and void in all respects, (ii) any settlement or compromise embodied in this Plan (including the fixing or limiting the amount of any Claim or Class of Claims), assumption or rejection of

37

executory contracts or leases effected by this Plan, and any document or agreement executed pursuant to this Plan shall be deemed null and void, and (iii) nothing contained in this Plan, and no acts taken in preparation for consummation of this Plan, shall (a) constitute or be deemed a waiver or release of any Claims by or against, or any Equity Interests in, the Debtors or any other Person, (b) prejudice in any manner any right, remedy or claim of the Debtors or any other Person in any further proceeding involving the Debtors or otherwise, or (c) constitute an admission against interest by the Debtors or any other Person.

## XI.

## RETENTION OF JURISDICTION

The Court shall have exclusive jurisdiction over all matters arising out of, and related to, the Chapter 11 Cases and this Plan pursuant to, and for the purposes of, section 105(a) and section 1142 of the Bankruptcy Code and for, among other things, the following purposes:

1.      to hear and determine motions for the assumption or rejection of executory contracts or unexpired leases pending on the Confirmation Date, and the allowance of Claims resulting therefrom;

2.      to determine any other applications, adversary proceedings, and contested matters pending on the Effective Date;

3.      to ensure that Distributions to holders of Allowed Claims are accomplished as provided herein;

4.      to resolve disputes as to the ownership of any Claim or Equity Interest;

5.      to hear and determine timely objections to Claims;

6.      to enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified or vacated;

7.      to issue such orders in aid of execution of this Plan, to the extent authorized by section 1142 of the Bankruptcy Code;

8.      to consider any modifications of this Plan, to cure any defect or omission, or to reconcile any inconsistency in any order of the Court, including the Confirmation Order;

9.      to hear and determine all applications for compensation and reimbursement of expenses of Professionals under sections 328, 330, 331 and 503(b) of the Bankruptcy Code;

10.     to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of this Plan;

11.     to hear and determine any issue for which this Plan requires a Final Order of the Court;

Exhibit A

12.     to hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code;

13.     to hear and determine disputes arising in connection with compensation and reimbursement of expenses of professionals for the DIP Agent and BOC for services rendered and expenses incurred during the period commencing on the Petition Date through and including the Effective Date;

14.     to hear and determine any Causes of Action preserved under this Plan under Bankruptcy Code sections 544, 547, 548, 549, 550, 551, 553, and 1123(b)(3);

15.     to hear and determine any matter regarding the existence, nature and scope of the Debtors' discharge;

16.     to hear and determine any matter regarding the existence, nature, and scope of the releases and exculpation provided in Article IX of this Plan; and

17.     to enter a final decree closing the Chapter 11 Cases.

If the Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising in, arising under, or related to the Chapter 11 Cases, then Article XI of this Plan shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having jurisdiction with respect to such matter.

## XII.

## MISCELLANEOUS PROVISIONS

### A.      <u>Modification of this Plan</u>.

Subject to the limitations contained in this Plan and the Restructuring Support Agreement: (1) the Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend, modify, revoke or withdraw this Plan prior to the entry of the Confirmation Order, including amendments or modifications to satisfy section 1129(b) of the Bankruptcy Code; and (2) after the entry of the Confirmation Order, the Debtors or the Reorganized Debtors, as the case may be, may, upon order of the Court, amend or modify this Plan, in accordance with Section 1127(b) of the Bankruptcy Code.

Entry of a Confirmation Order shall result in all modifications or amendments to this Plan occurring after the solicitation thereof being approved pursuant to section 1127(a) of the Bankruptcy Code.

Notwithstanding anything to the contrary herein, the Debtors may revoke or withdraw this Plan upon the occurrence of an unwaived "Termination Event" under (and as defined in) the Restructuring Support Agreement (other than a Termination Event caused by a breach by the Debtors); provided, however, that the Debtors reserve the right to fully or conditionally waive, on a prospective or retroactive basis, the effects of this paragraph in respect

Exhibit A

of any such Termination Event, with any such waiver effective only if in writing and signed by the Debtors.

