## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| MAC ACQUISITION LLC, *et al.*,[1] | Case No. 17-12224 (___) |
| Debtors. | (Joint Administration Requested) |

**DEBTORS' MOTION FOR ENTRY OF AN ORDER (A) AUTHORIZING PAYMENT OF CERTAIN PREPETITION WORKFORCE CLAIMS, INCLUDING WAGES, SALARIES, AND OTHER COMPENSATION; (B) AUTHORIZING PAYMENT OF CERTAIN EMPLOYEE BENEFITS AND CONFIRMING RIGHT TO CONTINUE EMPLOYEE BENEFITS ON POSTPETITION BASIS, (C) AUTHORIZING PAYMENT OF REIMBURSEMENT TO EMPLOYEES FOR EXPENSES INCURRED PREPETITION, (D) AUTHORIZING PAYMENT OF WITHHOLDING AND PAYROLL-RELATED TAXES, (E) AUTHORIZING PAYMENT OF WORKERS' COMPENSATION OBLIGATIONS, AND (F) AUTHORIZING PAYMENT OF PREPETITION CLAIMS OWING TO ADMINISTRATORS <u>AND THIRD PARTY PROVIDERS</u>**

Mac Acquisition LLC and its affiliated debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "<u>Debtors</u>") hereby move the Court (this "<u>Motion</u>") for entry of an order, substantially in the form annexed hereto as <u>Exhibit A</u>, pursuant to sections 105(a), 363(b), 507, 1107(a), and 1108 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>"), Rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), and Rule 9013-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "<u>Local Rules</u>"), authorizing, but not directing, the Debtors to (a) pay accrued prepetition wages, salaries, and other compensation to their Workforce (as defined below); (b) honor any prepetition obligations in respect of, and

---

[1] The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: Mac Acquisition LLC (6362); Mac Parent LLC (6715); Mac Holding LLC (6682); Mac Acquisition of New Jersey LLC (1121); Mac Acquisition of Kansas LLC (3910); Mac Acquisition of Anne Arundel County LLC (6571); Mac Acquisition of Frederick County LLC (6881); Mac Acquisition of Baltimore County LLC (6865); and Macaroni Grill Services LLC (5963). The headquarters for the above-captioned Debtors is located at 1855 Blake St., Ste. 200, Denver, CO 80202.

continue in the ordinary course of business until further notice (but not assume), certain of the

Debtors' paid time off policies, and employee benefit plans and programs, as described below;

(c) reimburse Employees (as defined below) for prepetition expenses that Employees incurred on

behalf of the Debtors in the ordinary course of business on a prepetition basis; (d) pay all related

prepetition payroll taxes and other deductions; (e) honor workers' compensation obligations; and

(f) pay any prepetition claims of administrators and providers in the ordinary course of business

to the extent that any of the foregoing programs are administered, insured or paid through a

third-party administrator or provider.  In support of the Motion, the Debtors rely upon and

incorporate by reference the *Declaration of Nishant Machado in Support of the Debtors'*

*Chapter 11 Petitions and Requests for First Day Relief* (the "First Day Declaration"), which was

filed with the Court concurrently herewith.  In further support of this Motion, the Debtors

respectfully represent as follows:

## JURISDICTION AND VENUE

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334(b) and

157, and the *Amended Standing Order of Reference* from the United States District Court for the

District of Delaware dated as of February 29, 2012.  This is a core proceeding pursuant to 28

U.S.C. § 157(b), and pursuant to Local Rule 9013-1(f), the Debtors consent to the entry of a final

order by the Court in connection with this Motion to the extent that it is later determined that the

Court, absent consent of the parties, cannot enter final orders or judgments in connection

herewith consistent with Article III of the United States Constitution.  Venue is proper before the

Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory and legal predicates for the relief

requested herein are sections 105(a), 363(b), and 507 of the Bankruptcy Code, Bankruptcy Rules

6003 and 6004, and Local Rule 9013-1.

# BACKGROUND

**A.     General Background**

2.      On the date hereof (the "<u>Petition Date</u>"), each of the Debtors commenced a voluntary case under chapter 11 of the Bankruptcy Code.  Pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, the Debtors are continuing to manage their financial affairs as debtors in possession.

3.      Contemporaneously herewith, the Debtors filed a motion seeking joint administration of their chapter 11 cases (collectively, the "<u>Chapter 11 Cases</u>") pursuant to Bankruptcy Rule 1015(b) and Local Rule 1015-1.  No trustee, examiner, or official committee of unsecured creditors has been appointed in the Chapter 11 Cases.

4.      Information regarding the Debtors' history and business operations, capital structure and primary secured indebtedness, and the events leading up to the commencement of the Chapter 11 Cases can be found in the First Day Declaration.

**B.     The Debtors' Workforce and Related Obligations**

5.      In connection with operating their businesses, the Debtors currently employ approximately 4,612 employees (the "<u>Employees</u>") in the 23 states in which they conduct their operations.  The Debtors' workforce includes: (i) approximately 47 corporate support personnel who are primarily based in the Debtors' Restaurant Support Center (the "<u>RSC Employees</u>") located at the Debtors' headquarters in Denver, Colorado; (ii) 285 restaurant management personnel (the "<u>Restaurant Management Employees</u>") at the Debtors' various restaurants; (iii) approximately 10 Director of Operations employees ("<u>DO Employees</u>"); and (vi) approximately 4,270 restaurant team members in the Debtors' various restaurants (the "<u>Team Member Employees</u>").

6.      The Employees are the lifeblood of the Debtors' business, and their value cannot be overstated.  The institutional knowledge, experience, and skills of the Employees are essential to the Debtors' ability to continue business operations during the Chapter 11 Cases.  If the Debtors cannot assure Employees that they will promptly pay prepetition Employee Obligations (as defined below) to the extent allowed under the Bankruptcy Code, and continue to honor, as applicable, Employee Benefits Obligations (as defined below), certain Employees will likely seek employment elsewhere.  The loss of Employees at this critical juncture would have a material adverse impact on the Debtors' business and ability to maximize value through the prosecution of the Chapter 11 Cases.

7.      The Debtors also utilize the services of approximately eight contract workers (collectively, the "Contract Workers", and, together with the Employees, the "Workforce") to provide a variety of training, operations support and other daily business services, and the number of Contract Workers fluctuates depending on the Debtors' needs.  Approximately five of Contract Workers are provided by Robert Half International (the "Employment Agency") and the Debtors currently engage three Contract Workers who are not provided by the Employment Agency.

8.      The Contract Workers fill certain critical and immediate business needs of the Debtors, and allow the Debtors to have a flexible workforce in a cost-effective way.  In such capacity, the Contract Workers fill several types of roles for the Debtors, including providing accounting, information systems, and marketing services as needed.  The Contract Workers are a reliable and cost-efficient component of the Debtors' operations.  Thus, as with the Debtors' regular Employees, if the Debtors fail to honor their prepetition compensation obligations for the

Contract Workers, it is likely that the Debtors will lose such individuals' valuable services to the detriment of the Debtors' ongoing business operations.

9.      In the ordinary course of business, the Debtors incur payroll and other compensation obligations for their Workforce.  The Debtors also provide other benefits to Employees for the performance of services.  These benefits and obligations are described in more detail below.

**(1)      Workforce Compensation Obligations**

**a.      Employee Compensation Obligations**

10.     In the ordinary course of business, the Debtors incur payroll obligations to Employees, comprised generally of salaries and wages.  Approximately 342 Employees, consisting of the RSC Employees, Restaurant Management Employees, and DO Employees (collectively, the "Salaried Employees") are paid a fixed salary and the approximately 4,270 Team Member Employees are paid on an hourly basis.  The Debtors pay approximately 90% of the Team Member Employees on a bi-weekly basis, a week in arrears, on Mondays ("Group A Team Member Employees"), with the remaining Team Member Employees paid on a weekly basis, a week in arrears, on Mondays ("Group B Team Member Employees").  The Debtors pay Salaried Employees on a bi-weekly basis, one week in arrears, on Mondays.  The Debtors' weekly gross payroll on account of the Employees averages approximately $1.5 million.

11.     The last date Employees were compensated prior to the Petition Date was (a) October 6, 2017 for Group A Team Member Employees and all Salaried Employees, with such Employees receiving payment primarily for salaries and wages earned for September 19, 2017 to October 2, 2017 and (b) October 13, 2017 for the Group B Team Member Employees,

with such Employees receiving payment primarily for wages earned from October 3, 2017 to October 9, 2017.

