## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| MAC ACQUISITION LLC, *et al.*,[1] | Case No. 17-12224 (___) |
| Debtors. | (Joint Administration Requested) |

**DEBTORS' MOTION FOR AN ORDER AUTHORIZING (A) CONTINUED USE OF CASH MANAGEMENT SYSTEM; (B) MAINTENANCE OF EXISTING BANK ACCOUNTS; (C) CONTINUED USE OF EXISTING BUSINESS FORMS; (D) CONTINUED PERFORMANCE OF INTERCOMPANY TRANSACTIONS IN THE ORDINARY COURSE OF BUSINESS AND GRANT OF ADMINISTRATIVE EXPENSE STATUS FOR POSTPETITION INTERCOMPANY CLAIMS; AND (E) INTERIM WAIVER OF SECTION 345(b) DEPOSIT AND INVESTMENT REQUIREMENTS**

Mac Acquisition LLC ("Mac Acquisition") and its affiliated debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors") hereby move the Court (this "Motion") for entry of an order (the "Proposed Order"), substantially in the form annexed hereto as Exhibit A, pursuant to sections 105, 345, 363, 364(a), 503(b), 1107(a), and 1108 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 2015-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), authorizing (a) the Debtors to (i) continue to use their Cash Management System (defined below), (ii) maintain existing Bank Accounts and Corporate Credit Cards (each as defined below), authorizing a waiver of certain operating guidelines relating to bank accounts, (iii) in their discretion, pay or otherwise satisfy all prepetition Credit

---

[1] The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: Mac Acquisition LLC (6362); Mac Parent LLC (6715); Mac Holding LLC (6682); Mac Acquisition of New Jersey LLC (1121); Mac Acquisition of Kansas LLC (3910); Mac Acquisition of Anne Arundel County LLC (6571); Mac Acquisition of Frederick County LLC (6881); Mac Acquisition of Baltimore County LLC (6865); and Macaroni Grill Services LLC (5963). The headquarters for the above-captioned Debtors is located at 1855 Blake St., Ste. 200, Denver, CO 80202.

Card Processing Fees (defined below), (iv) continue to use existing Business Forms (defined below), (b) continued performance of Intercompany Transactions and grant of administrative expense status for postpetition Intercompany Claims (defined below), and (c) an interim waiver of the deposit and investment requirements of section 345(b) of the Bankruptcy Code.   The Debtors also request that the Court authorize all Banks (defined below) with which the Debtors maintain accounts to continue to maintain, service, and administer such accounts on behalf of such Debtors.  In support of this Motion, the Debtors rely upon and incorporate by reference the *Declaration of Nishant Machado in Support of the Debtors' Chapter 11 Petitions and Requests for First Day Relief* (the "First Day Declaration"), which was filed concurrently herewith.  In further support of this Motion, the Debtors respectfully represent as follows:

## JURISDICTION AND VENUE

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334(b) and 157 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated as of February 29, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b), and pursuant to Local Rule 9013-1(f), the Debtors consent to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.  Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory and legal predicates for the relief requested herein are sections 105, 345, 363, 364(b), 503(b), 1107(a), and 1108 of the Bankruptcy Code, Bankruptcy Rules 2002, 6003, 6004, and 9007, and Local Rule 2015-2.

## BACKGROUND

### A.    General Background

2.      On the date hereof (the "Petition Date"), each of the Debtors commenced a voluntary case under chapter 11 of the Bankruptcy Code.  Pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, the Debtors are continuing to manage their financial affairs as debtors in possession.

3.      Contemporaneously herewith, the Debtors filed a motion seeking joint administration of their chapter 11 cases (collectively, the "Chapter 11 Cases") pursuant to Bankruptcy Rule 1015(b) and Local Rule 1015-1.  No trustee, examiner, or official committee of unsecured creditors has been appointed in these Chapter 11 Cases.

4.      Information regarding the Debtors' history and business operations, capital structure and primary secured indebtedness, and the events leading up to the commencement of these Chapter 11 Cases can be found in the First Day Declaration.

### B.    The Debtors' Cash Management System

5.      The Debtors' business requires the collection, payment, and transfer of funds through numerous bank accounts.  In the ordinary course of business and prior to the Petition Date, the Debtors maintained a centralized cash management system (the "Cash Management System").  Like other large businesses, the Debtors designed their Cash Management System to efficiently collect, transfer, and disburse funds generated through the Debtors' operations and to accurately record such collections, transfers, and disbursements as they are made.  The Debtors' financial personnel manage the Cash Management System from the Debtors' headquarters in Denver, Colorado.  The Debtors' Cash Management System is comprised of 118 bank accounts. Each general category of accounts is described below and a diagram of the Cash Management System is annexed hereto as Exhibit B.

6.      The Cash Management System includes the following bank accounts

(collectively, the "Bank Accounts") and corporate credit cards at various banks (collectively, the

"Banks") listed in the schedule annexed hereto as Exhibit C:

    a.      *Depository Accounts.*  The Debtors maintain several depository accounts (collectively, the "Depository Accounts").  These accounts are used to deposit cash from the Debtors' stores and other sources into the Debtors' Cash Management System.

        i.      Individual Restaurant Depository Accounts:  Each restaurant location maintains a separate depository account either at Wells Fargo Bank, N.A. ("Wells Fargo") or Bank of America, N.A. ("Bank of America") (the "Individual Restaurant Depository Accounts").  These Individual Restaurant Depository Accounts are used to collect cash sales from its customers.  Cash transactions constitute approximately 20% of the Debtors' total sales.  Balances in each Individual Restaurant Depository Account at Wells Fargo are automatically transferred daily to a master depository account at Wells Fargo.  Balances in this master depository account are automatically transferred weekly to the Intermediary Store Depository Account (as defined below).  Balances in each Individual Restaurant Depository Account at Bank of America are automatically transferred daily to the Intermediary Store Depository Account.

        ii.      Intermediary Store Depository Account.  Mac Acquisition maintains an intermediary store depository account that collects and aggregates all cash receipts from the Debtors' restaurant operations (the "Intermediary Store Depository Account").  The Intermediary Store Depository Account is a zero balance account ("ZBA").  All balances in the Intermediary Store Depository Account are automatically transferred daily to the Master Concentration Account (as defined below).

        iii.      Credit Card Depository Account.  Mac Acquisition maintains a separate depository account to collect credit card receipts from each of the Debtors' restaurants (the "Credit Card Depository Account").  Credit Card transactions constitute approximately 80% of the Debtors' total sales.  The Credit Card Depository Account is a ZBA, and all balances in the Credit Card Depository Account are automatically transferred daily to the Master Concentration Account.

b.  *Master Concentration Account.*  Mac Acquisition maintains a concentration account that collects all transfers from the Intermediary Store Depository Account and the Credit Card Depository Account (the "Master Concentration Account").[2]  The Master Concentration Account is the Debtors' primary operating account into which most of the Debtors' cash is concentrated, and through which the Debtors' disbursements are funded.

c.  *Liquor Imprest Account.*  Certain states in which the Debtors' operate require cash on delivery in connection with the purchase of alcoholic beverages.  The Debtors maintain an account for payments by individual stores in the purchase of alcoholic beverages in such states (the "Liquor Imprest Account").  The Liquor Imprest Account is a ZBA account, and is funded from the Master Concentration Account for the checks drawn against it.

d.  *Store Cash Replenishment Account.*  The Debtors maintain one deposit account with Wells Fargo used to replenish cash-on-hand at approximately five (5) of the Debtors' restaurant locations.  This is a ZBA account that is funded by the master depository account at Wells Fargo described in paragraph 6(a)(i) above.  This is a ZBA account, and receives only sufficient cash to write checks to individual restaurants to be cashed for use at the subject restaurant location.

e.  *Payroll and Benefits Accounts.*  The Debtors maintain separate accounts for payroll and benefits disbursements.  These accounts are both ZBA accounts, and are funded from the Master Concentration Account.[3]

f.  *Accounts Payable Account.*  The Debtors maintain an account for disbursements on account of the Debtors' accounts payable owing to the Debtors' trade vendors and similarly situated third parties (the "Accounts Payable Account").  The Accounts Payable Account is a ZBA account, and is funded from the Master Concentration Account.

g.  *Corporate Credit Cards.*  Certain employees are provided corporate credit cards issued by Bank of America for the purpose of paying for business and travel expenses and to pay certain vendors of the Debtors (the "Corporate Credit Cards").  Such employees are not personally liable on

---

[2]     The Master Concentration Account also collects funds from an account maintained by non-Debtor affiliate, RMG Development LLC ("RMG Development").  This account collects royalties from entities that have franchised Macaroni Grill restaurants outside the United States.

