## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>MAC ACQUISITION LLC, *et al.*,[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 17-12224 (___)<br><br>(Joint Administration Requested) |

**DEBTORS' MOTION FOR INTERIM AND FINAL ORDERS (I) PURSUANT TO
11 U.S.C. §§ 105, 361, 362, 363, 364, 507, AND 552 AUTHORIZING DEBTORS
TO (A) OBTAIN POSTPETITION SECURED FINANCING, (B) USE CASH
COLLATERAL, (C) GRANT ADEQUATE PROTECTION TO PREPETITION
SECURED PARTIES; (II) MODIFYING THE AUTOMATIC STAY; (III) SCHEDULING
A FINAL HEARING PURSUANT TO BANKRUPTCY RULES 4001(b) AND 4001(c);
AND (IV) GRANTING RELATED RELIEF**

Mac Acquisition LLC and its affiliated debtors and debtors in possession in the

above-captioned chapter 11 cases (collectively, the "Debtors") hereby file this motion (the

"Motion") requesting entry of an interim order, substantially in the form attached hereto as

Exhibit 1 (the "Interim Order"), and a Final DIP Order[2] (together with the Interim Order, the

"DIP Orders"):

> (i)     authorizing (a) Mac Acquisition LLC ("Mac Acquisition" or the
> "Borrower") to obtain up to $5,000,000 in principal amount of postpetition
> financing (the "DIP Loan") on the terms and conditions set forth in the
> Interim Order and the Debtor-in-Possession Credit, Guaranty and Security
> Agreement in the form attached to the Interim Order as Exhibit A (as
> hereafter amended, supplemented, or otherwise modified from time to
> time in accordance with the terms hereof and thereof, the "DIP
> Agreement"; together with all Credit Documents, including, without
> limitation, the Budget, in each case as hereafter amended, supplemented,

---

[1]     The Debtors and the last four digits of their respective taxpayer identification numbers are as follows:  Mac
Acquisition LLC (6362); Mac Parent LLC (6715); Mac Holding LLC (6682); Mac Acquisition of New Jersey LLC
(1121); Mac Acquisition of Kansas LLC (3910); Mac Acquisition of Anne Arundel County LLC (6571); Mac
Acquisition of Frederick County LLC (6881); Mac Acquisition of Baltimore County LLC (6865); and Macaroni
Grill Services LLC (5963).  The headquarters for the above-captioned Debtors is located at 1855 Blake St., Ste. 200,
Denver, CO 80202.

[2]     Capitalized terms used but not defined herein shall have the meaning given to them in the DIP Agreement
(as defined below) or the Interim Order, as applicable.

or otherwise modified from time to time in accordance with the terms hereof and thereof, the "DIP Documents," and together with the DIP Loan, the "DIP Facility"), among the Borrower, Mac Parent LLC ("Mac Parent"), MAC Holding LLC ("Mac Holding"), Macaroni Grill Services LLC, each of the direct and indirect subsidiaries of Borrower named therein or party thereto, including, without limitation each of the other Debtors (such subsidiaries, collectively with Borrower, the "Guarantors"),[3] the lenders from time to time party thereto (collectively, the "DIP Lenders") and the administrative agent and collateral agent for the DIP Lenders named therein (in such capacity, the "DIP Agent"), and (b) each of the Guarantors to guaranty the Borrower's obligations in respect of the DIP Loan and all other Obligations (as defined in the DIP Agreement) and indebtedness of the Borrower under or arising in connection with the DIP Documents (collectively, the "DIP Obligations") on a joint and several basis;

(ii)     authorizing the Debtors to execute and deliver the DIP Agreement and the other DIP Documents and to perform such other and further acts as may be required in connection with the DIP Documents;

(iii)    authorizing the Debtors to grant security interests, liens, and superpriority claims, including a superpriority administrative claim pursuant to section 364(c)(1) of the Bankruptcy Code and liens pursuant to sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code (including liens pursuant to section 364(d)(1) of the Bankruptcy Code to the DIP Agent, for the benefit of the DIP Lenders, which are senior to the Subordinate Liens and Related Rights[4]) in the DIP Collateral, including, without limitation, all Cash Collateral, to secure all obligations under the DIP Documents, subordinate only to the Carve-Out, and any Prior Liens (as defined in the Interim DIP Order) or Prepetition First Liens;

(iv)    authorizing the Debtors to (a) subject to the terms and provisions hereof, use all Cash Collateral pursuant to sections 361, 362, and 363 of the Bankruptcy Code, and all other Prepetition Collateral, and (b) to provide adequate protection to each holder of a prepetition lien, including, without limitation, Bank of Colorado, the Debtors' prepetition first lien lender (the "First Lien Lender");

---

[3]     Borrower's non-Debtor subsidiaries, RMG Development LLC and Mac Acquisition IP LLC, are guarantying the DIP Obligations and pledging their assets as collateral therefore. Further, subject to Section 5.10 of the DIP Agreement, DIP Agent may require guarantees or security agreements from any new subsidiary (Debtor or non-Debtor) of the Credit Parties. The Debtors do not seek any relief with respect to these non-Debtors.

[4]     Any liens in or security interests on collateral in connection with financial accommodations provided by Riesen Funding (as defined herein) or RedRock Partners, LLC ("RedRock") shall be treated as Subordinate Liens and Related Rights.

(v)    modifying the automatic stay imposed under section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Documents and the Interim Order;

(vi)    scheduling, pursuant to Federal Rule of Bankruptcy Procedure (the "Bankruptcy Rules") 4001, a final hearing (the "Final Hearing") for the Court to consider entry of a final order approving this Motion, which order shall be substantially in the form of the Interim Order and otherwise contain terms and conditions acceptable to the DIP Agent; and

(vii)    granting related relief.

In support of this Motion, the Debtors rely upon the *Declaration of Nishant Machado in Support of the Debtors' Chapter 11 Petitions and Requests First Day Relief* (the "First Day Declaration"), which was filed contemporaneously herewith and is incorporated herein by reference.  In further support of this Motion, the Debtors respectfully state as follows:

## JURISDICTION AND VENUE

1.    The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334(b) and 157, and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware dated as of February 29, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b) and pursuant to Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), the Debtors consent to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.  Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory and legal predicates for the relief requested herein are sections 105, 361, 362, 363, 364, 507, and 552 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004, and 9014, and Local Rules 2002-1, 4001-2, and 9013-1(m).

## BACKGROUND

2.      On the date hereof (the "Petition Date"), each of the Debtors commenced a voluntary case under chapter 11 of the Bankruptcy Code.  Pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, the Debtors are continuing to manage their financial affairs as debtors in possession.

3.      Contemporaneously herewith, the Debtors filed a motion seeking joint administration of their chapter 11 cases (collectively, the "Chapter 11 Cases") pursuant to Bankruptcy Rule 1015(b) and Local Rule 1015-1.  No trustee, examiner, or official committee of unsecured creditors has been appointed in the Chapter 11 Cases.

4.      Information regarding the Debtors' history and business operations, capital structure and primary secured indebtedness, and the events leading up to the commencement of the Chapter 11 Cases can be found in the First Day Declaration.

## I.      The Debtors' Prepetition Secured Indebtedness

### A.      The First Lien Loan Documents

5.      As of the Petition Date, Mac Parent was the borrower under a revolving line of credit in the amended amount of $12,000,000 (the "First Lien Revolving Loan") governed by that Business Loan Agreement, dated as of April 17, 2015, by and between Mac Parent and Bank of Colorado, the First Lien Lender.  When the First Lien Revolving Loan was entered into, it was guaranteed by Debtors Mac Acquisition and Mac Holding, and by several non-Debtor affiliates.[5] Mac Parent's obligations under the First Lien Revolving Loan, as well as Mac Acquisition's and

---

[5]      The non-Debtor persons or entities that have guarantied certain of the First Lien Revolving Loan, $2.5M Term Loan (defined below), and/or $3.5M Loan (defined below) include Dean Riesen and Richard Monfort, and certain affiliates thereof.  The family limited partnership established by Mr. Monfort that owned an interest in RedRock sold that interest to Riesen Funding, an entity 100% owned by Mr. Riesen, and no longer owns any equity in RedRock or indirectly in the Debtors, but Mr. Monfort has not been relieved of his commitment as a guarantor of certain of the First Lien Lender's claims.

Mac Holding's guarantees, are secured by grants of liens against such entities' "Inventory, Chattel Paper, Accounts, Equipment and General Intangibles," and all products and proceeds thereof.  On September 28, 2017, Debtors Macaroni Grill Services LLC ("Mac Grill Services"), Mac Acquisition of New Jersey LLC ("Mac Acquisition NJ"), Mac Acquisition of Kansas LLC ("Mac Acquisition KS"), Mac Acquisition of Anne Arundel County LLC ("Mac Acquisition AA"), Mac Acquisition of Frederick County LLC ("Mac Acquisition FC"), and Mac Acquisition of Baltimore County LLC ("Mac Acquisition BC", and together with Mac Grill Services, Mac Acquisition NJ, Mac Acquisition KS, Mac Acquisition AA, and Mac Acquisition FC, the "Debtor Operating Subsidiaries"), and certain non-Debtor entities, guarantied the First Lien Revolving Loan and pledged certain of their assets to secure such obligations.  As of the Petition Date, approximately $12,033,000 in principal and accrued interest was outstanding under the First Lien Revolving Loan, with approximately $4,100,000 of that amount representing unfunded and undrawn letters of credit that had been issued under the First Lien Revolving Loan.

6.        On or about December 20, 2016, the Debtors also arranged for a term loan from the First Lien Lender in the amount of $2,500,000 (the "$2.5M Term Loan").  As with the First Lien Revolving Loan, the $2.5M Term Loan is structured as a loan to Mac Parent, guarantied by Debtors Mac Acquisition and Mac Holding, as well as by non-Debtor affiliates.  Mac Parent granted liens on its assets to secure the $2.5M Term Loan.  On September 28, 2017, Mac Grill Services, the Debtor Operating Subsidiaries, and certain non-Debtor entities also guarantied the $2.5M Term Loan, and these entities, as well as Mac Holding and Mac Acquisition pledged certain of their assets to secure such obligations.  As of the Petition Date, approximately $2,396,065 in principal and accrued interest was outstanding under the $2.5M Term Loan.

7.      On or about September 19, 2017, the Debtors obtained an additional line of credit from the First Lien Lender in the amount of $3,500,000 (the "$3.5M Loan").[6]  The $3.5M Loan is structured as a loan to Mac Parent, and is guaranteed by all of the Debtors and by certain non-Debtor affiliates.  The Debtors' guaranties are secured by a security interest against such entity's "Inventory, Chattel Paper, Accounts, Equipment and General Intangibles," and all products and proceeds thereof.[7]  As of the Petition Date, approximately $3,500,015 in principal and accrued interest was outstanding under the $3.5M Loan.

### B.      The Riesen Funding Loan Documents

8.      On or about July 3, 2017, Mac Parent received a loan in the amount of $5,000,000 (the "Riesen Funding Loan") from Riesen Funding LLC ("Riesen Funding").  Riesen Funding is the ultimate indirect equity owner of the Debtors.  The Riesen Funding Loan was intended to enable the Debtors to meet their obligations on an on-going basis, while they completed their operational improvement plan and sought to negotiate settlements with their former lessors of surrendered locations.  The Riesen Funding Loan was guaranteed by Mac Acquisition and by Mac Holding.  The Riesen Funding Loan is secured by grants of security interests in substantially all of Mac Parent's, Mac Acquisition's, and Mac Holding's personal property, including, without limitation, Mac Acquisition's equity interests in those Debtor Operating

---

[6]      The loan agreements governing the First Lien Revolving Loan, $2.5M Term Loan, and $3.5M Term Loan, together with any other notes, security, pledge or guaranty agreements, and all other documentation executed directly in connection with any of the foregoing, each as amended, supplemented, or otherwise modified, are collectively referred to herein as the "First Lien Loan Documents"; for purposes of this Motion and the Interim Order, the First Lien Loan Documents and First Liens do not include any other financial accommodations that may have been provided by the Bank of Colorado to the Debtors or any financial accommodations that are otherwise unperfected, unenforceable or subject to avoidance or other challenge).

[7]      None of the collateral granted by any of the Debtors to any of the prepetition lenders, including, without limitation, the First Lien Lender, includes (a) real property leases, or (b) the Debtors' liquor licenses to the extent that applicable state law bars the imposition of a security interest on such licenses.  Therefore, the DIP Agent for the benefit of the DIP Lenders will receive first priority liens on such unencumbered assets or the proceeds thereof, as necessitated by applicable law, in connection with the DIP Facility.

Subsidiaries with remaining restaurant locations (the "Riesen Funding Liens").  The Riesen

Funding Liens are junior to any liens asserted against Mac Acquisition's assets by Bank of

Colorado, Sysco (defined below), Edward Don (defined below), and Cisco (as defined below).

As of the Petition Date, approximately $5,130,000 in principal and accrued interest was

outstanding under the Riesen Funding Loan.

C.    **Supplier Security Interests**

9.    Two of the Debtors' key suppliers—Sysco Corporation ("Sysco") and Edward

Don & Company ("Edward Don")—have also filed UCC-1 financing statements to perfect

security interests they assert against certain assets of Mac Acquisition.

10.    Sysco provides most of the food and beverages served at the Debtors' restaurants,

90% of which is entitled to special rights under PACA and PASA (as defined below), even if

Sysco did not have a security interest in the goods it has provided.  As security for MAC

Acquisition's payment obligations to Sysco for inventory and goods provided, Sysco asserts a

security interest in, among other things, all of Mac Acquisition's goods, inventory, equipment,

instruments, chattel paper, documents, accounts, accounts receivable, general intangibles, deposit

accounts, investment property, payment intangibles, and intellectual property.  The balance

owing to Sysco as of the Petition Date was approximately $2,500,000.

11.    Edward Don is a party to a distribution agreement with the Debtors, pursuant to

which Edward Don has and continues to deliver certain hard goods necessary to the Debtors'

restaurants, such as dinnerware, glassware, and flatware for the Debtors' restaurant tables.

Edward Don asserts a security interest in substantially all of Mac Acquisition's personal property

assets to secure Mac Acquisition's payment obligations to Edward Don.  The balance owing to

Edward Don as of the Petition Date was approximately $500,000.

12.     Cisco Systems Capital Corporation ("Cisco") has also recorded a UCC-1 financing statement relating to a lease of certain equipment to the Debtors.  The Debtors reserve all rights with respect to whether the Cisco lease is a true lease or disguised security device, but do include in their budget the regular monthly payment provided for in the Cisco lease.  The balance owing to Cisco as of the Petition Date was approximately $100,000.

## II.     The Debtors' Efforts to Obtain DIP Financing

13.     One of the critical elements to the Debtors' restructuring efforts is the availability of financing to fund the Debtors' anticipated cash shortfalls during the bankruptcy case, as well as the need for financing upon emergence from chapter 11.  With the assistance of its advisors, the Debtors contacted the First Lien Lender and four (4) other potential lenders to inquire as to their willingness to provide financing during the cases under chapter 11 of the Bankruptcy Code commenced by the Debtors (the "Chapter 11 Cases").  The First Lien Lender was not interested in providing a debtor-in-possession loan.  Based on the responses received from other potential lenders, the Debtors faced two primary hurdles in obtaining financing from traditional sources. *First*, the Debtors had secured debt potentially in excess of $18 million owing to Bank of Colorado alone and an additional $5 million in secured debt owed to Riesen Funding, all of which would require some form of adequate protection to the extent any DIP lender insisted on taking a first priority lien on the Debtors' assets.  *Second*, the Debtors have only recently ceased operations at their 37 underperforming restaurants.  While the Debtors are confident that they will be able to emerge from chapter 11 with a restructured balance sheet that will enable them to operate on a cash-flow positive basis during 2018, the Debtors' historical financial statements do not show EBITDA sufficient to service additional secured debt.  Indeed, the Debtors' trailing twelve month EBITDA was approximately negative $12 million.

14.     The Debtors were able to negotiate a DIP Facility with Raven Capital

Management LLC ("Raven"), which will provide the Debtors with $5 million in postpetition

financing ($3 million to be available on an interim basis) through the DIP Lenders and DIP

Agent to fund the Debtors' costs and expenses during the Chapter 11 Cases.  The proposed DIP

Facility overcomes all of the hurdles that the Debtors faced in identifying a potential financing

source.  *First*, Raven agreed to provide the DIP Facility secured by liens junior to Bank of

Colorado and any valid and enforceable "Prior Liens" (as defined in the Interim DIP Order).

The Prior Liens consist principal of valid and enforceable liens asserted by Sysco, Edward Don,

and Cisco.  Riesen Funding has agreed to subordinate the Riesen Funding Liens securing the $5

million Riesen Funding Loan to the DIP Liens granted to the DIP Agent under the DIP Facility.

*Second*, Raven agreed to structure the DIP Facility in a manner that will allow for the Debtors'

turnaround efforts to be fully realized.  Subject to satisfaction of several conditions, Raven has

agreed to provide the Debtor with an option to convert any principal and interest owing under the

DIP Facility into exit financing upon confirmation of an acceptable chapter 11 plan and the

Debtors' successful emergence from chapter 11, and has committed to provide up to an

additional $8.5 million as additional available exit financing (the "Exit Facility"), all subject to

the terms and conditions of the Exit Facility.[8]  This exit financing would provide the reorganized

Debtors with additional operating liquidity that would create opportunity for the Debtors to

successfully complete their turnaround and fund the chapter 11 plan.  In other words, Raven

could represent both an immediate and longer-term solution to the Debtors' current liquidity

needs.

---

[8]        The Debtors are not seeking approval of the Exit Facility in connection with this Motion.

01:22461463.2

15.     The terms of the proposed DIP Facility are favorable to the Debtors' estates and creditors.  The DIP Facility and the Exit Facility will be secured by substantially all of the assets of the Debtors, but that lien will be subordinate to any valid, unavoidable lien held by Bank of Colorado and certain other Prior Liens, all as set forth in the Interim DIP Order.

## III.    The DIP Facility

16.     A summary of the DIP Facility and certain material terms set forth in the DIP Agreement and the Interim Order is set forth below:[9]

| OVERVIEW OF THE DIP FACILITY | |
| --- | --- |
| **Borrower:** | Mac Acquisition LLC.<br><br>*See* DIP Agreement pmbl. |
| **Guarantors:** | The following Debtors will be Guarantors under the DIP Agreement: (i) Mac Parent LLC; (ii) Mac Holding LLC; (iii) Mac Acquisition of New Jersey LLC; (iv) Mac Acquisition of Kansas LLC; (v) Mac Acquisition of Anne Arundel County LLC; (vi) Mac Acquisition of Frederick County LLC; (vii) Mac Acquisition of Baltimore County LLC; and (viii) Macaroni Grill Services LLC.<br><br>The following non-Debtors will also be Guarantors under the DIP Agreement, in whole or in part:  (i) RMG Development, LLC; (ii) Mac Acquisition IP LLC; (iii) Dean A. Riesen; (iv) Richard Monfort; (v) Monfort Family Limited Partnership I; (vi) RedRock Partners, LLC; (vii) Riesen & Company, LLC; and (viii) Barbara H. Riesen.<br><br>*See* DIP Agreement § 1.1 (definition of Guarantors); § 5.10; separate non-Debtor guaranty documents |
| **DIP Agent:** | Raven Asset-Based Opportunity Fund III, LP, as administrative agent and collateral agent.<br><br>*See* DIP Agreement pmbl. |
| **DIP Lenders:** | Raven Asset-Based Opportunity Fund III, LP, and any other person that becomes a party to the DIP Agreement pursuant to an Assignment Agreement. |

---

[9]     This summary is provided in accordance with Bankruptcy Rule 4001 and Local Rule 4001-2 and is qualified in its entirety by reference to the provisions of the DIP Agreement and the Interim Order.  To the extent there exists any inconsistency between this summary and the provisions of the DIP Agreement, the Interim Order, or the Final Order, the provisions of the DIP Agreement, the Interim Order, and the Final Order, as applicable, shall control.

| | |
|---|---|
| | *See* DIP Agreement § 1.1 (definition of DIP Lender); § 10.6 (c)–(d). |
| **DIP Facility:** | Secured superpriority debtor-in-possession DIP Facility in the aggregate principal amount of up to $5 million (the "<u>DIP Loan</u>"), with $3 million of such amount available on an interim basis.  The availability of the DIP Facility is subject to satisfaction of the conditions precedent set forth in the DIP Agreement.<br><br>*See* Interim Order ¶ 5, 8; DIP Agreement § 2.1. |
| **DIP Budget:** | The Budget shall mean, at any time, the most recent cash flow forecast approved by the Requisite DIP Lenders and depicting, on a weekly basis for the subsequent thirteen (13) week period (or until the projected date of effectiveness of a plan of reorganization in the Chapter 11 Cases), all cash receipts and disbursements, expenses, cash balance and loan balance.  The Budget as of the Closing Date is attached to the DIP Agreement as <u>Annex A</u>, and may be updated once every week with the approval of the Requisite DIP Lenders in their sole discretion.<br><br>*See* DIP Agreement § 1.1 (definition of Budget); Interim Order ¶ 4(e). |
| **Uses of Proceeds:** | To provide working capital and for general corporate purposes, subject to the Budget and the terms and conditions of the DIP Agreement and DIP Orders, including to (i) fund costs of the administration of the Chapter 11 Cases; and (ii) fund the adequate protection payments contemplated under the DIP Orders.<br><br>*See* Interim Order ¶¶ 6, 16(c); DIP Agreement § 2.3. |
| **Use of Cash Collateral; Entities with an Interest in Cash Collateral:** | The Debtors are authorized to use Cash Collateral subject to and in accordance with the terms, conditions, and limitations set forth in the Interim Order, the Budget (and variances set forth in section 5.17(b) of the DIP Agreement) and the DIP Documents.<br><br>"Cash Collateral" means all "cash collateral" as defined by section 363(a) of the Bankruptcy Code, including, without limitation, all of the cash proceeds of the accounts receivable, inventory and other property constituting Prepetition Collateral in which any secured lender, including, without limitation, the DIP Agent, the DIP Lenders, the First Lien Lender or the holder of Subordinate Liens and Related Rights has an interest (including, without limitation, any adequate protection lien or security interest), whether such interest existed as of the Petition Date or arises thereafter pursuant to this Interim Order, any other order of this Court, applicable law or otherwise; <u>provided</u>, <u>however</u>, that Cash Collateral shall not include the DIP Loans or proceeds of the DIP Facility.<br><br>*See* Interim Order ¶¶ 13, 14. |
| **Interest Rate:** | A per annum rate equal to 12%. |

01:22461463.2

11

| | |
|---|---|
| | *See* DIP Agreement §§ 1.1 (definition of Interest Rate), 2.5. |
| **Default Rate:** | A per annum rate equal to 5.00% higher than the non-default rate.<br><br>*See* DIP Agreement § 2.7. |
| **Fees:** | <u>Commitment Fee</u>:  Fee payable to DIP Agent, for the account of each DIP Lender, on the Closing Date in the amount of $263,160, which will be paid in kind and added to the principal amount of the DIP Facility on the Closing Date.<br><br><u>Agent Fee</u>:  Fee payable to the DIP Agent, as administrative agent under the DIP Agreement, on the Closing Date in cash in the amount of $10,000.<br><br>*See* DIP Agreement § 1.1 (definition of Fee Letter); Fee Letter. |
| **Conditions to Borrowing:** | Certain customary conditions precedent to extensions of credit, including, among other things, (i) execution of DIP Documents, (ii) execution of a Restructuring Support Agreement, (iii) entry of the DIP Orders (as applicable), (iv) payment of certain fees and expenses required by the DIP Documents, (v) receipt of a Withdrawal Certificate, (vi) compliance with the Budget and (vii) no Default or Event of Default shall have occurred or be occurring.<br><br>*See* DIP Agreement § 2.1(c). |
| **DIP Collateral:** | "DIP Collateral" means all prepetition and postpetition real and personal, tangible and intangible property and assets of each of the Debtors of any kind or nature whatsoever, wherever located, whether now existing or hereafter acquired or arising, including, without limitation, all cash (including all Cash Collateral, wherever held), cash equivalents, bank accounts, accounts, other receivables, chattel paper, contract rights, inventory, instruments, documents, securities (whether or not marketable), equipment, goods, fixtures, real property interests, intellectual property, general intangibles, investment property, supporting obligations, letter of credit rights, commercial tort claims, one hundred percent (100%) of the capital stock of each Debtor's direct and indirect domestic subsidiaries, all inter-company notes held by the Debtors, trademarks, trade names, licenses, rights to payment including tax refund claims, and causes of action, and the proceeds, products, offspring, rents and profits of all of the foregoing, including insurance proceeds.[10]<br><br>Subject to entry of the Final DIP Order, the DIP Collateral will also include proceeds of Avoidance Actions. |

---

[10]        To the extent that the DIP Collateral cannot include specific assets, such as liquor licenses or leases that bar the granting of an interest in such leases, the DIP Collateral will include the proceeds of such assets.

| | |
|---|---|
| | *See* DIP Agreement § 7.14; Interim Order ¶ 7(b). |
| **Liens and Priorities of DIP Obligations:** | As security for the full and timely repayment of all of the DIP Obligations, the DIP Agent, for the benefit of the DIP Agent and the DIP Lenders, shall be granted by each Debtor:<br><br>(i)    First Lien on Unencumbered Property.  Pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first priority senior security interest in and lien upon all DIP Collateral that, on or as of the Petition Date, is not subject to valid, perfected, and non-avoidable liens.<br><br>(ii)    Junior Lien on Property Subject to Prior Liens and Prepetition First Liens.  Pursuant to section 364(c)(3) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected priority security interest in and lien upon all DIP Collateral, which lien is junior in priority only to the Prior Liens and Prepetition First Liens.<br><br>(iii) Liens Priming Subordinate Liens and Related Rights. Pursuant to section 364(d)(1) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected priority priming security interests in and liens on all DIP Collateral senior to Subordinate Liens and Related Rights.  "Subordinate Liens and Related Rights" means (i) any inter-company claim of any Debtor or any domestic or foreign subsidiary or affiliate of any Debtor, (ii) any security interest or lien which is avoided or disallowed or otherwise preserved for the benefit of any Debtor's estate under section 551 or any other provision of the Bankruptcy Code, (iii) the Adequate Protection Liens, and (iv) any other security interest or lien that is not a Prior Lien or Prepetition First Lien, including without limitation, the Riesen Funding Liens.<br><br>The DIP Agent and DIP Lenders are also, for all DIP Obligations, granted an allowed super-priority administrative expense claim pursuant to Section 364(c)(1) of the Bankruptcy Code (the "Super-Priority Claim") against each Debtor and its respective estate.  Except for the Carve-Out, the Super-Priority Claim shall have priority over (i) all other costs and expenses of administration of any kind (and no cost or expense of administration shall be senior to, equal to, or *pari passu* with, the Super-Priority Claim), including those specified in, or ordered pursuant to, sections 105, 326, 328, 330, 331, 363, 364, 503, 507, 546, 726, 1113, or 1114 or any other provision of the Bankruptcy Code or otherwise, in each case whether incurred in these Cases or any Successor Case, whether for adequate protection, the lack of, or failure to provide, adequate protection, or otherwise, including, without limitation, the 507(b) Claims, and whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment and (ii) any inter-company claim of any Debtor or any |

| | |
|---|---|
| | domestic or foreign subsidiary or affiliate of any Debtor. The Super-Priority Claims shall be deemed legal, valid, binding, and enforceable claims and expenses against the Debtors and their estates, and not subject to subordination, impairment or avoidance, for all purposes in the Cases and any Successor Case. Subject to the Carve-Out, the Super-Priority Claim shall be payable from, and have recourse to, any and all property and assets of each Debtor but only to proceeds of Avoidance Actions after entry of a final order on the DIP Facility.<br><br>*See* Interim Order ¶ 7.8. |
| **Carve-Out:** | "Carve-Out" means: (i) the claims of the respective retained professionals of the Debtors and any official statutory unsecured creditors' committee, whose retention is approved by this Court during the Cases pursuant to Sections 327, 328, and 1103, respectively, of the Bankruptcy Code, (collectively, the "<u>Retained Professionals</u>") for unpaid fees and expenses which were incurred at any time on and after the Carve-Out Trigger Date in an aggregate amount not exceeding $150,000 for all Retained Professionals in the aggregate; plus the claims of the Retained Professionals for accrued and unpaid fees and expenses which comply with the Budget and were incurred at any time on and after the Petition Date and before the Carve-Out Trigger Date; <u>provided</u> that, in each case, such fees and expenses of the Retained Professionals are ultimately allowed on a final basis by this Court under sections 330 and 331 of the Bankruptcy Code and are not excluded from the Carve-Out under paragraph 21 of the Interim Order; (ii) all reasonable and documented fees and expenses incurred by a trustee under Section 726(b) of the Bankruptcy Code not to exceed $25,000; and (iii) the unpaid fees payable to the U. S. Trustee and Clerk of the Bankruptcy Court pursuant to Section 1930 of Title 28 of the United States Code.<br><br>For the purposes of the foregoing, "<u>Carve-Out Trigger Date</u>" means the date on which the DIP Agent provides the Carve-Out Notice to the respective counsel to the Debtors and any such committee that the Carve-Out is invoked, which Carve-Out Notice shall be delivered only on or after the occurrence and continuation of an Event of Default under the DIP Agreement.<br><br>*See* Interim Order ¶ 12. |
| **Adequate Protection to Prepetition Secured Parties:** | The First Lien Lender and each holder of Subordinate Liens and Related Rights are entitled to and are by the Interim Order granted, pursuant to sections 361, 363(c)(2) and 363(e) of the Bankruptcy Code, adequate protection of their respective interests in their respective collateral, including the Prepetition Collateral and Cash Collateral, in an amount equal to the aggregate diminution in value of their respective interests in such collateral occurring on or after the Petition Date, including without limitation, any such diminution resulting from the use by the Debtors of the Cash Collateral and any other Prepetition Collateral and the imposition of the automatic stay pursuant to section 362 of the |

Bankruptcy Code (such diminution in value, the "<u>Adequate Protection Obligations</u>"), as follows:

(a)     <u>Adequate Protection Liens</u>:     continuing valid, binding, enforceable and perfected, liens and security interests in and on all of the DIP Collateral to the extent of the Adequate Protection Obligations (together with any additional adequate protection liens, if any, authorized pursuant to further order of the Court in accordance with paragraph 17 of the Interim Order).   The Adequate Protection Liens granted by the Interim Order shall be silent, subordinated liens and the holders thereof shall have no rights of enforcement against collateral other than the right to receive proceeds of collateral in the order of priority set forth in the Interim Order.   The Adequate Protection Liens shall (a) be subordinate to: (1) the Carve-Out, (2) the Prepetition First Liens, (3) the Prior Liens, and (4) the DIP Liens.   The Adequate Protection Liens of the First Lien Lender shall be superior and prior to the Adequate Protection Liens of each holder of Subordinate Liens and Related Rights;

(b)     <u>507(b) Claims</u>:     an allowed super-priority administrative expense claim subject to proof against each Debtor and its respective estate to the extent that the adequate protection afforded in the Interim Order for any Adequate Protection Obligations proves to be inadequate. The 507(b) Claims, if any, under the Interim Order shall be subordinate to the Carve-Out and the Super-Priority Claim.   Any 507(b) Claim of the First Lien Lender shall be superior and prior to any 507(b) Claim of a holder of Subordinate Liens and Related Rights.   Except as expressly permitted in the Interim Order, no cost or expense of administration under any provision of the Bankruptcy Code (whether incurred in these Cases or any Successor Case, whether for adequate protection, the lack of, or failure to provide, adequate protection, or otherwise), shall be senior to, equal to, or pari passu with, any 507(b) Claim granted by the Interim Order.   The 507(b) Claim shall be payable from, and have recourse to, any and all property and assets of each Debtor (but only to proceeds of Avoidance Actions after entry of a final order approving the DIP Facility), subject to the Carve-Out and Super-Priority Claim, but not in any event to the proceeds of Avoidance Actions until entry of a final order on the DIP Facility; and

(c)     <u>Adequate Protection Payments</u>:     subject to the review procedures and limitations set forth in the DIP Orders, the Debtors shall promptly pay on a current basis the First Lien Lender's reasonable out-of-pocket fees, costs and expenses (whether incurred before or after the Petition Date for the benefit of the First Lien Lender) of the First Lien Lender's attorneys in connection with (w) the negotiation and administration of the Cash Collateral use arrangement implemented by the Interim Order, (x) the review and negotiation of any amendment, supplement, waiver or modification to the Interim Order, the DIP Documents and any documentation related thereto or thereto,  (y) the monitoring of and involvement and participation in the Cases or any Successor Cases and the consummation and administration of the transactions contemplated by the Interim Order and the DIP Documents and (z) the preservation and protection of the First Lien Lender's rights

| | |
|---|---|
| | under the Interim Order or any documentation related thereto, in each case whether or not such amounts are included in the Budget or arose before or after the Petition Date, all without further notice, motion, fee application or order of the Court and whether such interest, fees, costs and expenses accrued prior to or after the Petition Date, subject in all respects to the terms of the DIP Order.<br><br>*See* Interim Order ¶ 16.<br><br>In addition, so long as no default has occurred under the DIP Order and DIP Documents, the First Lien Lender will receive current payment of post-petition interest at the non-default rate of interest set forth in and otherwise subject to the terms and conditions of the First Lien Loan Documents.<br><br>*See id.* |
| **Financial, Reporting, and Other Covenants:** | Section 5 of the DIP Agreement contains covenants customary and appropriate for DIP financings of this type, including, but not limited to, (i) provision of and compliance with the Budget, (ii) reporting of financial information, (iii) operation and maintenance of properties, and (iv) maintenance of insurance on properties.<br><br>*See* DIP Agreement art. 5. |
| **Plan Milestones:** | The DIP Agreement contains certain milestones, including (i) the filing of a chapter 11 plan within five (5) business days of the Petition Date, (ii) entry of the Final DIP Order within thirty (30) calendar days of the Petition Date, (iii) entry of an order approving the disclosure statement within sixty (60) calendar days of the Petition Date, (iv) entry of an order confirming a chapter 11 plan within 110 days of the Petition Date; and (v) the chapter 11 plan shall be effective within 120 days of the Petition Date.<br><br>The DIP Agreement also requires the Debtors to implement a bidding and sale process if the disclosure statement and plan are not approved or confirmed (as applicable) by the respective dates set forth above.<br><br>*See* DIP Agreement § 1.1 (definition of Chapter 11 Milestones), § 5.7, Annex B. |
| **DIP Maturity Date:** | The "Maturity Date" under the DIP Agreement means the earliest of (i) 120 days after the Petition Date, (ii) the date that the DIP Loan shall become due and payable in full, whether by acceleration or otherwise, or (iii) the effective date of a chapter 11 plan.<br><br>*See* DIP Agreement § 1.1 (definition of Maturity Date). |
| **Events of Default:** | The DIP Agreement contains customary events of default for commercial lending documents, including, without limitation, customary events of default related to: non-payment of obligations; breaches of |

|  | warranties; non-performance of covenants and obligations; incurrence of judgments; failure to comply with the Budget; sales of assets; the dismissal of the Chapter 11 Cases; the DIP Documents and obligations thereunder become unenforceable; the failure to satisfy Chapter 11 Milestones; the Debtors' current President, Chief Executive Officer, and Chief Restructuring Officer no longer retains such roles with the Debtors, unless a replacement acceptable to the DIP Agent is hired.<br><br>*See* DIP Agreement § 8.1. |
|---|---|
| **Exercise of Remedies** | The automatic stay provisions of section 362 of the Bankruptcy Code shall be automatically vacated and modified to the extent necessary (unless and until the Court has determined that an Event of Default has not occurred and/or is not continuing) to permit the DIP Agent and the DIP Lenders to exercise rights and remedies in accordance with the DIP Documents, upon the occurrence and during the continuation of any Event of Default and, in each case, after the provision by the DIP Agent to the Debtors of five (5) business days' prior written notice of such Event of Default.<br><br>*See* Interim Order ¶ 9; DIP Agreement § 8.1. |
| **Indemnification:** | The Debtors agree to indemnify, pay and hold harmless, DIP Agent and each DIP Lender, their Affiliates and each of their respective officers, directors, partners, shareholders, trustees, controlling persons, employees, agents, advisors, attorneys and representatives (each, an "Indemnitee"), from and against any and all Indemnified Liabilities, in all cases, whether or not causes by or arising, in whole or in part, out of the comparative, contributory, or sole negligence of such indemnitee; provided, that no Credit Party shall have any obligation to any Indemnitee under the Interim Order with respect to any Indemnified Liabilities to the extent that such Indemnified Liabilities arise from the gross negligence or willful misconduct of such Indemnitee or any of its Affiliates or any of its or its Affiliates' officers, directors, partners, shareholders, trustees, controlling persons, employees, agents, advisors, attorneys and representatives, in each case, as determined by a court of competent jurisdiction in a final, nonappealable order.<br><br>*See* Interim Order ¶ 5(d); DIP Agreement § 10.3. |
| **Debtors' Stipulations and Challenge Period:** | Paragraph 3 of the Interim Order has certain Debtors' Stipulations regarding the extent and perfection of the First Lien Obligations and the Prepetition First Liens.<br><br>The Debtors' Stipulations made in Paragraph 3 of the Interim Order are subject to the rights of parties to assert a Challenge, as detailed in paragraph 20(a) of the Interim Order, no later than sixty (60) days, if a committee is appointed in the cases, otherwise seventy-five (75) days after entry of the Interim Order. |

| | *See* Interim Order ¶¶ 3, 20. |
|---|---|
| **Sections 506(c) Waivers:** | Upon entry of the Final DIP Order, the Debtors (on behalf of themselves and their estates) shall irrevocably waive, and shall be prohibited from asserting in the Chapter 11 Cases or any Successor Cases, any surcharge claim under section 506(c) of the Bankruptcy Code or otherwise for any costs and expenses incurred in connection with the preservation, protection or enhancement of, or realization by the DIP Agent, the DIP Lenders, or the First Lien Lender upon, the DIP Collateral or the First Lien Lender Collateral.<br><br>*See* Interim Order ¶ 10. |
| **Marshalling:** | Subject to the entry of the Final DIP Order approving the same, in no event shall the DIP Agent, the DIP Lenders, or the First Lien Lender be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral or the First Lien Lender Collateral.<br><br>*See* Interim Order ¶ 22. |
| **Lien on Avoidance Action Proceeds:** | Upon entry of the Final DIP Order, the DIP Collateral, to which the DIP Liens have recourse, shall include the proceeds of causes of action under chapter 5 of the Bankruptcy Code.<br><br>*See* Interim Order ¶ 7(b). |

## **LOCAL RULE 4001-2 DISCLOSURES**

17.    The Debtors believe that the following financing terms are required to be highlighted pursuant to Local Rule 4001-2 and, as discussed herein, are necessary and justified in the context of, and the circumstances relating to, the Chapter 11 Cases.

- **Waiver of Section 506(c) Surcharge.** Local Rule 4001-2(a)(i)(C) requires disclosure of provisions that seek to waive, without notice, whatever rights the estate may have under section 506(c) of the Bankruptcy Code. Although the DIP Loan Documents provide for a waiver of rights under section 506(c) with respect to the First Lien Lender and DIP Agent and DIP Lender, the proposed waiver of the estates' rights will be effective only upon entry of the Final DIP Order. *See* Interim Order ¶ 10.

- **Liens on Avoidance Actions.** Local Rule 4001-2(a)(i)(D) requires disclosure of provisions that immediately grant the prepetition secured creditor liens on avoidance actions. Upon entry of the Final DIP Order, the DIP Collateral, to which the DIP Liens have recourse, shall include the proceeds of causes of action under chapter 5 of the Bankruptcy Code. *See* Interim Order ¶ 7(b).

- **Treatment of Professionals.** Local Rule 4001-2(a)(i)(F) requires disclosure of provisions that provide disparate treatment to professionals retained by the creditors' committee from professionals retained by the Debtors. The Budget includes line items for the Debtors' professionals and any committee' professionals. The Carve-Out permits payments to professionals in accordance with the DIP Budget, <u>provided</u> that upon a Carve-Out Trigger Date, professional fees (other than success and transaction fees) are subject to a cap of $150,000, which is available on an unallocated basis to the Debtors' professionals and the Committee's professionals (but in all cases, subject to the Budget). *See* Interim Order ¶ 13.

- **Priming Liens.** Local Rule 4001-2(a)(i)(G) requires disclosure of provisions that prime any secured liens without the consent of the lienholder. The DIP Liens will prime the existing liens of the Subordinate Liens and Related Rights. *See* Interim Order ¶¶ 3(b), 7(b). Riesen Funding has consented to the subordination of all of its liens.

18.     The provisions of the DIP Documents as to which disclosure was required pursuant to Local Rule 4001-2 are all justified under the circumstances of the Chapter 11 Cases because the DIP Lenders would not agree to the DIP Facility, Bank of Colorado would not agree to the use of Cash Collateral, and Riesen Funding would not agree to the priming of their liens by the DIP Lenders without the inclusion of such terms. As demonstrated below, the funds provided under the DIP Facility are needed to allow the Debtors to operate in chapter 11, and the DIP Facility presents the only financing available to the Debtors at this stage. Given the benefits that the DIP Facility provides overall—most importantly, setting a foundation upon which the Debtors can pursue a value-maximizing restructuring under chapter 11—the Debtors submit that the inclusion of these highlighted provisions in the DIP Orders are appropriate under the facts and circumstances.

### BASIS FOR RELIEF REQUESTED

19.     As set forth above and in the First Day Declaration, the Debtors believe that the DIP Facility is the best financing available under the circumstances and will enable the Debtors to pursue a necessary deleveraging of their balance sheet. The Debtors believe that access to $3

million under the DIP Facility on an interim basis is necessary to avoid immediate and irreparable harm to their business, prospects and assets. For the reasons stated herein, the Debtors submit that they have satisfied the requirements to obtain postpetition financing on a superpriority, secured basis pursuant to section 364 of the Bankruptcy Code.

20.     Section 364 of the Bankruptcy Code distinguishes among (i) obtaining unsecured credit in the ordinary course of business, (ii) obtaining unsecured credit out of the ordinary course of business, and (iii) obtaining credit with specialized priority or with security.[11] If a debtor-in-possession cannot obtain sufficient postpetition credit on an unsecured basis, section 364(c) of the Bankruptcy Code permits a bankruptcy court to authorize a debtor to obtain credit or incur debt, repayment of which is (i) entitled to superpriority, administrative-expense status or (ii) is secured by a senior lien on unencumbered property or a junior lien on encumbered property, or both.[12] Furthermore, section 364(d) of the Bankruptcy Code permits a bankruptcy court to authorize a debtor to obtain postpetition credit secured by a senior or equal lien on encumbered property (*i.e.*, a priming lien) when a debtor is unable to obtain credit elsewhere and the interests of existing lienholders are adequately protected.[13]

21.     As further discussed herein, the DIP Facility is secured by substantially all of the assets of the Debtors' estates through superpriority claims, security interests, and secured liens pursuant to section 364 of the Bankruptcy Code. The circumstances of the Chapter 11 Cases necessitate postpetition financing under sections 364(c) and (d) of the Bankruptcy Code, and the DIP Facility reflects the sound exercise of the Debtors' business judgment.

---

[11]     11 U.S.C. §§ 364(a)–(d).

[12]     11 U.S.C. §364(c).

[13]     11 U.S.C. § 364(d).

## I.    The Debtors Should Be Authorized to Obtain Postpetition Financing Under Section 364(c) of the Bankruptcy Code.

22.    Section 364(c) financing is appropriate when the debtor in possession is unable to obtain unsecured credit allowable as an ordinary administrative claim.[14]  Courts have articulated a three-part test to determine whether a debtor is entitled to financing under section 364(c) of the Bankruptcy Code.  Specifically, courts look to whether:

    i.    The debtor is unable to obtain unsecured credit under section 364(b), *i.e.*, by allowing a lender only an administrative claim;

    ii.    The credit transaction is necessary to preserve the assets of the estate; and

    iii.    The terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender.[15]

23.    The Debtors propose to obtain the financing set forth in the DIP Agreement by providing, among other things, superpriority claims, security interests, and liens pursuant to sections 364(c)(1)–(3) and 364(d) of the Bankruptcy Code.  For the reasons set forth below, the Debtors submit that entry into the DIP Facility satisfies the three-part test to obtain such financing.

### A.    The Debtors Could Not Obtain Unsecured Financing.

24.    To show that the credit required is not obtainable on an unsecured basis, a debtor need only demonstrate "by a good faith effort that credit was not available without" the protections of sections 364(c) of the Bankruptcy Code.[16]  Thus, "[t]he statute imposes no duty to

---

[14]    *See In re LA Dodgers* LLC, 457 B.R. 308, 312 (Bankr. D. Del. 2011) (denying motion for authorization to enter into postpetition credit facility where debtors could not prove that they were unable to obtain unsecured credit allowable as an administrative expense); *see also In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 37–39 (Bankr. S.D.N.Y. 1990) (stating that debtor must show that it has made a reasonable effort to seek other sources of financing under sections 364(a) and (b) of the Bankruptcy Code); *In re Crouse Grp., Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (stating that secured credit under section 364(c)(2) of the Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained).

[15]    *See In re L.A. Dodgers*, 457 B.R. at 312; *see also In re Ames Dep't Stores*, 115 B.R. at 37–39.

[16]    *Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986).

seek credit from every possible lender before concluding that such credit is unavailable."[17]

Moreover, in circumstances where only a few lenders likely can or will extend the necessary

credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct

such an exhaustive search for financing."[18]  As set forth above and in the First Day Declaration,

unsecured postpetition financing was simply not available to the Debtors.  This is unsurprising

given, among other things, the substantial level of secured debt the Debtors already have, the

competitive pressures the Debtors are facing in their industry, and that the Debtors have just

recently restructured their operations and their historical financial performance does not reflect

the benefits the Debtors hope to achieve from those measures.  Accordingly, the Debtors have

satisfied the requirement of sections 364(c) of the Bankruptcy Code that alternative credit on

more favorable terms was unavailable to the Debtors.

### B.    Entry Into the DIP Facility Is Necessary to Preserve Assets of the Estates and Is In the Best Interests of Creditors.

25.    A debtor's decision to enter into a postpetition lending facility under section 364

of the Bankruptcy Code is governed by the business judgment standard.[19]  Courts grant a debtor

considerable deference in acting in accordance with its sound business judgment.[20]  Further, to

---

[17]    *Id.*, *see also In re Ames Dep't Stores*, 115 B.R. at 40 (holding that debtor made a reasonable effort to secure financing where it approached four lending institutions, was rejected by two, and selected the least onerous financing option from the remaining two lenders).

[18]    *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), aff'd sub nom. *Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); see also *In re Snowshoe*, 789 F.2d at 1088 (4th Cir. 1986) (demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the geographic area); *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that section 364 requirement was met).

[19]    *See In re Barbara K. Enters., Inc.*, 2008 WL 2439649 at *14 (Bankr. S.D.N.Y.  Mar. 5, 2009) (explaining that courts defer to a debtor's business judgment); *Ames Dep't Stores*, 115 B.R. at 38 (noting that financing decisions under section 364 of the Bankruptcy Code must reflect a debtor's business judgment).

[20]    *See, e.g.*, *Barbara K. Enters.*, 2008 WL 2439649 at *14 (explaining that courts defer to a debtor's business judgment "so long as a request for financing does not 'leverage the bankruptcy process' and unfairly cede control of the reorganization to any party in interest").

determine whether the business judgment standard is met, a court is "required to examine whether a reasonable business person would make a similar decision under similar circumstances."[21]

26.     The Debtors' decision to enter into the DIP Facility is an exercise of their sound judgment that warrants approval by the Court.  The Debtors are at a point where they do not have adequate liquidity to fund their go-forward operations.  The Debtors' management and professionals have reviewed their restructuring alternatives in detail over the past several months and have explored alternative sources of capital and financing as part of this process.  This includes reaching out to several alternative sources of financing, including Bank of Colorado, to determine their interest in providing post-petition financing on alternative terms.  None of those efforts yielded any competitive offer of financing.  Therefore, the Debtors' management took the steps necessary and exercised their best business judgment in negotiating the DIP Facility.  The DIP Facility will provide immediate access to capital, on terms that, collectively, are the best and most favorable terms available to the Debtors.

27.     Without access to the DIP Facility, the Debtors could experience a liquidity shortfall and would be deprived of the capital necessary to operate their businesses.  The DIP Facility will provide the funding necessary to allow the Debtors to, among other things, maintain their businesses in the ordinary course and successfully implement a restructuring.  The DIP Facility also will enhance the Debtors' ability to minimize disruption to their businesses and instill confidence in their various creditor constituencies, including customers, employees, landlords, vendors, and service providers.  Moreover, the DIP Lenders have agreed that the outstanding DIP Facility may be rolled over into exit financing upon confirmation of an

---

[21]      *In re Dura Auto. Sys., Inc.*, No. 06-11202 (KJC), 2007 Bankr. LEXIS 2764, at *272 (Bankr. D. Del. Aug. 15, 2007) (quoting *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006)).

acceptable plan, with the DIP Lenders agreeing, subject to the satisfaction of certain conditions,

to provide up to an additional $8.5 million as part of an Exit Facility.[22]  With the DIP Facility,

the Debtors will be in a position to continue operations, thereby preserving the value of their

assets for the benefit of all creditors, and will be provided an opportunity to complete their

operational and balance-sheet restructuring and move forward as a profitable business.

> **C.    The Terms of the DIP Facility Are Fair and Reasonable
> Under the Circumstances.**

28.    In determining whether the terms of postpetition financing are fair and reasonable,

courts consider the relative circumstances of both the debtor and the potential lender.[23]  Judged

from that perspective, the terms of the DIP Facility are fair and reasonable.

29.    The DIP Facility does not prime any known valid, unavoidable liens held by

prepetition lenders, other than Riesen Funding and Intercompany Claims, if any.  Riesen has

consented to the priming liens.  The Debtors need not, therefore, satisfy the more stringent

standard for obtaining authority to grant a priming lien.  Under section 364(d)(1) of the

Bankruptcy Code, the Debtors were obligated to obtain credit not secured by a priming lien if

such credit was available, and the Debtors have largely succeeded in obtaining such credit by

procuring the "junior" DIP Facility from the DIP Lender, which is junior to the most significant

creditor of the estates, the Bank of Colorado, and the Prior Liens.  Riesen Funding is

consensually agreeing to subordinate its liens to the DIP Facility in recognition that the provision

of the DIP Facility provides Riesen Funding with the best opportunity for a recovery by

maximizing the Debtors' chances to reorganize.  While the DIP Facility will prime Riesen and

---

[22]    Conversion of the DIP Facility into an exit facility and confirmation of the proposed plan are not mandatory.  The Debtors remain free to pursue a sale process or alternative plan so long as it provides for payment in full of the DIP Facility on the effective date.

[23]    *See In re Farmland*, 294 B.R. at 886–89; *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Ellingsen MacLean Oil Co., Inc.)*, 65 B.R. 358, 364–65 n.7 (W.D. Mich. 1986) (recognizing a debtor may have to enter into "hard" bargains to acquire funds for its reorganization).

other Subordinate Liens and Related Rights, if there are any, the provision of the facility in and of itself provides adequate protection by allowing the Debtors to continue to operate, as Riesen has recognized by consenting.

30.     The DIP Facility, along with the coupled consent to use Cash Collateral, provides the Debtors with sufficient liquidity to continue their operations in the near term while they seek to substantially reduce their debt through a chapter 11 plan.  The financial terms of the DIP Facility are consistent with market terms for such financing under the current economic environment and the Debtors' recent and projected financial performance.  There is, in fact, no other financing proposal available to the Debtors, let alone a proposal with materially superior economic terms.  The non-economic terms of the DIP Facility make the DIP Facility superior to any other facility with comparable terms—particularly because Raven has indicated it is willing to provide exit financing, subject to reaching definitive terms and documentation.  After thorough analysis by the Debtors and their advisors, they have concluded that the terms of the DIP Facility are reasonable and appropriate under the circumstances.

31.     Likewise, the DIP Facility does not directly or indirectly deprive the Debtors' estates or other parties in interest of possible rights and powers by restricting the services for which professionals may be paid in the Chapter 11 Cases.  Instead, the DIP Facility subjects the security interests and administrative expense claims granted to the DIP Lenders to the Carve-Out for certain administrative and professional fees.  Carve-outs for professional fees have been found to be reasonable and necessary to ensure that a debtor's estate is adequately assisted by counsel and other professionals.[24]

---

[24]     *See In re Ames*, 115 B.R. at 38.

32.     For these reasons, in the Debtors' prudent business judgment, the terms of the

DIP Facility are fair and reasonable in the circumstances of the Chapter 11 Cases.

## II.     The Debtors Should Be Authorized to Use Cash Collateral.

33.     Section 363 of the Bankruptcy Code governs the Debtors' use of property of the

estates.  Section 363(c)(1) of the Bankruptcy Code provides that:

> If the business of the debtor is authorized to be operated under
> Section . . . 1108 . . . of this title and unless the court orders
> otherwise, the trustee may enter into transactions, including the
> sale or lease of property of the estate, in the ordinary course of
> business, without notice or a hearing, and may use property of the
> estate in the ordinary course of business without notice or a
> hearing.[25]

Section 363(c)(2) of the Bankruptcy Code, however, provides an exception with respect to "cash

collateral" to the general grant of authority to use property of the estate in the ordinary course set

forth in section 363 of the Bankruptcy Code.  Specifically, a trustee or debtor-in-possession may

not use, sell, or lease "cash collateral" under subsection (c)(1) unless:

> (A)     each entity that has an interest in such collateral consents;
> or
>
> (B)     the court, after notice and a hearing, authorizes such use,
> sale, or lease in accordance with the provisions of this
> section.[26]

34.     During the ordinary course of operations, the Debtors generate cash from the use

of the proposed DIP Collateral and the pre-petition collateral.  As of the Petition Date, the

Debtors did not have sufficient cash to fund their operations, and any postpetition receipts of the

Debtors constitute proceeds of perfected security interests, and are therefore Cash Collateral.

The Debtors need the DIP Facility and the use of Cash Collateral to fund their ordinary course of

---

[25]     11 U.S.C. § 363(c)(1).

[26]     11 U.S.C. § 363(c)(2).

business operations and administer the Chapter 11 Cases while they pursue prompt confirmation of a chapter 11 plan.  As the DIP Facility is contingent upon the Debtors obtaining approval to use Cash Collateral, it is imperative that the Debtors obtain authority to use Cash Collateral subject to the terms of this Motion.  Accordingly, to obtain the financing under the DIP Facility and to avoid immediate and irreparable harm to the Debtors' business operations and their estates, the Debtors have an immediate need for authority to use Cash Collateral.

35.    The Debtors submit that, under the circumstances here, their request to use Cash Collateral should be approved.  The parties with the material interest in the Cash Collateral— namely Bank of Colorado and Riesen Funding—consent to the use of Cash Collateral provided that the adequate protection proposed herein is granted.  Further, through separate motions, the Debtors are seeking authority to pay Sysco, the only other party that asserts a security interest in Cash Collateral, in the ordinary course of business during the Chapter 11 Cases, including for its prepetition putatively secured claim.  Thus, Sysco will be adequately protected during the Chapter 11 Cases.  Accordingly, the proposed adequate protection is fair, reasonable, and sufficient to justify the requirements of sections 363(c)(2) and (3) of the Bankruptcy Code.[27]

## III.    Interim Approval Should Be Granted.

36.    Bankruptcy Rules 4001(b) and (c) provide that a final hearing on a motion to obtain credit pursuant to section 364 of the Bankruptcy Code may not be commenced earlier than fourteen (14) days after the service of such motion.[28]  Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the motion and authorize the

---

[27]    Edward Don has filed a UCC-1 financing statement covering substantially all of Mac Acquisition's personal property assets.  However, the Debtors have not seen any security agreement granting such expansive liens. To the extent Edward Don has a secured claim at all, the Debtors believe such lien extends to goods that the Debtors do not sell, and therefore Edward Don does not have any lien in Cash Collateral requiring adequate protection.

[28]    *See* FED. R. BANKR. P. 4001(b)(2), (c)(2).

obtaining of credit to the extent necessary to avoid immediate and irreparable harm to the borrowers' estates.[29]

37.     The Debtors request that the Court hold and conduct an interim hearing immediately to consider entry of the proposed Interim Order authorizing the Debtors from and after the entry of the Interim Order until the Final Hearing to borrow up to $3 million under the DIP Facility as provided therein (the full $5 million of the DIP Facility to be funded into the Funding Account upon entry of the Interim Order, but the incremental $2 million amount only available to the Debtor upon entry of a final order approving the DIP Facility).  As set forth herein, this relief requested in the Interim Order will provide the Debtors with sufficient liquidity to operate their businesses in a manner that will permit them to preserve and maximize value, and allow them pursue a necessary deleveraging of their balance sheet, including through the prompt confirmation of a chapter 11 plan.  Under these circumstances and in light of the risk of immediate and irreparable harm and prejudice to their estates and all parties in interest, the Debtors submit that interim relief is warranted.

## FINAL HEARING

38.     In the case of any conflict between the Motion and the Interim Order, the Interim Order shall control.

39.     The Debtors further respectfully request that the Court schedule the Final Hearing and authorize it to serve a copy of the signed Interim Order, which fixes the time and date for the filing of objections, by first-class mail upon:  (i) the Office of the United States Trustee for the District of Delaware; (ii) the United States Securities and Exchange Commission; (iii) the Office of the United States Attorney General for the District of Delaware; (iv) the

---

[29]     *See id.*; *see also* Local Rule 4001-2(b).

Internal Revenue Service; (v) counsel for the DIP Lenders and DIP Agent; (vi) counsel for Bank

of Colorado; (vii) counsel for Riesen Funding LLC; (viii) the Debtors' cash management banks;

(ix) all entities known or reasonably believed to have asserted a security interest or lien against

property of the Debtors; (x) Edward Don or its counsel, if known; (xi) Sysco or its counsel, if

known; (xii) Cisco or its counsel, if known; (xiii) those creditors holding the thirty (30) largest

unsecured claims against the Debtors' estates (on a consolidated basis); and (xiv) all parties who

have requested notice in the Chapter 11 Cases pursuant to Bankruptcy Rule 2002 (collectively,

the "Notice Parties").  The Debtors request that the Court consider such notice of the Final

Hearing to be sufficient notice under Bankruptcy Rule 4001 and Local Rule 2002-1.

## NOTICE

40.     Notice of this Motion will be provided to the Notice Parties and will be served

with the Interim Order in accordance with Local Rule 9013-1(m).  In light of the nature of the

relief requested herein, the Debtors submit that no other or further notice is necessary.

01:22461463.2

WHEREFORE, the Debtors respectfully request that the Court (i) enter the

Interim Order granting the relief requested herein, (ii) schedule a Final Hearing, (iii) enter the

Final DIP Order following a Final Hearing, and (iv) grant such other relief as is just and proper.


Dated:    Wilmington, Delaware              YOUNG CONAWAY STARGATT & TAYLOR, LLP
          October 18, 2017

                                            */s/ Ryan M. Bartley*
                                            Michael R. Nestor (No. 3526)
                                            Edmon L. Morton (No. 3856)
                                            Ryan M. Bartley (No. 4985)
                                            Elizabeth S. Justison (No. 5911)
                                            Rodney Square
                                            1000 North King Street
                                            Wilmington, Delaware 19801
                                            Tel:    (302) 571-6600
                                            Fax:    (302) 571-1253
                                            Email:  mnestor@ycst.com
                                                    emorton@ycst.com
                                                    rbartley@ycst.com
                                                    ejustison@ycst.com

                                            -and-

                                            Jeffrey C. Krause (CA No. 94053)
                                            Michael S. Neumeister (CA No. 274220)
                                            Emily B. Speak (CA No. 294852)
                                            Brittany N. Schmeltz (CA No. 313552)
                                            GIBSON, DUNN & CRUTCHER LLP
                                            333 South Grand Avenue
                                            Los Angeles, CA 90071
                                            Telephone: (213) 229-7000
                                            Facsimile: (213) 229-7520
                                            Email:  jkrause@gibsondunn.com
                                                    mneumeister@gibsondunn.com
                                                    espeak@gibsondunn.com
                                                    bschmeltz@gibsondunn.com

                                            *Proposed Counsel for the Debtors*
                                            *and Debtors in Possession*

01:22461463.2

**<u>EXHIBIT 1</u>**

**INTERIM ORDER**

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| MAC ACQUISITION LLC, *et al.*,[1] | Case No. 17-_____ (___) |
| Debtors. | (Jointly Administered) |
| | **Ref. Docket No. ___** |

**INTERIM ORDER (I) AUTHORIZING DEBTORS TO OBTAIN POSTPETITION SECURED FINANCING; (II) AUTHORIZING DEBTORS TO USE CASH COLLATERAL; (III) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES; AND (IV) MODIFYING THE AUTOMATIC STAY**

Upon the motion, dated October 18, 2017 (the "Motion"), of MAC Acquisition LLC (the "Borrower") and its affiliated debtors, each as debtor and debtor-in-possession (collectively, the "Debtors") in the above-captioned cases (the "Cases") as of the date of the filing of their respective petitions for relief (the "Petition Date"), for interim and final orders under sections 105, 361, 362, 363(c), 364(c)(1), 364(c)(2), 364(c)(3), 364(d) and 364(e) of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (as amended, the "Bankruptcy Code"), and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (as amended, the "Bankruptcy Rules"), and Rule 4001-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), seeking:

(I)      authorization for (a) the Borrower to obtain up to $5,000,000 (Five Million Dollars) in principal amount of postpetition financing (the "DIP Loans"), and to access up to $3,000,000 (Three Million Dollars) of such DIP Loans in the interim and pending a final hearing, all on the terms and conditions set forth in this Interim Order and

---

[1]      The Debtors and the last four digits of their respective taxpayer identification numbers are as follows:  Mac Acquisition LLC (6362); Mac Parent LLC (6715); Mac Holding LLC (6682); Mac Acquisition of New Jersey LLC (1121); Mac Acquisition of Kansas LLC (3910); Mac Acquisition of Anne Arundel County LLC (6571); Mac Acquisition of Frederick County LLC (6881); Mac Acquisition of Baltimore County LLC (6865); and Macaroni Grill Services LLC (5963).  The headquarters for the above-captioned Debtors is located at 1855 Blake St., Ste. 200, Denver, CO 80202.

01:22461462.2

the Debtor-in-Possession Credit, Guaranty and Security Agreement substantially in the form attached hereto as <u>Exhibit A</u> (as hereafter amended, supplemented or otherwise modified from time to time in accordance with the terms hereof and thereof, the "<u>DIP Agreement</u>";[2] together with all agreements, documents and instruments delivered or executed in connection herewith or therewith, including, without limitation, the Approved Budget (as defined in <u>paragraph 4(e)</u> below), in each case as hereafter amended, supplemented or otherwise modified from time to time in accordance with the terms hereof and thereof, the "<u>DIP Documents</u>," and together with the DIP Loans, the "<u>DIP Facility</u>"), among the Borrower; MAC Parent LLC, MAC Holding LLC, Macaroni Grill Services LLC and each of the direct and indirect subsidiaries of Borrower named therein or party thereto from time to time (such subsidiaries, collectively with Borrower, the "<u>Guarantors</u>")[3]; the lenders from time to time party thereto (collectively, the "<u>DIP Lenders</u>") and the administrative agent and collateral agent for the DIP Lenders named therein (in such capacity, the "<u>DIP Agent</u>"), and (b) each of the Guarantors to guaranty the Borrower's obligations in respect of the DIP Loans and all other obligations and indebtedness of the Borrower under or arising in connection with the DIP Documents on a joint and several basis;

(II)     authorization for the Debtors to execute and deliver the DIP Agreement and the other DIP Documents and to perform such other and further acts as may be necessary or appropriate in connection therewith or reasonably requested by DIP Agent;

(III)     authorization for the Debtors to (a) subject to the terms and provisions hereof, use all Cash Collateral (as defined in <u>paragraph 13</u> below) pursuant to sections 361, 362 and 363 of the Bankruptcy Code, and all other Prepetition Collateral (as defined in <u>paragraph 3(b)</u> below), (b) to provide adequate protection to each holder of Subordinate Liens and Related Rights (defined below), and (c) to provide adequate protection to the prepetition first lien lender (the "<u>First Lien Lender</u>"[4]) under the following first lien credit agreements ("<u>First Lien Credit Agreements</u>"; and together with any other security, pledge or guaranty agreements and all other documentation executed directly in connection with any of the foregoing, each as amended, supplemented or otherwise modified prior to the Petition Date, the "<u>First Lien Loan Documents</u>"):

---

[2]     Capitalized terms used but not defined herein shall have the meaning assigned to such terms in the DIP Agreement.

[3]     For maximum disclosure, DIP Agent may require guarantees by non-debtor affiliates of the DIP Obligations and any other obligations of the Debtors to the DIP Agent and DIP Lenders in addition to the guarantees and liens, rights, claims and other privileges granted to the DIP Agent and DIP Lenders hereunder and in the DIP Documents by the Debtors and Guarantors.  This Interim Order does not grant the Debtors relief with respect to these non-debtor guarantors, nor does this Interim Order impair, affect, alter or otherwise modify in any way any of First Lien Lender's claims and rights against any non-debtor guarantors.

[4]     For the avoidance of doubt, the only First Lien Lender for purposes of the application and interpretation of this Interim Order is Bank of Colorado.  The only First Lien Obligations of the First Lien Lender to which the DIP Facility shall be subordinated are those that have been incurred in favor of Bank of Colorado in connection with the loan agreements identified in prefatory paragraphs III (A), (B) and (C) and only to the extent such obligations are valid and enforceable and secured by first priority liens that are duly perfected, unavoidable or otherwise not subject to challenge as of the Petition Date.

A.     Business Loan Agreement, dated as of April 17, 2015, Loan No. 2100000158, by and between Mac Parent LLC, as borrower, and Bank of Colorado, as prepetition first lien lender, in the amended principal amount of $12.0 million, as further amended, modified supplemented or extended;

B.     Business Loan Agreement, dated as of December 20, 2016, Loan No. 2100000196, by and between Mac Parent LLC, as borrower, and Bank of Colorado, as prepetition first lien lender, in the principal amount of $2.5 million, as amended, modified supplemented or extended;

C.     Business Loan Agreement, dated as of September 19, 2017, Loan No. 2100000235, by and between Mac Parent LLC, as borrower, and Bank of Colorado, as prepetition first lien lender, in the principal amount of $3.5 million, as amended, modified supplemented or extended.

(IV)    to schedule, pursuant to Bankruptcy Rule 4001, an interim hearing (the "Interim Hearing") on the Motion to be held before this Court to consider entry of the proposed interim order annexed to the Motion (the "Interim Order"); and

(V)    to schedule, pursuant to Bankruptcy Rule 4001, a final hearing for this Court to consider entry of a final order approving the Motion, which order shall be substantially in the form of the Interim Order and otherwise contain terms and conditions acceptable to the DIP Agent.

The Interim Hearing having been held by this Court on October ___ , 2017; and this Court having considered all of the pleadings, documents and other papers of record filed in the Case in connection with the Interim Hearing, including the officer's affidavit and related first day pleadings filed substantially contemporaneously with the Motion; and upon the record made by the Debtors at the Interim Hearing, and after due deliberation and consideration and sufficient cause appearing therefor;

**IT IS FOUND, DETERMINED, ORDERED AND ADJUDGED,** that:

1.     _Jurisdiction_.  This Court has core jurisdiction over the Cases, this Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334.  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The Debtors are continuing to operate their respective businesses and manage their respective properties as debtors-in-

possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  An official committee of unsecured creditors (the "Committee") had not been appointed in the cases as of the time of the Interim Hearing.

2.      *Notice*.  On October 18, 2017, the Debtors filed the Motion with this Court and pursuant to Bankruptcy Rules 2002, 4001 and 9014, and the Local Bankruptcy Rules of this Court, the Debtors provided notice of the Motion and the Interim Hearing by electronic mail, facsimile, hand delivery or overnight delivery to the following parties and/or to their counsel as indicated below: (i) the Office of the United States Trustee for this District (the "U.S. Trustee"); (ii) the Debtors' thirty (30) largest unsecured creditors on a consolidated basis; (iii) counsel to the DIP Agent; (iv) counsel to the First Lien Lender; (v) all other known parties with liens of record on assets of the Debtors as of the Petition Date; (vi) the local office for the Internal Revenue Service; and (vii) all other parties required to receive notice pursuant to Bankruptcy Rules 2002, 4001 or 9014 or requesting to receive notice prior to the date hereof (collectively, the "Notice Parties").  Given the nature of the relief sought in the Motion, this Court concludes that the form, scope and timing of the foregoing notice was sufficient and adequate under the circumstances and complies with the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and any other applicable law, and no further notice relating to the Interim Hearing or Motion is necessary or required.

3.      *Debtors' Stipulations*.  Without prejudice to the rights of any other party (but subject to the limitations thereon contained in paragraph 20 and paragraph 21 below), the Debtors admit, stipulate and agree that, on and as of the Petition Date, the Debtors were indebted and bound as described below:

01:22461462.2

4

(a)       the Debtors were indebted and liable to the First Lien Lender, without regard to any defense, counterclaim or offset of any kind, in the following aggregate principal amount of $13,900,000 (Thirteen Million Nine Hundred Thousand Dollars) in respect of loans made and other financial accommodations provided, in each case, by the First Lien Lender pursuant to the First Lien Loan Documents, plus obligations on account of approximately $4,100,000 (Four Million One Hundred Thousand Dollars) in outstanding letters of credit and accrued but unpaid interest, costs, fees and expenses as provided in the First Lien Loan Documents (collectively, the "First Lien Obligations"):

(b)       the liens and security interests granted to the First Lien Lender pursuant to the First Lien Loan Documents to secure the First Lien Obligations (collectively, the "Prepetition First Liens") are (i) duly perfected first priority liens on and security interests in the personal and real, tangible and intangible property of the Debtors constituting "Collateral" under, and as defined in, the First Lien Loan Documents in respect of the First Lien Obligations, including but not limited to the Debtors' accounts, inventory, equipment, general intangibles and proceeds thereof (such Collateral, together with all prepetition and postpetition proceeds thereof, the "Prepetition Collateral"), (ii) were perfected prior to the Petition Date (or perfected on or after the Petition Date to the extent permitted by section 546(b) of the Bankruptcy Code), and (iii) are senior in priority to all other prepetition liens except for liens permitted to be prior thereto under the First Lien Loan Documents; and

(c)       the First Lien Obligations constitute the legal, valid and binding obligations of the Debtors, enforceable in accordance with their terms (other than in respect of the stay of enforcement arising under section 362 of the Bankruptcy Code), without reference to

01:22461462.2

potential avoidance and recovery or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law.

      4.     <u>*Findings Regarding The DIP Facility*</u>.

      (a)     <u>*Good Cause*</u>.  Good cause has been shown for the entry of this Interim Order.  The Debtors have an immediate need to obtain DIP Loans under the DIP Documents and to continue to use the Prepetition Collateral, including the Cash Collateral, in order to, among other things, permit the orderly continuation of their businesses, preserve the going concern value of the Debtors, make payroll and satisfy other working capital and general corporate purposes of the Debtors.  The DIP Facility and the Debtors' continued use of the Prepetition Collateral (including the Cash Collateral) is necessary to ensure that the Debtors have sufficient working capital and liquidity to preserve and maintain the going concern value of the Debtors' estates.  Accordingly, the Debtors and their estates will suffer immediate and irreparable harm unless the Debtors are immediately authorized to obtain DIP Loans under the DIP Facility and to use the Cash Collateral on the terms and conditions set forth in this Interim Order.

      (b)     <u>*No Alternative Sources of Financing*</u>.  The Debtors believe they are unable to obtain financing on more favorable terms from sources other than the DIP Lenders pursuant to, and for the purposes set forth in, this Interim Order and the DIP Documents and believe they are unable to obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense.  The Debtors also believe they are unable to obtain secured credit allowable under sections 364(c)(1), 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code without the Debtors granting the DIP Liens (as defined in <u>paragraph 7</u> below) and the Super-Priority Claims (as defined in <u>paragraph 8</u> below), in each case on the terms and conditions set forth in this Interim Order and the DIP Documents.

(c)      *Reasonably Equivalent Value*.  The terms of the DIP Facility and the continued use of the Prepetition Collateral (including the Cash Collateral) pursuant to this Interim Order are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties and constitute reasonably equivalent value and fair consideration.  The Debtors require both additional financing under the DIP Facility and the continued use of Cash Collateral under the terms of this Interim Order for legitimate business purposes and in order to satisfy their postpetition liquidity needs.  After considering all of their alternatives, the Debtors have concluded, in an exercise of their sound business judgment, that the financing to be provided by the DIP Agent and the DIP Lenders pursuant to the terms of this Interim Order and the DIP Documents represents the best financing presently available to the Debtors.

(d)      *Good Faith*.  The DIP Documents and the continued use of the Prepetition Collateral (including the Cash Collateral) have been the subject of extensive negotiations conducted in good faith and at arm's length among the Debtors, the DIP Agent, the DIP Lenders, and the First Lien Lender.  All DIP Obligations (as defined in paragraph 5(a) below) have been, and shall be deemed to have been, extended by the DIP Agent and the DIP Lenders in "good faith" as such term is used in section 364(e) of the Bankruptcy Code, and in express reliance upon the protections set forth therein, and shall be entitled to, and are hereby granted, the full protection of section 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is stayed, vacated, reversed, amended or modified on appeal or otherwise.

(e)      *Approved Budget*.  Attached to this Interim Order as Exhibit B is an initial, thirteen week cash flow Budget under the DIP Agreement setting forth on a line-item basis the Debtors' anticipated cumulative cash receipts and expenditures and all necessary and required

cumulative expenses which the Debtors expect to incur during the period covered by the initial

Budget.  For each Budget Period under the DIP Agreement, the Debtors shall provide to the DIP

Agent a Budget, which Budget shall comply with the requirements of the DIP Agreement,

including, without limitation, the budget variances (provided for in the DIP Agreement).   With

the consent of the DIP Agent, in its sole discretion, the Budget may be updated no more than

once a week and upon approval of the DIP Agent, whereupon such updated Budget shall become

the Budget for purposes of the DIP Agreement and this Interim Order, in each instance without

further notice, motion or application to, order of, or hearing before, this Court (but subject to the

rights of the U.S. Trustee and any Committee upon its formation to object to any modification,

supplement or amendment within five (5) business days of the date of notice as provided in

paragraph 5(b)(ii) below).  Each of the initial Budget approved hereby and subsequent Budgets

so approved shall constitute an "Approved Budget."  The initial Approved Budget is an integral

part of this Interim Order and has been relied upon by the DIP Agent, the DIP Lenders, and the

First Lien Lender in deciding to consent, or not otherwise object, to entry of this Interim Order.

(f)      *Immediate Entry of Order*.  The Debtors have requested immediate entry
of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2) and Local Rule
4001-2(b).  Absent granting the relief set forth in this Interim Order, the Debtors' estates will be
immediately and irreparably harmed.  Consummation of the DIP Facility and the continued use
of the Prepetition Collateral (including the Cash Collateral) in accordance with this Interim
Order and the DIP Documents are, therefore, in the best interest of the Debtors' estates.

5.      *Authorization Of The DIP Facility And The DIP Documents*.

(a)      *Maximum Amount*.  The terms and conditions of the DIP Agreement are
hereby approved on an interim basis.  The Debtors are hereby authorized to enter into and

perform the transactions contemplated by this Interim Order and the DIP Documents and, in the

case of the Borrower, to borrow under the DIP Agreement up to an aggregate principal amount

of $3,000,000 (Three Million Dollars) on an interim basis from the Loan Proceeds Account

(which Loan Proceeds Account shall be funded with the maximum facility amount of $5,000,000

(Five Million Dollars) subject to the terms of the DIP Agreement, such incremental amount only

available to the Debtors following entry of a final order approving the DIP Facility) for working

capital and other general corporate purposes of the Debtors pursuant and subject to the terms and

conditions of this Interim Order and the DIP Documents.  All borrowings under this Interim

Order and the DIP Documents shall be funded into a cash collateral account in the name of DIP

Agent over which the DIP Agent shall have sole dominion and control and such monies shall be

subject to withdrawal and use by Borrower therefrom, all subject to the terms and conditions of

the DIP Documents, this Interim Order and the cash management order entered, or to be entered,

by the court substantially contemporaneously herewith.  For purposes of this Interim Order, the

term "DIP Obligations" shall mean and include all amounts owing under the DIP Agreement or

other DIP Documents (including, without limitation, all "Obligations" as defined in the DIP

Agreement) and shall include the principal of, interest on, fees, costs, expenses and other charges

owing in respect of, such amounts (including, without limitation, any reasonable attorneys',

accountants', financial advisors' and other fees, costs and expenses that are chargeable or

reimbursable by or to the DIP Agent or the DIP Lenders under this Interim Order, the DIP

Agreement, the other DIP Documents or otherwise in relation to the DIP Facility), and any

indemnity claims, in each case whether contingent or otherwise and whether arising before or

after the Petition Date.

01:22461462.2

(b)    *Further Assurances*.  In furtherance of the foregoing and without further notice, motion or application to, order of, or hearing before, this Court, each Debtor is authorized to perform all acts and to execute and deliver all instruments and documents that the DIP Agent or First Lien Lender, as applicable, determines to be reasonably required or necessary for the Debtors' performance of their obligations under the DIP Documents or this Interim Order, including without limitation:

(i)    the execution and delivery of, and performance of the transactions contemplated by, the DIP Documents;

(ii)    the execution, delivery and performance of one or more amendments, waivers, consents or other modifications to and under the DIP Documents, including any such matters respecting the Approved Budget, in each case in such form as the Debtors, the DIP Agent and the DIP Lenders may agree, and no further approval of this Court shall be required for non-material amendments, waivers, consents or other modifications to and under the DIP Documents for which no objection is made as set forth in the proviso to this paragraph; provided, however, that a copy of any such amendment, waiver, consent or other modification shall be filed by the Debtors with this Court and served by the Debtors on the U.S. Trustee and the respective counsel to the Committee, if and when appointed, and the First Lien Lender, each of whom shall have five (5) business days from the date of such notice within which to object in writing to any such amendment, waiver, consent or modification.  For the avoidance of doubt, the five (5) business day notice period shall apply to all amendments, waivers, consents, or modifications.  Further Court approval shall be required in all cases for any material amendments, waivers, consents, or modifications.  If any party timely objects to any proposed amendment, waiver, consent or modification, whether styled as material or non-material, then such amendment, waiver, consent or modification shall only be permitted pursuant to an order of this Court;

(iii)    the payment to the DIP Agent and the DIP Lenders, as the case may be, of the DIP Obligations as and when due as set forth in this Interim Order or the DIP Documents; and

(iv)    the prompt performance of all other acts required under or in connection with this Interim Order or the DIP Documents, including, without limitation, prompt delivery to the DIP Agent, of

such reporting and financial information and access to the Debtors' books and records, in each case, as may be reasonably requested by the DIP Agent from time to time.

(c)    *No Impairment*.  Upon execution and delivery of the DIP Documents, the DIP Documents shall constitute valid and binding obligations of the Debtors, be enforceable against the Debtors in accordance with the terms of this Interim Order and the DIP Documents and shall be incorporated by reference as part of this Interim Order.  Subject to paragraph 20 with respect to the First Lien Lender, no obligation or liability owed, or payment, transfer or grant of security, to the DIP Agent, any DIP Lender, the First Lien Lender under the Interim Order or any DIP Document shall be stayed, restrained, impaired, disgorged, voidable, avoidable or recoverable under the Bankruptcy Code or under any applicable non-bankruptcy law (including without limitation, under sections 502(d) or 548 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law), or be subject to any defense, reduction, setoff, recoupment or counterclaim, whether in the Cases or any other subsequent proceedings under the Bankruptcy Code, including, without limitation, any Chapter 7 proceeding if any of the Cases are converted to a case under Chapter 7 of the Bankruptcy Code (collectively, the "Successor Case").  The DIP Obligations, once paid by any Debtor, shall be indefeasible and non-refundable.

(d)    *Interest, Fees, Costs and Expenses*.  The DIP Obligations shall bear interest at the rates (including at the default rate after the occurrence of an Event of Default on the terms set forth in the DIP Agreement), and be due and payable (and paid), as set forth in, and in accordance with the terms and conditions of, this Interim Order and the DIP Documents, in each case without further notice, motion or application to, order of, or hearing before, this Court. The Debtors shall pay on demand all reasonable fees, costs, expenses and other charges payable under the terms of the DIP Documents, in each case whether or not the DIP Agreement and

01:22461462.2

transactions contemplated therein are consummated and whether or not such amounts are included in the Approved Budget or arose before or after the Petition Date.  None of such fees, costs and expenses payable pursuant to this paragraph shall be subject to separate approval by this Court (but this Court shall resolve any dispute as to the reasonableness of any such fees, costs and expenses) and no recipient of any such payment shall be required to file any interim or final fee application.  The Debtors shall pay the fees, costs and expenses provided for in this paragraph promptly, and in any event not later than ten (10) days after the invoices for such fees, costs and expenses shall have been submitted to the Debtors (which invoices may be redacted to the extent necessary to delete any information subject to the attorney-client privilege, any information constituting attorney work product, or any other confidential information, and the provision of such invoices shall not constitute any waiver of the attorney-client privilege or of any benefits of the attorney work product doctrine).  The Debtors (or DIP Agent at its election) shall promptly provide copies of such invoices to the respective counsel to the First Lien Lender, Committee, if and when appointed, and the U.S. Trustee.  The Debtors, First Lien Lender, Committee and the U.S. Trustee may object to the reasonableness of the fees, costs and expenses included in any professional fee invoice submitted by the DIP Agent; provided that, any such objection shall be waived and barred unless it is filed with this Court and served on counsel to the DIP Agent no later than ten (10) days after the objecting party's receipt of the applicable professional fee invoice; and further provided, in the event of a timely objection to any such invoice, the Debtor shall nonetheless pay the entire invoice, subject to the rights of the objecting parties to have a hearing on final disposition. If any such objection shall be sustained, the DIP Agent and DIP Lenders may retain the payment for application to the principal and interest on the DIP Loans under the DIP Documents.  The Debtors shall indemnify the DIP Agent and the

DIP Lenders (and other applicable parties) to the extent set forth in the DIP Documents.  Any and all fees, costs and expenses paid prior to the Petition Date by any Debtor to the DIP Agent or DIP Lenders in connection with or with respect to the DIP Facility, DIP Agreement or other DIP Documents are hereby approved in full.  Notwithstanding this paragraph 5(d), all such fees, costs and expenses shall first be paid out of any retainer or similar agreement between the DIP Agent, the DIP Lenders and the Debtors.

(e)     *Guarantors; Pledgors*.  Each Debtor hereby agrees that such Debtor is jointly and severally liable for, and hereby absolutely and unconditionally guarantees to DIP Agent and DIP Lenders and their respective successors and assigns, the full and prompt payment when due (whether at maturity or earlier, by reason of acceleration or otherwise, and at all times thereafter) and performance of, all DIP Obligations owed or hereafter owing to DIP Agent or any DIP Lenders by each other Debtor.  Each Debtor agrees that (a) its guaranty obligation hereunder is a present and continuing guaranty of payment and performance and not of collection, (b) its obligations under the Interim Order and any DIP Document shall not be discharged until the indefeasible payment and performance, in full, in cash of the DIP Obligations on a final basis, and the termination of the lending commitments under the DIP Documents, has occurred; and (c) its guaranty obligations hereunder shall be, and are, absolute and unconditional for all purposes in these Cases and any Successor Case.  Without limiting the foregoing or any other terms or conditions of this Interim Order or the DIP Documents, any Debtor (or any affiliate or subsidiary of any Debtor) that is a party to a guaranty of the First Lien Obligations or that has pledged any of its assets or property to secure the First Lien Obligations pursuant to a security agreement, pledge agreement or related document hereby guarantees and secures the DIP Obligations on the same basis as the First Lien Obligations without the necessity of further

documentation thereof, without regard to whether such guaranty or security in respect of the First Lien Obligations may be avoided; provided that any Prepetition First Liens granted in connection with the First Lien Obligations shall continue to be senior to any and all DIP Liens granted in connection with the DIP Obligations to the extent set forth in this Interim Order.

(f)    _Conditions Precedent_.  In addition to any conditions precedent contained in the DIP Documents, it is a condition precedent to DIP Agent's and DIP Lenders' willingness to provide the DIP Facility and to the First Lien Lender's willingness to permit the continued use of Cash Collateral that this Interim Order shall have been entered by this Court and such order shall be in form and substance acceptable to DIP Agent and First Lien Lender.

(g)    _Corporate Authorization_.  The Debtors have represented to the Court that they have obtained all corporate authorizations necessary or required to enter into the DIP Documents, to obtain financial accommodations pursuant to the DIP Facility including the DIP Loans and to grant the liens, claims and other rights to the DIP Agent and DIP Lenders as set forth therein.  No further board of directors, member, shareholder or other approval or resolutions shall be necessary or required to consummate, effect or validate the transactions contemplated in the DIP Documents or in this Interim Order.  Nothing herein shall be deemed to release any director or officer of a Debtor from his or her applicable fiduciary duties or otherwise.

6.    _Permitted Use_.

(a)    _Generally_.  Notwithstanding anything in this Interim Order to the contrary, the Debtors may continue to use the Cash Collateral and proceeds of the DIP Facility, and incur DIP Obligations, solely in accordance with and pursuant to the terms and conditions set forth in the DIP Documents and this Interim Order, including, without limitation, pursuant to the

Approved Budget, but in all events only until the occurrence of the Termination Date (as defined in paragraph 9 below) and regardless of whether the Debtors have expended the entire amount of Cash Collateral or proceeds of the DIP Facility permitted by the terms of this Interim Order prior to the Termination Date (but subject to the Debtors' reservation of rights contained in paragraph 9 below).  Notwithstanding the foregoing, if the DIP Agent, the DIP Lenders, or the First Lien Lender in their respective sole discretion advance funds, provide other extensions of credit to the Debtors or permit the continued use of Cash Collateral (as applicable) in excess of any financial covenants, availability formulae, or other terms and conditions (or any other limitations in the DIP Documents, including, without limitation, the Approved Budget), such advances and extensions of credit and uses of Cash Collateral shall be entitled to, and are hereby granted, the rights, priorities, benefits and protections of this Interim Order; provided that the principal amount of the DIP Loans available to Debtors on a cumulative basis shall not exceed the maximum amount permitted to be borrowed under this Interim Order and the DIP Documents without further order of this Court.

(b)    *No Duty to Monitor Compliance*.  The DIP Agent, the DIP Lenders, and the First Lien Lender may assume the Debtors will comply with the Interim Order, the Approved Budget and the DIP Documents and shall not: (i) have any obligation with respect to the Debtors' continued use of Cash Collateral or the continued use of proceeds of the DIP Facility; (ii) be obligated to ensure or monitor the Debtors' compliance with any financial covenants, formulae, or other terms and conditions of this Interim Order or any DIP Document; or (iii) be obligated to pay (directly or indirectly from the Cash Collateral or DIP Collateral) any expenses incurred or authorized to be incurred pursuant to this Interim Order or any DIP Document or be obligated to ensure or monitor that sufficient Cash Collateral or proceeds of DIP Facility exists

to pay such expenses.  Notwithstanding the foregoing, the Carve-Out shall be available on the terms and conditions set forth in this Interim Order, and nothing in this sub-paragraph is meant to modify the rights of the Retained Professionals and U.S. Trustee in and to the Carve-Out, irrespective of the identity of the party holding any Carve-Out funds.

(c)    *Restricted Payments; No Liens in DIP Loans and Proceeds*.  Except to the extent approved in writing by the DIP Agent and the First Lien Lender or as expressly provided in this Interim Order or the DIP Documents (or approved by further order of the Court in accordance with paragraph 9 below), no Debtor shall use any DIP Loans, Cash Collateral or proceeds of the DIP Facility to pay (i) unless set forth on an Approved Budget, any administrative expense claims arising under section 503(b)(9) of the Bankruptcy Code; (ii) unless set forth on an Approved Budget, any prepetition unsecured claims (including prepetition priority unsecured claims), in each case of clauses (i) and (ii) whether pursuant to section 105, 363, 365 or any other provision of the Bankruptcy Code or otherwise; (iii) any other amount not set forth on an Approved Budget; or (iv) any amount otherwise restricted from payment under the DIP Agreement.  The DIP Loans, DIP Facility and proceeds thereof shall not be subject at any time to any security interest, lien or claim of any party (except DIP Agent and DIP Lender), including any Prior Liens (defined below), Prepetition First Liens, Subordinate Liens and Related Rights or Adequate Protection Liens, and this Interim Order does not grant a security interest, lien or claim therein in favor of any party (except DIP Agent for the benefit of DIP Lender).  The Debtors shall not grant liens in any other order or agreement in the DIP Loans, DIP Facility or proceeds thereof.  For purposes of this Interim Order, "Prior Liens" means prepetition liens in and security interests upon the Prepetition Collateral that are valid, enforceable, and non-avoidable liens in such collateral that (x) (A) are granted in favor of Sysco

Corporation and any direct or indirect affiliates thereof, (B) Edward Don & Company to secure financial accommodations in a maximum aggregate principal amount of $550,000 (Five Hundred Fifty Thousand Dollars), inclusive of any dollar amounts asserted by any direct or indirect affiliates thereof, (C) Cisco Capital Corporation to secure financial accommodations in a maximum aggregate principal amount of $150,000 (One Hundred Fifty Thousand Dollars), inclusive of any dollar amounts asserted by any direct or indirect affiliates of the foregoing, or (D) constitute "Permitted Liens" (as defined in the DIP Agreement), except for the liens of Riesen Funding LLC (which shall constitute Subordinate Liens and Related Rights), in each of clauses (A) – (D) including any reasonable fees, costs or charges allowed under section 506(b) of the Bankruptcy Code, (y) were duly perfected prior to the Petition Date (or duly perfected on or after the Petition Date to the extent permitted by section 546(b) of the Bankruptcy Code), and (z) are not subject to avoidance, disallowance,  subordination or other successful challenge pursuant to the Bankruptcy Code or applicable non-bankruptcy law.  For the avoidance of doubt, and without limiting the generality of the foregoing, no security interests, liens or other claims in respect of loans or other financial accommodations of any nature provided by Riesen Funding LLC or Redrock Partners, LLC or their respective affiliates or assigns shall constitute Prior Liens and all such security interests, liens and claims of such persons or entities shall be Subordinate Liens and Related Rights hereunder.

(d)     *Budget Reports*.  The Debtors shall comply with all reporting requirements in respect of the Budget as set forth and required by the DIP Agreement.  Permitted budget variances shall be tested during each Budget Testing Period in accordance with the DIP Agreement.

7.      *DIP Agreement; Liens*.

(a)      *Generally*.  The Debtors are authorized to enter into the DIP Agreement and all other DIP Documents and to perform in accordance with this Interim Order and the DIP Documents.  Each of the terms of the DIP Agreement and other DIP Documents are hereby approved, including, but not limited to, paragraphs 2.1(c)(ii) (Loan Proceeds Account); 2.6 (Fees); 2.7 (Default Interest); 2.10 (Mandatory Prepayments); 5.7 (Chapter 11 Milestones); 6.16 (Prohibited Conduct); 10.2 (Expenses); 10.3 (Indemnity); 10.4 (Setoff); 10.27 (Credit Bid); and Section 8 (Events of Default) of the DIP Agreement.  The omission of discussion of any specific term of any DIP Document herein shall not impair the approval or enforceability of any such term, no inference shall be made from any such omission, and all terms of the DIP Documents shall be equally enforceable whether or not mentioned herein.  With respect to any credit bid by the DIP Agent and/or the DIP Lenders, such credit bid shall be subject to the Prepetition First Liens of the First Lien Lender.

(b)      *DIP Liens*.  As security for the full and timely repayment of all of the DIP Obligations, the DIP Agent, for the benefit of the DIP Agent and the DIP Lenders, is hereby granted by each Debtor, pursuant to sections 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code (but in this latter case of section 364(d) only with respect to Subordinate Liens and Related Rights (defined below) on the DIP Collateral) valid, binding, enforceable, unavoidable and fully perfected security interests and liens (collectively, the "DIP Liens") in and upon the Prepetition Collateral and all other prepetition and postpetition real and personal, tangible and intangible property and assets of each of the Debtors of any kind or nature whatsoever, wherever located, whether now existing or hereafter acquired or arising, including, without limitation, all cash (including all Cash Collateral, wherever held), cash equivalents, bank accounts, accounts, other

receivables, chattel paper, contract rights, inventory, instruments, documents, securities (whether or not marketable), equipment, goods, fixtures, real property interests, intellectual property, general intangibles, investment property, supporting obligations, letter of credit rights, commercial tort claims, one hundred percent (100%) of the capital stock of each Debtor's direct and indirect domestic subsidiaries, all inter-company notes held by the Debtors, trademarks, trade names, licenses, rights to payment including tax refund claims, and causes of action including, but only pursuant to a final order approving the DIP Facility, proceeds of avoidance actions for preferences, fraudulent conveyances, and other avoidance power claims under sections 544, 545, 547, 548, 549, 550, 552(b) and 553 of the Bankruptcy Code (the "Avoidance Actions") (the proceeds of Avoidance Actions shall be sought to be subject to the DIP Liens at the time of a final hearing on the Motion)), and any and all proceeds, products, offspring, rents and profits of all of the foregoing, including insurance proceeds (all of the foregoing, together with the Prepetition Collateral, the "DIP Collateral"); provided DIP Liens (x) shall not be granted hereby in any assets or property of the Debtors upon which, after giving effect to the terms and conditions of this Interim Order, a security interest or lien may not be lawfully granted, the "Excluded Assets") but (y) shall be granted hereby in any and all proceeds of the Excluded Assets.

(c)     *Other Priority Matters*.  Notwithstanding anything in the Interim Order to the contrary, the DIP Liens: (a) shall, pursuant to section 364(c)(2) of the Bankruptcy Code, constitute first priority security interests in and liens on all DIP Collateral that is not otherwise subject to any prior encumbrances including in respect of any Prior Liens or Prepetition First Liens; (b) shall, pursuant to section 364(c)(3) of the Bankruptcy Code, constitute junior security interests in and liens on all DIP Collateral immediately junior in priority to any and all Prior

Liens and Prepetition First Liens on or in the DIP Collateral (but not junior to Subordinate Liens and Related Rights in accordance with the following clause (c)); and (c) shall, pursuant to section 364(d) of the Bankruptcy Code, constitute senior priority priming security interests in and liens on all DIP Collateral but only with respect to Subordinate Liens and Related Rights (in all cases for clauses (a), (b) and (c) of this sub-paragraph, the DIP Liens shall be subject to the Carve-Out). The DIP Liens shall at all times be senior to the following (collectively, the "Subordinate Liens and Related Rights"): (i) any inter-company claim of any Debtor or any domestic or foreign subsidiary or affiliate of any Debtor, (ii) any security interest or lien which is avoided or disallowed or otherwise preserved for the benefit of any Debtor's estate under section 551 or any other provision of the Bankruptcy Code, (iii) the Adequate Protection Liens (defined below) and (iv) any other security interest or lien that is not a Prior Lien or Prepetition First Lien. The DIP Liens shall, as of the Petition Date, be deemed legal, valid, binding, enforceable, and perfected liens, not subject to subordination (except as expressly provided in this Interim Order), impairment or avoidance, for all purposes in the Cases and any Successor Case, in each case without the necessity of any further action, including the execution or delivery by the Debtors (or recordation or other filing) of security agreements, control agreements, pledge agreements, financing statements, mortgages or other similar documents, or the possession or control by the DIP Agent or any DIP Lenders of any DIP Collateral. Other than the Carve-Out, Prior Liens, and Prepetition First Liens, no other liens or security interests, whether for postpetition financing, adequate protection or otherwise, whether arising pursuant to sections 363 or 364 of the Bankruptcy Code or otherwise, shall be senior or equal to or pari passu with the DIP Liens in these Cases or any Successor Case without the express written consent of the DIP Agent given in accordance with the DIP Documents (which consent may be withheld in its sole discretion).

Without either (a) the prior written consent of DIP Agent, which may be withheld in its sole discretion, or (b) the indefeasible payment and satisfaction in full, in cash of the DIP Obligations and termination of the lending commitments under the DIP Facility, all on a final basis, no security interest or lien shall be granted or allowed in the Cases or any Successor Case, whether for postpetition financing, adequate protection or otherwise, whether arising pursuant to sections 363 or 364 of the Bankruptcy Code or otherwise, on any Excluded Asset or any other asset or property of any Debtor that is not subject to the DIP Liens in favor of DIP Agent.

8.      *Super-Priority Claims*.  In addition to the DIP Liens, the DIP Agent and DIP Lenders are hereby granted, for all DIP Obligations, an allowed super-priority administrative expense claim pursuant to section 364(c)(1) of the Bankruptcy Code (the "Super-Priority Claim") against each Debtor and its respective estate.  Except for the Carve-Out, the Super-Priority Claim shall have priority over (i) all other costs and expenses of administration of any kind (and no cost or expense of administration shall be senior to, equal to, or pari passu with, the Super-Priority Claim), including those specified in, or ordered pursuant to, sections 105, 326, 328, 330, 331, 363, 364, 503, 507, 546, 726, 1113 or 1114 or any other provision of the Bankruptcy Code or otherwise, in each case whether incurred in these Cases or any Successor Case, whether for adequate protection, the lack of, or failure to provide, adequate protection, or otherwise, including, without limitation, the 507(b) Claims (as defined in paragraph 16 below), and whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, and (ii) any inter-company claim of any Debtor or any domestic or foreign subsidiary or affiliate of any Debtor.  The Super-Priority Claims shall be deemed legal, valid, binding, and enforceable claims and expenses against the Debtor and their estates, and not subject to subordination, impairment or avoidance, for all purposes in the Cases

01:22461462.2

and any Successor Case.  Subject to the Carve-Out, the Super-Priority Claim shall be payable

from, and have recourse to, any and all property and assets of each Debtor, including, without

limitation, the Excluded Assets and the proceeds thereof, but not (on this interim basis) the

proceeds of Avoidance Actions (which will be sought to be subject to the Super-Priority Claim

as part of a final hearing on the Motion).

       9.     *Modification of Automatic Stay; Exercise of Remedies*.

      (a)     Except as set forth in <u>sub-paragraph (b)</u> of this paragraph, which sub-

paragraph exclusively governs the applicability of the automatic stay to any action by DIP

Agent, DIP Lenders, or First Lien Lender to foreclose on its security interests in and liens on any

DIP Collateral granted hereunder, the Court hereby orders that (x) the automatic stay pursuant to

section 362 of the Bankruptcy Code is hereby modified as to DIP Agent, DIP Lenders, and First

Lien Lender to permit such parties solely to perform the actions described in or permitted by this

Interim Order, in each case without further notice, application or motion to, or order from the

Court, and (y) neither section 105 of the Bankruptcy Code nor any other provision of the

Bankruptcy Code or applicable law shall be utilized to prohibit such party's exercise, enjoyment

and enforcement of any of such rights, benefits, privileges and remedies regardless of any change

in circumstances (whether or not foreseeable).  Consistent with the foregoing sentence, the DIP

Agent, DIP Lenders, and First Lien Lender are hereby granted leave to (i) receive and apply

payments of the DIP Obligations, the First Lien Obligations and proceeds of the DIP Collateral,

as applicable, (ii) file or record any financing statements, mortgages or other instruments or other

documents to evidence the security interests in and liens upon the DIP Collateral provided by

this Interim Order, (iii) charge and collect any interest, fees, costs and other expenses accruing at

any time under this Interim Order, the DIP Documents or First Lien Loan Documents, as

applicable and to the extent authorized herein and, in the case of the First Lien Lender, subject to

section 506(b) of the Bankruptcy Code, (iv) give the Debtors any notice provided for in this

Interim Order, the DIP Documents or First Lien Loan Documents, as applicable, and (v) (1) with

respect to the DIP Agent and DIP Lenders, upon the Termination Date (as defined below), but

subject to the last sentence of this paragraph, and in each case without further notice, motion or

application to, order of, or hearing before, this Court: (A) terminate the DIP Agreement and/or

the other DIP Documents, (B) cease making DIP Loans and/or suspend or terminate its lending

commitments to the Debtors, (C) accelerate any or all of the DIP Obligations and declare such

DIP Obligations immediately due and payable in cash, and/or (D) revoke any Debtor's right, if

any, to use the DIP Collateral and proceeds of the DIP Collateral on the consensual terms and

conditions described in this Interim Order and/or DIP Loans and proceeds of the DIP Facility or

to otherwise utilize the DIP Facility, including the right to freeze the Loan Proceeds Account and

restrict the Debtors' access thereto and (2) with respect to the First Lien Lender, upon the

Termination Date, but subject to the last sentence of this paragraph, terminate the arrangement

for the consensual use of Prepetition Collateral also constituting DIP Collateral and Cash

Collateral contained herein without further notice, motion or application to, order of, or hearing

before, this Court.  Notwithstanding anything to the contrary contained in this Interim Order, the

Debtors reserve all rights to seek authorization to use the Cash Collateral and/or DIP Collateral

of the DIP Agent, DIP Lenders, and First Lien Lender on a non-consensual basis on and after the

Termination Date upon five (5) business days' notice and hearing, and the DIP Agent, DIP

Lenders, and First Lien Lender reserve all rights to object to, and contest, such authorization.

      (b)    Upon the Termination Date, and after obtaining relief from this Court

from the automatic stay upon hearing and five (5) business days' prior notice to respective

counsel to the Debtors, Committee, if and when appointed, First Lien Lender and U.S. Trustee, the DIP Agent and DIP Lenders shall be entitled to foreclose or otherwise enforce its security interests in and liens on any or all of the DIP Collateral and/or to exercise any other default-related remedies against the DIP Collateral under the DIP Documents, this Interim Order or applicable law in seeking to recover payment of the DIP Obligations, including applying all monies in the Loan Proceeds Account to payment of the DIP Obligations.  In addition to the Debtors' rights to seek authorization to use the Cash Collateral and/or DIP Collateral of the DIP Agent, DIP Lenders, and First Lien Lender on a non-consensual basis on and after the Termination Date upon three (3) business days' prior notice and hearing, and the reservation of all rights of the DIP Agent, DIP Lenders, and First Lien Lender to object to, and contest, such authorization as described above, the parties acknowledge and agree that with respect to any cause of the Termination Date, any and all rights and objections of the Committee, if and when appointed, to oppose the DIP Agent's, DIP Lenders', or the First Lien Lender's request to vacate the automatic stay are reserved in full.

(c)     If any of the First Lien Lender, a holder of Subordinate Liens and Related Rights or, subject to the second sentence of <u>paragraph 16(a)</u>, the holder of an Adequate Protection Lien is granted relief from the automatic stay, then the DIP Agent and DIP Lenders shall automatically be granted co-extensive relief at such time.  If any of the DIP Agent, the DIP Lenders, a holder of Subordinate Liens and Related Rights or, subject to the second sentence of <u>paragraph 16(a)</u>, the holder of an Adequate Protection Lien is granted relief from the automatic stay, then the First Lien Lender shall automatically be granted co-extensive relief at such time. The DIP Agent is hereby permitted, upon notice, to elect to become collateral agent with respect to some or all property constituting DIP Collateral, with the exclusive right, in its reasonable

discretion, to enforce remedies with respect to and otherwise realize upon some or all property constituting DIP Collateral, and with respect to such collateral that is Prepetition Collateral subject to the Prepetition First Liens of the First Lien Lender, and to distribute proceeds thereof in accordance with the priorities set forth in this Interim Order.  No other party with security interests in or liens on property constituting the DIP Collateral shall exercise any rights or remedies or otherwise seek to realize upon such property constituting DIP Collateral at any time after notice by DIP Agent that it is exercising its authority as collateral agent hereunder, except with respect to the First Lien Lender as set forth in the first sentence of this paragraph 9(c). The DIP Agent shall have no duty of care as to any party (other than a duty of reasonable care to the First Lien Lender solely with respect to the Prepetition Collateral in the event that the DIP Agent elects to become collateral agent with respect to such Prepetition Collateral) and shall be and hereby is exculpated and released from all liability, damages, and other obligations relating to its performance as collateral agent hereunder, including with respect to any action, omission or other conduct, except to the extent directly caused by the gross negligence or willful misconduct of DIP Agent.  In the event that the DIP Agent elects to become collateral agent with respect to such Prepetition Collateral, the DIP Agent shall inform BOC on no less than a weekly basis regarding any of the DIP Agent's enforcement of remedies and efforts to sell, liquidate or otherwise realize value from such Prepetition Collateral.

(d)     As used in this Order, the term "Termination Date" means the earliest of (i) the date of the occurrence of an Event of Default under the DIP Agreement (after giving effect to any cure period provided therein) that is not waived by DIP Agent in writing, and (ii) the Maturity Date:

10.    _Waiver of Section 506(c) Surcharge_.  Subject to entry of a final order on the DIP Facility, no costs or expenses of administration or other charge, lien, assessment or claim incurred at any time (including, without limitation, any expenses set forth in the Approved Budget) by any Debtor or any other person or entity shall be imposed or charged against any or all of the DIP Agent, DIP Lenders, or First Lien Lender, their respective claims, or their respective collateral under section 506(c) of the Bankruptcy Code or otherwise, and the Debtors, on behalf of their estates, waive any such rights on behalf of all parties.  It is expressly understood by all parties that in making all such undertakings and proceeding in compliance with this Interim Order, each of the DIP Agent, the DIP Lenders, and the First Lien Lender has relied on the foregoing provisions of this paragraph.  Notwithstanding any approval of or consent to an Approved Budget, nothing in this Interim Order shall constitute or be deemed to constitute the consent by any of the DIP Agent, the DIP Lenders, or the First Lien Lender to the imposition of any costs or expense of administration or other charge, lien, assessment or claim (including, without limitation, any amounts set forth in the Approved Budget) against such party, its claims or its collateral under section 506(c) of the Bankruptcy Code or otherwise and no such consent shall be implied from any other action or inaction by such parties.

11.    _No Lien Alteration_.  The receipt by the Debtors of any Cash Collateral or other proceeds of DIP Collateral or the comingling thereof shall not, and shall not be deemed to, affect, alter or otherwise modify the validity, priority or perfection of any liens in and/or claims against such Cash Collateral or other proceeds and such liens and claims shall continue to exist in and against such Cash Collateral or other proceeds in the possession of the Debtors, in each case with the same validity, priority and perfection as existed immediately prior to such receipt by the Debtors.

01:22461462.2

26

12. _Carve-Out_.

(a) _Generally_. Notwithstanding anything to the contrary contained in this Interim Order, upon the occurrence of the Carve-Out Trigger Date (as defined below), the liens and claims granted to any of the DIP Agent, DIP Lenders, First Lien Lender or a holder of an Adequate Protection Lien in this Interim Order, the DIP Documents, and/or the First Lien Loan Documents shall be subject only to the payment, without duplication, of the following fees and expenses (the amounts set forth below, together with the limitations set forth therein, collectively, the "Carve-Out");

(i) the claims of the respective retained professionals of the Debtors and any official statutory unsecured creditors' committee, whose retention is approved by this Court during the Cases pursuant to sections 327, 328, and 1103, respectively, of the Bankruptcy Code, (collectively, the "Retained Professionals") for unpaid fees and expenses which were incurred at any time on and after the Carve-Out Trigger Date in an aggregate amount not exceeding $150,000 (One Hundred Fifty Thousand Dollars) for all Retained Professionals in the aggregate; plus the claims of the Retained Professionals for accrued and unpaid fees and expenses which comply with the Approved Budget and were incurred at any time on and after the Petition Date and before the Carve-Out Trigger Date; provided that, in each case, such fees and expenses of the Retained Professionals are ultimately allowed on a final basis by this Court under sections 330 and 331 of the Bankruptcy Code and are not excluded from the Carve-Out under paragraph 21 of this Order;

(ii) all reasonable and documented fees and expenses incurred by a trustee under section 726(b) of the Bankruptcy Code not to exceed $25,000; and

(iii) the unpaid fees payable to the U. S. Trustee and Clerk of the Bankruptcy Court pursuant to section 1930 of Title 28 of the United States Code.

(b) _Carve-Out Trigger Date_. As used herein, the term "Carve-Out Trigger Date" means the date on which the DIP Agent provides the Carve-Out Notice to the respective counsel to the Debtors and any such committee that the Carve-Out is invoked, which Carve-Out

Notice shall be delivered only on or after the occurrence and continuation of an Event of Default

under the DIP Agreement.

(c)    _Reduction of Amounts_.  Subject to the terms and conditions of this Interim

Order and the DIP Documents, the Debtors shall be permitted to pay compensation and

reimbursement of reasonable fees and expenses of the Retained Professionals allowed and

payable under sections 328, 330 and 331 of the Bankruptcy Code, as the same may be due and

payable, and such payments shall not reduce or be deemed to reduce the Carve-Out.  The dollar

amounts available to be paid under the Carve-Out shall be reduced, dollar-for-dollar, by the

aggregate amount of payments made on and after the Carve-Out Trigger Date to the Retained

Professionals on account of their allowed fees and expenses (whether from Cash Collateral, DIP

Loans or any proceeds of the DIP Facility, or otherwise).

(d)    _Reservation of Rights on Professional Payments_.  Payment of any fees and

expenses of the Retained Professionals pursuant to the Carve-Out shall not, and shall not be

deemed to, (i) reduce any Debtor's obligations owed to any of the DIP Agent, DIP Lenders, or

First Lien Lender or (ii) modify, alter or otherwise affect any of the liens and security interests of

such parties in the DIP Collateral or Prepetition Collateral (or their respective claims against the

Debtors).  The DIP Agent, DIP Lenders, and First Lien Lender shall not be responsible for the

direct payment or reimbursement of any fees or disbursements of any Retained Professionals (or

of any other Person) incurred in connection with the Cases or any Successor Case, and nothing in

this Interim Order or otherwise shall be construed to obligate such parties in any way to pay

compensation to or to reimburse expenses of any Retained Professional or any other Person;

provided that all liens and claims of the DIP Agent, DIP Lenders, and First Lien Lender shall be

subordinate to the Carve-Out to the extent set forth in this Interim Order.  Nothing herein shall

impair, or be construed to impair, the ability of any party to object to any of the fees, expenses, reimbursement or compensation of the Retained Professionals.

13.     _Cash Collateral_.  For purposes of this Order, the term "Cash Collateral" shall mean and include all "cash collateral" as defined by section 363(a) of the Bankruptcy Code and shall include and consist of, without limitation, all of the cash proceeds of the accounts receivable, inventory and other property constituting Prepetition Collateral in which any of the DIP Agent, the DIP Lenders, the First Lien Lender or the holder of Subordinate Liens and Related Rights has an interest (including, without limitation, any adequate protection lien or security interest), whether such interest existed as of the Petition Date or arises thereafter pursuant to this Interim Order, any other order of this Court, applicable law or otherwise; provided further that Cash Collateral shall not include DIP Loans or proceeds of the DIP Facility.

14.     Use Of Prepetition Collateral (including Cash Collateral).  Subject to the Debtors' reservation of rights contained in paragraph 9 above, the Debtors are hereby authorized to continue to use the Prepetition Collateral and all Cash Collateral during the period from the Petition Date through and including the Termination Date for general corporate purposes in accordance with the terms and conditions of this Interim Order and the DIP Documents (including the Approved Budget), provided that, the First Lien Lender and each holder of Subordinate Liens and Related Rights are granted adequate protection as set forth in paragraph 16 below.

15.     _Covenants_.  Except as expressly permitted by the DIP Documents, and in addition to any restrictions contained in the DIP Documents, the Debtors (i) shall not transfer any Cash Collateral or DIP Loans or proceeds of the DIP Facility to any of their non-Debtor affiliates or non-Debtor subsidiaries, (ii) shall not sell, lease or otherwise dispose of or transfer any DIP

Collateral (other than in the ordinary course of any Debtor's business); provided that should the Debtors sell, lease or otherwise dispose of or transfer any DIP Collateral in breach of the covenant contained in this clause (ii), the Debtors shall hold the proceeds of such sale, lease or disposition in trust for the benefit of the DIP Agent for the benefit of the DIP Lenders and the First Lien Lender, subject to the priorities of such parties in the items of DIP Collateral so disposed or transferred (subject to the reservation of rights contained in paragraph 20 below), (iii) shall continue to comply with the covenants and agreements specified in the First Lien Loan Documents pertaining to the maintenance and preservation of the Prepetition Collateral, and (iv) shall cause each non-Debtor affiliate and subsidiary to comply in all material respects with each of the First Lien Loan Documents to which such affiliate or subsidiary is a party or is otherwise subject or bound.

16.    *Adequate Protection*.  The First Lien Lender and each holder of Subordinate Liens and Related Rights are entitled to and are hereby granted, pursuant to sections 361, 363(c)(2) and 363(e) of the Bankruptcy Code, adequate protection of their respective interests in their respective collateral, including the Prepetition Collateral and Cash Collateral, in an amount equal to the aggregate diminution in value of their respective interests in such collateral occurring on or after the Petition Date, including without limitation, any such diminution resulting from the use by the Debtors of the Cash Collateral and any other Prepetition Collateral and the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code (such diminution in value, the "Adequate Protection Obligations").  As adequate protection, the First Lien Lender and each holder of Subordinate Liens and Related Rights are hereby granted the following (but only to the extent of any Adequate Protection Obligations):

01:22461462.2

(a)      *Adequate Protection Liens*.  Pursuant to sections 361(2), 362, 363(c)(2), and 363(e) of the Bankruptcy Code, the First Lien Lender and each holder of Subordinate Liens and Related Rights is hereby granted by each Debtor continuing valid, binding, enforceable and perfected, liens and security interests in and on all of the DIP Collateral to the extent of the Adequate Protection Obligations (together with any additional adequate protection liens, if any, authorized pursuant to further order of the Court in accordance with paragraph 17 below, the "Adequate Protection Liens").  The Adequate Protection Liens granted hereby shall be silent, subordinated liens and the holders thereof shall have no rights of enforcement against collateral other than the right to receive proceeds of collateral in the order of priority set forth herein.  The Adequate Protection Liens shall (a) be subordinate to: (1) the Carve-Out, (2) the Prepetition First Liens, (3) the Prior Liens, and (4) the DIP Liens.  The Adequate Protection Liens of the First Lien Lender shall be superior and prior to the Adequate Protection Liens of each holder of Subordinate Liens and Related Rights.  The Adequate Protection Liens shall be deemed legal, valid, binding, enforceable, and perfected liens, and not subject to further subordination (except as expressly provided in this Interim Order), impairment or avoidance, for all purposes in the Cases and any Successor Case, subject to paragraph 20 of this Interim Order.  Except as described in this paragraph, no other liens or security interests, whether for adequate protection or otherwise, shall be senior or equal to or pari passu with the Adequate Protection Liens in these Cases or any Successor Case without the prior written consent of the parties affected thereby.

(b)      *507(b) Claims*.  Each of the First Lien Lender and each holder of Subordinate Liens and Related Rights shall have, pursuant to section 507(b) of the Bankruptcy Code, an allowed super-priority administrative expense claim subject to proof (the "507(b) Claim") against each Debtor and its respective estate to the extent that the adequate protection

afforded herein for any Adequate Protection Obligations proves to be inadequate.  The 507(b) Claims, if any, hereunder shall be subordinate to the Carve-Out and the Super-Priority Claim. Any 507(b) Claim of the First Lien Lender shall be superior and prior to any 507(b) Claim of a holder of Subordinate Liens and Related Rights.  Except as expressly permitted herein, no cost or expense of administration under any provision of the Bankruptcy Code (whether incurred in these Cases or any Successor Case, whether for adequate protection, the lack of, or failure to provide, adequate protection, or otherwise), shall be senior to, equal to, or pari passu with, any 507(b) Claim granted hereby.  Each 507(b) Claim shall be deemed legal, valid, binding, and enforceable claims and expenses against the Debtor and their estates, and not subject to subordination (except as expressly provided in this Interim Order), impairment or avoidance, for all purposes in the Cases and any Successor Case.  The 507(b) Claim shall be payable from, and have recourse to, any and all property and assets of each Debtor, including, without limitation, the Excluded Assets and the proceeds thereof, subject to the Carve-Out and Super- Priority Claim, but not in any event to the proceeds of Avoidance Actions until entry of a final order on the DIP Facility.

(c)      *Payment of Non-Default Interest; Payment of Professional Fees and Expenses*.  As further adequate protection, and without limiting any rights of the First Lien Lender under section 506(b) of the Bankruptcy Code which are hereby preserved and subject in all respects to section 506(b) of the Bankruptcy Code and paragraph 20 of this Order, (i) only during such periods when no default shall have occurred and be continuing under the DIP Documents and this Interim Order, the Debtors shall pay to the First Lien Lender, on a current basis, interest accruing upon the First Lien Obligations at the non-default rate of interest as provided in and otherwise subject to the terms of the First Lien Loan Documents, and (ii) the

01:22461462.2

32

Debtors shall promptly pay on a current basis the First Lien Lender's reasonable out-of-pocket fees, costs and expenses (whether incurred before or after the Petition Date for the benefit of the First Lien Lender) of the First Lien Lender's attorneys in connection with (w) the negotiation and administration of the Cash Collateral use arrangement implemented by this Interim Order, (x) the review and negotiation of any amendment, supplement, waiver or modification to this Interim Order, the DIP Documents and any documentation related hereto or thereto,  (y) the monitoring of and involvement and participation in the Cases or any Successor Cases and the consummation and administration of the transactions contemplated by this Interim Order and the DIP Documents and (z) the preservation and protection of the First Lien Lender's rights under this Interim Order or any documentation related hereto, in each case whether or not such amounts are included in the Approved Budget or arose before or after the Petition Date, all without further notice, motion, fee application or order of the Court and whether such interest, fees, costs and expenses accrued prior to or after the Petition Date (all such payments under clause (ii) hereof, the "Permitted Adequate Protection Payments"); provided, however, that all parties reserve the right under section 506(b) of the Bankruptcy Code to object to the final allowance and payment of post-petition interest upon the First Lien Obligations.  None of the fees, costs and expenses payable pursuant to this paragraph shall be subject to separate approval by this Court (but this Court shall resolve any dispute as to the reasonableness of any such fees, costs and expenses), and no recipient of any such payment shall be required to file any interim or final fee application with respect thereto.  The Debtors shall pay the fees, costs and expenses provided for in this paragraph promptly and, in any event, not later than ten (10) days after the invoices for such fees, costs and expenses shall have been submitted to the Debtors (which invoices may be redacted to the extent necessary to delete any information subject to the

attorney-client privilege, any information constituting attorney work product, or any other confidential information, and the provision of such invoices shall not constitute any waiver of the attorney-client privilege or of any benefits of the attorney work product doctrine), and the Debtors (or First Lien Lender at its election) shall promptly provide copies of such invoices to the respective counsel to the DIP Agent, Committee (if and when appointed) and the U.S. Trustee.  The DIP Agent, Committee and the U.S. Trustee may object to the reasonableness of the fees, costs and expenses included in any professional fee invoice submitted by the First Lien Lender; *provided* that, any such objection shall, subject to the reservation of rights provisions of paragraph 20 below, be waived and barred unless it is filed with this Court and served on counsel to the First Lien Lender no later than ten (10) days after the objecting party's receipt of the applicable professional fee invoice; and *further provided*, in the event of a timely objection to any such invoice, the Debtor shall nonetheless pay the entire invoice, subject to the rights of the objecting parties to have a hearing on final disposition.  If any such objection shall be sustained, the First Lien Lender may retain the payment for application to the principal and interest on the First Lien Obligations.   Nothing contained herein shall be deemed to constitute a waiver of any right of the First Lien Lender to seek payment of interest accruing from and after the Petition Date at the default rate provided under the First Lien Credit Agreements at any subsequent point in this case, with the rights, objections and defenses of all parties reserved in connection therewith.  Notwithstanding this paragraph 16(c), all such fees, costs and expenses shall first be paid out of any retainer or similar agreement between the First Lien Lender and the Debtors.

17.    *Reservation Of Rights Of First Lien Lender*.  Based upon the terms and conditions of this Interim Order, this Court finds that the adequate protection provided herein is reasonable and sufficient to protect the interests of the First Lien Lender and each holder of Subordinate

Liens and Related Rights.  Notwithstanding any other provision hereof, the grant of adequate protection to any party pursuant hereto is without prejudice to the right of such party to seek modification of the grant of adequate protection provided hereby so as to provide different or additional adequate protection and without prejudice to the right of the Debtors or any other party in interest to contest any such modification.  Except as expressly provided herein, nothing contained in this Interim Order (including without limitation, the authorization to use any Cash Collateral) shall impair, prejudice or modify any rights, claims or defenses available in law or equity to the First Lien Lender, including, without limitation, the right to (a) request conversion of the Debtors' chapter 11 case to chapter 7, (b) seek to terminate the exclusive rights of the Debtors to file, and solicit acceptances to, a plan of reorganization under section 1121 of the Bankruptcy Code or propose, subject to the provisions of section 1121 of the Bankruptcy Code, a chapter 11 plan or plans, (c) object to the fees and expenses of any retained professionals of the Debtors or any Committee that may be appointed, and (d) seek relief from the automatic stay. All such rights, claims and defenses, and the rights, objections and defenses of all parties in connection therewith, are hereby reserved.

18.    *Perfection Of DIP Liens And Adequate Protection Liens*.

(a)    The DIP Liens and the Adequate Protection Liens shall not be subject to challenge and shall attach and become valid, perfected, enforceable, non-avoidable and effective by operation of law as of the Petition Date without any further notice, act or action of or by any person or entity, and without the necessity of execution by the Debtors, or the filing or recordation, of any financing statements, security agreements, vehicle lien applications, mortgages, filings with the U.S. Patent and Trademark Office, or other documents.  If the DIP Agent or First Lien Lender hereafter request that the Debtors execute and deliver to it any

01:22461462.2

35

financing statements, security agreements, collateral assignments, mortgages, or other

instruments and documents considered by such party to be reasonably necessary or desirable to

further evidence the perfection of the liens and security interests provided under this Interim

Order, then the Debtors are hereby authorized at their sole cost and expense, to promptly execute

and deliver such financing statements, security agreements, mortgages, collateral assignments,

instruments, and documents, and the DIP Agent and First Lien Lender (as applicable) are hereby

authorized to file or record such documents in their respective discretion, in which event all such

documents shall be deemed to have been filed or recorded at the time and on the date of entry of

this Interim Order, but with the priorities as set forth herein.

(b)      The DIP Agent and First Lien Lender may (in their respective sole

discretion), but shall not be required to, file a certified copy of this Interim Order in any filing or

recording office in any state, county or other jurisdiction in which any Debtor has real or

personal property and such filing or recording may be accepted and shall constitute sufficient

evidence of perfection of such applicable parties' interests in the DIP Collateral at the time and

on the date of entry of this Interim Order, but with the priorities as set forth herein.

(c)      To the extent that any applicable non-bankruptcy law would otherwise

restrict the grant, scope, enforceability, attachment or perfection of the security interests and

liens authorized or created under or in connection with this Interim Order or the DIP Documents,

or otherwise would impose filing or registration requirements or fees and charges with respect

thereto, such law is hereby pre-empted to the maximum extent permitted by the United States

Constitution, the Bankruptcy Code, applicable federal law, and the judicial power of the United

States Bankruptcy Court; provided that the DIP Agent and First Lien Lender (as applicable) may

still take such steps as they wish to perfect their respective security interests and liens under

otherwise applicable state law without waiving the benefits of this provision of this Interim

Order.

(d)     Except as otherwise expressly provided herein, notwithstanding anything

to the contrary contained in any prepetition or postpetition agreement, contract, lease, document,

note or instrument to which any Debtor is a party or under which any Debtor is obligated or

bound, any provision therein that restricts, conditions, prohibits, limits or impairs in any way any

Debtor from granting the DIP Agent, DIP Lenders, and First Lien Lender the postpetition claims,

security interests or liens granted herein upon any of its assets, properties or other DIP Collateral

or otherwise entering into and complying with all of the terms, conditions and provisions of this

Interim Order and the DIP Documents shall be unenforceable against such Debtor, and therefore,

shall not adversely affect the validity, priority, perfection or enforceability of the liens, security

interests, claims, rights, priorities and/or protections granted to such parties pursuant to this

Interim Order or the DIP Documents.

19.     _Preservation Of Rights Granted Under This Order; 364(e) Protection_.

(a)     _Survival_.  The provisions of this Interim Order and any actions taken

pursuant hereto: (a) shall survive the occurrence of the Termination Date and/or entry of any

order: (i) converting any of the Cases to a case under chapter 7 of the Bankruptcy Code;

(ii) substantively consolidating any of the Debtors or their respective estates; (iii) dismissing or

closing any of the Cases or (iv) confirming a plan of reorganization in any of the Cases (and,

pursuant to section 1141(d)(4) of the Bankruptcy Code, the Debtors hereby waive any discharge

as to the DIP Obligations); and (b) shall continue in full force and effect notwithstanding the

occurrence of the Termination Date or entry of any such order.  The claims, liens, and security

interests granted pursuant to this Interim Order shall maintain their priority, validity and

perfection as provided by this Interim Order until all of the DIP Obligations and Adequate

Protection Obligations (as applicable) are indefeasibly paid in full in cash on a final basis and

discharged (and all lending commitments terminated under the DIP Facility) in accordance with

the respective terms and conditions of this Interim Order and the DIP Documents (as applicable).

(b)    _Section 364(e); Effect of Modification or Appeal_.  Based on the findings

set forth herein, in consideration for the financing provided under the DIP Facility, the DIP

Agent and the DIP Lenders are entitled to, and hereby are granted, the full rights, benefits,

privileges and protections of, and provided by, section 364(e) of the Bankruptcy Code with

respect to the DIP Obligations (and related liens, claims, rights, remedies and benefits) created or

authorized by this Interim Order in the event that this Interim Order or any authorization or

approval contained herein is subsequently stayed, vacated, reversed, amended or modified on

appeal.  Any subsequent stay, modification, reversal, amendment or vacation of this Interim

Order shall not alter, modify or affect the validity, priority, perfection or enforceability of any

claim, lien, or security interest of the DIP Agent, the DIP Lenders, or the First Lien Lender

authorized, created or granted pursuant to this Interim Order and outstanding immediately prior

to the actual receipt of written notice by the DIP Agent and First Lien Lender of the effective

date of such stay, modification, reversal, amendment or vacation.  Notwithstanding any such

stay, modification, reversal, amendment or vacation, all obligations and other financial

accommodations made or incurred pursuant to this Interim Order or the DIP Documents, all DIP

Obligations incurred and uses of Cash Collateral permitted by the Debtors pursuant hereto prior

to the actual receipt of written notice by the DIP Agent and First Lien Lender of the effective

date of such stay, modification, reversal, amendment or vacation, shall be governed in all

respects by the original provisions of this Interim Order and the DIP Agent, DIP Lenders, and the

First Lien Lender shall be entitled to all of the rights, privileges, remedies, protections and

benefits contained or granted in section 364(e) of the Bankruptcy Code, the DIP Documents, and

this Interim Order including, without limitation, the DIP Liens, Super-Priority Claims, Adequate

Protection Liens and 507(b) Claims.

20.    *Effect Of Stipulations On Third Parties*.  The stipulations, admissions, releases

and waivers of the Debtors contained in paragraph 3 of this Order (collectively, the "Lien and

Claim Perfection Matters") shall be binding on all parties-in-interest, including, without

limitation, any committees appointed in the Cases (and any subsequent trustee of the Debtors'

estates), unless, and solely to the extent that, (a) such committee (including any chapter 7 trustee

that may be appointed or elected prior to the Action Filing Deadline, as defined below, or

thereafter for the duration of any litigation commenced by the filing of a complaint or other

proper pleading on or prior to the Actual Filing Deadline described in this subparagraph), or

another party-in-interest with standing and requisite authority, has timely filed the appropriate

pleadings, and timely commenced the appropriate proceeding, required under the Bankruptcy

Code and Bankruptcy Rules, including, without limitation, as required pursuant to Part VII of the

Bankruptcy Rules (in each case subject to the limitations set forth in paragraph 21 of this Order)

challenging the Lien and Claim Perfection Matters by no later than sixty (60) days after the

appointment of the Committee, if so appointed, or seventy-five (75) days after entry of this

Interim Order if no Committee is appointed (as such date may be extended from time to time in

the sole discretion of the First Lien Lender, the "Action Filing Deadline"), and (b) this Court

rules in favor of the plaintiff in any such timely and properly commenced proceeding.  To the

extent no such proceeding is timely and properly commenced by the Action Filing Deadline, or

to the extent such proceeding does not result in a final and non-appealable order of this Court

that is inconsistent with the Lien and Claim Perfection Matters, then, without further notice, motion or application to, order of, or hearing before, this Court and without the need or requirement to file any proof of claim, the Lien and Claim Perfection Matters shall become binding, conclusive and final on such committee (and any subsequent trustee of the Debtors' estates) and any other Person, entity or party-in-interest in the Cases and any Successor Case and shall not be subject to challenge or objection by any party-in-interest. Notwithstanding anything to the contrary herein, if any such proceeding is properly and timely commenced, the Lien and Claim Perfection Matters shall nonetheless remain binding on all parties-in-interest and preclusive as provided in sub-paragraph (a) above except to the extent that such Lien and Claim Perfection Matters are expressly challenged in such proceeding.  To the extent any such proceeding is timely commenced, the First Lien Lender shall be entitled to include the related costs and expenses, including but not limited to reasonable attorneys' fees, incurred in defending themselves in any such proceeding, as part of the First Lien Obligations to the extent permitted under applicable law and the First Lien Loan Documents.

21.    *Limitation On Use Of DIP Facility and DIP Collateral*.  Notwithstanding anything herein to the contrary, no portion or proceeds of the DIP Loans and DIP Facility, the DIP Collateral, the Prepetition Collateral, the Cash Collateral, or the Carve-Out, and no disbursements set forth in the Approved Budget, shall be used for the payment of professional fees, disbursements, costs or expenses incurred in connection with: (a) objecting, contesting or raising any defense to the validity, perfection, priority, or enforceability of any amount due under the DIP Documents or the First Lien Loan Documents or any security interests, liens or claims granted under this Interim Order, the DIP Documents, or the First Lien Loan Documents to secure such amounts; (b) asserting any claims, actions or causes of action against any of the DIP

Agent, the DIP Lenders, or the First Lien Lender or any of their respective agents, affiliates,

subsidiaries, directors, officers, representatives, attorneys or advisors; (c) preventing, hindering

or otherwise delaying any of the DIP Agent's, the DIP Lender's, or the First Lien Lender's

assertion, enforcement or realization on the Prepetition Collateral or the DIP Collateral in

accordance with the terms and conditions of this Interim Order and the DIP Documents or First

Lien Loan Documents; or (d) seeking to amend or modify any of the rights granted to, or

prosecuting any claims, actions or causes of action adverse to interests of, the DIP Agent, the

DIP Lenders, or the First Lien Lender under this Interim Order, the DIP Documents or the First

Lien Loan Documents, in each case without such party's prior written consent given in its sole

discretion; provided, however, that no more than $50,000.00 in the aggregate of the DIP Facility,

the Cash Collateral, and the Carve-Out may be used by the Committee to investigate (but not

prosecute any action or challenge to) the Lien and Claim Perfection Matters.

22.     _No Marshaling_.  Subject to entry of a final order on the DIP Facility, in no event

shall the DIP Agent, the DIP Lenders, or the First Lien Lender be subject to the equitable

doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral.

23.     _No Subrogation_.  In no event shall any person or entity who pays (or through the

extension of credit to any Debtor, causes to be paid) any of the DIP Obligations be subrogated, in

whole or in part, to any rights, remedies, claims, privileges, liens or security interests granted in

favor of, or conferred upon, DIP Agent or any DIP Lender by the terms of the DIP Documents or

this Interim Order or otherwise at law or contract or in equity, unless and until such time as all of

the DIP Obligations have been indefeasibly paid in full in cash on a final basis and all lending

commitments have been terminated under the DIP Facility and the DIP Agent and DIP Lenders

have received a full release in connection therewith.

01:22461462.2

24.    _No Implied Waiver_.  The failure, at any time or times hereafter, of the DIP Agent, the DIP Lenders, or the First Lien Lender to require strict performance by the Debtors of any provision of this Interim Order shall not waive, affect or diminish any right of such parties thereafter to demand strict compliance and performance therewith.  No delay on the part of any party in the exercise of any right or remedy under this Interim Order, the DIP Documents or otherwise at law or contract or in equity shall preclude any other or further exercise of any such right or remedy or the exercise of any other right or remedy.  None of the rights or remedies of any party under this Interim Order or the DIP Documents or otherwise at law or contract or in equity shall be deemed to have been amended, modified, suspended or waived unless such amendment, modification, suspension or waiver is in writing and signed by the party against whom such amendment, modification, suspension or waiver is sought.  None of the DIP Agent, the DIP Lenders, or the First Lien Lender waives, and each expressly reserves, any and all claims, causes of action, defenses, rights and remedies it has or may have pursuant to any or all of the DIP Documents, the First Lien Loan Documents, the Bankruptcy Code and/or under applicable law, in contract or equity against or with respect to any Debtor and any other person or entity.  Except as expressly provided in this Interim Order, the obligations of the Debtors, and the rights, remedies, and priorities of the DIP Agent, the DIP Lenders, and the First Lien Lender arising under or in connection with this Interim Order are in addition to, and are not intended as a waiver or substitution for, those granted to, or contained in favor of, such parties under any or all of the DIP Documents, the First Lien Loan Documents, the Bankruptcy Code and/or under applicable law or in contract or equity.

25.    _Order Governs_.  In the event of any conflict between the provisions of this Interim Order and the DIP Documents, the provisions of this Interim Order shall control and

01:22461462.2

govern to the extent of such conflict.  All actions taken in connection with or in reliance on this Interim Order shall be reaffirmed in full as part of entry of a final order on the Motion.

26.     *Successors and Assigns*.  The provisions of this Interim Order and the DIP Documents shall, as applicable, be binding upon and inure to the benefit of the DIP Agent, the DIP Lenders, the First Lien Lender, and the Debtors and their respective estates, and their respective successors and assigns, including, without limitation, any trustee or other fiduciary hereafter appointed as a legal representative of any of the Debtors or their estates, whether in these Cases or any Successor Case.

27.     *No Consent to Plan of Reorganization*.  Nothing in this Interim Order shall be deemed to be, the consent to, or agreement to support or vote for, any disclosure statement or plan of reorganization filed by the Debtors or any other party in these Cases.  The rights, defenses and objections of all parties, including, without limitation, the Committee, if and when appointed, in connection therewith are hereby reserved.

28.     *Effectiveness*.  This Interim Order shall constitute findings of fact and conclusions of law and shall take effect immediately upon execution hereof, and there shall be no stay of execution of effectiveness of this Interim Order.  All objections to the entry of this Interim Order have been withdrawn or overruled and the Motion is approved on an interim basis on the terms and conditions set forth herein.  Pursuant to Bankruptcy Rule 7052, any findings of fact contained herein that may be construed as matters of law shall be treated as conclusions of law as if set forth below, and vice versa.

29.    <u>Final Hearing; Final Order</u>.

(a)    The Final Hearing to consider entry of a final order on approval of the DIP Facility is scheduled for November _____, 2017, at _____ (prevailing Eastern time) at the United States Bankruptcy Court for the District of Delaware.

(b)    The proposed Final Order will (i) be filed before the Final Hearing, (ii) contain, among other forms of relief, (a) a waiver of the right of any party pursuant to section 506(c) of the Bankruptcy Code or otherwise to surcharge collateral or secured parties; (b) a waiver of the application of the equitable doctrine of "marshaling" or any other similar doctrine; and (c) provisions that provide that the DIP Liens and the Adequate Protection Liens shall attach to and be perfected with respect to, and the Super-Priority Claims shall be payable from, the proceeds of Avoidance Actions.

(c)    Final Hearing Notice.  Within three (3) business days of entry of this Interim Order, the Debtors shall serve, by United States mail, first-class postage prepaid, (such service constituting adequate notice of the Final Hearing) notice of the entry of this Interim Order and of the Final Hearing (the  "Final Hearing Notice") upon the Notice Parties and Committee counsel, if the same shall have been appointed.  The Final Hearing Notice shall state that any party in interest objecting to the entry of the proposed Final Order shall file a written objection with the Clerk of the Bankruptcy Court no later than November __, 2017, which objection shall be served so that it is actually received on or before 4:00 p.m. (prevailing Eastern time) on such date by: (a) counsel for the Debtors, Gibson, Dunn & Crutcher LLP, 333 South Grand Avenue, Los Angeles, CA 90071-3197; Attn: Jeffrey C. Krause and Gibson, Dunn & Crutcher, LLP, 200 Park Avenue, New York, New York 10166; Attn: J. Eric Wise; (c) counsel for the DIP Lenders, Winston & Strawn LLP, 200 Park Avenue, New York, New York 10166,

Attn: Carey Schreiber; Winston & Strawn LLP, 333 South Grand Avenue, Los Angeles,

California 90071, Attn: Justin Rawlins and Eric Sagerman; and Ashby & Geddes, 500 Delaware

Avenue, Wilmington, Delaware 19899, Attn:  Gregory A. Taylor; (d) counsel for the First Lien

Lender, Markus Williams Young & Zimmermann LLC, 1700 Lincoln, Suite 4550, Denver, CO

80203, Attn: James Markus; (e) counsel for any committee; and (f) the Office of the United

States Trustee for the District of Delaware and shall be filed with the Clerk of the United States

Bankruptcy Court for the District of Delaware.


Dated: _____, 2017
          Wilmington, Delaware


_____

UNITED STATES BANKRUPTCY JUDGE

**<u>EXHIBIT A</u>**

**DIP AGREEMENT**

**DEBTOR-IN-POSSESSION**
**CREDIT, GUARANTY AND SECURITY AGREEMENT**

**dated as of October 18, 2017**

**among**

**MAC ACQUISITION LLC,**
**as Borrower,**

**CERTAIN SUBSIDIARIES AND AFFILIATES OF THE BORROWER,**
**as Guarantors,**

**VARIOUS DIP LENDERS,**

**and**

**RAVEN ASSET-BASED OPPORTUNITY FUND III LP,**
**as DIP Agent**

_____

**$5,000,000 Debtor-in-Possession Senior Secured Term Loan Facility**

_____

**TABLE OF CONTENTS**

<u>Page</u>

SECTION 1.     DEFINITIONS AND INTERPRETATION ....................................................... 1

    1.1     Definitions .................................................................................................. 1

    1.2     Accounting Terms ..................................................................................... 20

    1.3     Interpretation, etc ..................................................................................... 20

    1.4     Timing of Performance ............................................................................ 21

SECTION 2.     LOANS ........................................................................................................ 21

    2.1     Loans ......................................................................................................... 21

    2.2     Pro Rata Shares; Availability of Funds .................................................. 22

    2.3     Use of Proceeds ....................................................................................... 23

    2.4     Register; Notes ........................................................................................ 23

    2.5     Interest on Loans ..................................................................................... 24

    2.6     Fees ........................................................................................................... 24

    2.7     Default Interest ........................................................................................ 24

    2.8     [Reserved] ................................................................................................ 24

    2.9     Voluntary Prepayments ........................................................................... 24

    2.10     Mandatory Prepayments ......................................................................... 25

    2.11     Application of Prepayments .................................................................... 25

    2.12     General Provisions Regarding Payments and Notices ........................... 26

    2.13     Ratable Sharing ....................................................................................... 27

    2.14     [Reserved] ................................................................................................ 28

    2.15     Capital Adequacy .................................................................................... 28

    2.16     Taxes; Withholding, etc .......................................................................... 28

    2.17     Obligation to Mitigate ............................................................................ 31

SECTION 3.     CONDITIONS PRECEDENT .................................................................... 31

    3.1     Closing Date ............................................................................................ 31

SECTION 4.     REPRESENTATIONS AND WARRANTIES ............................................ 33

    4.1     Organization; Requisite Power and Authority; Qualification ............... 33

    4.2     Capital Stock and Ownership .................................................................. 34

    4.3     Due Authorization ................................................................................... 34

    4.4     No Conflict .............................................................................................. 34

    4.5     Governmental Consents .......................................................................... 34

    4.6     Binding Obligation .................................................................................. 34

    4.7     Historical Financial Statements .............................................................. 35

    4.8     Budget ...................................................................................................... 35

**TABLE OF CONTENTS**
**(continued)**

|  |  |  | Page |
|---|---|---|---|
| 4.9 | Adverse Proceedings | | 35 |
| 4.10 | Payment of Taxes | | 35 |
| 4.11 | Properties | | 35 |
| 4.12 | Environmental Matters | | 36 |
| 4.13 | No Defaults | | 36 |
| 4.14 | Governmental Regulation | | 37 |
| 4.15 | Margin Stock | | 37 |
| 4.16 | Employee Matters | | 37 |
| 4.17 | No Material Adverse Change | | 37 |
| 4.18 | Employee Benefit Plans | | 37 |
| 4.19 | Certain Fees | | 38 |
| 4.20 | Compliance with Statutes, etc | | 38 |
| 4.21 | Disclosure | | 38 |
| 4.22 | Insurance | | 38 |
| 4.23 | Intellectual Property | | 38 |
| 4.24 | Permits, etc | | 39 |
| 4.25 | OFAC | | 39 |
| 4.26 | Deposit Accounts, Securities Accounts and Commodities Accounts | | 39 |
| 4.27 | Cash Balance | | 39 |
| SECTION 5. | AFFIRMATIVE COVENANTS | | 39 |
| 5.1 | Financial Statements and Other Reports | | 39 |
| 5.2 | Existence | | 41 |
| 5.3 | Payment of Taxes and Claims | | 41 |
| 5.4 | Maintenance of Properties | | 42 |
| 5.5 | Insurance | | 42 |
| 5.6 | Books and Records; Inspections | | 42 |
| 5.7 | Chapter 11 Milestones | | 43 |
| 5.8 | Compliance with Laws | | 43 |
| 5.9 | Environmental | | 43 |
| 5.10 | Subsidiaries | | 44 |
| 5.11 | Bankruptcy Cases | | 44 |
| 5.12 | Lender Meetings | | 44 |
| 5.13 | Further Assurances | | 44 |

**TABLE OF CONTENTS**
(continued)

|  |  | **Page** |
|---|---|---|
| 5.14 | Use of Proceeds | 44 |
| 5.15 | Cash Management | 45 |
| 5.16 | Accounts Receivable | 45 |
| 5.17 | Compliance with Budget | 45 |
| 5.18 | Master Concentration Account | 45 |
| SECTION 6. | NEGATIVE COVENANTS | 46 |
| 6.1 | Indebtedness | 46 |
| 6.2 | Liens | 46 |
| 6.3 | No Further Negative Pledges | 47 |
| 6.4 | Restricted Junior Payments | 47 |
| 6.5 | Restrictions on Subsidiary Distributions | 47 |
| 6.6 | Investments | 47 |
| 6.7 | [Reserved] | 48 |
| 6.8 | Fundamental Changes; Disposition of Assets, Acquisitions | 48 |
| 6.9 | Disposal of Subsidiary Interests | 48 |
| 6.10 | Sales and Lease Backs | 48 |
| 6.11 | Transactions with Shareholders and Affiliates | 49 |
| 6.12 | Conduct of Business | 49 |
| 6.13 | Fiscal Year | 49 |
| 6.14 | Amendments to Organizational Agreements | 49 |
| 6.15 | Issuance of Disqualified Capital Stock | 49 |
| 6.16 | Prohibited Conduct | 49 |
| 6.17 | Additional Restrictions on the Credit Parties | 50 |
| SECTION 7. | GUARANTY BY GUARANTORS; SECURITY AGREEMENT BY CREDIT PARTIES | 51 |
| 7.1 | Guaranty of the Obligations | 51 |
| 7.2 | Contribution by Guarantors | 51 |
| 7.3 | Payment by Guarantors | 51 |
| 7.4 | Liability of Guarantors Absolute | 52 |
| 7.5 | Waivers by Guarantors | 53 |
| 7.6 | Guarantors' Rights of Subrogation, Contribution, etc | 54 |
| 7.7 | Subordination of Other Obligations | 54 |
| 7.8 | Continuing Guaranty | 54 |

iv

**TABLE OF CONTENTS**
(continued)

**Page**

| | | |
|---|---|---|
| 7.9 | Authority of Guarantors or Borrower | 55 |
| 7.10 | Financial Condition of Borrower | 55 |
| 7.11 | Bankruptcy, etc | 55 |
| 7.12 | Discharge of Guaranty Upon Sale of Guarantor | 55 |
| 7.13 | Taxes | 56 |
| 7.14 | Grant of Security Interest | 56 |
| 7.15 | No Additional Perfection Steps Required | 56 |
| 7.16 | Administrative Priority | 57 |
| SECTION 8. | EVENTS OF DEFAULT | 57 |
| 8.1 | Events of Default | 57 |
| SECTION 9. | DIP AGENT | 60 |
| 9.1 | Appointment of Agent | 60 |
| 9.2 | Powers and Duties | 60 |
| 9.3 | General Immunity | 60 |
| 9.4 | DIP Agent Entitled to Act as DIP Lender | 62 |
| 9.5 | DIP Lenders' Representations, Warranties and Acknowledgment | 62 |
| 9.6 | Right to Indemnity | 63 |
| 9.7 | Successor Agents | 63 |
| 9.8 | Collateral Documents and Guaranty | 64 |
| 9.9 | Posting of Approved Electronic Communications | 66 |
| SECTION 10. | MISCELLANEOUS | 68 |
| 10.1 | Notices | 68 |
| 10.2 | Expenses | 68 |
| 10.3 | Indemnity | 69 |
| 10.4 | Set Off | 69 |
| 10.5 | Amendments and Waivers | 70 |
| 10.6 | Successors and Assigns; Participations | 71 |
| 10.7 | Special Purpose Funding Vehicles | 73 |
| 10.8 | Independence of Covenants | 74 |
| 10.9 | Survival of Representations, Warranties and Agreements | 74 |
| 10.10 | No Waiver; Remedies Cumulative | 74 |
| 10.11 | Marshalling; Payments Set Aside | 74 |
| 10.12 | Severability | 75 |

**TABLE OF CONTENTS**
**(continued)**

**Page**

10.13  Obligations Several; Independent Nature of DIP Lenders' Rights ................................... 75

10.14  Headings ............................................................................................................................. 75

10.15  APPLICABLE LAW .......................................................................................................... 75

10.16  CONSENT TO JURISDICTION ........................................................................................ 75

10.17  WAIVER OF JURY TRIAL ............................................................................................... 76

10.18  Confidentiality .................................................................................................................... 76

10.19  Usury Savings Clause ......................................................................................................... 77

10.20  Counterparts ........................................................................................................................ 77

10.21  Effectiveness ....................................................................................................................... 77

10.22  Patriot Act ........................................................................................................................... 77

10.23  Disclosure and Equity Holder Information ........................................................................ 77

10.24  Appointment for Perfection ................................................................................................ 77

10.25  Advertising and Publicity ................................................................................................... 77

10.26  Entire Agreement ................................................................................................................ 78

10.27  Authorization to Credit Bid ............................................................................................... 78

10.28  DIP Order Controls ............................................................................................................ 78

**TABLE OF CONTENTS**
(continued)

Page

**ANNEXES:**    A    Budget (as of the Closing Date)
B    Chapter 11 Milestones
C    Exit Facility Term Sheet

**APPENDIX:**    A    Notice Addresses

**SCHEDULES:**    I    Commitments
4.1    Company Info; Jurisdiction of Organization
4.2    Capital Stock and Ownership
4.9    Adverse Proceedings
4.10    Certain Tax Matters
4.11(b)    Real Estate Assets
4.18    Employee Benefit Plans
4.22    Insurance
4.26    Deposit Accounts, Securities Accounts and Commodities Accounts
6.1    Certain Indebtedness
6.2    Certain Liens
6.5    Certain Subsidiary Restrictions
6.6    Certain Investments
7.14(a)    Pledged Investment Property
7.14(b)    Commercial Tort Claims

**EXHIBITS:**    A    Funding Notice
B    Note
C    Withdrawal Certificate
D    Assignment Agreement
E    Closing Date Certificate
F    Certificate Regarding Non-Bank Status
H    U.S. Tax Compliance Certificate (For Foreign Lenders That Are Not Partnerships For U.S. Federal Income Tax Purposes)
I    U.S. Tax Compliance Certificate (For Foreign Lenders That Are Partnerships For U.S. Federal Income Tax Purposes)
J    U.S. Tax Compliance Certificate (For Foreign Participants That Are Not Treated As Partnerships For U.S. Federal Income Tax Purposes)
K    U.S. Tax Compliance Certificate (For Foreign Participants That Are Treated As Partnerships For U.S. Federal Income Tax Purposes)

# DEBTOR-IN-POSSESSION
# CREDIT, GUARANTY AND SECURITY AGREEMENT

This **DEBTOR-IN-POSSESSION CREDIT, GUARANTY AND SECURITY AGREEMENT**, dated as of October 18, 2017, is entered into by and among **MAC ACQUISITION LLC**, a Delaware corporation (the "**Borrower**"), **CERTAIN SUBSIDIARIES AND AFFILIATES OF THE BORROWER,** as Guarantors, the DIP Lenders party hereto from time to time, and **RAVEN ASSET-BASED OPPORTUNITY FUND III LP** ("**Raven**") as administrative agent and collateral agent (in such capacities, together with any successors and assigns, collectively, "**DIP Agent**").

## RECITALS:

**WHEREAS**, capitalized terms used in these Recitals shall have the respective meanings set forth for such terms in Section 1.1 hereof;

**WHEREAS**, each of Borrower and certain of the Guarantors (together with any of its Subsidiaries and Affiliates that are or become debtors in the Bankruptcy Cases, collectively, the "**Debtors**") filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court on the filing date (the "**Petition Date**");

**WHEREAS**, Borrower has requested that DIP Lenders provide it with a senior secured term loan credit facility in the principal amount of $5,000,000 (the "**DIP Facility**") to be used during the Bankruptcy Cases for general corporate purposes and working capital in accordance with the terms hereof;

**WHEREAS**, Borrower and Guarantors have agreed, subject to the terms hereof and the DIP Order, to secure all of the Obligations hereunder by granting to DIP Agent, for the benefit of Secured Parties, a Lien on substantially all of their assets; and

**WHEREAS**, subject to the Carve-Out and the terms hereof and of the DIP Order, all Obligations will be secured by valid first priority perfected Liens (subject to Permitted Liens (it being understood and agreed that any Liens in favor of Riesen Funding LLC are subordinate to the Liens securing the Obligations), the terms of the DIP Order and the Carve-Out) on all of the Credit Parties' assets;

**NOW, THEREFORE**, in consideration of the premises and the agreements, provisions and covenants herein contained, the parties hereto agree as follows:

## SECTION 1.    DEFINITIONS AND INTERPRETATION

**1.1    Definitions**.  The following terms used herein, including in the preamble, recitals, exhibits and schedules hereto, shall have the following meanings:

"**Acceptable Plan**" a plan of reorganization and related disclosure statement filed in the Bankruptcy Cases in form and substance reasonably acceptable to the Requisite DIP Lenders.

"**Acceptable Plan Effective Date**" the effective date of an Acceptable Plan.

"**Adverse Proceeding**" means any action, suit, proceeding (whether administrative, judicial or otherwise), governmental investigation or arbitration at law or in equity, or before or by any Governmental Authority, domestic or foreign (including any Environmental Claims) or other regulatory body or any arbitrator whether pending or, to the knowledge of an Authorized Officer of the Credit Parties

or any of their Subsidiaries, threatened in writing by or against the Credit Parties or any of their Subsidiaries or any property of the Credit Parties or any of their Subsidiaries.

"**Affiliate**" means, as applied to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with, that Person.  For the purposes of this definition, "control" (including, with correlative meanings, the terms "controlling," "controlled by" and "under common control with"), as applied to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of that Person, whether through the ownership of voting securities or by contract or otherwise.

"**Aggregate Amounts Due**" as defined in Section 2.13.

"**Aggregate Payments**" as defined in Section 7.2.

"**Agreement**" means this Debtor-in-Possession Credit, Guaranty and Security Agreement, dated as of the date hereof, and any annexes, appendices, exhibits and schedules hereto.

"**Asset Sale**" means a sale, lease or sublease (as lessor or sublessor), sale and leaseback, assignment, conveyance, license, transfer or other disposition to, or any exchange of property with, any Person, in one transaction or a series of transactions, of all or any part of any Credit Party's or any of its Subsidiaries' businesses, assets or properties of any kind, whether real, personal, or mixed and whether tangible or intangible, whether now owned or hereafter acquired, including the Capital Stock of any of Credit Party, other than any Asset Sale permitted pursuant to Section 6.8(a) – (c) or (f) hereof.

"**Assignment Agreement**" means an Assignment and Assumption Agreement substantially in the form of Exhibit D, with such amendments or modifications as may be approved by the Requisite DIP Lenders.

"**Authorized Officer**" means, as applied to any Person, any individual holding the position of chief executive officer, president, chief financial officer or treasurer, in each case, whose signatures and incumbency have been certified to DIP Agent.

"**Avoidance Actions**" means any causes of action under Chapter 5 of the Bankruptcy Code.

"**Bankruptcy Cases**" means the bankruptcy cases of the Debtors commenced by the filing of voluntary petition for relief filed by the Debtors under chapter 11 of the Bankruptcy Code in the Bankruptcy Court on the Petition Date and any successor cases.

"**Bankruptcy Code**" means Title 11 of the United States Code, 11 U.S.C. §§ 101 et seq., entitled "Bankruptcy," as now and hereafter in effect, or any successor statute.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the District of Delaware.

"**Beneficiary**" means DIP Agent and each DIP Lender.

"**Borrower**" as defined in the preamble hereto.

"**Borrower's Knowledge**" means the actual knowledge of the chief executive officer, chief financial officer, chief operating officer, president and general counsel of the Credit Parties or any of their Subsidiaries.

2

"**Budget**" means, at any time, the most recent cash flow forecast approved by the Requisite DIP Lenders and depicting, on a weekly basis for the subsequent thirteen (13) week period (or until the projected date of effectiveness of a plan of reorganization in the Bankruptcy Cases), all cash receipts and disbursements, expenses, cash balance and loan balance.  The Budget as of the Closing Date is attached as Annex A, and may be updated once every week with the approval of the Requisite DIP Lenders in their sole discretion.

"**Budget Testing Period**" shall mean the cumulative period from the Petition Date through the Friday of the most recently ended week; *provided*, that such test shall not commence until the second full week ended after the Petition Date.

"**Budget Covenant**" as defined in Section 5.17.

"**Business Day**" means any day excluding Saturday, Sunday and any day which is a legal holiday under the laws of the State of New York or is a day on which banking institutions located in such state are authorized or required by law or other governmental action to close, or are in fact closed.

"**Capital Lease**" means, as applied to any Person, any lease of (or other arrangement conveying the right to use) any property (whether real, personal or mixed) by that Person as lessee (or the equivalent) that, in conformity with GAAP, is required to be accounted for as a capital lease on the balance sheet of that Person.

"**Capital Stock**" means any and all shares, interests, participations or other equivalents (however designated) of capital stock of a corporation, any and all equivalent ownership interests in a Person (other than a corporation), including partnership interests and membership interests, and any and all warrants, rights or options to purchase or acquire any of the foregoing.

"**Carve-Out**" shall have the meaning assigned to it in the DIP Order.

"**Cash Balance**" means, as of any date of determination, the aggregate amount of unrestricted cash and Cash Equivalents of the Credit Parties.

"**Cash Equivalents**" means, as at any date of determination, (i) marketable securities (a) issued or directly and unconditionally guaranteed or insured as to interest and principal by the United States Government, or (b) issued by any agency of the United States the obligations of which are backed by the full faith and credit of the United States, in each case maturing within one year after such date; (ii) marketable direct obligations issued by any state of the United States of America or any political subdivision of any such state or any public instrumentality thereof, in each case maturing within one year after such date and having, at the time of the acquisition thereof, a rating of at least A-1 from S&P or at least P-1 from Moody's; (iii) commercial paper maturing no more than one year from the date of creation thereof and having, at the time of the acquisition thereof, a rating of at least A-1 from S&P or at least P-1 from Moody's; (iv) certificates of deposit or bankers' acceptances maturing within one (1) year after such date and issued or accepted by any DIP Lender or by any commercial bank organized under the laws of the United States of America or any state thereof or the District of Columbia that (a) is at least "adequately capitalized" (as defined in the regulations of its primary Federal banking regulator), and (b) has Tier 1 capital (as defined in such regulations) of not less than $100,000,000; and (v) shares of any money market mutual fund that (a)  has at least ninety five percent (95%) of its assets invested continuously in the types of investments referred to in clauses (i) and (ii) above, (b) has net assets of not less than $500,000,000, and (c) has the highest rating obtainable from either S&P or Moody's.

"**Casualty/Condemnation Event**" means any event that gives rise to the receipt by the Credit Parties or any of their Subsidiaries of any insurance proceeds or condemnation awards in respect of any equipment, fixed assets or real property (including any improvements thereon) to replace or repair such equipment, fixed assets or real property.

"**Certificate Regarding Non-Bank Status**" means a certificate substantially in the form of Exhibit F.

"**Chapter 11 Milestones**" means the milestones relating to the Bankruptcy Cases, as set forth on Annex B.

"**Charges**" as defined in Section 10.19.

"**Closing Date**" as defined in Section 2.1(a)(i).

"**Closing Date Certificate**" means a Closing Date Certificate substantially in the form of Exhibit E.

"**Collateral**" means, collectively, all of the real, personal and mixed property (including Capital Stock), including, without limitation, the property described in Section 7.14, in which Liens are granted pursuant to the Collateral Documents as security for the Obligations.

"**Collateral Documents**" means this Agreement, the Non-Debtor Security Agreement, the DIP Order and all other instruments, documents and agreements delivered by any Credit Party pursuant to this Agreement or any of the other Credit Documents in order to grant to DIP Agent, for the benefit of Secured Parties, a perfected Lien on any real, personal or mixed property of that Credit Party as security for the Obligations.

"**Commitment**" means the commitment of a DIP Lender to make or otherwise fund a Loan, and "**Commitments**" means such commitments of all DIP Lenders in the aggregate. The aggregate amount of the Commitments as of the Closing Date is $5,000,000 and are set forth on Schedule I.

"**Commodity Account**" means any "commodity account" as defined in the UCC.

"**Communications**" as defined in Section 9.9(a).

"**Connection Income Taxes**" means Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"**Consolidated Cumulative Net Cash Flow**" means, as of any date of determination, total cumulative cash revenues from operations of the Credit Parties (which, for clarity, excludes all proceeds from the DIP Facility), less all disbursements and expenses paid by the Credit Parties.

"**Contractual Obligation**" means, as applied to any Person, any provision of any Security issued by that Person or of any indenture, mortgage, deed of trust, contract, undertaking, agreement or other instrument to which that Person is a party or by which it or any of its properties is bound.

"**Contributing Guarantors**" as defined in Section 7.2.

"**Control Agreement**" means a control agreement, in form and substance reasonably satisfactory to the Borrower and the Requisite DIP Lenders, entered into with the bank at which any applicable Deposit Account is maintained by the Borrower, as required pursuant to the terms hereof.

"**Copyright Licenses**" means any and all agreements providing for the granting of any right in or to Copyrights (whether a Credit Party is licensee or licensor thereunder).

"**Copyrights**" means all United States and foreign copyrights, including copyrights in software and databases, and all Mask Works (as defined under 17 U.S.C. 901 of the U.S. Copyright Act), whether registered or unregistered, and, with respect to any and all of the foregoing: (i) all registrations and applications therefor, (ii) all extensions and renewals thereof, (iii) all rights corresponding thereto throughout the world, and (iv) all proceeds of the foregoing, including licenses, royalties, income, payments, claims, damages and proceeds of suit.

"**Credit Date**" means the date of a Credit Extension.

"**Credit Document**" means any of this Agreement, the Non-Debtor Security Agreement, the Personal Guaranty, the Notes, the Fee Letter, if any, the Collateral Documents and all other certificates, documents, instruments or agreements executed and delivered by a Credit Party for the benefit of DIP Agent, any DIP Lender or DIP Agent's or such DIP Lender's respective Affiliates or Related Funds in connection herewith.

"**Credit Extension**" means the making of a Loan.

"**Credit Party**" means Borrower and each Guarantor.

"**Currency Agreement**" means any foreign exchange contract, currency swap agreement, futures contract, option contract, synthetic or other similar agreement or arrangement, each of which is for the purpose of hedging the foreign currency risk associated with Borrower's and its Subsidiaries' operations and not for speculative purposes.

"**Debtors**" as defined in the recitals hereto and any affiliates thereof that subsequently commence Bankruptcy Cases.

"**Default**" means a condition or event that, after notice or lapse of time or both, would constitute an Event of Default.

"**Default Rate**" means any interest payable pursuant to Section 2.7.

"**Deposit Account**" means a demand, time, savings, passbook or like account with a bank, savings and loan association, credit union or like organization, other than an account evidenced by a negotiable certificate of deposit.

"**DIP Agent**" as defined in the preamble hereto.

"**DIP Agent's Account**" means an account at a bank designated by DIP Agent from time to time as the account into which Credit Parties shall make all payments to DIP Agent for the benefit of DIP Agent and DIP Lenders under this Agreement and the other Credit Documents.

"**DIP Facility**" as defined in the recitals hereto.

"**DIP Lender**" means, initially, the Initial DIP Lender and thereafter, each Person that becomes a party hereto pursuant to an Assignment Agreement.

"**DIP Order**" means the Interim DIP Order, unless the Final DIP Order shall have been entered, in which case it shall mean the Final DIP Order.

"**Disqualified Capital Stock**" means Capital Stock that, by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable), or upon the happening of any event, (a) matures (excluding any maturity as the result of an optional redemption by the issuer thereof) or is mandatorily redeemable (other than solely for Qualified Capital Stock), pursuant to a sinking fund obligation or otherwise (except as a result of a change of control, public equity offering or asset sale event so long as any rights of the holders thereof upon the occurrence of such event shall expressly be subject to the prior repayment in full of the Loans and all other Obligations that are due and payable when the Loans are paid in full) or is redeemable at the option of the holder thereof (other than solely for Qualified Capital Stock), in whole or in part, in each case prior to the date that is 180 days after the Maturity Date, (b) is convertible into or exchangeable (unless at the sole option of the issuer thereof) for (i) debt securities or (ii) any Capital Stock that would constitute Disqualified Capital Stock, in each case at any time prior to the date that is 180 days after the Maturity Date, (c) contains any repurchase obligation that is not subject to the prior repayment in full of the Loans and all other Obligations that are accrued and payable, (d) requires cash dividend payments prior to the date that is 180 days after the Maturity Date or (e) provides the holders of such Capital Stock with any rights to receive any cash upon the occurrence of a change of control, which rights are not subject to the prior repayment in full of the Loans and all other Obligations that are accrued and payable.

"**Dollars**" and the sign "**$**" mean the lawful money of the United States of America.

"**Employee Benefit Plan**" means any "employee benefit plan" as defined in Section 3(3) of ERISA which is or was sponsored, maintained or contributed to by, or required to be contributed to by, Borrower or any ERISA Affiliate and in respect of which any of such Persons would have any liability.

"**Environmental Claim**" means any investigation, written notice, written notice of violation, claim, action, suit, proceeding, demand, abatement order or other order or directive (conditional or otherwise), by any Governmental Authority or any other Person, arising (i) pursuant to or in connection with any actual or alleged violation of any Environmental Law; (ii) in connection with any Release of or exposure to any Hazardous Material or any actual or alleged Hazardous Materials Activity; or (iii) in connection with any actual or alleged damage, injury, threat or harm to natural resources or the environment.

"**Environmental Laws**" means any and all applicable foreign or domestic, federal or state (or any subdivision of either of them), laws, codes, statutes, ordinances, orders, rules, regulations, judgments, Governmental Authorizations promulgated or entered into by, or any other legally binding requirements of, any Governmental Authorities relating to (i) public health and safety (as it relates to the Release of or exposure to Hazardous Materials), protection of the environment or other environmental matters relating to any Hazardous Materials Activity; (ii) the generation, use, storage, transportation or disposal of Hazardous Materials; or (iii) occupational safety and health and industrial hygiene (as each relates to the Release of or exposure to Hazardous Materials), land use or the protection of natural resources.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and any successor thereto, in each case together with the regulations promulgated and rulings issued thereunder.

"**ERISA Affiliate**" means any trade or business (whether or not incorporated) that, together with Borrower, is (or at the relevant time was) (i) a member of a group of which any of the Credit Parties or any of their Subsidiaries is or was a member and which is or was under common control within the meaning of Section 4001(b)(1) of ERISA or Section 414(m) or (n) of the Internal Revenue Code or (ii) for purposes of Section 412 of the Internal Revenue Code, is or was a member of a group that includes the Credit Parties or any of their Subsidiaries and is treated as a single employer under Section 414(b) or (c) of the Internal Revenue Code.  Any former ERISA Affiliate shall continue to be considered an ERISA Affiliate within the meaning of this definition with respect to the period such entity was an ERISA Affiliate and with respect to liabilities arising after such period for which Borrower could be liable under the Internal Revenue Code or ERISA.

"**ERISA Event**" means (i) a "reportable event" within the meaning of Section 4043 of ERISA with respect to any Pension Plan (excluding those for which the provision for 30-day notice to the PBGC has been waived by regulation); (ii) the failure to meet the minimum funding standard of Sections 412 and 430 of the Internal Revenue Code with respect to any Pension Plan (whether or not waived in accordance with Section 412(c) of the Internal Revenue Code) or the failure to make by its due date a required installment under Section 430 of the Internal Revenue Code with respect to any Pension Plan or the failure to make any required contribution to a Pension Plan; (iii) any Pension Plan is or becomes subject to the limitations of Section 436 of the Internal Revenue Code; (iv) notice of intent to terminate a Pension Plan in a distress termination described in Section 4041(c) of ERISA or the treatment of a plan amendment as such a termination; (v) the withdrawal by Borrower or any ERISA Affiliate from any Multiemployer Plan or Multiple Employer Plan or the termination of any Multiemployer Plan or Multiple Employer Plan resulting in material liability to Borrower or any ERISA Affiliate pursuant to Section 4063 or 4064 of ERISA; (vi) the institution by the PBGC of proceedings to terminate any Pension Plan, or the occurrence of any event or condition which might reasonably constitute grounds under ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan, or the imposition on Borrower or any ERISA Affiliate of any material liability under Title IV of ERISA (other than for the payment of premium to the PBGC); (vii) the imposition of liability on Borrower or any ERISA Affiliate pursuant to Section 4062(e) or 4069 of ERISA or by reason of the application of Section 4212(c) of ERISA; (viii) the withdrawal of Borrower or any ERISA Affiliate in a complete or partial withdrawal (within the meaning of Sections 4203 and 4205 of ERISA) from any Multiemployer Plan if there is any potential material withdrawal liability therefor, or the receipt by Borrower or any ERISA Affiliate of notice from any Multiemployer Plan or Multiple Employer Plan that it is in insolvency pursuant to Section  4245 of ERISA, or that it intends to terminate or has terminated under Section 4041A or 4042 of ERISA; (ix) the occurrence of an act or omission which could give rise to the imposition on Borrower or any ERISA Affiliate of fines, penalties, taxes or related charges which individually or in the aggregate could reasonably be expected to result in material liability under Chapter 43 of the Internal Revenue Code or under Section 409, Section 502(c), (i) or (l), or Section 4071 of ERISA in respect of any Employee Benefit Plan; (x) the assertion of a material claim (other than routine claims for benefits) against any Employee Benefit Plan or the assets thereof, or against Borrower or any ERISA Affiliate in connection with any Employee Benefit Plan; (xi) receipt from the Internal Revenue Service of notice of the failure of any Pension Plan (or any other Employee Benefit Plan intended to be qualified under Section 401(a) of the Internal Revenue Code) to qualify under Section 401(a) of the Internal Revenue Code, or the failure of any trust forming part of any Pension Plan to qualify for exemption from taxation under Section 501(a) of the Internal Revenue Code; or (xii) the imposition of a Lien pursuant to Section 430(k) of the Internal Revenue Code or pursuant to ERISA with respect to any Pension Plan.

"**Event of Default**" means each of the conditions or events set forth in Section 8.1.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended from time to time, and any successor statute.

"**Excluded Assets**" means any assets or property of the Debtors upon which, after giving effect to the terms and conditions of the DIP Order, a security interest or lien may not be lawfully granted (including, without limitation, any liquor licenses and real property leasehold interests, to the extent applicable).

"**Excluded Taxes**" means any of the following Taxes imposed on or with respect to, or required to be withheld or deducted from a payment to, DIP Agent or a DIP Lender, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of such DIP Agent or DIP Lender being organized under the laws of, or having its principal office or, in the case of any DIP Lender, its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of a DIP Lender, U.S. federal withholding Taxes imposed on amounts payable to or for the account of such DIP Lender with respect to an applicable interest in a Loan or Commitment pursuant to a law in effect on the date on which (i) such DIP Lender acquires such interest in the Loan or Commitment (other than pursuant to an assignment request by the Borrower) or (ii) such DIP Lender changes its lending office, except in each case to the extent that, pursuant to Section 2.16, amounts with respect to such Taxes were payable either to such DIP Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its lending office, (c) Taxes attributable to such DIP Lender or DIP Agent's failure to comply with Section 2.16(f) (other than as a result of any change in applicable law after the date a DIP Lender becomes a party to this Agreement or, with respect to a Participant, the date the Participant acquired its participation) and (d) any U.S. federal withholding Taxes imposed under FATCA.

"**Exit Facility**" as defined in Section 2.1(d).

"**Exposure**" means, with respect to any DIP Lender, as of any date of determination, the outstanding principal amount of the Loans of such DIP Lender and such DIP Lender's undrawn Commitment.

"**Facility**" means any real property (including all buildings, fixtures or other improvements located thereon) owned, leased, operated or used by the Credit Parties or any of their Subsidiaries or any of their respective predecessors or Affiliates.

"**Fair Share**" as defined in Section 7.2.

"**Fair Share Contribution Amount**" as defined in Section 7.2.

"**FATCA**" means Sections 1471 through 1474 of the Internal Revenue Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof and any agreements entered into pursuant to Section 1471(b)(1) of the Internal Revenue Code, and any intergovernmental agreements implementing any of the foregoing.

"**Fee Letter**" that certain Fee Letter, dated as of the date hereof, between the DIP Agent and the Borrower.

"**Federal Funds Effective Rate**" means for any day, the rate per annum (expressed, as a decimal, rounded upwards, if necessary, to the next higher one-hundredth of one percent (1/100 of 1%)) equal to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers on such day, as published by the Federal Reserve Bank of New York on the Business Day next succeeding such day; *provided*, that (i) if such day is not a Business Day, the Federal Funds Rate for such day shall be such rate on such transactions on the next

8

preceding Business Day as so published on the next succeeding Business Day, and (ii) if no such rate is so published on such next succeeding Business Day, the Federal Funds Rate for such day shall be the average of the quotations on such day received by DIP Agent from three federal funds brokers of recognized standing selected by it.

"**Final DIP Order**" means an order entered by the Bankruptcy Court approving the DIP Facility on a final basis under the Bankruptcy Code, which order shall be in form and substance satisfactory to DIP Agent and the Requisite DIP Lenders in their sole and absolute discretion (as such order may be amended, modified or extended in a manner satisfactory to DIP Agent and the Requisite DIP Lenders), which order has not been reversed or stayed or is otherwise subject to a timely filed motion for a stay, rehearing, reconsideration, appeal or any other review without the consent of DIP Agent and the Requisite DIP Lenders.

"**Financial Officer Certification**" means, with respect to the financial statements for which such certification is required, the certification of an Authorized Officer of Borrower that such financial statements fairly present, in all material respects, the financial condition of the Credit Parties and their Subsidiaries as at the dates indicated and the results of their operations and their cash flows for the periods indicated, in each case, in conformity with GAAP applied on a consistent basis, subject, in the case of interim financial statements, to changes resulting from audit and normal year-end adjustments and the absence of footnotes.

"**First Day Orders**" means all orders entered by the Bankruptcy Court on, or within five days of, the Petition Date or based on motions filed on or about the Petition Date.

"**First Lien Loan Documents**" as defined in the DIP Orders.

"**First Priority**" means, with respect to any Lien purported to be created in any Collateral pursuant to any Collateral Document, that, subject in all cases to the priorities set forth in the DIP Order, (i) such Lien is the only Lien to which such Collateral is subject, other than any Permitted Lien (it being understood and agreed that any Liens in favor of Riesen Funding LLC are subordinate to the Liens securing the Obligations) and (ii) such Lien is the most senior Lien in priority to which such Collateral is subject (but subject to the terms of the DIP Order and the Carve-Out).

"**Fiscal Month**" means a four fiscal week period of any Fiscal Year.

"**Fiscal Quarter**" means a fiscal quarter of any Fiscal Year.

"**Fiscal Year**" means the fiscal year of Borrower and its Subsidiaries.

"**Flood Hazard Property**" means any Real Estate Asset which is part of the Collateral and which contains improvements located in a "flood hazard area" on the most current applicable Flood Insurance Rate Map published by the Federal Emergency Management Agency for such Real Estate.

"**Funding**" as defined in Section 2.1(a)(i).

"**Funding Guarantor**" as defined in Section 7.2.

"**Funding Notice**" means a notice substantially in the form of Exhibit A.

"**GAAP**" means, subject to the limitations on the application thereof set forth in Section 1.2, United States generally accepted accounting principles in effect as of the date of determination

thereof; *provided*, *however*, that if Borrower notifies DIP Agent and the DIP Lenders that Borrower requests an amendment to any provision hereof to eliminate the effect of any change occurring after the Closing Date in GAAP or in the application thereof on the operation of such provision (or if the Requisite DIP Lenders (or DIP Agent at the direction of the Requisite DIP Lenders) notify Borrower that the Requisite DIP Lenders request an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn or such provision amended in accordance herewith.

"**Governmental Authority**" means any federal, state, municipal, national or other government, governmental department, commission, board, bureau, court, agency or instrumentality or political subdivision thereof or any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to any government or any court, in each case whether associated with a state of the United States, the United States, or a foreign state or government.

"**Governmental Authorization**" means any permit, license, authorization, plan, directive, consent order or consent decree of or from any Governmental Authority.

"**Granting DIP Lender**" as defined in Section 10.7.

"**Guarantee**" means, with respect to any Person, any obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation of any other Person in any manner, whether directly or indirectly, and including any obligation of the guarantor, direct or indirect, that is (a) an obligation of such Person the purpose of which is to provide assurance to an obligee that the Indebtedness or other obligation of the obligor thereof will be paid or discharged, or any agreement relating thereto will be complied with, or the holders thereof will be protected (in whole or in part) against loss in respect thereof; or (b) a liability of such Person for Indebtedness or other obligation of another through any agreement (contingent or otherwise) (i) to purchase, repurchase or otherwise acquire such Indebtedness or other obligation or any security therefor, or to provide funds for the payment or discharge of such Indebtedness or other obligation (whether in the form of loans, advances, stock purchases, capital contributions or otherwise) or (ii) to maintain the solvency or any balance sheet item, level of income or financial condition of another if, in the case of any agreement described under subclauses (i) or (ii) of this clause (b), the purpose thereof is as described in clause (a) above; *provided* that the term "Guarantee" shall not include endorsements for collection or deposit, in either case in the ordinary course of business.  The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by the guaranteeing Person in good faith.  The term "Guarantee" as a verb has a corresponding meaning.

"**Guaranteed Obligations**" as defined in Section 7.1.

"**Guarantor**" means each Person listed on the signature pages to this Agreement as a "Guarantor" and each other Person required to become a Guarantor pursuant to Section 5.10.

"**Guaranty**" means the guaranty of each Guarantor set forth in Section 7.

"**Hazardous Materials**" means any chemical, material or substance, exposure to which is prohibited, limited or regulated by any Environmental Law or Governmental Authority or as to which

liability is imposed as a hazard to the health and safety of the owners, occupants or any Persons in the vicinity of any Facility or to the indoor or outdoor environment.

"**Hazardous Materials Activity**" means any activity, event or occurrence involving any Hazardous Materials, including the use, manufacture, possession, storage, holding, presence, existence, location, Release, threatened Release, discharge, placement, generation, transportation, processing, construction, treatment, abatement, removal, remediation, disposal, disposition or handling of any Hazardous Materials, and any corrective action or response action with respect to any of the foregoing.

"**Highest Lawful Rate**" as defined in Section 10.19.

"**Historical Financial Statements**" means the following delivered by Borrower to the DIP Lenders on or prior to the Closing Date: (i) the audited consolidated financial statements of Borrower and its Subsidiaries, for the Fiscal Years ended December 31, 2015 and December 31, 2016, consisting of a consolidated balance sheet and the related consolidated statements of operations, stockholders' equity (deficit) and cash flows for such Fiscal Year, and (ii) consolidated financial statements of Borrower and its Subsidiaries for the Fiscal Quarters ended March 31, 2017 and June 30, 2017, consisting of a consolidated balance sheet and the related consolidated statement of cash flows for such Fiscal Quarter.

"**Incremental Proceeds**" as defined in Section 2.1(c)(iv).

"**Indebtedness**" as applied to any Person, means, without duplication: (i) all indebtedness for borrowed money; (ii) the capitalized amount with respect to Capital Leases that would appear on a balance sheet of such Person in conformity with GAAP; (iii) all obligations of such Person evidenced by notes, bonds or similar instruments; (iv) any obligation of such Person owed for all or any part of the deferred purchase price of property or services (excluding trade payables incurred in the ordinary course of business having a term of less than twelve (12) months and accrued expenses incurred in the ordinary course of business); (v) all obligations of such Person created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person; (vi) all Indebtedness of others secured by any Lien on any property or asset owned by that Person regardless of whether the Indebtedness secured thereby shall have been assumed by that Person or is nonrecourse to the credit of that Person; (vii) the maximum amount (after giving effect to any prior reductions or drawings which have been reimbursed), of any letter of credit or letter of guaranty issued, bankers' acceptances facilities, surety bond and similar credit transactions for the account of that Person or as to which that Person is otherwise liable for reimbursement of drawings or drafts; (viii) any Guarantee or liability as a co-obligor or co-maker of Indebtedness of another Person; (ix) the net obligations of such Person in respect of any Interest Rate Agreement, Currency Agreement and any other Rate Management Transaction, whether entered into for hedging or speculative purposes; and (x) all obligations of such Person, contingent or otherwise, to purchase, redeem, retire or otherwise acquire for value any Disqualified Capital Stock of such Person. Indebtedness of any Person shall include the Indebtedness of any partnership or Joint Venture (other than a Joint Venture that is itself a corporation or limited liability company) in which such Person is a general partner or joint venturer, unless such Indebtedness is expressly non-recourse to such Person, except to the extent such Person's liability for such Indebtedness is otherwise limited. For all purposes hereof, the Indebtedness of the Credit Parties and their Subsidiaries shall exclude customer deposits and advances and interest payable thereon in the ordinary course of business in accordance with customary trade terms and other obligations incurred in the ordinary course of business through credit on an open account basis customarily extended to such Person. The amount of any net obligation under any Rate Management Transaction on any date shall be deemed to be the Termination Value thereof as of such date. The amount of Indebtedness of any Person for purposes of clause (vi) shall be deemed to be equal to the lesser of (x) the aggregate unpaid amount of such Indebtedness and (y) the fair market value of the property encumbered thereby as determined by such Person in good faith.

"**Indemnified Liabilities**" means, collectively, any and all liabilities, obligations, losses (including the reasonable out-of-pocket costs of any investigation, study, sampling, testing, abatement, cleanup, removal, remediation or other response action necessary to remove, remediate, clean up or abate any Hazardous Materials Activity), damages (including natural resource damages), fines, penalties, actions, claims (including Environmental Claims), judgments, suits, litigations, inquiries, proceedings and related reasonable out-of-pocket costs, expenses and disbursements of any kind or nature whatsoever (including, without limitation, the reasonable fees and disbursements of counsel for Indemnitees in connection with any investigative, administrative or judicial proceeding, whether or not any such Indemnitee shall be designated as a party or a potential party thereto, and any reasonable out-of-pocket fees or expenses incurred by Indemnitees in enforcing this indemnity), whether direct, indirect or consequential and whether based on any federal, state or foreign laws, statutes, rules or regulations, on common law or equitable cause or on contract or otherwise, that may be imposed on, incurred by, or asserted against any such Indemnitee, in any manner relating to or arising out of (i) this Agreement or the other Credit Documents or the transactions contemplated hereby or thereby or the Bankruptcy Cases (including the DIP Lenders' agreement to make Credit Extensions or the use or intended use of the proceeds thereof, or any enforcement of any of the Credit Documents (including any sale of, collection from, or other realization upon any of the Collateral or the enforcement of the Guaranty)), or (ii) any Environmental Claim against or any Hazardous Materials Activity relating to or arising from, directly or indirectly, any past or present activity, operation, land ownership, or practice of the Credit Parties or any of their Subsidiaries.

"**Indemnified Taxes**" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made under any Credit Document and (b) to the extent not otherwise described in (a), Other Taxes.

"**Indemnitee**" as defined in Section 10.3(a).

"**Indemnitee Agent Party**" as defined in Section 9.6.

"**Information**" as defined in Section 10.18.

"**Initial DIP Lender**" means Raven Asset-Based Opportunity Fund III LP in its capacity as the initial DIP Lender.

"**Insurance**" means (i) all insurance policies covering any or all of the Collateral (regardless of whether DIP Agent is the loss payee thereof) and (ii) any key man life insurance or business interruption policies.

"**Intellectual Property**" means all right, title and interest in or to intellectual property and industrial property, including, but not limited to, all Copyrights, IP Licenses, Patents, Trademarks and Trade Secrets.

"**Interest Payment Date**" means the last day of each calendar month, commencing on the first such date to occur after the Closing Date.

"**Interest Rate**" means a rate per annum of twelve percent (12%).

"**Interest Rate Agreement**" means any interest rate swap agreement, interest rate cap agreement, interest rate collar agreement, interest rate hedging agreement or other similar agreement or arrangement for the purpose of hedging interest rate exposure.

"**Interim DIP Order**" means an order entered by the Bankruptcy Court approving the DIP Facility on an interim basis under the Bankruptcy Code, which order shall be in form and substance satisfactory to DIP Agent and the Requisite DIP Lenders in their sole and absolute discretion (as such order may be amended, modified or extended in a manner satisfactory to DIP Agent and the Requisite DIP Lenders), which order is not subject to a stay, injunction or other limitation not approved by DIP Agent and DIP Lenders.

"**Internal Revenue Code**" means the Internal Revenue Code of 1986, as amended to the date hereof and from time to time hereafter, and any successor statute.

"**Investment**" means (i) any direct or indirect purchase or other acquisition by the Credit Parties or any of their Subsidiaries of, or of a beneficial interest in, any of the Securities of any other Person; (ii) any direct or indirect purchase or other acquisition for value, by the Credit Parties or any of their Subsidiaries, of any Capital Stock of any other Person; (iii) any direct or indirect loan, advance or capital contributions by the Credit Parties or any of their Subsidiaries to any other Person, (iv) any direct or indirect Guarantee of any obligations of any other Person; and (v) the purchase or other acquisition (in one transaction or a series of related transactions) of all or substantially all of the property and assets or business of another Person or assets constituting a business unit, line of business or division of such Person.  The amount of any Investment shall be the original cost of such Investment *plus* the cost of all additions thereto, without any adjustments for increases or decreases in value, or write-ups, write-downs or write-offs with respect to such Investment.

"**IP Licenses**" means any and all agreements providing for the granting of any right in or to Intellectual Property (whether a Credit Party is licensee or licensor thereunder), including, but not limited to, the Copyright Licenses, the Patent Licenses, the Trademark Licenses, and the Trade Secret Licenses.

"**Joint Venture**" means a joint venture, partnership or other similar arrangement, whether in corporate, partnership or other legal form; *provided*, that in no event shall any corporate Subsidiary of any Person be considered to be a Joint Venture to which such Person is a party.

"**Lease**" means any lease or sublease of real property under which a Credit Party is the lessee or sublessee.

"**Lien**" means any lien, mortgage, deed of trust, pledge, assignment by way of security, security interest, charge or encumbrance of any kind, including, in the case of real property, any easement, restrictive covenant, encroachment or other survey defect or right of first refusal (including any agreement to give any of the foregoing, any conditional sale or other title retention agreement, and any lease in the nature thereof) and any option, trust or other preferential arrangement having the practical effect of any of the foregoing.

"**Loan**" means a term loan made by a DIP Lender to Borrower pursuant to the terms hereof.

"**Loan Proceeds Account**" means the Deposit Account established by DIP Agent in the name of DIP Agent and under the sole dominion and control of DIP Agent, to be used by Borrower for the purposes described in Sections 2.1(b) and (c).

"**Margin Stock**" as defined in Regulation U of the Board of Governors of the Federal Reserve System as in effect from time to time.

"**Master Concentration Account**" means the deposit account ending in account number x1001 held with Bank of America, N.A. in the name of the Borrower.

"**Material Adverse Effect**" means a material adverse effect on (i) the business operations, properties, operations, assets or condition of the Credit Parties and their Subsidiaries taken as a whole (other than as has resulted or may customarily result as a consequence of the commencement of the Bankruptcy Cases); (ii) the ability of the Credit Parties (taken as a whole) to fully and timely perform their Obligations; (iii) the legality, validity, binding effect, or enforceability against the Credit Parties (taken as a whole) of a Credit Document; (iv) DIP Agent's Liens (on behalf of the Secured Parties) on the Collateral or the priority of such Liens; or (v) the rights, remedies and benefits available to, or conferred upon, DIP Agent, any DIP Lender or any other Secured Party under any Credit Document.

"**Maturity Date**" means the earliest of (i) 120 days after the Petition Date, (ii) the date that all Loans shall become due and payable in full hereunder, whether by acceleration or otherwise, or (iii) the effective date of a chapter 11 plan in the Bankruptcy Cases.

"**Moody's**" means Moody's Investor Services, Inc.

"**Multiemployer Plan**" means any Employee Benefit Plan which is a "multiemployer plan" as defined in Section 4001(a)(3) of ERISA.

"**Multiple Employer Plan**" means a single employer plan, as defined in Section 4001(a)(15) of ERISA, which (i) is maintained for employees or former employees of Borrower or any ERISA Affiliate and at least one Person other than Borrower and the ERISA Affiliates or (ii) was so maintained and in respect of which Borrower or any ERISA Affiliate could have liability under Section 4063 or 4064 of ERISA in the event such plan has been or were to be terminated.

"**Net Asset Sale Proceeds**" means, with respect to any Asset Sale, an amount equal to: (i) the sum of cash payments and Cash Equivalents received by the Credit Parties or any of their Subsidiaries from such Asset Sale (including any cash or Cash Equivalents received by way of deferred payment pursuant to, or by monetization of, a note receivable or otherwise, but only as and when so received), *minus* (ii) the sum of, without duplication, (a) taxes paid by the Credit Parties or any of their Subsidiaries in connection with such Asset Sale (after taking into account any available tax credits or deductions and any tax-sharing arrangements) and (b) the out-of-pocket expenses (including reasonable attorneys' fees, investment banking fees, accounting fees and other reasonable professional and transactional fees, survey costs, title insurance premiums, and related search and recording charges, transfer taxes, deed or mortgage recording taxes and reasonable brokerage, consultant and other commissions and fees) actually incurred by the Credit Parties or any of their Subsidiaries in connection with such Asset Sale; it being understood that "Net Asset Sale Proceeds" shall include any cash or Cash Equivalents received upon the sale of any non-cash consideration received by the Credit Parties or any of their Subsidiaries in any such Asset Sale.

"**Net Insurance/Condemnation Proceeds**" means an amount equal to: (i) any cash payments or proceeds received by the Credit Parties or any of their Subsidiaries in connection with any Casualty/Condemnation Event (a) under any casualty insurance policies in respect of any covered loss thereunder, or (b) as a result of the taking of any assets of the Credit Parties or any of their Subsidiaries by any Person pursuant to the power of eminent domain, condemnation or otherwise, or pursuant to a sale of any such assets to a purchaser with such power under threat of such a taking, *minus* (ii) the sum of, without duplication, (a) taxes paid by the Credit Parties or any of their Subsidiaries in connection with such Casualty/Condemnation Event (after taking into account any available tax credits or deductions and any tax-sharing arrangements) and (b) the out-of-pocket expenses (including reasonable investment banking fees, attorneys' fees, accounting fees and other reasonable professional and transactional fees, and other reasonable fees and expenses) actually incurred by the Credit Parties or any of their Subsidiaries in connection with such Casualty/Condemnation Event; it being understood that "Net Insurance/Condemnation Proceeds" shall include any cash or Cash Equivalents received upon the sale of

any non-cash consideration received by the Credit Parties or any of their Subsidiaries in any such Casualty/Condemnation Event.

"**Non-U.S. DIP Lender**" as defined in Section 2.16(f).

"**Non-Debtor Guarantors**" means, (i) as of the Closing Date, RMG Development, LLC and Mac Acquisition IP LLC and (ii) after the Closing Date, any Subsidiary of any Credit Party that is not a Debtor.

"**Non-Debtor Security Agreement**" means the Pledge and Security Agreement, dated as of the Closing Date among the Non-Debtor Guarantors and the DIP Agent.

"**Note**" means a promissory note in the form of Exhibit B.

"**Obligations**" means all liabilities and obligations of every nature of each Credit Party and its Subsidiaries from time to time owed to DIP Agent, the DIP Lenders, any of DIP Agent's or DIP Lender's respective Affiliates or Related Funds, or any of them, under any Credit Document, whether for principal, interest (including interest which, but for the filing of a petition in bankruptcy with respect to such Credit Party, would have accrued on any Obligation, whether or not a claim is allowed against such Credit Party for such interest in the related bankruptcy proceeding), fees, expenses, indemnification or otherwise or arising in or related to the Bankruptcy Cases and whether primary, secondary, direct, indirect, contingent, fixed or otherwise (including obligations of performance).

"**Obligee Guarantor**" as defined in Section 7.7.

"**OFAC**" means the United States Department of Treasury Office of Foreign Assets Control.

"**OFAC Sanctions Programs**" means all laws, regulations, and Executive Orders administered by OFAC, including without limitation, the Bank Secrecy Act, anti-money laundering laws (including, without limitation, the Patriot Act), and all economic and trade sanction programs administered by OFAC, any and all similar United States federal laws, regulations or Executive Orders, and any similar laws, regulators or orders adopted by any State within the United States.

"**OFAC SDN List**" means the list of the Specially Designated Nationals and Blocked Persons maintained by OFAC.

"**Organizational Documents**" means (i) with respect to any corporation, its certificate or articles of incorporation or organization, as amended, and its by-laws, as amended, (ii) with respect to any limited partnership, its certificate of limited partnership, as amended, and its partnership agreement, as amended, (iii) with respect to any general partnership, its partnership agreement, as amended, and (iv) with respect to any limited liability company, its articles of organization, as amended, and its operating agreement, as amended.  In the event any term or condition of this Agreement or any other Credit Document requires any Organizational Document to be certified by a secretary of state or similar governmental official, the reference to any such "Organizational Document" shall only be to a document of a type customarily certified by such governmental official.

"**Other Connection Taxes**" means, with respect to any DIP Lender or DIP Agent, Taxes imposed as a result of a present or former connection between such DIP Lender or DIP Agent and the jurisdiction imposing such Tax (other than connections arising from such DIP Lender or DIP Agent having executed, delivered, become a party to, performed its obligations under, received payments under, received

or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"**Other Taxes**" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery or, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment pursuant to Section 2.17).

"**Participant**" as defined in Section 10.6(i).

"**Participant Register**" as defined in Section 10.6(i).

"**Patent Licenses**" means all agreements providing for the granting of any right in or to Patents (whether a Credit Party is licensee or licensor thereunder).

"**Patents**" means all United States and foreign patents and certificates of invention, supplementary protection certificates or similar industrial property rights, and applications for any of the foregoing, including all reissues, divisions, continuations, continuations-in-part, extensions, renewals, and reexaminations thereof, all rights corresponding thereto throughout the world, and all proceeds of the foregoing, including licenses, royalties, income, payments, claims, damages, and proceeds of suit.

"**Patriot Act**" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA Patriot Act of 2001).

"**PBGC**" means the Pension Benefit Guaranty Corporation or any successor thereto.

"**Pension Plan**" means an Employee Benefit Plan (other than a Multiemployer Plan) that is a "defined benefit plan" (as defined in Section 414(j) of the Internal Revenue Code and Section 3(35) of ERISA).

"**Permitted Adequate Protection Payments**" as defined in the DIP Order.

"**Permitted Liens**" means each of the Liens permitted pursuant to Section 6.2.

"**Person**" means and includes natural persons, corporations, limited partnerships, general partnerships, limited liability companies, limited liability partnerships, joint stock companies, Joint Ventures, associations, companies, trusts, banks, trust companies, land trusts, business trusts or other organizations, whether or not legal entities, and Governmental Authorities.

"**Personal Guaranty**" means that certain Personal Guaranty dated as of the date hereof by Richard L. Monfort and Dean Riesen and certain of their respective affiliated Persons in favor of the DIP Agent.

"**Petition Date**" as defined in the recitals hereto.

"**Platform**" as defined in Section 9.9(b).

"**Pledged Certificated Stock**" means all certificated securities and any other Capital Stock of any Person evidenced by a certificate, instrument or other similar document (as defined in the UCC), in

each case owned by any Credit Party, and any distribution of property made on, in respect of or in exchange for the foregoing from time to time.

"**Pledged Investment Property**" means any investment property of any Credit Party, and any distribution of property made on, in respect of or in exchange for the foregoing from time to time, including any Pledged Stock.

"**Pledged Stock**" means all Pledged Certificated Stock and all Pledged Uncertificated Stock.

"**Pledged Uncertificated Stock**" means any Capital Stock of any Person that is not Pledged Certificated Stock, including all right, title and interest of any Credit Party as a limited or general partner in any partnership not constituting Pledged Certificated Stock or as a member of any limited liability company, all right, title and interest of any Credit Party in, to and under any Organizational Document of any partnership or limited liability company to which it is a party, and any distribution of property made on, in respect of or in exchange for the foregoing from time to time, to the extent such interests are not certificated.

"**Prepayment Date**" as defined in Section 2.11(c).

"**Principal Office**" means DIP Agent's "Principal Office" as set forth on Appendix A, or such other office as DIP Agent may from time to time designate in writing to Borrower and each DIP Lender.

"**Pro Rata Share**" means, with respect to any DIP Lender, the percentage obtained by dividing (i) the Exposure of that DIP Lender, by (ii) the aggregate Exposure of all DIP Lenders.

"**Qualified Capital Stock**" means Capital Stock that is not Disqualified Capital Stock.

"**Rate Management Transaction**" means any transaction (including an agreement with respect thereto) which is a rate swap, basis swap, forward rate transaction, commodity swap, commodity option, equity or equity index swap, equity or equity index option, bond option, interest rate option, foreign exchange transaction, cap transaction, floor transaction, collar transaction, forward transaction, currency swap transaction, cross-currency rate swap transaction, currency option or any other similar transaction (including any option with respect to any of these transactions) or any combination thereof, whether linked to one or more interest rates, foreign currencies, commodity prices, equity prices or other financial measures.

"**Raven**" as defined in the preamble hereto.

"**Real Estate Asset**" means, at any time of determination, (i) the leasehold interest created by any Lease or (ii) any fee interest in real property then owned by any Credit Party.

"**Register**" as defined in Section 2.4(a).

"**Regulation D**" means Regulation D of the Board of Governors of the Federal Reserve System, as in effect from time to time.

"**Related Fund**" means, with respect to any DIP Lender that is an investment fund, any other investment fund that invests in commercial loans and that is managed or advised by the same investment advisor as such DIP Lender or by an Affiliate of such investment advisor.

"**Release**" means any release, spill, emission, leaking, pumping, pouring, injection, escaping, deposit, disposal, discharge, dispersal, dumping, leaching or migration of any Hazardous Material into the indoor or outdoor environment (including the abandonment or disposal of any barrels, containers or other closed receptacles containing any Hazardous Material), including the movement of any Hazardous Material through the air, soil, surface water or groundwater.

"**Remaining Obligations**" means, as of any date of determination, the Obligations that as of such date of determination are Obligations under the Credit Documents that survive termination of the Credit Documents, but as of such date of determination are not due and payable and for which no claims have been made.

"**Requirements of Law**" means, with respect to any Person, collectively, the common law and all federal, state, local, foreign, multinational or international laws, statutes, codes, treaties, standards, and legally binding rules, regulations, guidelines, ordinances, orders, judgments, writs, injunctions and decrees (including administrative or judicial precedents or authorities) and the interpretation or administration thereof by, and other determinations, directives, requirements or requests of, any Governmental Authority, in each case that are applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"**Requisite DIP Lenders**" means one or more DIP Lenders having or holding Exposure representing more than sixty six and two thirds (66.67%) of the aggregate Exposure of all DIP Lenders.

"**Restaurant Wind-Down Proceeds**" as defined in Section 6.8(d).

"**Restricted Junior Payment**" means: (i) any dividend or other distribution, direct or indirect, on account of any shares of any class of stock of Borrower or any Subsidiary of Borrower now or hereafter outstanding, except a dividend payable solely in shares of that class of stock to the holders of that class or in shares of Qualified Capital Stock; (ii) any redemption, retirement, sinking fund or similar payment, purchase or other acquisition for value (except to the extent paid in shares of Qualified Capital Stock), direct or indirect, of any shares of any class of stock of Borrower or any Subsidiary of Borrower now or hereafter outstanding; (iii) any payment (except to the extent paid in shares of Qualified Capital Stock) made to retire, or to obtain the surrender of, any outstanding warrants, options or other rights to acquire shares of any class of Capital Stock of Borrower or any Subsidiary of Borrower now or hereafter outstanding; (iv) management, consulting or similar fees payable to any Affiliate of any Credit Party; and (v) any payment or prepayment of principal of, fee, if any, or interest on, or any redemption, purchase, repurchase, retirement, defeasance (including in-substance or legal defeasance) or other acquisition for value of, or any making of a sinking fund or similar payment with respect to, any subordinated indebtedness.

"**RSA**" as defined in Section 3.1(a).

"**S&P**" means Standard & Poor's Ratings Group, a division of The McGraw Hill Corporation.

"**Secured Parties**" means DIP Agent and DIP Lenders.

"**Securities**" means any stock, shares, partnership interests, voting trust certificates, certificates of interest or participation in any profit-sharing agreement or arrangement, options, warrants, bonds, debentures, notes, or other evidences of indebtedness, secured or unsecured, convertible, subordinated or otherwise, or in general any instruments commonly known as "securities" or any certificates of interest, shares or participations in temporary or interim certificates for the purchase or acquisition of, or any right to subscribe to, purchase or acquire, any of the foregoing.

"**Securities Account**" means any "securities account" as defined in the UCC.

"**Securities Act**" means the Securities Act of 1933, as amended from time to time, and any successor statute.

"**Securities Laws**" means the Securities Act, the Exchange Act, Sarbanes-Oxley Act of 2002 and the applicable accounting and auditing principles, rules, standards and practices promulgated, approved or incorporated by the Securities and Exchange Commission or the Public Company Accounting Oversight Board, as each of the foregoing may be amended and in effect on any applicable date hereunder.

"**Software**" means (i) all computer programs, including source code and object code versions, (ii) all data, databases and compilations of data, whether machine readable or otherwise, and (iii) all documentation, training materials and configurations related to any of the foregoing.

"**SPC**" as defined in Section 10.7.

"**Subsidiary**" means, with respect to any Person, any corporation, partnership, limited liability company, association, Joint Venture or other business entity the accounts of which would be consolidated with those of such Person in such Person's consolidated financial statements if such financial statements were prepared in accordance with GAAP as of such date, as well as any other corporation, partnership, limited liability company, association, Joint Venture or other business entity of which more than fifty percent (50%) of the total voting power of shares of stock or other ownership interests entitled (other than stock and other interests having such power only by reason of the occurrence of any contingency) to vote in the election of the Person or Persons (whether directors, managers, trustees or other Persons performing similar functions) having the power to direct or cause the direction of the management and policies thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof; *provided*, that in determining the percentage of ownership interests of any Person controlled by another Person, no ownership interest in the nature of a nominee or a qualifying share of the former Person shall be deemed to be outstanding.

"**Tax**" means any present or future tax, levy, impost, duty, assessment, charge, fee, deduction or withholding (including backup withholding) of any nature and whatever called, by whomsoever, on whomsoever and wherever imposed, levied, collected, withheld or assessed, and any interest, penalties or additional amounts thereon.

"**Termination Value**" means, in respect of any one or more Rate Management Transactions, after taking into account the effect of any legally enforceable netting agreement relating to such Rate Management Transactions, (a) for any date on or after the date such Rate Management Transactions have been closed out and termination value(s) determined in accordance therewith, such termination value(s), and (b) for any date prior to the date referenced in clause (a), the amount(s) determined as the mark-to-market value(s) for such Rate Management Transactions, as determined based upon one or more mid-market or other readily available quotations provided by any recognized dealer in such Rate Management Transactions (which may include a DIP Lender or an Affiliate of a DIP Lender).

"**Terrorism Laws**" means any of the following (a) Executive Order 13224 issued by the President of the United States, (b) the Terrorism Sanctions Regulations (Title 31 Part 595 of the U.S. Code of Federal Regulations), (c) the Terrorism List Governments Sanctions Regulations (Title 31 Part 596 of the U.S. Code of Federal Regulations), (d) the Foreign Terrorist Organizations Sanctions Regulations (Title 31 Part 597 of the U.S. Code of Federal Regulations), (e) the Patriot Act (as it may be subsequently codified), (f) all other present and future legal requirements of any Governmental Authority addressing, relating to, or attempting to eliminate, terrorist acts and acts of war and (g) any regulations promulgated

pursuant thereto or pursuant to any legal requirements of any Governmental Authority governing terrorist acts or acts of war.

"**Trade Secret Licenses**" means any and all agreements providing for the granting of any right in or to Trade Secrets (whether a Credit Party is licensee or licensor thereunder).

"**Trade Secrets**" means all trade secrets and other confidential and proprietary information and know-how whether or not such Trade Secret has been reduced to a writing or other tangible form (including confidential and proprietary delivery routes) and all proceeds of the foregoing, including licenses, royalties, income, payments, claims, damages, and proceeds of suit.

"**Trademark Licenses**" means any and all agreements providing for the granting of any right in or to Trademarks (whether a Credit Party is licensee or licensor thereunder).

"**Trademarks**" means all United States, and foreign trademarks, trade names, corporate names, company names, business names, fictitious business names, internet domain names, service marks, certification marks, collective marks, logos, other source or business identifiers, all registrations and applications for any of the foregoing including all extensions or renewals of any of the foregoing, all of the goodwill of the business connected with the use of and symbolized by the foregoing, and all proceeds of the foregoing, including licenses, royalties, income, payments, claims, damages, and proceeds of suit.

"**UCC**" means the Uniform Commercial Code (or any similar or equivalent legislation) as in effect in any applicable jurisdiction.

"**U.S. Person**" means any Person that is a "United States Person" as defined in Section 7701(a)(30) of the Internal Revenue Code.

"**U.S. Tax Compliance Certificate**" has the meaning assigned to such term in paragraph (iii) of Section 2.16(f).

"**U.S. Trustee**" means the Office of the United States Trustee for the District of Delaware.

"**Waivable Prepayment**" as defined in Section 2.11(c).

"**Withdrawal Certificate**" a withdrawal certificate to be delivered by the Borrower to the DIP Agent in substantially in the form of Exhibit C.

1.2    **Accounting Terms.**  Except as otherwise expressly provided herein, all accounting terms not otherwise defined herein shall have the meanings assigned to them in conformity with GAAP.  Financial statements and other information required to be delivered by Borrower to DIP Lenders pursuant to Section 5.1 shall be prepared in accordance with GAAP as in effect at the time of such preparation.  Subject to the foregoing, and except as otherwise prescribed herein, calculations in connection with definitions, covenants and other provisions hereof shall utilize accounting principles and policies in conformity with those used to prepare the Historical Financial Statements.

1.3    **Interpretation, etc.**  Any of the terms defined herein may, unless the context otherwise requires, be used in the singular or the plural, depending on the reference.  References herein to any Section, Annex, Appendix, Schedule or Exhibit shall be to a Section, an Annex, an Appendix, a Schedule or an Exhibit, as the case may be, hereof unless otherwise specifically provided.  The use herein of the word "include" or "including," when following any general statement, term or matter, shall not be construed to limit such statement, term or matter to the specific items or matters set forth immediately following such

word or to similar items or matters, whether or not no limiting language (such as "without limitation" or "but not limited to" or words of similar import) is used with reference thereto, but rather shall be deemed to refer to all other items or matters that fall within the scope of such general statement, term or matter. Unless otherwise indicated, any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein). The following terms have the meanings given to them in the UCC and terms used herein without definition that are defined in the UCC have the meanings given to them in the UCC (such meanings to be equally applicable to both the singular and plural forms of the terms defined): "account", "account debtor", "certificated security", "chattel paper", "commercial tort claim", "electronic chattel paper", "equipment", "fixture", "general intangible", "goods", "instruments", "inventory", "investment property", "letter-of-credit right", "proceeds", "record" and "supporting obligation". The term "insider" as used herein has the meaning given to such term in the Bankruptcy Code.

**1.4**    **Timing of Performance**.  Unless otherwise specified, all references herein to times of day shall be references to Eastern time (daylight or standard, as applicable).  When the performance of any covenant, duty or obligation is stated to be due or performance required on a day which is not a Business Day, the date of such performance shall extend to the immediately succeeding Business Day.

**SECTION 2.    LOANS**

**2.1**    **Loans**.

(a)    <u>Loans</u>.

(i)    Upon the satisfaction (or waiver by the Requisite DIP Lenders (in their sole discretion)) of the conditions precedent set forth in Section 3.1 and the terms and conditions of the DIP Order, each DIP Lender severally agrees to make Loans to Borrower into the Loan Proceeds Account in an amount equal to such DIP Lender's Commitment in a single borrowing (the "**Funding**"), on the date of the entry of the Interim DIP Order or a later date mutually agreed upon between Borrower and DIP Agent (but in accordance with the terms of the DIP Order) (such date, the "**Closing Date**"); *provided*, that all such Commitments shall terminate automatically on October 25, 2017 to the extent that the Closing Date has not occurred on or prior to October 25, 2017 (or such later date as agreed to by Borrower and the Requisite DIP Lenders).

(ii)    Any amount borrowed under this Section 2.1(a) and subsequently repaid or prepaid may not be reborrowed.  Subject to Sections 2.9 and 2.10, all principal and other amounts owed hereunder with respect to the Loans shall be paid in full no later than the Maturity Date (subject to Section 2.1(d)).

(b)    <u>Borrowing Mechanics for Loans</u>.

(i)    Borrower shall deliver to DIP Agent and each DIP Lender a fully executed Funding Notice no later than one Business Day (or such shorter period as may be reasonably acceptable to DIP Agent) prior to the Closing Date.

(ii)    Each DIP Lender shall make its Pro Rata Share of the Funding available to DIP Agent not later than 11:00 a.m. on the Closing Date by wire transfer of same day funds in Dollars, to DIP Agent's Account.  DIP Agent shall make the proceeds of the Funding, upon the occurrence of the Closing Date available to Borrower on the Closing Date (but subject, in all cases,

to Section 2.1(c)), by causing an amount of same day funds in Dollars equal to the proceeds of all such Loans received by DIP Agent from DIP Lenders to be credited to the Loan Proceeds Account.

      (c)     <u>Withdrawal of Funds from Loan Proceeds Account</u>.

      (i)     From time to time (but no more frequently than once each calendar week), the DIP Agent shall, subject to the consent of the Requisite DIP Lenders, release such funds from the Loan Proceeds Account to the Master Concentration Account, upon Borrower's delivery of a Withdrawal Certificate to the DIP Agent by 12:00 p.m. at least two Business Days prior to the date on which such funds are requested to be released specifying the amount of the requested withdrawal and certifying, both before and after giving effect to the withdrawal and the proposed use of proceeds, the satisfaction of each of the following conditions:

      (1)     no Default or Event of Default has occurred and is continuing;

      (2)     the representations and warranties contained in this Agreement and in the other Credit Documents shall be true and correct in all material respects (except such representations and warranties that by their terms are qualified by materiality or a Material Adverse Effect, which representations and warranties shall be true and correct in all respects) on and as of the date of delivery of the Withdrawal Certificate;

      (3)     the Borrower will be in pro forma compliance with the Budget Covenant;

      (4)     the intended use of proceeds will be in compliance with the Budget; and

      (5)     the aggregate withdrawals made by the Borrower from the Loan Proceeds Accounts since the Petition Date does not exceed the amount permitted to be borrowed pursuant to the terms of the applicable DIP Order.

      (ii)     On any date on which the Loans shall have been accelerated, any amounts remaining in the Loan Proceeds Account, as the case may be, may be applied by the DIP Agent to reduce the Loans then outstanding, in accordance with Section 2.11(b).  Except as otherwise provided in the DIP Order, none of the Credit Parties shall have (and each Credit Party hereby affirmatively waives) any right to withdraw, claim or assert any property interest in any funds on deposit in the Loan Proceeds Account upon the occurrence and continuance of any Default or Event of Default.

      (d)     <u>Conversion to Exit</u>.  Subject to approval of the Bankruptcy Court, on the Acceptable Plan Effective Date, the Borrower shall (with the consent of the DIP Lenders in their  sole and absolute discretion) convert the outstanding principal amount all of the Loans and all then accrued and unpaid interest, on a dollar-for-dollar basis, into term loans under an exit facility (the "**Exit Facility**") and incur new exit term loans, in each case, as more fully described on Annex C and other terms acceptable to the DIP Lenders; *provided*, that all accrued and unpaid fees with respect to the Loans will be paid in cash on the Acceptable Plan Effective Date.

      **2.2**     **Pro Rata Shares; Availability of Funds**.

      (a)     <u>Pro Rata Shares</u>.  All Loans shall be made by DIP Lenders simultaneously and proportionately to their applicable respective Pro Rata Shares, it being understood that no DIP Lender shall

22

be responsible for any default by any other DIP Lender in such other DIP Lender's obligation to make a Loan requested hereunder nor shall any Commitment of any DIP Lender be increased or decreased as a result of a default by any other DIP Lender in such other DIP Lender's obligation to make a Loan requested hereunder.

(b)    <u>Availability of Funds</u>.  Unless DIP Agent shall have been notified by (i) any DIP Lender prior to the Closing Date that such DIP Lender does not intend to make available to DIP Agent the amount of such DIP Lender's Loan requested on the Closing Date, DIP Agent may assume that such DIP Lender has made such amount available to DIP Agent on such date and DIP Agent may, in its sole discretion, but shall not be obligated to, make available to Borrower a corresponding amount on any such date.  If such corresponding amount is not in fact made available to DIP Agent by such DIP Lender, DIP Agent shall be entitled to recover such corresponding amount on demand from such DIP Lender together with interest thereon, for each day from the Closing Date until the date such amount is paid to DIP Agent, at the customary rate set by DIP Agent for the correction of errors among banks for three (3) Business Days and thereafter at the Interest Rate.  If such DIP Lender does not pay such corresponding amount forthwith upon DIP Agent's demand therefor, DIP Agent shall promptly notify Borrower and Borrower shall immediately pay such corresponding amount to DIP Agent together with interest thereon, for each day from the Closing Date until the date such amount is paid to DIP Agent, at the Interest Rate.  Nothing in this Section 2.2(b) shall be deemed to relieve any DIP Lender from its obligation to fulfill its Commitment hereunder or to prejudice any rights that Borrower may have against any DIP Lender as a result of any default by such DIP Lender hereunder.

(c)    <u>Funding Limitations</u>.  For the avoidance of doubt, DIP Agent shall have no Commitments (to make Loans) in its capacity as DIP Agent and DIP Agent's requirement to make Loans (from the Loan proceeds received from the DIP Lenders) in accordance with the provisions hereof shall be limited to the funds that it receives from the DIP Lenders (to fund such Loans).

**2.3**    **Use of Proceeds**.  Subject to Section 2.1(c)(i), (iv) and (v) in all respects:

(a)    The proceeds of the Loans may be withdrawn from Loan Proceeds Account to fund, subject to compliance with the Budget (after giving effect to the variance permitted pursuant to Section 5.17(b)) and Section 2.1(c), or otherwise upon the approval of the Requisite DIP Lenders in their sole discretion, general corporate purposes and working capital during the Bankruptcy Cases, including without limitation costs to administer and prosecute the Bankruptcy Cases, and to make Permitted Adequate Protection Payments to the  extent permitted by the Budget.

(b)    Except as otherwise approved by the Requisite DIP Lenders in their sole discretion, the proceeds of the Loans shall be applied by Borrower for uses solely to the extent that any such application of proceeds shall be in pro forma compliance with the Budget Covenant.

(c)    No portion of the proceeds of any Loan shall be used in any manner that causes such Loan or the application of such proceeds to violate Regulation T, Regulation U or Regulation X of the Board of Governors of the Federal Reserve System or any other regulation thereof.

**2.4**    **Register; Notes**.

(a)    <u>Register</u>.  DIP Agent shall, acting as a non-fiduciary agent of the Borrower, maintain at its Principal Office a copy of each Assignment Agreement delivered to it and a register for the recordation of the names and addresses of DIP Lenders and the principal amount of and stated interest on the Loans owing to each DIP Lender from time to time (the "**Register**").  The Register shall be available for inspection by Borrower, and a redacted version of the Register showing the entries with respect to any

DIP Lender shall be available for inspection by such DIP Lender, at any reasonable time and from time to time upon reasonable prior notice.  DIP Agent shall record in the Register the Loans, and each repayment or prepayment in respect of the principal amount of the Loans, and any such recordation shall be conclusive and binding on Borrower and each DIP Lender, absent manifest error; *provided*, that failure to make any such recordation, or any error in such recordation, shall not affect Borrower's Obligations in respect of any Loan.  Borrower hereby designates the entity serving as DIP Agent to serve as such Borrower's non-fiduciary agent solely for purposes of maintaining the Register as provided in this Section 2.4, and Borrower hereby agrees that, to the extent such entity serves in such capacity, the entity serving as DIP Agent and its officers, directors, employees, agents and Affiliates shall constitute "Indemnitees".

(b)    Notes.  If so requested by any DIP Lender by written notice to Borrower (with a copy to DIP Agent) at least two (2) Business Days prior to the Closing Date, or at any time thereafter, Borrower shall execute and deliver to such DIP Lender (and/or, if applicable and if so specified in such notice, to any Person who is a permitted assignee of such DIP Lender pursuant to Section 10.6) on the Closing Date (or, if such notice is delivered after the second Business Day prior to the Closing Date, promptly after Borrower's receipt of such notice), a Note or Notes to evidence such DIP Lender's Loan.

**2.5    Interest on Loans.**  Except as otherwise set forth herein, each Loan shall bear interest on the unpaid principal amount thereof from Closing Date through the date of repayment (whether by acceleration or otherwise) thereof at the Interest Rate.   Subject to Section 2.1(d), all accrued and unpaid interest shall be paid in cash on the Maturity Date and on the date of any repayment or prepayment (whether pursuant to a voluntary prepayment or mandatory prepayment, acceleration or otherwise) of any Loans, with respect to the principal amount of Loans repaid or prepaid.  Interest shall be computed on the basis of a 365/366 day year for the actual number of days elapsed in the period during which it accrues.

**2.6    Fees**.  Borrowers shall pay to DIP Agent and the DIP Lenders, as applicable, for their respective accounts, certain fees and other amounts in accordance with the terms hereof and of the Fee Letter; *provided*, that, as described in the Fee Letter, on the Closing Date, the aggregate principal amount of the Loans shall be deemed to be increased by the amount of the commitment fee described in the Fee Letter.

**2.7    Default Interest**.  Upon the occurrence and during the continuance of any Event of Default described in Section 8.1, the principal amount of all Loans outstanding and, to the extent permitted by applicable law, any interest payments on all Obligations owed hereunder, shall thereafter bear interest in cash (including post-petition interest in any successor proceeding under the Bankruptcy Code or other applicable bankruptcy laws, whether or not allowed in such a proceeding) payable on demand at a rate that is five percent (5.0%) per annum in excess of the Interest Rate.  Payment or acceptance of the increased rates of interest provided for in this Section 2.7 is not a permitted alternative to timely payment and shall not constitute a waiver of any Event of Default or otherwise prejudice or limit any rights or remedies of DIP Agent or any DIP Lender.

**2.8    [Reserved]**.

**2.9    Voluntary Prepayments.**  Subject in all respects to the DIP Order, any time and from time to time, Borrower may prepay any such Loans on any Business Day in whole or in part in an aggregate minimum amount of $250,000 and integral multiples of $100,000 in excess of that amount.  All such prepayments shall be made upon not less than one Business Day's prior written notice by Borrower in writing to DIP Agent and each DIP Lender by 12:00 p.m. on the date required.  Upon the giving of any such notice, the principal amount of the Loans specified in such notice shall become due and payable on the prepayment date specified therein.  Any such voluntary prepayment shall be applied as specified in Section 2.11(a).

2.10    **Mandatory Prepayments**.  Subject in all respects to the DIP Order:

(a)    Asset Sales.  No later than the third Business Day following the date of receipt by the Credit Parties or any of their Subsidiaries of any Net Asset Sale Proceeds, Borrower shall cause an aggregate amount equal to such Net Asset Sale Proceeds to be applied to repay the Obligations in accordance with Section 2.11(b); *provided*, that to the extent that the Bank of Colorado has a perfected First Priority Lien under the First Lien Loan Documents with respect to any of the underlying assets resulting in such Net Asset Sale Proceeds ("**BOC Primary Collateral**"), the Borrower shall notify DIP Agent and each DIP Lender of the amount of such prepayment attributable to the BOC Primary Collateral, and the Borrower shall be permitted instead to make a prepayment of the First Lien Loan Documents in the amount of the Net Asset Sale Proceeds of such BOC Primary Collateral; *provided, further*, that to the extent the Bank of Colorado declines to receive such Net Asset Sale Proceeds of BOC Primary Collateral, such Net Asset Sale Proceeds shall instead be applied by the Borrower to repay the Obligations in accordance with Section 2.11(b).

(b)    Insurance/Condemnation Proceeds.  No later than the third Business Day following the date of receipt by the Credit Parties or any of their Subsidiaries of any Net Insurance/Condemnation Proceeds, Borrower shall cause an aggregate amount equal to such Net Insurance/Condemnation Proceeds to be applied to repay the Obligations in accordance with Section 2.11(b).

(c)    Issuance of Debt.  No later than the first Business Day following the date of receipt by the Credit Parties or any of their Subsidiaries of any cash proceeds from the incurrence of any Indebtedness of the Credit Parties or any of their Subsidiaries (other than with respect to any Indebtedness permitted to be incurred pursuant to Section 6.1), Borrower shall cause an aggregate amount equal to one hundred percent (100%) of such proceeds, net of underwriting and other reasonable discounts, commissions, costs and other reasonable out-of-pocket fees, transfer and similar taxes, reasonable attorneys', investment banking and accountants' fees, and other reasonable out-of-pocket costs and expenses actually incurred by the Credit Parties or any of their Subsidiaries directly in connection therewith, to be applied to repay the Obligations in accordance with Section 2.11(b).

(d)    Prepayment Certificate.  Concurrently with any prepayment of the Loans pursuant to Sections 2.10(a)-(c) Borrower shall deliver to DIP Agent and each DIP Lender a certificate of an Authorized Officer demonstrating the calculation in reasonable detail of the amount giving rise to the prepayment.  In the event that Borrower shall subsequently determine that the actual amount required to be prepaid pursuant to the applicable clause of Section 2.10 exceeded the amount set forth in such certificate, Borrower shall promptly cause an amount equal to such excess to be applied to repay Obligations in accordance with Section 2.11(b), and Borrower shall concurrently therewith deliver to DIP Agent and each DIP Lender a certificate of an Authorized Officer demonstrating in reasonable detail such excess.

2.11    **Application of Prepayments**.

(a)    Application of Voluntary Prepayments of Loans.  Any voluntary prepayment of any Loan pursuant to Section 2.9 shall be applied to repay all outstanding Loans on a pro rata basis (in accordance with the respective outstanding principal amounts thereof).

(b)    Application of Mandatory Prepayments.  Any mandatory prepayment of any Loan pursuant to Section 2.10 shall be applied as follows:

*first*, to the payment of any outstanding Obligation to DIP Agent, including all indemnities, all expenses and fees then due and payable under any Credit Document to DIP Agent to the full

extent thereof, and other amounts then due and payable to DIP Agent under the Credit Documents until paid in full;

> *second*, to the payment of all other expenses and fees then due and payable under any Credit Document until paid in full;

> *third*, to the payment of any accrued interest thereon at the Default Rate, if any, until paid in full;

> *fourth*, to the payment of any accrued and unpaid interest thereon (other than that calculated at the Default Rate and paid in clause "*third*" above) until paid in full;

> *fifth*, to prepay the principal amount of Loans on a pro rata basis (in accordance with the respective outstanding principal amounts thereof) until paid in full;

> *sixth,* to the payment of any other outstanding Obligations; and

> *seventh,* any remainder shall be for the account of and paid to Borrower or whoever else may be lawfully entitled thereto.

(c)    <u>Waiver of Certain Prepayments</u>.    Anything contained herein to the contrary notwithstanding, in the event Borrower is required to make any mandatory prepayment (a "**Waivable Prepayment**"), not less than three (3) Business Days prior to the date (the "**Prepayment Date**") on which Borrower is required to make such Waivable Prepayment Borrower shall notify DIP Agent and each DIP Lender of the amount of such prepayment, and DIP Agent will promptly thereafter notify each DIP Lender holding outstanding Loans of the amount of such DIP Lender's Pro Rata Share of such Waivable Prepayment and such DIP Lender's option to refuse such amount.  Each such DIP Lender may exercise such option by giving written notice to Borrower and DIP Agent of its election to do so on or before the first Business Day prior to the Prepayment Date (it being understood that any DIP Lender which does not notify Borrower and DIP Agent of its election to exercise such option on or before the first Business Day prior to the Prepayment Date shall be deemed to have elected, as of such date, not to exercise such option). On the Prepayment Date, Borrower shall pay to DIP Agent the amount of the Waivable Prepayment in an amount equal to that portion of the Waivable Prepayment payable to those DIP Lenders that have elected not to exercise such option, to prepay the Loans of such DIP Lenders on a pro rata basis, and Borrower may retain any excess, which may be used for any purpose in accordance with the Budget.

**2.12    General Provisions Regarding Payments and Notices**.

(a)    All payments made by Borrower of principal, interest, fees and other Obligations shall be made in Dollars in same day funds, without, recoupment, setoff, counterclaim or other defense free of any restriction or condition, and delivered to DIP Agent not later than 1:00 p.m. on the date due to DIP Agent's Account for the account of DIP Lenders; funds received by DIP Agent after that time on such due date shall be deemed to have been paid by Borrower on the next Business Day**.**

(b)    All payments in respect of the principal amount of any Loan shall be accompanied by payment of accrued interest on the principal amount being repaid or prepaid**.**

(c)    DIP Agent shall promptly distribute to each DIP Lender at such address as such DIP Lender shall indicate in writing, such DIP Lender's applicable Pro Rata Share of all payments and prepayments of principal and interest due hereunder, together with all other amounts due thereto, including all fees payable with respect thereto, to the extent received by DIP Agent**.**

(d)     Whenever any payment to be made hereunder shall be stated to be due on a day that is not a Business Day, such payment shall be made on the next succeeding Business Day and such extension of time shall be included in the computation of the payment of interest hereunder.

(e)     DIP Agent shall deem any payment by or on behalf of Borrower hereunder that is not made in same day funds prior to 1:00 p.m. to be a nonconforming payment.  Any such payment shall not be deemed to have been received by DIP Agent until the later of (i) the time such funds become available funds, and (ii) the applicable next Business Day.  Interest shall continue to accrue on any principal as to which a nonconforming payment is made until such funds become available funds (but in no event less than the period from the date of such payment to the next succeeding applicable Business Day) at the Default Rate determined pursuant to Section 2.7 from the date such amount was due and payable until the date such amount is paid in full.

(f)     Notwithstanding anything in this Agreement to the contrary, and in all cases subject to the Carve-Out and the terms of the DIP Order, if an Event of Default shall have occurred and be continuing, all payments or proceeds received by DIP Agent hereunder in respect of any of the Obligations shall be applied first, to pay any costs and expenses then due and payable to DIP Agent under the Credit Documents, including in connection with the foreclosure or realization upon, the disposal, storage, maintenance or otherwise dealing with any of, the Collateral or otherwise in connection with the Credit Documents, and indemnities and other amounts then due and payable to DIP Agent under the Credit Documents until paid in full, second, to pay any costs, expenses, indemnities, fees then due and payable to DIP Agent under the Credit Documents until paid in full, third, ratably to pay any fees, expenses or indemnities then due and payable to any of the DIP Lenders or any of their respective affiliates or Related Funds under the Credit Documents, until paid in full, fourth, ratably to pay interest then due and payable in respect of all Loans calculated at the Default Rate until paid in full, fifth, ratably to pay interest then due and payable in respect of all Loans (other than interest calculated at the Default Rate and paid pursuant to clause "fourth" above) until paid in full, sixth, ratably to pay the principal amount of all Loans then outstanding until paid in full, and, seventh, to pay ratably any other Obligations then due and payable.

(g)     Any Funding Notice shall be executed by an Authorized Officer of Borrower in a writing delivered to DIP Agent and each DIP Lender.

**2.13     Ratable Sharing**.  DIP Lenders hereby agree among themselves that if any of them shall, whether by voluntary payment (other than a voluntary prepayment of Loans made and applied in accordance with the terms hereof), through the exercise of any right of set off or banker's lien, by counterclaim or cross action or by the enforcement of any right under the Credit Documents or otherwise, or as adequate protection of a deposit treated as cash collateral under the Bankruptcy Code, receive payment or reduction of a proportion of the aggregate amount of principal, interest, fees and other amounts then due and owing to such DIP Lender hereunder or under the other Credit Documents (collectively, the "**Aggregate Amounts Due**" to such DIP Lender) which is greater than the proportion received by any other DIP Lender in respect of the Aggregate Amounts Due to such other DIP Lender, then the DIP Lender receiving such proportionately greater payment shall (a) notify DIP Agent and each other DIP Lender of the receipt of such payment and (b) apply a portion of such payment to purchase participations (which it shall be deemed to have purchased from each seller of a participation simultaneously upon the receipt by such seller of its portion of such payment) in the Aggregate Amounts Due to the other DIP Lenders so that all such recoveries of Aggregate Amounts Due shall be shared by all DIP Lenders in proportion to the Aggregate Amounts Due to them; *provided*, that if all or part of such proportionately greater payment received by such purchasing DIP Lender is thereafter recovered from such DIP Lender upon the bankruptcy or reorganization of Borrower or otherwise, those purchases to that extent shall be rescinded and the purchase prices paid for such participations shall be returned to such purchasing DIP Lender ratably to the extent of such recovery, but without interest.  Borrower expressly consents to the foregoing arrangement and agrees that any holder

of a participation so purchased may exercise any and all rights of banker's lien, set off or counterclaim with respect to any and all monies owing by Borrower to that holder with respect thereto as fully as if that holder were owed the amount of the participation held by that holder.

**2.14**    **[Reserved]**.

**2.15**    **Capital Adequacy**.

(a)    _Capital Adequacy Adjustment_.   In the event that any DIP Lender shall have determined in good faith that the issuance, adoption, or phase in after the Closing Date of any law, rule or regulation (or any provision thereof), or if such law, rule or regulation or provision becomes effective or applicable after the Closing Date, regarding capital adequacy, or any change therein or in the interpretation or administration thereof by any Governmental Authority, central bank or comparable agency charged with the interpretation or administration thereof, or compliance by any DIP Lender (or its applicable lending office) with any guideline, request or directive regarding capital adequacy (whether or not having the force of law) of any such Governmental Authority, central bank or comparable agency issued, adopted, phased in or made effective or applicable after the Closing Date, has or would have the effect of reducing the rate of return on the capital of such DIP Lender or any corporation controlling such DIP Lender as a consequence of, or with reference to, such DIP Lender's Loans or other obligations hereunder with respect to the Loans to a level below that which such DIP Lender or such controlling corporation could have achieved but for such adoption, effectiveness, phase in, applicability, change or compliance (taking into consideration the policies of such DIP Lender or such controlling corporation with regard to capital adequacy) by an amount deemed by such DIP Lender to be material, then from time to time, within ten (10) days after receipt by Borrower from such DIP Lender of the statement referred to in the next sentence, Borrower shall pay to such DIP Lender such additional amount or amounts as will compensate such DIP Lender or such controlling corporation on an after tax basis for such reduction.  Such DIP Lender shall deliver to Borrower (with a copy to DIP Agent) a written statement, setting forth in reasonable detail the basis for calculating the additional amounts owed to DIP Lender under this Section 2.15(b), which statement shall be conclusive and binding upon all parties hereto absent manifest error.

(b)    Failure or delay on the part of any DIP Lender to demand compensation pursuant to this Section 2.15 shall not constitute a waiver of such DIP Lender's right to demand such compensation.

**2.16**    **Taxes; Withholding, etc**.

(a)    _Defined Terms_.   For purposes of this Section 2.16, the term "applicable law" includes FATCA.

(b)    _Payments to Be Free and Clear_.  All sums payable by any Credit Party hereunder and under the other Credit Documents shall (except to the extent required by law) be paid free and clear of, and without any deduction or withholding on account of, any Tax imposed, levied, collected, withheld or assessed.

(c)    _Withholding of Taxes_.  If any Credit Party or any other Person is required by law to make any deduction or withholding on account of any Tax from any sum paid or payable under any of the Credit Documents: (i) Borrower shall notify DIP Agent and each impacted DIP Lender of any such requirement or any change in any such requirement as soon as Borrower becomes aware of it; (ii) Credit Parties shall timely pay any such withheld or deducted amount to the relevant Governmental Authority in accordance with applicable law before the date on which penalties attach thereto; (iii) if such tax is an Indemnified Tax, the sum payable by such Credit Party in respect of which the relevant deduction or withholding is required shall be increased to the extent necessary to ensure that after any such deduction or

withholding, DIP Agent or such DIP Lender, as the case may be, receives on the due date a net sum equal to what it would have received had no such deduction or withholding been required (including such deductions and withholdings applicable to additional sums payable under this Section 2.16(c)); and (iv) within thirty (30) days after making any such deduction or withholding Borrower shall deliver to DIP Agent and each impacted DIP Lender evidence satisfactory to the affected parties of such deduction or withholding and of the remittance thereof to the relevant taxing or Governmental Authority.

(d)    Other Taxes.  In addition, the Credit Parties shall pay, or at the option of the DIP Agent reimburse the DIP Agent or the DIP Lenders, for all Other Taxes to the relevant Governmental Authorities in accordance with applicable law.  The Credit Parties shall deliver to DIP Agent and each DIP Lender official receipts or other evidence of such payment satisfactory to the Requisite DIP Lenders in respect of any Other Taxes payable pursuant to this Section 2.16(d) promptly after payment of such Other Taxes.

(e)    Indemnification.  The Credit Parties shall jointly and severally indemnify DIP Agent and each DIP Lender  for the full amount of any Indemnified Taxes paid or incurred by, asserted on or attributable to amount payable DIP Agent or such DIP Lender, as the case may be, relating to, arising out of, or in connection with any Credit Document or any payment or transaction contemplated hereby or thereby, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority and all reasonable costs and expenses incurred in enforcing the provisions of this Section 2.16(iv); *provided*, however, that the Credit Parties shall not be required to indemnify DIP Agent, DIP Lenders and Participants in duplication of Taxes covered by Sections 2.16(c) or (d).  A certificate from the relevant DIP Lender or DIP Agent, setting forth in reasonable detail the basis and calculation of such Taxes shall be conclusive, absent manifest error.

(f)    Evidence of Exemption From U.S. Withholding Tax.

(i)    Any DIP Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall, to the extent legally entitled to do so, deliver to the Borrower and DIP Agent, at the time or times reasonably requested by Borrower or DIP Agent, such properly completed and executed documentation reasonably requested by Borrower or DIP Agent as will permit such payments to be made without withholding or at a reduced rate of withholding.  In addition, any DIP Lender, if reasonably requested by the Borrower or DIP Agent, shall, to the extent legally entitled to do so, deliver such other documentation prescribed by applicable law or reasonably requested by the Borrower or DIP Agent as will enable the Borrower or DIP Agent to determine whether or not such DIP Lender is subject to backup withholding or information reporting requirements.  Notwithstanding anything to the contrary in this Section 2.16(f), the completion, execution and submission of the documentation described in this Section 2.16(f) (other than such documentation described in Section 2.16(f)(ii), (iii) and (v) below) shall not be required if in the DIP Lender's reasonable judgment such completion, execution or submission would subject such DIP Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such DIP Lender or as a result of any change in any applicable law, treaty or governmental rule, regulation or order, or any change in the interpretation, administration or application thereof, such DIP Lender is no longer property entitled to delivery forms, certificates or other evidence at a subsequent date establishing the fact that such DIP Lender is not subject to withholding described herein.

(ii)    Each DIP Lender that is a U.S. Person shall deliver to DIP Agent and Borrower, on or prior to the Closing Date (in the case of each DIP Lender listed on the signature pages hereof on the Closing Date) or on or prior to the date of the Assignment Agreement pursuant

29

to which it becomes a DIP Lender (in the case of each other DIP Lender), and at such other times as may be necessary in the determination of Borrower or DIP Agent (each in the reasonable exercise of its discretion), two executed copies of Internal Revenue Service Form W-9 (or any successor forms), properly completed and duly executed by such DIP Lender, and such other documentation required under the Internal Revenue Code and reasonably requested by Borrower or DIP Agent.

(iii)      Each DIP Lender that is not a U.S. Person (a "**Non-U.S. DIP Lender**") shall deliver to DIP Agent and Borrower, on or prior to the Closing Date (in the case of each DIP Lender listed on the signature pages hereof on the Closing Date) or on or prior to the date of the Assignment Agreement pursuant to which it becomes a DIP Lender (in the case of each other DIP Lender), and at such other times as may be necessary in the determination of Borrower or DIP Agent (each in the reasonable exercise of its discretion),

(1)      in the case of a Non-U.S. DIP Lender claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Loan Document, executed copies of IRS Form W-8BEN or W-8BEN-E, as applicable, establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, IRS Form W-8BEN or W-8BEN-E, as applicable, establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(2)      to the extent applicable, executed copies of IRS Form W-8ECI;

(3)      in the case of a Non-U.S. DIP Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Internal Revenue Code, (x) a certificate substantially in the form of <u>Exhibit H</u> to the effect that such Non-U.S. DIP Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Internal Revenue Code, a "10 percent shareholder" of the Borrower within the meaning of Section 881(c)(3)(B) of the Internal Revenue Code, or a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Internal Revenue Code (a "**U.S. Tax Compliance Certificate**") and (y) executed copies of IRS Form W-8BEN or W-8BEN-E, as applicable; or

(4)      to the extent a Non-U.S. DIP Lender is not the beneficial owner, executed copies of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN or W-8BEN-E, a U.S. Tax Compliance Certificate in substantially in the form of <u>Exhibit I</u> or <u>Exhibit J</u>, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; *provided* that if the Non-U.S. DIP Lender is a partnership and one or more direct or indirect partners of such Non-U.S. DIP Lender are claiming the portfolio interest exemption, such Non-U.S. DIP Lender may provide a U.S. Tax Compliance Certificate substantially in the form of <u>Exhibit K</u> on behalf of each such direct and indirect partner;

(iv)      any Non-U.S. DIP Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and DIP Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Non-U.S. DIP Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or DIP Agent), executed copies of any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such

supplementary documentation as may be prescribed by applicable law to permit the Borrower or DIP Agent to determine the withholding or deduction required to be made; and

(v)      if a payment made to a DIP Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such DIP Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Internal Revenue Code, as applicable), such DIP Lender shall deliver to the Borrower and DIP Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or DIP Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Internal Revenue Code) and such additional documentation reasonably requested by the Borrower or DIP Agent as may be necessary for the Borrower and DIP Agent to comply with their obligations under FATCA and to determine that such DIP Lender has complied with such DIP Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment.  Solely for purposes of this clause (D), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrower and DIP Agent in writing of its legal inability to do so.

**2.17     Obligation to Mitigate**.  Each DIP Lender agrees that, as promptly as practicable after the officer of such DIP Lender responsible for administering its Loans becomes aware of the occurrence of an event or the existence of a condition that would entitle such DIP Lender to receive payments under Section 2.14, 2.15 or 2.16, it will, to the extent not inconsistent with the internal policies of such DIP Lender and any applicable legal or regulatory restrictions, use reasonable efforts to (a) make, issue, fund or maintain its Loans through another office of such DIP Lender, or (b) take such other measures as such DIP Lender may deem reasonable, if as a result thereof the additional amounts which would otherwise be required to be paid to such DIP Lender pursuant to Section 2.14, 2.15 or 2.16 would be materially reduced and if, as determined by such DIP Lender in its sole discretion, the making, issuing, funding or maintaining of such Loans through such other office or in accordance with such other measures, as the case may be, would not otherwise adversely affect such Loans or subject such DIP Lender to any economic, legal, regulatory or other disadvantage; *provided*, that such DIP Lender will not be obligated to utilize such other office pursuant to this Section 2.17 unless Borrower agrees to pay all reasonable out-of-pocket costs and expenses incurred by such DIP Lender as a result of utilizing such other office as described above.  A certificate as to the amount of any such expenses payable by Borrower pursuant to this Section 2.17 (setting forth in reasonable detail the basis for requesting such amount) submitted by such DIP Lender to Borrower (with a copy to DIP Agent) shall be conclusive absent manifest error.

## SECTION 3.     CONDITIONS PRECEDENT

**3.1     Closing Date**.  The obligation of each DIP Lender to make any Loan on the Closing Date is subject to the satisfaction, or waiver (by the Requisite DIP Lenders in their sole discretion), of the following conditions on or before October 25, 2017 (or such later date as agreed to by Borrower and the Requisite DIP Lenders (in their sole discretion)):

(a)      <u>Restructuring Support Agreement</u>.  The Debtors shall have entered into a restructuring support agreement with the Bank of Colorado and Riesen Funding LLC, in form and substance satisfactory to the Requisite DIP Lenders in their sole discretion (the "**RSA**").

(b)      <u>Interim DIP Order</u>.  The Interim DIP Order shall have been entered by the Bankruptcy Court and such order shall not have been stayed or modified.

(c)    Petition Date and First Day Orders.  The Petition Date shall have occurred and each Debtor shall be a debtor and debtor-in-possession in the Bankruptcy Cases.  The First Day Orders sought by the Debtors (including a cash management order consistent herewith) shall be satisfactory in form and substance to the Requisite DIP Lenders in their sole discretion.

(d)    Credit Documents.  DIP Agent and each DIP Lender shall have received each Credit Document executed and delivered by each applicable Credit Party.

(e)    Budget.  DIP Agent and each DIP Lender shall have received the initial Budget, in form and substance satisfactory to the Requisite DIP Lenders.

(f)    Organizational Documents; Incumbency.  DIP Agent and each DIP Lender shall have received: (i) sufficient copies of each Organizational Document of each Credit Party, as applicable, and, to the extent applicable, certified as of a recent date by the appropriate governmental official, for each DIP Lender, each dated the Closing Date or a recent date prior thereto; (ii) signature and incumbency certificates of the officers of such Person executing the Credit Documents to which it is a party; (iii) resolutions of the board of directors or similar governing body of each Credit Party approving and authorizing the execution, delivery and performance of this Agreement and the other Credit Documents to which it is a party or by which it or its assets may be bound as of the Closing Date, certified as of the Closing Date by its secretary or an assistant secretary as being in full force and effect without modification or amendment; (iv) a good standing certificate from the applicable Governmental Authority of each Credit Party's jurisdiction of incorporation, organization or formation, each dated a recent date prior to the Closing Date; and (v) such other documents relating to the foregoing as the Requisite DIP Lenders may reasonably request.

(g)    Fees.  Subject to Section 10.2, Borrower shall have paid (or shall pay on the Closing Date with the proceeds of the Loans by net funding, to the extent applicable, as described below) the fees contemplated by the Fee Letter and all accrued and unpaid fees and expenses owed to DIP Agent and DIP Lenders under or relating to the Credit Documents, in each case, which may be net funded out of the proceeds of the Loans on the Closing Date.

(h)    Closing Date Certificate.  Borrower shall have delivered to DIP Agent and each DIP Lender an originally executed Closing Date Certificate, together with all attachments thereto.

(i)    "Know Your Customer" Information.  DIP Agent and each DIP Lender shall have received from the Credit Parties and their Subsidiaries, at least two (2) days (or such shorter period as DIP Agent may agree) prior to the Closing Date, all documentation and other information reasonably required by it or any DIP Lender that is required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including the Patriot Act.

(j)    Funding Notice.  DIP Agent and each DIP Lender shall have received a fully executed and delivered Funding Notice.

(k)    Representations and Warranties.  The representations and warranties contained herein and in the other Credit Documents shall be true and correct in all material respects (except such representations and warranties that by their terms are qualified by materiality or a Material Adverse Effect, which representations and warranties shall be true and correct in all respects) on and as of the Closing Date.

(l)    No Default.  As of the Closing Date, no event shall have occurred and be continuing or would result from the making of the Loans on the Closing Date that would constitute an Event of Default or a Default.

(m)    <u>Control Agreements</u>.  Except to the extent that the DIP Agent agrees such items may be delivered on a post-closing basis, the DIP Agent shall have received executed Control Agreements with respect to any deposit account or securities account to the extent required by Section 5.15.

(n)    <u>Opinions of Counsel</u>.  DIP Agent shall have received a legal opinion in form, scope and substance satisfactory to the DIP Agent and the DIP Lenders, a legal opinion of Gibson, Dunn & Crutcher LLP, counsel to the Credit Parties, with respect to the Non-Debtor Guarantors.

(o)    <u>No Injunction, etc</u>.  There shall exist no unstayed action, suit, investigation, litigation or proceeding pending or threatened in any court or before any arbitrator or governmental instrumentality with respect to the Credit Documents.

(p)    <u>Restructuring Advisors</u>.  The Credit Parties shall have continued to retain restructuring advisors reasonably acceptable to Requisite DIP Lenders (it being understood and agreed that Mackinac Partners LLC is reasonably acceptable to Requisite DIP Lenders).

(q)    <u>Insurance</u>.  Except to the extent that the DIP Agent agrees such items may be delivered on a post-closing basis, the Credit Parties shall provide DIP Agent and each DIP Lender with a certificate from the Credit Parties' insurance broker (or other evidence satisfactory to the Requisite DIP Lenders) that all insurance required to be maintained pursuant to this Section 5.5 is in full force and effect, together with endorsements naming DIP Agent, for the benefit of Secured Parties, as additional insured and loss payee thereunder to the extent required under this Section 5.5.

(r)    <u>Security Interest</u>.  The DIP Agent, for the benefit of the DIP Lenders, shall have a valid and perfected security interest in the Collateral pursuant to (i) the Interim Order (in the case of the Debtors) and (ii) applicable law (in the case of the Non-Debtor Guarantors).

(s)    <u>Other Matters</u>.  The Debtors shall have delivered such additional pleadings, agreements, documents or other papers, taken such other actions to evidence their obligation hereunder and the perfection and priority of the security interests granted to the DIP Agent and DIP Lenders, and performed such other actions in connection with the occurrence of the Closing Date, all as may be reasonably requested by DIP Agent and DIP Lenders.

Each DIP Lender, by delivering its signature page to this Agreement and funding a Loan on the Closing Date, shall be deemed to have acknowledged receipt of, and consented to and approved, each Credit Document and each other document required to be approved by Requisite DIP Lenders or DIP Lenders, as applicable, on the Closing Date.

## SECTION 4.    REPRESENTATIONS AND WARRANTIES

In order to induce DIP Agent and DIP Lenders to enter into this Agreement and to furnish the Loans hereunder, each Credit Party represents and warrants to DIP Agent and each DIP Lender on the Closing Date that the following statements are true and correct:

**4.1    Organization; Requisite Power and Authority; Qualification**.  Each Credit Party (a) is duly organized, validly existing and in good standing (to the extent such concept is applicable in the applicable jurisdiction) under the laws of its jurisdiction of organization as identified and except as otherwise stated in Schedule 4.1, (b) subject to the entry of the DIP Order, has all requisite power and authority to own and operate its properties, to carry on its business as now conducted and as proposed to be conducted, to enter into the Credit Documents to which it is a party and to carry out the transactions contemplated thereby and, in the case of Borrower, to make the borrowings hereunder, and (c) is qualified

to do business and in good standing (to the extent such concept is applicable in the applicable jurisdiction) in every jurisdiction where the ownership of its assets or the conduct of its business and operations requires such qualification, except in jurisdictions where the failure to be so qualified or in good standing has not had, and could not be reasonably expected to have, a Material Adverse Effect.

      **4.2**    **Capital Stock and Ownership**.  Each Credit Party's jurisdiction of organization or formation, legal name and organizational identification number, if any, and the location of such Credit Party's chief executive office or sole place of business is specified on Schedule 4.2. The Capital Stock of each Credit Party has been duly authorized and validly issued and is fully paid and non-assessable.  Except as set forth on Schedule 4.2, there is no existing option, warrant, call, right, commitment or other agreement to which any Credit Party is a party requiring, and there is no membership interest or other Capital Stock of any Credit Party outstanding which upon conversion or exchange would require, the issuance by any Credit Party of any additional membership interests or other Capital Stock of any of Credit Party or other Securities convertible into, exchangeable for or evidencing the right to subscribe for or purchase, a membership interest or other Capital Stock of any Credit Party.  Schedule 4.2 sets forth a true, complete and correct list, both before and after giving effect to the transactions contemplated by the Credit Documents, of the name and jurisdiction of organization of each of Credit Party and indicates for each such Person its ownership (by holder and percentage interest) and the type of entity of each of them, and the number and class of authorized and issued Capital Stock of such Person.  Except as set forth on Schedule 4.2, no Credit Party nor any of their Subsidiaries has any equity investments in any other corporation or entity.

      **4.3**    **Due Authorization**.  Subject to entry of the DIP Order, the execution, delivery and performance by each Credit Party of the Credit Documents to which it is a party have been duly authorized by all necessary corporate or other organizational action on the part of such Credit Party.

      **4.4**    **No Conflict**.  The execution, delivery and performance by each of the Credit Parties of the Credit Documents to which it is a party and the consummation of the transactions contemplated by the Credit Documents do not and will not (a) violate any provision of any law or any governmental rule or regulation applicable to such Credit Party or any order, judgment or decree of any court or other agency of government binding such Credit Party; (b) violate the terms of such Credit Party's Organizational Documents; (c) violate, result in a breach of or constitute (with due notice or lapse of time or both) a default under any post-petition Contractual Obligation or Lease of such Credit Party; or (d) result in or require the creation or imposition of any Lien upon any of the properties or assets of such Credit Party (other than any Permitted Liens), except, with respect to any violation, breach or default referred to in clause (a) or (c) above, to the extent that such violation, breach or default, individually or in the aggregate, could not reasonably be expected to have  a Material Adverse Effect.

      **4.5**    **Governmental Consents**.  The execution, delivery and performance by each of the Credit Parties of the Credit Documents to which it is a party and the legality, validity, binding effect and enforceability against each of the Credit Parties of the Credit Documents to which it is a party do not and will not require any material registration with, consent or approval of, or notice to, or other action to, with or by, any Governmental Authority except (a) for the entry of the DIP Order and (b) the registrations, consents, approvals, notices and actions which have been duly made, obtained, given or taken and are in full force and effect.

      **4.6**    **Binding Obligation**.  Subject to the entry of the DIP Order, each Credit Document has been duly executed and delivered by each Credit Party that is a party thereto and is the legally valid and binding obligation of each Credit Party that is a party thereto, enforceable against such Credit Party in accordance with its respective terms, except as may be limited by bankruptcy, insolvency, reorganization,

moratorium or similar laws relating to or limiting creditors' rights generally or by general principles of equity, regardless of whether considered in a proceeding at equity or law.

**4.7    Historical Financial Statements**.  The Historical Financial Statements and the financial statements delivered pursuant to Section 5.1 were prepared in conformity with GAAP and fairly present, in all material respects, the financial position, on a consolidated basis, of the Persons described in such financial statements as at the respective dates thereof and the results of operations and cash flows, on a consolidated basis, of the entities described therein for each of the periods covered thereby, subject, in the case of any such unaudited financial statements, to changes resulting from audit and normal year-end adjustments and the absence of footnotes.

**4.8    Budget**.  The Budget was prepared in good faith based upon assumptions and projections believed by Borrower to be reasonable as of the time the Budget was prepared, it being understood that projections are, by their nature, inherently uncertain and such projections may vary from actual results and that such variances may be material.

**4.9    Adverse Proceedings**.  Except (i) for the Bankruptcy Cases, (ii) as has not been resolved by the DIP Order, (iii) as has otherwise been disclosed in "first day" motions or pleadings or (iv) Adverse Proceedings described in Schedule 4.9, there are no Adverse Proceedings, individually or in the aggregate, that (a) relate to any Credit Document or credit facility provided hereunder or (b) could reasonably be expected to have a Material Adverse Effect.  No Credit Party nor any of their Subsidiaries is subject to or in default with respect to any final judgments, writs, injunctions, decrees, rules or regulations of any court or any Governmental Authority that, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

**4.10    Payment of Taxes**.  Except as otherwise permitted under Section 5.3 or set forth in Schedule 4.10, all federal income and other material tax returns and reports of the Credit Parties and their Subsidiaries required to be filed by any of them have been timely filed, and all material amounts of taxes shown on such tax returns to be due and payable and all assessments, fees and other governmental charges upon the Credit Parties and their Subsidiaries and upon their respective properties, assets, income, businesses and franchises which are due and payable have been paid when due and payable, except (a) for taxes, assessments, fees or charges which are being contested by Borrower or such Subsidiary in good faith and by appropriate proceedings for which reserves, if any, to the extent required in conformity with GAAP shall have been made or (b) to the extent that the failure to do so, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

**4.11    Properties**.

(a)    <u>Title</u>.  Each Credit Party has (i) good, marketable and insurable fee simple title to (in the case of fee interests in real property), (ii) valid leasehold interests in (in the case of leasehold interests in real or personal property except intellectual property), and (iii) good title to (in the case of all other personal property except intellectual property), all of their respective Real Estate Assets, properties and assets (as applicable) reflected in their respective Historical Financial Statements referred to in Section 4.7, except for Real Estate Assets, properties and other assets disposed of since the date of such financial statements in the ordinary course of business or as otherwise permitted under Section 6.8.  All material assets (other than intellectual property) used in the business of the Credit Parties are in a condition reasonably satisfactory to operate such material assets in a manner consistent with the current and planned operation of the business as of the Closing Date.  All such properties and assets are held free and clear of Liens, except for Permitted Liens.

(b)    _Real Estate_.  Schedule 4.11(b) contains a true, accurate and complete list of all Real Estate Assets.  Except as set forth therein, none of the Credit Parties are in default under any Lease, other than as a result of the Bankruptcy Cases and other defaults that could not reasonably be expected to have a Material Adverse Effect, and all such Leases are in full force and effect, except for Leases in respect of which the failure to be in full force and effect could not reasonably be expected to have a Material Adverse Effect.  Except as set forth on Schedule 4.11(b), (i) each Credit Party enjoys peaceful and undisturbed possession under all such Leases, other than Leases in respect of which the failure to enjoy peaceful and undisturbed possession would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect and (ii) to the knowledge of the Credit Parties, no other party to any Lease is in material default of its obligations thereunder.

(c)    _Other Property_.  Except for the Lien granted to DIP Agent pursuant to this Agreement and other Permitted Liens, each Credit Party has good title to, or valid leasehold interests in, each item of the Collateral described in Section 7.14 (except for defects in title that, individually or in the aggregate, do not materially interfere with its ability to conduct its business as currently conducted or utilize such properties for their intended purposes).  Such Collateral is owned by such Credit Party free and clear of any and all effective Liens, other than Permitted Liens.  Such Credit Party (i) is the record and beneficial owner of such Collateral pledged by it hereunder constituting instruments or certificates and (ii) except as otherwise permitted hereunder, has rights in or the power to transfer each other item of such Collateral in which a Lien is granted by it hereunder, free and clear of any other effective Lien, other than Permitted Liens.  Upon the entry of the DIP Order, the Lien on, and security interest in, all right, title and interest of the Credit Parties in such Collateral contemplated hereunder and the proceeds thereof, as security for the Obligations, shall be fully perfected, having the priority contemplated by the DIP Order.

**4.12    Environmental Matters**.  Except as could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, (i) none of the Credit Parties nor any of their respective Facilities or operations are subject to any outstanding written order, consent decree or legally binding settlement agreement with any Person pursuant to or under any Environmental Law or as a result of any Environmental Claim, or any Hazardous Materials Activity; (ii) none of the Credit Parties has received any letter or request for information under Section 104 of the Comprehensive Environmental Response, Compensation, and Liability Act (42 U.S.C. § 9604) or any comparable state law; (iii) to each of the Credit Parties' knowledge, there are and have been, no conditions, occurrences, or Hazardous Materials Activities that could reasonably be expected to form the basis of an Environmental Claim against Borrower or any other Credit Party; (iv) neither Borrower nor any other Credit Party nor, to any Credit Party's knowledge, any predecessor of Borrower or any other Credit Party has filed any notice under any Environmental Law reporting that it has conducted any treatment of Hazardous Materials at any Facility; (v) to any Credit Party's knowledge, compliance with all current requirements (including requirements promulgated but not yet effective) pursuant to or under Environmental Laws during the current and following fiscal year would not reasonably be expected to result in expenditures by Borrower or any other Credit Party in excess of amounts budgeted for those fiscal years as of the Closing Date; and (vi) neither Borrower nor any other Credit Party is subject to liability pursuant to any Environmental Law relating to any Release of Hazardous Materials, any Hazardous Materials Activity or any violation of an Environmental Law.

**4.13    No Defaults**.  Other than as a result of the commencement of the Bankruptcy Cases, neither Borrower nor any other Credit Party in default in the performance, observance or fulfillment of any of the obligations, covenants or conditions contained in any of its Contractual Obligations (other than Contractual Obligations in respect of Indebtedness), and no condition exists which, with the giving of notice or the lapse of time or both, could constitute such a default, except where the consequences, direct or indirect, of such default or defaults, if any, could not reasonably be expected to have a Material Adverse Effect.  No Default has occurred and is continuing.

**4.14    Governmental Regulation**.  No Credit Parties nor any of their Subsidiaries is required to be registered as an "investment company" under the Investment Company Act of 1940.

**4.15    Margin Stock**.  No Credit Parties nor any of their Subsidiaries is engaged principally, or as one of its important activities, in the business of extending credit for the purpose of purchasing or carrying any Margin Stock.  No part of the proceeds of the Loans made to such Credit Party will be used to purchase or carry any such Margin Stock or to extend credit to others for the purpose of purchasing or carrying any such Margin Stock or for any purpose that violates the provisions of Regulation T, U or X of the Board of Governors of the Federal Reserve System.

**4.16    Employee Matters**.  No Credit Parties nor any of their Subsidiaries is engaged in any unfair labor practice that could reasonably be expected to have a Material Adverse Effect.  There is (a) no unfair labor practice complaint pending against the Credit Parties or any of their Subsidiaries, or to the best knowledge of Borrower, threatened against any of them before the National Labor Relations Board and no grievance or arbitration proceeding arising out of or under any collective bargaining agreement that is so pending against the Credit Parties or any of their Subsidiaries or to the best knowledge of Borrower, threatened against any of them, (b) no strike or work stoppage in existence or threatened involving Borrower or other Credit Party, and (c) to the best knowledge of Borrower, no union representation question existing with respect to the employees of the Credit Parties or any of their Subsidiaries and, to the best knowledge of Borrower, no union organization activity that is taking place, except (with respect to any matter specified in clause (a), (b) or (c) above, either individually or in the aggregate) such as is not reasonably likely to have a Material Adverse Effect.

**4.17    No Material Adverse Change**.  Other than as a result of the Bankruptcy Cases (and the events resulting therefrom), since December 31, 2016, no event, circumstance or change has occurred that has caused or evidences, either in any case or in the aggregate, a Material Adverse Effect.

**4.18    Employee Benefit Plans**.  Other than with respect to, arising out of, or attributable to, any failure by the Credit Parties and their Subsidiaries to make payments with respect to one or more of their Multiemployer Plans or otherwise file reports with respect thereto (including, without limitation, any claim, liability or obligation with respect to unpaid contributions (and any interest, fees, penalties or damages attributable to such unpaid contributions), termination of participation in such Multiemployer Plans, withdrawal liability under Title IV, subtitle E or any other liability or obligation under Requirements of Law with respect thereto) as set forth in Schedule 4.18 (in the case of each of subparagraphs (a), (b) and (c) below):

(a)    Borrower and each ERISA Affiliate are in compliance with all applicable provisions and requirements of ERISA and the Internal Revenue Code with respect to each Employee Benefit Plan and have performed all their obligations under each Employee Benefit Plan except to the extent that such non-compliance or failure to perform, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.  No liability to any Employee Benefit Plan or the PBGC (other than required premium payments) or to the Internal Revenue Service has been or is expected to be incurred by Borrower or any ERISA Affiliate with respect to any Employee Benefit Plan, except to the extent that such liability, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.  Borrower and each ERISA Affiliate have complied with the requirements of Section 515 of ERISA with respect to each Multiemployer Plan and are not in "default" (as defined in Section 4219(c)(5) of ERISA) with respect to any Multiemployer Plan, except to the extent that such non-compliance or "default," individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

(b)    No ERISA Event has occurred or is reasonably likely to occur that, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect**.**

(c)    Except as disclosed on Schedule 4.18 or to the extent required under Section 4980B of the Internal Revenue Code and/or Section 601 of ERISA, no Credit Parties nor any of their Subsidiaries maintains or contributes to any employee welfare benefit plan (as defined in Section 3(1) of ERISA) that provides health or welfare benefits (through the purchase of insurance or otherwise) for any retired or former employees of Borrower or any Subsidiary of Borrower, except to the extent that such liability, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

**4.19    Certain Fees**.  No broker's or finder's fee or commission will be payable with respect to the transactions contemplated hereby, except to the extent required by any Bankruptcy Court order relating to the retention of estate professionals.

**4.20    Compliance with Statutes, etc.**  Subject to the following two sentences, each of Borrower and each other Credit Party are in compliance with its Organizational Documents and all applicable statutes, regulations and orders of, and all applicable restrictions imposed by, all Governmental Authorities, in respect of the conduct of its business and the ownership of its property (including compliance with all applicable Environmental Laws and land use requirements with respect to any Real Estate Asset or governing its business and the requirements of any permits issued under such Environmental Laws with respect to any such Real Estate Asset or the operations of Borrower or any other Credit Party), except such noncompliance in connection with matters described in "first day" pleadings, motions and/or orders filed or entered in the Bankruptcy Cases and such noncompliance that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.  The Credit Parties and each of their Subsidiaries is in compliance, in all material respects, with the Terrorism Laws.  No part of the proceeds of the Loans will be used by the Credit Parties or any of their Subsidiaries for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended.

**4.21    Disclosure**.  No representation or warranty of any Credit Party contained in any Credit Document, and none of the reports, financial statements or other documents, certificates or written statements furnished to DIP Lenders by or on behalf of the Credit Parties or any of their Subsidiaries for use in connection with the transactions contemplated hereby (as modified or supplemented by other information so furnished), when taken as a whole, contains any untrue statement of a material fact or omits to state a material fact (known to Borrower, in the case of any document not furnished by either of them) necessary in order to make the statements contained herein or therein not misleading in light of the circumstances in which the same were made; *provided* that, with respect to projected financial information and pro forma financial information contained in such materials, the Credit Parties represent only that such projections and pro forma financial information were prepared in good faith based upon assumptions believed by Borrower to be reasonable at the time made; it being understood that projections are, by their nature, inherently uncertain and such projections may vary from actual results and that such variances may be material.

**4.22    Insurance**.  The insurance maintained by the Credit Parties and each of their Subsidiaries complies in all material respects with the requirements of Section 5.5.  Schedule 4.22 sets forth a list of all insurance currently maintained by or on behalf of the Credit Parties and their Subsidiaries and all premiums due in respect of such insurance have been paid.

**4.23    Intellectual Property**.  Each Credit Party owns, or has a valid and continuing license to use, all Intellectual Property necessary for the operation of the business of Borrower and each Credit Party, taken as a whole, as currently conducted.  All material Intellectual Property is subsisting, valid and enforceable. The use of material Intellectual Property by such Credit Party does not infringe upon the rights

of any other Person, except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.  No claim has been asserted or is pending by any Person challenging or questioning the ownership or use by any Credit Party of any Intellectual Property or the validity of any Intellectual Property, or alleging infringement, misappropriation or violation by any Credit Party of any Intellectual Property of any Person, except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

**4.24    Permits, etc.**  Each Credit Party has, and is in compliance with, all government and regulatory permits, licenses, authorizations, approvals, entitlements and accreditations required for such Person lawfully to own, lease, manage or operate, or to acquire, each business currently owned, leased, managed or operated, or to be acquired, by such Person, which, if not obtained, could not reasonably be expected to have a Material Adverse Effect.  To the knowledge of Borrower and each Credit Party, no condition exists or event has occurred which, in itself or with the giving of notice or lapse of time or both, would result in the suspension, revocation, impairment, forfeiture or non-renewal of any such permit, license, authorization, approval, entitlement or accreditation, and there is no claim that any thereof is not in full force and effect, except, to the extent any such condition, event or claim could not be reasonably be expected to have a Material Adverse Effect.

**4.25    OFAC**.  (i) Each Credit Party is in compliance with the requirements of all OFAC Sanctions Programs applicable to it, (ii) each Subsidiary of each Credit Party is in compliance with the requirements of all OFAC Sanctions Programs applicable to such Subsidiary, (iii) each Credit Party has provided to DIP Agent and DIP Lenders all information regarding such Credit Party and its Affiliates and Subsidiaries requested by DIP Agent and DIP Lenders that are necessary to comply with all applicable OFAC Sanctions Programs, and (iv) neither the Credit Parties nor their Subsidiaries or, to the best of each Credit Party's knowledge, any of their respective Affiliates is, as of the date hereof, named on the current OFAC SDN List.

**4.26    Deposit Accounts, Securities Accounts and Commodities Accounts**.  Set forth on Schedule 4.26 is a list of all Deposit Accounts, Securities Accounts and Commodities Accounts of the Credit Parties and their Subsidiaries.

**4.27    Cash Balance**.  As of the Closing Date, the Cash Balance is approximately $1,750,000.

**SECTION 5.    AFFIRMATIVE COVENANTS**

Each Credit Party covenants and agrees that until the indefeasible payment in full in cash of all Loans and other Obligations (other than Remaining Obligations) that are due and payable hereunder, each Credit Party shall perform, and shall cause each of its Subsidiaries to perform, all covenants in this Section 5 (and shall refrain from applying to the Bankruptcy Court for authority to amend, supplement or otherwise modify, or deviate from, any of such covenants in any respect, without the prior written consent of the Requisite DIP Lenders).

**5.1    Financial Statements and Other Reports**.

Unless otherwise provided below, Borrower will deliver to DIP Agent for distribution to each DIP Lender:

(a)    Notice of Default.  Prompt written notice (but, in any event, within three (3) days) after Borrower's Knowledge of the occurrence of a Default or an Event of Default that is continuing at the time such Person becomes aware thereof, which notice shall be accompanied by a certificate of an

Authorized Officer of Borrower specifying the nature and period of existence of such Default or Event of Default, and what action Borrower has taken, is taking and proposes to take with respect thereto;

(b)     Notice of Litigation.  Prompt written notice (but, in any event, within ten (10) days) after Borrower's Knowledge of (i) the institution of, or receipt of a threat in writing with respect to, any Adverse Proceeding not previously disclosed in writing by Borrower to DIP Lenders, or (ii) any material development in any Adverse or (iii) to the extent such notice is permitted to be provided under applicable laws, the allegation in writing by any Governmental Authority of any criminal misconduct by any Credit Party, together in each case with such other information as may be reasonably available to the Credit Parties as any DIP Lender (or DIP Agent at the request of any DIP Lender) may reasonably request to enable DIP Lenders and their counsel to evaluate such matters;

(c)     ERISA.  (i) Prompt written notice (but, in any event, within ten (10) days) after Borrower's Knowledge of the occurrence of any ERISA Event that could reasonably be expected to have a Material Adverse Effect, together with a written statement of an Authorized Officer of Borrower specifying the nature thereof, what action Borrower or any ERISA Affiliate has taken, is taking or proposes to take with respect thereto and, when known, any action taken or threatened by the Internal Revenue Service, the Department of Labor or the PBGC with respect thereto; (ii) with reasonable promptness (but, in any event, within three (3) Business Days), copies of all notices received by Borrower or any ERISA Affiliate from any Person concerning an ERISA Event that could reasonably be expected to have a Material Adverse Effect in respect of a Pension Plan; and (iii) with respect to any event described in the foregoing clauses (i) or (ii), such other documents or governmental reports or filings relating to any Employee Benefit Plan as any DIP Lender (or DIP Agent at the request of any DIP Lender) shall reasonably request;

(d)     Budget Reports.  The Debtors shall deliver to the DIP Agent by 11:59 p.m., on Thursday of each week, (i) rolling 13-week cash flows, together with a reconciliation for the prior week and the cumulative period from the Petition Date of actual expenses and disbursements (including professional fees) and sales receipts and (ii) a statement of Consolidated Cumulative Net Cash Flow, in each case, as to the amounts set forth in the Budget for such periods, together with comparative statements for the relevant periods, in form and substance satisfactory to the Requisite DIP Lenders.

(e)     Budget.  Borrower shall furnish to DIP Agent all reports relating to the Budget in the manner and at the times set forth in this Agreement and in the DIP Order.

(f)     Information Regarding Collateral.  Borrower will furnish to DIP Agent prompt written notice following the occurrence of any change (i) in any Credit Party's corporate name, (ii) in any Credit Party's jurisdiction of organization or corporate form, or (iii) in any Credit Party's Federal Taxpayer Identification Number.  Borrower agrees not to effect or permit any change referred to in the preceding sentence unless Borrower shall have delivered to DIP Agent all financing statements under the Uniform Commercial Code and other documents reasonably requested by DIP Agent or any DIP Lender.  Borrower will furnish to DIP Agent prompt written notice (but in any event within ten (10) Business Days) after an Authorized Officer of a Credit Party becomes aware (a) of any Lien (other than Permitted Liens) against any material portion of the Collateral or (b) that any material portion of the Collateral is lost, damaged or destroyed.

(g)     Reports to Holders of Indebtedness and U.S. Trustee.  (i) Within three (3) days after the same are sent, copies of all financial statements and reports that any Debtor sends to the holders of any Indebtedness of such Debtor, and, within one (1) Business Day after the same are filed, copies of all financial statements and reports that any Debtor files with the Bankruptcy Court or the U.S. Trustee and (ii) promptly, such additional financial and other information (including financial and actuarial information)

as any DIP Lender (or DIP Agent at the request of any DIP Lender) may from time to time reasonably request.

(h)    <u>Copies of Motions and Other Documentation</u>.  To the extent reasonably practicable, one (1) Business Day before any motion, application or pleading is filed with or submitted to the Bankruptcy Court by Debtors, a copy of any such motion, application or pleading.

(i)    <u>Other Information</u>.  Such information and data with respect to The Credit Parties or any of their Subsidiaries as from time to time may be reasonably requested by DIP Agent or any DIP Lender (including, without limitation, monthly or quarterly financial statements and information described in Section 10.22).

(j)    <u>Insurance Programs</u>.  Borrower shall promptly provide DIP Agent with such information with respect to its insurance programs as DIP Agent or any DIP Lender may reasonably request.

(k)    <u>Cash on Hand</u>.  Commencing on the first Monday following the Closing Date, and on each Monday thereafter (or more frequently if requested by the Requisite DIP Lenders), a report of the aggregate balance sheet cash and bank cash balances as of the close of business on the previous Business Day, containing such detail and other information as the DIP Agent may reasonably request.

(l)    <u>Offers to Purchase</u>.  The Borrower shall promptly provide DIP Agent with notice of any written or oral proposals or offers to purchase any material assets of the Credit Parties, including copies of any term sheets, letters of intent or indications of interest.

(m)    <u>Restaurant Wind-Down Proceeds</u>.  The Borrower shall provide at least two Business Days' prior written notice to the DIP Agent of any proposed Asset Sale pursuant to Section 6.8(d), together with a summary of the terms of such sale and the amount of Restaurant Wind-Down Proceeds to be received (with a reasonably detailed description of the allocation of the purchase price).

**5.2    Existence**.  Except as otherwise permitted under Section 6.8 or the Bankruptcy Code, each Credit Party will, and will cause each of its Subsidiaries to, at all times preserve and keep in full force and effect (i) its existence and (ii) all rights and governmental authorizations, qualifications, franchises, licenses and permits material to its business and to conduct its business in each jurisdiction in which its business is conducted, except where the failure to do so, individually and in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

**5.3    Payment of Taxes and Claims**.  Except to the extent prohibited or excused by the Bankruptcy Code or the Bankruptcy Court, each Credit Party will, and will cause each of its Subsidiaries to, pay and discharge promptly when due all Taxes imposed upon it or any of its properties or assets or in respect of any of its income, businesses or franchises before any penalty or fine accrues thereon, and all post-petition claims (including claims for labor, services, materials and supplies, but excluding claims in respect of Indebtedness) for sums that have become due and payable and/or that by law have or may become a Lien upon any of its properties or assets, prior to the time when any penalty or fine shall be incurred with respect thereto; *provided*, that no such Tax or claim need be paid if (a) it is being contested in good faith by appropriate proceedings and reserves to the extent required by GAAP shall have been made therefor or (b) to the extent the failure to pay or discharge the same, individually and in the aggregate, could not reasonably be expected to have a Material Adverse Effect.  No Credit Party will, nor will it permit any of its Subsidiaries to, file or consent to the filing of any consolidated income tax return with any Person (other than the Credit Parties or any of their Subsidiaries).

**5.4    Maintenance of Properties**.  Each Credit Party will, and will cause each of its Subsidiaries to, (a) maintain or cause to be maintained in good repair, working order and condition, ordinary wear and tear and casualty and condemnation excepted, all material assets used or useful in the business of Borrower and the other Credit Parties from time to time will make or cause to be made all appropriate repairs, renewals and replacements thereof in accordance with prudent industry practices and (b) comply at all times with the provisions of all material leases to which it is a party as lessee or under which it occupies property, to the extent necessary to prevent any loss or forfeiture thereof or thereunder, in each case, except as could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

**5.5    Insurance**.  The Credit Parties will, and will cause each of their Subsidiaries to, maintain or cause to be maintained, with financially sound and reputable insurers, and in each case reasonably satisfactory to the Requisite DIP Lenders, business interruption insurance, casualty insurance, public liability insurance and third party property damage insurance with respect to liabilities, losses or damage in respect of the assets, properties and businesses of the Credit Parties and their Subsidiaries as are customarily carried or maintained under similar circumstances by Persons of established reputation of similar size and engaged in similar businesses, in each case in such amounts (after giving effect to any self-insurance that is reasonable and customary for Persons of established reputation of similar size and engaged in similar businesses and provided that reserves therefor, if any, are maintained to the extent required by GAAP), with such deductible levels, covering such risks and otherwise on such terms and conditions as shall be customary for such Persons.  Without limiting the generality of the foregoing, the Credit Parties and their Subsidiaries will maintain or cause to be maintained flood insurance with respect to each Flood Hazard Property that is located in a community that participates in the National Flood Insurance Program, in each case (i) in an amount not less than the outstanding principal amount of the Indebtedness secured by this Agreement that is reasonably allocable to such real property or the maximum limit of coverage made available with respect to the particular type of property under the National Flood Insurance Act of 1968, whichever is less, (ii) with a term ending not later than the maturity of the Indebtedness secured by this Agreement or that may be extended to such maturity date and (iii)  in compliance with any applicable regulations of the Board of Governors of the Federal Reserve System.  Each such policy of insurance shall (unless the Requisite DIP Lenders shall otherwise agree) (x) name DIP Agent, on behalf of DIP Lenders, as an additional insured thereunder as its interests may appear, and (y) in the case of each casualty insurance policy, contain a loss payable clause or endorsement, satisfactory in form and substance to the Requisite DIP Lenders, that names DIP Agent, on behalf of DIP Lenders, as the loss payee thereunder and provides for at least thirty (30) days' prior written notice to DIP Agent and each DIP Lender of any cancellation of such policy.

**5.6    Books and Records; Inspections**.  Each Credit Party will, and will cause each of its Subsidiaries to, permit any representatives designated by the Requisite DIP Lenders (or any DIP Lender while an Event of Default is continuing) (including employees thereof or any consultants, accountants, lawyers and appraisers retained thereby) to visit and inspect any of the properties of any Credit Party, to inspect, copy and take extracts from its and their financial and accounting records, and to discuss its and their affairs, finances and accounts with its and their officers and independent accountants and any other advisors, all upon reasonable notice and at such reasonable times during normal business hours, in all cases subject to applicable law and the terms of any applicable confidentiality agreements not entered into for the purposes of obstructing the operation of this Section 5.6.  By this provision the Credit Parties authorize their independent accountants and other advisors to discuss with DIP Agent (and DIP Lenders while an Event of Default is continuing), and such representatives the affairs, finances and accounts of Borrower and the other Credit Parties.  Unless otherwise consented to by Borrower or if any Default or Event of Default has occurred and is continuing, Borrower shall be present at or have the opportunity to participate in any discussions with the Credit Parties' independent accountants and other advisors.  The Credit Parties acknowledge that DIP Agent, after exercising its rights of inspection, may prepare and distribute to DIP

Lenders certain reports pertaining to the Credit Parties' assets for internal use by DIP Agent and DIP Lenders.

**5.7**    **Chapter 11 Milestones**.    Each Credit Party will timely, and will cause each of its Subsidiaries timely to, comply with each Chapter 11 Milestone.

**5.8**    **Compliance with Laws**.    Each Credit Party will, and will cause each of its Subsidiaries to, comply and shall cause all other Persons, if any, on or occupying any Facilities to comply, in each case, in all material respects with the requirements of all applicable laws, rules, regulations and orders of any Governmental Authority (including all Environmental Laws and Terrorism Laws), except in each case such noncompliance in connection with matters described in "first day" pleadings, motions or orders filed or entered in the Bankruptcy Cases and such noncompliance that could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.    Each Credit Party shall promptly take, and shall cause each of its Subsidiaries promptly to take, any and all actions reasonably necessary to make an appropriate response to any Environmental Claim against such Credit Party or any of its Subsidiaries and, except where such obligations are being contested in good faith, discharge any obligations it may have to any Person thereunder, except where failure to do so, individually and in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

**5.9**    **Environmental**.

(a)    Environmental Notices.    Borrower will deliver to DIP Agent and DIP Lenders:

(i)    as soon as reasonably practicable (but, in any event, within three (3) days) following Borrower's Knowledge of the receipt thereof, copies of all material notices or correspondence with respect to any environmental liabilities or obligations concerning any Facility or otherwise relating to any Credit Party or its Subsidiaries that could reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect;

(ii)    as soon as reasonably practicable following Borrower's Knowledge of the submission or receipt thereof, copies of all written notices to any governmental or regulatory agency reporting any Releases of Hazardous Materials, or any submission providing material information concerning such Releases, or from any governmental or regulatory agency concerning liability of the Credit Parties or any of their Subsidiaries for environmental matters at any Facility or with respect to any Environmental Claims against the Credit Parties or any of their Subsidiaries, in each case that could reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect;

(iii)    reasonably prompt written notice after Borrower's Knowledge, describing in reasonable detail (1) any proposed acquisition of stock, assets, or property by the Credit Parties or any of their Subsidiaries that could reasonably be expected to (A) expose the Credit Parties or any of their Subsidiaries to, or result in, Environmental Claims that could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect or (B) affect the ability of Borrower or any other Credit Party to maintain in full force and effect all material Governmental Authorizations required under any Environmental Laws for their respective operations, except as could not reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect and (2) any proposed action to be taken by Borrower or any other Credit Party to modify current operations in a manner that could reasonably be expected to subject the Credit Parties or any of their Subsidiaries to any additional obligations or requirements under any Environmental Laws that could reasonably be expected, individually or in the aggregate, to have a Material Adverse Effect; and

(iv)    with reasonable promptness, such other documents and information as from time to time may be reasonably requested by DIP Agent in relation to any pending matters disclosed pursuant to this Section 5.9(a).

(b)    <u>Hazardous Materials Activities, etc</u>.    Except as otherwise required by the Bankruptcy Code, each Credit Party shall promptly take, and shall cause each of its Subsidiaries to promptly take, any and all actions necessary to (i) cure any violation of applicable Environmental Laws by such Credit Party or Subsidiary that could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, and (ii) make an appropriate response to any Environmental Claim against such Credit Party or Subsidiary and discharge any obligations it may have to any Person thereunder where failure to do so could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

5.10    **Subsidiaries**.  In the event that any Person becomes a Subsidiary of any Credit Party after the Closing Date, (i) to the extent such Person is or becomes a Debtor, cause such Person to become a Guarantor and grantor under Section 7 hereof by executing and delivering to DIP Agent and each DIP Lender a joinder agreement to this Agreement in form and substance satisfactory to the Requisite DIP Lenders, (ii) to the extent such Person is not a Debtor, cause such Person to become (a) a Guarantor under Section 7 hereof by executing and delivering to DIP Agent and each DIP Lender a joinder agreement to this Agreement in form and substance satisfactory to the Requisite DIP Lenders and (b) a grantor by executing and delivering to DIP Agent and each DIP Lender a joinder agreement to the Non-Debtor Security Agreement in form and substance satisfactory to the Requisite DIP Lenders and (iii) take all such actions and execute and deliver, or cause to be executed and delivered, all such documents, instruments, agreements, and certificates as the Requisite DIP Lenders may reasonably require in connection with the foregoing.

5.11    **Bankruptcy Cases**.  The Credit Parties shall obtain entry of the Interim DIP Order and Final DIP Order and obtain the approval of the Bankruptcy Court of this Agreement and the other Credit Documents.

5.12    **Lender Meetings**.  Borrower will, upon the request of the Requisite DIP Lenders, participate in a telephonic meeting or in-person meeting at Borrower's corporate office (if requested by the Requisite DIP Lenders) with DIP Agent and DIP Lenders once during each calendar week at such time as may be mutually and reasonably agreed to by Borrower and the Requisite DIP Lenders.

5.13    **Further Assurances**.  At any time or from time to time upon the reasonable request of the Requisite DIP Lenders, each Credit Party will, and will cause each of its Subsidiaries to, at its expense, promptly execute, acknowledge and deliver such further documents and do such other acts and things as the Requisite DIP Lenders may reasonably request in order to effect fully the purposes of the Credit Documents, including providing DIP Lenders with any information reasonably requested pursuant to Section 10.22.  In furtherance and not in limitation of the foregoing, each Credit Party shall take such actions as the Requisite DIP Lenders may reasonably request from time to time to ensure that the Obligations are guaranteed by the Guarantors and the Liens granted by the Collateral Documents and the DIP Order are perfected to the extent and with the priority required by the Credit Documents and the DIP Order.

5.14    **Use of Proceeds**.  The proceeds of the Loans will be used only in accordance with Section 2.3.

5.15    **Cash Management**.

(a)    Borrower shall cause DIP Agent to open and maintain the Loan Proceeds Account in the manner and for the purposes described in this Agreement**.**

(b)    Each Credit Party shall, and shall cause each of its Subsidiaries to, establish and maintain cash management systems acceptable to the Requisite DIP Lenders, including ensuring that all Deposit Accounts and Securities Accounts of each Credit Party are subject to Control Agreements in form and substance reasonably acceptable to the Requisite DIP Lenders and the DIP Agent, other than zero-balance accounts for the purpose of managing local or franchise disbursements and receipts, or payroll, withholding tax and other fiduciary accounts.

(c)    Debtors shall obtain entry of a cash management order establishing requirements for cash management of the Debtors substantially contemporaneously with entry of the Interim DIP Order, all in form and substance satisfactory to DIP Agent and DIP Lenders in their sole discretion.

5.16    **Accounts Receivable**.  Each Credit Party shall, and shall cause each of its Subsidiaries to, collect all accounts receivable owing from account debtors as they become due and payable in accordance with the applicable trade terms provided therein without any extensions or amendments thereto.

5.17    **Compliance with Budget**.

(a)    The Credit Parties will use Loan proceeds solely to make disbursements for expenditures as provided for in accordance with the Budget (after giving effect to the variances permitted in clause (b) below).

(b)    Together with the budget report contemplated by Section 5.1(d), the Borrower shall deliver to the DIP Agent calculations in a form and with detail reasonably satisfactory to the Requisite DIP Lenders demonstrating that the negative variance of Consolidated Cumulative Net Cash Flow for the relevant Budget Testing Period did not exceed the greater of (i) a $2.5 million net change in cash or (ii) 5% of cumulative actual receipts, in each case, as set forth in the Budget for such Budget Testing Period.  The variances described in this Section 5.17(b) shall be tested on a cumulative basis for the relevant Budget Testing Period.

(c)    No Debtor shall make any disbursement not contemplated by the Budget

(d)    The obligations of Credit Parties under this Section 5.17 are collectively referred to herein as the "Budget Covenant".

5.18    **Master Concentration Account**.  The Borrower shall ensure that all amounts received in respect of accounts receivable owing from account debtors or otherwise shall be transferred to, deposited and maintained in the Master Concentration Account within one Business Day of receipt, and the Borrower shall not withdraw or otherwise transfer such amounts from the Master Concentration Account in a manner prohibited by the Budget; *provided, however*, that (i) receipts received into the deposit account ending in account number x0383 held with Bank of America, N.A. in the name of RMG Development, LLC must be transferred to the Master Concentration Account within ten (10) Business Days of receipt; and (ii) receipts received into the deposit account X6998 held with Wells Fargo Bank, N.A., in the name of the Borrower must be transferred to the Master Concentration Account within six (6) Business Days of receipt.

## SECTION 6.    NEGATIVE COVENANTS

Each Credit Party covenants and agrees that, unless otherwise permitted under the DIP Order, until the indefeasible payment in full in cash of all Loans and other Obligations (other than Remaining Obligations) that are due and payable hereunder, such Credit Party shall perform, and shall cause each of its Subsidiaries to perform, all covenants in this Section 6 (and shall not apply, and shall cause each of its Subsidiaries not to apply, to the Bankruptcy Court for authority to amend, supplement or otherwise modify, or deviate from, any of such covenants in any respect, without the prior written consent of the Requisite DIP Lenders).

**6.1    Indebtedness.**  No Credit Party shall, nor shall it permit any of its Subsidiaries to, directly or indirectly, create, incur, assume or guaranty, or otherwise become or remain directly or indirectly liable with respect to any Indebtedness, except:

(a)    the Obligations;

(b)    Indebtedness which may be deemed to exist pursuant to any guaranties, performance, surety, statutory, appeal, bid or similar obligations or obligations in respect of letters of credit, bank guaranties or similar instruments related thereto, in each case incurred in the ordinary course of business;

(c)    Indebtedness in respect of netting services, overdraft protections and similar arrangements and related liabilities arising from treasury, depository and cash management services or any automated clearing house transfers of funds in the ordinary course of business;

(d)    Indebtedness incurred by Borrower or any other Credit Party in respect of bank guarantees, bankers' acceptances or similar instruments issued or created in the ordinary course of business, including in respect of workers compensation claims, health, disability or other employee benefits or property, casualty or liability insurance or self-insurance or other Indebtedness with respect to reimbursement-type obligations regarding workers compensation claims; *provided*, that any reimbursement obligations in respect thereof are reimbursed within 30 days following the incurrence thereof;

(e)    Guarantees by Borrower or any other Credit Party of Indebtedness of any Credit Party to the extent such Indebtedness is permitted under this Section 6.1 and such Guarantee is permitted under Section 6.6; and

(f)    Indebtedness existing on the Closing Date and described in Schedule 6.1.

**6.2    Liens.**  No Credit Party shall, nor shall it permit any of its Subsidiaries to, directly or indirectly, create, incur, assume or permit to exist any Lien on or with respect to any property or asset of any kind (including any document or instrument in respect of goods or accounts receivable and any Security) of Borrower or any other Credit Party, whether now owned or hereafter acquired, or any income or profits therefrom, except:

(a)    Liens in favor of DIP Agent for the benefit of Secured Parties granted pursuant to any Credit Document;

(b)    Liens for Taxes which are not overdue for a period of more than thirty (30) days or which are being contested in good faith by appropriate proceedings diligently conducted, including in connection with the Bankruptcy Cases, so long as reserves, if any, to the extent required by GAAP shall have been made for any such contested amounts, or for Taxes not yet due and payable;

(c)        statutory Liens of landlords, banks (and rights of set off), of carriers, warehousemen, mechanics, repairmen, workmen and materialmen, suppliers, construction contractors and other like Liens, in each case incurred in the ordinary course of business (i) for amounts not overdue for a period of more than thirty (30) days or (ii) that are being contested in good faith by appropriate proceedings, including in connection with the Bankruptcy Cases, so long as reserves, if any, to the extent required by GAAP shall have been made for any such contested amounts;

(d)        Liens existing on the Closing Date and described in Schedule 6.2; *provided*, that the priority of such Liens shall be as described in the DIP Orders; and

(e)        bankers' Liens (i) relating to (A) Indebtedness in respect of netting services, overdraft protections and similar arrangements and related liabilities arising from treasury, depository and cash management services or any automated clearing house transfers of funds incurred in the ordinary course of business or  (B) the establishment of depository relations with banks not given in connection with the issuance of Indebtedness, and (ii) relating to pooled deposit or sweep accounts of Borrower or any other Credit Party to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business**.**

**6.3        No Further Negative Pledges**.  No Credit Party shall, nor shall it permit any of its Subsidiaries to, enter into any agreement prohibiting the creation or assumption of any Lien upon any of its properties or assets, whether now owned or hereafter acquired, to secure the Obligations, except prohibitions or restrictions existing under or by reason of this Agreement, the other Credit Documents or the DIP Orders.

**6.4        Restricted Junior Payments**.  Unless expressly permitted in the DIP Order or, with prior written consent of the Requisite DIP Lenders (in their sole discretion), any other order by the Bankruptcy Court, no Credit Party shall, nor shall it permit any of its Subsidiaries to, directly or indirectly, declare, order, pay, make or set apart any Restricted Junior Payment.

**6.5        Restrictions on Subsidiary Distributions**.  No Credit Party shall, nor shall it permit any of its Subsidiaries to, create or otherwise cause or suffer to exist or become effective any consensual encumbrance or restriction of any kind on the ability of any Subsidiary of Borrower to (a) pay dividends or make any other distributions on any of such Subsidiary's Capital Stock owned by Borrower or any other Subsidiary of Borrower, (b) repay or prepay any Indebtedness owed by such Subsidiary to Borrower or any other Subsidiary of Borrower, (c) make loans or advances to Borrower or any other Subsidiary of Borrower, or (d) transfer, lease or license any of its property or assets to Borrower or any other Subsidiary of Borrower other than restrictions described on Schedule 6.5.

**6.6        Investments**.  No Credit Party shall, nor shall it permit any of its Subsidiaries to, directly or indirectly, make or own any Investment in any Person, including without limitation any Joint Venture, except:

(a)        Investments in cash and Cash Equivalents;

(b)        Investments by Borrower or any other Credit Party in any Credit Party;

(c)        Investments (i) consisting of extensions of credit in the nature of accounts receivable or notes receivable arising from the grant of trade credit in the ordinary course of business and consistent with past practice, and (ii) constituting deposits, prepayments and other credits to suppliers made in the ordinary course of business and consistent with past practice; and

(d)        Investments existing on the Closing Date and set forth on Schedule 6.6.

**6.7        [Reserved]**.

**6.8        Fundamental Changes; Disposition of Assets, Acquisitions**.  No Credit Party shall, nor shall it permit any of its Subsidiaries to, enter into any transaction of merger or consolidation, or liquidate, wind up or dissolve itself (or suffer any liquidation or dissolution), or convey, sell, lease or sublease (as lessor or sublessor), exchange, transfer or otherwise dispose of, in one transaction or a series of transactions, all or any part of its business, assets or property of any kind whatsoever, whether real, personal or mixed and whether tangible or intangible, whether now owned or hereafter acquired, and no Subsidiary of Borrower shall issue or sell or enter into an agreement to issue or sell, its Capital Stock, except:

(a)        any Subsidiary of Borrower (other than Borrower) may be merged with or into Borrower or any Guarantor, or be liquidated, wound up or dissolved, or all or any part of its business, property or assets may be conveyed, sold, leased, subleased, transferred or otherwise disposed of, in one transaction or a series of transactions, to Borrower or any Guarantor; *provided*, that, in the case of such a merger, such Borrower or such Guarantor, as applicable, shall be the continuing or surviving Person;

(b)        sales, transfers or other dispositions of assets made to any Credit Party;

(c)        sales or other dispositions of (i) inventory in the ordinary course of business or (ii) accounts receivable in connection with the collection or compromise thereof in the ordinary course of business;

(d)        sales of liquor licenses or surplus assets at any restaurant location at which the Credit Parties have terminated operations; *provided*, that the proceeds of any such sales ("**Restaurant Wind-Down Proceeds**") shall (i) constitute Collateral and (ii) the Net Asset Sale Proceeds thereof shall be applied by the Borrower to repay the Obligations as set forth in Section 2.10(a);

(e)        a sale or sales pursuant to Section 363 of the Bankruptcy Code the proceeds of which indefeasibly pay in full the Obligations in cash and provide a full release of the DIP Agent and the DIP Lenders on terms satisfactory to the DIP Agent and the Requisite DIP Lenders; and

(f)        conveyances or assignments of intellectual property and other related property in the ordinary course of business in connection with the entry into new franchise agreements, which agreements shall be on terms and conditions consistent with the Credit Parties' historical franchise agreements.

**6.9        Disposal of Subsidiary Interests**.  No Credit Party shall, nor shall it permit any of its Subsidiaries to, directly or indirectly sell or otherwise dispose of any Capital Stock of any of its Subsidiaries, except to another Credit Party (subject to the restrictions on such disposition otherwise imposed hereunder and excluding the Capital Stock of Borrower) or in connection with a sale or sales permitted by Section 6.8(d).

**6.10        Sales and Lease Backs**.  No Credit Party shall, nor shall it permit any of its Subsidiaries to, directly or indirectly, become or remain liable as lessee or as a guarantor or other surety with respect to any lease of any property (whether real, personal or mixed), whether now owned or hereafter acquired, which such Credit Party (a) has sold or transferred or is to sell or to transfer to any other Person (other than Borrower or any other Credit Party) or (b) intends to use for substantially the same purpose as any other property which has been or is to be sold or transferred by such Credit Party to any Person (other than Borrower or any other Credit Party), in each case in connection with such lease.

**6.11    Transactions with Shareholders and Affiliates**.  No Credit Party shall, nor shall it permit any of its Subsidiaries to, directly or indirectly, enter into or permit to exist any transaction (including the purchase, sale, lease or exchange of any property or the rendering of any service) with any Affiliate of Borrower other than a Credit Party.

**6.12    Conduct of Business**.  From and after the Closing Date, no Credit Party shall, nor shall it permit any of its Subsidiaries to, engage in any business substantially different from those lines of the business engaged in by the Credit Parties on the Closing Date, and businesses reasonably related, ancillary or complementary thereto.

**6.13    Fiscal Year**.  No Credit Party shall, nor shall it permit any of its Subsidiaries to, change its Fiscal Year end from December 31.

**6.14    Amendments to Organizational Agreements**.  No Credit Party shall, nor shall it permit any of its Subsidiaries to, amend, restate, supplement or otherwise modify, or permit any amendments, restatements, supplements or other modifications, to any Credit Party's Organizational Documents in a manner that could reasonably be expected to be adverse to the interests of DIP Lenders.

**6.15    Issuance of Disqualified Capital Stock**.  No Credit Party shall, nor shall it permit any of its Subsidiaries to, issue or sell, or enter into any agreement or arrangement for the issuance or sale of, any Disqualified Capital Stock, any securities convertible into or exchangeable for Disqualified Capital Stock, or any warrants, options or other rights for the purchase or acquisition of shares of Disqualified Capital Stock.

**6.16    Prohibited Conduct**.  Without the prior written consent of the Requisite DIP Lenders, no Credit Party shall, nor shall it permit any of its Subsidiaries to, do any of the following:

(a)    file any pleading relating to the DIP Facility that is not satisfactory to the Requisite DIP Lenders;

(b)    object to or contest the validity or enforceability of the DIP Order, any Liens granted to the DIP Agent and DIP Lenders therein, or any terms of the Credit Documents or cooperate with any party with respect to such an objection or contest;

(c)    assert or prosecute any claim or cause of action against any of the DIP Agent or DIP Lenders or any affiliate thereof or cooperate with any party with respect to any such claim or cause of action;

(d)    seek to modify any of the rights granted under the DIP Order to any of DIP Agent or DIP Lenders, or seek (without the consent of the Requisite DIP Lenders (in their sole discretion)) approval of (or entry of an order by the Bankruptcy Court approving) adequate protection payments (other than Permitted Adequate Protection Payments) to any Person;

(e)    make any payment in settlement or satisfaction of any prepetition or administrative claim, unless provided for in the Budget in pro forma compliance with the Budget Covenant and, with respect to the payment of any prepetition claim or non-ordinary course administration claim, separately approved by the Bankruptcy Court;

(f)    subject to the terms of the DIP Order, object to, contest, delay, prevent or interfere with in any way the lawful exercise of rights and remedies by DIP Agent or DIP Lenders with respect to the Collateral following the occurrence of an Event of Default (provided that Debtors (i) may contest or

dispute whether an Event of Default has occurred and (ii) shall be entitled to any notice provisions provided in the DIP Order);

(g)    except as expressly provided or permitted hereunder (including, without limitation, to the extent expressly identified in any line item in the Budget) or any other order by the Bankruptcy Court, make any payment or distribution to any non-Debtor Affiliate, holder of Capital Stock or insider of any Debtor outside of the ordinary course of business (provided that in no event shall any management or consulting fees be paid to any Affiliate of the Debtors);

(h)    incur, create, assume, suffer to exist or permit any administrative expense, unsecured claim, or other superpriority claim or Lien which is pari passu with or senior to the claims of the Secured Parties against the Credit Parties hereunder, or apply to the Bankruptcy Court for authority to do so, except for the Carve-Out and as permitted by the terms of the DIP Order; or

(i)    unless provided for in the Budget or in connection with a sale or sales permitted under Section 6.8(d), seek authority to consummate a sale of assets of any Debtor or the Collateral in one or a series of related transactions having a fair market value in excess of $25,000 outside the ordinary course of business or as otherwise permitted pursuant to Section 6.8 hereof.

6.17    **Additional Restrictions on the Credit Parties**. Without the prior consent of the Requisite DIP Lenders, no Credit Party shall, nor shall it permit any of its Subsidiaries to:

(a)    (i) enter into any contract, term sheet, letter of intent or similar agreement for the actual or proposed sale, lease or disposition of any material assets in excess of $25,000 outside the ordinary course of business or as otherwise permitted pursuant to Section 6.8 hereof, (ii) enter into any material contract with any third party, except as otherwise permitted pursuant to the terms of this Agreement or with the consent of the Requisite DIP Lenders or (iii) file any pleading with the Bankruptcy Court seeking authority to do any of the foregoing, unless, in each case, such transaction, if consummated, would result in the DIP Facility being indefeasibly paid in full in cash on or before consummation;

(b)    (i) pay any management, consulting or similar fees to executives, directors, officers or shareholders of any Credit Party by direct payment or otherwise or (ii) enter into any employment or consulting agreements, or assume any existing contracts, with current management, shareholders or directors of Borrower or its Affiliates;

(c)    make any adequate protection payments (other than Permitted Adequate Protection Payments);

(d)    enter into any key employee retention plan, key employee incentive program, pay any bonuses or severance to any employees, or increase the salary of any employee;

(e)    create any new Subsidiaries;

(f)    assume or reject any lease or executory contract (other than leases and executory contracts designated in the Acceptable Plan) (such consent of the Requisite DIP Lenders not to be unreasonably withheld or delayed); and

(g)    make any payments on account of any creditor's claims incurred prior to the Petition Date, other than "critical vendor" payments approved by the Bankruptcy Court and provided in the Budget.

**SECTION 7.    GUARANTY BY GUARANTORS; SECURITY AGREEMENT BY CREDIT PARTIES**

**7.1    Guaranty of the Obligations**.  Subject to the provisions of Section 7.2, the Guarantors jointly and severally hereby irrevocably and unconditionally guaranty to DIP Agent for the ratable benefit of the Beneficiaries the due and punctual indefeasible payment in full in cash of all Obligations when the same shall become due, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise (including amounts that would become due but for the operation of the automatic stay under Section 362(a) of the Bankruptcy Code, 11 U.S.C. §362(a)) (collectively, the "**Guaranteed Obligations**").

**7.2    Contribution by Guarantors**.  All Guarantors desire to allocate among themselves (collectively, the "**Contributing Guarantors**"), in a fair and equitable manner, their obligations arising under this Guaranty.  Accordingly, in the event any payment or distribution is made on any date by a Guarantor (a "**Funding Guarantor**") under this Guaranty such that its Aggregate Payments exceeds its Fair Share as of such date, such Funding Guarantor shall be entitled to a contribution from each of the other Contributing Guarantors in an amount sufficient to cause each Contributing Guarantor's Aggregate Payments to equal its Fair Share as of such date.  "**Fair Share**" means, with respect to a Contributing Guarantor as of any date of determination, an amount equal to (a) the ratio of (i) the Fair Share Contribution Amount with respect to such Contributing Guarantor, to (ii) the aggregate of the Fair Share Contribution Amounts with respect to all Contributing Guarantors, multiplied by (b) the aggregate amount paid or distributed on or before such date by all Funding Guarantors under this Guaranty in respect of the obligations guaranteed.  "Fair Share Contribution Amount" means, with respect to a Contributing Guarantor as of any date of determination, the maximum aggregate amount of the obligations of such Contributing Guarantor under this Guaranty that would not render its obligations hereunder or thereunder subject to avoidance as a fraudulent transfer or conveyance under Section 548 of the Bankruptcy Code or any comparable applicable provisions of state law; *provided*, that solely for purposes of calculating the Fair Share Contribution Amount with respect to any Contributing Guarantor for purposes of this Section 7.2, any assets or liabilities of such Contributing Guarantor arising by virtue of any rights to subrogation, reimbursement or indemnification or any rights to or obligations of contribution hereunder shall not be considered as assets or liabilities of such Contributing Guarantor.  "Aggregate Payments" means, with respect to a Contributing Guarantor as of any date of determination, an amount equal to (1) the aggregate amount of all payments and distributions made on or before such date by such Contributing Guarantor in respect of this Guaranty (including in respect of this Section 7.2), minus (2) the aggregate amount of all payments received on or before such date by such Contributing Guarantor from the other Contributing Guarantors as contributions under this Section 7.2.  The amounts payable as contributions hereunder shall be determined as of the date on which the related payment or distribution is made by the applicable Funding Guarantor.  The allocation among Contributing Guarantors of their obligations as set forth in this Section 7.2 shall not be construed in any way to limit the liability of any Contributing Guarantor hereunder. Each Guarantor is a third party beneficiary to the contribution agreement set forth in this Section 7.2.

**7.3    Payment by Guarantors**.  Subject to Section 7.2, Guarantors hereby jointly and severally agree, in furtherance of the foregoing and not in limitation of any other right which any Beneficiary may have at law or in equity against any Guarantor by virtue hereof, that upon the failure of Borrower to pay any of the Guaranteed Obligations when and as the same shall become due, whether at stated maturity, by required prepayment, declaration, acceleration, demand or otherwise (including amounts that would become due but for the operation of the automatic stay under Section 362(a) of the Bankruptcy Code, 11 U.S.C. §362(a)), Guarantors will upon demand pay, or cause to be paid, in cash, to DIP Agent for the ratable benefit of Beneficiaries, an amount equal to the sum of the unpaid principal amount of all Guaranteed Obligations then due as aforesaid, accrued and unpaid interest on such Guaranteed Obligations (including interest which, but for Borrower's becoming the subject of a case under the Bankruptcy Code,

would have accrued on such Guaranteed Obligations, whether or not a claim is allowed against such Borrower for such interest in the related bankruptcy case) and all other Guaranteed Obligations then owed to Beneficiaries as aforesaid.

  **7.4  Liability of Guarantors Absolute**.  To the fullest extent permitted by applicable law, each Guarantor agrees that its obligations hereunder are irrevocable, absolute, independent and unconditional and shall not be affected by any circumstance which constitutes a legal or equitable discharge of a guarantor or surety other than indefeasible payment in full or performance of the Guaranteed Obligations.   In furtherance of the foregoing and without limiting the generality thereof, each Guarantor agrees as follows:

    (a)  this Guaranty is a guaranty of payment when due and not of collectability.  This Guaranty is a primary obligation of each Guarantor and not merely a contract of surety;

    (b)  DIP Agent, at the request of the Requisite DIP Lenders shall enforce this Guaranty upon the occurrence of an Event of Default notwithstanding the existence of any dispute between Borrower and any Beneficiary with respect to the existence of such Event of Default;

    (c)  the obligations of each Guarantor hereunder are independent of the obligations of Borrower and the obligations of any other guarantor (including any other Guarantor) of the obligations of Borrower, and a separate action or actions may be brought and prosecuted against such Guarantor whether or not any action is brought against Borrower or any of such other guarantors and whether or not Borrower is joined in any such action or actions;

    (d)  payment by any Guarantor of a portion, but not all, of the Guaranteed Obligations shall in no way limit, affect, modify or abridge any Guarantor's liability for any portion of the Guaranteed Obligations which has not been paid; and without limiting the generality of the foregoing, if DIP Agent or any DIP Lender is awarded a judgment in any suit brought to enforce any Guarantor's covenant to pay a portion of the Guaranteed Obligations, such judgment shall not be deemed to release such Guarantor from its covenant to pay the portion of the Guaranteed Obligations that is not the subject of such suit, and such judgment shall not, except to the extent satisfied by such Guarantor, limit, affect, modify or abridge any other Guarantor's liability hereunder in respect of the Guaranteed Obligations;

    (e)  to the fullest extent permitted by law, each Guarantor shall remain obligated hereunder, without notice or demand and without affecting the validity or enforceability hereof or giving rise to any reduction, limitation, impairment, discharge or termination of any Guarantor's liability hereunder, notwithstanding that from time to time (i) the Guaranteed Obligations may be renewed, extended, accelerated, the rate of interest thereon increased, or the time, place, manner or terms of payment thereof otherwise changed; (ii) the Guaranteed Obligations or any agreement relating thereto may be settled, compromised, released or discharged, or any offer of performance with respect thereto accepted or refused, or substitutions made for, and/or the payment of the same subordinated to the payment of any other obligations; (iii) other guaranties of the Guaranteed Obligations may be requested and accepted and security for the payment hereof or the Guaranteed Obligations may be taken and held; (iv) any security for payment of the Guaranteed Obligations, any other guaranties of the Guaranteed Obligations, or any other obligation of any Person (including any other Guarantor) with respect to the Guaranteed Obligations may be released, surrendered, exchanged, substituted, compromised, settled, rescinded, waived, altered, subordinated or modified, with or without consideration; (v) any security now or hereafter held by or for the benefit of any Beneficiary in respect hereof or the Guaranteed Obligations may be enforced and applied and the order or manner of sale thereof directed, or  any other right or remedy that any Beneficiary may have against any such security may be exercised, in each case as such Beneficiary in its discretion may determine consistent herewith and any applicable security agreement, including foreclosure on any such security pursuant to one or more judicial or nonjudicial sales, whether or not every aspect of any such sale is commercially

reasonable, and even though such action operates to impair or extinguish any right of reimbursement or subrogation or other right or remedy of any Guarantor against Borrower or any security for the Guaranteed Obligations; and (vi) any other rights available to any Beneficiary under the Credit Documents may be exercised; and

(f)     to the fullest extent permitted by applicable law, this Guaranty and the obligations of Guarantors hereunder shall be valid and enforceable and shall not be subject to any reduction, limitation, impairment, discharge or termination for any reason (other than indefeasible payment in full or performance of the Guaranteed Obligations), including the occurrence of any of the following, whether or not any Guarantor shall have had notice or knowledge of any of them: (i) any failure or omission to assert or enforce or agreement or election not to assert or enforce, or the stay or enjoining, by order of court, by operation of law or otherwise, of the exercise or enforcement of, any claim or demand or any right, power or remedy (whether arising under the Credit Documents, at law, in equity or otherwise) with respect to the Guaranteed Obligations or any agreement relating thereto, or with respect to any other guaranty of or security for the payment of the Guaranteed Obligations; (ii) any rescission, waiver, amendment or modification of, or any consent to departure from, any of the terms or provisions (including provisions relating to events of default) hereof, any of the other Credit Documents or any agreement or instrument executed pursuant thereto, or of any other guaranty or security for the Guaranteed Obligations, in each case whether or not in accordance with the terms hereof or such Credit Document or any agreement relating to such other guaranty or security; (iii) the Guaranteed Obligations, or any agreement relating thereto, at any time being found to be illegal, invalid or unenforceable in any respect; (iv) the application of payments received from any source (other than payments received pursuant to the other Credit Documents or from the proceeds of any security for the Guaranteed Obligations, except to the extent such security also serves as collateral for indebtedness other than the Guaranteed Obligations) to the payment of indebtedness other than the Guaranteed Obligations, even though any Beneficiary might have elected to apply such payment to any part or all of the Guaranteed Obligations; (v) any Beneficiary's consent to the change, reorganization or termination of the corporate structure or existence of the Credit Parties or any of their Subsidiaries and to any corresponding restructuring of the Guaranteed Obligations; (vi) any failure to perfect or continue perfection of a security interest in any collateral which secures any of the Guaranteed Obligations; (vii) any defenses, set offs or counterclaims which Borrower may allege or assert against any Beneficiary in respect of the Guaranteed Obligations, including failure of consideration, breach of warranty, payment, statute of frauds, statute of limitations, accord and satisfaction and usury; and (viii) any other act or thing or omission, or delay to do any other act or thing, which may or might in any manner or to any extent vary the risk of any Guarantor as an obligor in respect of the Guaranteed Obligations**.**

**7.5    Waivers by Guarantors**.  To the fullest extent permitted by applicable law, each Guarantor hereby waives, for the benefit of Beneficiaries: (a) any right to require any Beneficiary, as a condition of payment or performance by such Guarantor, to (i) proceed against Borrower, any other guarantor (including any other Guarantor) of the Guaranteed Obligations or any other Person, (ii) proceed against or exhaust any security held from Borrower, any such other guarantor or any other Person, (iii) proceed against or have resort to any balance of any Deposit Account or credit on the books of any Beneficiary in favor of Borrower or any other Person, or (iv) pursue any other remedy in the power of any Beneficiary whatsoever; (b) any defense arising by reason of the incapacity, lack of authority or any disability or other defense of Borrower or any other Guarantor including any defense based on or arising out of the lack of validity or the unenforceability of the Guaranteed Obligations or any agreement or instrument relating thereto or by reason of the cessation of the liability of Borrower or any other Guarantor from any cause other than payment in full of the Guaranteed Obligations; (c) any defense based upon any statute or rule of law which provides that the obligation of a surety must be neither larger in amount nor in other respects more burdensome than that of the principal; (d) any defense based upon any Beneficiary's errors or omissions in the administration of the Guaranteed Obligations, except behavior which amounts to bad faith; (e) (i) any principles or provisions of law, statutory or otherwise, which are or might be in conflict

with the terms hereof and any legal or equitable discharge of such Guarantor's obligations hereunder, (ii) the benefit of any statute of limitations affecting such Guarantor's liability hereunder or the enforcement hereof, (iii) any rights to set offs, recoupments and counterclaims (other than a defense of payment or performance of the Guaranteed Obligations) and (iv) promptness, diligence and any requirement that any Beneficiary protect, secure, perfect or insure any security interest or lien or any property subject thereto; (f) notices, demands, presentments, protests, notices of protest, notices of dishonor and notices of any action or inaction, including acceptance hereof, notices of default hereunder or any agreement or instrument related thereto, notices of any renewal, extension or modification of the Guaranteed Obligations or any agreement related thereto, notices of any extension of credit to Borrower and notices of any of the matters referred to in Section 7.4 and any right to consent to any thereof; and (g) any defenses or benefits that may be derived from or afforded by law which limit the liability of or exonerate guarantors or sureties, or which may conflict with the terms hereof.

   **7.6    Guarantors' Rights of Subrogation, Contribution, etc**.   Until the Guaranteed Obligations (other than the Remaining Obligations) shall have been indefeasibly paid in full, each Guarantor hereby agrees not to assert any claim, right or remedy, direct or indirect, that such Guarantor now has or may hereafter have against Borrower or any other Guarantor or any of its assets in connection with this Guaranty or the performance by such Guarantor of its obligations hereunder, in each case whether such claim, right or remedy arises in equity, under contract, by statute, under common law or otherwise and including without limitation (a) any right of subrogation, reimbursement or indemnification that such Guarantor now has or may hereafter have against Borrower with respect to the Guaranteed Obligations, (b) any right to enforce, or to participate in, any claim, right or remedy that any Beneficiary now has or may hereafter have against Borrower, and (c) any benefit of, and any right to participate in, any collateral or security now or hereafter held by any Beneficiary.   In addition, until the Guaranteed Obligations (other than the Remaining Obligations) shall have been indefeasibly paid in full, each Guarantor shall withhold exercise of any right of contribution such Guarantor may have against any other guarantor (including any other Guarantor) of the Guaranteed Obligations, including any such right of contribution as contemplated by Section 7.2. Each Guarantor further agrees that, to the extent the agreement to withhold the exercise of its rights of subrogation, reimbursement, indemnification and contribution as set forth herein is found by a court of competent jurisdiction to be void or voidable for any reason, any rights of subrogation, reimbursement or indemnification such Guarantor may have against Borrower or against any collateral or security, and any rights of contribution such Guarantor may have against any such other guarantor, shall be junior and subordinate to any rights any Beneficiary may have against Borrower, to all right, title and interest any Beneficiary may have in any such collateral or security, and to any right any Beneficiary may have against such other guarantor.   If any amount shall be paid to any Guarantor on account of any such subrogation, reimbursement, indemnification or contribution rights at any time when all Guaranteed Obligations shall not have been indefeasibly paid in full, such amount shall be held in trust for DIP Agent on behalf of Beneficiaries and shall forthwith be paid over to DIP Agent for the benefit of Beneficiaries to be credited and applied against the Guaranteed Obligations, whether matured or unmatured, in accordance with the terms hereof.

   **7.7    Subordination of Other Obligations**.   Any Indebtedness of Borrower or any Guarantor now or hereafter held by any Guarantor (the "**Obligee Guarantor**") is hereby subordinated in right of payment to the Guaranteed Obligations, and any such indebtedness collected or received by the Obligee Guarantor after an Event of Default has occurred and is continuing shall be held in trust for DIP Agent on behalf of Beneficiaries and shall forthwith be paid over to DIP Agent for the benefit of Beneficiaries to be credited and applied against the Guaranteed Obligations but without affecting, impairing or limiting in any manner the liability of the Obligee Guarantor under any other provision hereof.

   **7.8    Continuing Guaranty**.   This Guaranty is a continuing guaranty and shall remain in effect until all of the Guaranteed Obligations (other than the Remaining Obligations) shall have been indefeasibly

paid in full. Each Guarantor hereby irrevocably waives any right to revoke this Guaranty as to future transactions giving rise to any Guaranteed Obligations.

**7.9    Authority of Guarantors or Borrower**.  It is not necessary for any Beneficiary to inquire into the capacity or powers of any Guarantor or Borrower or the officers, directors or any agents acting or purporting to act on behalf of any of them.

**7.10    Financial Condition of Borrower**.  Any Credit Extension may be made to Borrower or continued from time to time without notice to or authorization from any Guarantor regardless of the financial or other condition of Borrower at the time of any such grant or continuation.  No Beneficiary shall have any obligation to disclose or discuss with any Guarantor its assessment, or any Guarantor's assessment, of the financial condition of Borrower.  Each Guarantor has adequate means to obtain information from Borrower on a continuing basis concerning the financial condition of such Borrower and its ability to perform its obligations under the Credit Documents, and each Guarantor assumes the responsibility for being and keeping informed of the financial condition of Borrower and of all circumstances bearing upon the risk of nonpayment of the Guaranteed Obligations.  Each Guarantor hereby waives and relinquishes any duty on the part of any Beneficiary to disclose any matter, fact or thing relating to the business, operations or conditions of Borrower, now known or hereafter known by any Beneficiary.

**7.11    Bankruptcy, etc**.

(a)    The obligations of Guarantors hereunder shall not be reduced, limited, impaired, discharged, deferred, suspended or terminated by any case or proceeding, voluntary or involuntary, involving the bankruptcy, insolvency, receivership, reorganization, liquidation or arrangement of Borrower or any other Guarantor or by any defense which Borrower or any other Guarantor may have by reason of the order, decree or decision of any court or administrative body resulting from any such proceeding**.**

(b)    Each Guarantor acknowledges and agrees that any interest on any portion of the Guaranteed Obligations which accrues after the commencement of any case or proceeding referred to in clause (a) above (or, if interest on any portion of the Guaranteed Obligations ceases to accrue by operation of law by reason of the commencement of such case or proceeding, such interest as would have accrued on such portion of the Guaranteed Obligations if such case or proceeding had not been commenced) shall be included in the Guaranteed Obligations because it is the intention of Guarantors and Beneficiaries that the Guaranteed Obligations which are guaranteed by Guarantors pursuant hereto should be determined without regard to any rule of law or order which may relieve Borrower of any portion of such Guaranteed Obligations.  Guarantors will permit any trustee in bankruptcy, receiver, debtor in possession, assignee for the benefit of creditors or similar person to pay DIP Agent, or allow the claim of DIP Agent in respect of, any such interest accruing after the date on which such case or proceeding is commenced.

(c)    In the event that all or any portion of the Guaranteed Obligations are paid by Borrower, the obligations of Guarantors hereunder shall continue and remain in full force and effect or be reinstated, as the case may be, in the event that all or any part of such payment(s) are rescinded or recovered directly or indirectly from any Beneficiary as a preference, fraudulent transfer or otherwise, and any such payments which are so rescinded or recovered shall constitute Guaranteed Obligations for all purposes hereunder**.**

**7.12    Discharge of Guaranty Upon Sale of Guarantor**.  If all of the Capital Stock of any Guarantor or any of its successors in interest hereunder shall be sold or otherwise disposed of (including by merger or consolidation) in accordance with the terms and conditions hereof, the Guaranty of such Guarantor or such successor in interest, as the case may be, hereunder shall automatically be discharged

and released without any further action by any Beneficiary or any other Person effective as of the time of such Asset Sale.

**7.13    Taxes**.  The provisions of Section 2.16 shall apply, *mutatis mutandis*, to the Guarantors and payments thereby.

**7.14    Grant of Security Interest**.  As security for the full and timely payment and performance of all of the Obligations, each Credit Party hereby assigns, pledges, transfers and grants to DIP Agent, for the benefit of Secured Parties, pursuant to Sections 364(c) and 364(d) of the Bankruptcy Code, as delineated in the DIP Orders, perfected security interests in and to, and Liens on, all currently existing or hereafter acquired or arising real and personal property, including but not limited to:

(a)    the Loan Proceeds Account, all accounts, chattel paper, Deposit Accounts, documents (as defined in the UCC), equipment, general intangibles, Intellectual Property, instruments, Insurance, inventory, investment property (including, without limitation, the Pledged Investment Property (including, without limitation, such property set forth in Schedule 7.14(a))), letter-of-credit rights, money (as defined in the UCC) and any supporting obligations related thereto;

(b)    all commercial tort claims (including, without limitation, those identified in Schedule 7.14(b));

(c)    all books and records pertaining to the Collateral;

(d)    all property of such Credit Party held by any Secured Party, including all property of every description, in the custody of or in transit to such Secured Party for any purpose, including safekeeping, collection or pledge, for the account of such Credit Party or as to which such Credit Party may have any right or power, including but not limited to cash;

(e)    all other goods (including but not limited to fixtures) and personal property of such Credit Party, whether tangible or intangible and wherever located;

(f)    all Real Estate Assets;

(g)    the proceeds of all Avoidance Actions; and

(h)    to the extent not otherwise included, all proceeds of the foregoing.

The Collateral shall not include any Excluded Assets but shall include all proceeds of Excluded Assets.

**7.15    No Additional Perfection Steps Required**.  Upon entry of the DIP Order and pursuant to its terms, all Liens granted by the Debtors in favor of Secured Parties shall be valid, binding, enforceable and perfected Liens in the Collateral with the priority set forth in the DIP Orders, and none of DIP Agent or any DIP Lender shall be required to file any financing statements, mortgages, notices of Lien or similar instruments in any jurisdiction or filing office, enter into any control agreements, or to take any other action in order to validate or perfect the Liens granted by Credit Parties to Secured Parties pursuant to the Credit Documents or the DIP Order.  Without in any way suggesting that the entry of the DIP Order is not sufficient for such purpose, each Credit Party irrevocably and unconditionally authorizes DIP Agent (or its agent) to file at any time and from time to time such financing statements with respect to the Collateral naming DIP Agent, for the benefit of Secured Parties, as secured party and such Credit Party as debtor, as the Requisite DIP Lenders may require, and including any other information with respect to such Credit Party or otherwise required by part 5 of Article 9 of the UCC, or otherwise, as the Requisite DIP Lenders may

determine, together with any amendment and continuations with respect thereto, which authorization shall apply to all financing statements filed on, prior to or after the Closing Date. Each Credit Party hereby ratifies and approves all financing statements naming DIP Agent, for the benefit of Secured Party, as secured party and such Credit Party as debtor with respect to the Collateral (and any amendments with respect to such financing statements) filed by or on behalf of DIP Agent prior to the Closing Date and ratifies and confirms the authorization of DIP Agent to file such financing statements (and amendments, if any). Without in any way suggesting that the entry of the DIP Order is not sufficient for such purpose, each Credit Party shall take any other actions necessary or as reasonably requested by DIP Agent or the Requisite DIP Lenders from time to time to cause the attachment, perfection and priority of, and the ability of DIP Agent to enforce, any Liens of Secured Parties in any and all of the Collateral, including the filing of a financing statement, mortgage or the taking of delivery or control or by appropriate filings with the United States Patent and Trademark Office or United States Copyright Office, in accordance with the laws and regulations of the United States of America and its political subdivisions, or otherwise.

**7.16    Administrative Priority**.  Subject to the proviso below, pursuant to Section 364(c)(1) of the Bankruptcy Code, each Credit Party agrees that the Obligations shall constitute allowed superpriority administrative expenses in the Bankruptcy Cases having priority over all administrative expenses and unsecured claims against such Credit Party now existing or hereafter arising, of any kind or nature whatsoever, including all administrative expenses of the kind specified in Sections 503(b) and 507(b) of the Bankruptcy Code; *provided*, however, that such allowed superpriority administrative expenses of Secured Parties shall be subject to the Carve-Out.

## SECTION 8.    EVENTS OF DEFAULT

**8.1    Events of Default**.  If any one or more of the following conditions or events shall occur:

(a)    <u>Failure to Make Payments When Due</u>.  Failure by (A) Borrower to pay when due (i) any installment of principal of any Loan, whether at stated maturity, by acceleration, by notice of voluntary prepayment, by mandatory prepayment or otherwise or (ii) any interest on any Loan or any fee or any other amount due hereunder within three (3) Business Days of the due date therefor; or (B) any Credit Party to pay when due any amount due hereunder within three (3) Business Days of the due date therefor; or

(b)    <u>Breach of Certain Covenants</u>.  Failure of any Credit Party to perform or comply with any term or condition contained in Section 5.2(i) (with respect to the Credit Parties), Section 5.7, Section 5.11, Section 5.12, Section 5.15(b), Section 5.16, Section 5.17 or Section 6; or

(c)    <u>Failure to Comply with Credit Documents or DIP Order</u>.  Failure of any Credit Party to perform (or cause the performance of, as applicable) any term, provision, condition, covenant or obligation contained herein or any other Credit Document, other than any such term specifically referred to in any other clause of this Section 8.1 or the DIP Order, and such failure shall continue unremedied for a period of ten (10) calendar days after written notice is given to such Credit Party; *provided* that the foregoing grace period shall not apply to any breach or failure by such Credit Party to comply with any deadline set forth herein, any other Credit Document or the DIP Order (unless the provision setting forth such deadline contains a grace period or provides for the extension of such deadline, in which case the grace period or the extension, if exercised, set forth therein shall apply); or

(d)    <u>Invalidity of Liens or Super-Priority Claim</u>.  Any Lien granted by any Credit Party in any of the Collateral hereunder or under any other Credit Document or any Super-Priority Claim (as defined in the DIP Orders) shall have ceased to have the validity, perfection or priority set forth herein, the other Credit Documents or the DIP Order; or

(e)      Breach of Representations, etc.  Any representation, warranty, certification or other statement made or deemed made to the DIP Agent or DIP Lender by any Credit Party in any Credit Document or in any statement or certificate at any time given by any Credit Party or any of its Subsidiaries in writing pursuant hereto or thereto or in connection herewith or therewith shall be false in any material respect as of the date made or deemed made; or

(f)      Order Modifying Automatic Stay.  Any order shall have been entered by the Bankruptcy Court granting any relief from or modifying the automatic stay to allow any creditor to execute upon or enforce a Lien in any Credit Party's asset or assets with a combined fair market value in excess of $50,000 (unless the Requisite DIP Lenders shall have granted prior written consent to such relief or such relief consists solely of insurance proceeds payable to such creditor); or

(g)      Reversal or Modification of DIP Order; Change of Venue.  A reversal, vacatur, stay, amendment, supplementation or other modification (without the prior written consent of the Requisite DIP Lenders and DIP Agent) of the DIP Order shall have occurred, or an order providing for a change in venue with respect to the Bankruptcy Cases shall have been entered (without the prior written consent of the Requisite DIP Lenders (in their sole discretion); or

(h)      Dismissal of Bankruptcy Cases, etc.  An order shall have been entered by the Bankruptcy Court (i) dismissing the Bankruptcy Cases, (ii) converting any of the Bankruptcy Cases to a chapter 7 case or (iii) appointing a chapter 11 trustee or an examiner or responsible officer for the operation of Debtors' business (in any such case, with expanded powers relating to such operation); or

(i)      Claims, Judgments and Attachments.  There is entered against any Credit Party or any of its Subsidiaries a judgment or order for the payment of money in an aggregate amount for all such judgments and orders exceeding $50,000 (to the extent due and payable and not covered by a solvent and unaffiliated third-party insurance as to which the insurer has been notified of such judgment or order and has not disputed coverage) and such judgments or orders shall not have been vacated, discharged or stayed; or

(j)      Exclusivity.  The exclusive period that the Credit Parties have to file a plan of reorganization under the Bankruptcy Cases shall terminate or be otherwise lifted (except to the extent allowing the Initial DIP Lender to file a plan), and any Debtor shall have proposed, supported or failed to contest such action; or

(k)      Challenges.  Any Credit Party shall challenge, support or encourage a challenge of any payments made to the DIP Agent or any DIP Lender with respect to the Obligations; or

(l)      Avoidance; Disgorgement; etc.  The Bankruptcy Court shall (i) enter an order avoiding or requiring disgorgement by the DIP Lenders of any amounts received in respect of the Obligations, (ii) enter an order authorizing or directing payment of any claim or claims under Section 506(c) or 552(b) of the Bankruptcy Code against or with respect to any of the Collateral or (iii) enter an order requiring the marshaling of any Collateral or precluding the attachment of Liens securing the Obligations to post-petition property based on the "equities of the case" under Section 552(b) of the Bankruptcy Code; or

(m)      Superpriority Status.  The entry of an order in any of the Bankruptcy Cases granting any other superpriority administrative claim or Lien equal or superior to that granted to DIP Agent, on behalf of itself and DIP Lenders (other than the Carve-Out and as permitted by the terms of the DIP Order), or any Credit Party shall file any pleading requesting such relief (without the prior written consent

of the Requisite DIP Lenders) unless such pleading is in respect of a transaction that would indefeasibly repay all Obligations in full in cash on or prior to the date of incurrence of any such claim or Lien; or

(n)     Guaranties, Collateral Documents and other Credit Documents.  At any time after the execution and delivery thereof, (i) the Guaranty for any reason, other than the satisfaction in full of all Obligations, shall cease to be in full force and effect (other than in accordance with its terms) or shall be declared to be null and void or any Guarantor shall repudiate in writing its obligations thereunder, (ii) this Agreement or any Collateral Document ceases to be in full force and effect (other than by reason of a release of Collateral in accordance with the terms hereof or thereof or the satisfaction in full of the Obligations in accordance with the terms hereof) or shall be declared null and void, in the case of each of clauses (i) and (ii) above, for any reason other than any action of DIP Agent or the failure of DIP Agent to take any action within its control, or (iii) any Credit Party shall contest the validity or enforceability of any Credit Document in writing or deny in writing that it has any further liability under any Credit Document to which it is a party (other than as a result of payment in full of the Obligations); or

(o)     Adverse Plan of Reorganization.  Any Debtor shall file, propose, support or fail to contest a chapter 11 plan that is not an Acceptable Plan (an "**Adverse Plan**") unless, within 30 calendar days of the proposal date of such Adverse Plan, the Obligations are indefeasibly repaid in full, in cash and the DIP Agent and the DIP Lenders receive a release on terms satisfactory to the DIP Agent and the Requisite DIP Lenders; or

(p)     Asset Purchase Agreement.  The Debtors shall sell a material portion of any assets of any of the Debtors, the proceeds of which shall be insufficient to repay in full all the Obligations in cash upon consummation thereof without the prior written consent of the Requisite DIP Lenders; or

(q)     Credit Bidding.  Entry of an order precluding the DIP Agent or the DIP Lenders from credit bidding; or

(r)     Key Man Provision.  Nishant Machado (or a replacement acceptable to the Requisite DIP Lenders in their sole discretion) shall fail to be actively involved in his current role as of the Petition Date in the management of the Credit Parties; or

(s)     RSA.  The RSA shall terminate or any provision thereof shall be amended, modified or waived without the prior written consent of the Requisite DIP Lenders; *provided*, that there shall be no Event of Default to the extent that the RSA is terminated pursuant to Section 8(l) thereof and within 30 calendar days of such termination (or such longer period as agreed to by the Requisite DIP Lenders in their sole discretion), the Obligations are indefeasibly repaid in full, in cash and the DIP Agent and the DIP Lenders receive a full release on terms satisfactory to the DIP Agent and the Requisite DIP Lenders.

**THEN**, subject to the DIP Order, DIP Agent shall, at the request of the Requisite DIP Lenders, upon five (5) Business Days' notice to the Borrower, (i) declare all Obligations to be immediately due and payable, without any presentment, demand, protest or other requirements of any kind, all of which are hereby expressly waived by each Credit Party, (ii) terminate any of the remaining Commitments and Credit Parties' ability to access the funds in the Loan Proceeds Account and/or (iii) exercise all rights and remedies available to it under any of the Credit Documents (including, without limitation, the right to set-off under Section 10.4), the DIP Order and any applicable law, including the Bankruptcy Code and the UCC.

**SECTION 9.    DIP AGENT**

**9.1    Appointment of Agent**.  Raven is hereby appointed DIP Agent hereunder and under the other Credit Documents and each DIP Lender hereby irrevocably designates, appoints and authorizes Raven, in such capacity, to act as its agent in accordance with the terms hereof and the other Credit Documents.  DIP Agent hereby agrees to act upon the express conditions contained herein and the other Credit Documents, as applicable.  The provisions of this Section 9 (other than Section 9.8(b)) are solely for the benefit of DIP Agent and DIP Lenders and no Credit Party shall have any rights as a third party beneficiary of any of the provisions thereof.  In performing its functions and duties hereunder, DIP Agent shall act solely as an agent of DIP Lenders and does not assume and shall not be deemed to have assumed any obligation towards or relationship of agency or trust with or for Borrower, any of its Subsidiaries or any other Credit Party.

**9.2    Powers and Duties**.  Each DIP Lender irrevocably authorizes DIP Agent, in such capacity (and the exercise by DIP Agent of any of the following shall be binding upon each DIP Lender), to take such action on such DIP Lender's behalf and to exercise such powers, rights and remedies and perform such duties on its behalf hereunder and under the other Credit Documents as are specifically delegated or granted to DIP Agent by the terms hereof and thereof, together with such actions, powers, rights and remedies as are reasonably incidental thereto.  DIP Agent shall have only those duties and responsibilities that are expressly specified herein and the other Credit Documents.  DIP Agent may exercise such powers, rights and remedies and perform such duties by or through its agents or employees.  As to any matters not expressly provided for by this Agreement or any other Credit Document (including, without limitation, enforcement or collection of any Notes), DIP Agent shall not be required to exercise any discretion or take any action, but shall only be required to act or to refrain from acting (and shall be fully protected in so acting or refraining from acting) upon the instructions of the Requisite DIP Lenders, and such instructions shall be binding upon all DIP Lenders; *provided*, *however*, that DIP Agent shall not be required to take any action which exposes DIP Agent to personal liability or which is contrary to this Agreement, any other Credit Document, or applicable law.  Nothing herein or any of the other Credit Documents, expressed or implied, is intended to or shall be so construed as to impose upon DIP Agent any fiduciary or other implied duties, covenants, functions, responsibilities, obligations or liabilities in respect hereof or any of the other Credit Documents, regardless of whether a Default has occurred and is continuing, except as expressly set forth herein or therein.  Without limiting the generality of any other provision of this Section 9, the use of the term "agent" in this Agreement with reference to DIP Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable law.  Instead, such term is used merely as a matter of market custom and is intended to create or reflect only an administrative relationship between independent contracting parties.

**9.3    General Immunity**.

(a)    No Responsibility for Certain Matters.  DIP Agent shall not be responsible to any DIP Lender for the execution, effectiveness, genuineness, validity, enforceability, collectability or sufficiency hereof or any other Credit Document or for any representations, warranties, recitals or statements made herein or therein or made in any written or oral statements or in any financial or other statements, instruments, reports or certificates or any other documents furnished or made by DIP Agent to DIP Lenders or by or on behalf of any Credit Party to DIP Agent or any DIP Lender in connection with the Credit Documents and the transactions contemplated thereby or for the financial condition or business affairs of any Credit Party or any other Person liable for the payment of any Obligations, nor shall DIP Agent be required to ascertain or inquire as to the performance or observance of any of the terms, conditions, provisions, covenants or agreements contained in any of the Credit Documents or as to the use of the proceeds of the Loans or as to the existence or possible existence of any Event of Default or Default or to make any disclosures with respect to the foregoing.  Neither DIP Agent nor any of its officers, partners,

directors, employees or agents shall have any responsibility to any Credit Party on account of the failure or delay in performance or breach by any DIP Lender or by any Credit Party of any of their obligations under this Agreement or under any other Credit Document or in connection herewith or therewith. Anything contained herein to the contrary notwithstanding, DIP Agent shall not have any liability arising from confirmations of the amount of outstanding Loans or the component amounts thereof.

(b)     Exculpatory Provisions.  Neither DIP Agent nor any of its officers, partners, directors, employees or agents shall be liable to DIP Lenders for any action taken or omitted by DIP Agent under or in connection with any of the Credit Documents except to the extent caused by DIP Agent's gross negligence or willful misconduct as determined by a court of competent jurisdiction in a final, nonappealable order.  DIP Agent shall be entitled to refrain from any act or the taking of any action (including the failure to take an action) in connection herewith or any of the other Credit Documents or from the exercise of any power, discretion or authority vested in it hereunder or thereunder unless and until DIP Agent shall have received instructions in respect thereof from the Requisite DIP Lenders (or such other DIP Lenders as may be required to give such instructions under Section 10.5) or in accordance herewith or other applicable Collateral Document, and, upon receipt of such instructions from the Requisite DIP Lenders (or such other DIP Lenders, as the case may be), or in accordance herewith or other applicable Collateral Document, as the case may be, DIP Agent shall be entitled to act or (where so instructed) refrain from acting, or to exercise such power, discretion or authority, in accordance with such instructions (*provided*, *however*, that, with respect to any consent or approval that the DIP Agent may provide in its sole discretion hereunder, no direction or instruction from the Requisite DIP Lenders shall be required in connection with the DIP Agent providing or refusing to provide such consent or approval); *provided*, *however*, that DIP Agent shall not be required to take any action which exposes DIP Agent to personal liability or which is contrary to this Agreement, any other Credit Document, or applicable law.  Without prejudice to the generality of the foregoing, (i) DIP Agent shall be entitled to rely, and shall be fully protected in relying, upon any communication (including any oral communication), instrument or document believed by it to be genuine and correct and to have been signed, sent or made by the proper Person or Persons; (ii) to the extent an officers' certificate or opinion of counsel is required or permitted under this Agreement or any other Credit Document to be delivered to DIP Agent in respect of any matter, DIP Agent may rely conclusively on an officers' certificate or opinion of counsel as to such matter and such officers' certificate or opinion of counsel shall be full warranty and protection to DIP Agent for any action taken, suffered or omitted by it under the provisions of this Agreement and the other Credit Documents; (iii) DIP Agent may treat the payee of any Note or Loan as the holder thereof until DIP Agent receives written notice of the assignment or transfer thereof signed by such payee and in form satisfactory to the Requisite DIP Lenders; (iv) DIP Agent may seek and rely upon, and shall be fully protected in relying upon, any judicial order or judgment, upon any advice, opinion or statement of legal counsel (including counsel for any Credit Party), independent public accountants, and other experts selected by it and upon any certification (including, without limitation, any officer's certificate), instruction, notice or other writing delivered to it by the Borrower or any other Credit Party or delivered to it by any Secured Party, without being required to determine the authenticity thereof or the correctness of any fact stated therein or the propriety or validity of service thereof; (v) DIP Agent may presume that, in determining compliance with any condition hereunder to the making of a Loan, that by its terms must be fulfilled to the satisfaction of a DIP Lender, such condition is satisfactory to such DIP Lender unless DIP Agent shall have received written notice to the contrary from such DIP Lender before the making of such Loan; (vi) DIP Agent makes no warranty or representation to any DIP Lender and shall not be responsible to any DIP Lender for any statements, warranties, or representations made in or in connection with this Agreement or the other Credit Documents; (vii) DIP Agent shall be entitled to be indemnified to its reasonable satisfaction by the DIP Lenders against any and all liability and expense that may be incurred by it by reason of taking or continuing to take any such action; and (viii) no DIP Lender shall have any right of action whatsoever against DIP Agent as a result of DIP Agent acting or (where so instructed) refraining from acting hereunder or any of the other Credit Documents in accordance with the instructions of the Requisite DIP Lenders (or such other DIP

Lenders as may be required to give such instructions under Section 10.5) or in accordance herewith or other applicable Collateral Document.

(c)    Notice of Default.  DIP Agent shall not be deemed to have knowledge or notice of the occurrence of any Default or Event of Default, except with respect to Events of Default in the payment of principal, interest and fees required to be paid to DIP Agent for the account of the DIP Lenders, unless DIP Agent shall have received written notice from a DIP Lender or Borrower referring to this Agreement, describing such Default or Event of Default and stating that such notice is a "notice of default."  DIP Agent will notify the DIP Lenders of its receipt of any such notice.  DIP Agent shall take such action with respect to any such Default or Event of Default as may be directed by the Requisite DIP Lenders; *provided*, *however*, that unless and until DIP Agent has received any such direction, DIP Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of Default as it shall deem advisable or in the best interest of the DIP Lenders.

**9.4    DIP Agent Entitled to Act as DIP Lender**.  The agency hereby created shall in no way impair or affect any of the rights and powers of, or impose any duties or obligations upon, DIP Agent in its individual capacity as a DIP Lender hereunder.  With respect to its participation in the Loans, DIP Agent shall have the same rights and powers hereunder as any other DIP Lender and may exercise the same as if it were not performing the duties and functions delegated to it hereunder, and the term "DIP Lender" shall, unless the context clearly otherwise indicates, include DIP Agent in its individual capacity.  DIP Agent and its Affiliates may accept deposits from, lend money to, own securities of, and generally engage in any kind of banking, trust, financial advisory or other business with Borrower or any of its Affiliates as if it were not performing the duties specified herein, and may accept fees and other consideration from Borrower for services in connection herewith and otherwise without having to account for the same to DIP Lenders.

**9.5    DIP Lenders' Representations, Warranties and Acknowledgment**.

(a)    Each DIP Lender represents and warrants to DIP Agent that it has made its own independent investigation of the financial condition and affairs of the Credit Parties and their Subsidiaries, without reliance upon DIP Agent, any other DIP Lender or any of their Affiliates and based on such documents and information as it has deemed appropriate, in connection with Credit Extensions hereunder and that it has made and shall continue to make its own appraisal of the creditworthiness of the Credit Parties and their Subsidiaries.  DIP Agent shall not have any duty or responsibility, either initially or on a continuing basis, to make any such investigation or any such appraisal on behalf of DIP Lenders or to provide any DIP Lender with any credit or other information with respect thereto, whether coming into its possession before the making of the Loans or at any time or times thereafter, nor shall DIP Agent have any responsibility with respect to the accuracy of or the completeness of any information provided to DIP Lenders.

(b)    Each DIP Lender, by delivering its signature page to this Agreement and funding its Loans, shall be deemed to have acknowledged receipt of, and consented to and approved, each Credit Document and each other document required to be approved by DIP Agent, the Requisite DIP Lenders or the DIP Lenders, as applicable.

(c)    Each DIP Lender agrees that it shall not take or institute any actions or proceedings, judicial or otherwise, for any right or remedy against any Credit Party or any other obligor under any of the Credit Documents (including the exercise of any right of setoff, rights on account of any banker's lien or similar claim or other rights of self-help), or institute any actions or proceedings, or otherwise commence any remedial procedures or cause any of the foregoing (through Affiliates or otherwise), with respect to any Collateral or any other property of any such Credit Party, without the prior written consent of DIP Agent (acting at the direction of the Requisite DIP Lenders).  Without limiting the

62

foregoing, each DIP Lender agrees that, except as otherwise provided in any Credit Documents or with the written consent of DIP Agent and the Requisite DIP Lenders, it will not take any enforcement action, accelerate Obligations under any Credit Documents, or exercise any right that it might otherwise have under applicable law to credit bid or purchase any portion of the Collateral at any sale or foreclosure thereof; provided that nothing contained in this clause (c) shall affect any DIP Lender's right to credit bid its pro rata share of the Obligations pursuant to Section 363(k) of the Bankruptcy Code.

**9.6      Right to Indemnity**.  Each DIP Lender, in proportion to its Pro Rata Share in effect on the date on which such indemnification is sought (or, if indemnification is sought after the date upon which all loans have been paid in full, in proportion to its Pro Rata Share in effect immediately before such date), severally agrees to indemnify DIP Agent, their Affiliates and their respective officers, partners, directors, trustees, employees, representatives and agents of DIP Agent (each, an "Indemnitee Agent Party"), to the extent that such Indemnitee Agent Party shall not have been reimbursed by any Credit Party (and without limiting the obligation of the Credit Parties to do so), for and against any and all liabilities, obligations, losses, damages, Taxes (including Indemnified Taxes attributable to a DIP Lender, Excluded Taxes attributable to a DIP Lender and Taxes attributable to DIP Lender's failure to comply with Section 10.6(h)), fines, penalties, actions, claims, judgments, suits, litigations, investigations, inquiries, proceedings costs, expenses (including counsel fees and disbursements) or disbursements of any kind or nature whatsoever which may be imposed on, incurred by or asserted against such Indemnitee Agent Party in exercising its powers, rights and remedies or performing its duties hereunder or under the other Credit Documents or otherwise in its capacity as such Indemnitee Agent Party in any way relating to or arising out of this Agreement, the Loans or the other Credit Documents, IN ALL CASES, WHETHER OR NOT CAUSED BY OR ARISING, IN WHOLE OR IN PART, OUT OF THE COMPARATIVE, CONTRIBUTORY, OR SOLE NEGLIGENCE OF DIP AGENT; *provided*, that no DIP Lender shall be liable for any portion of such liabilities, obligations, losses, damages, Taxes (including Indemnified Taxes attributable to a DIP Lender, Excluded Taxes attributable to a DIP Lender and Taxes attributable to DIP Lender's failure to comply with Section 10.6(h)), fines, penalties, actions, claims, judgments, suits, litigations, investigations, inquiries, proceedings costs, expenses or disbursements resulting from such Indemnitee Agent Party's gross negligence or willful misconduct as determined by a court of competent jurisdiction in a final, nonappealable order.  If any indemnity furnished to any Indemnitee Agent Party for any purpose shall, in the opinion of such Indemnitee Agent Party, be insufficient or become impaired, such Indemnitee Agent Party may call for additional indemnity and cease, or not commence, to do the acts indemnified against until such additional indemnity is furnished; *provided*, that in no event shall this sentence require any DIP Lender to indemnify any Indemnitee Agent Party against any liability, obligation, loss, damage, penalty, action, judgment, suit, cost, expense or disbursement in excess of such DIP Lender's Pro Rata Share thereof; and *provided further*, that this sentence shall not be deemed to require any DIP Lender to indemnify any Indemnitee Agent Party against any liability, obligation, loss, damage, penalty, action, judgment, suit, cost, expense or disbursement described in the proviso in the immediately preceding sentence.  The agreements in this Section 9.6 shall survive the payment in full of the Obligations and the termination of this Agreement and the other Credit Documents.

**9.7      Successor Agents**.

(a)      DIP Agent may resign at any time by giving ten (10) days' prior written notice thereof to DIP Lenders and Borrower.  Upon any such notice of resignation, Requisite DIP Lenders shall have the right, upon five (5) Business Days' notice to Borrower, to appoint a successor DIP Agent.  If no such successor shall have been so appointed by the Requisite DIP Lenders and shall have accepted such appointment within ten (10) days after the retiring DIP Agent gives notice of its resignation, then the retiring DIP Agent may, on behalf of the DIP Lenders, appoint a successor DIP Agent from among the DIP Lenders and such DIP Lender shall accept such appointment.  Upon the acceptance of any appointment as DIP Agent hereunder by a successor DIP Agent, that successor DIP Agent shall thereupon succeed to and

become vested with all the rights, powers, privileges and duties of the retiring DIP Agent and the retiring DIP Agent shall promptly (i) transfer to such successor DIP Agent all sums, Securities and other items of Collateral held under the Collateral Documents, together with all records and other documents necessary or appropriate in connection with the performance of the duties of the successor DIP Agent under the Credit Documents, and (ii) execute and deliver to such successor DIP Agent such amendments to financing statements, and take such other actions, as may be necessary or appropriate in connection with the assignment to such successor DIP Agent of the security interests created under the Collateral Documents, whereupon such retiring DIP Agent shall be discharged from its duties and obligations hereunder. After any retiring DIP Agent's resignation hereunder as DIP Agent, the provisions of this Section 9, Section 10.3, Section 10.15, Section 10.16 and Section 10.17 shall inure to its benefit as to any actions taken or omitted to be taken by it while it was DIP Agent hereunder.

(b)     Notwithstanding anything herein to the contrary, DIP Agent may assign its rights and duties as DIP Agent hereunder to an Affiliate of Raven, any other financing source of Raven or Affiliate of Raven or to any DIP Lender without the prior written consent of, or Raven written notice to Borrower or DIP Lenders; *provided* that Borrower and the DIP Lenders may deem and treat such assigning DIP Agent as DIP Agent for all purposes hereof, unless and until such assigning DIP Agent provides written notice to Borrower and DIP Lenders of such assignment. Upon such assignment such Affiliate shall succeed to and become vested with all rights, powers, privileges and duties as DIP Agent hereunder and under the other Credit Documents. After such assignment, the provisions of this Section 9, Section 10.3, Section 10.15, Section 10.16 and Section 10.17 shall inure to the benefit of the assigning DIP Lender as to any actions taken or omitted to be taken by it while it was DIP Agent hereunder

(c)     <u>Delegation of Duties</u>.  DIP Agent may perform any and all of its duties and exercise its rights and powers under this Agreement or under any other Credit Document by or through any one or more sub-agents appointed by DIP Agent.  DIP Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Affiliates.  The exculpatory, indemnification and other provisions of Section 9.3 and Section 9.6 shall apply to any Affiliates of DIP Agent and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as DIP Agent.  All of the rights, benefits and privileges (including the exculpatory and indemnification provisions) of Section 9.3 and of Section 9.6 shall apply to any such sub-agent and to the Affiliates of any such sub-agent, and shall apply to their respective activities as sub-agent as if such sub-agent and Affiliates were named herein.  Notwithstanding anything herein to the contrary, with respect to each sub-agent appointed by DIP Agent, (i) such sub-agent shall be a third party beneficiary under this Agreement with respect to all such rights, benefits and privileges (including exculpatory and rights to indemnification) and shall have all of the rights, benefits and privileges of a third party beneficiary, including an independent right of action to enforce such rights, benefits and privileges (including exculpatory rights and rights to indemnification) directly, without the consent or joinder of any other Person, against any or all of the Credit Parties and the DIP Lenders, (ii) such rights, benefits and privileges (including exculpatory rights and rights to indemnification) shall not be modified or amended without the consent of such sub-agent, and (iii) such sub-agent shall only have obligations to DIP Agent, and not to any Credit Party, DIP Lender or any other Person and no Credit Party, DIP Lender or any other Person shall have the rights, directly or indirectly, as a third party beneficiary or otherwise, against such sub-agent.

**9.8     Collateral Documents and Guaranty**.

(a)     <u>Agent under Collateral Documents and Guaranty</u>.  Each DIP Lender hereby further irrevocably authorizes DIP Agent, on behalf of and for the benefit of DIP Lenders, to be the agent for and representative of DIP Lenders with respect to the Guaranty, the Collateral and the Collateral Documents. Subject to Section 10.5, without further written consent or authorization from DIP Lenders, DIP Agent may

execute any documents or instruments necessary to (i) perfect and maintain Liens upon the Collateral granted pursuant to the Credit Documents, (ii) release any Lien encumbering any item of Collateral that is the subject of a sale or other disposition of assets permitted hereby or to which the Requisite DIP Lenders (or such other DIP Lenders as may be required to give such consent under Section 10.5) have otherwise consented, or (ii) release any Guarantor from the Guaranty pursuant to Section 7.12 or with respect to which the Requisite DIP Lenders (or such other DIP Lenders as may be required to give such consent under Section 10.5) have otherwise consented, in all cases subject to the automatic stay. DIP Agent is further authorized on behalf of the Secured Parties, without the necessity of any notice to or further consent from the Secured Parties, from time to time, to take any action (other than enforcement actions requiring the consent of, or request by, the Requisite DIP Lenders as set forth in Section 8) in exigent circumstances as may be reasonably necessary to preserve any rights or privileges of the Secured Parties under the Credit Documents or applicable law.

(b)    <u>Release and Subordination of Liens</u>.  Each DIP Lender hereby irrevocably agrees that:

(i)    any Lien on any property granted to or held by DIP Agent under any Credit Document shall be automatically released (A) upon termination of the Commitments and indefeasible payment in full of all Obligations (other than contingent reimbursement and indemnification obligations not yet accrued and payable), (B) at the time the property subject to such Lien is transferred or to be transferred as part of or in connection with any transfer permitted hereunder to any Person other than a Credit Party (and DIP Agent may rely conclusively on a certificate or document that that effect provided to it by a Credit Party upon its request without further inquiry), or (C) subject to Section 10.5, if the release of such Lien is approved, authorized or ratified in writing by the Requisite DIP Lenders (or such greater number of DIP Lenders as may be required pursuant to Section 10.5), upon the satisfaction of any conditions contained in such approval, authorization or ratification, or (D) if the property subject to such Lien is owned by a Guarantor, upon release of such Guarantor from its obligations under its Guaranty hereunder pursuant to clause (iii) below; and

(ii)    DIP Agent is authorized (but not required) to release or subordinate any Lien on any property granted to or held by  DIP Agent under any Credit Document to the holder of any Lien on such property that is permitted by any clause of Section 6.2.

Upon request by DIP Agent at any time, the Requisite DIP Lenders (or such greater number of DIP Lenders as may be required pursuant to Section 10.5) will confirm in writing or the Borrower will provide an officer's certificate confirming, as the case may be, the authority of DIP Agent to take or refrain from taking any action with respect to the release or subordinate its interest in particular types or items of property, or to release any Guarantor from its obligations hereunder pursuant to this Section 9.8.  In each case as specified in this Section 9.8, DIP Agent will (and each DIP Lender irrevocably authorizes DIP Agent to), at Borrower's expense, execute and deliver to the applicable Credit Party such documents as such Credit Party may reasonably request to evidence the release or subordination of such item of Collateral from the assignment and security interest granted under the Credit Documents, or to evidence the release of such Guarantor from its obligations under the Guaranty, in each case in accordance with the terms of the Credit Documents and this Section 9.8.

In each case as specified in this Section 9.8, DIP Agent will (and each DIP Lender irrevocably authorizes DIP Agent to), at the direction of the Requisite DIP Lenders and at the Borrower's expense, execute and deliver to the applicable Credit Party such documents as such Credit Party may reasonably request to evidence the release of such item of Collateral from the security interest granted under this Agreement or the Collateral Documents, in each case in accordance with the terms of the Credit Documents; *provided,*

*however*, that (1) DIP Agent shall not be required to execute any document necessary to evidence such release on terms that, in DIP Agent's opinion, would expose it to liability or create any obligation or entail any consequence other than the release of such Collateral or such Guarantor without recourse, representation, or warranty, and (2) such release shall not in any manner discharge, affect, or impair the Obligations or any Liens (other than those expressly so released) and DIP Agent's Liens shall automatically attach to the proceeds from any such sale, license, lease, or other dispositions of any such Collateral.

(c)     Right to Realize on Collateral and Enforce Guaranty.  Anything contained in any of the Credit Documents to the contrary notwithstanding, each Credit Party, DIP Agent and each DIP Lender hereby agree that (i) no DIP Lender shall have any right individually to realize upon any of the Collateral or to enforce the Guaranty, it being understood and agreed that all powers, rights and remedies hereunder may be exercised solely by DIP Agent at the direction of the Requisite DIP Lenders, on behalf of the Secured Parties in accordance with the terms hereof, and all powers, rights and remedies under the Collateral Documents may be exercised solely by DIP Agent at the direction of the Requisite DIP Lenders, and (ii) in the event of a foreclosure by DIP Agent on any of the Collateral pursuant to a public or private sale, DIP Agent or any DIP Lender may be the purchaser of any or all of such Collateral at any such sale and DIP Agent, as agent for and representative of Secured Parties (but not any DIP Lender or DIP Lenders in its or their respective individual capacities unless the Requisite DIP Lenders shall otherwise agree in writing) shall be entitled, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold at any such public sale, to use and apply any of the Obligations as a credit on account of the purchase price for any collateral payable by DIP Agent at such sale.

(d)     Agent Obligations.  DIP Agent shall have no obligation whatsoever to any of the DIP Lenders to assure the value or sufficiency of any Collateral or that the Collateral exists or is owned by any Credit Party or its Subsidiaries or is cared for, protected, or insured or has been encumbered, or that DIP Agent's Liens have been properly or sufficiently or lawfully created, perfected, protected, maintained, preserved, continued or enforced or are entitled to any particular priority, or that any particular items of Collateral meet the eligibility criteria applicable in respect thereof, or whether to impose, maintain, reduce, or eliminate any particular reserve hereunder or whether the amount of any such reserve is appropriate or not, or to exercise at all or in any particular manner or under any duty of care, disclosure or fidelity, or to continue exercising, any of the rights, authorities and powers granted or available to DIP Agent pursuant to any of the Credit Documents, it being understood and agreed that in respect of the Collateral, or any act, omission, or event related thereto, subject to the terms and conditions contained herein, DIP Agent may act in any manner it may deem appropriate, in its sole discretion given DIP Agent's own interest in the Collateral in its capacity as one of the DIP Lenders and that DIP Agent shall have no other duty or liability whatsoever to any DIP Lender as to any of the foregoing, except as otherwise provided herein.

**9.9     Posting of Approved Electronic Communications**.

(a)     Delivery of Communications.  Each Credit Party hereby agrees, unless directed otherwise by DIP Agent, that it will, or will cause its Subsidiaries to, provide to DIP Agent all information, documents and other materials that it is obligated to furnish to DIP Agent or to the DIP Lenders pursuant to the Credit Documents, including all notices, requests, financial statements, financial and other reports, certificates and other information materials, but excluding any such communication that (i) is or relates to a Funding Notice, (ii) relates to the payment of any principal or other amount due under this Agreement prior to the scheduled date therefor, (iii) provides notice of any Default or Event of Default under this Agreement or any other Credit Document or (iv) is required to be delivered to satisfy any condition precedent to the effectiveness of this Agreement and/or any Loan or other extension of credit hereunder (all such non-excluded communications being referred to herein collectively as "**Communications**"), by transmitting the Communications in an electronic/soft medium that is properly identified in a format

acceptable to DIP Agent.  In addition, each Credit Party agrees, and agrees to cause its Subsidiaries, to continue to provide the Communications to DIP Agent and DIP Lenders, as the case may be, in the manner specified in the Credit Documents.

(b)     Platform.  Each Credit Party further agrees that (i) DIP Agent may make the Communications available to DIP Lenders by posting the Communications on Intralinks, Syndtrak or a substantially similar electronic transmission system (the "**Platform**") and (ii) certain of the DIP Lenders may be "public-side" DIP Lenders (i.e., DIP Lenders that do not wish to receive material non-public information with respect to the Credit Parties or their securities) (each, a "**Public Lender**").  The Borrower hereby agrees that (A) all Communications that are to be made available to Public Lenders shall be clearly and conspicuously marked "PUBLIC" which, at a minimum, shall mean that the word "PUBLIC" shall appear prominently on the first page thereof; (B) by marking Communications "PUBLIC," the Borrower shall be deemed to have authorized DIP Agent and the DIP Lenders on behalf of all Credit Parties to treat such Communications as not containing any material non-public information with respect to the Credit Parties or their securities for purposes of United States Federal and state securities laws (*provided*, *however*, that to the extent such Communications constitute Information, they shall be treated as set forth in Section 10.18); (C) all Communications marked "PUBLIC" are permitted to be made available through a portion of the Platform designated as "Public Investor;" and (D) DIP Agent shall be entitled to treat any Borrower materials that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform not marked as "Public Investor" and shall post the same only on such portion.  Notwithstanding the foregoing, the following Communications shall be marked "PUBLIC", unless the Borrower notifies DIP Agent promptly that any such document contains material non-public information: (1) the Credit Documents and (2) notification of changes in the terms of the Credit Documents.

Each Public Lender agrees to cause at least one individual at or on behalf of such Public Lender to at all times have selected the "Private Side Information" or similar designation on the content declaration screen of the Platform in order to enable such Public Lender or its delegate, in accordance with such Public Lender's compliance procedures and applicable law, including United States Federal and state securities laws, to make reference to Communications that are not made available through the "Public Side Information" portion of the Platform and that may contain material non-public information with respect to the Credit Parties or their securities for purposes of United States Federal or state securities laws.

(c)     No Warranties as to Platform.  THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE".  THE INDEMNITEE AGENT PARTIES DO NOT WARRANT THE ACCURACY OR COMPLETENESS OF THE COMMUNICATIONS OR THE ADEQUACY OF THE PLATFORM AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS OR OMISSIONS IN THE COMMUNICATIONS.  NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS IS MADE BY THE INDEMNITEE AGENT PARTIES IN CONNECTION WITH THE COMMUNICATIONS OR THE PLATFORM.  IN NO EVENT SHALL THE INDEMNITEE AGENT PARTIES HAVE ANY LIABILITY TO ANY DIP LENDER, ANY CREDIT PARTY OR ANY OTHER PARTY HERETO FOR DAMAGES OF ANY KIND, WHETHER OR NOT BASED ON STRICT LIABILITY AND INCLUDING DIRECT OR INDIRECT, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES, LOSSES OR EXPENSES (WHETHER IN TORT, CONTRACT OR OTHERWISE) ARISING OUT OF ANY CREDIT PARTY'S OR DIP AGENT'S TRANSMISSION OF COMMUNICATIONS THROUGH THE INTERNET, EXCEPT TO THE EXTENT THE LIABILITY OF ANY INDEMNITEES IS FOUND IN A FINAL, NONAPPEALABLE ORDER BY A COURT OF COMPETENT JURISDICTION TO HAVE RESULTED PRIMARILY FROM SUCH INDEMNITEE'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT.

(d)    <u>Delivery Via Platform</u>.  DIP Agent agrees that the receipt of the Communications by DIP Agent at its electronic mail address set forth above shall constitute effective delivery of the Communications to DIP Agent for purposes of the Credit Documents.  Each DIP Lender agrees that receipt of notice to it (as provided in the next sentence) specifying that the Communications have been posted to the Platform shall constitute effective delivery of the Communications to such DIP Lender for purposes of the Credit Documents.  Each DIP Lender agrees to notify DIP Agent and the Borrower in writing (including by electronic communication) from time to time of such DIP Lender's electronic mail address to which the foregoing notice may be sent by electronic transmission and that the foregoing notice may be sent to such electronic mail address.

(e)    <u>No Prejudice to Notice Rights</u>.  Nothing herein shall prejudice the right of DIP Agent or any DIP Lender to give any notice or other communication pursuant to any Credit Document in any other manner specified in such Credit Document.

**SECTION 10.  MISCELLANEOUS**

**10.1    Notices**.  Unless otherwise specifically provided herein, any notice or other communication herein required or permitted to be given to a Credit Party or DIP Agent, shall be sent to such Person's address as set forth on Appendix A or in the other relevant Credit Document, and in the case of any DIP Lender, the address as indicated on Appendix A or otherwise indicated to DIP Agent and the Borrower in writing.  Each notice hereunder shall be in writing and may be personally served or sent by telecopy or United States mail or courier service and shall be deemed to have been given when delivered in person or by courier service and signed for against receipt thereof, upon receipt of telecopy or telex; *provided* that no notice to DIP Agent shall be effective until received by DIP Agent.

**10.2    Expenses**.  In the event that the transactions contemplated hereby have been consummated, Borrower agrees to pay promptly upon demand (a) all reasonable documented out-of-pocket expenses of DIP Agent and the Initial DIP Lender incurred in connection with the credit facility provided hereunder and the structuring, negotiation, preparation, execution, delivery and administration of the Credit Documents (including, without limitation, the reasonable out-of-pocket costs and expenses of creating and perfecting Liens in favor of DIP Agent, for the benefit of Secured Parties pursuant to the Credit Documents and all reasonable out-of-pocket fees, expenses and disbursements of legal counsel) and any consents, amendments, waivers or other modifications thereto and any other documents or matters requested by Borrower (including, without limitation, the reasonable fees, disbursements and other charges of counsel for DIP Agent and the Initial DIP Lender; (b) all reasonable out-of-pocket expenses of DIP Agent and the Initial DIP Lender incurred in connection with, and all other amounts payable to DIP Agent or the Initial DIP Lender under the Credit Documents and the DIP Order; (c) all reasonable out-of-pocket costs and expenses incurred by DIP Agent and the Initial DIP Lender in connection with the custody or preservation of any of the Collateral; and (d) all other reasonable out-of-pocket costs and expenses including reasonable attorneys' fees and costs of settlement, incurred by DIP Agent or any DIP Lender in connection with enforcing any Obligations of or in collecting any payments due from any Credit Party hereunder or under the other Credit Documents (including, without limitation, the fees, disbursements and other charges of counsel for DIP Agent and the DIP Lenders) including in connection with the sale of, collection from, or other realization upon any of the Collateral or the enforcement of the Guaranty) or in connection with any refinancing or restructuring of the credit arrangements provided hereunder in the nature of a "work out" or pursuant to any insolvency or bankruptcy cases or proceedings.  DIP Agent is authorized to pay any of the foregoing fees and expenses on behalf of the Borrower with proceeds held the Loan Proceeds Account upon delivery of an invoice to the DIP Agent and the Borrower.

**10.3** **Indemnity**.

(a)     In addition to the payment of expenses pursuant to Section 10.2, whether or not the transactions contemplated hereby shall be consummated, each Credit Party agrees to defend (subject to Indemnitees' selection of counsel), indemnify, pay and hold harmless, DIP Agent and each DIP Lender, their Affiliates and each of their respective officers, directors, partners, shareholders, trustees, controlling persons, employees, agents, advisors, attorneys and representatives (each, an "**Indemnitee**"), from and against any and all Indemnified Liabilities, IN ALL CASES, WHETHER OR NOT CAUSED BY OR ARISING, IN WHOLE OR IN PART, OUT OF THE COMPARATIVE, CONTRIBUTORY, OR SOLE NEGLIGENCE OF SUCH INDEMNITEE; *provided*, that no Credit Party shall have any obligation to any Indemnitee hereunder with respect to any Indemnified Liabilities to the extent that such Indemnified Liabilities arise from the gross negligence or willful misconduct of such Indemnitee or any of its Affiliates or any of its or its Affiliates' officers, directors, partners, shareholders, trustees, controlling persons, employees, agents, advisors, attorneys and representatives, in each case, as determined by a court of competent jurisdiction in a final, nonappealable order.  To the extent that the undertakings to defend, indemnify, pay and hold harmless set forth in this Section 10.3 may be unenforceable in whole or in part because they are violative of any law or public policy, the applicable Credit Party shall contribute the maximum portion that it is permitted to pay and satisfy under applicable law to the payment and satisfaction of all Indemnified Liabilities incurred by Indemnitees or any of them.

(b)     If any Indemnitee shall receive an indemnification payment in respect of any Indemnified Liability pursuant to Section 10.3(a) and such Indemnified Liability is determined by a court of competent jurisdiction in a final, nonappealable order to have resulted from the gross negligence or willful misconduct of such Indemnitee, then such Indemnitee shall refund the amount received by it in respect of such indemnification in excess of that amount to which it is entitled under the terms of Section 10.3(a).

(c)     To the extent permitted by applicable law, no Credit Party shall assert, and each Credit Party hereby waives, any claim against DIP Lenders, DIP Agent and their respective Affiliates, and their or their Affiliates' officers, directors, partners, shareholders, trustees, controlling persons, employees, agents, advisors, attorneys and representatives, on any theory of liability, for special, indirect, consequential or punitive damages  (as opposed to direct or actual damages) (whether or not the claim therefor is based on contract, tort or duty imposed by any applicable legal requirement) arising out of, in connection with, as a result of, or in any way related to, this Agreement or any Credit Document or any agreement or instrument contemplated hereby or thereby or referred to herein or therein, the transactions contemplated hereby or thereby, any Loan or the use of the proceeds thereof or any act or omission or event occurring in connection therewith, and each Credit Party hereby waives, releases and agrees not to sue upon any such claim or any such damages, whether or not accrued and whether or not known or suspected to exist in its favor.

(d)     The agreements in this Section 10.3 shall survive the payment in full of the Obligations and the termination of this Agreement and the other Credit Documents.

**10.4** **Set Off**.  Subject to the DIP Order, in addition to any rights now or hereafter granted under applicable law and not by way of limitation of any such rights, upon the occurrence and during the continuance of any Event of Default, DIP Agent, each DIP Lender and its respective Affiliates are hereby authorized by each Credit Party at any time or from time to time subject to the consent of the Requisite DIP Lenders, in their sole discretion (such consent not to be unreasonably withheld or delayed), without notice to any Credit Party or to any other Person (other than DIP Agent), any such notice being hereby expressly waived to the fullest extent permitted by applicable law, to set off and to appropriate and to apply any and all deposits (general or special, including Indebtedness evidenced by certificates of deposit, whether matured or unmatured, but not including trust accounts (in whatever currency)), including, without

limitation, funds on deposit in the Loan Proceeds Account, and any other Indebtedness at any time held or owing by DIP Agent, such DIP Lender or such Affiliate to or for the credit or the account of any Credit Party (in whatever currency) against and on account of the Obligations of any Credit Party to DIP Agent or such DIP Lender hereunder and under the other Credit Documents, including all claims of any nature or description arising out of or connected hereto or with any other Credit Document, irrespective of whether or not (a) DIP Agent, such DIP Lender or such Affiliate shall have made any demand hereunder, (b) the principal of or the interest on the Loans or any other amounts due hereunder shall have become due and payable pursuant to Section 2 and although such Obligations, or any of them, may be contingent or unmatured or (c) such Obligation is owed to a branch or office of DIP Agent, such DIP Lender or such Affiliate different from the branch or office holding such deposit or obligation or such Indebtedness.

**10.5     Amendments and Waivers**.

(a)     <u>Requisite DIP Lenders' Consent</u>.  Subject to Sections 10.5(b) and 10.5(c) and except as otherwise expressly set forth in the Credit Documents, no amendment, modification, termination or waiver of any provision of the Credit Documents, or consent to any departure by any Credit Party therefrom, shall in any event be effective without the written concurrence of (i) in the case of this Agreement, DIP Agent, the Requisite DIP Lenders and Credit Parties or (ii) in the case of any other Credit Document, the Credit Parties party thereto and DIP Agent, with the consent of the Requisite DIP Lenders.

(b)     <u>Affected DIP Lenders' Consent</u>.  Without the written consent of each DIP Lender that would be directly affected thereby, no amendment, modification, termination, or consent shall be effective if the effect thereof would:

(i)     extend the scheduled final maturity of any Loan or Note of such DIP Lender;

(ii)     waive, reduce or postpone any scheduled repayment due such DIP Lender (but not prepayment);

(iii)     reduce the rate of interest on any Loan of such DIP Lender (other than any amendment to the definition of "Default Rate" (which may be effected by consent of the Requisite DIP Lenders) and any waiver of any increase in the interest rate applicable to any Loan pursuant to Section 2.7) or any fee payable hereunder;

(iv)     extend the time for payment of any such interest or fees to such DIP Lender;

(v)     reduce the principal amount of any Loan of such DIP Lender or increase the Commitment of such DIP Lender;

(vi)     amend, modify, terminate or waive any provision of this Section 10.5(b) or Section 10.5(c);

(vii)     amend the definition of "Requisite DIP Lenders" to reduce the required voting percentage or "Pro Rata Share"; or

(viii)     consent to the assignment or transfer by any Credit Party of any of its rights and obligations under any Credit Document.

(c)     Other Consents.  No amendment, modification, termination or waiver of any provision of the Credit Documents, or consent to any departure by any Credit Party therefrom, shall amend, modify, terminate or waive any provision of Section 2.11(b), Section 2.12(g), Section 9, Section 10.2 or Section 10.3 as the same applies to DIP Agent, or any other provision hereof as the same applies to the rights or obligations of DIP Agent, in each case without the prior written consent of DIP Agent.

(d)     Execution of Amendments, etc.  DIP Agent may, but shall have no obligation to, with the concurrence of any DIP Lender, execute amendments, modifications, waivers or consents on behalf of such DIP Lender.  Any waiver or consent shall be effective only in the specific instance and for the specific purpose for which it was given.  No notice to or demand on any Credit Party in any case shall entitle any Credit Party to any other or further notice or demand in similar or other circumstances.  Any amendment, modification, termination, waiver or consent effected in accordance with this Section 10.5 shall be binding upon each DIP Lender at the effective time thereof, each future DIP Lender and, if signed by a Credit Party, on such Credit Party).

**10.6     Successors and Assigns; Participations**.

(a)     Generally.  This Agreement shall be binding upon the parties hereto and their respective successors and permitted assigns and shall inure to the benefit of the parties hereto and the successors and permitted assigns of DIP Lenders.  Except pursuant to a merger or consolidation permitted by Section 6.8, no Credit Party's rights or obligations hereunder nor any interest therein may be assigned or delegated by any Credit Party without the prior written consent of all DIP Lenders (and any attempted assignment or transfer by any Credit Party without such consent shall be null and void).  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby and, to the extent expressly contemplated hereby, Affiliates of each of DIP Agent and DIP Lenders and Indemnitees) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)     Register.  Borrower, DIP Agent and DIP Lenders shall deem and treat the Persons listed as DIP Lenders in the Register as the holders and owners of the corresponding Commitments and Loans listed therein for all purposes hereof, and no assignment or transfer of any such Commitment or Loan shall be effective, in each case, unless and until an Assignment Agreement effecting the assignment or transfer thereof shall have been delivered to and accepted by DIP Agent and recorded in the Register as provided in Section 2.4(a) and 10.6(e).  Prior to such recordation, all amounts owed with respect to the applicable Commitment or Loan shall be owed to the DIP Lender listed in the Register as the owner thereof, and any request, authority or consent of any Person who, at the time of making such request or giving such authority or consent, is listed in the Register as a DIP Lender shall be conclusive and binding on any subsequent holder, assignee or transferee of the corresponding Commitments or Loans.  Solely for the purposes of maintaining the Register and for tax purposes only DIP Agent shall be deemed to be acting on behalf of the Credit Parties as a non-fiduciary agent.

(c)     Right to Assign.  Subject to Section 10.6(f), each DIP Lender shall have the right at any time to sell, assign or transfer all or a portion of its rights and obligations under this Agreement, including all or a portion of its Commitment or Loans owing to it or other Obligations (*provided, however*, that each such assignment shall be of a uniform, and not varying, percentage of all rights and obligations under and in respect of any Loan) to any Person.

(d)     Mechanics.  The assigning DIP Lender and the assignee thereof shall execute and deliver to DIP Agent an Assignment Agreement, together with such forms, certificates or other evidence, if any, with respect to United States federal income tax withholding matters as the assignee under such Assignment Agreement may be required to deliver to DIP Agent pursuant to Section 2.16(e).

(e)      Notice of Assignment; Recordation.  Upon its (i) receipt and acceptance of a duly executed and completed Assignment Agreement, any forms, certificates or other evidence required by this Agreement in connection therewith and (ii) receipt of $3,500 recordation fee (per each Assignment Agreement), DIP Agent shall record the information contained in such Assignment Agreement in the Register, shall give prompt notice thereof to Borrower and shall maintain a copy of such Assignment Agreement.

(f)      [Reserved].

(g)      Representations and Warranties of Assignee.  Each DIP Lender, upon execution and delivery hereof or upon executing and delivering an Assignment Agreement, as the case may be, represents and warrants as of the Closing Date or as of the applicable Effective Date (as defined in the applicable Assignment Agreement) that (i) it has experience and expertise in the making of or investing in commitments or loans such as the applicable Commitments or Loans, as the case may be; and (ii) it will make or invest in, as the case may be, its Commitments or Loans for its own account in the ordinary course of its business and without a view to distribution of such Commitments or Loans within the meaning of the Securities Act or the Exchange Act or other federal securities laws (it being understood that, subject to the provisions of this Section 10.6, the disposition of such Commitments or Loans or any interests therein shall at all times remain within its exclusive control).

(h)      Effect of Assignment.  Subject to the terms and conditions of this Section 10.6, as of the "Effective Date" specified in the applicable Assignment Agreement: (i) the assignee thereunder shall have the rights and obligations of a "DIP Lender" hereunder to the extent such rights and obligations hereunder have been assigned to it pursuant to such Assignment Agreement and shall thereafter be a party hereto and a "DIP Lender" for all purposes hereof; (ii) the assigning DIP Lender thereunder shall, to the extent that rights and obligations hereunder have been assigned thereby pursuant to such Assignment Agreement, relinquish its rights (other than any rights which survive the termination hereof under Section 10.9) and be released from its obligations hereunder (and, in the case of an Assignment Agreement covering all or the remaining portion of an assigning DIP Lender's rights and obligations hereunder, such DIP Lender shall cease to be a party hereto; *provided*, that anything contained in any of the Credit Documents to the contrary notwithstanding, such assigning DIP Lender shall continue to be entitled to the benefit of Sections 2.14(c), 2.15, 2.16, 10.2 and 10.3 with respect to facts and circumstances occurring prior to the effective date of such assignment); (iii) if applicable, the Commitments shall be modified to reflect the Commitment of such assignee and any Commitment of such assigning DIP Lender, if any; and (iv) if any such assignment occurs after the issuance of any Note hereunder, the assigning DIP Lender shall, upon the effectiveness of such assignment or as promptly thereafter as practicable, surrender its applicable Notes to DIP Agent for cancellation, and thereupon Borrower shall issue and deliver new Notes, if so requested by the assignee and/or assigning DIP Lender, to such assignee and/or to such assigning DIP Lender, with appropriate insertions, to reflect the new outstanding Loans of the assignee and/or the assigning DIP Lender.

(i)      Participations.  Each DIP Lender shall have the right at any time to sell one or more participations to any Person (other than Borrower, any of its Subsidiaries or any of its Affiliates) in all or any part of its Commitments, Loans or in any other Obligation.  The holder of any such participation (a "**Participant**"), other than an Affiliate of the DIP Lender granting such participation, shall not be entitled to require such DIP Lender to take or omit to take any action hereunder except with respect to any amendment, modification or waiver that would (i) extend the final scheduled maturity of any Loan or Note in which such Participant is participating, or reduce the rate or extend the time of payment of interest or fees thereon (except any amendment to the definition of "Default Rate" or in connection with a waiver of applicability of any post default increase in interest rates) or reduce the principal amount thereof, or increase the amount of the Participant's participation over the amount thereof then in effect (it being understood that a waiver of any Default or Event of Default shall not constitute a change in the terms of such participation,

and that an increase in any Commitment or Loan shall be permitted without the consent of any Participant if the Participant's participation is not increased as a result thereof), (ii) consent to the assignment or transfer by any Credit Party of any of its rights and obligations under this Agreement, or (iii) release all or substantially all of the Collateral under the Collateral Documents or all or substantially all of the Guarantors from the Guaranty (in each case, except as expressly provided in the Credit Documents) supporting the Loans hereunder in which such Participant is participating.  Borrower agrees that each Participant shall be entitled, through the participating DIP Lender, to the benefits of Sections 2.14(c), 2.15 and 2.16 to the same extent as if it were a DIP Lender and had acquired its interest by assignment pursuant to clause (c) of this Section; *provided*, that (i) a Participant shall not be entitled to receive any greater payment under Section 2.14(c), 2.15 or 2.16 than the applicable DIP Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with Borrower's prior written consent, and (ii) a Participant that would be a Non-U.S. DIP Lender if it were a DIP Lender shall not be entitled to the benefits of Section 2.16 unless Borrower is notified of the participation sold to such Participant and such Participant agrees, for the benefit of Borrower, to comply with Section 2.16 as though it were a DIP Lender.  To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 10.4 as though it were a DIP Lender, provided such Participant agrees to be subject to Section 2.13 as though it were a DIP Lender.  Each DIP Lender that has sold participations to one or more Participants, acting solely for this purpose as a non-fiduciary agent of Borrower, shall maintain a register on which it enters the name and address of  each such Participant, and the amount of each such Participant's interest in such DIP Lender's rights and/or obligations under this Agreement, including the principal amount of and interest on a Loan (the "**Participant Register**"); provided that no DIP Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any commitments, loans, letters of credit or its other obligations under any Credit Document) to any Person except to the extent that such disclosure is necessary in connection with a tax audit or other proceeding to establish that such commitment, loan, letter of credit or other obligation is in registered form under Treasury regulation §5f.103-1(c).  The entries in the Participant Register shall be conclusive absent manifest error, and such DIP Lender shall treat each Person whose name is recorded in the Participant Register as the owner of the applicable rights and/or obligations of such DIP Lender under this Agreement.

(j)    Certain Other Assignments.  In addition to any other assignment permitted pursuant to this Section 10.6, any DIP Lender may assign, pledge and/or grant a security interest in, all or any portion of its Loans, the other Obligations owed by or to such DIP Lender, and its Notes, if any, to secure obligations of such DIP Lender including any Federal Reserve Bank as collateral security pursuant to Regulation A of the Board of Governors of the Federal Reserve System and any operating circular issued by such Federal Reserve Bank; *provided*, that no DIP Lender, as between Borrower and such DIP Lender, shall be relieved of any of its obligations hereunder as a result of any such assignment and pledge, and *provided further*, that in no event shall the applicable Federal Reserve Bank, pledgee or trustee be considered to be a "DIP Lender" or be entitled to require the assigning DIP Lender to take or omit to take any action hereunder.

**10.7    Special Purpose Funding Vehicles**.  Notwithstanding anything to the contrary contained herein, any DIP Lender ("**Granting DIP Lender**") may grant to a special purpose funding vehicle (an "**SPC**"), identified as such in writing from time to time by the Granting DIP Lender to DIP Agent and Borrower, the option to provide to Borrower all or any part of any Loan that such Granting DIP Lender would otherwise be obligated to make to Borrower pursuant to this Agreement; *provided*, that (x) nothing herein shall constitute a commitment by any SPC to make any Loans and (y) if an SPC elects not to exercise such option or otherwise fails to provide all or any part of such Loan, the Granting DIP Lender shall be obligated to make such Loan pursuant to the terms hereof.  The making of a Loan by an SPC hereunder shall utilize the Commitment of the Granting DIP Lender to the same extent, and as if, such Loan were made by such Granting DIP Lender.  Each party hereto hereby agrees that no SPC shall be liable for any

indemnity or similar payment obligation under this Agreement (all liability for which shall remain with the Granting DIP Lender).  In furtherance of the foregoing, each party hereto hereby agrees (which agreement shall survive the termination of this Agreement) that, prior to the date that is one year and one day after the payment in full of all outstanding commercial paper or other senior indebtedness of any SPC, it will not institute against, or join any other person in instituting against, such SPC any bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings under the laws of the United States or any State thereof. In addition, notwithstanding anything to the contrary contained in this clause, any SPC may (i) with notice to, but without the prior written consent of Borrower or DIP Agent and without paying any processing fee therefor, assign all or a portion of its interests in any Loans to the Granting DIP Lender or to any financial institutions (consented to by Borrower and the Requisite DIP Lenders) providing liquidity and/or credit support to or for the account of such SPC to support the funding or maintenance of Loans and (ii) disclose on a confidential basis any non-public information relating to its Loans to any rating agency, commercial paper dealer or provider of any surety, guarantee or credit or liquidity enhancement to such SPC.  This Section may not be amended without the written consent of the SPC.  Borrower acknowledges and agrees, subject to the next sentence, that, to the fullest extent permitted under applicable law, each SPC, for purposes of Sections 2.13, 2.14, 2.15, 2.16, 10.2, 10.3 and 10.4, shall be considered a DIP Lender.  Borrower shall not be required to pay any amount under Sections 2.13, 2.14, 2.15, 2.16, 10.2, 10.3 and 10.4 that is greater than the amount which it would have been required to pay had no grant been made by a Granting DIP Lender to a SPC.  A Granting DIP Lender shall maintain an SPC Register similar to the Participant Register in Section 10.6(h) above with respect to any loan made by an SPC under this Section 10.7 and such Participant agreed, for the benefit of the Borrower to comply with Section 2.16 as though it were a DIP Lender.

**10.8    Independence of Covenants**.  All covenants hereunder shall be given independent effect so that if a particular action or condition is not permitted by any of such covenants, the fact that it would be permitted by an exception to, or would otherwise be within the limitations of, another covenant shall not avoid the occurrence of a Default or an Event of Default if such action is taken or condition exists.

**10.9    Survival of Representations, Warranties and Agreements**.  All representations, warranties and agreements made herein shall survive the execution and delivery hereof and the making of any Credit Extension.  Notwithstanding anything herein or implied by law to the contrary, the agreements of each Credit Party set forth in Sections 2.14(c), 2.15, 2.16, 10.2, 10.3 and 10.4 and the agreements of DIP Lenders set forth in Sections 2.13, 9.3(b) and 9.6 shall survive the payment of the Loans and the termination of this Agreement.

**10.10    No Waiver; Remedies Cumulative**.  No failure or delay on the part of DIP Agent or any DIP Lender in the exercise of any power, right or privilege hereunder or under any other Credit Document shall impair such power, right or privilege or be construed to be a waiver of any default or acquiescence therein, nor shall any single or partial exercise of any such power, right or privilege preclude other or further exercise thereof or of any other power, right or privilege.  The rights, powers and remedies given to DIP Agent and each DIP Lender hereby are cumulative and shall be in addition to and independent of all rights, powers and remedies existing by virtue of any statute or rule of law or in any of the other Credit Documents. Any forbearance or failure to exercise, and any delay in exercising, any right, power or remedy hereunder shall not impair any such right, power or remedy or be construed to be a waiver thereof, nor shall it preclude the further exercise of any such right, power or remedy.

**10.11    Marshalling; Payments Set Aside**.  Neither DIP Agent nor any DIP Lender shall be under any obligation to marshal any assets in favor of any Credit Party or any other Person or against or in payment of any or all of the Obligations.  To the extent that any Credit Party makes a payment or payments to DIP Agent or DIP Lenders (or to DIP Agent, on behalf of DIP Lenders), or DIP Agent or DIP Lenders enforce any security interests or exercise their rights of setoff, and such payment or payments or the proceeds of

such enforcement or setoff or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside and/or required to be repaid to a trustee, receiver or any other party under any bankruptcy law, any other state or federal law, common law or any equitable cause, then, to the extent of such recovery, the obligation or part thereof originally intended to be satisfied, and all Liens, rights and remedies therefor or related thereto, shall be revived and continued in full force and effect as if such payment or payments had not been made or such enforcement or setoff had not occurred.

**10.12    Severability**.  In case any provision in or obligation hereunder or any Note or other Credit Document shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby.

**10.13    Obligations Several; Independent Nature of DIP Lenders' Rights**.  The obligations of DIP Lenders hereunder are several and no DIP Lender shall be responsible for the obligations or Commitment of any other DIP Lender hereunder.  Nothing contained herein or in any other Credit Document, and no action taken by DIP Lenders pursuant hereto or thereto, shall be deemed to constitute DIP Lenders as a partnership, an association, a Joint Venture or any other kind of entity.  The amounts payable at any time hereunder to each DIP Lender shall be a separate and independent debt, and each DIP Lender shall be entitled to protect and enforce its rights arising out hereof and it shall not be necessary for any other DIP Lender to be joined as an additional party in any proceeding for such purpose.

**10.14    Headings**.  Section headings herein are included herein for convenience of reference only and shall not constitute a part hereof for any other purpose or be given any substantive effect.

**10.15    APPLICABLE LAW**.  (a)    EXCEPT TO THE EXTENT GOVERNED BY THE BANKRUPTCY CODE, THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

(b)    Borrower is obligated and fully liable for the amount due under their respective Notes and this Agreement.  DIP Agent, at the direction of the Requisite DIP Lenders, on behalf of the DIP Lenders, has the right to sue on the Notes and this Agreement and obtain a judgment against the applicable borrowers for satisfaction of the amount due under the Notes and this Agreement.

**10.16    CONSENT TO JURISDICTION**.  BY EXECUTING AND DELIVERING THIS AGREEMENT, EACH PARTY HERETO, FOR ITSELF AND IN CONNECTION WITH ITS PROPERTIES, IRREVOCABLY (i) ACCEPTS GENERALLY AND UNCONDITIONALLY THE NONEXCLUSIVE GENERAL JURISDICTION AND VENUE OF THE BANKRUPTCY COURT (AND, IF THE BANKRUPTCY COURT DOES NOT HAVE, OR ABSTAINS FROM, EXERCISING SUCH JURISDICTION, THE JURISDICTION OF ANY STATE OR FEDERAL COURT OF COMPETENT JURISDICTION IN THE STATE, COUNTY AND CITY OF NEW YORK); (ii) WAIVES ANY DEFENSE OF FORUM NON CONVENIENS; (iii) AGREES THAT SERVICE OF ALL PROCESS IN ANY SUCH PROCEEDING IN ANY SUCH COURT MAY BE MADE BY REGISTERED OR CERTIFIED MAIL, RETURN RECEIPT REQUESTED, TO THE APPLICABLE PARTY HERETO AT ITS ADDRESS PROVIDED IN ACCORDANCE WITH SECTION 10.1 IS SUFFICIENT TO CONFER PERSONAL JURISDICTION OVER THE APPLICABLE PARTY HERETO IN ANY SUCH PROCEEDING IN ANY SUCH COURT, AND OTHERWISE CONSTITUTES EFFECTIVE AND BINDING SERVICE IN EVERY RESPECT; AND (iv) AGREES THAT EACH PARTY HERETO RETAINS THE RIGHT TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO BRING PROCEEDINGS AGAINST ANY OTHER PARTY HERETO IN THE COURTS OF ANY OTHER JURISDICTION.

**10.17    WAIVER OF JURY TRIAL**.  EACH OF THE PARTIES HERETO HEREBY AGREES TO WAIVE ITS RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING HEREUNDER OR UNDER ANY OF THE OTHER CREDIT DOCUMENTS OR ANY DEALINGS BETWEEN THEM RELATING TO THE SUBJECT MATTER OF THIS LOAN TRANSACTION OR THE LENDER/BORROWER RELATIONSHIP THAT IS BEING ESTABLISHED.  THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS TRANSACTION, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS.  EACH PARTY HERETO ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO ENTER INTO A BUSINESS RELATIONSHIP, THAT EACH HAS ALREADY RELIED ON THIS WAIVER IN ENTERING INTO THIS AGREEMENT, AND THAT EACH WILL CONTINUE TO RELY ON THIS WAIVER IN ITS RELATED FUTURE DEALINGS.  EACH PARTY HERETO FURTHER WARRANTS AND REPRESENTS THAT IT HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL AND THAT IT KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL.  THIS WAIVER IS IRREVOCABLE, MEANING THAT IT MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING (OTHER THAN BY A MUTUAL WRITTEN WAIVER SPECIFICALLY REFERRING TO THIS SECTION 10.17 AND EXECUTED BY EACH OF THE PARTIES HERETO), AND THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS HERETO OR ANY OF THE OTHER CREDIT DOCUMENTS OR TO ANY OTHER DOCUMENTS OR AGREEMENTS RELATING TO THE LOANS MADE HEREUNDER.   IN THE EVENT OF LITIGATION, THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

**10.18    Confidentiality**.    Each of DIP Agent and DIP Lenders agrees to maintain the confidentiality of the Information, except that Information may be disclosed (a) to its Affiliates and its and its Affiliates' directors, officers, employees, trustees, investment advisors and agents, including accountants, legal counsel and other advisors (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential pursuant to the terms hereof); (b) to the extent requested by any Governmental Authority; (c) to the extent required by applicable laws or regulations or by any subpoena or similar legal process (including the Bankruptcy Cases); (d) to any other party to this Agreement; (e) to any bona fide potential pledgee referred to in Section 10.6(j) or bona fide potential assignee, transferee or participant with respect to the Obligations, and their advisors, in each case to the extent reasonably required in connection with the contemplated transaction, provided that such Persons and advisors are advised of and agree to be bound by the provisions of this Section 10.18); (f) with the written consent of Borrower; (g) to the extent such Information becomes publicly available other than as a result of a breach of this Section 10.18; (h) to any Governmental Authority or examiner (including the National Association of Insurance Commissioners or any other similar organization) regulating any DIP Lender; and (i) to any rating agency when required by it (it being understood that, prior to any such disclosure, such rating agency shall undertake to preserve the confidentiality of any Information relating to the Credit Parties received by it from such DIP Lender). In addition, DIP Agent and DIP Lenders may disclose the existence of this Agreement and information about this Agreement to service providers to DIP Agent and DIP Lenders in connection with the administration and management of this Agreement, the other Credit Documents, the Commitments, and the Loans.  For the purposes of this Section 10.18, "Information" means all non-public information regarding the Credit Parties and their businesses and obtained by DIP Agent or such DIP Lender pursuant to the requirements hereof.  Notwithstanding the foregoing, on or after the Closing Date, subject to the prior written consent of Borrower (such consent not to be unreasonably withheld or delayed) DIP Agent may, at its own expense, issue news releases and publish "tombstone" advertisements and other announcements relating to this transaction in newspapers, trade journals and other appropriate media.

**10.19    Usury Savings Clause**.  Notwithstanding anything to the contrary contained in any Credit Document, if at any time the interest rate applicable to any Loan, together with all fees, charges and other amounts which are treated as interest on such Loan under applicable law (collectively the "Charges"), shall exceed the maximum lawful rate (the "Highest Lawful Rate") which may be contracted for, charged, taken, received or reserved by the DIP Lender holding such Loan in accordance with applicable law, the rate of interest payable in respect of such Loan hereunder, together with all Charges payable in respect thereof, shall be limited to the Highest Lawful Rate and, to the extent lawful, the interest and Charges that would have been payable in respect of such Loan but were not payable as a result of the operation of this Section shall be cumulated and the interest and Charges payable to such DIP Lender in respect of other Loans or periods shall be increased (but not above the Highest Lawful Rate therefor) until such cumulated amount, together with interest thereon at the Federal Funds Effective Rate to the date of repayment, shall have been received by such DIP Lender.

**10.20    Counterparts**.  This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed an original, but all such counterparts together shall constitute but one and the same instrument.  Delivery of an executed signature page of this Agreement by telecopy or electronic mail transmission shall be effective as delivery of a manually executed counterpart hereof.

**10.21    Effectiveness**.  This Agreement shall become effective upon the execution of a counterpart hereof by each of the parties hereto and receipt by Borrower and DIP Agent of written or telephonic notification of such execution and authorization of delivery thereof.

**10.22    Patriot Act**.  Each DIP Lender and DIP Agent (for itself and not on behalf of any DIP Lender) hereby notifies Borrower that pursuant to the requirements of the Patriot Act, it is required to obtain, verify and record information that identifies such Borrower, which information includes the name and address of such Borrower and other information that will allow such Lender or DIP Agent, as applicable, to identify such Borrower in accordance with the Patriot Act.

**10.23    Disclosure and Equity Holder Information**.  Each Credit Party and each DIP Lender hereby acknowledges and agrees that DIP Agent, DIP Lenders and/or their Affiliates and their respective Related Funds from time to time may hold investments in, and make other loans to, or have other relationships with any of the Credit Parties and their respective Affiliates, including the ownership, purchase and sale of equity interests in Borrower, and each Credit Party, DIP Agent and each DIP Lender hereby expressly consents to such relationships.

**10.24    Appointment for Perfection**.  Each DIP Lender hereby appoints DIP Agent and each other DIP Lender as its agent for the purpose of perfecting Liens, for the benefit of DIP Agent and DIP Lenders, in assets which, in accordance with Article 9 of the UCC or any other applicable law can be perfected only by possession.  Should any DIP Lender (other than DIP Agent) obtain possession of any such Collateral, such DIP Lender shall notify DIP Agent thereof, and, promptly upon the DIP Lenders' request therefore shall deliver such Collateral to DIP Agent or otherwise deal with such Collateral in accordance with DIP Agent's instructions.

**10.25    Advertising and Publicity**.  No Credit Party shall issue or disseminate to the public generally (by advertisement, including without limitation any "tombstone" advertisement, press release or otherwise), submit for publication or otherwise cause or seek to publish to the public generally any information describing the credit or other financial accommodations made available by DIP Lenders pursuant to this Agreement and the other Credit Documents without the prior written consent of DIP Agent, in its sole discretion (such consent not to be unreasonably withheld or delayed).  Nothing in the foregoing shall be construed to prohibit any Credit Party from making any disclosure, submission or filing which it is

77

required to make by applicable law or the applicable rules of any securities exchange or pursuant to judicial or administrative process or upon the demand or request of any regulatory authority having jurisdiction over such Credit Party or any of its Affiliates or to any rating agency.

**10.26    Entire Agreement**.  This Agreement and the other Credit Documents represent the final agreement among the parties and may not be contradicted by evidence of prior, contemporaneous, or subsequent oral agreements of the parties; *provided* that nothing herein shall supersede any previously executed non-disclosure agreement by and between one or more of the Credit Parties and one or more of the DIP Lenders.  There are no unwritten oral agreements among the parties.

**10.27    Authorization to Credit Bid**.  The DIP Lenders hereby irrevocably authorize DIP Agent, at the direction of the Requisite DIP Lenders, to credit bid all or any portion of the Obligations  and in such manner purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral (a) at any sale thereof conducted under the provisions of the Bankruptcy Code, including under Sections 363, 1123 or 1129 of the Bankruptcy Code or any similar laws in any other jurisdictions to which a Credit Party is subject, (b) at any other sale or foreclosure or acceptance of collateral in lieu of debt conducted by (or with the consent or at the direction of) DIP Agent (whether by judicial action or otherwise) in accordance with any applicable law.  In connection with any such credit bid and purchase, the Obligations owed to the DIP Lenders shall be entitled to be, and shall be, credit bid on a ratable basis (with Obligations with respect to contingent or unliquidated claims receiving contingent interests in the acquired assets on a ratable basis that would vest upon the liquidation of such claims in an amount proportional to the liquidated portion of the contingent claim amount used in allocating the contingent interests) in the asset or assets so purchased (or in the Capital Stock or debt instruments of the acquisition vehicle or vehicles that are used to consummate such purchase).  In connection with any such bid (i) DIP Agent shall be authorized to form one or more acquisition vehicles to make a bid, (ii) to adopt documents providing for the governance of the acquisition vehicle or vehicles (*provided* that, any actions by DIP Agent with respect to such acquisition vehicle or vehicles, including any disposition of the assets or Capital Stock thereof shall be governed, directly or indirectly, by the vote of the Requisite DIP Lenders, irrespective of the termination of this Agreement), (iii) DIP Agent shall be authorized to assign the relevant Obligations to any such acquisition vehicle pro rata by the DIP Lenders, as a result of which each of the DIP Lenders shall be deemed to have received a pro rata portion of any Capital Stock and/or debt instruments issued by such an acquisition vehicle on account of the assignment of the Obligations to be credit bid, all without the need for any DIP Lender or acquisition vehicle to take any further action, and (iv) to the extent that Obligations that are assigned to an acquisition vehicle are not used to acquire Collateral for any reason (as a result of another bid being higher or better, because the amount of Obligations assigned to the acquisition vehicle exceeds the amount of debt credit bid by the acquisition vehicle or otherwise), such Obligations shall automatically be reassigned to the DIP Lenders pro rata and the Capital Stock and/or debt instruments issued by any acquisition vehicle on account of the Obligations that had been assigned to the acquisition vehicle shall automatically be cancelled, without the need for any DIP Lender or any acquisition vehicle to take any further action.  To the extent that there is no bid received in any such sale that is sufficient to repay in full in cash all Obligations, the DIP Lenders hereby agree that they will authorize the DIP Agent to make a credit bid in an amount equal to 100% of the Obligations for all or substantially all of the Collateral, on terms to be agreed satisfactory to the Requisite DIP Lenders, unless otherwise agreed by the Requisite DIP Lenders and the Borrower.

**10.28    DIP Order Controls**.  In the event of any inconsistency between the provisions of the DIP Order and this Agreement, the provisions of the DIP Order shall govern.

[Remainder of page intentionally left blank]

IN WITNESS WHEREOF, the parties hereto have caused this Debtor-in-Possession Credit, Guaranty and Security Agreement to be duly executed and delivered by their respective officers thereunto duly authorized as of the date first written above.

**BORROWER**:

**MAC ACQUISITION LLC**

By: _____
Name: Nishant Machado
Title: President, Chief Executive Officer
      and Chief Restructuring Officer

**GUARANTORS**:

**MAC PARENT LLC**

By: _____
Name: Nishant Machado
Title: President, Chief Executive Officer
      and Chief Restructuring Officer

**MAC HOLDING LLC**

By: _____
Name: Nishant Machado
Title: President, Chief Executive Officer
      and Chief Restructuring Officer

**MACARONI GRILL SERVICES LLC**

By: _____
Name: Nishant Machado
Title: President, Chief Executive Officer
      and Chief Restructuring Officer

*[Debtor-in-Possession Credit, Guaranty and Security Agreement]*

**MAC ACQUISITION OF NEW JERSEY LLC**


By: _____
Name: Nishant Machado
Title: President, Chief Executive Officer
        and Chief Restructuring Officer


**MAC ACQUISITION OF KANSAS LLC**


By: _____
Name: Nishant Machado
Title: President, Chief Executive Officer
        and Chief Restructuring Officer


**MAC ACQUISITION OF ANNE ARUNDEL COUNTY LLC**


By: _____
Name: Nishant Machado
Title: President, Chief Executive Officer
        and Chief Restructuring Officer


**MAC  ACQUISITION OF FREDERICK COUNTY LLC**


By: _____
Name: Nishant Machado
Title: President, Chief Executive Officer
        and Chief Restructuring Officer

**MAC  ACQUISITION OF**
**BALTIMORE COUNTY LLC**


By: _____
Name: Nishant Machado
Title: President, Chief Executive Officer
       and Chief Restructuring Officer


**MAC ACQUISITION IP LLC**


By: _____
Name: Nishant Machado
Title: President, Chief Executive Officer
       and Chief Restructuring Officer


**RMG DEVELOPMENT, LLC**


By: _____
Name: Nishant Machado
Title: President, Chief Executive Officer
       and Chief Restructuring Officer

**AGENT AND INITIAL DIP LENDER:**

**RAVEN ASSET-BASED OPPORTUNITY FUND III LP**, a Delaware limited partnership

By: Raven Capital Management GP LLC, a Delaware limited liability company, its general partner


By: _____
Name:  Joshua A. Green
Title:  Managing Member

**ANNEX A**

**Budget (as of the Closing Date)**

**See attached.**

13-Week Cash Flow Projection

Prepared by Mackinac Partners

| Romano's Macaroni Grill — Weekly Cash Flow Projection (US$ 000's) | Week 1 Ended 10/20/2017 | Week 2 Ended 10/27/2017 | Week 3 Ended 11/3/2017 | Week 4 Ended 11/10/2017 | Week 5 Ended 11/17/2017 | Week 6 Ended 11/24/2017 | Week 7 Ended 12/1/2017 | Week 8 Ended 12/8/2017 | Week 9 Ended 12/15/2017 | Week 10 Ended 12/22/2017 | Week 11 Ended 12/29/2017 | Week 12 Ended 1/5/2018 | Week 13 Ended 1/12/2018 | Period Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Operational Cash Receipts:** | | | | | | | | | | | | | | |
| Restaurant Receipts | 2,934 | 2,905 | 2,633 | 3,148 | 3,170 | 3,523 | 2,683 | 3,197 | 3,732 | 4,881 | 3,824 | 3,120 | 3,221 | 42,972 |
| Gift Card Sales Receipts | 119 | 122 | 122 | 114 | 131 | 524 | 132 | 124 | 149 | 167 | 218 | 273 | 562 | 2,757 |
| Royalty Receipts | – | 43 | 50 | – | – | 54 | 54 | 54 | – | 58 | 58 | 58 | – | 429 |
| Rebate Receipts | – | – | 20 | – | 117 | – | – | – | – | – | – | – | – | 137 |
| Other Receipts | 58 | 35 | – | 23 | – | 35 | – | – | 32 | 35 | – | – | – | 220 |
| **Total Operational Cash Receipts** | 3,112 | 3,105 | 2,825 | 3,285 | 3,418 | 4,136 | 2,869 | 3,375 | 3,913 | 5,141 | 4,100 | 3,451 | 3,783 | 46,514 |
| **Non-Operational Cash Receipts:** | | | | | | | | | | | | | | |
| DIP Financing / New Borrowing | 3,000 | – | – | – | 1,000 | – | 1,000 | – | – | – | – | – | – | 5,000 |
| **Total Non-Operational Cash Receipts** | 3,000 | – | – | – | 1,000 | – | 1,000 | – | – | – | – | – | – | 5,000 |
| **Total Cash Receipts** | 6,112 | 3,105 | 2,825 | 3,285 | 4,418 | 4,136 | 3,869 | 3,375 | 3,913 | 5,141 | 4,100 | 3,451 | 3,783 | 51,514 |
| **Operational Cash Disbursements:** | | | | | | | | | | | | | | |
| Food and Liquor Cost [1] | (726) | (730) | (734) | (757) | (687) | (774) | (809) | (833) | (798) | (766) | (834) | (736) | (1,025) | (10,209) |
| Payroll and Benefit Cost | (1,776) | (1,290) | (1,703) | (1,012) | (1,842) | (1,043) | (1,633) | (1,057) | (1,621) | (1,198) | (1,836) | (1,228) | (1,803) | (19,042) |
| Occupancy | (200) | (136) | (1,892) | (29) | (50) | (40) | (1,487) | (180) | (60) | (200) | (1,443) | (99) | (644) | (6,460) |
| Capital Expenditures | (32) | (32) | (32) | (32) | (32) | (32) | (32) | (32) | (32) | – | – | – | – | (289) |
| Sales Tax | (176) | (769) | (59) | (6) | (3) | (794) | (65) | (7) | (29) | (916) | (3) | (2) | (150) | (2,976) |
| Ordinary Course Professional Fees | – | (25) | – | – | (25) | – | – | (25) | – | (13) | – | – | (22) | (110) |
| Other Operating Expenses | (568) | (497) | (486) | (457) | (321) | (536) | (691) | (577) | (585) | (536) | (644) | (512) | (475) | (6,887) |
| **Total Operating Cash Disbursements** | (3,478) | (3,479) | (4,906) | (2,293) | (2,960) | (3,219) | (4,717) | (2,711) | (3,125) | (3,629) | (4,760) | (2,577) | (4,119) | (45,973) |
| **Cash Operating Margin** | 2,633 | (373) | (2,081) | 992 | 1,458 | 917 | (848) | 664 | 788 | 1,512 | (660) | 875 | (336) | 5,541 |
| **Non-Operational Cash Disbursements:** | | | | | | | | | | | | | | |
| Debtor Professional Fees | (180) | (180) | (180) | (154) | (154) | (154) | (154) | (145) | (145) | (145) | (145) | (132) | (132) | (2,000) |
| Senior Lender Professional Fees | (8) | (8) | (8) | (5) | (5) | (5) | (5) | (3) | (3) | (3) | (3) | (1) | (1) | (57) |
| Unsecured Creditor Professional Fees | – | – | (25) | (25) | (25) | (25) | (25) | (25) | (25) | (25) | (25) | (25) | (25) | (275) |
| Deposits / Other | – | – | – | (450) | (450) | – | – | – | – | – | – | – | – | (900) |
| General Unsecured Creditors Pool [2] | – | – | – | – | – | – | – | – | – | – | – | – | – | – |
| Cure Costs [2] | – | – | – | – | – | – | – | – | – | – | – | – | – | – |
| Critical Vendor Payments | – | (200) | (100) | (100) | (100) | (100) | (100) | – | – | – | – | – | – | (700) |
| PACA Claims | – | (500) | – | – | – | – | – | – | – | – | – | – | – | (500) |
| 503(B)(9) Claims [2] | – | – | – | – | – | – | – | – | – | – | – | – | – | – |
| US Trustee Fees | – | – | – | – | – | – | – | – | – | – | (35) | – | – | (35) |
| DIP & BoC Interest and Fees | (66) | – | – | – | – | (89) | – | – | – | (99) | – | – | – | (255) |
| Debt Repayment | – | – | – | – | – | – | – | – | – | – | – | – | – | – |
| **Total Non-Operating Cash Disbursements** | (255) | (888) | (313) | (734) | (734) | (373) | (284) | (173) | (173) | (272) | (208) | (158) | (158) | (4,721) |
| **Total Cash Disbursements** | (3,733) | (4,367) | (5,220) | (3,027) | (3,694) | (3,592) | (5,001) | (2,883) | (3,298) | (3,901) | (4,968) | (2,734) | (4,277) | (50,694) |
| Net Change in Cash | 2,379 | (1,261) | (2,394) | 258 | 724 | 544 | (1,132) | 491 | 616 | 1,240 | (868) | 717 | (493) | 820 |
| Beginning Cash Balance | 1,443 | 3,822 | 2,560 | 166 | 424 | 1,148 | 1,692 | 560 | 1,051 | 1,667 | 2,907 | 2,039 | 2,756 | 1,443 |
| **Ending Cash Balance** | 3,822 | 2,560 | 166 | 424 | 1,148 | 1,692 | 560 | 1,051 | 1,667 | 2,907 | 2,039 | 2,756 | 2,263 | 2,263 |

[1] The "Food and Liquor Cost" line item includes an additional $2.25 million to be paid on account of pre-petition PACA/PASA claims that are in addition to the $500,000 in the "PACA Claims" line item.

[2] Allowed 503(b)(9) Claims, Cure Costs, and the proposed General Unsecured Claims Pool payment will be paid on the effective date and are not reflected in the initial 13-week cash flow.

10/17/2017

**ANNEX B**

**Chapter 11 Milestones**

The Borrower shall comply with each of the following chapter 11 milestones (the "***Plan Milestones***"):

(a) On or before the date that is thirty (30) calendar days following the Petition Date, the Final DIP Order shall have been entered by the Bankruptcy Court;

(b) On or before the date that is five (5) Business Days following the Petition Date, the Debtors shall file an Acceptable Plan;

(c) On or before the date that is sixty (60) calendar days following the Petition Date, the Bankruptcy Court shall have entered an order approving the disclosure statement and plan solicitation procedures acceptable to the Requisite DIP Lenders, as confirmed by the Requisite DIP Lenders in writing;

(d) On or before the date that is one-hundred (110) calendar days following the Petition Date, the Bankruptcy Court shall have entered an order acceptable to the Requisite DIP Lenders, as confirmed by the Requisite DIP Lenders in writing, confirming an Acceptable Plan; and

(e) On or before the date that is one hundred-twenty (120) calendar days following the Petition Date, the Acceptable Plan Effective Date shall have occurred.

Unless otherwise agreed by the Requisite DIP Lenders, if (i) any Default occurs under Section 8.1(s) or (ii) the Bankruptcy Court does not enter the order approving the disclosure statement or the order confirming the Acceptable Plan on or prior to the applicable date set forth above (the first such date, the "***Sale Trigger Date***" shall mean the required date that is not satisfied), the Borrower shall commence a Sale Process (as defined below) designed to ensure consummation of the Sale promptly.

"***Sale Process***" shall mean the implementation of bidding and sale procedures in respect of substantially all of the Debtors' assets and property, approved by an order of the Bankruptcy Court, in form and substance acceptable to the Requisite DIP Lenders in all respects which complies with each of the following milestones (the "***Sale Milestones***" and together with the Plan Milestones, the "***Chapter 11 Milestones***"):

(a) Within three (3) Business Days after the Sale Trigger Date, the Debtors shall commence a marketing process for a sale of all or substantially all of the Debtors' assets (the "***Purchased Assets***");

(b) No later than twenty-one (21) calendar days after the Sale Trigger Date, the Debtors shall file a motion (the "***Bid Procedures Motion***") with the Bankruptcy Court to approve bid procedures and establish the date of an auction (the "***Auction***") to sell the Purchased Assets. The bid procedures will require that any bid contain a cash component sufficient to repay in full all amounts outstanding under the DIP Facility. The Bid Procedures Motion will allow for the selection of a stalking horse bidder and entry into a stalking horse asset purchase agreement (a "***Stalking Horse Asset Purchase Agreement***");

(c) no later than thirty (30) calendar days after the Sale Trigger Date, the Bankruptcy Court shall enter an order approving the Bid Procedures Motion (the "***Bid Procedures Order***"), in form and substance acceptable to the Requisite DIP Lenders in their sole and absolute discretion as confirmed by the Requisite DIP Lenders in writing;

(d) no later than forty-five (45) calendar days after the Sale Trigger Date, the Debtors shall conduct the Auction for the Purchased Assets (if qualified bids are received). The Borrower shall promptly

distribute to the Requisite DIP Lenders fully executed copies of all qualified binding bids received in connection with the Auction;

(e)  no later than sixty (60) calendar days after the Sale Trigger Date, the Court shall enter an order approving the sale (the "***Sale***") of the Purchased Assets to the party determined to have made the highest or otherwise best bid (which shall also include a "successful back-up bidder") (the "***Sale Order***"), which shall be in form and substance acceptable to the Requisite DIP Lenders in their sole and absolute discretion as confirmed by the Requisite DIP Lenders in writing and shall provide for indefeasible payment in full in cash of all Obligations or other treatment acceptable to the Requisite DIP Lenders in their sole and absolute discretion as confirmed by the Requisite DIP Lenders in writing; and

(f)  no later than ten (10) calendar days after the entry of the Sale Order, the Debtors shall have consummated the Sale to the party determined to have made the highest or otherwise best bid for the Debtors' assets in accordance with the Sale Order.

**ANNEX C**

**Exit Facility Term Sheet**

_____

| | |
|---|---|
| <u>Borrowers:</u> | Reorganized Borrower (the "***Exit Borrower***"). |
| <u>Guarantors:</u> | Each entity that is a guarantor under the DIP Facility (collectively with the Exit Borrower, the "***Exit Guarantors***"; together with the Exit Borrower, the "***Exit Loan Parties***") shall guarantee the Exit Facility on a joint and several basis. |
| <u>Exit Lenders:</u> | The DIP Lenders and any additional entities selected by the DIP Lenders (collectively, the "***Exit Lenders***"). |
| <u>Limited Guaranty:</u> | In addition to the guarantees described above, the same parties that provide the Personal Guaranty under and as defined in the DIP Facility shall provide a guarantee, on a joint and several basis, of 30% of the outstanding principal amount under the Exit Facility (as defined below) at all times while any financial accommodations under the Exit Facility remain unpaid. |
| <u>Definitive Documentation:</u> | The terms of the Exit Facility shall, except as otherwise set forth herein, initially be based upon the definitive documentation for the DIP Facility, with such modifications to reflect the terms set forth in this Term Sheet and other terms required by the Exit Lenders. |
| <u>Exit Facility:</u> | A senior secured term loan facility (the "***Exit Facility***") in a principal amount equal to: (i) the aggregate principal amount outstanding under the DIP Facility on the Acceptable Plan Effective Date (the "***Converted Loans***") plus (ii) up to an additional $8.5 million (at the sole and absolute discretion of the Exit Lenders) of additional "new money" loans (the "***New Money Loans***" and together with the Converted Loans, the "***Exit Loans***") to be used for purposes to be agreed between the Exit Lenders and the Exit Borrower, in each case, to be funded in a single advance on the Exit Closing Date (as defined below). |
| <u>Interest Rate:</u> | 12% per annum, payable in cash on a monthly basis (plus an additional 5% per annum upon the occurrence and during the continuance of an event of default; <u>provided</u>, that prior to the one-year anniversary of the closing date of the Exit Facility (the "***Exit Closing Date***"), the Exit Borrower shall be allowed, on a monthly basis, to elect to pay such interest in-kind so long as the average aggregate cash and cash equivalents of the Exit Loan Parties (the "***Average Cash Balance***") during the three calendar months immediately prior to the date on which such interest payment is due did not exceed $3.5 million. |
| <u>Fees:</u> | Exit Lenders shall receive a closing fee in the amount of $447,368 on the Exit Closing Date, which shall be payable in-kind by adding such |

amount to the principal amount of the Exit Facility on the Exit Closing Date; <u>provided</u>, that such closing fee may, at the election of the Exit Agent, be structured as original issue discount.

The Exit Agent shall receive an annual administrative agency fee in the amount of $30,000, which shall be paid in full in cash on the Exit Closing Date and each anniversary thereof.

Exit Lenders shall receive warrants representing 5% of the equity of the Exit Borrower or another parent entity acceptable to the Exit Lenders on a fully diluted basis.

| | |
|---|---|
| Amortization: | None. |
| Maturity: | Three (3) years after the Exit Closing Date (the "***Exit Maturity Date***"). |
| Security and Priority: | The Exit Facility shall be secured by a perfected lien on substantially all assets of the Exit Loan Parties, subject to customary exceptions to be agreed.  The Exit Lenders will agree to subordinate the priority of its liens to Permitted Liens on terms substantially consistent with the subordination terms provided in the DIP Orders. |
| Mandatory Prepayments: | Customary for facilities of this type and acceptable to the Exit Lenders and to include, commencing with the first fiscal year during which, at any point, the Average Cash Balance exceeds an amount to be agreed for a period to be agreed upon, an annual excess cash flow sweep, with one step-down to the extent the total leverage ratio of the Exit Loan Parties, on a consolidated basis, does not exceed an amount to be agreed as of the last day of any fiscal quarter.  At the election of the Exit Lenders in their sole discretion, all or a portion of such mandatory prepayments may be declined. |
| Asset Sale Proceeds: | The proceeds of any asset sales on which the Exit Agent has a first lien (other than certain asset sales to be agreed) shall be placed in a deposit account (the "***Asset Sale Proceeds Account***") subject to the sole control of the agent under the Exit Facility (the "***Exit Agent***").   To the extent the Exit Cash Flow Report (as defined below) shows the cash balance of the Exit Loan Parties dropping below $1 million for any week in the subsequent 4 week period, the Exit Borrower may withdraw funds from the Asset Sale Proceeds Account in an amount sufficient to restore a balance of at least $1.5 million. Total withdrawals from the Asset Sale Proceeds Account shall not exceed $2.0 million in the aggregate. |

To the extent that, (i) as of the last day of the most recently ended calendar month, 12-month "run rate" EBITDA (to be defined in a manner to be agreed) of the Exit Loan Parties was greater than $5.0 million and (ii) the Average Cash Balance during the three calendar months immediately prior to the closing of the applicable asset sale was greater than $3.0 million, then within one business day of the occurrence of such events, the Exit Borrower shall be required to make a voluntary prepayment on the First Lien Obligations (as defined in the

DIP Order) in the amount of $2.0 million (with such payment being made first from cash on hand not held in the Asset Sale Proceeds Account in an amount such that, after giving effect to such prepayment, the aggregate cash and cash equivalents of the Exit Loan Parties is $1.5 million and, thereafter, from the Asset Sale Proceeds Account).

Optional Prepayments:    The Exit Term Loans may be prepaid at any time on three (3) business days' prior notice in writing, at (i) a premium of 105% to the extent prepaid on or prior to the second anniversary of the Exit Closing Date and (ii) at par any time after the second anniversary of the Exit Closing Date.

Representations and Warranties:    Usual and customary for facilities of this type and acceptable to the Exit Lenders.

Affirmative and Negative Covenants:    Usual and customary for facilities of this type and acceptable to the Exit Lenders.  The Exit Borrower shall continue to provide to the Exit Lenders rolling 13-week cash flows, together with a reconciliation for the prior week consistent with the reporting provided under the DIP Facility (the "***Exit Cash Flow Report***").

Financial Covenants:    Usual and customary for facilities of this type and acceptable to the Exit Lenders and to include quarterly total leverage and fixed charge coverage ratio financial maintenance covenants.

Assignments:    Usual and customary for facilities of this type and acceptable to the Exit Lenders.

Conditions Precedent:    Usual and customary for facilities of this type and acceptable to the Exit Lenders, including (i) satisfactory definitive documentation for the Exit Facility, (ii) the occurrence of the Acceptable Plan Effective Date, (iii) the execution of amendments to the First Lien Loan Documents in form and substance satisfactory to the Exit Lenders, (iv) satisfaction with the post-effective date debt and equity capital structure of the Exit Loan Parties and (v) satisfaction with the post-Acceptable Plan Effective Date business prospects of the Exit Loan Parties.

Events of Default:    Usual and customary for facilities of this type and acceptable to the Exit Lenders and to include a "key man" event of default that requires (i) Nishant Machado to remain involved with the business in substantially the same capacity as prior to the Petition Date (or such other person as may be acceptable to the Exit Lenders in their sole discretion), and (ii) Richard Monfort to remain involved with the business in substantially the same capacity after giving effect to the Acceptable Plan Effective Date (or such other person as may be acceptable to the Exit Lenders in their sole discretion).

Expense Reimbursement and Indemnification:    Usual and customary for facilities of this type and acceptable to the Exit Lenders.

| Assignments: | Usual and customary for facilities of this type and acceptable to the Exit Lenders, it being understood and agreed that the Exit Borrower shall have no consent right over assignments. |
|---|---|
| Governing Law: | New York. |

**APPENDIX A**

**Notice Addresses**

Borrower
1855 Blake Street
Suite 200
Denver, CO  80202
Attention: Nishant Machado
E-Mail: nmachado@mackinacpartners.com

with a copy to:

Gibson, Dunn & Crutcher LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
Attention: Jeffrey C. Krause
E-Mail: JKrause@gibsondunn.com

DIP Agent or Initial DIP Lender:
c/o Raven Capital Management LLC
501 Santa Monica Blvd.
Suite 501
Santa Monica, CA 90401
Attention: Dimitri Cohen
E-Mail: dimitri@ravencm.com

with a copy to:

Winston & Strawn LLP
355 South Grand Avenue
Los Angeles, CA 90071
Attention: Justin Rawlins
E-Mail: jrawlins@winston.com

**Schedule I**

**Commitments**

| DIP Lender | Commitment |
|---|---|
| Raven Asset-Based Opportunity Fund III LP | $5,000,000.00 |

**Schedule 4.1**
**Jurisdiction of Organization**

| Credit Party | Jurisdiction of Organization |
|---|---|
| Mac Acquisition LLC | Delaware |
| Mac Parent LLC | Delaware |
| Mac Holding LLC | Delaware |
| Macaroni Grill Services LLC | Florida |
| Mac Acquisition of New Jersey LLC | New Jersey |
| Mac Acquisition of Kansas LLC | Kansas |
| Mac Acquisition of Anne Arundel County LLC | Maryland |
| Mac Acquisition of Frederick County LLC | Maryland |
| Mac Acquisition of Baltimore County LLC | Maryland |
| Mac Acquisition IP LLC | Delaware |
| RMG Development, LLC | Delaware |

## Schedule 4.2
## Capital Stock and Ownership

| Credit Party | Jurisdiction of Organization | Legal Name | Organizational Identification Number | Chief Executive Office | Owner and Percentage Interest | Type of Entity | Number and Class of Stock |
|---|---|---|---|---|---|---|---|
| Mac Acquisition LLC | Delaware | Mac Acquisition LLC | 4569940 | 1855 Blake St., Ste. 200, Denver, CO 80202 | Mac Holding LLC: 100% | limited liability company | membership interests |
| Mac Parent LLC | Delaware | Mac Parent LLC | 4570385 | 1855 Blake St., Ste. 200, Denver, CO 80202 | Redrock Partners, LLC: 100% | limited liability company | membership interests |
| Mac Holding LLC | Delaware | Mac Holding LLC | 4570273 | 1855 Blake St., Ste. 200, Denver, CO 80202 | Mac Parent LLC: 100% | limited liability company | membership interests |
| Macaroni Grill Services LLC | Florida | Macaroni Grill Services LLC | L15000192811 | 1855 Blake St., Ste. 200, Denver, CO 80202 | Mac Holding LLC: 100% | limited liability company | membership interests |
| Mac Acquisition of New Jersey LLC | New Jersey | Mac Acquisition of New Jersey LLC | 0600348542 | 1855 Blake St., Ste. 200, Denver, CO 80202 | Mac Acquisition LLC: 100% | limited liability company | membership interests |
| Mac Acquisition of Kansas LLC | Kansas | Mac Acquisition of Kansas LLC | 4233805 | 1855 Blake St., Ste. 200, Denver, CO 80202 | Mac Acquisition LLC: 100% | limited liability company | membership interests |
| Mac Acquisition of Anne Arundel County LLC | Maryland | Mac Acquisition of Anne Arundel County LLC | W12706958 | 1855 Blake St., Ste. 200, Denver, CO 80202 | Mac Acquisition LLC: 100% Class A membership interests C. Castle-Behlert: 50% Class B membership interests* A. Udelson: 50% Class B membership interests* | limited liability company | membership interests |

| Mac Acquisition of Frederick County LLC | Maryland | Mac Acquisition of Frederick County LLC | W12707014 | 1855 Blake St., Ste. 200, Denver, CO 80202 | Mac Acquisition LLC: 100% | limited liability company | membership interests |
|---|---|---|---|---|---|---|---|
| Mac Acquisition of Baltimore County LLC | Maryland | Mac Acquisition of Baltimore County LLC | W12707063 | 1855 Blake St., Ste. 200, Denver, CO 80202 | Mac Acquisition LLC: 100% Class A membership interests T. Norris: 50% Class B membership interests* A. Udelson: 50% Class B membership interests* | limited liability company | membership interests |
| Mac Acquisition IP LLC | Delaware | Mac Acquisition IP LLC | 4610859 | 1855 Blake St., Ste. 200, Denver, CO 80202 | Mac Parent LLC: 100% | limited liability company | membership interests |
| RMG Development, LLC | Delaware | RMG Development, LLC | 5373390 | 1855 Blake St., Ste. 200, Denver, CO 80202 | Mac Acquisition LLC: 100% | limited liability company | membership interests |

* Class B membership interests do not receive any voting rights and represent only economic interests.

**Schedule 4.9**
**Adverse Proceedings**

| Matter | Type of Claim | Location |
|---|---|---|
| Chadha, et al. v. Mac Acquisition LLC | Consumer Liability | Anaheim, CA |
| Dinova, Inc. v. Mac Acquisition LLC | Breach of Contract | Various |
| Ekryss et al. v. Ignite Restaurant Group, et al. | Wage and Hour | Various |
| Holly v. Mac Acquisition LLC | Trip and Fall | Desert Ridge, AZ |
| Mendoza v. Mac Acquisition LLC | Wrongful Termination | Huntington Beach |
| Sanchez et al. v. Mac Acquisition LLC | Slip and Fall | Beacon Center, FL |
| Startzel v. Mac Acquisition LLC | Harassment/Wrongful Term | Alisio Viejo, CA |
| Testiler v. Mac Acquisition of Delaware LLC | Slip and Fall | Carrolwood, FL |
| Westbrook v. Mac Parent LLC et al. | Slip and Fall | South Austin, TX |

Attorney representation letter with respect to WARN violations alleged by Jose Arellano.
Attorney representation letter with respect to disability discrimination alleged by Charles Hicks.
Attorney representation letter with respect to FMLA, ADA, ADEA and ERISA violations alleged by Thomas Mackey.
Attorney representation letter from Woodmont Properties LLC regarding sale of liquor license.
EEOC Charge alleging gender discrimination filed by Charese Crayton.
EEOC Charge alleging race, color, and sex discrimination, retaliation filed by Mark Ruzicho.
EEOC/Colorado Civil Rights Division Charge alleging discrimination based on gender and sexual orientation; retaliation; wage claim filed by Samantha Gurtler.
EEOC Charge alleging sexual harassment and hostile work environment filed by Erika Sanchez.

**Schedule 4.10**
**Certain Tax Matters**

None.

**Schedule 4.11(b)**
**Real Estate**

| Store # | Unit Name | Address | City | ST | Zip | Landlord/Financial Entity |
|---|---|---|---|---|---|---|
| 31029 | Albuquerque | 2100 Louisiana Blvd. NE | Albuquerque | NM | 87110 | Winrock Partners LLC |
| 31349 | Alderwood | 3000 184th St. SW #922 | Alderwood | WA | 98037 | Alderwood Mall, LLC |
| 31145 | Aliso Viejo | 26641 Aliso Creek Rd. | Aliso Viejo | CA | 92656 | MG.AVC LLC & MG.LBC LLC |
| 31257 | Anaheim Hills | 8150 E Santa Ana Canyon Rd. | Anaheim | CA | 92808 | Donahue Schriber Realty Group, LP |
| 31141 | Ann Arbor | 3010 S State St. | Ann Arbor | MI | 48108 | Briarwood, LLC |
| 31089 | Annapolis | 178 Jennifer Rd. | Annapolis | MD | 21401 | Annapolis Mall Owner LLC |
| 31017 | Arapahoe | 7979 E Arapahoe Rd. | Greenwood Village | CO | 80112 | 7979 MAC LLC |
| 31199 | Auburn Hills | 2111 N Squirrel Rd. | Auburn Hills | MI | 48326 | First Michigan Mac Associates, LLC |
| 31004 | Austin | 9828 Great Hills Trail | Austin | TX | 78759 | The Retail Connection |
| 31286 | Bakersfield | 8850 Rosedale Hwy. | Bakersfield | CA | 93312 | Flushing Quail, LLC |
| 31132 | Beacon Center | 8700 NW 18th Terrace | Doral | FL | 33172 | Francisco R. Unanue, Maria Elena Ortega Wollberg and Jose A. Ortega, Jr., as co-trustees of the P&L Trust dated September 22, 1999 |
| 31174 | Birmingham | 241 Summit Blvd. | Vestavia | AL | 35243 | Bayer Retail Company, L.L.C. |
| 31022 | Brandon | 132 Brandon Town Center Dr. | Brandon | FL | 33511 | 307 East Edgewater Avenue, LLC |
| 31039 | Carrollwood | 14904 N Dale Mabry Hwy. | Tampa | FL | 33618 | Kimco Carrollwood 664, Inc. c/o Kimco Realty Corporation |
| 31115 | Cary | 740 SE Maynard Rd. | Cary | NC | 27511 | Brinker North Carolina, Inc. |

| | | | | | | |
|---|---|---|---|---|---|---|
| 31212 | Cedar Hill | 388 N Highway 67 | Cedar Hill | TX | 75104 | VR Partners I, LP |
| 31197 | Cerritos | 12875 Towne Center Dr. | Cerritos | CA | 90703 | Cerritos GARP, LLC |
| 31314 | Church Ranch | 10411 Town Center Dr. | Broomfield | CO | 80021 | Boas Laguna Village, LLC |
| 31165 | Colonie | 1 Metro Park Rd. | Albany | NY | 12205 | Wolf Road Park II, LLC |
| 31294 | Corona | 3591 Grand Oaks | Corona | CA | 92881 | Castle & Cooke Corona, Inc. |
| 31131 | Corpus Christi | 5133 S Padre Island Dr. | Corpus Christi | TX | 78411 | Brinker Texas, Inc. |
| 90901 | Dairy Block | 1855 Blake Street, Suite 200 | Denver | CO | 80202 | BLK220, LLC |
| 31178 | Deer Valley | 2949 W Agua Fria Fwy. | Phoenix | AZ | 85027 | DDRA Community Centers Either, L.P. |
| 31167 | Denver West | 14245 W Colfax Ave. | Lakewood | CO | 80401 | Denver West Mills, LP |
| 31233 | Desert Ridge | 21001 N Tatum Blvd, Suite 4 | Phoenix | AZ | 85050 | Vestar DRM-OPCO, LLC |
| 31268 | East El Paso | 11885 Gateway Blvd. W | El Paso | TX | 79936 | BRE RC Las Palmas MP TX LP |
| 31347 | El Cerrito | 8000 El Cerrito Blvd. | El Cerrito | CA | 94530 | 8000 El Cerrito Investors LLC |
| 31252 | Elk Grove | 8295 Laguna Blvd | Elk Grove | CA | 95758 | Pappas Laguna No. 2, L.P. |
| 31182 | Fashion Place | 102 E Winchester St. | Salt Lake City | UT | 84107 | Roderick Enterprises |
| 31245 | Folsom | 2739 E Bidwell St. | Folsom | CA | 95630 | Keller Family Trust |
| 31284 | Franconia | 5925 Kingstowne Towne Ctr. | Alexandria | VA | 22315 | Kingstowne Town Center, LP |
| 31279 | Frederick | 5201 Buckeystown Pike | Frederick | MD | 21704 | Frederick Westview Properties, LLC |
| 31161 | Fresno | 7650 N Blackstone Ave. | Fresno | CA | 93720 | Lance-Kashian & Co. |

| | | | | | | |
|---|---|---|---|---|---|---|
| 31234 | Frisco | 3111 Preston Rd. | Frisco | TX | 75034 | BRE Retail Residual Owner 1 LLC |
| 31292 | Ft. Collins | 4627 S Timberline Rd. | Fort Collins | CO | 80528 | Moriah Investments, LLC |
| 31108 | Greenville | 105 E Beacon Dr. | Greenville | SC | 29615 | Central Realty Corporation |
| 31327 | Harrisburg | 2531 Brindle Dr. | Harrisburg | PA | 17110 | ISBI Susquehanna, LLC c/o Metro Commercial Management Services Inc. |
| 31156 | Henderson | 573 N Stephanie St. | Henderson | NV | 89014 | HIP Stephanie, LLC |
| 31112 | Henrietta | 760 Jefferson Rd. | Rochester | NY | 14623 | RB 3 Associates |
| 31120 | Huntington Beach | 7901 Edinger Ave. | Huntington Beach | CA | 92647 | Bella Terra Associates, LLC |
| 31003 | Kendall | 12100 SW 88th St. | Miami | FL | 33186 | Kendallgate Center Associates, Ltd. |
| 31060 | Kissimmee | 5320 W Irlo Bronson Hwy. | Kissimmee | FL | 34746 | Richard J. Rosenthal |
| 31081 | Lake Buena Vista | 12148 S Apopka Vineland Rd. | Orlando | FL | 32836 | Wells Lake Buena Vista, LLC |
| 31229 | Legacy | 7205 N Central Expy | Plano | TX | 75025 | Legacy |
| 31050 | Little Rock | 11100 W Markham St. | Little Rock | AR | 72211 | Brinker Arkansas, Inc. |
| 31053 | Livonia | 39300 7 Mile Rd. | Livonia | MI | 48152 | Brinker Michigan, Inc. |
| 31015 | Louisville | 401 S Hurstbourne Pkwy. | Louisville | KY | 40222 | RDT Limited Partnership |
| 31216 | Mall of GA | 3207 Buford Dr. | Buford | GA | 30519 | Mall of Georgia, LLC c/o Simon Property Group |
| 31346 | Milpitas | 110 Ranch Dr. | Milpitas | CA | 95035 | H&Y Northern California, LLC |
| 31064 | Montrose | 41 Springside Dr. | Akron | OH | 44333 | Grilloni, LLC |
| 31342 | Murfreesboro | 2535 Medical Center Pkwy. | Murfreesboro | TN | 37129 | Hines Global REIT 2615 Med Center Parkway LLC |

| ID | Name | Address | City | State | Zip | Entity |
|---|---|---|---|---|---|---|
| 31296 | N. Aurora | 14241 E Alameda Ave. | Aurora | CO | 80012 | Weingarten/Miller/Aurora II LLC and GDC Aurora, LLC, tenants in common |
| 31033 | N. Olmsted | 25001 Country Club Blvd. | North Olmsted | OH | 44070 | 25001 Country Club LLC |
| 31301 | N. Tucson | 2265 W Ina Rd. | Tucson | AZ | 85741 | Casas Adobes Baptist Church c/o Cushman & Wakefield/PICOR |
| 31285 | North County Fair | 202 E Via Rancho Pkwy. | Escondido | CA | 92025 | EWH Escondido Associates, L.P. |
| 31203 | Northridge | 19400 Plummer St. | Northridge | CA | 91324 | GGP Northridge Fashion Center, LP c/o General Growth Properties, Inc. |
| 31283 | Oceanside | 2655 Vista Way | Oceanside | CA | 92054 | PK II El Camino North, LP |
| 31280 | Opry Mills | 517 Opry Mills Dr. | Nashville | TN | 37214 | Opry Mills Mall Limited Partnership |
| 31339 | Otay Ranch (Chula Vista) | 2015 Birch Rd. Suite 2500 | Chula Vista | CA | 91915 | GGP-Otay Ranch, L.P. |
| 31345 | Oviedo | 7123 Red Bug Lake Rd. | Oviedo | FL | 32765 | CWS-Oviedo Development, LLC c/o CWS Development LLC |
| 31116 | Oxford Valley | 640 Commerce Blvd. | Fairless Hills | PA | 19030 | Oxford Valley Road Associates, LP |
| 31246 | Palm Valley | 1828 N Litchfield Rd. | Goodyear | AZ | 85395 | The Ann Drever Cottrell Trust |
| 31045 | Plano | 5005 W Park Blvd. | Plano | TX | 75093 | Brinker Texas, Inc. |
| 31302 | Puente Hills | 17603 Colima Rd. | City Of Industry | CA | 91748 | JCC California Properties, LLC c/o Festival Management Corporation |
| 31324 | Redlands | 27490 W Lugonia Ave. | Redlands | CA | 92374 | Redlands Joint Venture, LLC |
| 31184 | Reno | 5505 S Virginia St. | Reno | NV | 89502 | Shankar Nevada, LLC |
| 31222 | Retama | 8355 Agora Pkwy. | Selma | TX | 78154 | Mike and Martha Witt |
| 31078 | Roseville | 2010 Douglas Blvd. | Roseville | CA | 95661 | Rocky Ridge Station LLC |
| 31176 | Round Rock | 2501 S IH 35 | Round Rock | TX | 78664 | Macaroni RR I-35 Partnership Ltd. |

| 31037 | S. Arlington | 1670 W Interstate 20 | Arlington | TX | 76017 | Brinker Texas, Inc. |
|---|---|---|---|---|---|---|
| 31196 | S. Colorado Springs | 2510 Tenderfoot Hill St. | Colorado Springs | CO | 80906 | Harkan Properties, LLC |
| 31127 | S. Portland | 415 Philbrook Ave. Suite 100 | South Portland | ME | 4106 | Philbrook Avenue Associates LLC |
| 31072 | Sahara | 2400 W Sahara Ave. | Las Vegas | NV | 89102 | NFC, LLC |
| 31255 | Seal Beach | 12380 Seal Beach Blvd. | Seal Beach | CA | 90740 | Ranch Town Center, LLC |
| 31185 | Shelby | 14331 Hall Rd. | Shelby Township | MI | 48315 | WDRE MG LLC |
| 31307 | Simi Valley | 2920 Tapo Canyon Rd. | Simi Valley | CA | 93063 | South Street Center, LLc |
| 31235 | South Austin | 701 E Stassney Ln. Suite B | Austin | TX | 78745 | Thomas Tyler, Patricia Tyler and William Seider |
| 31287 | Stockton | 5420 Pacific Ave. | Stockton | CA | 95207 | Brixton Sherwood, LLC |
| 31109 | Strongsville | 17095 Southpark Ctr. | Strongsville | OH | 44136 | Southpark Mall, LLC c/o SRP Property Management, LLC |
| 31151 | Summerlin | 2001 N Rainbow Blvd. | Las Vegas | NV | 89108 | North Rainbow Boulevard Holdings |
| 31251 | Temecula | 41221 Margarita Rd. | Temecula | CA | 92591 | PFP Temecula Real Estate Holdings, LLC |
| 31273 | Triangle Town Center | 3421 Sumner Blvd. | Raleigh | NC | 27616 | CBL & Associates Management, Inc. |
| 31163 | Tucson | 5100 E Broadway Blvd. | Tucson | AZ | 85711 | Patricia Wahl Lapan, as Trustee of the Patricia Wahl Lapan Living Trust Pursuant to the Declatration of Trust dated April 15, 1994 which Trust was Restated on or about March 16, 2005, an Arizona Trust |
| 31148 | Tustin | 13652 Jamboree Rd. | Irvine | CA | 92602 | The Irvine Company LLC |
| 31238 | Tyrone Square | 2302 Tyrone Blvd. N | St. Petersburg | FL | 33710 | Seritage Growth Properties, L.P. |
| 31206 | UNCC | 8620 Research Dr. | Charlotte | NC | 28262 | OMILOS 1 LLC |

| 31067 | University | 1505 S University Dr. | Fort Worth | TX | 76107 | Bearden Children's Trust c/o C.C. Bearden Enterprises |
| 31300 | Virginia Beach | 4574 Virginia Beach Blvd. | Virginia Beach | VA | 23462 | Pembroke Square Associates |
| 31179 | Vista Ridge | 2437 S Stemmons Fwy. | Lewisville | TX | 75067 | Bill Stubbs & Company |
| 31299 | West Cobb | 3625 Dallas Hwy. SW | Marietta | GA | 30064 | CP Venture Five AWC LLC c/o Lennar Commercial Services, LLC |
| 31289 | Windward Pkwy | 5045 Windward Pkwy. | Alpharetta | GA | 30004 | Pioneer Real Estate Development |
| 31340 | Winter Garden | 3143 Daniels Rd. | Winter Garden | FL | 34787 | DDR Winter Garden LLC |
| 31195 | Wolfchase | 2859 N Germantown Pkwy. | Memphis | TN | 38133 | Brixmor Wolfcreek Outparcel Owner |
| 31088 | Woodlands | 1155 Lake Woodlands Dr. | Spring | TX | 77380 | AmREIT, Inc. |

**Schedule 4.18**
**Employee Benefit Plans**

None.

**Schedule 4.22**
**Insurance**

| Type of Coverage | Insurer & Last 4 Digits of Policy Number | Effective Date | Expiration Date | Annual Premium/ Fees |
|---|---|---|---|---|
| **1.  Property Policies** | | | | |
| Property | Liberty Mutual Fire Insurance Company 3097 | 4/17/17 | 4/17/18 | $695,979 |
| Flood (Lousiville, KY) | Integon National Insurance Company 8377 | 6/14/17 | 6/14/18 | $3,097 |
| Flood (Miami, Florida) | Imperial Fire & Casualty Insurance Company 8027 | 6/14/17 | 6/14/18 | $1,359 |
| Flood (Doral, Florida) | Imperial Fire & Casualty Insurance Company 8042 | 6/14/17 | 6/14/18 | $1,677 |
| Excess Flood* | Evanston Insurance Company, 2044 | 4/17/17 | 4/17/18 | $16,000 |
| **2.  Casualty** | | | | |
| Food Borne Illness* | Lloyds, London 7019 | 4/17/17 | 4/17/18 | $56,322 |
| Liquor Liability | Liberty Mutual Fire Insurance Company 3037 | 4/17/17 | 4/17/18 | $70,764 |
| General Liability | Liberty Mutual Fire Insurance Company 3027 | 4/17/17 | 4/17/18 | $196,891 |
| Automobile Liability | Liberty Mutual Fire Insurance Company 3047 | 4/17/17 | 4/17/18 | $20,400 |
| Umbrella Liability Policy | Liberty Insurance Corporation 3057 | 4/17/17 | 4/17/18 | $112,655 |
| Excess Liability* | Fireman's Fund 2286 | 4/17/17 | 4/17/18 | $44,370 |
| Cyber Liability* | XL Caitlin 24 01 | 4/17/17 | 4/17/18 | $84,200 |

| Type of Coverage | Insurer & Last 4 Digits of Policy Number | Effective Date | Expiration Date | Annual Premium/ Fees |
|---|---|---|---|---|
| International | Liberty Insurance Corporation 3067 | 4/17/17 | 4/17/18 | $2,624 |
| **3.  Management Liability Policies** | | | | |
| Directors & Officers Liability / Fiduciary Liability / Employment Practices Liability / Crime / Kidnap and Ransom* | Federal Insurance Company 6508 | 4/17/17 | 4/17/18 | $155,664 |
| **4.  Workers' Compensation** | | | | |
| Workers' Compensation & Employers' Liability[1] | Liberty Insurance Corporation 3017 | 4/17/17 | 4/17/18 | $536,821 |
| Workers' Compensation | Ohio Bureau of Workers' Compensation 2377-0 | 7/1/17 | 7/1/18 | $69,759 |
| Workers' Compensation | Washington State Department of Labor & Industries | 1/1/2017 | 12/31/2017 | Approx. $40,000 |

*Premiums for this Insurance Policy are financed pursuant to the PFA.

---

[1]     A standby letter of credit in favor of Liberty Mutual Insurance Company issued by the Bank of Colorado with a liability amount of $2,000,000 is outstanding in connection with policy periods from 2016 to 2018 in connection with the Debtors' workers' compensation policies.  A standby letter of credit in favor of The Travelers Indemnity Company issued by the Bank of Colorado with a liability amount of $425,000 is outstanding in connection with policy periods from 2009 to 2014 in connection with previous workers' compensation policies.  A standby letter of credit in favor of Zurich American Insurance Company issued by the Bank of Colorado with a liability amount of $700,000 is outstanding in connection with policy periods from 2014 to 2015 in connection with previous workers' compensation policies.

**Schedule 4.26**
**Deposit Accounts, Securities Accounts and Commodities Accounts**

| Credit Party | Bank | Account # | Bank Store Number | Mac Store Number | Account Purpose/ Restaurant Name |
|---|---|---|---|---|---|
| Mac Acquisition LLC | Bank of America | #1001 | N/A | N/A | Master concentration account |
| Mac Acquisition LLC | Bank of America | #2029 | N/A | N/A | Master depository account |
| Mac Acquisition LLC | Bank of America | #6608 | N/A | N/A | Payroll |
| Mac Acquisition LLC | Bank of America | #6611 | N/A | N/A | Accounts payable |
| Mac Acquisition LLC | Bank of America | #6624 | N/A | N/A | Imprest |
| Mac Acquisition LLC | Bank of America | #6637 | N/A | N/A | Credit card receipts |
| Mac Acquisition LLC | Bank of America | #7380 | N/A | N/A | Credit card cash collateral account[2] |
| Mac Acquisition LLC | Bank of America | #9721 | N/A | N/A | Benefits |
| Mac Acquisition LLC | Wells Fargo | #6998 | N/A | N/A | Store depository account |
| Mac Acquisition LLC | Wells Fargo | #8231 | N/A | N/A | Checking account |
| RMG Development, LLC | Bank of America | #0383 | N/A | N/A | Foreign royalties |
| Mac Parent LLC | Bank of Colorado | #9998 | N/A | N/A | Loan servicing |
| Mac Parent LLC | JPMorgan Chase | #5567 | N/A | N/A | Dental claims run-out |
| ***Restaurant Depository Accounts:*** | | | | | |
| Mac Acquisition LLC | Bank of America | #1415 | 10003 | 1003 | Kendall- |
| Mac Acquisition LLC | Bank of America | #4946 | 10004 | 1004 | Austin- |
| Mac Acquisition LLC | Bank of America | #1460 | 10015 | 1015 | Louisville- |
| Mac Acquisition LLC | Bank of America | #1473 | 10017 | 1017 | Arapahoe- |
| Mac Acquisition LLC | Bank of America | #1499 | 10022 | 1022 | Brandon- |
| Mac Acquisition LLC | Bank of America | #1716 | 10029 | 1029 | Albuquerque- |
| Mac Acquisition LLC | Bank of America | #1813 | 10033 | 1033 | N. Olmsted- |
| Mac Acquisition LLC | Bank of America | #1622 | 10037 | 1037 | S. Arlington- |
| Mac Acquisition LLC | Bank of America | #1729 | 10039 | 1039 | Carrollwood- |
| Mac Acquisition LLC | Bank of America | #1732 | 10045 | 1045 | Plano/544- |
| Mac Acquisition LLC | Bank of America | #1648 | 10050 | 1050 | Little Rock- |
| Mac Acquisition LLC | Bank of America | #1745 | 10053 | 1053 | Livonia- |
| Mac Acquisition LLC | Bank of America | #1651 | 10060 | 1060 | Kissimmee- |
| Mac Acquisition LLC | Bank of America | #1855 | 10064 | 1064 | Montrose- |
| Mac Acquisition LLC | Bank of America | #1664 | 10067 | 1067 | University- |
| Mac Acquisition LLC | Bank of America | #1868 | 10072 | 1072 | Sahara- |
| Mac Acquisition LLC | Bank of America | #1871 | 10078 | 1078 | Roseville- |
| Mac Acquisition LLC | Bank of America | #1583 | 10081 | 1081 | Lake Buena Vista- |
| Mac Acquisition LLC | Bank of America | #1596 | 10088 | 1088 | Woodlands- |
| Mac Acquisition LLC | Bank of America | #1693 | 10089 | 1089 | Annapolis- |
| Mac Acquisition LLC | Bank of America | #1703 | 10108 | 1108 | Greenville- |
| Mac Acquisition LLC | Bank of America | #1800 | 10109 | 1109 | Strongsville- |
| Mac Acquisition LLC | Bank of America | #1910 | 10112 | 1112 | Henrietta- |
| Mac Acquisition LLC | Bank of America | #1936 | 10115 | 1115 | Cary- |
| Mac Acquisition LLC | Bank of America | #1949 | 10116 | 1116 | Oxford Valley- |
| Mac Acquisition LLC | Bank of America | #1952 | 10120 | 1120 | Huntington Beach- |

---

[2]     Account maintained to collateralize the balances under the corporate credit cards issued pursuant to the Authorization and Agreement for Treasury Services dated as of May 5, 2010 between Mac Acquisition LLC, Mac Parent LLC and Bank of America set forth on Schedule 6.1.

| Mac Acquisition LLC | Bank of America | #2003 | 10127 | 1127 | S. Portland- |
|---|---|---|---|---|---|
| Mac Acquisition LLC | Bank of America | #2016 | 10131 | 1131 | Corpus Christi- |
| Mac Acquisition LLC | Bank of America | #2113 | 10132 | 1132 | Beacon Center- |
| Mac Acquisition LLC | Bank of America | #2029 | 10141 | 1141 | Ann Arbor- |
| Mac Acquisition LLC | Bank of America | #2320 | 10145 | 1145 | Aliso Viejo- |
| Mac Acquisition LLC | Bank of America | #2032 | 10148 | 1148 | Tustin- |
| Mac Acquisition LLC | Bank of America | #2139 | 10151 | 1151 | Summerlin- |
| Mac Acquisition LLC | Bank of America | #2333 | 10156 | 1156 | Henderson- |
| Mac Acquisition LLC | Bank of America | #2142 | 10161 | 1161 | Fresno- |
| Mac Acquisition LLC | Bank of America | #2346 | 10163 | 1163 | Tucson- |
| Mac Acquisition LLC | Bank of America | #2058 | 10165 | 1165 | Colonie- |
| Mac Acquisition LLC | Bank of America | #2155 | 10167 | 1167 | Denver West- |
| Mac Acquisition LLC | Bank of America | #2168 | 10174 | 1174 | Birmingham- |
| Mac Acquisition LLC | Bank of America | #4962 | 10176 | 1176 | Round Rock- |
| Mac Acquisition LLC | Bank of America | #2362 | 10178 | 1178 | Deer Valley- |
| Mac Acquisition LLC | Bank of America | #2074 | 10179 | 1179 | Vista Ridge- |
| Mac Acquisition LLC | Bank of America | #2278 | 10182 | 1182 | Fashion Place- |
| Mac Acquisition LLC | Bank of America | #2375 | 10184 | 1184 | Reno- |
| Mac Acquisition LLC | Bank of America | #2087 | 10185 | 1185 | Shelby- |
| Mac Acquisition LLC | Bank of America | #2388 | 10195 | 1195 | Wolfchase- |
| Mac Acquisition LLC | Bank of America | #2090 | 10197 | 1197 | Cerritos- |
| Mac Acquisition LLC | Bank of America | #2294 | 10199 | 1199 | Auburn Hills- |
| Mac Acquisition LLC | Bank of America | #2100 | 10203 | 1203 | Northridge- |
| Mac Acquisition LLC | Bank of America | #2304 | 10206 | 1206 | UNCC- |
| Mac Acquisition LLC | Bank of America | #3400 | 10212 | 1212 | Cedar Hill- |
| Mac Acquisition LLC | Bank of America | #3439 | 10216 | 1216 | Mall of Georgia- |
| Mac Acquisition LLC | Bank of America | #3442 | 10222 | 1222 | Retama- |
| Mac Acquisition LLC | Bank of America | #3471 | 10229 | 1229 | Legacy- |
| Mac Acquisition LLC | Bank of America | #3484 | 10233 | 1233 | Desert Ridge- |
| Mac Acquisition LLC | Bank of America | #3497 | 10234 | 1234 | Frisco- |
| Mac Acquisition LLC | Bank of America | #4988 | 10235 | 1235 | South Austin- |
| Mac Acquisition LLC | Bank of America | #2430 | 10238 | 1238 | Tyrone Square- |
| Mac Acquisition LLC | Bank of America | #2472 | 10245 | 1245 | Folsom- |
| Mac Acquisition LLC | Bank of America | #2485 | 10246 | 1246 | Palm Valley- |
| Mac Acquisition LLC | Bank of America | #2498 | 10251 | 1251 | Temecula- |
| Mac Acquisition LLC | Bank of America | #2508 | 10252 | 1252 | Elk Grove- |
| Mac Acquisition LLC | Bank of America | #2524 | 10255 | 1255 | Seal Beach- |
| Mac Acquisition LLC | Bank of America | #2728 | 10257 | 1257 | Anaheim Hills- |
| Mac Acquisition LLC | Bank of America | #2566 | 10268 | 1268 | East El Paso- |
| Mac Acquisition LLC | Bank of America | #2579 | 10273 | 1273 | Triangle Town Center |
| Mac Acquisition LLC | Bank of America | #2689 | 10279 | 1279 | Frederick- |
| Mac Acquisition LLC | Bank of America | #2595 | 10280 | 1280 | Opry Mills- |
| Mac Acquisition LLC | Bank of America | #2692 | 10283 | 1283 | Oceanside- |
| Mac Acquisition LLC | Bank of America | #2605 | 10285 | 1285 | North County Fair |
| Mac Acquisition LLC | Bank of America | #2702 | 10286 | 1286 | Bakersfield- |
| Mac Acquisition LLC | Bank of America | #2618 | 10287 | 1287 | Stockton- |
| Mac Acquisition LLC | Bank of America | #2715 | 10289 | 1289 | Windward Parkway- |
| Mac Acquisition LLC | Bank of America | #2757 | 10292 | 1292 | Ft. Collins- |
| Mac Acquisition LLC | Bank of America | #2760 | 10294 | 1294 | Corona- |
| Mac Acquisition LLC | Bank of America | #2773 | 10296 | 1296 | North Aurora- |
| Mac Acquisition LLC | Bank of America | #2799 | 10299 | 1299 | West Cobb- |
| Mac Acquisition LLC | Bank of America | #2809 | 10300 | 1300 | North Tucson- |
| Mac Acquisition LLC | Bank of America | #2812 | 10301 | 1301 | Virginia Beach- |
| Mac Acquisition LLC | Bank of America | #2825 | 10302 | 1302 | Puente Hills- |

| | | | | | |
|---|---|---|---|---|---|
| Mac Acquisition LLC | Bank of America | #2838 | 10307 | 1307 | Simi Valley- |
| Mac Acquisition LLC | Bank of America | #2854 | 10314 | 1314 | Church Ranch- |
| Mac Acquisition LLC | Bank of America | #2870 | 10324 | 1324 | Redlands- |
| Mac Acquisition LLC | Bank of America | #2980 | 10327 | 1327 | Harrisburg- |
| Mac Acquisition LLC | Bank of America | #2922 | 10339 | 1339 | Otay Ranch- |
| Mac Acquisition LLC | Bank of America | #3028 | 10340 | 1340 | Winter Garden- |
| Mac Acquisition LLC | Bank of America | #3507 | 10342 | 1342 | Murfreesboro- |
| Mac Acquisition LLC | Bank of America | #3510 | 10345 | 1345 | Oviedo- |
| Mac Acquisition LLC | Bank of America | #4594 | 10346 | 1346 | Milpitas- |
| Mac Acquisition LLC | Bank of America | #4620 | 10347 | 1347 | El Cerrito- |
| Mac Acquisition LLC | Bank of America | #4604 | 10349 | 1349 | Alderwood- |
| Mac Acquisition LLC | Wells Fargo | #6972 | 410.002.0284 | 1284 | Franconia |
| Mac Acquisition LLC | Wells Fargo | #8121 | 410.002.0196 | 1196 | So. Colorado Springs-Mac Grill |
| Mac Acquisition LLC | Wells Fargo | #6914 | 4100020079 | 31079 | Fairfax |
| Mac Acquisition LLC | Wells Fargo | #6927 | 4100020119 | 31119 | Winston Salem |
| Mac Acquisition LLC | Wells Fargo | #6930 | 4100020158 | 31158 | Woodbridge |
| Mac Acquisition LLC | Wells Fargo | #6943 | 4100020207 | 31207 | Dulles |
| Mac Acquisition LLC | Wells Fargo | #6969 | 4100020259 | 31259 | Greensboro |
| Mac Acquisition LLC | Wells Fargo | #5863 | N/A | 31017 | Arapahoe |
| Mac Acquisition LLC | Wells Fargo | #5871 | N/A | 31167 | Denver West |
| Mac Acquisition LLC | Wells Fargo | #5889 | N/A | 31292 | Ft. Collins |
| Mac Acquisition LLC | Wells Fargo | #5897 | N/A | 31296 | N. Aurora |
| Mac Acquisition LLC | Wells Fargo | #5905 | N/A | 31314 | Church Ranch |
| Mac Acquisition LLC | Wells Fargo | #5913 | N/A | 31174 | Birmingham |
| Mac Acquisition LLC | Wells Fargo | #5921 | N/A | 31182 | Fashion Place |
| Mac Acquisition LLC | Wells Fargo | #0427 | N/A | 31327 | Harrisburg |

**Schedule 6.1**
**Indebtedness**

Indebtedness incurred pursuant to:

Business Loan Agreement dated as of April 17, 2015 between Mac Parent LLC and Bank of Colorado, as amended, and guarantees made in connection therewith, in the maximum principal amount of $12,000,000.

Business Loan Agreement dated as of December 20, 2016 between Mac Parent LLC and Bank of Colorado, as amended, and guarantees made in connection therewith, in the maximum principal amount of $2,500,000.

Business Loan Agreement dated as of September 19, 2017 between Mac Parent LLC and Bank of Colorado, as amended, and guarantees made in connection therewith, in the maximum principal amount of $3,500,000.

Promissory Note dated as of July 3, 2017 made by Mac Parent LLC in favor of Riesen Funding LLC, in the maximum principal amount of $5,000,000.

Authorization and Agreement for Treasury Services dated as of May 5, 2010 between Mac Acquisition LLC, Mac Parent LLC and Bank of America, in a maximum amount of $73,000[3].

Master Lease and Financing Agreement No. 12128 dated on or about July 28, 2015 between Mac Acquisition LLC and Cisco Systems Capital Corporation, as amended, in an amount of $344,434.97.

Master Distribution Agreement dated as of July 1, 2016 by and between Sysco Corporation and Mac Acquisition LLC, in the amount of approximately $2,500,000 as of the Closing Date.

Distribution Agreement dated as of July 29, 2016 by and between Mac Acquisition LLC d/b/a Romano's Macaroni Grill and Edward Don & Company, in the amount of approximately $500,000 as of the Closing Date.

Services and Supplier Agreement by Mac Parent LLC and Cozzini Bros., Inc.

---

[3]     The credit limit for the corporate credit cards is subject to the balance in the cash collateral account, which must hold 110% of the amount of credit available. There is approximately $80,000 in the cash collateral as of the date hereof and approximately $50,000 in outstanding balances as of the date hereof.

Schedule 6.2
Liens

| Debtor | File Number | File Date | Expiration Date | Filing Jurisdiction | Secured Party |
|---|---|---|---|---|---|
| ROMANO'S MACARONI GRILL | 20163725411 | 06/21/2016 | 06/21/2021 | Delaware SOS | SYSCO CORPORATION CORPORATE HEADQUARTERS |
| MAC ACQUISITION LLC | 20153370573 | 08/04/2015 | 08/04/2020 | Delaware SOS | CISCO SYSTEMS CAPITAL CORPORATION |
| MAC ACQUISITION LLC | 20152433331 | 06/08/2015 | 06/08/2020 | Delaware SOS | BANK OF COLORADO |
| MAC ACQUISITION LLC | 20173749246 | 06/07/2017 | 06/07/2022 | Delaware SOS | EDWARD DON & COMPANY |
| MAC ACQUISITION LLC | 20174368873 | 07/03/2017 | 07/03/2022 | Delaware SOS | REISEN FUNDING LLC |
| MAC PARENT LLC | 20152433166 | 06/08/2015 | 06/08/2020 | Delaware SOS | BANK OF COLORADO |
| MAC PARENT LLC | 20174387814 | 07/03/2017 | 07/03/2022 | Delaware SOS | RIESEN FUNDING LLC |
| MAC HOLDING LLC | 20152440823 | 06/08/2015 | 06/08/2020 | Delaware SOS | BANK OF COLORADO |
| MAC HOLDING LLC | 20174387772 | 07/03/2017 | 07/03/2022 | Delaware SOS | RIESEN FUNDING LLC |
| MAC ACQUISITION OF NEW JERSEY LLC | 52421914 | 09/22/2017 | 09/22/2022 | New Jersey SOS | BANK OF COLORADO |
| MAC ACQUISITION OF KANSAS LLC | 113041085 | 09/22/2017 | 09/22/2022 | Kansas SOS | BANK OF COLORADO |
| MAC ACQUISITION OF ANNE ARUNDEL COUNTY LLC | 170922-1959000 | 09/22/2017 | 09/22/2022 | Maryland SOS | BANK OF COLORADO |
| MAC ACQUISITION OF BALTIMORE COUNTY LLC | | | | | |
| MAC ACQUISITION OF FREDERICK COUNTY LLC | | | | | |
| MAC ACQUISITION IP LLC | 20152441078 | 06/08/2015 | 06/08/2020 | Delaware SOS | BANK OF COLORADO |
| RMG DEVELOPMENT, LLC | 20152441300 | 06/08/2015 | 06/08/2020 | Delaware SOS | BANK OF COLORADO |
| MAC PARENT LLC | R2017-092123 | 09/07/2017 | | DuPage County Recorder, Illinois | LIG ELECTRIC, INC. |
| ROMANO'S MACARONI GRILL | Doc 34762 Bk: 34173 Pg: 49 | 07/20/3017 | | Cumberland County Registry of Deeds, Maine | AIRTEMP, INC. |
| MAC ACQUISITION LLC | | | | | |
| ROMANO'S MACARONI GRILL | | | | County of Wayne, Michigan | GRAMPIAN STRIPING, INC.* |
| ROMANO'S MACARONI GRILL | | | | Oakland County, Michigan | GRAMPIAN STRIPING, INC.* |
| MAC ACQUISITION LLC | Orig: 775 Bndl: 12,808 | 04/25/2017 | | East Baton Rouge Parish Clerk of Court and Recorded | HY-TECH ROOFING SERVICES, INC.* |
| ROMANO'S MACARONI GRILL | | | | | |

Account in the name of Mac Acquisition LLC maintained to collateralize the balances under the corporate credit cards issued pursuant to the Authorization and Agreement for Treasury Services dated as of May 5, 2010 between Mac Acquisition LLC, Mac Parent LLC and Bank of America set forth on Schedule 6.1.

*Vendor has been paid in full and a lien release has been requested.

**Schedule 6.5**
**Restrictions on Subsidiary Distributions**.

Restrictions imposed by:

Business Loan Agreement dated as of April 17, 2015 between Mac Parent LLC and Bank of Colorado, as amended, and guarantees made in connection therewith.

**Schedule 6.6**
**Investments**

None.

**Schedule 7.14(a)**
**Pledged Investment Property**

| Credit Party | Issuer | Percentage Ownership | Type of Entity | Number and Class of Stock |
|---|---|---|---|---|
| Mac Holding LLC | Mac Acquisition LLC | 100% | limited liability company | membership interests |
| Mac Parent LLC | Mac Holding LLC | 100% | limited liability company | membership interests |
| Mac Holding LLC | Macaroni Grill Services LLC | 100% | limited liability company | membership interests |
| Mac Acquisition LLC | Mac Acquisition of New Jersey LLC | 100% | limited liability company | membership interests |
| Mac Acquisition LLC | Mac Acquisition of Kansas LLC | 100% | limited liability company | membership interests |
| Mac Acquisition LLC | Mac Acquisition of Anne Arundel County LLC | 100% | limited liability company | membership interests |
| Mac Acquisition LLC | Mac Acquisition of Frederick County LLC | 100% | limited liability company | membership interests |
| Mac Acquisition LLC | Mac Acquisition of Baltimore County LLC | 100% | limited liability company | membership interests |
| Mac Parent LLC | Mac Acquisition IP LLC | 100% | limited liability company | membership interests |
| Mac Acquisition LLC | RMG Development, LLC | 100% | limited liability company | membership interests |

**Schedule 7.14(b)**
**Commercial Tort Claims**

None.

EXHIBIT A TO
DEBTOR-IN-POSSESSION CREDIT, GUARANTY
AND SECURITY AGREEMENT

**FUNDING NOTICE**

**October [●], 2017**

Reference is made to the Debtor-in-Possession Credit, Guaranty and Security Agreement, dated as of October [●], 2017 (as it may be amended, supplemented or otherwise modified, the "**Credit Agreement**"; the terms defined therein and not otherwise defined herein being used herein as therein defined), by and among **MAC ACQUISITION LLC**, a Delaware limited liability company ("**Borrower**"), certain subsidiaries and affiliates of Borrower, as Guarantors, the DIP Lenders party thereto from time to time, and **RAVEN ASSET-BASED OPPORTUNITY FUND III LP**, a Delaware limited partnership, as DIP Agent.

Pursuant to Section 2.1 of the Credit Agreement and the DIP Order, Borrower desires that DIP Lenders make Loans in an aggregate principal amount of $[_____] to Borrower by deposit into the Loan Proceeds Account and otherwise in accordance with the applicable terms and conditions of the Credit Agreement and the DIP Order on [**mm/dd/yy**] (the "**Credit Date**").

Borrower hereby certifies that:

(i)        as of the Credit Date, the representations and warranties contained in each of the Credit Documents are true and correct in all material respects (except such representations and warranties that by their terms are qualified by materiality or a Material Adverse Effect, which representations and warranties are true and correct in all respects) on and as of the Credit Date; and

(ii)        as of the Credit Date, no event has occurred and is continuing or would result from the making of the Loans on the Credit Date that would constitute an Event of Default or a Default.

[Remainder of page intentionally left blank]

**MAC ACQUISITION LLC**, as Borrower

By: _____
Name:
Title:

EXHIBIT B TO
DEBTOR-IN-POSSESSION CREDIT, GUARANTY
AND SECURITY AGREEMENT

**NOTE**

$[___,___,___]

[DATE]                                                          New York, New York

   **FOR VALUE RECEIVED, MAC ACQUISITION LLC,** a Delaware limited liability company
(**"Borrower"**) promises to pay [_____] (**"Payee"**) or its registered assigns the principal amount of
[_____] **DOLLARS** ($[___,____,____]) or, if less, the unpaid principal amount of all Loan(s)
made by DIP Lender, in each case, on or before the Maturity Date (as defined in the Credit Agreement
referred to below).

   Borrower also promises to pay interest on the unpaid principal amount hereof, from the date
hereof until paid in full, at the rates and at the times which shall be determined in accordance with the
provisions of that certain Debtor-in-Possession Credit, Guaranty and Security Agreement, dated as of
October [●], 2017 (as it may be amended, supplemented or otherwise modified, the "**Credit Agreement**";
the terms defined therein and not otherwise defined herein being used herein as therein defined), by and
among **BORROWER**, certain subsidiaries and affiliates of Borrower, as Guarantors, the DIP Lenders
party thereto from time to time, and **RAVEN ASSET-BASED OPPORTUNITY FUND III LP**, a
Delaware limited partnership, as DIP Agent.

   This Note is one of the "**Notes**" issued pursuant to and entitled to the benefits of, and evidences
Obligations incurred under, the Credit Agreement, to which reference is hereby made for a more complete
statement of the terms and conditions under which the Loan(s) evidenced hereby was made and is to be
repaid.

   All payments of principal and interest in respect of this Note shall be made in Dollars in same day
funds to DIP Agent's Account or at such other place as shall be designated in writing for such purpose in
accordance with the terms of the Credit Agreement.  Unless and until an Assignment Agreement effecting
the assignment or transfer of the Obligations evidenced hereby in accordance with the provisions of the
Credit Agreement shall have been accepted by DIP Agent and recorded in the Register, Borrower, DIP
Agent and DIP Lenders shall be entitled to deem and treat Payee as the owner and holder of this Note and
the Obligations evidenced hereby.  Payee hereby agrees, by its acceptance hereof, that before disposing of
this Note or any part hereof it will make a notation hereon of all principal payments previously made
hereunder and of the date to which interest hereon has been paid; *provided*, that the failure to make a
notation of any payment made on this Note shall not limit or otherwise affect the obligations of Borrower
hereunder with respect to payments of principal of or interest on this Note.

   This Note is subject to mandatory prepayment and to prepayment at the option of Borrower, each
as provided in the Credit Agreement.

   EXCEPT TO THE EXTENT GOVERNED BY THE BANKRUPTCY CODE, THIS NOTE
AND THE RIGHTS AND OBLIGATIONS OF BORROWER AND PAYEE HEREUNDER SHALL BE
GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH,
THE LAWS OF THE STATE OF NEW YORK.

Upon the occurrence of an Event of Default, the unpaid balance of the principal amount of this Note, together with all accrued and unpaid interest thereon, may become, or may be declared to be, due and payable in the manner, upon the conditions and with the effect provided in the Credit Agreement.

The terms of this Note are subject to amendment only in the manner provided in the Credit Agreement.

No reference herein to the Credit Agreement and no provision of this Note or the Credit Agreement shall alter or impair the obligations of Borrower, which are absolute and unconditional, to pay the principal of and interest on this Note at the place, at the respective times, and in the currency herein prescribed.

Borrower promises to pay all reasonable and documented out-of-pocket costs and expenses, including reasonable and documented attorneys' fees, all as provided in and to the extent required by the Credit Agreement, incurred in the collection and enforcement of this Note.  Borrower and any endorsers of this Note hereby consent to renewals and extensions of time at or after the maturity hereof, without notice, and hereby waive diligence, presentment, protest, demand notice of every kind and, to the full extent permitted by law, the right to plead any statute of limitations as a defense to any demand hereunder.

Borrower is obligated and fully liable for the amount due under this Note in accordance with the terms and conditions of the Credit Documents. The DIP Agent, on behalf of the Payee, has the right to sue on this Note and obtain a judgment against Borrower for satisfaction of the amount due under this Note.

[Remainder of page intentionally left blank]

**IN WITNESS WHEREOF**, Borrower has caused this Note to be duly executed and delivered by its officers thereunto duly authorized as of the date and at the place first written above.

**MAC ACQUISITION LLC**, as Borrower

By: _____
Name:
Title:

EXHIBIT C TO
DEBTOR-IN-POSSESSION CREDIT, GUARANTY
AND SECURITY AGREEMENT

**WITHDRAWAL CERTIFICATE**

**[_____ __], 2017**

Reference is made to the Debtor-in-Possession Credit, Guaranty and Security Agreement, dated as of October [●], 2017 (as it may be amended, supplemented or otherwise modified, the "**Credit Agreemen**t"; the terms defined therein and not otherwise defined herein being used herein as therein defined), by and among **MAC ACQUISITION LLC**, a Delaware limited liability company ("**Borrower**"), certain subsidiaries and affiliates of Borrower, as Guarantors, the DIP Lenders party thereto from time to time, and **RAVEN ASSET-BASED OPPORTUNITY FUND III LP**, a Delaware limited partnership, as DIP Agent.

Pursuant to Section 2.1(c)(i) of the Credit Agreement, Borrower hereby requests that on **[mm/dd/yy]** (the "**Withdrawal Date**") DIP Lenders and DIP Agent (at the direction of the Requisite DIP Lenders) release funds in an aggregate amount of $[_____] (the "**Withdrawal**") from the Loan Proceeds Account to the Master Concentration Account on [_____], 2017[1].

Borrower hereby certifies that, both before and after giving effect to the Withdrawal and the proposed use of proceeds thereof:

(i)     no Default or Event of Default has occurred and is continuing;

(ii)    the representations and warranties contained in each of the Credit Documents are true and correct in all material respects (except such representations and warranties that by their terms are qualified by materiality or a Material Adverse Effect, which representations and warranties are true and correct in all respects) on and as of the date of delivery of this Withdrawal Certificate;

(iii)   Borrower is in pro forma compliance with the Budget Covenant;

(iv)    the intended use of proceeds is in compliance with the Budget; and

(v)     the aggregate withdrawals made by Borrower from the Loan Proceeds Accounts since the Petition Date does not exceed the amount permitted to be borrowed pursuant to the terms of the applicable DIP Order.

[Remainder of page intentionally left blank]

---

[1] To be at least 2 Business Days after the date of the Withdrawal Certificate.

**MAC ACQUISITION LLC**, as Borrower

By: _____

Name:

Title:

EXHIBIT D TO<br>
DEBTOR-IN-POSSESSION CREDIT, GUARANTY<br>
AND SECURITY AGREEMENT

**ASSIGNMENT AND ASSUMPTION AGREEMENT**

This Assignment and Assumption Agreement (the "**Assignment**") is dated as of the Effective Date set forth below and is entered into by and between [*Insert name of Assignor*] (the "**Assignor**") and [*Insert name of Assignee*] (the "**Assignee**"). Capitalized terms used but not defined herein shall have the meanings given to them in the Credit Agreement identified below (as it may be amended, supplemented or otherwise modified from time to time, the "**Credit Agreement**"), receipt of a copy of which is hereby acknowledged by the Assignee. The Standard Terms and Conditions set forth in Annex 1 attached hereto are hereby agreed to and incorporated herein by reference and made a part of this Assignment as if set forth herein in full.

For an agreed consideration, the Assignor hereby irrevocably sells and assigns to the Assignee, and the Assignee hereby irrevocably purchases and assumes from the Assignor, subject to and in accordance with the Standard Terms and Conditions and the Credit Agreement, as of the Effective Date inserted by the DIP Agent as contemplated below (i), the interest in and to all of the Assignor's rights and obligations under the Credit Agreement and any other documents or instruments delivered pursuant thereto that represents the amount and percentage interest identified below of all of the Assignor's outstanding rights and obligations under the facility identified below, and (ii) to the extent permitted to be assigned under applicable law, all claims, suits, causes of action and any other right of the Assignor against any person, whether known or unknown, arising under or in connection with the Credit Agreement, any other documents or instruments delivered pursuant thereto or the loan transactions governed thereby or in any way based on or related to any of the foregoing, including, but not limited to, contract claims, tort claims, malpractice claims, statutory claims and all other claims at law or in equity related to the rights and obligations sold and assigned pursuant to clause (i) above (the rights and obligations sold and assigned by the Assignor to the Assignee pursuant to clauses (i) and (ii) above being referred to herein collectively as the "**Assigned Interest**"). Such sale and assignment is without recourse to the Assignor and, except as expressly provided in this Assignment and the Credit Agreement, without representation or warranty by the Assignor.

1. Assignor:           _____

2. Assignee:           _____ which is an Eligible Assignee

3. Borrower:           **MAC ACQUISITION LLC,** a Delaware limited liability company

4. DIP Agent:          **RAVEN ASSET-BASED OPPORTUNITY FUND III LP**, a Delaware limited partnership, as administrative agent and collateral agent under the Credit Agreement

5. Credit Agreement:   Debtor-in-Possession Credit, Guaranty and Security Agreement dated as of October [●], 2017, as amended, supplemented and/or modified from time to time, by and

among the Borrower, certain subsidiaries and affiliates of Borrower, as Guarantors, the DIP Lenders party thereto from time to time, and the DIP Agent

6.   Assigned Interest:

| Facility Assigned | Aggregate Principal Amount of Loans/Commitments for all DIP Lenders | Principal Amount of Loans/Commitments Assigned | Percentage Assigned of Loans/Commitments[1] |
|---|---|---|---|
| Loans | $_____ | $_____ | _____% |

Effective Date: _____, 20__ [TO BE INSERTED BY DIP AGENT AND WHICH SHALL BE THE EFFECTIVE DATE OF RECORDATION OF TRANSFER IN THE REGISTER THEREFOR.]

7.   Notice and Wire Instructions:

**[NAME OF ASSIGNOR]**                              **[NAME OF ASSIGNEE]**

Notices:                                           Notices:

_____                        _____
_____                        _____
_____                        _____
Attention:                                         Attention:
Telecopier:                                        Telecopier:

with a copy to:                                    with a copy to:

_____                        _____
_____                        _____
_____                        _____
Attention:                                         Attention:
Telecopier:                                        Telecopier:

Wire Instructions:                                 Wire Instructions:

---

[1]   Set forth, to at least 9 decimals, as a percentage of the Loans of all DIP Lenders thereunder.

The terms set forth in this Assignment are hereby agreed to:

ASSIGNOR
**[NAME OF ASSIGNOR]**

By: _____
Name:
Title:


ASSIGNEE
**[NAME OF ASSIGNEE]**

By: _____
Name:
Title:


ACKNOWLEDGED AND AGREED:

**RAVEN ASSET-BASED OPPORTUNITY FUND III LP**, a Delaware limited partnership,
as DIP Agent

By: Raven Capital Management GP LLC, a Delaware limited liability company, its general partner

By: _____
Name:
Title:

ANNEX 1

STANDARD TERMS AND CONDITIONS FOR ASSIGNMENT<br>AND ASSUMPTION AGREEMENT

1.      <u>Representations and Warranties</u>.

    1.1     <u>Assignor</u>.  The Assignor (a) represents and warrants that (i) it is the legal and beneficial owner of the Assigned Interest, (ii) the Assigned Interest is free and clear of any lien, encumbrance or other adverse claim and (iii) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and to consummate the transactions contemplated hereby; and (b) assumes no responsibility with respect to (i) any statements, warranties or representations made in or in connection with any Credit Document (as defined below), (ii) the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Credit Agreement or any other  instrument or document delivered pursuant thereto, other than this Assignment (herein collectively the "**Credit Documents**"), or any collateral thereunder, (iii) the financial condition of Borrower, any of its Subsidiaries or Affiliates or any other Person obligated in respect of any Credit Document or (iv) the performance or observance by Borrower, any of its Subsidiaries or Affiliates or any other Person of any of their respective obligations under any Credit Document.

    1.2     <u>Assignee</u>.  The Assignee (a) represents and warrants that (i) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and to consummate the transactions contemplated hereby and to become a DIP Lender under the Credit Agreement, (ii) from and after the Effective Date, it shall be bound by the provisions of the Credit Agreement and the other Credit Documents and, to the extent of the Assigned Interest, shall have the obligations of a DIP Lender thereunder, (iii) it is sophisticated with respect to decisions to acquire assets of the type represented by the Assigned Interest and either it, or the person exercising discretion in making its decision to acquire the Assigned Interest, is experienced in acquiring assets of such type, (iv) it has received a copy of the Credit Agreement and has received or has been accorded the opportunity to receive copies of the most recent financial statements delivered pursuant to the terms of the Credit Agreement, as applicable, and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Assignment and to purchase the Assigned Interest on the basis of which it has made such analysis and decision, (v) it has, independently and without reliance upon the DIP Agent or any other DIP Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Assignment and to purchase the Assigned Interest, and (vi) if it is a Non-U.S. DIP Lender, attached to the Assignment is any documentation required to be delivered by it pursuant to the terms of the Credit Agreement, duly completed and executed by the Assignee; and (b) agrees that (i) it will, independently and without reliance on the DIP Agent, the Assignor or any other DIP Lender, and based on such documents and information as it shall deem appropriate at that time, continue to make its own credit decisions in taking or not taking action under the Credit Documents, and (ii) it will perform in accordance with their

terms all of the obligations which by the terms of the Credit Documents are required to be performed by it as a DIP Lender.

2.    <u>Payments</u>.  All payments with respect to the Assigned Interests shall be made on the Effective Date as follows:  unless notice to the contrary is delivered to the DIP Lender from the DIP Agent, payment to the Assignor by the Assignee in respect of the Assigned Interest shall include such compensation to the Assignor as may be agreed upon by the Assignor and the Assignee with respect to all unpaid interest which has accrued on the Assigned Interest to but excluding the Effective Date.  On and after the applicable Effective Date, the Assignee shall be entitled to receive all interest paid or payable with respect to the Assigned Interest, whether such interest accrued before or after the Effective Date.

3.    <u>General Provisions</u>.  This Assignment shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and assigns.  This Assignment may be executed in any number of counterparts, which together shall constitute one instrument.  Delivery of an executed counterpart of a signature page of this Assignment by telecopy or electronic mail transmission shall be effective as delivery of a manually executed counterpart of this Assignment.  Except to the extent governed by the Bankruptcy Code, this Assignment shall be governed by, and construed and enforced in accordance with, the laws of the State of New York.

[Remainder of page intentionally left blank]

EXHIBIT E TO
DEBTOR-IN-POSSESSION CREDIT, GUARANTY
AND SECURITY AGREEMENT

**CLOSING DATE CERTIFICATE**

October [●], 2017

**THE UNDERSIGNED HEREBY CERTIFY AS FOLLOWS:**

1.      I am the Chief Financial Officer of **MAC ACQUISITION LLC**, a Delaware limited liability company ("**Borrower**").

2.      Pursuant to Section 2.1 of the Debtor-in-Possession Credit, Guaranty and Security Agreement, dated as of the date hereof (as it may be amended, supplemented or otherwise modified, the "**Credit Agreement**"; the terms defined therein and not otherwise defined herein being used herein as therein defined), by and among Borrower, certain subsidiaries and affiliates of Borrower, as Guarantors, the DIP Lenders party thereto from time to time, and **RAVEN ASSET-BASED OPPORTUNITY FUND III LP**, a Delaware limited partnership, as DIP Agent, Borrower requests that DIP Lenders make the following Loans to Borrower, on October [●], 2017 (the "**Closing Date**"):

Loan:                                  $[_____]

3.      I have reviewed the terms of Section 3 of the Credit Agreement and the definitions and provisions contained in such Credit Agreement relating thereto, and in my opinion, have made, or have caused to be made under my supervision, such examination or investigation as is reasonably necessary to enable me to express an informed opinion as to the matters referred to herein.

4.      Based upon my review and examination described in paragraph 3 above, I certify, solely in my capacity as Chief Financial Officer of Borrower, that as of the date hereof:

(i)      as of the Closing Date, the representations and warranties contained in each of the Credit Documents are true and correct in all material respects (except such representations and warranties that by their terms are qualified by materiality or a Material Adverse Effect, which representations and warranties are true and correct in all respects) on and as of Closing Date; and

(ii)      as of the Closing Date, no event has occurred and is continuing or would result from the making of the Loans on the Closing Date that would constitute an Event of Default or a Default.

The foregoing certifications are made and delivered as of October [●], 2017.

By: _____
    Name:
    Title:

EXHIBIT F TO
DEBTOR-IN-POSSESSION CREDIT,
GUARANTY
AND SECURITY AGREEMENT

**CERTIFICATE REGARDING NON-BANK STATUS**

**October [●], 2017**

Reference is made to the Debtor-in-Possession Credit, Guaranty and Security Agreement, dated as of October [●], 2017 (as it may be amended, supplemented or otherwise modified, the "**Credit Agreement**"; the terms defined therein and not otherwise defined herein being used herein as therein defined), by and among **MAC ACQUISITION LLC**, a Delaware limited liability company ("**Borrower**"), certain subsidiaries and affiliates of Borrower, as Guarantors, the DIP Lenders party thereto from time to time, and **RAVEN ASSET-BASED OPPORTUNITY FUND III LP**, a Delaware limited partnership, as DIP Agent.  Pursuant to Section 2.16(f) of the Credit Agreement, the undersigned hereby certifies that it is not a "bank" or other Person described in Section 881(c)(3) of the Internal Revenue Code of 1986, as amended.

**[_____]**

By: _____
      Name:
      Title:

EXHIBIT H TO
DEBTOR-IN-POSSESSION CREDIT, GUARANTY
AND SECURITY AGREEMENT

**U.S. TAX COMPLIANCE CERTIFICATE**
**(For Foreign Lenders That Are Not Partnerships**
**For U.S. Federal Income Tax Purposes)**

Reference is made to the Debtor-in-Possession Credit, Guaranty and Security Agreement, dated as of October [●], 2017 (as it may be amended, supplemented or otherwise modified, the "**Credit Agreement**"; the terms defined therein and not otherwise defined herein being used herein as therein defined), by and among **MAC ACQUISITION LLC**, a Delaware limited liability company ("**Borrower**"), certain subsidiaries and affiliates of Borrower, as Guarantors, the DIP Lenders party thereto from time to time, and **RAVEN ASSET-BASED OPPORTUNITY FUND III LP**, a Delaware limited partnership, as DIP Agent.

Pursuant to Section 2.16(f)(iii) of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record and beneficial owner of the Loan(s) (as well as any Note(s) evidencing such Loan(s)) in respect of which it is providing this certificate, (ii) it is not a "bank" within the meaning of Section 881(c)(3)(A) of the Internal Revenue Code, (iii) it is not a "10 percent shareholder" of the Borrower within the meaning of Section 881(c)(3)(B) of the Internal Revenue Code, and (iv) it is not a "controlled foreign corporation" related to the Borrower as described in Section 881(c)(3)(C) of the Internal Revenue Code.

The undersigned has furnished the DIP Agent and the Borrower with a certificate of its non-U.S. Person status on IRS Form W-8BEN or W-8BEN-E, as applicable.  By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform the Borrower and the DIP Agent, and (2) the undersigned shall have at all times furnished the Borrower and the DIP Agent with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

[_____]
By:
Name:
Title:
Date: _____ __, 20[  ]

### U.S. TAX COMPLIANCE CERTIFICATE
### (For Foreign Lenders That Are Partnerships
### For U.S. Federal Income Tax Purposes)

Reference is made to the Debtor-in-Possession Credit, Guaranty and Security Agreement, dated as of October [●], 2017 (as it may be amended, supplemented or otherwise modified, the "**Credit Agreement**"; the terms defined therein and not otherwise defined herein being used herein as therein defined), by and among **MAC ACQUISITION LLC**, a Delaware limited liability company ("**Borrower**"), certain subsidiaries and affiliates of Borrower, as Guarantors, the DIP Lenders party thereto from time to time, and **RAVEN ASSET-BASED OPPORTUNITY FUND III LP**, a Delaware limited partnership, as DIP Agent.

Pursuant to Section 2.16(f)(iii) of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record owner of the Loan(s) (as well as any Note(s) evidencing such Loan(s)) in respect of which it is providing this certificate, (ii) its direct or indirect partners/members are the sole beneficial owners of such Loan(s) (as well as any Note(s) evidencing such Loan(s)), (iii) with respect to the extension of credit pursuant to this Credit Agreement or any other Credit Document, neither the undersigned nor any of its direct or indirect partners/members is a "bank" extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business within the meaning of Section 881(c)(3)(A) of the Internal Revenue Code, (iv) none of its direct or indirect partners/members is a "10 percent shareholder" of the Borrower within the meaning of Section 881(c)(3)(B) of the Internal Revenue Code and (v) none of its direct or indirect partners/members is a "controlled foreign corporation" related to the Borrower as described in Section 881(c)(3)(C) of the Internal Revenue Code.

The undersigned has furnished the DIP Agent and the Borrower with IRS Form W-8IMY accompanied by one of the following forms from each of its partners/members that is claiming the portfolio interest exemption: (i) an IRS Form W-8BEN or W-8BEN-E, as applicable or (ii) an IRS Form W-8IMY accompanied by an IRS Form W-8BEN or W-8BEN-E, as applicable, from each of such partner's/member's beneficial owners that is claiming the portfolio interest exemption.  By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform the Borrower and the DIP Agent, and (2) the undersigned shall have at all times furnished the Borrower and the DIP Agent with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

[_____]

By:
Name:
Title:

Date: _____ __, 20[ ]

EXHIBIT J TO
DEBTOR-IN-POSSESSION CREDIT, GUARANTY
AND SECURITY AGREEMENT

**U.S. TAX COMPLIANCE CERTIFICATE**
**(For Foreign Participants That Are Not Treated As Partnerships**
**For  U.S. Federal Income Tax Purposes)**

Reference is made to the Debtor-in-Possession Credit, Guaranty and Security Agreement, dated as of October [●], 2017 (as it may be amended, supplemented or otherwise modified, the "**Credit Agreement**"; the terms defined therein and not otherwise defined herein being used herein as therein defined), by and among **MAC ACQUISITION LLC**, a Delaware limited liability company ("**Borrower**"), certain subsidiaries and affiliates of Borrower, as Guarantors, the DIP Lenders party thereto from time to time, and **RAVEN ASSET-BASED OPPORTUNITY FUND III LP**, a Delaware limited partnership, as DIP Agent.

Pursuant to Section 2.16(f)(iii) of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record and beneficial owner of the participation in respect of which it is providing this certificate, (ii) it is not a "bank" within the meaning of Section 881(c)(3)(A) of the Internal Revenue Code, (iii) it is not a "10 percent shareholder" of the Borrower within the meaning of Section 881(c)(3)(B) of the Internal Revenue Code, and (iv) it is not a "controlled foreign corporation" related to the Borrower as described in Section 881(c)(3)(C) of the Internal Revenue Code.

The undersigned has furnished its participating Lender with a certificate of its non-U.S. Person status on IRS Form W-8BEN or W-8BEN-E, as applicable.  By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform such Lender in writing, and (2) the undersigned shall have at all times furnished such Lender with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

[NAME OF PARTICIPANT]
By:
Name:
Title:

**Date: _____ __, 20[  ]**

EXHIBIT K TO
DEBTOR-IN-POSSESSION CREDIT, GUARANTY
AND SECURITY AGREEMENT

**U.S. TAX COMPLIANCE CERTIFICATE**
**(For Foreign Participants That Are Treated As Partnerships**
**For  U.S. Federal Income Tax Purposes)**

Reference is made to the Debtor-in-Possession Credit, Guaranty and Security Agreement, dated as of October [●], 2017 (as it may be amended, supplemented or otherwise modified, the "**Credit Agreement**"; the terms defined therein and not otherwise defined herein being used herein as therein defined), by and among **MAC ACQUISITION LLC**, a Delaware limited liability company ("**Borrower**"), certain subsidiaries and affiliates of Borrower, as Guarantors, the DIP Lenders party thereto from time to time, and **RAVEN ASSET-BASED OPPORTUNITY FUND III LP**, a Delaware limited partnership, as DIP Agent.

Pursuant to Section 2.16(f)(iii) of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record owner of the participation in respect of which it is providing this certificate, (ii) its direct or indirect partners/members are the sole beneficial owners of such participation, (iii) with respect such participation, neither the undersigned nor any of its direct or indirect partners/members is a "bank" extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business within the meaning of Section 881(c)(3)(A) of the Internal Revenue Code, (iv) none of its direct or indirect partners/members is a "10 percent shareholder" of the Borrower within the meaning of Section 881(c)(3)(B) of the Internal Revenue Code and (v) none of its direct or indirect partners/members is a "controlled foreign corporation" related to the Borrower as described in Section 881(c)(3)(C) of the Internal Revenue Code.

The undersigned has furnished its participating Lender with IRS Form W-8IMY accompanied by one of the following forms from each of its partners/members that is claiming the portfolio interest exemption: (i) an IRS Form W-8BEN or W-8BEN-E, as applicable, or (ii) an IRS Form W-8IMY accompanied by an IRS Form W-8BEN or W-8BEN-E, as applicable, from each of such partner's/member's beneficial owners that is claiming the portfolio interest exemption.  By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform such Lender and (2) the undersigned shall have at all times furnished such Lender with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

[NAME OF PARTICIPANT]
By:
Name:
Title:

Date: _____ __, 20[  ]

**<u>EXHIBIT B</u>**

**INITIAL 13-WEEK CASH FLOW**

13-Week Cash Flow Projection

| Romano's Macaroni Grill Weekly Cash Flow Projection (USD$ 000's) | Week 1 Ended 10/20/2017 | Week 2 Ended 10/27/2017 | Week 3 Ended 11/3/2017 | Week 4 Ended 11/10/2017 | Week 5 Ended 11/17/2017 | Week 6 Ended 11/24/2017 | Week 7 Ended 12/1/2017 | Week 8 Ended 12/8/2017 | Week 9 Ended 12/15/2017 | Week 10 Ended 12/22/2017 | Week 11 Ended 12/29/2017 | Week 12 Ended 1/5/2018 | Week 13 Ended 1/12/2018 | Period Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Operational Cash Receipts:** | | | | | | | | | | | | | | |
| Restaurant Receipts | 2,934 | 2,905 | 2,633 | 3,148 | 3,170 | 3,523 | 2,683 | 3,197 | 3,732 | 4,881 | 3,824 | 3,120 | 3,221 | 42,972 |
| Gift Card Sales Receipts | 119 | 122 | 122 | 114 | 131 | 524 | 132 | 124 | 149 | 167 | 218 | 273 | 562 | 2,757 |
| Royalty Receipts | - | 43 | 50 | - | - | 54 | 54 | 54 | - | 58 | 58 | 58 | - | 429 |
| Rebate Receipts | - | - | 20 | 23 | 89 | - | - | - | 5 | - | - | - | - | 137 |
| Other Receipts | 58 | 35 | - | - | 28 | 35 | - | - | 28 | 35 | - | - | - | 220 |
| **Total Operational Cash Receipts** | **3,112** | **3,105** | **2,825** | **3,285** | **3,418** | **4,136** | **2,869** | **3,375** | **3,913** | **5,141** | **4,100** | **3,451** | **3,783** | **46,514** |
| **Non-Operational Cash Receipts:** | | | | | | | | | | | | | | |
| DIP Financing / New Borrowing | 3,000 | - | - | - | 1,000 | - | 1,000 | - | - | - | - | - | - | 5,000 |
| **Total Operational Cash Receipts** | **3,000** | **-** | **-** | **-** | **1,000** | **-** | **1,000** | **-** | **-** | **-** | **-** | **-** | **-** | **5,000** |
| **Total Cash Receipts** | **6,112** | **3,105** | **2,825** | **3,285** | **4,418** | **4,136** | **3,869** | **3,375** | **3,913** | **5,141** | **4,100** | **3,451** | **3,783** | **51,514** |
| **Operational Cash Disbursements:** | | | | | | | | | | | | | | |
| Food and Liquor Cost [1] | (726) | (730) | (734) | (757) | (737) | (687) | (774) | (809) | (833) | (798) | (766) | (834) | (1,025) | (10,209) |
| Payroll and Benefit Cost | (1,776) | (1,290) | (1,703) | (1,012) | (1,842) | (1,043) | (1,633) | (1,057) | (1,621) | (1,198) | (1,836) | (1,228) | (1,803) | (19,042) |
| Occupancy | (200) | (168) | (1,892) | (29) | - | (50) | (1,487) | (232) | - | (148) | (1,443) | - | (810) | (6,460) |
| Capital Expenditures | (32) | - | (32) | (32) | (32) | (32) | - | (32) | (32) | (32) | (32) | - | - | (289) |
| Sales Tax | (175) | (794) | (40) | (6) | (3) | (871) | (112) | (2) | (9) | (916) | (39) | (2) | (6) | (2,976) |
| Ordinary Course Professional Fees | - | - | (20) | - | (25) | - | (20) | - | (45) | - | - | - | - | (110) |
| Other Operating Expenses | (568) | (497) | (486) | (457) | (321) | (536) | (691) | (577) | (585) | (536) | (644) | (512) | (475) | (6,887) |
| **Total Operating Cash Disbursements** | **(3,478)** | **(3,479)** | **(4,906)** | **(2,293)** | **(2,960)** | **(3,219)** | **(4,717)** | **(2,711)** | **(3,125)** | **(3,629)** | **(4,760)** | **(2,577)** | **(4,119)** | **(45,973)** |
| **Cash Operating Margin** | **2,633** | **(373)** | **(2,081)** | **992** | **1,458** | **917** | **(848)** | **664** | **788** | **1,512** | **(660)** | **875** | **(336)** | **5,541** |
| **Non-Operational Cash Disbursements:** | | | | | | | | | | | | | | |
| Debtor Professional Fees | (180) | (180) | (180) | (154) | (154) | (154) | (154) | (145) | (145) | (145) | (145) | (132) | (132) | (2,000) |
| Senior Lender Professional Fees | (8) | (8) | (8) | (5) | (5) | (5) | (5) | (3) | (3) | (3) | (3) | (1) | (1) | (57) |
| Unsecured Creditor Professional Fees | - | - | (25) | (25) | (25) | (25) | (25) | (25) | (25) | (25) | (25) | (25) | (25) | (275) |
| Deposits / Other | - | - | - | (450) | (450) | - | - | - | - | - | - | - | - | (900) |
| General Unsecured Creditors Pool [2] | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Cure Costs [2] | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Critical Vendor Payments | - | (200) | (100) | (100) | (100) | (100) | (100) | - | - | - | - | - | - | (700) |
| PACA Claims | - | (500) | - | - | - | - | - | - | - | - | - | - | - | (500) |
| 503(B)9 Claims [2] | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| US Trustee Fees | - | - | - | - | - | - | - | - | - | - | - | (35) | - | (35) |
| DIP & BoC Interest and Fees | (66) | - | - | - | - | (89) | - | - | - | (99) | - | - | - | (255) |
| Debt Repayment | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Non-Operating Cash Disbursements** | **(255)** | **(888)** | **(313)** | **(734)** | **(734)** | **(373)** | **(284)** | **(173)** | **(173)** | **(272)** | **(208)** | **(158)** | **(158)** | **(4,722)** |
| **Total Cash Disbursements** | **(3,733)** | **(4,367)** | **(5,220)** | **(3,027)** | **(3,694)** | **(3,592)** | **(5,001)** | **(2,883)** | **(3,298)** | **(3,901)** | **(4,968)** | **(2,734)** | **(4,277)** | **(50,694)** |
| Beginning Cash Balance | 1,443 | 3,822 | 2,560 | 166 | 424 | 1,148 | 1,692 | 560 | 1,051 | 1,667 | 2,907 | 2,039 | 2,756 | 1,443 |
| Net Change in Cash | 2,379 | (1,261) | (2,394) | 258 | 724 | 544 | (1,132) | 491 | 616 | 1,240 | (868) | 717 | (493) | 820 |
| **Ending Cash Balance** | **3,822** | **2,560** | **166** | **424** | **1,148** | **1,692** | **560** | **1,051** | **1,667** | **2,907** | **2,039** | **2,756** | **2,263** | **2,263** |

*(1): The "Food and Liquor Cost" line item includes an additional $2.25 million to be paid on account of pre-petition PACA/PASA claims that are in addition to the $500,000 in the "PACA Claims" line item.*

*(2): Allowed 503(b)(9) Claims, Cure Costs, and the proposed General Unsecured Claims Pool payment will be paid on the effective date and are not reflected in the initial 13-week cash flow.*