**B.      Dissolution of Creditors' Committee.**

The Creditors' Committee shall continue in existence until the Effective Date to exercise those powers and perform those duties specified in section 1103 of the Bankruptcy Code.  On the Effective Date, the Creditors' Committee shall be dissolved and its members shall be deemed released of all their duties, responsibilities and obligations in connection with the Chapter 11 Cases or this Plan and its implementation, and the retention or employment of the Creditors' Committee's attorneys, financial advisors, and other agents shall terminate as of the Effective Date.

**C.      Votes Solicited in Good Faith.**

The Debtors have, and upon confirmation of this Plan shall be deemed to have, solicited acceptances of this Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code.  The Debtors (and each of their respective affiliates, agents, directors, managers, officers, members, employees, advisors, and attorneys) have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code in the offer and issuance of the securities offered and sold under this Plan and, therefore, are not, and on account of such offer and issuance will not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of this Plan or the offer or issuance of the securities offered and distributed under this Plan.

**D.      Obligations Incurred After the Effective Date.**

Except as otherwise specifically provided for in this Plan, from and after the Effective Date, the Reorganized Debtors shall, in the ordinary course of business and without any further notice to or action, order, or approval of the Court, pay in Cash all obligations including the reasonable legal, professional, or other fees and expenses related to the implementation of this Plan incurred by the Reorganized Debtors.  Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation of services rendered after such date shall terminate, and the Reorganized Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order or approval of the Court.

**E.      Request for Expedited Determination of Taxes.**

The Reorganized Debtors shall have the right to request an expedited determination under section 505(b) of the Bankruptcy Code with respect to tax returns (other than federal tax returns) filed by any of them, or to be filed by any of them, for any and all taxable periods ending after the Petition Date through the Effective Date.

**F.      Determination of Tax Filings and Taxes.**

(a) For all taxable periods ending on or prior to, or including, the Effective Date, the Reorganized Debtors shall prepare and file (or cause to be prepared and filed) on behalf of

Exhibit A

the Debtors, all combined, consolidated or unitary tax returns, reports, certificates, forms or similar statements or documents for any group of entities that include the Debtors (collectively, "Group Tax Returns") required to be filed or that the Reorganized Debtors otherwise deem appropriate, including the filing of amended Group Tax Returns or requests for refunds.

(b) The Reorganized Debtors shall be entitled to the entire amount of any refunds and credits (including interest thereon) with respect to or otherwise relating to any taxes of the Debtors, including for any taxable period ending on or prior to, or including, the Effective Date.

### G.    <u>Governing Law</u>.

Unless a rule of law or procedure is supplied by Federal law (including the Bankruptcy Code and Bankruptcy Rules), the laws of the State of Delaware shall govern the construction and implementation of this Plan, any agreements, documents, and instruments executed in connection with this Plan (except as otherwise set forth in those agreements or instruments, in which case the governing law of such agreements shall control). Entity governance matters shall be governed by the laws of the state of incorporation or formation of the applicable Debtor.

### H.    <u>Filing or Execution of Additional Documents</u>.

On or before the Effective Date, the Debtors (with the consent of the DIP Agent) or the Reorganized Debtors, shall file with the Court or execute, as appropriate, such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of this Plan.

### I.    <u>Exemption From Transfer Taxes</u>.

Pursuant to section 1146(c) of the Bankruptcy Code, (a) the issuance, transfer or exchange under this Plan of the New Equity Interests, (b) the making or assignment of any lease or sublease, or (c) the making or delivery of any other instrument whatsoever, in furtherance of or in connection with this Plan shall not be subject to any stamp, real estate transfer, mortgage, recording sales or use or other similar tax.