12.     The next scheduled payroll date for all Employees is October 23, 2017 for all Employees, which will include salaries and wages for Group A Team Member Employees and Salaried Employees from October 3, 2017 to October 16, 2017 and wages for Group B Team Member Employees from October 10, 2017 to October 16, 2017, and will include salaries and wages earned prepetition.[2]  The Debtors estimate that, as of the Petition Date, they owe approximately $1.75 million on account of accrued and unpaid prepetition salaries and wages (the "Employee Compensation Obligations").  To the best of the Debtors' understanding, none of the Employees are owed more than $12,850 in accrued and unpaid general prepetition wages or salaries.[3]

13.     Approximately 90% of the Employees elect to have their payroll administered via direct deposit, with the remainder of the Employees electing to receive a physical check. The Debtors use InfoSync Services (the "Payroll Administrator") to process their payroll and coordinate the payment of Withholding Obligations (as defined below).  In connection with each payroll cycle, the Debtors create certain interface reports which they submit to the Payroll Administrator and approve cash disbursements processed by the Payroll Administrator from the Debtors' accounts to transfer the appropriate amounts to the various parties.

---

[2]     In the ordinary course of business, the Debtors prefund direct deposit and paycard payroll payments on the Thursday preceding a Monday payday and funds are deposited in Employee accounts on or before the Monday payday; physical checks are delivered to Employees on the Monday payday. Due to the imminent filing of these Chapter 11 Cases and the Debtors' desire to ensure that Employees received timely payment for wages earned prepetition, the Debtors prefunded direct deposit and paycard payroll payments on Tuesday, October 17, 2017 (rather than Thursday, October 19, 2017), and the funds for the direct deposit and paycard payroll payments have already left the Debtors' accounts and are not part of the Debtors' estates. Physical checks for the October 23, 2017 payroll payment will be delivered to Employees on October 23, 2017.

[3]     Although some Employees may have accrued PTO (defined below), the value of which would cause the amount owed to such Employees to exceed $12,850, the Debtors do not believe such Employees are owed the value of their PTO in cash as the Debtors will continue the PTO program.

14.     The ongoing services of the Payroll Administrator are imperative to the smooth functioning of the Debtors' payroll system.  The Debtors pay the Payroll Administrator approximately $30,000 per month for its services, which include payroll processing, tax filing, time and attendance, self-service benefits administration, and data processing services.  As of the Petition Date, the Debtors estimate that they owe the Payroll Administrator approximately $30,000 in outstanding fees in connection with its services (the "Payroll Administrator Obligations").

15.     The Debtors seek authorization, but not direction, to pay any unpaid Employee Compensation Obligations, and any unpaid Payroll Administrator Obligations.  In addition, the Debtors seek authority to cause any prepetition checks or electronic payment requests that were given in payment of Employee Compensation Obligations and/or Payroll Administrator Obligations to be honored and to reissue any check or electronic payment request that is not cleared by the applicable bank or other financial institution, to the extent necessary.

### b.    Contract Workers Obligations

16.     As noted above, the Debtors also utilize Contract Workers in the ordinary course of business.  The Contract Workers are skilled persons who allow for a flexible workforce to meet the business' fluctuating staffing needs.

17.     As of the Petition Date, the Debtors estimate that the aggregate amount owing to the Contract Workers not provided by the Employment Agency is less than $10,000 and the aggregate amount owing to the Employment Agency on account of the Contract Workers for services performed prior to the Petition Date is approximately $25,000 (the "Contract Workers Obligations" and collectively with the Employee Compensation Obligations the "Compensation Obligations").  The Debtors would be irreparably harmed without the services of the Contract

Workers because such parties play a critical role in the Debtors' day-to-day operations, and, as such, the Debtors request authorization, but not direction, to honor and pay any unpaid Contract Workers Obligations. To the best of the Debtors' understanding, none of the Contract Workers are owed more than $12,850 in accrued and unpaid general prepetition wages or salaries.

### c. Withholding Obligations

18. For each applicable pay period, the Debtors routinely deduct certain amounts directly from Employees' paychecks, including, without limitation, (a) garnishments, child support and service charges, and similar deductions and (b) other pre- and after-tax deductions payable pursuant to certain of the Employees' benefit plans discussed herein (such as an Employee's share of health care benefits and insurance premiums and 401(k) contributions), legally-ordered deductions, and miscellaneous deductions (collectively, the "Deductions").

19. In connection with the salaries and wages paid to Employees, the Debtors are required by law to withhold from Employees' wages amounts related to federal, state, and local income taxes, as well as social security and Medicare taxes (collectively, the "Employee Withholding Taxes") and to remit the same to the applicable taxing authorities. In addition, the Debtors are required to make matching payments from their own funds for, among other things, social security and Medicare taxes and to pay, based on a percentage of gross payroll, state and federal unemployment insurance, employment training taxes, and state disability insurance contributions (the "Employer Payroll Tax Obligations," and together with Employee Withholding Taxes, the "Payroll Tax Obligations"). Each pay cycle, the Debtors withhold any applicable Employee Withholding Taxes from the Employees' wages, and the Payroll Administrator remits the same to the applicable taxing authorities. The amounts in satisfaction

01:22445797.3

of the Payroll Tax Obligations are transferred to the Payroll Administrator in advance of the relevant payroll processing day.

20.     The Debtors estimate that, as of the Petition Date, the Debtors have withheld approximately $1.2 million in Deductions and Payroll Tax Obligations (collectively, the "Withholding Obligations") to be remitted to the appropriate third-party recipients.

21.     The Debtors seek authorization, but not direction, to continue to make the Deductions and satisfy Payroll Tax Obligations (collectively, the "Withholding Obligations") and to remit amounts withheld on behalf of third parties post-petition in the ordinary course of business.

**(2)     Bonus Programs**

22.     In the ordinary course of business, the Debtors have typically maintained a number of performance-based bonus programs for Restaurant Management Employees, RSC Employees, and certain catering Employees (collectively, the "Bonus Programs"; the bonuses earned under the Bonus Programs, the "Bonuses").  Approximately 340 employees participate in the following Bonus Programs:

- *Restaurant Bonus Programs*:  Eligible Restaurant Management Employees are entitled to participate in various Bonus Programs (the "Restaurant Bonus Programs") under which such Employees can earn Bonuses based on restaurant level catering sales, Bonuses based on guest satisfaction, Bonuses based on cost savings for goods and labor, Bonuses for general managers based on sales, staff retention and exceptional accomplishment, Bonuses for the regional director of operations based on the bonuses earned by their region, and safety-related Bonuses.  Approximately 285 Employees participate in the Restaurant

Bonus Programs and Bonuses under the Restaurant Bonus Programs are paid quarterly.

- *RSC Bonus Program*: RSC Employees are entitled to participate in a Bonus Program (the "RSC Bonus Program"), wherein a pool of bonus funds based on the Debtors' financial performance is shared among participating RSC Employees, including the Executive Leadership Team.  The maximum amount of the potential RSC Bonus Program pool for 2017 is $820,000.  Approximately 47 Employees participate in the RSC Bonus Program and Bonuses under the RSC Bonus Program are paid annually.

- *Catering Bonus Program*: Eligible catering sales managers and coordinators are entitled to participate in a Bonus Program (the "Catering Bonus Program") that allows eligible Employees to earn up to a 3% commission on catering sales.  Approximately three (3) Employees participate in the Catering Bonus Program and Bonuses under the Catering Bonus Program are paid quarterly.

23.     For all of the Employees who receive them, the Bonuses are an important aspect of their overall compensation.  Maintaining the historical prepetition practices with regard to the Bonuses is essential to ensuring that the Debtors can retain their Workforce and continue to operate their businesses and maximize value through the prosecution of the Chapter 11 Cases.

24.     As of the Petition Date, the Debtors estimate that approximately $300,000 has accrued under the Debtors' Bonus Programs.  The next payment under the Bonus Programs is scheduled to be made in late October and relates to the Restaurant Bonus Programs and Catering Bonus Program.  The Debtors do not believe that there are any Bonus Program payments owed

to insiders.  To the best of the Debtors' understanding, none of the Employees will have earned

Bonuses that, when taken together with accrued and unpaid general prepetition wages or salaries,

will exceed $12,850.

25.     Therefore, by this Motion, the Debtors seek authority, but not direction, to honor

their obligations under the Restaurant Bonus Program and Catering Bonus Program and to

maintain these Bonus Programs in the ordinary course of the Debtors' business.  Payment of

amounts due under the RSC Bonus Program will only be made after the filing of a separate

motion and entry of a separate order.

**(3)    PTO**

26.     The Debtors offer Salaried Employees paid time off ("PTO").  The rate at which

an Employee accrues PTO varies depends on the Employee's length of employment.  In general,

most Employees accrue 3.08 hours per pay period for zero through four years of service, 4.62

hours per pay period for five through nine years of service, 6.16 hours per pay period for ten

through fifteen years of service, and 7.69 hours per pay period for fifteen or more years of

service.  PTO may be accrued up to certain caps, which vary based on an Employee's service

time.  Employees may not elect to receive payment in lieu of taking PTO.  In accordance with

applicable law, Employees who are terminating their employment for any reason are entitled to

payment for all accrued but unused PTO as of the date of termination of employment.  These

PTO programs are typical and customary, and continuing to offer them is necessary for the

Debtors to retain Employees during the reorganization process.

27.     Because PTO is accrued and used by Employees on a continuous basis, it is

difficult to precisely quantify the cost of accrued PTO as of the Petition Date.  However, the

Debtors estimate that as of the Petition Date the value of accrued and unpaid PTO is

approximately $550,000.