[3]     A description of the Debtors' wages and benefits provided to their employees is provided in the First Day Declaration in connection with the Debtors' Wages and Benefits Motion (as defined in the First Day Declaration) filed contemporaneously herewith.

the Corporate Credit Cards.  Bank of America requires that the Debtors maintain a separate account (the "Corporate Credit Cards Collateral Account") to collateralize the balances under the Corporate Credit Cards, although the balances under the Corporate Credit Cards are paid automatically through the Master Concentration Account.  There was approximately $80,000 in the Corporate Credit Cards Collateral Account as of the Petition Date, and the Debtors estimate there is approximately $50,000 in outstanding balances under the Corporate Credit Cards as of the Petition Date.

h.      *BOC Loan Account*.  Mac Parent maintains an account with Bank of Colorado (the "BOC Loan Account") for the sole purpose of (i) either receiving loan proceeds under the Debtors' secured debt facilities with the bank, which proceeds are then distributed to the Master Concentration Account, or (ii) making principal or interest payments to Bank of Colorado, which funds are transferred to the BOC Loan Account from the Master Concentration Account.[4]

7.      Further, the Debtors have entered into that Debtor-in-Possession Credit, Guaranty and Security Agreement dated as of October 18, 2017 (the "DIP Credit Agreement"), pursuant to which, if approved, the Debtors shall have access to $5 million in postpetition financing.  Under the proposed DIP Credit Agreement, the DIP Agent (as defined in the DIP Credit Agreement) will hold the proceeds of the DIP Facility (as defined in the DIP Credit Agreement) in a separate deposit account (the "Loan Proceeds Account")  for withdrawal to the Debtors.  Subject to the terms of the DIP Credit Agreement, funding under the DIP Facility will be released from Loan Proceeds Account directly to the Master Concentration Account to be used consistent with the Debtors' Cash Management System.  Entry of an order approving this Motion is a condition to the closing of the transactions under the DIP Credit Agreement, and therefore the relief requested herein is critical to the Debtors' ability to maintain their operations during these cases.

---

[4]      The Debtors maintain a deposit account with JP Morgan Chase Bank, N.A. that remains open in connection with a legacy dental plan that is no longer active.  There is minimal activity in this account, but it is referenced herein for disclosure purposes.

01:22445794.3

8.     The Debtors accept Visa, Mastercard, American Express, and Discover credit cards at all of their restaurants.  The Debtors' credit card receipts are all processed through Bank of America Merchant Services (the "Processor").  The Debtors receive funds directly into the Credit Card Depository Account electronically each day from the Processor.  The Processor automatically deducts its fees (collectively, the "Credit Card Processing Fees") for its card processing services, certain amount of which may have accrued, but remain unpaid as of the Petition Date.  Through the Motion, the Debtors seek authority, but not direction, in their discretion to continue payment the Credit Card Processing Fees in the ordinary course of business through the Processor's automatic deduction of such fees from the Debtors' daily fund transfer.

9.     The Cash Management System is a mainstay of the Debtors' ordinary, usual, and essential business practices.  The Debtors' system provides numerous benefits, including the ability to (a) quickly create status reports on the location and amount of funds, thereby allowing management to track and control corporate funds; (b) ensure cash availability and prompt payment of corporate, employee, and vendor related expenses; and (c) reduce administrative costs by facilitating the efficient movement of funds.

**C.     The Debtors' Existing Business Forms and Check Stock**

10.     In the ordinary course of business, the Debtors use a variety of checks and business forms.  To minimize expenses to their estates and avoid unnecessarily confusing their employees, customers, and suppliers, the Debtors believe it is appropriate to continue to use all checks, correspondence, and other business forms (including, without limitation, letterhead, purchase orders, and invoices) (collectively, the "Business Forms") as such forms were in existence immediately before the Petition Date—without reference to the Debtors' status as debtors in possession—rather than requiring the Debtors to incur the expense and delay of

ordering entirely new business forms.  With respect to checks, the Debtors will, as debtors in possession, use the existing check stock until depleted and then reorder checks with a reference to the Debtors' status as debtors in possession and bankruptcy case.

**D.     The Debtors' Intercompany Transactions**

11.     Prior to the Petition Date, in the ordinary course of their business, the Debtors engaged in intercompany transactions and transfers amongst themselves and with non-Debtor affiliates (the "Intercompany Transactions") related to their gift card program, the collection of credit card receivables, the payment of expenses, and intercompany loans.  The Intercompany Transactions may result in intercompany receivables and payables (the "Intercompany Claims").

12.     The Debtors maintain strict records of transfers of cash and can readily ascertain, trace, and account for all such intercompany transactions.  The Debtors will continue to maintain such records, including records of all current intercompany accounts receivable and payable.

13.     Further, the Debtors engage in intercompany transactions with affiliates that are not debtors in possession.  Specifically, RMG Development and Mac Acquisition IP LLC ("Mac Acquisition IP") are wholly owned subsidiaries of Mac Acquisition.  Mac Acquisition IP owns the Debtors' intellectual property, and licenses such intellectual property to Mac Acquisition for no cost.  Further, RMG Development is the franchisor under franchise agreements with respect to the Debtors' franchised Macaroni Grill locations.  Mac Acquisition employs a person specifically to manage such franchise agreements, and all foreign royalty proceeds received on account of RMG Development's franchise agreements are transferred directly from RMG Development's depository account to the Master Concentration Account to be used by the Debtors.  As a result, any costs of the Debtors in connection with non-Debtor affiliates are netted out by the proceeds and other benefits received, and the Debtors do not seek to make any

01:22445794.3

payments on account of prepetition indebtedness to non-Debtor affiliates pursuant to this Motion.

14.     If the Intercompany Transactions were discontinued, the Cash Management System and related administrative controls would be disrupted to the Debtors' detriment.  As described in more detail below, discontinuing the Intercompany Transactions would disrupt the Debtors' business operations, harming their creditors and other parties in interest.  Accordingly, the Debtors seek authority to continue the Intercompany Transactions, and request, pursuant to sections 503(b)(1) and 364(b) of the Bankruptcy Code, that postpetition Intercompany Claims resulting from ordinary course Intercompany Transactions be accorded administrative priority. Subject to the terms of the DIP Credit Agreement and any orders thereon (collectively, the "DIP Order"), the Intercompany Claims shall be junior to the claims and liens afforded to the DIP Agent under the DIP Credit Agreement and DIP Order.

**E.     The Debtors' Depository Policies and Practices**

15.     The Debtors believe they are in compliance with the requirements of section 345 of the Bankruptcy Code because the Bank Accounts are maintained at institutions approved by the Office of the United States Trustee (the "U.S. Trustee").  Therefore, the Bank Accounts are likely already in compliance with the requirements of section 346(b) of the Bankruptcy Code. However, the Debtors request that the Court waive the requirements of section 345(b) of the bankruptcy code on an interim basis.

## **RELIEF REQUESTED**

16.     The Debtors seek entry of the Proposed Order, pursuant to sections 105, 345, 363, 364(b), and 503(b) of the Bankruptcy Code, Bankruptcy Rules 6003 and 6004, and Local Rule 2015-2, authorizing (a) continued use of their Cash Management System, (b) maintenance of existing Bank Accounts, including a waiver of certain operating guidelines relating to bank

accounts, (c) the Debtors, in their discretion, to pay or otherwise satisfy all prepetition Credit

Card Processing Fees, (d) continued use of existing Business Forms, (e) continued performance

of Intercompany Transactions and grant of administrative status for postpetition Intercompany

Claims, and (f) an interim waiver of the deposit and investment requirements of section 345(b) of

the Bankruptcy Code.

17.     To enable the Debtors to carry out the relief requested, the Debtors also request

that the Court authorize the Banks to continue to service and administer the Bank Accounts as

accounts of the Debtors as debtors in possession without interruption and in the usual and

ordinary course, and to receive, process, honor, and pay any and all checks and drafts drawn on,

or electronic transfer requests made on, the Bank Accounts after the Petition Date by the holders

or makers thereof, as the case may be, in accordance with the orders of this Court.

## BASIS FOR RELIEF REQUESTED

**A.      Continued Use of the Cash Management System Is Essential to the Debtors'
Business Operations**

18.     In light of the substantial size and complexity of the Debtors' operations, the

maintenance of the Debtors' current Cash Management System is important for the preservation

and enhancement of the value of the Debtors' business.