### J.    <u>Exemption for Issuance of New Equity Interests</u>.

The issuance of the New Equity Interests and Distribution thereof to holders of the Riesen Funding Claim and the warrants issued pursuant to the Exit Facility, to the extent that they are deemed Securities (as defined in the Securities Act of 1933, as amended), shall be authorized and exempt from registration under the securities laws solely to the extent permitted under section 1145 of the Bankruptcy Code, as of the Effective Date without further act or action by any person, unless required by provision of the relevant governance documents or applicable law, regulation, order or rule; and all documents evidencing the same shall be executed and delivered as provided for in this Plan or the Plan Supplement.

Exhibit A

**K.**     **Waiver of Federal Rule of Civil Procedure 62(a).**

The Debtors may request that the Confirmation Order include (a) a finding that Fed. R. Civ. P. 62(a) shall not apply to the Confirmation Order, and (b) authorization for the Debtors to consummate this Plan immediately after entry of the Confirmation Order.

**L.**     **Exhibits/Schedules.**

All Exhibits and schedules to this Plan and the Plan Supplement are incorporated into and constitute a part of this Plan as if set forth herein.

**M.**     **Notices.**

All notices, requests, and demands hereunder to be effective shall be in writing and unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

To the Debtors:        Mac Acquisition LLC
                       1855 Blake Street
                       Suite 200
                       Denver, CO 80202
                       Attention:  Nishant Machado, President, CEO & CRO
                       nmachado@mackinacpartners.com

with copies to:        Young Conaway Stargatt & Taylor, LLP
                       1000 North King Street
                       Wilmington, DE 19801
                       Attention:  Edmon L. Morton, Esq. and Michael R. Nestor, Esq.
                       emorton@ycst.com
                       mnestor@ycst.com

                       - and -

                       Gibson Dunn & Crutcher LLP
                       333 South Grand Avenue
                       Los Angeles, CA  90071-3197
                       Attention:  Jeffrey C. Krause, Esq. and Michael S. Neumeister, Esq.
                       jkrause@gibsondunn.com
                       mneumeister@gibsondunn.com

**N.**     **Plan Supplement.**

The Plan Supplement will be filed with the Clerk of the Court no later than ten (10) calendar days prior to the Confirmation Hearing, unless such date is further extended by order of the Court on notice to parties in interest.  The Plan Supplement may be inspected in the office of the Clerk of the Court during normal court hours and shall be available online at "https://ecf.deb.uscourts.gov."  Holders of Claims or Existing Equity Interests may obtain a copy

Exhibit A

of the Plan Supplement upon written request to counsel to the Debtors in accordance with Article XII.N of this Plan or by accessing the website maintained by the Debtors' claims and noticing agent at [https://www.donlinrecano.com/Clients/lr/Index].

### O.    Further Actions; Implementations.

The Debtors shall be authorized to execute, deliver, file or record such documents, contracts, instruments, releases and other agreements and take such other or further actions as may be necessary to effectuate or further evidence the terms and conditions of this Plan.  From and after the Confirmation Date, the Debtors shall be authorized to take any and all steps and execute all documents necessary to effectuate the provisions contained in this Plan.

### P.    Severability.

If, prior to the entry of the Confirmation Order, any term or provision of this Plan is held by the Court to be invalid, void, or unenforceable, the Court, at the request of the Debtors (with the consent of the DIP Agent), shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of this Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

### Q.    Entire Agreement.

Except as otherwise indicated, this Plan and the Plan Supplement supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into this Plan.

### R.    Binding Effect.

This Plan shall be binding on and inure to the benefit of the Debtors, the holders of Claims against and Equity Interests in the Debtors, and each of their respective successors and assigns, including each of the Reorganized Debtors, and all other parties in interest in the Chapter 11 Cases.

Subject to Article X of this Plan and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of this Plan, the Plan Supplement and the Confirmation Order shall be immediately effective and enforceable and deemed binding upon the Debtors and any and all holders of Claims or Interests (regardless of whether such Claims or Interests are deemed to have accepted or rejected this Plan), all entities that are parties to or are subject to the settlements, compromises, releases, and injunctions described in this Plan, and any and all non-Debtor parties to the executory contracts

Exhibit A

and unexpired leases with the Debtors. All Claims and debts shall be as fixed, adjusted, or compromised, as applicable, pursuant to this Plan regardless of whether any holder of a Claim or debt has voted on this Plan.