28.     The Debtors request that they be authorized, but not directed, to continue to honor their PTO policy going forward, and with regard to any PTO that accrued prepetition, including to the extent that Employees may use prepetition PTO throughout the administration of these cases in accordance with prepetition policy.

### (4)     Reimbursable Expense Obligations and Car Allowance Obligations

29.     Prior to the Petition Date, in the ordinary course of business, the Debtors reimbursed Salaried Employees for approved, legitimate expenses incurred on behalf of the Debtors in the scope of the Employee's employment ("Reimbursable Expense Obligations"). Reimbursable Expense Obligations typically include expenses for, among other things, air travel, meals, parking, mileage and certain other business related expenses, and, as explained below, for certain Salaried Employees includes a modest car allowance (the "Car Allowance Obligations"). All such expenses are incurred with the applicable Employee's understanding that he or she will be reimbursed by the Debtors in accordance with the Debtors' reimbursement policy, as described in more detail below.  In all cases, reimbursement is contingent on the Debtors' determination that the charges are for legitimate, reimbursable business expenses.

30.     The Debtors have policies whereby Employees seek reimbursement, or file expense reports for the Debtors' payment, of business related expenses.  The expenses are ordinary course expenses that the Employees incur in performing their job functions.  It is essential to the continued operation of the Debtors' business that the Debtors' be permitted to continue reimbursing, or making direct payments on behalf of, employees for such expenses.

31.     The Debtors process expense and reimbursement payments on a rolling basis, and are current on all expense and reimbursement payments submitted through September 2017.  It is difficult for the Debtors to determine the exact amount of Reimbursable Expense Obligations

outstanding as of the Petition Date because, among other things, Employees may have expenses that they have yet to submit to the Debtors for reimbursement.  On average, over the past year, the Debtors have paid approximately $40,000 per month on account of Reimbursable Expense Obligations.  As of the Petition Date, the Debtors estimate that the total amount of unpaid prepetition Reimbursable Expense Obligations will not exceed $40,000.

32.     Further, as a means of inducing and retaining high quality and talented employees and to support employees with company roles that require extensive travel, the Debtors pay the costs to finance or lease a personal vehicle for approximately thirteen (13) Salaried Employees. The Debtors reimburse these employees for the loan or lease payments for their personal vehicles in the ordinary course of business.  These Car Allowance Obligations cost the Debtors approximately $3,500 every two (2) weeks. In the absence of these expenses, the Debtors do not believe they would be able to maintain the high level of employee support that will be necessary as part of the Debtors' reorganization. As of the Petition Date, the Debtors estimate that the total amount of unpaid Car Allowance Obligations will not exceed $5,000.

33.     Employees incurred Reimbursable Expense Obligations and Car Allowance Obligations as business expenses on the Debtors' behalf and/or as part of their employment agreements, and with the understanding that they would be reimbursed.  To avoid harming Employees who incurred Reimbursable Expense Obligations or Car Allowance Obligations, the Debtors request authority, but not direction, to satisfy all prepetition Reimbursable Expense Obligations and Car Allowance Obligations to the extent Employees have paid for such expenses directly from their own funds or are otherwise personally liable for such expenses.  The Debtors also seek authority to continue their reimbursement policy in the ordinary course during the administration of the Chapter 11 Cases.

(5)     **Employee Benefit Programs**

34.     In the ordinary course of business, the Debtors implement various benefit plans and policies for Employees that can be divided into the following categories, all as are described in more detail below: (a) prescription and medical benefits (collectively the "Medical Plans"), dental care (the "Dental Plan"), vision care (the "Vision Plan", and collectively with the Medical Plans and the Dental Plan, the "Health Plans"); (b) basic life and accidental death and dismemberment insurance, supplemental life and accidental death and dismemberment insurance, short- and long-term disability insurance, and other voluntary insurance plans (collectively, the "Income Protection Plans"); (c) a retirement savings 401(k) plan ("401(k) Plan"); (d) a flexible spending account plan (the "FSA Plan"); (e) employee assistance programs ("EAPs"); (f) the Relocation Programs (as defined below); (g) the Family Fund (as defined below); and (h) the Crave Card Program (as defined below; and, collectively with the Health Plans, Income Protection Plans, 401(k) Plan, FSA Plan, EAP, the Relocation Programs and the Family Fund, the "Employee Benefits Plans").  In certain instances, the Debtors deduct specified amounts from the participating Employees' wages in connection with the Employee Benefits Plans.  All obligations with respect to the Employee Benefits Plans are hereinafter referred to as the "Employee Benefits Obligations."  There are no Employee Benefits Obligations owed by the Debtors to retired Employees.

          a.     **Health Plans**

35.     The Debtors primarily offer the Health Plans to Salaried Employees.  Salaried Employee contributions to the Health Plans have been and are collected through payroll deductions from participating Salaried Employees.  The Debtors believe that it is necessary and appropriate to continue to honor their obligations to current Salaried Employees under the Health

Plans.  The Debtors request authority, but not direction, to pay all prepetition amounts due under the Health Plans, including any unpaid Medical Administrator Obligations (defined below).  The Debtors also request authority, but not direction, to continue to offer the Health Plans and honor their obligations thereunder and any Medical Administrator Obligations in the ordinary course during the administration of the Chapter 11 Cases.

**(i)    Medical Plans**

36.    The Debtors' offer two Medical Plans (the "HRA Plans") to Salaried Employees through Blue Cross Blue Shield of Texas ("Blue Cross") that provide a "Health Reimbursement Arrangement" pursuant to which a Salaried Employee first uses Debtor-funded dollars (the " HRA Fund") to pay medical expenses up to a set amount, and then the Salaried Employee becomes responsible for all medical expense up to an annual deductible.  After a Salaried Employee reaches his/her annual deductible, the Debtors share the cost of medical expenses with the Employee, subject to an out-of-pocket maximum that caps the Salaried Employee's total expenses in a plan year.  At the end of the plan year, any unused HRA Fund dollars can be rolled over and used in the following plan year, provided that the Salaried Employee remains enrolled in the HRA Plan.  The two HRA Plans vary in the amounts of the HRA Fund and annual deductible. Under the "Base Plan" the HRA Fund is $750 for an individual Employee and $1,500 for a family and under the "Buy-Up Plan" the HRA Fund is $1,000 for an individual Employee and $2,000 for a family.

37.    Approximately 315 Salaried Employees are enrolled in the HRA Plans. The HRA Plans are self-insured by the Debtors.  The Debtors pay Blue Cross approximately $35,000 per month for the HRA Plans, including stop loss premiums.  Although it is difficult to estimate the amount of claims submitted under the HRA Plans due to high variability in the number of claims

in process at any time, the Debtors estimate that, as of the Petition Date, approximately $0.5 million is owed to Salaried Employees on account of claims submitted under the HRA Plans prior to the Petition Date.  Additionally, as of the Petition Date, the Debtors owe Blue Cross approximately $35,000 in connection with the HRA Plans, including stop loss premiums.

38.     The Debtors also offer a Medical Plan through Blue Cross to Team Member Employees who average over 30 hours worked per week over a rolling 12-month look-back period (the "Hourly Medical Plan").  The Hourly Medical Plan covers the costs of preventive care and screenings and for other services a Team Member Employee pays the full cost of the service up to an annual deductible amount ($6,350 for an individual and $12,700 for a family). After a Team Member Employee reaches his/her annual deductible, the Hourly Medical Plan pays 100% of in-network covered medical expenses for the remainder of the year.

39.     On average, approximately 40 Team Member Employees are enrolled in the Hourly Medical Plan each month.  The Debtors pay Blue Cross approximately $38,000 per month for the Hourly Medical Plan.

40.     The HRA Plans are administered by TaxSaver (the "Medical Administrator"). The Debtors pay the Medical Administrator approximately $850 per month for its services.  As of the Petition Date, the Debtors owe the Medical Administrator approximately $850 in outstanding fees in connection with its services (the "Medical Administrator Obligations").

### (ii)     Dental Plan

41.     The Debtors offer the Dental Plan to Salaried Employees through Met Life. Approximately 250 Salaried Employees participate in the Dental Plan.  The Dental Plan is fully insured and has a monthly premium of approximately $20,000.  As of the Petition Date, the Debtors owe approximately $15,000 on account of the Dental Plan.

01:22445797.3

### (iii)    Vision Plan

42.    The Debtors offer the Vision Plan, administered by Vision Service Plan, to Salaried Employees.  Approximately 200 Salaried Employees participate in the Vision Plan.  The Debtors do not subsidize Salaried Employees' participation in the Vision Plan, but Salaried Employees may pay for the Vision Plan through payroll deductions.  The estimated monthly payment by the Debtors for the Vision Plan is approximately $3,000.  The Debtors estimate that as of the Petition Date they owe approximately $3,000 in Withholding Obligations in connection with the Vision Plan.