19.     The Debtors' request for authorization to continue to use their Cash Management

System is consistent with section 363(c)(1) of the Bankruptcy Code, which authorizes a debtor in

possession to "use property of the estate in the ordinary course of business, without notice or a

hearing." 11 U.S.C. § 363(c)(1).  Section 363(c)(1) is intended to provide a debtor in possession

with the flexibility to engage in the ordinary transactions required to operate its business.  *See,*

*e.g.*, *In re Roth Am., Inc.*, 975 F.2d 949, 952 (3d Cir. 1992); *see also In re Nellson Nutraceutical,*

*Inc.*, 369 B.R. 787, 796 (Bankr. D. Del. 2007).  Included within the purview of section 363(c) is

a debtor's ability to continue the routine transactions necessitated by its cash management

system. *See Amdura Nat'l Distrib. Co. v. Amdura Corp. (In re Amdura Corp.)*, 75 F.3d 1447,

1453 (10th Cir. 1996). Nevertheless, the Debtors bring this Motion out of an abundance of

caution, to the extent any aspect of the Cash Management System could be considered as outside

the ordinary course of business for purposes of section 363(c).

20.     Courts in this and other districts have noted that an integrated cash management

system "allows efficient utilization of cash resources and recognizes the impracticalities of

maintaining separate cash accounts for the many different purposes that require cash." *In re*

*Columbia Gas Sys., Inc.*, 136 B.R. 930, 934 (Bankr. D. Del. 1992), *rev'd on other grounds*, 997

F.2d 1039 (3d Cir. 1993); *see also Southmark Corp. v. Grosz (In re Southmark Corp.)*, 49 F.3d

1111, 1114 (5th Cir. 1995) (finding cash management system allows a debtor "to administer

more efficiently and effectively its financial operations and assets"). The United States Court of

Appeals for the Third Circuit has agreed, emphasizing that requiring a debtor to maintain

separate accounts "would be a huge administrative burden and economically inefficient." *In re*

*Columbia Gas Sys., Inc.*, 997 F.2d 1039, 1061 (3d Cir. 1993). For these reasons, the Debtors

should be permitted to continue their Cash Management System.

21.     The Cash Management System has been used by the Debtors for several years and

is a customary and essential business practice. The widespread use of such systems

demonstrates the numerous benefits they provide, including the ability to control and monitor

corporate funds, invest idle cash, ensure cash availability, and reduce administrative expenses by

facilitating the movement of funds. In light of the size and complexity of the Debtors'

operations, the value of the Debtors' estates cannot be maximized if the Cash Management

System is substantially disrupted. In addition, preserving a "business as usual" atmosphere and

01:22445794.3

avoiding the unnecessary distractions that inevitably would be associated with any substantial disruption of the Cash Management System will facilitate the stabilization of the Debtors' business operations.

22.     Parties in interest will not be harmed by the Debtors' maintenance of the Cash Management System, including the Bank Accounts, because the Debtors have implemented appropriate mechanisms to ensure that unauthorized payments will not be made on account of obligations incurred prior to the Petition Date.  Specifically, with the assistance of their professionals and consistent with prior practice, the Debtors will continue to maintain detailed records of all transfers of cash and record all transactions on applicable accounts.  Therefore, the Debtors should be permitted to continue to manage their cash and transfer monies among the Bank Accounts in accordance with the Cash Management System.

23.     In complex chapter 11 cases such as these, courts have granted substantially similar relief.  *See, e.g.*, *In re The Standard Register Co.*, Case No. 15-10541 (BLS) (Bankr. D. Del. Mar. 13, 2015); *In re Brookstone Holdings Corp*, Case No. 14-10752 (BLS) (Bankr. D. Del. Apr. 4, 2014); *In re F&H Acquisition Corp.*, Case No. 13-13220 (KG) (Bankr. D. Del. Dec. 17, 2013); *In re Overseas Shipholding Grp., Inc.*, Case No. 12-20000 (PJW) (Bankr. D. Del. Jan. 24, 2013); *In re Vertis Holdings, Inc.*, Case No. 12-12821 (CSS) (Bankr. D. Del. Nov. 1, 2012); *In re THQ Inc.*, Case No. 12-13398 (MFW) (Bankr. D. Del. Dec. 20, 2012); *In re Delta Petroleum Corp.*, Case No. 11-14006 (KJC) (Bankr. D. Del. Dec. 16, 2011); *Sports Auth. Holdings, Inc.*, Case No. 16-10527 (MFW) (Bankr. D. Del. Mar. 24, 2016).  Similar authorization is appropriate in the Chapter 11 Cases.

**B.     The Court Should Authorize the Debtors to Maintain Existing Bank Accounts**

24.     The U.S. Trustee has established several operating guidelines for chapter 11 debtors in possession, including a requirement that the debtor in possession open new bank

accounts and close all existing accounts.  This requirement was designed to provide a clear line of demarcation between prepetition and postpetition claims and payments and to help protect against the inadvertent payment of prepetition claims.  The U.S. Trustee's guidelines also require opening a separate operating account and a special tax payment account into which all funds (including funds held in trust for employee tax withholdings) that may be collected and/or payable during the pendency of a debtor's case will be deposited.  This requirement is meant to provide cash collateral for, and ensure payment of, certain priority tax claims such as federal and state payroll taxes and sales taxes.

25.     To avoid substantial disruption to the normal operation of their business and to preserve a "business as usual" atmosphere, the Debtors request that they be permitted to continue to use the existing Bank Accounts without establishing separate accounts for cash collateral or tax payments.  Allowing the Debtors to maintain the Bank Accounts will assist them in accomplishing a smooth transition to operations under chapter 11.  Moreover, the Debtors can distinguish between prepetition and postpetition obligations and payments without closing the Bank Accounts and opening new ones.  Additionally, all Banks with which the Debtors maintain the Bank Accounts will be immediately advised not to honor checks, advises, drafts, or other requests for payment issued prior to the Petition Date, except as otherwise expressly permitted by an order of the Court and directed by the Debtors.  Therefore, the goals of the U.S. Trustee guidelines can be satisfied, and the Debtors' creditors can be protected, without closing the Bank Accounts.

26.     In addition, the Debtors have strict systems in place to make sure that priority tax obligations  claims are satisfied on a timely basis.  Altering the Bank Account structure would interrupt these systems, thereby significantly disrupting the Debtors' business operations and

jeopardizing the Debtors' prompt and timely payment of employee taxes and other priority tax obligations. The Debtors' systems provide the protections required by the U.S. Trustee guidelines—ensuring payment of taxes—without requiring the creation of new accounts and payment procedures.

27.     Thus, the Debtors respectfully request that the Court authorize the Banks to continue to maintain, service, and administer the Bank Accounts as accounts of the Debtors as debtors in possession, without interruption and in the ordinary course of business. In this regard, the Banks should be authorized to receive, process, honor, and pay any and all checks, automated clearing house payments ("ACH Payments") and other instructions, and drafts payable through, drawn, or directed on such Bank Accounts after the Petition Date by holders, makers, or other parties entitled to issue instructions with respect thereto, whether such checks, drafts, wires, or ACH Payments are dated prior to or subsequent to the Petition Date consistent with any order of the Court and governing law; *provided*, *however*, that any check, advise, draft, or other notification that the Debtors advised the Banks to have been drawn, issued, or otherwise presented prior to the Petition Date may be honored by the Banks only to the extent authorized by order of the Court.

28.     The Debtors also request that, to the extent a Bank honors a prepetition check or other item drawn on any account that is the subject of this Motion either (a) at the direction of the Debtors, (b) in a good-faith belief that the Court has authorized such prepetition check or item to be honored, or (c) as the result of an innocent mistake despite the above-described protective measures, such Bank will not be deemed to be liable to the Debtors or to their estates on account of such prepetition check or other item honored postpetition. Both as part of this Motion and in other motions that have been concurrently filed, the Debtors are requesting

authority, but not direction, to pay certain prepetition obligations.  With respect to some of these obligations, the Debtors issued checks prior to the Petition Date that have yet to clear the banking system.  In other instances, the Debtors will create the relevant check once the Court enters an order permitting the Debtors to do so.  The Debtors intend to inform the Banks which such checks should be so honored.  Therefore, the Debtors request that the Banks be authorized to rely on the representations of the Debtors with respect to whether any check or other payment order drawn or issued by the Debtor prior to the Petition Date should be honored.  The Debtors respectfully submit that such relief is reasonable and appropriate because the Banks are not in a position to independently verify or audit whether a particular item may be paid in accordance with a court order or otherwise.

29.    As an essential part of the operation of their business, the Debtors required employees to use the Corporate Credit Cards to pay for the Company's payment of certain vendors in the ordinary course of the operation of the Debtors' business, and to pay for certain other business-related expenses such as business travel.  Use of the Corporate Credit Card account is an integral part of the Debtors' cash management and account functions, and continuation of the ability of the Debtors' employees to use the Corporate Credit Cards is essential to the continued operation of the Debtors' business.

30.    In the ordinary course of business, the Banks charge, and the Debtors pay, honor, or allow the deduction from the appropriate account, certain service charges and other fees, costs, and expenses (collectively, the "Bank Fees").  The Debtors respectfully request that the Court authorize the Banks to (a) continue to charge the Debtors the Bank Fees and (b) charge-back returned items to the Bank Accounts in the ordinary course of business, whether such items are dated prior to, on, or subsequent to the Petition Date.