       **S.**    <u>**No Change in Ownership or Control**</u>.

       Consummation of this Plan is not intended to and shall not constitute a change in ownership or change in control, as defined in any employment or other agreement or plan in effect on the Effective Date to which a Debtor is a party.

       **T.**    <u>**Substantial Consummation**</u>.

       On the Effective Date, this Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code; <u>provided</u>, <u>however</u>, that nothing herein shall prevent the Debtors or any other party in interest from arguing that substantial consummation of this Plan has occurred prior to the Effective Date.

       **U.**    <u>**Conflict**</u>.

       The terms of this Plan shall govern in the event of any inconsistency with the summaries of this Plan set forth in the Disclosure Statement. In the event of any inconsistency or ambiguity between and among the terms of this Plan, the Disclosure Statement, and the Confirmation Order, the terms of the Confirmation Order shall govern and control.

Exhibit A

IN WITNESS WHEREOF, each Debtor has executed this Plan this [____] day of October, 2017.

MAC ACQUISITION LLC

_____
Nishant Machado
President, Chief Executive Officer
and Chief Restructuring Officer


MACARONI GRILL SERVICES LLC

_____
Nishant Machado
President, Chief Executive Officer
and Chief Restructuring Officer


MAC PARENT LLC

_____
Nishant Machado
President, Chief Executive Officer
and Chief Restructuring Officer


MAC HOLDING LLC

_____
Nishant Machado
President, Chief Executive Officer
and Chief Restructuring Officer


MAC ACQUISITION OF NEW JERSEY LLC

_____
Nishant Machado
President, Chief Executive Officer
and Chief Restructuring Officer


MAC ACQUISITION OF KANSAS LLC

_____
Nishant Machado
President, Chief Executive Officer
and Chief Restructuring Officer


MAC ACQUISITION OF ANNE ARUNDEL COUNTY LLC

_____
Nishant Machado
President, Chief Executive Officer
and Chief Restructuring Officer


MAC ACQUISITION OF FREDERICK COUNTY LLC

_____
Nishant Machado
President, Chief Executive Officer
and Chief Restructuring Officer


MAC ACQUISITION OF BALTIMORE COUNTY LLC

_____
Nishant Machado
President, Chief Executive Officer
and Chief Restructuring Officer

45

Exhibit A

**Exhibit B**

**DIP Agreement**

[Document Intentionally Omitted from Filing Version of Restructuring Support Agreement.  *See* Exhibit A (DIP Agreement) to Exhibit 1 (Interim DIP Order) to the *DEBTORS' MOTION FOR INTERIM AND FINAL ORDERS (I) PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364, 507, AND 552 AUTHORIZING DEBTORS TO (A) OBTAIN POSTPETITION SECURED FINANCING, (B) USE CASH COLLATERAL, (C) GRANT ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES; (II) MODIFYING THE AUTOMATIC STAY; (III) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULES 4001(b) AND 4001(c); AND (IV) GRANTING RELATED RELIEF*, filed with the Bankruptcy Court on October 18, 2017]

**Exhibit C**

**Interim DIP Order**

[Document Intentionally Omitted from Filing Version of Restructuring Support Agreement. *See* Exhibit 1 (Interim DIP Order) to the *DEBTORS' MOTION FOR INTERIM AND FINAL ORDERS (I) PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364, 507, AND 552 AUTHORIZING DEBTORS TO (A) OBTAIN POSTPETITION SECURED FINANCING, (B) USE CASH COLLATERAL, (C) GRANT ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES; (II) MODIFYING THE AUTOMATIC STAY; (III) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULES 4001(b) AND 4001(c); AND (IV) GRANTING RELATED RELIEF*, filed with the Bankruptcy Court on October 18, 2017]