### b.    Income Protection Plans:  Life and AD&D Insurance

43.    The Debtors maintain certain Income Protection Plans including primary life and accidental death and dismemberment insurance (the "Life and AD&D Insurance") through The Hartford for Salaried Employees.  All benefits-eligible Salaried Employees have Life and AD&D Insurance.  Life and AD&D Insurance costs the Debtors approximately $2,000 per month.  The Debtors estimate that as of the Petition Date they owe approximately $2,000 on account of Life and AD&D Insurance.  In addition, certain of the Debtors' Salaried Employees choose elective coverage such as supplemental, spousal and dependent life insurance.

44.    As part of the Income Protection Plans, the Debtors also offer benefits-eligible Salaried Employees short and long term disability insurance ("Disability Insurance").  The Debtors maintain long-term Disability Insurance through The Hartford and the Debtors' short-term Disability Insurance is self-insured and administered by The Hartford.  Disability Insurance costs the Debtors approximately $6,500 per month.  As of the Petition Date, the Debtors owe approximately $6,500 on account of Disability Insurance as of the Petition Date.

45.     As part of the Income Protection Plans, the Debtors offer Team Member Employees the option to enroll in accident insurance and critical illness insurance through MetLife ("Accident Insurance").  The Debtors do not subsidize Team Member Employees' participation in the Accident Insurance, but Team Member Employees may pay for the Accident Insurance through payroll deductions.  As of the Petition Date, the Debtors believe that they owe approximately $1,000 in Withholding Obligations in connection with the Accident Insurance.

46.     The Debtors request authority, but not direction, to maintain the Income Protection Plans in the ordinary course during the administration of the Chapter 11 Cases and honor their obligations thereunder.

### c.     The 401(k) Plan

47.     The Debtors maintain the 401(k) Plan, a retirement savings plans for eligible Salaried Employees pursuant to section 401 of the Internal Revenue Code.  For the 401(k) Plan, Dean Mackey and David Godfrey serves as trustees, and Principal Financial Services serves as the record keeper.  Salaried Employees participating in the 401(k) Plan may contribute up to 90% of their pay or the federal statutory cap of $18,000 per year.  Approximately 90 individuals, comprised of both Salaried Employees and former Salaried Employees, currently participate in the 401(k) Plan, and the approximate amount withheld from the participating Salaried Employees' September 2017 paychecks for 401(k) contributions was $20,000.

48.     The annual compliance fee in connection with the 401(k) Plan is approximately $3,200.  As of the Petition Date, the Debtors believe that they owe approximately $25,000 in connection with the 401(k) Plan, including Withholding Obligations.

49.     The Debtors request authority, but not direction, to maintain the 401(k) Plan in the ordinary course during the administration of the Chapter 11 Cases and honor their obligations thereunder.

### d.     The FSA Plans

50.     Under the Debtors' FSA Plan, the Debtors offer Salaried Employees the ability to contribute a portion of their pre-tax compensation to flexible spending accounts to pay for qualified medical and dependent care expenses.  The FSA Plan has two components: (1) a Healthcare Flex Account that allows eligible Salaried Employees to elect to set aside up to $2,550 in pre-tax contributions to be used for reimbursement of eligible medical, dental, and vision care expenses and (2) a Dependent Care Flex Account that allows eligible Employees to elect to set aside up to $5,000 in pre-tax contributions to be used for reimbursement of qualified day care costs for children under age 13, parents, grandparents, disabled spouse, domestic partner or dependents who qualify as an eligible dependent under IRS rules.

51.     Approximately 70 Salaried Employees participate in the FSA Plan with approximately 65 participating in the Healthcare Flexible Spending Account and approximately 5 participating in the Dependent Care Spending Account. Salaried Employees participating in the FSA Plan designate approximately $6,000 per month on account of health care, and approximately $1,500 per month on account of dependent care.  These amounts are Deductions withheld by the Debtors through payroll.  As of the Petition Date, the Debtors estimate owing $7,500 in Withholding Obligations in connection with the FSA Plan.

52.     The FSA Plan is administered by TaxSaver (the "<u>FSA Administrator</u>") and the Debtors pay the FSA Administrator approximately $350 per month for its services.  As of the Petition Date, the Debtors owe the FSA Administrator approximately $350 in outstanding fees in

connection with its services (the "FSA Administrator Obligations").

53.     The Debtors request authority, but not direction, to continue to pay all prepetition amounts due under the FSA Plan and any unpaid FSA Administrator Obligations as and when they come due and to continue to honor their obligations thereunder and any FSA Administrator Obligations in the ordinary course during the administration of the Chapter 11 Cases.

### e.     Employee Assistance Program

54.     The Debtors offer the EAPs through Hartford Ability Assist Program and through Interface EAP.  The EAPs provides Salaried Employees and Team Member Employees with assistance relating to a variety of issues including marital and family concerns, substance abuse problems, and similar type supportive services.  The EAPs costs the Debtors approximately $600 per quarter.  The Debtors estimate that, as of the Petition Date, $300 is owed on account of the EAPs.  The Debtors seek authority, but not direction, to continue the EAPs in the ordinary course and honor any payments owed with respect to the EAPs regardless of when such obligations arose.

### f.     Relocation Program

55.     The Debtors also reimburse certain relocation expenses to DO Employees, managers and general managers who have relocated at the request of the Debtors (the "Permanent Relocation Program").  Expenses reimbursed under the Permanent Relocation Program include home finding, home selling, household goods movement and final trip expenses and the payments under the Permanent Relocation Program include tax gross-up payments made directly to the relevant taxing authority, if applicable.  The maximum amount of expenses reimbursed under the Permanent Relocation Program varies based on the eligible Employee's position.  In 2016, the Debtors spent approximately $50,000 in connection with the Permanent

Relocation Program.  As of the Petition Date, approximately $10,000 in Permanent Relocation

Program expenses were accrued and unpaid.  The Debtors seek authority, but not direction, to

continue with the Permanent Relocation Program in place prior to the Petition Date in the

ordinary course and honor any payments owed by the Debtors with respect to the Permanent

Relocation Program, regardless of when they arose.

56.     The Debtors also use a third party vendor, Lodging Source, to reserve and pay

hotel accommodations for managers in training who temporarily relocate to work on-site at a

designated training restaurant as part of the manager training program (the "Temporary

Relocation Program", and together with the Permanent Relocation Program, the "Relocation

Programs").  The Temporary Relocation Program is a benefit offered to Employees to compete

in the marketplace for talent, and any disruption would be to the detriment of the Debtors' efforts

to recruit, train and retain top restaurant management talent.  As of the Petition Date, the Debtors

owe approximately $50,000 in connection with the Temporary Relocation Program. The Debtors

seek authority, but not direction, to continue with the Temporary Relocation Program in place

prior to the Petition Date in the ordinary course and honor any payments owed by the Debtors

with respect to the Temporary Relocation Program, regardless of when they arose.

**(6)     Family Fund**

57.     The Debtors have formed Romano's Macaroni Grill Family Fund, a Texas

nonprofit corporation that is tax-exempt pursuant to section 501(c)(3) of the Internal Revenue

Code (the "Family Fund"),[4] to assist Team Member Employees with living, medical, funeral and

other expenses in the event of illness, injury, death, fire or other catastrophic conditions.  Team

Member Employees may make tax-deductible donations to the Family Fund through payroll

---

[4]     The Family Fund is not a Debtor in the Chapter 11 Cases.

deductions.  Eligible Team Member Employees may apply for support from the Family Fund

through a supervisor.  Support payments are subject to caps, which vary based on the applicable

Employee's service time.  The Family Fund is a separate legal entity and the cash it has received

is held in its name is not property of the Debtors' estates.

58.    The Debtors seek authority, but not direction, to continue offering Employees the

ability to make donations to the Family Fund through payroll deductions consistent with the

procedures in place prior to the Petition Date in the ordinary course and to honor any payments

owed by the Debtors to the Family Fund with respect to such donations, regardless of when they

arose.

### (7)    Complimentary Meals

59.    The Debtors provide Employees with cards that entitle the Employee to a certain

dollar amount of complimentary meals and beverages each month through the Debtors' "Crave

Card Program".  The maximum amount of complimentary meals provided to an eligible

Employee under the Crave Card Program varies based on the Employee's position.  In addition

to these complimentary meals, the Debtors reimburse eligible Employees at the end of the year

for taxes that the Employees would owe due to their complimentary meal benefit.  The Debtors

pay approximately $50,000 per year to reimburse Employees for taxes in connection with the

Crave Card Program. The Debtors estimate that, as of the Petition Date, the Debtors owe

approximately $40,000 on account of accrued and unpaid tax reimbursement obligations in

connection with the Crave Card Program.