31.     Although the Debtors are requesting the waiver of the requirement that they close

all Bank Accounts and open new debtor-in-possession bank accounts, the Debtors may

determine, in their business judgment, that opening new bank accounts and/or closing existing

Bank Accounts is in the best interests of the estates.  Nothing contained herein should prevent

the Debtors from opening any additional bank accounts, or closing any existing Bank Accounts,

as they may deem necessary and appropriate in their sole discretion, or as required by any debtor

in possession financing agreements that are approved by the Court; *provided, however*, that any

new domestic account is established at a bank that is insured with the FDIC or the FSLIC and

organized under the laws of the United States or any State therein, or, in the case of accounts that

may carry a balance exceeding the insurance limitations set thereby, on the U.S. Trustee's List of

Authorized Bank Depositories for the District of Delaware.

32.     Consistent with the relief courts in this District have granted in other chapter 11

cases, the Debtors' continued use of the Bank Accounts should be authorized.  *See, e.g.*, *In re

The Standard Register Co.*, Case No. 15-10541 (BLS) (Bankr. D. Del. Mar. 13, 2015); *In re

Brookstone Holdings Corp*, No. 14-10752 (BLS) (Bankr. D. Del. Apr. 4, 2014); *In re F&H

Acquisition Corp.*, No. 13-13220 (KG) (Bankr. D. Del. Dec. 17, 2013); *In re Overseas

Shipholding Grp., Inc.*, No. 12-20000 (PJW) (Bankr. D. Del. Jan. 24, 2013); *In re Vertis

Holdings, Inc.*, No. 12-12821 (CSS) (Bankr. D. Del. Nov. 1, 2012); *In re THQ Inc.*, No. 12-

13398 (MFW) (Bankr. D. Del. Dec. 20, 2012); *In re Delta Petroleum Corp.*, No. 11-14006

(KJC) (Bankr. D. Del. Dec. 16, 2011); *Sports Auth. Holdings, Inc.*, Case No. 16-10527 (MFW)

(Bankr. D. Del. Mar. 24, 2016).

**C.      The Debtors Must be Permitted to Satisfy Any Prepetition Credit Card Processing Fees**

33.      The Debtors, operating their businesses as debtors in possession under section 1107(a) and 1108 of the Bankruptcy Code, are fiduciaries "holding the bankruptcy estate and operating the business for the benefit of [their] creditors." *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002).  Implicit in the duties of a chapter 11 debtor in possession is the duty to "protect and preserve the estate, including an operating business's going-concern value." *Id.*

34.      The *CoServ* court specifically noted that pre-plan satisfaction of pre-petition claims would be a valid exercise of a debtor's fiduciary duty when the payment "is the only means to effect a substantial enhancement of the estate." *Id.* at 498. The court provided a three-pronged test for determining whether a pre-plan payment on account of a pre-petition claim was a valid exercise of a debtor's fiduciary duty:

> First, it must be critical that the debtor deal with the claimant.  Second, unless it deals with the claimant, the debtor risks the probability of harm, or, alternatively, loss of economic advantage to the estate or the debtor's going concern value, which is disproportionate to the amount of the claimant's pre-petition claim.  Third, there is no practical or legal alternative by which the debtor can deal with the claimant other than by payment of the claim.

*Id.* at 498.

35.      Satisfying the Credit Card Processing Fees, including any pre-petition obligations on account thereof, meets each element of the *CoServ* court's standard.  Not surprisingly, a significant percentage of the Debtors' revenues are generated from credit and debit card sales. The Debtors therefore believe that they can only meet their fiduciary duties as debtors in possession under sections 1107(a) and 1108 of the Bankruptcy Code by having the authority, but

not the direction, of this Court to satisfy any outstanding pre-petition obligations on account of the Credit Card Processing Fees.

36.     The Court may also authorize the payment of the Credit Card Processing Fees pursuant to section 363(b) of the Bankruptcy Code. Section 363(b) provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Under this section, a court may authorize a debtor to pay certain pre-petition claims. *See In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) (authorizing payment of pre-petition claims where the debtors "articulate some business justification, other than the mere appeasement of major creditors"); *see also In re James A. Phillips, Inc.*, 29 B.R. 391, 395–97 (S.D.N.Y. 1983) (authorizing, pursuant to section 363, a contractor to pay pre-petition claims of some suppliers who were potential lien claimants because the payments were necessary for the general contractors to release funds owed to the debtors).

37.     Additionally, section 105(a) of the Bankruptcy Code authorizes the Court to issue "any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a). A bankruptcy court's use of its equitable powers to "authorize the payment of pre-petition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept." *In re Ionosphere Clubs, Inc.*, 98 B.R. at 175. Under section 105(a) of the Bankruptcy Code and the "necessity of payment" doctrine, the Court "can permit pre-plan payment of a pre-petition obligation when essential to the continued operation of the debtor." *In re NVR L.P.*, 147 B.R. 126, 127 (Bankr. E.D. Va. 1992); *see also In re Lehigh & New England Ry. Co.*, 657 F.2d 570, 581 (3d Cir. 1981) (stating the necessity of payment doctrine "teaches no more than, if payment of a claim which arose prior to

reorganization is essential to the continued operation of the [business] during reorganization, payment may be authorized even if it is made out of corpus."); *In re Just for Feet, Inc.*, 242 B.R. 821, 825 (D. Del. 1999) ("to invoke the necessity of payment doctrine, a debtor must show that payment of the pre-petition claims is 'critical to the debtor's reorganization'") (citation omitted).

38.    In light of the Debtors' need to maximize value for the benefit of all creditors, the relief requested herein is proper and should be granted.  Approximately 80% of the Debtors' daily customer revenues is in the form of credit card transactions.  The success of the Debtors' chapter 11 efforts is dependent upon, among other things, the ability to process customer credit and debit card transactions.  In the Debtors' business judgment, the ability to pay the Credit Card Processing Fees, including any related pre-petition amounts, is critical to the Debtors' successful prosecution of the Chapter 11 Cases.  Any inability on the Debtors' part to continue to satisfy pre-petition obligations with respect to the Credit Card Processing Fees would threaten the Debtors' ability to continue to accept those credit cards, thereby disrupting their customers' experience and potential depriving the Debtors of significant revenue while they try to find replacements for the Processor.  Finally, because the Processor is responsible for remitting the actual funds from credit card transactions to the Debtors, they may assert administrative holds against funds owing to the Debtors to allow them time to adjudicate any setoff rights they have with respect to the Credit Card Processing Fees.  Given the disparity in amount between the Credit Card Processing Fees and the respective amounts owed to the service providers, the Debtors would be deprived of substantial liquidity and their operations will be disrupted if they are forced to engage in such litigation.  Accordingly, the Debtors believe that the relief requested herein is warranted and a sound exercise of business judgment.

39.      In light of the foregoing, the Debtors submit that the relief requested herein with respect to the Credit Card Processing Fees is necessary, prudent, and in the best interests of their estates and creditors and should therefore be granted.

**D.      The Debtors Should be Authorized to Use Existing Check Stock and Related Business Forms**

40.      Local Rule 2015-2(a) provides:

> Where the debtor uses pre-printed checks, upon motion of the debtor, the Court may, without notice and hearing, permit the debtor to use its existing checks without the designation "Debtor-in-Possession" and use its existing bank accounts.  However, once the debtor's existing checks have been used, the debtor shall, when reordering checks, require the designation "Debtor-in-Possession" and the corresponding bankruptcy number on all such checks.

Del. Bankr. L.R. 2015-2(a).

41.      The Debtors use numerous Business Forms in the ordinary course of their business.  In order to minimize expenses to their estates, the Debtors request authority to continue using their existing prepetition Business Forms without reference to their status as debtors in possession or any other alteration.  It is essential that the Debtors be authorized to continue using their existing Business Forms because they routinely deal with a large number of vendors and customers, and changing business forms would impose a substantial burden without corresponding benefit.  With respect to checks, the Debtors will use the existing check stock until depleted and then reorder postpetition checks with the legend "Debtor in Possession" and the Debtors' bankruptcy case number.

42.      Courts in this District have routinely granted the same or similar relief as requested in the Motion to chapter 11 debtors.  *See, e.g.*, *In re The Standard Register Co.*, Case No. 15-10541 (BLS) (Bankr. D. Del. Mar. 13, 2015); *In re A123 Sys., Inc.*, Case No. 12-12859 (KJC) (Bankr. D. Del. Oct. 18, 2012) (granting interim relief); *In re WP Steel Venture LLC*, No. 12-11661 (KJC) (Bankr. D. Del. June 1, 2012); *In re DSI Holdings, Inc.*, Case No. 11-11941

01:22445794.3

(KJC) (Bankr. D. Del. June 28, 2011); *In re Friendly Ice Cream Corp.*, Case No. 11-13167 (KG)

(Bankr. D. Del. Oct. 6, 2011); *In re Neb. Book Co.*, Case No. 11-12005 (PJW) (Bankr. D. Del.