Exhibit C

**Exhibit D**

**Consent of Non-Debtor Guarantors**

**See attached.**

Exhibit D

## AGREEMENT AND CONSENT OF NON-DEBTOR GUARANTORS AND REAFFIRMATION OF GUARANTIES

   This AGREEMENT AND CONSENT OF NON-DEBTOR GUARANTORS AND REAFFIRMATION OF GUARANTIES (the "Agreement") is made and entered into as of the _____ day of October, 2017 by RICHARD MONFORT, an individual, MONFORT FAMILY LIMITED PARTNERSHIP I, a Colorado limited partnership, DEAN A. RIESEN, an individual, BARBARA H. RIESEN, an individual, MAC ACQUISITION IP LLC, a Delaware limited liability company, REDROCK PARTNERS, LLC, an Arizona limited liability company, RIESEN & COMPANY LLC, an Arizona limited liability company, RIESEN FUNDING LLC, an Arizona limited liability company, and RMG DEVELOPMENT LLC, a Delaware limited liability company (jointly and severally, "Guarantors") for the benefit of Bank of Colorado ("Lender"), with reference to the following:

   A. Mac Parent LLC ("Borrower") has incurred debts to Lender pursuant to a series of Business Loan Agreements, Notes, and related loan documents referred to in the Guaranties (as defined below) as "Related Documents". The Business Loan Agreements and all other agreements, documents and instruments executed by Borrower which evidence, secure or relate to the  are hereinafter sometimes collectively referred to as the "Loan Documents." All defined terms used herein and not otherwise defined herein shall have the meaning ascribed to such terms in the Loan Agreements.

   B. In connection with and as a condition to Lender providing financial accommodations to Borrower, each Guarantor executed and delivered a Commercial Guaranty Agreement, including those described on Exhibit A attached hereto, (the "Guaranties") to and in favor of Lender.

   C. Each Guarantor has guaranteed Borrower's "Indebtedness" to Lender, as defined in each Guaranty, and has waived various defenses, including, without limitation, defenses that might otherwise arise from Lender's decisions regarding enforcement of Lender's rights with respect to the Indebtedness or waiver of or modification of rights relating to the Indebtedness.

   D. Borrower, Mac Acquisition LLC, a Delaware limited liability company, Mac Holding LLC, a Delaware limited liability company, Macaroni Grill Services LLC, a Florida limited liability company, Mac Acquisition of New Jersey LLC, a New Jersey limited liability company, Mac Acquisition of Kansas LLC, a Kansas limited liability company, Mac Acquisition of Anne Arundel County LLC, a Maryland limited liability company, Mac Acquisition of Frederick County LLC, a Maryland limited liability company, and Mac Acquisition of Baltimore County LLC, a Maryland limited liability company (collectively, "**Debtors**"), intend to commence voluntary reorganization cases under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (such court, or another court of competent jurisdiction with respect to the subject matter, the "**Bankruptcy Court**") to effect the restructuring and recapitalization transactions (the "**Restructuring**") through the chapter 11 plan of reorganization ("**Plan**").

   E. Debtors have requested that Lender consent to the Restructuring, and to documents and agreements governing the Restructuring consisting of the following ("**Restructuring Documents**"):  (i) a Restructuring Support Agreement between Debtors, Lender, and Riesen Funding LLC, an Arizona limited liability company; (ii) a Debtor-in-Possession Credit, Guaranty and Security Agreement (the "**DIP Credit Agreement**"); (iii) an Interim DIP Order (as defined in the DIP Credit Agreement), and the Final DIP Order (as defined in the DIP Credit Agreement), and the Credit Documents (as defined in the DIP Credit

Agreement); (iv) the Plan (and all exhibits thereto); (v) a disclosure statement for the Plan when it is finalized, the other solicitation materials in respect of the Plan (such materials, collectively, the "**Solicitation Materials**"), the motion to approve the Disclosure Statement, and the order entered by the Bankruptcy Court approving the Disclosure Statement and Solicitation Materials as containing, among other things, "adequate information" as required by section 1125 of the Bankruptcy Code; (vi) the order entered by the Bankruptcy Court confirming the Plan; (vii) the documentation with respect to the Exit Facility (as defined in the DIP Credit Agreement); and (viii) such other documents or agreements as may be reasonably necessary to implement the Restructuring contemplated by the Restructuring Support Agreement;

F.    Each Guarantor hereby acknowledges that one of the conditions precedent to the effectiveness of the Restructuring Support Agreement is the execution and delivery of this Agreement by Guarantors to and in favor of Lender.  In consideration of Lender executing the Restructuring Support Agreement, Guarantors have each agreed, at the request of Borrower, to execute and deliver this Agreement to and in favor of Lender.