### (8)    Workers' Compensation Claims

60.    The Debtors maintain workers' compensation policies with Liberty Insurance

Corporation, the Ohio Bureau of Workers' Compensation and the Washington State Department

of Labor & Industries(the "Workers' Compensation Policies").[5]  The Debtors' deductible under

the Liberty Insurance Corporation Workers' Compensation Policy is $250,000 per incident.  The

Debtors are liable for all claim amounts below the deductible and are also liable for similar

claims under previous workers' compensation policies (collectively, the "Workers'

Compensation Claims").  The Debtors estimate that they paid approximately $50,000 per month

in Workers' Compensation Claims in the last two years.  The Debtors' liability for Workers'

Compensation Claims under the current Workers' Compensation Policy and for Workers'

Compensation Claims under previous policies is secured by letters of credit.[6]

61.     The Debtors utilize the services of Liberty Mutual Insurance Corporation and

Broadspire (the "Workers' Compensation Administrators") to administer the Workers'

Compensation Claims.  The Workers' Compensation Administrators are paid per claim fees

when claims are processed (the "Workers' Compensation Administrator Obligations").  In the

twelve months preceding the Petition Date, the Debtors paid approximately $67,435 in Workers'

Compensation Administrator Obligations.

62.     Although it is difficult to estimate the amount of Workers' Compensation Claims

due to high variability in the number of claims in process at any time, the Debtors estimate that,

as of the Petition Date, there are approximately $1 million in outstanding Workers'

Compensation Claims for which the Debtors may be liable.  The Debtors seek authority, but not

---

[5]     Authority to continue the Workers' Compensation Policies is sought in the *Debtors' Motion for Order (A) Authorizing Continuation of, and Payment of Prepetition Obligations Incurred in the Ordinary Course of Business in Connection with, Various Insurance Policies, and (B) Authorizing Banks to Honor and Process Checks and Electronic Transfer Requests Related Thereto.*

[6]     A standby letter of credit in favor of Liberty Mutual issued by the Bank of Colorado with a liability amount of $2,000,000 is outstanding in connection with policy periods from 2016 to 2018 in connection with the Debtors' workers' compensation policies.  A standby letter of credit in favor of Travelers issued by the Bank of Colorado with a liability amount of $425,000 is outstanding in connection with policy periods from 2009 to 2014 in connection with previous workers' compensation policies.  A standby letter of credit in favor of Zurich issued by the Bank of Colorado with a liability amount of $700,000 is outstanding in connection with policy periods from 2014 to 2015 in connection with previous workers' compensation policies.

direction, to continue to pay the Workers' Compensation Claims and any unpaid Workers' Compensation Administrator Obligations in the ordinary course and honor any payments owed with respect to the Workers' Compensation Claims regardless of when such obligations arose.

## RELIEF REQUESTED

63.     By this Motion, the Debtors seek entry of an order authorizing, but not directing, the Debtors, in their sole discretion, to (a) pay prepetition claims and honor obligations incurred or related to the Compensation Obligations, the Withholding Obligations, the Restaurant Bonus Programs and Catering Bonus Program, PTO, Reimbursable Expense Obligations, the Employee Benefits Obligations, Workers' Compensation Claims, and all fees and costs incident to the foregoing, including amounts owed to third-party administrators, (including the Payroll Administrator Obligations, the Medical Administrator Obligations, the FSA Administrator Obligations, and the Workers' Compensation Administrator Obligations) (collectively, the "Employee Obligations") and (b) maintain, continue and honor, in the ordinary course of business, the Restaurant Bonus Programs and Catering Bonus Program, PTO, postpetition Reimbursable Expense Obligations, the Employee Benefit Plans, and the Workers' Compensation Claims (collectively, the "Employee Plans and Programs").

64.     To enable the Debtors to carry out the relief requested, the Debtors also request that the Court authorize all applicable banks and financial institutions (collectively, the "Banks"), and the Payroll Administrator (together with the Banks, the "Processors"), to receive, process, honor, and pay all checks presented for payment and all electronic payment requests made by the Debtors relating to the Employee Obligations and the Employee Plans and Programs, whether

such checks were presented or electronic-payment requests were submitted prior to or after the

Petition Date.[7]

## BASIS FOR RELIEF

65.     The Debtors' ability to successfully operate is contingent on a reliable and loyal

Workforce.  Thus, it is essential to assure the Employees that the Debtors will honor the

Employee Obligations and continue and maintain the Employee Plans and Programs in the

ordinary course of business throughout the Chapter 11 Cases.  A failure to promptly do so will

create concern and discontent among the Employees and could lead to resignations or, in the case

of Contract Workers, the decision to not complete work for the Debtors or accept future hiring

proposals.  Loss of even a few key personnel would immediately and irreparably harm the

Debtors' ability to maintain operations to the detriment of all interested parties.

66.     Therefore, pursuant to sections 507, 363, 1107(a), 1108, and 105(a) of the

Bankruptcy Code, the Debtors seek authority to pay the Employee Obligations, in their sole

discretion, and to maintain and continue the Employee Plans and Programs, in their sole

discretion, and in the ordinary course of business, in the exercise of their business judgment.

This relief is necessary to retain the Workforce, the loss of which would disable the Debtors'

business operations.

**A.      A Significant Portion of the Employee Obligations is Entitled to Priority Treatment**

67.     Section 507(a)(4)(A) of the Bankruptcy Code grants priority status to up to

$12,850 for each employee's claims for "wages, salaries, or commission, including vacation,

severance, and sick leave pay" earned within 180 days before the Petition Date.  11 U.S.C.

§ 507(a)(4)(A).  Similarly, section 507(a)(5) of the Bankruptcy Code grants priority to

---

[7]      Concurrently herewith, the Debtors have filed a motion for authority to, among other things, continue
utilizing their cash management system (the "Cash Management Motion").

contributions to employee benefit plans, up to an aggregate amount of $12,850 multiplied by the

number of employees covered, less any amounts paid to such employees under section 507(a)(4)

of the Bankruptcy Code.

68.    Indeed, "[w]age priority has been a feature of the bankruptcy law since 1898." *In re Garden Ridge Corp.*, No. 04-10324 (KJC), 2006 WL 521914, at *2 (Bankr. D. Del. Mar. 2, 2006) (citing 4 Alan N. Resnick & Henry J. Sommer, *Collier on Bankruptcy* ¶ 507.05[1] (15th ed. 2005)).  Its purpose is to "alleviate hardship on workers . . . who may have no other source of income and "to encourage employees to stand by an employer in financial difficulty." *Id.* (citing *Collier on Bankruptcy* ¶ 507.05[1]).  This priority extends to certain other "benefits that are considered akin to compensation, such as vacation, severance and sick leave pay." *Id.*

69.    The vast bulk of the Employee Obligations relating to the period prior to the

Petition Date constitutes priority claims under sections 507(a)(4) and (5) of the Bankruptcy

Code.  Amounts that are paid on account of priority claims for the majority of the Employee

Obligations would not otherwise be available for distribution to unsecured creditors.  Therefore,

the Debtors' unsecured creditors will not be prejudiced by permitting priority obligations to be

satisfied in the ordinary course of business during the Chapter 11 Cases rather than at the

conclusion of the cases.  Indeed, the Debtors submit that payment of Employee Obligations at

this time enhances value for the benefit of the Debtors and all interested parties by retaining the

Workforce.

**B.    The Debtors Should be Authorized to Pay the Employee Obligations Under Sections 1107(a) and 1108 of the Bankruptcy Code**

70.    The Debtors, operating their businesses as debtors in possession under sections

1107(a) and 1108 of the Bankruptcy Code, are fiduciaries "holding the bankruptcy estate[s] and

operating the business[es] for the benefit of [their] creditors and (if the value justifies) equity

owners." *In re CoServ, LLC*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002).  "Implicit in the

duties" of a chapter 11 debtor in possession is the duty "to protect and preserve the estate,

including an operating business's going-concern value." *Id.*

71.    Courts have noted that there are instances in which a debtor in possession can

fulfill its fiduciary duty "only . . . by the preplan satisfaction of a prepetition claim." *Id.*  The

*CoServ* court specifically noted that preplan satisfaction of prepetition claims is a valid exercise

of a debtor's fiduciary duty when the payment "is the only means to effect a substantial

enhancement of the estate." *Id.*  The court provided a three-pronged test for determining whether

a preplan payment on account of a prepetition claim is a valid exercise of a debtor's fiduciary

duty:

> First, it must be critical that the debtor deal with the claimant.  Second, unless it
> deals with the claimant, the debtor risks the probability of harm, or, alternatively,
> loss of economic advantage to the estate or the debtor's going concern value,
> which is disproportionate to the amount of the claimant's prepetition claim.
> Third, there is no practical or legal alternative by which the debtor can deal with
> the claimant other than by payment of the claim.

*Id.* at 498.

72.    Payment of the Employee Obligations as set forth herein meets each element of

the *CoServ* court's standard.  The Debtors' operations are complex, and rely on the skill and

expertise of their Employees.  Many Employees possess unique knowledge regarding specific

aspects of the Debtors' operations, which would be virtually irreplaceable should such

Employees be lost through a failure to pay their obligations.  In addition, any failure by the

Debtors to pay the Employee Obligations as set forth herein would negatively impact the morale

of the Workforce at a critical time for the Debtors and their businesses when the Workforce is

most needed.  The Workforce is also critical to the Debtors' ability to maintain their operations

consistent with past practices, which would be impossible without the continued efforts of the

Workforce.  The damage to the value of the Debtors' business and, hence, the costs to creditors as a whole, would be immediate and irreparable if the Employee Obligations were not met.  In short, the potential harm and economic disadvantage that would stem from the failure to pay the Employee Obligations as set forth herein greatly outweighs the amount of any prepetition claims that the Debtors are seeking authorization to pay.