June 28, 2011); *In re L.A. Dodgers LLC*, Case No. 11-12010 (KG) (Bankr. D. Del. June 28,

2011).

E.    **Cause Exists to Permit Continued use of Intercompany Transactions and Postpetition Intercompany Claims Should Be Given Administrative Priority Status**

43.    As described above, the Debtors enter into certain Intercompany Transactions in

the ordinary course of business.  The Intercompany Transactions reduce the administrative costs

incurred by the Debtors.  If the Intercompany Transactions were to be discontinued, the Cash

Management System and related administrative controls would be disrupted.

44.    The continuation of the Intercompany Transactions will not prejudice the

Debtors' estates or their creditors.  Furthermore, the Debtors maintain strict records of all

transfers of cash and can account for all such Intercompany Transactions.  Accordingly, the

Debtors believe that continuation of the Intercompany Transactions is in the best interests of the

Debtors' estates and creditors.

45.    Because the Debtors engage in Intercompany Transactions on a regular basis and

such transactions are common among similar enterprises, the Debtors believe the Intercompany

Transactions are ordinary course transactions within the meaning of section 363(c)(1) of the

Bankruptcy Code and, therefore, do not require the Court's approval.  Nonetheless, out of an

abundance of caution, the Debtors are seeking express authority to engage in such transactions

on a postpetition basis.  The continued performance of the ordinary course Intercompany

Transactions is necessary to ensure the Debtors' ability to operate their business after the Petition

Date.

01:22445794.3

46.    To ensure that each individual Debtor will not fund, at the expense of its own creditors, the operations of another Debtor, the Debtors respectfully request that, pursuant to sections 503(b)(1) and 364(b) of the Bankruptcy Code, all Intercompany Claims arising after the Petition Date be awarded administrative expense priority status.  If all Intercompany Claims against the Debtors are accorded administrative expense priority status, each entity will continue to bear the ultimate payment responsibility for such ordinary course transactions.[5]

47.    Section 503(b)(1) of the Bankruptcy Code provides, in pertinent part, that after notice and a hearing "there shall be allowed administrative expenses . . . including the actual, necessary costs and expenses of preserving the estate including – wages, salaries, and commissions for services rendered after the commencement of the case . . . ."  11 U.S.C. § 503(b)(1).  Administrative expense treatment for intercompany transactions has been granted in other comparable chapter 11 cases in this District and should be granted here.  *See, e.g.*, *In re Physiotherapy Holdings, Inc.*, No. 13-12965 (KG) (Bankr. D. Del. Nov. 14, 2013); *In re Sch. Specialty, Inc.*, No. 13-10125 (KJC) (Bankr. D. Del. Jan. 30, 2013); *In re Overseas Shipholding Grp., Inc.*, No. 12-20000 (PJW) (Bankr. D. Del. Jan. 24, 2013); *In re THQ Inc.*, No. 12-13398 (MFW) (Bankr. D. Del. Dec. 20, 2012); *In re PMI Grp., Inc.*, No. 11-13730 (BLS) (Bankr. D. Del. Jan. 6, 2012); *In re William Lyon Homes*, No. 11-14019 (CSS) (Bankr. D. Del. Dec. 20, 2011).

**F.    Cause Exists to Grant an Interim Waiver of Section 345(b) to Allow the Debtors to Continue Use of Their Cash Management System Without the Need to Post a Bond or Provide Other Security**

48.    Pursuant to section 345(b) of the Bankruptcy Code, any deposit or other investment made by a debtor, except those insured or guaranteed by the United States or by a

---

[5]    Subject to the terms of the DIP Credit Agreement and the DIP Order, the Intercompany Claims shall be junior to the claims and liens afforded to the DIP Agent under the DIP Credit Agreement and DIP Order.

department, agency or instrumentality of the United States or backed by the full faith and credit of the United States, must be secured by a bond in favor of the United States that is secured by the undertaking of a corporate surety approved by the U.S. Trustee or by the deposit of securities of the kind specified in 31 U.S.C. § 9303.  *See* 11 U.S.C. § 345(b).  Section 345(b) provides further, however, that a bankruptcy court may allow the use of alternatives to these approved investment guidelines "for cause."  *Id.*; s*ee also In re Serv. Merch. Co.*, 240 B.R. 894, 896 (Bankr. M.D. Tenn. 1999).  Moreover, Local Rule 2015-2 provides that, if a motion for waiver of the section 345 requirements is filed on the first day of a chapter 11 case, the Court may grant an interim waiver of the section 345 requirements until such motion is heard.  *See* Local Rule 2015-2.

49.    In *Service Merchandise*, the court identified the following factors for determining whether cause exists to waive the requirements of Bankruptcy Code section 345(b):

(a)    the sophistication of the debtor's business;

(b)    the size of the debtor's business operations;

(c)    the amount of investments involved;

(d)    the bank ratings of the financial institutions where the debtor's funds are held;

(e)    the complexity of the case;

(f)    the safeguards in place within the debtor's own business for insuring the safety of the funds;

(g)    the debtor's ability to reorganize in the face of a failure of one or more of the financial institutions;

(h)    the benefit to the debtor of current practices;

(i)    the harm, if any, to the estate; and

(j)    the reasonableness of the debtor's request for relief from the section 345(b) requirements in light of the overall circumstances of the case.

01:22445794.3

*Service Merchandise*, 240 B.R. at 896.  Examining these factors, the *Service Merchandise* court

concluded that "cause" existed in that case because the debtors were "large, sophisticated

[companies] with a complex cash management system," with the ability to shift money as needed

to insure the safety of their funds.  *Id.*  Moreover, the benefits to the debtor of waiving the

section 345(b) requirements far outweighed any potential harm to the estate, and the failure to

waive the requirements "would needlessly handcuff this debtor's reorganization efforts."  *Id.* at

896–97.

50.    As in *Service Merchandise*, the Debtors operate a sophisticated enterprise with a

complex Cash Management System that provides the Debtors with the ability to transfer funds

rapidly to ensure their safety.  In light of the *Service Merchandise* factors and the safety of the

institutions that the Debtors propose to utilize as a continuation of their Prepetition Practices, the

Debtors believe that sufficient cause exists to allow deviation from the investment guidelines set

forth in section 345(b) of the Bankruptcy Code.  Satisfaction of those requirements would

impose needless costs on the Debtors' estates and the process of satisfying those requirements

would lead to needless inefficiencies in the management of the Debtors' business.

51.    The Debtors hereby request that this Court grant them a 45-day extension of the

time to comply with the investment requirements of section 345 and authorize the Debtors to

continue investing their excess funds in accordance with the Prepetition Practices.  During the

extension period, the Debtors propose to discuss with the U.S. Trustee what modifications to

their Prepetition Practices, if any, would be appropriate under the circumstances.

52.    Courts in this District have granted relief similar.  *See, e.g.*, *In re The Standard

Register Co.*, Case No. 15-10541 (BLS) (Bankr. D. Del. Mar. 13, 2015); *In re Ambient Corp.*,

Case No. 14-11791 (KG) (Aug. 11, 2014) (waiving 345(b) deadline); *In re Natrol, Inc.*, Case No.

14-11446 (BLS) (June 23, 2014) (granting a 75-day waiver of the 345(b) deadline); *In re*

*Altegrity, Inc.*, Case No. 15-10226 (LSS) (Feb. 10, 2015) (granting a 60-day waiver of the 345(b)

deadline); *In re Trump Entm't Resorts, Inc.*, Case No. 14-12103 (KG) (Sept. 10, 2014) (same); *In*

*re Orchard Supply Hardware Stores Corp.*, Case No. 13-11565 (CSS) (June 18, 2013) (same).

### G.    The Court Should Authorize Applicable Banks to Continue to Service and Administer the Debtors' Bank Accounts

53.    In connection with the foregoing, the Debtors respectfully request that the Court

(a) authorize all applicable Banks to receive, process, honor, and pay all checks and transfers

issued by the Debtors in accordance with this Motion, without regard to whether any checks or

transfers were issued before or after the Petition Date; (b) provide that all Banks may rely on the

representations of the Debtors with respect to whether any check or transfer issued or made by

the Debtors before the Petition Date should be honored pursuant to this Motion (such banks and

other financial institutions having no liability to any party for relying on such representations by

the Debtors provided for herein); and (c) authorize the Debtors to issue replacement checks or

transfers to the extent any checks or transfers that are issued and authorized to be paid in

accordance with this Motion are dishonored or rejected by the Banks.