NOW THEREFORE, for valuable consideration, the receipt and sufficiency of which is hereby acknowledged by each Guarantor, each Guarantor, intending to be legally bound hereby, agrees as follows:

Section 1.  <u>Acknowledgment of and Consent to Execution of Restructuring Support Agreement</u>.  Each Guarantor acknowledges that it is fully and adequately informed as to all of the terms of the Restructuring Support Agreement and the other Restructuring Documents. Each Guarantor expressly consents to Borrower's and Lender's execution and delivery of, and to performance of their respective obligations under, the Restructuring Support Agreement, all documents related to the Restructuring Support Agreement, and the Loan Documents, as amended by the Restructuring Support Agreement.

Section 2.  <u>Reaffirmation</u>.  Each Guarantor hereby expressly reaffirms its Guaranty as of and upon the date hereof, and confirms that such Guaranty is and will remain in full force and effect without impairment, termination, abrogation or reduction in any manner or to any extent.  Each Guarantor acknowledges that Lender is relying on this Agreement in entering into and performing under the Restructuring Support Agreement.  Each Guarantor acknowledges that the consents, agreements and waivers contained herein constituted a material inducement to Lender to enter into the Restructuring Support Agreement, and that Lender would not have done so but for those consents, agreements and waivers and Lender's expectation that the same are valid and enforceable in any and all events.

Section 3.  <u>New Guaranties</u>.  Guarantors will, under the Plan, execute and deliver to Lender new or restated Guaranties of the Indebtedness of Borrower to Lender (and of any other Debtor that becomes a borrower rather than a guarantor of such Indebtedness).

Section 4.  <u>Governing Law</u>.  This Agreement shall be governed by and construed under the laws of the State of Colorado.

Witness the due execution as of the date first above written.

[*Remainder of page intentionally left blank; signature pages to follow.*]

Exhibit D

**"GUARANTOR"**

RMG DEVELOPMENT LLC

By: _____
    Name: Nishant Machado
    Title: President, Chief Executive Officer
       and Chief Restructuring Officer

**"GUARANTOR"**

MAC ACQUISITION IP LLC

By: _____
    Name: Nishant Machado
    Title: President, Chief Executive Officer
       and Chief Restructuring Officer

Exhibit D

**"GUARANTOR"**

RIESEN FUNDING LLC

RIESEN & COMPANY LLC, Member of
Riesen Funding LLC

By: _____
        Dean A. Riesen
        Manager of Riesen & Company LLC

**"GUARANTOR"**

REDROCK PARTNERS, LLC

RIESEN FUNDING LLC, Member of
RedRock Partners, LLC

RIESEN & COMPANY LLC, Member of
Riesen Funding LLC

By: _____
        Dean A. Riesen
        Manager of Riesen & Company LLC

**"GUARANTOR"**

RIESEN & COMPANY LLC

By: _____
        Dean A. Riesen
        Manager of Riesen & Company LLC

**"GUARANTOR"**

_____
Barbara H. Riesen

**"GUARANTOR"**

_____
Dean A. Riesen

Exhibit D

**"GUARANTOR"**                          **"GUARANTOR"**

                                         MONFORT FAMILY LIMITED
_____          PARTNERSHIP I
Richard Monfort

                                         By:  _____
                                              Richard Monfort

STATE OF COLORADO                    )
                                     )          SS:
CITY AND COUNTY OF DENVER)

     The foregoing instrument was acknowledged before me on the _____ day of _____, 2017, by Nishant Machado, as President, Chief Executive Officer and Chief Restructuring Officer of Mac Acquisition IP LLC, a Delaware limited liability company, and RMG Development LLC, a Delaware limited liability company.