73.     After careful consideration in consultation with their advisors, the Debtors have determined in their business judgment that to avoid significant disruption to their business operations there exists no practical or legal alternative to the payment of the Employee Obligations as set forth herein.  Therefore, the Debtors can meet their fiduciary duties as debtors-in-possession under sections 1107(a) and 1108 of the Bankruptcy Code only by payment of the Employee Obligations as set forth herein.

**C.     Payment of the Employee Obligations is Warranted Pursuant to Section 363 of the Bankruptcy Code**

74.     Section 363(b)(1) of the Bankruptcy Code provides that a debtor may "after notice and a hearing, use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  A debtor's decision to use, sell, or lease assets outside the ordinary course of business must be based upon the sound business judgment of that debtor.  *See Official Comm. of Unsecured Creditors of LTV Aerospace & Def. Co. v. LTV Co. (In re Chateaugay Corp.)*, 973 F.2d 141, 143 (2d Cir. 1992) (holding that a court determining an application pursuant to section 363(b) must find from the evidence a good business reason to grant such application); *see also In re Ionosphere Clubs, Inc.*, 100 B.R. 670, 675 (Bankr. S.D.N.Y. 1989) (standard for determining a section 363(b) motion is whether the debtor has a "good business reason" for the requested relief).  "Where the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously),

courts will generally not entertain objections to the debtor's conduct." *Comm. of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986). Consistent with a debtor's fiduciary duties, where there is a sound business purpose for the payment of prepetition obligations, and where the debtor is able to "articulate some business justification, other than the mere appeasement of major creditors," courts have authorized debtors to make such payments under section 363(b) of the Bankruptcy Code. *See, e.g., In re Ionosphere Clubs*, 98 B.R. at 175 (accepting debtor's argument that payment of employee wage claims was "critical . . . in order to preserve and protect its business and ultimately reorganize, retain its currently working employees and maintain positive employee morale," and finding that the debtor had "clearly demonstrated sound business reasons to justify such payments.").

75.    In addition, the Debtors pay the Employee Obligations in the ordinary course of business, as permitted by section 363(c) of the Bankruptcy Code. However, to the extent that the Court finds that approval is necessary and in an abundance of caution, the Debtors request that the Court grant the relief requested herein and enter an order authorizing them to pay the Employee Obligations, consistent with their compensation, vacation, and other benefit policies and plans, and to permit, but not require, the Debtors, in their discretion, to maintain and continue the Employee Plans and Programs for their Employees as those practices, programs, policies, and plans were in effect as of the Petition Date, as such may be modified, terminated, amended, or supplemented from time to time hereafter.

**D.     Payment of Certain Withholding Obligations is Appropriate Under Section 541 of the Bankruptcy Code**

76.    The Debtors also seek authority to pay the Withholding Obligations to the appropriate entities. These amounts principally represent the Employees' earnings that

governments, the Employees, and the judicial authorities have designated for deduction from the

Employees' paychecks.  Indeed, certain Withholding Obligations are not property of the

Debtors' estates because the Debtors have withheld such amounts from Employees' paychecks

on another party's behalf.  *See* 11 U.S.C. § 541; *see also City of Farrell v. Sharon Steel Corp.*, 41

F.3d 92, 95 (3d Cir. 1994) (observing the "well-settled principle that debtors do 'not own an

equitable interest in property . . . [they] hold[] in trust for another,' and that therefore funds held

in trust are not 'property of the estate.'") (quoting *Begier v. IRS*, 496 U.S. 53, 59 (1990)).

77.     Further, federal and state laws require the Debtors to withhold certain tax

payments from Employees' paychecks and to pay such amounts to the appropriate taxing

authority.  *See* 26 U.S.C. §§ 6672 and 7501(a); *see also City of Farrell v. Sharon Steel Corp.*, 41

F.3d 92, 95–97 (3d Cir. 1994) (finding that state law requiring a corporate debtor to withhold

city income tax from its employees' wages created a trust relationship between debtor and the

city for payment of withheld income taxes); *In re DuCharmes & Co.*, 852 F.2d 194, 196 (6th Cir.

1988) (noting that individual officers of a company may be held personally liable for failure to

pay trust fund taxes).  A failure to pay over these amounts could subject the Debtors and their

officers and directors to liability.  *See, e.g.*, John F. Olson, *et al.*, *Director & Officer Liability:*

*Indemnification and Insurance* § 3:21 (2003).  To avoid the potential of such liability, and

because the Withholding Obligations are not property of the Debtors' estates, the Debtors request

that the Court authorize them to remit these amounts to the appropriate parties in the ordinary

course of business.

**E.      Payment of the Employee Obligations is Warranted Pursuant to Section 105(a) of the Bankruptcy Code and Under the Doctrine of Necessity**

78.     Courts have also authorized payment of prepetition claims in appropriate

circumstances pursuant to section 105(a) of the Bankruptcy Code.  Section 105(a) of the

Bankruptcy Code, which codifies the inherent equitable powers of the bankruptcy court, empowers the bankruptcy court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).  Under section 105(a), courts may permit pre-plan payments of prepetition obligations when such payments are essential to the continued operation of the debtor's business and, in particular, where nonpayment of a prepetition obligation would trigger a withholding of goods or services essential to the debtors' business reorganization plan.  *See, e.g.*, *In re Ionosphere Clubs*, 98 B.R. at 177 (finding that section 105 empowers bankruptcy courts to authorize payment of prepetition debt when such payment is needed to facilitate the rehabilitation of the debtor).

79.    Numerous courts have used their section 105(a) powers under the "doctrine of necessity" to authorize payment of prepetition obligations where, as here, such payment is an essential element of the preservation of the debtor-in-possession's potential for rehabilitation. *See In re CoServ, L.L.C.,* 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002) (reasoning that because the debtor-in-possession has fiduciary duties it must meet, it is logical that the bankruptcy court may "use Section 105(a) of the [Bankruptcy] Code to authorize satisfaction of the prepetition claim in aid of preservation or enhancement of the estate"); *In re Synteen Techs., Inc.,* No. 00-02203-W, 2000 WL 33709667, at *2 (Bankr. D.S.C. Apr. 14, 2000) (courts have permission to "allow payment of a prepetition claim when essential to the continued operation of the debtor" (citation omitted)); *In re Just For Feet, Inc.,* 242 B.R. 821, 824 (D. Del. 1999) ("courts have used their equitable power under section 105(a) . . . to authorize the payment of pre-petition claims when such payment is deemed necessary to the survival of a debtor in a chapter 11 reorganization"); *In re NVR L.P.,* 147 B.R. 126, 127 (Bankr. E.D. Va. 1992) ("Under [section 105] the court can permit pre-plan payment of a prepetition obligation when essential to the continued operation of

the debtor"); *In re Eagle-Picher Indus., Inc.*, 124 B.R. 1021, 1023 (Bankr. S.D. Ohio 1991)

(approving payment of prepetition unsecured claims of tool makers as "necessary to avert a

serious threat to the Chapter 11 process"); *In re Quality Interiors, Inc.*, 127 B.R. 391, 396

(Bankr. N.D. Ohio 1991) ("[P]ayment by a debtor-in-possession of pre-petition claims outside of

a confirmed plan of reorganization is generally prohibited by the Bankruptcy Code," but "[a]

general practice has developed . . . where bankruptcy courts permit the payment of certain pre-

petition claims, pursuant to 11 U.S.C. § 105, where the debtor will be unable to reorganize

without such payment.").

80.    The "doctrine of necessity" is frequently invoked early in reorganization cases,

during the so-called "breathing spell," when preservation of the estate is most critical and often

extremely difficult.  *See* 2 *Collier on Bankruptcy* ¶ 105.02[4][a] (16th ed.) (discussing cases in

which courts have relied upon the "doctrine of necessity" or the "necessity of payment" rule to

pay prepetition claims immediately).  For example, in *In re Structurlite Plastics Corp.,* the court

embraced "the principle that a bankruptcy court may exercise its equity powers under section

105(a) to authorize payment of prepetition claims where such payment is necessary to 'permit

the greatest likelihood of survival of the debtor . . . .'" 86 B.R. 922, 931 (Bankr. S.D. Ohio

1988) (quoting *In re Chateaugay Corp.,* 80 B.R. 279, 287 (S.D.N.Y. 1987).  The court explained

that "a *per se* rule proscribing the payment of prepetition indebtedness may well be too inflexible

to permit the effectuation of the rehabilitative purposes of the Code."  *Id.* at 932.  Flexibility of

payment is particularly critical when the prepetition creditor provides vital goods or services to

the debtor.