### H.    Immediate Relief is Justified

54.    Pursuant to Bankruptcy Rule 6003, the Court may grant relief within 21 days after

the filing of the petition regarding a motion to "use, sell, lease, or otherwise incur an obligation

regarding property of the estate" only if such relief is necessary to avoid immediate and

irreparable harm.  Fed. R. Bankr. P. 6003(b).  Immediate and irreparable harm exists where the

absence of relief would impair a debtor's ability to reorganize or threaten the debtor's future as a

going concern.  *See In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 36 n.2 (Bankr. S.D.N.Y. 1990)

(discussing the elements of "immediate and irreparable harm" in relation to Bankruptcy Rule 4001).

55.     Moreover, Bankruptcy Rule 6003 authorizes the Court to grant the relief requested herein to avoid harm to the Debtors' customers and other third parties.  Unlike Bankruptcy Rule 4001, Bankruptcy Rule 6003 does not condition relief on imminent or threatened harm to the estate alone.  Rather, Bankruptcy Rule 6003 speaks of "immediate and irreparable harm" generally.  *Cf.* Fed. R. Bankr. P. 4001(b)(2), (c)(2) (referring to "irreparable harm to the estate").  Indeed, the "irreparable harm" standard is analogous to the traditional standards governing the issuance of preliminary junctions.  *See* 9 Alan N. Resnick & Henry J. Sommer, *Collier on Bankruptcy* ¶ 4001.07[b][3] (16th ed.) (discussing source of "irreparable harm" standard under Rule 4001(c)(2)).  Courts will routinely consider third-party interests when granting such relief.  *See, e.g., Capital Ventures Int'l v. Argentina*, 443 F.3d 214, 223 n.7 (2d Cir. 2006); *see also Linnemeir v. Bd. of Trs. of Purdue Univ.*, 260 F.3d 757, 761 (7th Cir. 2001).

56.     As described herein and in the First Day Declaration, the Debtors will suffer immediate and irreparable harm without Court authorization for the relief requested herein.

57.     Accordingly, Bankruptcy Rule 6003 has been satisfied and the relief requested herein should be granted.

### REQUEST FOR WAIVER OF STAY

58.     The Debtors also request that the Court waive the stay imposed by Bankruptcy Rule 6004(h), which provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  Fed. R. Bankr. P. 6004(h).  As described above, the relief that the Debtors seek in this Motion is necessary for the Debtors to operate their business without interruption and to preserve value for their estates.  Accordingly, the Debtors respectfully request

that the Court waive the fourteen-day stay imposed by Bankruptcy Rule 6004(h), as the exigent nature of the relief sought herein justifies immediate relief.

59.     To implement the foregoing immediately, the Debtors respectfully request a waiver of the notice requirements of Bankruptcy Rule 6004(a) to the extent they are deemed to apply.

## DEBTORS' RESERVATION OF RIGHTS

60.     Nothing contained herein is intended or should be construed as an admission of the validity of any claim against the Debtors; a waiver of the Debtors' right to dispute any claim; or an approval, assumption, or rejection of any agreement, contract, or lease under section 365 of the Bankruptcy Code.

## NOTICE

61.     The Debtors have provided notice of this Motion to:  (i) the Office of the United States Trustee for the District of Delaware; (ii) the United States Securities and Exchange Commission; (iii) the Office of the United States Attorney General for the District of Delaware; (iv) the Internal Revenue Service; (v) counsel for Raven Capital Management LLC; (vi) counsel for Bank of Colorado; (vii) counsel for Riesen Funding LLC; (viii) the Debtors' cash management banks; and (ix) those creditors holding the thirty (30) largest unsecured claims against the Debtors' estates (on a consolidated basis).  Notice of this Motion and any order entered on this Motion will be served as required by Local Rule 9013-1(m).  In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is necessary.

01:22445794.3

WHEREFORE, the Debtors respectfully request that the Court grant the relief requested herein and such other and further relief as the Court may deem just and proper.

Dated:    Wilmington, Delaware
          October 18, 2017

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Michael R. Nestor*

Michael R. Nestor (No. 3526)
Edmon L. Morton (No. 3856)
Ryan M. Bartley (No. 4985)
Elizabeth S. Justison (No. 5911)
Rodney Square
1000 North King Street
Wilmington, Delaware 19801
Tel:    (302) 571-6600
Fax:    (302) 571-1253
Email: mnestor@ycst.com
       emorton@ycst.com
       rbartley@ycst.com
       ejustison@ycst.com

-and-

Jeffrey C. Krause (CA No. 94053)
Michael S. Neumeister (CA No. 274220)
Emily B. Speak (CA No. 294852)
Brittany N. Schmeltz (CA No. 313552)
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
Telephone: (213) 229-7000
Facsimile: (213) 229-7520
Email: jkrause@gibsondunn.com
       mneumeister@gibsondunn.com
       espeak@gibsondunn.com
       bschmeltz@gibsondunn.com

*Proposed Counsel for the Debtors*
*and Debtors in Possession*

01:22445794.3

# EXHIBIT A

## PROPOSED ORDER

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| MAC ACQUISITION LLC, *et al.*,[1] | Case No. 17-_____ (___) |
| Debtors. | (Jointly Administered) |
| | Ref. Docket No. ____ |

**ORDER AUTHORIZING (A) CONTINUED USE OF CASH MANAGEMENT SYSTEM;
(B) MAINTENANCE OF EXISTING BANK ACCOUNTS; (C) CONTINUED
USE OF EXISTING BUSINESS FORMS; (D) CONTINUED PERFORMANCE
OF INTERCOMPANY TRANSACTIONS IN THE ORDINARY COURSE OF
BUSINESS AND GRANT OF ADMINISTRATIVE EXPENSE STATUS FOR
POSTPETITION INTERCOMPANY CLAIMS; AND (E) INTERIM WAIVER OF
SECTION 345(b) DEPOSIT AND INVESTMENT REQUIREMENTS**

Upon the *Debtors' Motion for Interim and Final Orders Authorizing (A) Continued Use of Cash Management System; (B) Maintenance of Existing Bank Accounts; (C) Continued Use of Existing Business Forms; (D) Continued Performance of Intercompany Transactions in the Ordinary Course of Business and Grant of Administrative Expense Status for Postpetition Intercompany Claims; and (E) Interim Waiver of Section 345(b) Deposit and Investment Requirements* (the "Motion")[2] filed by the above-captioned debtors and debtors in possession (collectively, the "Debtors"); and this Court having found that it has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334(b) and 157, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated as of February 29, 2012; and this Court having found that venue of these cases and the Motion in this District is proper

---

[1]    The Debtors and the last four digits of their respective taxpayer identification numbers are as follows:  Mac Acquisition LLC (6362); Mac Parent LLC (6715); Mac Holding LLC (6682); Mac Acquisition of New Jersey LLC (1121); Mac Acquisition of Kansas LLC (3910); Mac Acquisition of Anne Arundel County LLC (6571); Mac Acquisition of Frederick County LLC (6881); Mac Acquisition of Baltimore County LLC (6865); and Macaroni Grill Services LLC (5963).  The headquarters for the above-captioned Debtors is located at 1855 Blake St., Ste. 200, Denver, CO 80202.

[2]    All capitalized terms used and not defined herein shall have the meanings ascribed to them in the Motion.

01:22445794.3

pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that this matter is a core

proceeding pursuant to 28 U.S.C. § 157(b); and this Court having found that notice of the Motion

has been given as set forth in the Motion and that such notice is adequate and no other or further

notice need be given; and this Court having determined that it may enter a final order consistent

with Article III of the United States Constitution; and upon consideration of the First Day

Declaration; and a hearing having been held to consider the relief requested in the Motion; and

upon the record of the hearing and all of the proceedings had before this Court; and this Court

having found and determined that the relief sought in the Motion is in the best interests of the

Debtors, their estates, their creditors and all other parties in interest; and that the legal and factual

bases set forth in the Motion establish just cause for the relief granted herein; and after due

deliberation and sufficient cause appearing therefor,

       **IT IS HEREBY ORDERED THAT**:

       1.      The Motion is GRANTED as set forth herein.

       2.      The Debtors are authorized to maintain and use the Cash Management System as

described in the Motion.

       3.      The Debtors are authorized to (a) continue to use, with the same account numbers,

the Bank Accounts and Corporate Credit Cards, including, without limitation, those accounts

identified on Exhibit C to the Motion; (b) treat the Bank Accounts for all purposes as accounts of

the Debtors as debtors in possession; and (c) use, in their present form, all Business Forms,

without reference to their status as debtors in possession, except as otherwise provided in this

Order.