     Witness my hand and official seal.
     My commission expires: _____

                               _____
                               Notary Public


STATE OF COLORADO                    )
                                     )          SS:
CITY AND COUNTY OF DENVER)

     The foregoing instrument was acknowledged before me on the _____ day of _____, 2017, by Richard Monfort, individually and as Managing Partner of Monfort Family Limited Partnership I, a Colorado limited partnership.

     Witness my hand and official seal.
     My commission expires: _____

                               _____
                               Notary Public


STATE OF COLORADO                    )
                                     )          SS:
COUNTY OF _____)

     The foregoing instrument was acknowledged before me on the _____ day of _____, 2017, by Dean A. Riesen, individually and as Manager of Riesen & Company LLC.

     Witness my hand and official seal.
     My commission expires: _____

                               _____
                               Notary Public

Exhibit D

STATE OF COLORADO                )
                                 )        SS:
COUNTY OF _____)

The foregoing instrument was acknowledged before me on the _____ day of _____, 2017, by Barbara H. Riesen.

Witness my hand and official seal.
My commission expires: _____

_____
Notary Public

Exhibit D

## EXHIBIT A

(Guaranties)

1.   Commercial Guaranty, dated April 17, 2015, made by Richard Monfort

2.   Commercial Guaranty, dated April 17, 2015, made by Monfort Family Limited Partnership I

3.   Commercial Guaranty, dated April 17, 2015, made by Dean A. Riesen

4.   Commercial Guaranty, dated April 17, 2015, made by Barbara H. Riesen

5.   Commercial Guaranty, dated April 17, 2015, made by Mac Acquisition IP LLC

6.   Commercial Guaranty, dated April 17, 2015, made by Redrock Partners, LLC

7.   Commercial Guaranty, dated April 17, 2015, made by Riesen & Company, LLC

8.   Commercial Guaranty, dated April 17, 2015, made by RMG Development LLC

9.   Commercial Guaranty, dated December 20, 2016, made by Richard Monfort

10.   Commercial Guaranty, dated December 20, 2016, made by Monfort Family Limited Partnership I

11.   Commercial Guaranty, dated December 20, 2016, made by Dean A. Riesen

12.   Commercial Guaranty, dated December 20, 2016, made by Barbara H. Riesen

13.   Commercial Guaranty, dated December 20, 2016, made by Mac Acquisition IP LLC

14.   Commercial Guaranty, dated December 20, 2016, made by Redrock Partners, LLC

15.   Commercial Guaranty, dated December 20, 2016, made by Riesen & Company, LLC

16.   Commercial Guaranty, dated December 20, 2016, made by RMG Development LLC

17.   Commercial Guaranty, dated September 19, 2017, made by Richard Monfort

18.   Commercial Guaranty, dated September 19, 2017, made by Monfort Family Limited Partnership I

19.   Commercial Guaranty, dated September 19, 2017, made by Dean A. Riesen

20.   Commercial Guaranty, dated September 19, 2017, made by Barbara H. Riesen

21.    Commercial Guaranty, dated September 19, 2017, made by Mac Acquisition IP LLC

22.    Commercial Guaranty, dated September 19, 2017, made by Redrock Partners, LLC

23.    Commercial Guaranty, dated September 19, 2017, made by Riesen & Company, LLC

24.    Commercial Guaranty, dated September 19, 2017, made by Riesen Funding LLC

25.    Commercial Guaranty, dated September 19, 2017, made by RMG Development LLC

26.    Commercial Guaranty, dated September 28, 2017, made by Redrock Partners, LLC

27.    Commercial Guaranty, dated September 28, 2017, made by Riesen & Company, LLC

28.    Commercial Guaranty, dated September 28, 2017, made by Riesen Funding LLC

Exhibit D