81.    Here, the majority of the Employees rely on their compensation, benefits, and

reimbursement of expenses to satisfy their daily living expenses and maintain their health and

well-being.  Consequently, these Employees will be exposed to significant financial hardships if the Debtors are not permitted to honor the Employee Obligations.  If the Debtors are unable to satisfy such obligations, Employee morale and loyalty will suffer at a time when Employee support is critical.  Further, if the Court does not authorize the Debtors to honor their various obligations under the Employee Benefits Plans, the Employees' health coverage could be threatened, potentially burdening individual Employees with the costs of health care.  At a minimum, the loss of health care coverage, or uncertainty regarding coverage, would result in considerable anxiety for the Employees at a time when the Debtors need their Employees to perform their jobs at peak efficiency.  For all of the foregoing reasons, a sound business purpose exists to pay the Employee Obligations.

82.     In the absence of such payments, the Debtors believe that their Employees may seek alternative employment opportunities.  Such a development would deplete the Workforce, hinder the Debtors' ability to service the needs of their customers, and likely diminish creditor and counterparty confidence in the Debtors.  Moreover, the loss of valuable Employees and the recruiting efforts that would be required to replace such Employees would be a substantial and costly distraction at a time when the Debtors must focus on sustaining their operations.  Accordingly, the Debtors must be able to pursue all reasonable measures to retain the Employees by, among other things, continuing to honor wages, benefits, and related obligations, including those that accrued prior to the Petition Date, consistent with the terms set forth in the order attached hereto.

83.     Taken together, the nature of the Employee Obligations, the substantial harm to the Debtors' businesses that would be caused if those obligations were not honored, the related potential for loss of value in the Debtors' estates, and the fact that a significant portion of the

obligations in question relates to priority wage claims, lead to the conclusion that the Employee

Obligations fall well within the scope of obligations whose payments may be authorized

pursuant to the doctrine of necessity.

84. The relief requested herein is commonly granted by bankruptcy courts in this

District. *See, e.g.*, *In re Synagro Techs., Inc.*, Case No. 13-11041 (BLS) (Bankr. D. Del. Apr. 24,

2013); *In re Exide Techs.*, Case No. 13-11482 (KJC) (Bankr. D. Del. June 10, 2013); *In re Dendreon*

*Corp.*, Case No. 14-12515 (LSS) (Bankr. D. Del. Nov. 10, 2014); *In re CHL, Ltd.*, Case No. 12-

12437 (KJC) (Bankr. D. Del. Aug. 31, 2012) (granting interim relief) and (Bankr. D. Del. Sept. 24,

2012) (granting final relief for payments in excess of the section 504(a)(4) priority cap); *In re WP*

*Steel Venture LLC*, Case No. 12-11661 (KJC) (Bankr. D. Del. June 1, 2012); *In re Contract Research*

*Sols., Inc. et al.*, Case No. 12-11004 (KG) (Bankr. D. Del. Mar. 27, 2012); *In re Friendly Ice Cream,*

*Corp.*, No. 11-13167 (KG) (Bankr. D. Del. Oct. 6, 2011); *In re DSI Holdings, Inc. et al.*, Case No.

11-11941 (KJC) (Bankr. D. Del. June 28, 2011).

85. Accordingly, for all of the foregoing reasons, the relief requested herein will

benefit the Debtors' estates and creditors by allowing the Debtors' business operations to

continue without interruption and should therefore be approved.

**F.    The Court Should Authorize Applicable Banks and Other Processors to Honor**
**Checks and Electronic Fund Transfers in Accordance with the Motion**

86. In connection with the foregoing, the Debtors respectfully request that the Court

(a) authorize all applicable Processors to receive, process, honor, and pay all checks and transfers

issued by the Debtors in accordance with this Motion, without regard to whether any checks or

transfers were issued before or after the Petition Date; (b) provide that all Processors may rely on

the representations of the Debtors with respect to whether any check or transfer issued or made

by the Debtors before the Petition Date should be honored pursuant to this Motion (such Banks

and other Processors having no liability to any party for relying on such representations by the

Debtors provided for herein); and (c) authorize the Debtors to issue replacement checks or

transfers to the extent any checks or transfers that are issued and authorized to be paid in

accordance with this Motion are dishonored or rejected by the Processors.

## G.    Immediate Relief is Justified

87.    Pursuant to Bankruptcy Rule 6003, the Court may grant relief within 21 days after

the filing of the petition regarding a motion to "use, sell, lease, or otherwise incur an obligation

regarding property of the estate" only if such relief is necessary to avoid immediate and

irreparable harm.  Fed. R. Bankr. P. 6003(b).  Immediate and irreparable harm exists where the

absence of relief would impair a debtor's ability to reorganize or threaten the debtor's future as a

going concern.  *See In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 36 n.2 (Bankr. S.D.N.Y. 1990)

(discussing the elements of "immediate and irreparable harm" in relation to Bankruptcy Rule

4001).

88.    Moreover, Bankruptcy Rule 6003 authorizes the Court to grant the relief

requested herein to avoid harm to the Debtors' customers and other third parties.  Unlike

Bankruptcy Rule 4001, Bankruptcy Rule 6003 does not condition relief on imminent or

threatened harm to the estate alone.  Rather, Bankruptcy Rule 6003 speaks of "immediate and

irreparable harm" generally.  *Cf.* Fed. R. Bankr. P. 4001(b)(2), (c)(2) (referring to "irreparable

harm to the estate").  Indeed, the "irreparable harm" standard is analogous to the traditional

standards governing the issuance of preliminary junctions.  *See* 9 *Collier on Bankruptcy*

¶ 4001.07[b][3] (discussing source of "irreparable harm" standard under Rule 4001(c)(2)).

Courts will routinely consider third-party interests when granting such relief.  *See, e.g., Capital*

*Ventures Int'l v. Argentina*, 443 F.3d 214, 223 n.7 (2d Cir. 2006); *see also Linnemeir v. Bd. of*

*Trs. of Purdue Univ.*, 260 F.3d 757, 761 (7th Cir. 2001).

89.     As described herein and in the First Day Declaration, the Debtors will suffer

immediate and irreparable harm without Court authorization to pay the Employee Obligations

and other related relief requested herein.  Accordingly, Bankruptcy Rule 6003 has been satisfied

and the relief requested herein should be granted.

## REQUEST FOR WAIVER OF STAY

90.     To implement the foregoing, the Debtors seek a waiver of any stay of the

effectiveness of the order approving this Motion.  Pursuant to Bankruptcy Rule 6004(h), any

"order authorizing the use, sale, or lease of property other than cash collateral is stayed until the

expiration of 14 days after entry of the order, unless the court orders otherwise."  The Debtors

submit that the relief requested in this Motion is necessary to avoid immediate and irreparable

harm to the Debtors for the reasons set forth herein.  Accordingly, the Debtors submit that ample

cause exists to justify a waiver of the 14-day stay imposed by Bankruptcy Rule 6004(h).

91.     To implement the foregoing immediately, the Debtors respectfully request a

waiver of the notice requirements of Bankruptcy Rule 6004(a) to the extent that they are deemed

applicable.

## DEBTORS' RESERVATION OF RIGHTS

92.     Nothing contained herein is intended or should be construed as an admission as to

the validity of any claim against the Debtors, a waiver of the Debtors' rights to dispute any

claim, or an approval or assumption of any agreement, contract, or lease under section 365 of the

Bankruptcy Code.  The Debtors expressly reserve their rights to dispute any claim asserted by a

member of the Workforce under applicable law and to assume or reject any Workforce

agreements in accordance with the applicable provisions of the Bankruptcy Code.  Likewise, if

this Court grants the relief sought herein, any payment made pursuant to the Court's order is not

intended and should not be construed as an admission as to the validity of any claim or a waiver of the Debtors' rights to dispute such claim subsequently.

## **NOTICE**

93.      The Debtors have provided notice of this Motion to:  (i) the Office of the United States Trustee for the District of Delaware; (ii) the United States Securities and Exchange Commission; (iii) the Office of the United States Attorney General for the District of Delaware; (iv) the Internal Revenue Service; (v) counsel for Raven Capital Management LLC; (vi) counsel for Bank of Colorado; (vii) counsel for Riesen Funding LLC; (viii) the Debtors' cash management banks; and (ix) those creditors holding the thirty (30) largest unsecured claims against the Debtors' estates (on a consolidated basis).  Notice of this Motion and any order entered on this Motion will be served as required by Local Rule 9013-1(m).  In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

*[Remainder of Page Intentionally Left Blank]*

WHEREFORE, the Debtors respectfully request that the Court grant the relief requested herein and such other and further relief as the Court may deem just and proper.