       4.      The Banks are hereby authorized to continue to service and administer the Bank

Accounts as accounts of the Debtors as debtors in possession without interruption and in the

usual and ordinary course, and to receive, process, honor and pay any and all checks and drafts drawn on, or electronic transfer requests made on, the Bank Accounts after the Petition Date by the holders or makers thereof, as the case may be; *provided, however*, that any check drawn or issued by the Debtors before the Petition Date may be honored by a Bank if specifically authorized by order of this Court.

5.      Notwithstanding any other provision of this Order, no Bank that honors a prepetition check or other item drawn on any account that is the subject of this Order (a) at the direction of the Debtors, (b) in good faith belief that the Court has authorized such prepetition check or item to be honored, or (c) as the result of an innocent mistake made despite implementation of reasonable item handling procedures, shall be deemed to be liable to the Debtors or their estates or otherwise in violation of this Order.

6.      Each of the Debtors' Banks is authorized to debit the Debtors' accounts in the ordinary course of business without need for further order of this Court for: (a) all checks, items, and other payment orders drawn on the Debtors' accounts which are cashed at such Bank's counters or exchanged for cashier's checks by the payees thereof prior to the Bank's receipt of notice of filing of the Chapter 11 Cases; (b) all checks, automated clearing house entries, and other items deposited or credited to one of Debtors' accounts with such Bank prior to filing of the Chapter 11 Cases which have been dishonored, reversed, or returned unpaid for any reason, together with any fees and costs in connection therewith, to the same extent the Debtors were responsible for such items prior to filing of the Chapter 11 Cases; and (c) all undisputed prepetition amounts outstanding as of the date hereof, if any, owed to any Bank as service charges for the maintenance of the Cash Management System.

01:22445794.3

7.      The Banks may rely on the representations of the Debtors with respect to whether any check, item, or other payment order drawn or issued by the Debtors prior to the Petition Date should be honored pursuant to this or any other order of this Court, and such Banks shall not have any liability to any party for relying on such representations by the Debtors as provided for herein.

8.      For Banks at which the Debtors hold accounts that are party to a Uniform Depository Agreement with the Office of the U.S. Trustee for the District of Delaware, within fifteen (15) days of the date of entry of this Order the Debtors shall (a) contact each bank, (b) provide the bank with each of the Debtors' employer identification numbers and the case number of the Chapter 11 Cases and (c) identify each of their bank accounts held at such banks as being held by a debtor in possession in a bankruptcy case.

9.      For Banks at which the Debtors hold accounts that are not party to a Uniform Depository Agreement with the Office of the U.S. Trustee for the District of Delaware, the Debtors shall use their good-faith efforts to cause such Banks to execute a Uniform Depository Agreement in a form prescribed by the Office of the U.S. Trustee within forty-five (45) days of the date of this Order.  The U.S. Trustee's rights to seek further relief from this Court on notice in the event that the aforementioned banks are unwilling to execute a Uniform Depository Agreement in a form prescribed by the U.S. Trustee are fully reserved.

10.     The Debtors are authorized to open any new bank accounts or close any existing Bank Accounts as they may deem necessary and appropriate in their sole discretion; *provided* that the Debtors give notice within fifteen (15) days thereafter to the U.S. Trustee, the DIP Agent and any statutory committees appointed in the Chapter 11 Cases; *provided*, *further*, that the Debtors shall only open any such new bank accounts at banks that have executed a Uniform

Depository Agreement with the U.S. Trustee, or at banks that are willing to immediately execute such an agreement.

11.     The Debtors are authorized to pay up to $50,000 in outstanding balances, charges, and fees due with respect to the Corporate Credit Cards.

12.     The Debtors are authorized, but not directed, in their discretion, to pay or otherwise satisfy all pre-petition Credit Card Processing Fees and any related pre-petition obligations in accordance with the Debtors' pre-petition policies and practices and to continue paying Credit Card Processing Fees in the ordinary course of business.

13.     The Debtors are authorized to use their existing Business Forms; *provided*, that once the Debtors' existing checks have been used, the Debtors shall, when reordering checks, require the designation "Debtor in Possession" and the corresponding bankruptcy case number on all checks.

14.     The Debtors are authorized to continue performing Intercompany Transactions in the ordinary course of business and to honor and pay obligations in connection with the Intercompany Transactions; *provided*, *however*, that the Debtors may not make any intercompany transfers to non-debtor affiliates or subsidiaries absent further order of the Court.

15.     The Debtors shall maintain accurate and detailed records of all transfers, including Intercompany Transfers, so that all transactions may be readily ascertained, traced, recorded properly and distinguished between prepetition and post-petition transactions.

16.     All Intercompany Claims owed by a Debtor to another Debtor shall be accorded administrative priority status of the kind specified in section 503(b) of the Bankruptcy Code to the extent such obligations arise after the Petition Date.

17.     Subject to the terms of the DIP Credit Agreement and the DIP Order, the Intercompany Claims shall be junior to the claims and liens afforded to the DIP Agent under the DIP Credit Agreement and DIP Order.  In the event of any inconsistency between this Order the DIP Order, the DIP Order shall control.

18.     The Debtors' time to comply with section 345(b) of the Bankruptcy Code is hereby extended until the date that is 45 days after the date hereof, without prejudice to the Debtors' right to seek further waivers from the U.S. Trustee without further Order of this Court, or to seek further waivers from the Court if necessary..

19.     Notwithstanding use of a consolidated Cash Management System, the Debtor shall calculate quarterly fees under 28 U.S.C. § 1930(a)(6) based on the disbursements of each Debtor, regardless of which entity pays those disbursements.

20.     Within five (5) business days from the date of the entry of this Order, the Debtors shall (i) serve a copy of this Order on each Bank and (ii) request that each Bank internally code each of the Bank Accounts as "debtor in possession" accounts.

21.     Nothing in this Order (a) is intended or shall be deemed to constitute an assumption of any agreement pursuant to section 365 of the Bankruptcy Code or an admission as to the validity of any claim against the Debtors, (b) shall impair, prejudice, waive or otherwise affect the rights of the Debtors or their estates with respect to the validity, priority or amount of any claim against the Debtors and their estates, or (c) shall be construed as a promise to pay a claim.

22.     The Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order in accordance with the Motion.

23.     The requirements set forth in Bankruptcy Rule 6003(b) are satisfied.

24.     Notice of the Motion as provided therein shall be deemed good and sufficient and the requirements of Bankruptcy Rule 6004(a) and the Local Rules are satisfied by such notice.

25.     Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

26.     This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation of this Order.


Dated: October ___, 2017
        Wilmington, Delaware

_____
UNITED STATES BANKRUPTCY JUDGE

**EXHIBIT B**

**DIAGRAM OF CASH MANAGEMENT SYSTEM**



Mac Parent LLC
Acct #9998
Checking Account
Bank of Colorado
Purpose: Loan Servicing Account
Mac Acquisition LLC
Acct #1001
Bank of America
Purpose: Master Concentration Account
Mac Acquisition LLC
Acct #7380
Standalone Account
Bank of America
Purpose: Restricted Money Market for Corp Credit Cards Collateral
ZBA Accounts
Mac Acquisition LLC
Acct #6608
Payroll Account
Bank of America
Purpose: Payroll Disbursements
Mac Acquisition LLC
Acct #9721
Benefits
Bank of America
Purpose: Benefit Disbursements
Mac Acquisition LLC
Acct #6611
Account Payables
Bank of America
Purpose: Accounts Payable Disbursements
Mac Acquisition LLC
Acct #6624
Imprest Account
Bank of America
Purpose: Liquor - Cash Replenishment Disbursements
Mac Acquisition LLC
Acct #6637
Credit Cards
Bank of America
Purpose: Credit Card Receipts
Mac Acquisition LLC
Acct #2029
Master Depository
Purpose: Intermediary Store Depository Account
Individual Store Depository Subsidiary Accounts
Mac Acquisition LLC
Acct #8231
Checking Account
Wells Fargo
Purpose: Store Level Cash Replenishment
ZBA Account
Mac Acquisition LLC
Acct #6998
Store Depository Master Account
Wells Fargo
Purpose: Wells Fargo Subsidiary Accounts
Weekly Auto Transfer
Individual Store Depository Subsidiary Accounts