Dated:  Wilmington, Delaware
October 18, 2017

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Elizabeth S. Justison*
Michael R. Nestor (No. 3526)
Edmon L. Morton (No. 3856)
Ryan M. Bartley (No. 4985)
Elizabeth S. Justison (No. 5911)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Tel:    (302) 571-6600
Fax:    (302) 571-1253
Email: mnestor@ycst.com
          emorton@ycst.com
          rbartley@ycst.com
          ejustison@ycst.com

-and-

Jeffrey C. Krause (CA No. 94053)
Michael S. Neumeister (CA No. 274220)
Emily B. Speak (CA No. 294852)
Brittany N. Schmeltz (CA No. 313552)
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, California 90071
Tel:    (213) 229-7000
Fax:    (213) 229-7520
Email: jkrause@gibsondunn.com
          mneumeister@gibsondunn.com
          espeak@gibsondunn.com
          bschmeltz@gibsondunn.com

*Proposed Counsel for the Debtors
and Debtors in Possession*

## EXHIBIT A

## PROPOSED ORDER

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| MAC ACQUISITION LLC, *et al.,*[1] | Case No. 17-_____ (___) |
| Debtors. | (Jointly Administered) |
| | Ref. Docket No. ____ |

**ORDER (A) AUTHORIZING PAYMENT OF CERTAIN PREPETITION WORKFORCE
CLAIMS, INCLUDING WAGES, SALARIES AND OTHER COMPENSATION, (B)
AUTHORIZING PAYMENT OF CERTAIN EMPLOYEE BENEFITS AND
CONFIRMING RIGHT TO CONTINUE EMPLOYEE BENEFITS ON POSTPETITION
BASIS, (C) AUTHORIZING PAYMENT OF REIMBURSEMENT
TO EMPLOYEES FOR PREPETITION EXPENSES, (D) AUTHORIZING
PAYMENT OF WITHHOLDING AND PAYROLL-RELATED TAXES,
(E) AUTHORIZING PAYMENT OF WORKERS' COMPENSATION OBLIGATIONS,
AND (F) AUTHORIZING PAYMENT OF PREPETITION CLAIMS OWING
TO ADMINISTRATORS AND THIRD PARTY PROVIDERS**

Upon the *Debtors' Motion for Entry of an Order (A) Authorizing Payment of Certain
Prepetition Workforce Claims, Including Wages, Salaries and Other Compensation,
(B) Authorizing Payment of Certain Employee Benefits and Confirming Right to Continue
Employee Benefits on Postpetition Basis, (C) Authorizing Payment of Reimbursement to
Employees for Expenses Incurred Prepetition, (D) Authorizing Payment of Withholding and
Payroll-Related Taxes, (E) Authorizing Payment of Workers' Compensation Obligations, and
(F) Authorizing Payment of Prepetition Claims Owing to Administrators and Third Party
Providers* (the "Motion")[2] filed by the above-captioned debtors and debtors in possession

---

[1]     The Debtors and the last four digits of their respective taxpayer identification numbers are as follows:  Mac Acquisition LLC (6362); Mac Parent LLC (6715); Mac Holding LLC (6682); Mac Acquisition of New Jersey LLC (1121); Mac Acquisition of Kansas LLC (3910); Mac Acquisition of Anne Arundel County LLC (6571); Mac Acquisition of Frederick County LLC (6881); Mac Acquisition of Baltimore County LLC (6865); and Macaroni Grill Services LLC (5963).  The headquarters for the above-captioned Debtors is located at 1855 Blake St., Ste. 200, Denver, CO 80202.

[2]     All capitalized terms used and not defined herein shall have the meanings ascribed to them in the Motion.

(collectively, the "Debtors"); and upon consideration of the First Day Declaration; and this Court

having found that it has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334(b) and 157,

and the *Amended Standing Order of Reference* from the United States District Court for the

District of Delaware dated as of February 29, 2012; and this Court having found that venue of

these cases and the Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and

this Court having found that this matter is a core proceeding pursuant to 28 U.S.C. § 157(b); and

this Court having determined that it may enter a final order consistent with Article III of the

United States Constitution; and this Court having found that notice of the Motion has been given

as set forth in the Motion and that such notice is adequate and no other or further notice need be

given; and a hearing having been held to consider the relief requested in the Motion; and upon

the record of the hearing and all of the proceedings had before this Court; and this Court having

found and determined that the relief sought in the Motion is in the best interests of the Debtors,

their estates, their creditors, and all other parties in interest; and that the legal and factual bases

set forth in the Motion establish just cause for the relief granted herein; and after due deliberation

and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT**:

1.      The Motion is GRANTED as set forth herein.

2.      Except as otherwise set forth herein, the Debtors are authorized, pursuant to

sections 105(a) and 363(b) of the Bankruptcy Code, but not obligated or directed, in the

reasonable exercise of their business judgment and in the ordinary course of business, to pay and

honor amounts on account of Employee Compensation Obligations and Contract Workers

Obligations (exclusive of Withholding Obligations); *provided*, *however*, that, subject to the

requirements of 11 U.S.C. section 507(a)(4) of the Bankruptcy Code, without prejudice to the

Debtors' right to seek additional payments, the Debtors shall not make any payments in excess of $12,850 on account of prepetition Employee Compensation Obligations or Contract Workers Obligations to any one Employee, respectively, absent further order of the Court, and (b) the aggregate amount of such payments on account of Employee Compensation Obligations and Contract Workers Obligations (inclusive of Withholding Obligations) shall not exceed $1.75 million unless further ordered by the Court.

3.      The Debtors and any applicable third parties are authorized to continue to allocate and distribute Withholding Obligations to the appropriate third-party recipients or taxing authorities in accordance with the Debtors' stated policies and prepetition practices.

4.      The Debtors are authorized, but not directed, to make payments under the Restaurant Bonus Programs and Catering Bonus Programs to non-insiders in an aggregate amount not to exceed $300,000.  The Debtors are further authorized, but not directed, to maintain the Restaurant Bonus Programs and Catering Bonus Program in the ordinary course of business.  Notwithstanding anything herein to the contrary, payment of amounts due under the RSC Bonus Program will only be made after the filing of a separate motion and entry of a separate order.

5.      The Debtors are authorized, but not directed, (a) to continue the Debtors' PTO policies in the ordinary course of business and (b) to honor all obligations under the Debtors' PTO policies, including payout of accrued PTO upon termination in accordance with the Debtors' prepetition practice and applicable law; *provided*, *however*, that payments to any terminated Employee on account of PTO shall not exceed (i) $12,850, *minus* (ii) any amount the terminated Employee received pursuant to paragraph 2 of this Order.

6.      The Debtors are authorized, but not directed, to continue to honor their Reimbursable Expense Obligations, and including any prepetition obligations, in accordance with the Debtors' stated policies and prepetition practices, and are authorized to satisfy such Reimbursable Expense Obligations in an amount not to exceed $40,000; *provided*, *however*, that satisfaction of prepetition Reimbursable Expense Obligations shall only be allowed to the extent Employees have paid for such expenses directly from their own funds or are otherwise personally liable for such expenses.

7.      The Debtors are authorized, but not directed, to continue to honor their Car Allowance Obligations, including any prepetition obligations, in accordance with the terms and conditions existing as of the Petition Date, and are authorized to satisfy such Car Allowance Obligations in an amount not to exceed $5,000.

8.      The Debtors are authorized, but not directed, to honor the Employee Benefit Plans in the ordinary course of business and in accordance with the Debtors' prepetition policies and programs, and to make any necessary contributions to such programs and pay any unpaid premium, claim, or amount owed as of the Petition Date with respect thereto.

9.      The Debtors are authorized, but not directed, to pay Workers 'Compensation Claims.

10.      The Debtors are authorized, but not directed, to pay all processing and administrative fees associated with and all costs and expenses incidental to payment of the Compensation Obligations or the Employee Benefits Obligations, including the Payroll Administrator Obligations, the Medical Administrator Obligations, the FSA Administrator Obligations, and the Workers' Compensation Administrator Obligations.

11.     Nothing in the Motion or this Order, nor as a result of any payment made pursuant to this Order, shall be deemed or construed as an admission as to the validity or priority of any claim against the Debtors, an approval or assumption of any agreement, contract or lease pursuant to section 365 of the Bankruptcy Code, or a waiver of the right of the Debtors, or shall impair the ability of the Debtors, or any other party in interest, to the extent applicable, to contest the validity and amount of any payment made pursuant to this Order.

12.     Each of the Processors is authorized to receive, process, honor, and pay all checks and transfers issued or requested by the Debtors, to the extent that sufficient funds are on deposit in the applicable accounts, in accordance with this Order and any other order of this Court.

13.     The Debtors are authorized to issue postpetition checks, or to effect postpetition fund transfer requests, in replacement of any checks or fund transfer requests in connection with any Employee Obligations that are dishonored or rejected.

14.     Nothing in the Motion or this Order shall be construed to authorize any payments governed by section 503(c)(3) of the Bankruptcy Code or any severance payments to insiders in excess of the limits set forth in section 503(c)(2) of the Bankruptcy Code.

15.     The requirements set forth in Bankruptcy Rule 6003(b) are satisfied.

16.     The requirements set forth in Bankruptcy Rule 6004(a) are satisfied by the contents of the Motion.

17.     Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

*[Remainder of Page Intentionally Left Blank]*

18.     The Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Motion.

19.     This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation of this Order.

Dated: _____, 2017
       Wilmington, Delaware


                                       _____

                                       UNITED STATES BANKRUPTCY JUDGE