## **EXHIBIT C**

## **BANK ACCOUNTS**

| Bank | Account # | Bank Store Number | Mac Store Number | Account Purpose/ Restaurant Name |
|------|-----------|-------------------|------------------|-----------------------------------|
| Bank of America | #1001 | N/A | N/A | Mac Acquisition Master Concentration |
| Bank of America | #2029 | N/A | N/A | MAC ACQUISITION LLC - MASTER DEPOSITORY ACCOUNT |
| Bank of America | #6608 | N/A | N/A | Mac Acqusition LLC - Payroll |
| Bank of America | #6611 | N/A | N/A | Mac Acqsution LLC - Accounts Payable |
| Bank of America | #6624 | N/A | N/A | Mac Acqusition LLC - Imprest |
| Bank of America | #6637 | N/A | N/A | Mac Acquisition LLC - Credit Card |
| Bank of America | #7380 | N/A | N/A | MAC ACQUISITION LLC - Corporate Credit |
| Bank of America | #9721 | N/A | N/A | MAC ACQUISITION LLC - Benefits |
| Bank of Colorado | #9998 | N/A | N/A | Mac Parent LLC |
| Wells Fargo | #6998 | N/A | 90901 | STORE DEPOSITORY ACCOUNT |
| Wells Fargo | #8231 | N/A | N/A | Checking Account |
|  |  |  |  |  |
| ***Restaurant Depository Accounts:*** |  |  |  |  |
| Bank of America | #1415 | 10003 | 31003 | Kendall |
| Bank of America | #4946 | 10004 | 31004 | Austin |
| Bank of America | #1460 | 10015 | 31015 | Louisville |
| Bank of America | #1473 | 10017 | 31017 | Arapahoe |
| Bank of America | #1499 | 10022 | 31022 | Brandon |
| Bank of America | #1716 | 10029 | 31029 | Albuquerque |
| Bank of America | #1813 | 10033 | 31033 | N. Olmsted |
| Bank of America | #1622 | 10037 | 31037 | S. Arlington |
| Bank of America | #1729 | 10039 | 31039 | Carrollwood |
| Bank of America | #1732 | 10045 | 31045 | Plano/544 |
| Bank of America | #1648 | 10050 | 31050 | Little Rock |
| Bank of America | #1745 | 10053 | 31053 | Livonia |
| Bank of America | #1651 | 10060 | 31060 | Kissimmee |
| Bank of America | #1855 | 10064 | 31064 | Montrose |
| Bank of America | #1664 | 10067 | 31067 | University |
| Bank of America | #1868 | 10072 | 31072 | Sahara |
| Bank of America | #1871 | 10078 | 31078 | Roseville |
| Bank of America | #1583 | 10081 | 31081 | Lake Buena Vista |
| Bank of America | #1596 | 10088 | 31088 | Woodlands |
| Bank of America | #1693 | 10089 | 31089 | Annapolis |
| Bank of America | #1703 | 10108 | 31108 | Greenville |
| Bank of America | #1800 | 10109 | 31109 | Strongsville |
| Bank of America | #1910 | 10112 | 31112 | Henrietta |
| Bank of America | #1936 | 10115 | 31115 | Cary |
| Bank of America | #1949 | 10116 | 31116 | Oxford Valley |
| Bank of America | #1952 | 10120 | 31120 | Huntington Beach |
| Bank of America | #2003 | 10127 | 31127 | S. Portland |
| Bank of America | #2016 | 10131 | 31131 | Corpus Christi |
| Bank of America | #2113 | 10132 | 31132 | Beacon Center |
| Bank of America | #2029 | 10141 | 31141 | Ann Arbor |
| Bank of America | #2320 | 10145 | 31145 | Aliso Viejo |
| Bank of America | #2032 | 10148 | 31148 | Tustin |
| Bank of America | #2139 | 10151 | 31151 | Summerlin |
| Bank of America | #2333 | 10156 | 31156 | Henderson |
| Bank of America | #2142 | 10161 | 31161 | Fresno |
| Bank of America | #2346 | 10163 | 31163 | Tucson |
| Bank of America | #2058 | 10165 | 31165 | Colonie |
| Bank of America | #2155 | 10167 | 31167 | Denver West |
| Bank of America | #2168 | 10174 | 31174 | Birmingham |
| Bank of America | #4962 | 10176 | 31176 | Round Rock |
| Bank of America | #2362 | 10178 | 31178 | Deer Valley |
| Bank of America | #2074 | 10179 | 31179 | Vista Ridge |
| Bank of America | #2278 | 10182 | 31182 | Fashion Place |
| Bank of America | #2375 | 10184 | 31184 | Reno |
| Bank of America | #2087 | 10185 | 31185 | Shelby |
| Bank of America | #2388 | 10195 | 31195 | Wolfchase |
| Bank of America | #2090 | 10197 | 31197 | Cerritos |
| Bank of America | #2294 | 10199 | 31199 | Auburn Hills |
| Bank of America | #2100 | 10203 | 31203 | Northridge |
| Bank of America | #2304 | 10206 | 31206 | UNCC |
| Bank of America | #3400 | 10212 | 31212 | Cedar Hill |
| Bank of America | #3439 | 10216 | 31216 | Mall of Georgia |
| Bank of America | #3442 | 10222 | 31222 | Retama |
| Bank of America | #3471 | 10229 | 31229 | Legacy |
| Bank of America | #3484 | 10233 | 31233 | Desert Ridge |
| Bank of America | #3497 | 10234 | 31234 | Frisco |
| Bank of America | #4988 | 10235 | 31235 | South Austin |
| Bank of America | #2430 | 10238 | 31238 | Tyrone Square |

| Bank of America | #2472 | 10245 | 31245 | Folsom |
|---|---|---|---|---|
| Bank of America | #2485 | 10246 | 31246 | Palm Valley |
| Bank of America | #2498 | 10251 | 31251 | Temecula |
| Bank of America | #2508 | 10252 | 31252 | Elk Grove |
| Bank of America | #2524 | 10255 | 31255 | Seal Beach |
| Bank of America | #2728 | 10257 | 31257 | Anaheim Hills |
| Bank of America | #2566 | 10268 | 31268 | East El Paso |
| Bank of America | #2579 | 10273 | 31273 | Triangle Town Center-Mac Grill |
| Bank of America | #2689 | 10279 | 31279 | Frederick |
| Bank of America | #2595 | 10280 | 31280 | Opry Mills |
| Bank of America | #2692 | 10283 | 31283 | Oceanside |
| Bank of America | #2605 | 10285 | 31285 | North County Fair-Mac Grill |
| Bank of America | #2702 | 10286 | 31286 | Bakersfield |
| Bank of America | #2618 | 10287 | 31287 | Stockton |
| Bank of America | #2715 | 10289 | 31289 | Windward Parkway |
| Bank of America | #2757 | 10292 | 31292 | Ft. Collins |
| Bank of America | #2760 | 10294 | 31294 | Corona |
| Bank of America | #2773 | 10296 | 31296 | North Aurora |
| Bank of America | #2799 | 10299 | 31299 | West Cobb |
| Bank of America | #2809 | 10300 | 31300 | North Tucson |
| Bank of America | #2812 | 10301 | 31301 | Virginia Beach |
| Bank of America | #2825 | 10302 | 31302 | Puente Hills |
| Bank of America | #2838 | 10307 | 31307 | Simi Valley |
| Bank of America | #2854 | 10314 | 31314 | Church Ranch |
| Bank of America | #2870 | 10324 | 31324 | Redlands |
| Bank of America | #2980 | 10327 | 31327 | Harrisburg |
| Bank of America | #2922 | 10339 | 31339 | Otay Ranch |
| Bank of America | #3028 | 10340 | 31340 | Winter Garden |
| Bank of America | #3507 | 10342 | 31342 | Murfreesboro |
| Bank of America | #3510 | 10345 | 31345 | Oviedo |
| Bank of America | #4594 | 10346 | 31346 | Milpitas |
| Bank of America | #4620 | 10347 | 31347 | El Cerrito |
| Bank of America | #4604 | 10349 | 31349 | Alderwood |
| JP Morgan Chase | #5567 | ** | ** | Legacy Dental Plan Account (Largely inactive) |
| Wells Fargo | #5863 | ** | 31017 | Arapahoe |
| Wells Fargo | #6914 | 4100020079 | 31079 | Fairfax |
| Wells Fargo | #6927 | 4100020119 | 31119 | Winston Salem |
| Wells Fargo | #6930 | 4100020158 | 31158 | Woodbridge |
| Wells Fargo | #5871 | ** | 31167 | Denver West |
| Wells Fargo | #5913 | ** | 31174 | Birmingham |
| Wells Fargo | #5921 | ** | 31182 | Fashion Place |
| Wells Fargo | #8121 | 410.002.0196 | 31196 | So. Colorado Springs |
| Wells Fargo | #6943 | 4100020207 | 31207 | Dulles |
| Wells Fargo | #6969 | 4100020259 | 31259 | Greensboro |
| Wells Fargo | #6972 | 410.002.0284 | 31284 | Franconia |
| Wells Fargo | #5889 | ** | 31292 | Ft. Collins |
| Wells Fargo | #5897 | ** | 31296 | N. Aurora |
| Wells Fargo | #5905 | ** | 31314 | Church Ranch |
| Wells Fargo | #0427 | ** | 31327 | Harrisburg |